**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS<br><br>and<br><br>JOSEPH R. CAPEN,<br><br>               Plaintiffs,<br><br>     v.<br><br>CHARLES D. BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts,<br><br>and<br><br>MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts,<br><br>           Defendants. | CIVIL ACTION No. 22-cv-11431-FDS |

## MOTION FOR PRELIMINARY INJUNCTION

      Plaintiffs submit the following Motion for Preliminary Injunction against Defendant.

      **Certification**:  The undersigned conferred with counsel for Defendant.  Defendant opposes this motion.

## INTRODUCTION

      This action challenges the constitutionality of certain provisions of MASS. GEN. LAWS ch. 140, §§ 121 and 131M (the "Statutes").  The Statutes ban (1) certain semi-automatic firearms that are held by millions of law-abiding American citizens for lawful purposes and (2) certain firearm magazines that are held by millions of law-abiding American citizens for lawful purposes.  The Second Amendment protects the right of law-abiding citizens to own weapons in

1

common use by law-abiding citizens for lawful purposes.  *D.C. v. Heller*, 554 U.S. 570, 627 (2008).  Thus, the Statutes are unconstitutional.  Accordingly, Plaintiffs hereby move the Court to enter a preliminary injunction enjoining the Commonwealth of Massachusetts (the "Commonwealth") from enforcing these unconstitutional statutes.

## FACTS

1.      MASS. GEN. LAWS ch. 140, § 121 defines the term "assault weapon."  The term "assault weapon" as used in the Statutes is not a technical term used in the firearms industry or community for firearms commonly available to civilians.  Brown Dec. ¶ 3. Instead, the term is a rhetorically charged political term[1] meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes.  *Id.* Plaintiffs refuse to adopt the Defendants' politically charged rhetoric in this Motion.  Therefore, for purposes of this Motion, the term "Banned Firearm" shall have the same meaning as the term "assault weapon" in MASS. GEN. LAWS ch. 140, § 121.

2.      MASS. GEN. LAWS ch. 140, § 121 defines the term "large-capacity feeding device" to mean any firearm magazine capable of holding more than ten rounds of ammunition.  The Statutes again use politically charged rhetoric to describe the arms they ban. Brown Dec. ¶ 4. Their characterization of these magazines as "large capacity" is a misnomer. *Id*. Magazines capable of holding more than 10 rounds are standard capacity magazines. *Id*.  Plaintiffs refuse to adopt the Commonwealth's politically charged rhetoric in this Complaint.  Therefore, for purposes of this Motion, the term "Banned Magazine" shall have the same meaning as the term "large-capacity magazine" in section MASS. GEN. LAWS ch. 140, § 121.

---

[1] *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

3.      MASS. GEN. LAWS ch. 140, § 131M states in relevant part:

> No person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Whoever not being licensed under the provisions of section 122 violates the provisions of this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than five years nor more than 15 years, or by both such fine and imprisonment.

4.      Plaintiff Joseph Capen and the members of National Association for Gun Rights ("NAGR") on whose behalf this action is brought are residents of the Commonwealth of Massachusetts and law-abiding citizens of the United States.  Capen Dec. ¶ 3; Brown Dec. ¶ 6. They are otherwise eligible under the laws of the United States and the Commonwealth of Massachusetts to receive and possess firearms and magazines, including the Banned Firearms and Banned Magazines.  *Id.*  They intend to and, but for the credible threat of prosecution under the Statutes, would acquire Banned Firearms and Banned Magazines to keep in their homes for self- defense and for other lawful purposes.  *Id.*

5.      At least 20 million semi-automatic firearms such as those defined as "assault weapons" are owned by millions of American citizens who use those firearms for lawful purposes. Declaration of James Curcuruto ¶ 6.  Mr. Curcuruto's declaration was originally submitted in *Rocky Mountain Gun Owners, et al. v. Town of Superior*, 22-CV-1685-RM.  It is used with permission in this action.

6.      At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes.  Declaration of James Curcuruto ¶ 7.

## STANDARD FOR GRANTING PRELIMINARY INJUNCTION

When assessing a request for a preliminary injunction, this Court must consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest. *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (internal quotation marks omitted).  Likelihood of success on the merits is the most important of the four preliminary injunction factors. *Id.* In a case involving an alleged violation of a constitutional right, the likelihood of success on the merits will often be the determinative factor. *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012).[2] This is because the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Id.* And the quantification of injury is difficult and damages are therefore not an adequate remedy. *Id.* If a plaintiff establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional. *Id.*

## THE GOVERNMENT BEARS THE BURDEN OF DEMONSTRATION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court unambiguously placed on the government a substantial burden of demonstrating that any law seeking to regulate firearms is consistent with this Nation's historical tradition of firearm regulation.[3] Specifically, the Court stated:

---

[2] *Alvarez* was a First Amendment case, but that difference does not matter, because in *Bruen*, *infra*, the Supreme Court held that Second Amendment rights should be protected in the same way First Amendment rights are protected. *Id.*, 142 S. Ct. at 2130.
[3] "Significantly, the plaintiff need not demonstrate the absence of regulation in order to prevail; the burden rests squarely on the government to establish that the activity has been subject to some measure of regulation." *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 415 (7th Cir. 2015) (Manion, J., dissenting).

> "To support that [its claim that its regulation is permitted by the Second
> Amendment], the burden falls on [the government] to show that New York's
> proper-cause requirement is consistent with this Nation's historical tradition of
> firearm regulation. Only if respondents carry that burden can they show that the
> pre-existing right codified in the Second Amendment, and made applicable to the
> States through the Fourteenth, does not protect petitioners' proposed course of
> conduct."

*Bruen*, 142 S. Ct. at 2135.

In this case, the Second Amendment's plain text covers Plaintiffs' conduct in seeking to acquire bearable arms.  *Bruen*, 142 S. Ct. at 2132 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms").  Accordingly, Plaintiff's conduct is **presumptively** protected by the Second Amendment.  *Bruen*, 142 S. Ct. at 2126 ("when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct").  The government may attempt to rebut that presumption by demonstrating that its law is consistent with this Nation's historical tradition of firearm regulation.  If the government attempts to meet that burden in its response, Plaintiff will have an opportunity to submit rebuttal evidence in its reply.

## ARGUMENT

I.    **The Supreme Court has Reaffirmed the *Heller* Standard**

    A.    **A Regulation Burdening the Right to Keep and Bear Arms is
        Unconstitutional Unless it is Consistent with the Text of the Second
        Amendment and the Nation's History and Traditions**

In *Bruen*, the Court rejected the two-part balancing test for Second Amendment challenges that several courts of appeal adopted in the wake of *Heller* and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010).  Instead, it reiterated the *Heller* standard, which it summarized as follows:

> "Today, we decline to adopt that two-part approach. In keeping with *Heller*, we
> hold that when the Second Amendment's plain text covers an individual's

conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."

*Bruen*, 142 S. Ct. at 2126 (internal quotation marks omitted).

The *Bruen* court spent significant time describing how lower courts are to proceed in Second Amendment cases. As particularly relevant here, *Bruen* described the proper analysis of the term "arms." That word, *Bruen* affirmed, has a "historically fixed meaning" but one that "applies to new circumstances." *Id.* at 2132. It thus "covers modern instruments that facilitate armed self-defense." *Id.*, *citing Caetano v. Massachusetts*, 577 U.S. 411, 411—412 (2016) *(per curiam)* (stun guns). Accordingly, the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*

The Court then explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Id.*  In considering history, courts are to engage in "reasoning by analogy." *Id.* This analogical reasoning requires the government to identify a well-established and representative historical analogue to the challenged regulation. *Id.* at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court today. *Id.* at 2132. Two metrics are particularly salient in determining if a historical regulation is relevantly similar: [1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense. *Id.* at 2133. By considering these two metrics, a court can determine if the

government has demonstrated that a modern-day regulation is analogous enough to historical precursors that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id.*

As noted above, the Court held that the judicial balancing of means and ends pursuant to intermediate scrutiny review plays no part in Second Amendment analysis.  "*Heller* does not support applying means-end scrutiny."  *Id.*, 142 S. Ct. at 2127; *see also Id.*, 142 S. Ct. at 2129 (inquiry into the statutes alleged "salutary effects" upon "important governmental interests" is not part of the test).

### B.       Only "Dangerous and Unusual Arms" Can be Banned Consistent with Our History and Tradition

This case involves a blanket prohibition on two classes of arms. Both *Bruen* and *Heller* identified only one aspect of the nation's history and tradition that is sufficiently analogous to – and therefore capable of justifying – such a ban: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm is in common use, there is, by definition, no historical tradition of banning it. Thus, for the type of restriction at issue in this case, the Court has already analyzed the relevant historical tradition and established its scope: "dangerous and unusual" weapons may be subject to a blanket ban, but arms "in common use at the time" may not be. *Id.*

The *Heller* test is based on historical practice and "the historical understanding of the scope of the right," but with reference to modern realities of firearm ownership. *Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."). In summary, in the context of

7

blanket bans on bearable arms, the Supreme Court has already done the historical spadework, and the only restrictions of this kind that it has deemed consistent with the historical understanding of the right to keep and bear arms are restrictions limited to dangerous and unusual arms that are not in common use.

This Court's task is therefore a simple one: it merely must determine whether the banned arms are "dangerous and unusual." Importantly, this is a "conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., *concurring*). An arm that is in common use for lawful purposes is, by definition, not unusual. Such an arm therefore cannot be both dangerous and unusual and therefore cannot be the subjected to a blanket ban. *Bruen*, 142 S. Ct. at 2143*; Heller*, 554 U.S. at 629.

To determine whether an arm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people nationwide, not just, say, in this State. *See id*. at 2131 ("It is this balance – struck by the traditions of the American people – that demands our unqualified deference."); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., *concurring*) ("stun guns are widely owned and accepted as a legitimate means of self-defense across the country"). Therefore, the Second Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation (like the Commonwealth's ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions.

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several reasons that a citizen may

prefer a handgun for home defense, the Court held that "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id*., 554 U.S. at 629.   The Court reaffirmed that the traditions of the American people, which includes their choice of preferred firearms, demand the courts' "unqualified deference." *Id*., 142 S. Ct. at 2131.

As set forth below, the Banned Firearms and the Banned Magazines are "typically possessed by law-abiding citizens for lawful purposes." **Under *Heller* and *Bruen*, that is the end of the analysis**.  The Second Amendment "[does] not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home." *Id*., 142 S. Ct. at 2128 (internal quotation marks omitted).

Finally, the Second Amendment inquiry focuses on the choices commonly made by contemporary law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *Id*. at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that arms protected by the Second Amendment need not have been in existence at the time of the Founding. 577 U.S. 411-12, *quoting Heller*, 554 U.S. at 582. The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id*. And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

## II.      The First Circuit's Decision in *Worman* is no Longer Good Law

In *Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018), *abrogated by Bruen*, 142 S. Ct. 2111 (2022), the First Circuit held that laws that burden the Second Amendment should be analyzed pursuant to an ends-means intermediate scrutiny.  *Id.*, 907 F.3d at 670-71.  The Supreme Court expressly abrogated *Gould* in *Bruen*.  *Id.*, 142 S. Ct. at 2127.  Relying on its decision in *Gould*, the First Circuit upheld the statutes at issue in this action against a Second Amendment challenged in *Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019), *abrogated by Bruen*, 142 S. Ct. 2111 (2022).  The Supreme Court also expressly abrogated *Worman* in *Bruen*.  *Id.*, 142 S. Ct. at 2127 (see note 4).

The rule requiring a court to follow a previous First Circuit decision is not applicable when Supreme Court precedent that postdates the original decision provides a clear and convincing basis to believe that the earlier panel would have decided the issue differently. *United States v. Guerrero*, 19 F.4th 547, 552 (1st Cir. 2021).  Such is the case here.  The Supreme Court has expressly abrogated *Worman* and therefore the case is no longer good law binding on this Court.

## III.     The Commonwealth's Prohibition on Possession of Banned Firearms is Unconstitutional

### A.      Introduction

Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2126. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. Here, the Second Amendment's plain text covers the Banned Firearms, so it falls to the Commonwealth to attempt to justify its

law as consistent with historical tradition rooted in the Founding. It cannot possibly do so, because the Banned Firearms are commonly possessed by law abiding citizens, and *Bruen* has already established that, by definition, there cannot be a tradition of banning an arm if it is commonly possessed.

### B.        The Banned Firearms are in Common Use

This case thus reduces to the following, straightforward inquiry: are the arms banned by the Commonwealth in "common use," according to the lawful choices by contemporary Americans? They unquestionably are.  There is no class of firearms known as "assault weapon." "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 (2000) at n. 16 (Thomas, J., dissenting). But while "assault weapon" is not a recognized category of firearms, "semiautomatic rifle" is. And it is semiautomatic rifles that the Commonwealth's "assault weapon" ban targets. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will not fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 (1994) at n. 1.

There is therefore a significant practical difference between a truly automatic and a merely semiautomatic rifle. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. Dept. of the Army, RIFLE MARKSMANSHIP: ML6-/M4-SERIES WEAPONS,  2-1 tbl. 2-1 (2008), available at https://bit.ly/3pvS3SW.

There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles. The Supreme Court has held as much.  In *Staples,* it concluded that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTMP. L. 381, 413 (1994).

In contrast to this long history of legal ownership of semi-automatic rifles, the first "assault weapon" ban was not enacted until California did so in 1989, a full 200 years after the Constitution became effective.  Obviously, that is far too late to demonstrate anything about the original meaning of the Second or Fourteenth Amendment, no matter which is the relevant historical reference point. *Bruen*, 142 S.Ct. at 2126 (cautioning against giving post enactment history more weight than it can rightly bear)  Even today, the vast majority of states (42 out of 50)[4], do not ban semiautomatic weapons that would be deemed "assault weapons" under the Statutes at issue in this action.[5]

Thus, there is no historical tradition of banning semi-automatic firearms.  This is borne out by the fact that millions of law-abiding citizens choose to possess firearms in that category. *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1147 (9th Cir. 2020) ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910

---

[4] The federal government banned semi-automatic rifles from 1994 to 2004 when Congress allowed that law after the Justice Department concluded that it produced "no discernible reduction" in gun violence.  Christopher S. Koper, Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms, 19 Crim'y & Pub. Pol'y 96 (2020).

[5] The bans and the year each was enacted are: CAL. PENAL CODE §§ 30600, 30605 (**1989**); N.J. STAT. §§ 2C:39-5(f), 2C:39-9(g) (**1990**); HAW. REV. STAT. § 134-8(a) (**1992**); CONN. GEN. STAT. § 53-202c (**1993**); MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303 (**1994**); MASS. GEN. LAWS ch. 140, § 131M (**1994**); N.Y. PENAL LAW §§ 265.02(7), 265.10(1)-(3) (**2000**); 11 DEL. CODE § 1466 (**2022**).

F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows

that "millions" are owned); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242,

255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by

*amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*.");

*Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . .

. are indeed in 'common use.'").

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at

1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in

the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the

Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009); *see also Duncan v. Becerra*

("*Duncan III*"), 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).

This issue was addressed in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), abrogated by

*Bruen*, *supra*.  In his dissent (which, after *Bruen*, likely represents the correct interpretation of

the law), Judge Traxler stated:

> "It is beyond any reasonable dispute from the record before us that a statistically
> significant number of American citizens possess semiautomatic rifles (and
> magazines holding more than 10 rounds) for lawful purposes.  Between 1990 and
> 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were
> manufactured in or imported into the United States.  In 2012, semiautomatic
> sporting rifles accounted for twenty percent of all retail firearms sales.  In fact, in
> 2012, the number of AR- and AK- style weapons manufactured and imported into
> the United States was more than double the number of the most commonly sold
> vehicle in the U.S., the Ford F-150.  In terms of absolute numbers, these statistics
> lead to the unavoidable conclusion that popular semiautomatic rifles such as the
> AR-15 are commonly possessed by American citizens for lawful purposes within
> the meaning of *Heller*."

*Id.*, 849 F.3d at 153, Traxler, J. dissenting (internal citations and quotation marks omitted).

Today, the number of AR-rifles and other modern sporting rifles in circulation in the

United States exceeds twenty-four million. The Firearms Industry Trade Ass'n, *Commonly*

*Owned:  NSSF Announces Over 24 Million MSRS in Circulation*, (July 20, 2022), available at

https://bit.ly/3pUj8So.[6]

According to industry sources, as of 2018, roughly thirty-five percent of all newly

manufactured guns sold in America are modern semiautomatic rifles, Bloomberg, *Why*

*Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), available at

https://bit.ly/3R2kZ3s, and an estimated 5.4 million Americans purchased firearms for the first

time in 2021. The Firearms Industry Trade Ass'n, *NSSF Retailer Surveys Indicate 5.4 million*

*First-Time Gun Buyers in 2021,* (Jan. 25, 2022), available at https://bit.ly/3dV6RKI.  In fact, a

recent survey of gun owners estimated that 24.6 million Americans have owned AR-15 or

similar rifles. *See* William English, *2021 National Firearms Survey: Updated Analysis*

*Including Types of Firearms Owned,* 1 (May 13, 2022), available at https://bit.ly/3yPfoHw .

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens

for lawful purposes.  In a 2021 survey of 16,708 gun owners, recreational target shooting was

the most common reason (cited by 66% of owners) for possessing an AR-style firearm,

followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English,

*supra*, at 33-34. This is consistent with the findings of an earlier 2013 survey of 21,942

confirmed owners of such firearms, in which home-defense again followed (closely) only

recreational target shooting as the most important reason for owning these firearms. *See also*

*Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014), *aff'd* 784 F.3d

406 (7th Cir. 2015). "An additional survey estimated that approximately 11,977,000 people

participated in target shooting with a modern sporting rifle." *Id*. Indeed the "AR-15 type rifle . .

. is the leading type of firearm used in national matches and in other matches sponsored by the

---

[6] *See also* Declaration of James Curcuruto ¶ 6 ("At least 20 million semi-automatic firearms such as those defined
as "assault weapons" are owned by millions of American citizens who use those firearms for lawful purposes."

congressionally established Civilian Marksmanship program." *Shew v. Malloy*, 994 F. Supp. 2d 234, 245 n.40 (D. Conn. 2014).

The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other Banned Firearms are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'" Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997).  This conclusion is borne out by FBI statistics.  In the five years from 2015 to 2019 (inclusive), there were an average of 14,556 murders per year in the United States.  On average, rifles of all types (of which so-called "assault weapons" are a subset) were identified as the murder weapon in 315 murders per year. U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V.  By way of comparison, on average 669 people are murdered by "personal weapons" such as hands, fists and feet.  *Id*.  According to the FBI, a murder victim is more than twice as likely to have been killed by hands and feet than by a rifle of any type.

Even in the counterfactual event that a modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2019, an infinitesimal percentage of the approximately 24 million modern sporting rifles in circulation in the United States during that time period – around .001 percent – would have been used for that unlawful purpose. More broadly, as of 2016, only 0.8 percent of state and federal prisoners reported using any kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates*, 2016, U.S. DEPT OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), available at https://bit.ly/31VjRa9

Finally, the Supreme Court's decision in *Caetano* further confirms that the arms banned by the Commonwealth are in common use.  That case concerned Massachusetts's ban on the possession of stun guns, which that state's highest court had upheld on the ground that such weapons are not protected by the Second Amendment.  *Id*., 577 U.S. at 411.  In a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id*. at 411-12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id*. at 420 (Alito, J., concurring) (cleaned up) (citation omitted). If hundreds of thousands" of arms constitute wide ownership, *a fortiori* so does the tens of millions of semiautomatic rifles sold to private citizens nationwide.

The Massachusetts court got the message.  In a subsequent case, that court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the Commonwealth to rebut the prima facie presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019). This reasoning is sound, and it

necessarily entails the invalidity of the Commonwealth's blanket ban, which restricts arms that are many times more common than stun guns.

### III.    The Commonwealth's Prohibition on Possession of Banned Magazines is Unconstitutional

#### A.    Magazines Capable of Holding More Than 10 Rounds Are in Common Use

Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (without bullets, the right to bear arms would be meaningless).

Just as the First and Fourteenth Amendments protect modern forms of communications and search, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *Caetano*, *supra* (stun guns). Thus, as the Supreme Court reiterated in *Bruen*, when assessing whether arms are protected by the Second Amendment, the question is whether they are "in common use today." 142 S.Ct. at 2134.  If they are, then they are presumptively protected by the Second Amendment, and it is the government's burden to prove that any efforts to restrict their possession or use have a "well- established and representative historical analogue."  *Bruen*, 142 S.Ct. at 2133.  But, as noted above, in the context of a blanket prohibition such as that at issue here with respect to the Banned Magazines, establishing such an analogue is impossible.  The Commonwealth may impose a blanket prohibition only on "dangerous and unusual" arms, but by definition, an arm in common use is not unusual. The

17

Second Amendment "[does] not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home." *Id.*, 142 S. Ct. at 2128 (internal quotation marks omitted).

The magazines the Commonwealth has banned unquestionably satisfy the "common use" test.  *See Duncan III*, 366 F.Supp.3d at 1143-45; *Duncan IV*, 970 F.3d at 1142, 1146-47. Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting.[7] They come standard with many of the most popular handguns and long guns on the market, and Americans own roughly **115 million of them**, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta ("Duncan V")*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145. In short, there can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment.

In his dissent in *Kolbe v. Hogan*, Judge Traxler also addressed magazines such as the Banned Magazines.  He stated:

> "The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States.  These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

---

[7] *See* Declaration of James Curcuruto ¶ 7 ("At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes.")

*Id.*, 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

Magazines such as those banned by the Commonwealth are without the slightest question commonly possessed by law abiding citizens for lawful purposes (again, the dispositive fact under *Heller* and *Bruen*).  Therefore, based on this fact alone, the Statutes are unconstitutional.

### B.       There Is No Historical Tradition of Restricting Firearms Capable of Firing More Than 10 Rounds Without Reloading.

Even if magazines such as those banned by the Commonwealth were not in common use, the Commonwealth cannot come close to proving that restrictions on firing or magazine capacity are part of the nation' s historical tradition. To the contrary, history and tradition establish the exact opposite.  *See Duncan III*, 366 F.Supp.3d at 1149-53; *Duncan IV*, 970 F.3d at 1147-51 (when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years); *Duncan V*, 19 F.4th at 1148-59 (Bumatay, J., dissenting) (summarizing history)

Firearms capable of firing more than 10 rounds without reloading are nothing new. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such handguns and long guns "pre-date[d] the American Revolution." *Duncan IV*, 970 F.3d at 1147. Well before the framing of the Fourteenth Amendment, they had become "common," as witnessed by popular firearms such as the Pepperbox-style pistol, which could "shoot 18 or 24 shots before reloading individual cylinders." *Id*. By the end of the Civil War, "repeating, cartridge-fed firearms" were ubiquitous, and many of the most popular models had magazines that held more than 10 rounds.  Id. at 1148. For example, the Winchester 66 had a 17- round magazine and could fire all 17 rounds plus the one in the chamber in under nine seconds. *Id*. Later models, including the famed Winchester 73 ("the gun that won the West"),

likewise had magazines that held more than 10 rounds and sold a combined "over 1.7 million total copies" between 1873 and 1941. *Id*.

As detachable box-style magazines became more popular around the turn of the twentieth century, so too did rifles and handguns with box magazines capable of holding more than 10 rounds, such as Auto Ordnance Company's semi-automatic rifle (1927, 30 rounds) and the Browning Hi-Power pistol (1935, 13 rounds). *Id*. In 1963, the U.S. government sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount. *Id*. That same year, the first AR-15 rifle was released. *Id*. The AR-15 comes standard with a 30-round magazine and as noted above, remains the most popular rifle in America today. *Id*.; *Duncan III*, 366 F.Supp.3d 1145.  Today, the most popular handgun in America is the Glock 17, which comes standard with a 17-round magazine.  *Duncan IV*, 970 F.3d at 1142, 1148.  Many other popular pistols likewise come standard with magazines that hold more than 10 rounds. For example, the Beretta Model 92 comes standard with a sixteen-round magazine, Smith & Wesson M&P 9 M2.0 nine-millimeter magazines contain seventeen rounds, and the Ruger SR9 has a 17-round standard magazine. *Id*. at 1142 & n.4.

Firearms capable of firing more than 10 rounds predate the founding by more than a century. *See Duncan IV*, 970 F.3d at 1147. Such arms were neither novelties nor confined to the military; to the contrary, they were marketed to and bought by civilians from the start. "[I]n 1821, the New York Evening Post described the invention of a new repeater as 'importan[t], both for public and private use,' whose 'number of charges may be extended to fifteen or even twenty.'" *Ass 'n of N J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N J*. ("ANJRPC II"), 974 F.3d 237, 255 (3d Cir. 2020) (Matey, dissenting). The popular Pepperbox-style pistol was marketed to civilians, the Girandoni air rifle "was famously carried on the Lewis and Clark expedition,"

and millions of Winchesters were sold to civilians in the decades following the ratification of

the Fourteenth Amendment. *Duncan IV*, 970 F.3d at 1147-48; *Duncan V*, 19 F.4th at 1154-55

(Bumatay, J., dissenting). And the federal government itself sold hundreds of thousands of

surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its

standard 30-round magazine came on the market.  *Duncan IV*, 970 F.3d at 1148.

  The historical record confirms that, "[l]ong before 1979, magazines of more than ten

rounds had been well established in the mainstream of American gun ownership." David B.

Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849,

862 (2015). In short, arms that could fire more than 10 rounds without reloading would by no

means have been "unforeseen inventions to the Founders." *Duncan IV*, 970 F.3d at 1147. They

have been available for centuries, and "magazines of more than ten rounds had been well

established in the mainstream of American gun ownership" "long before" a handful of capacity

restrictions started to pop in the late twentieth century. *See Kopel, supra* at 862-64.

  There were no restrictions on firing or magazine capacity when either the Second or the

Fourteenth Amendment was ratified. The first such laws did not come until the Prohibition Era,

and, even then, they were few and far between. Many states and the federal government began

regulating automatic weapons almost as soon as they came on the market in the 1920s and

1930s.  In contrast, only during Prohibition did a handful of state legislatures enact capacity

restrictions, many of which were soon repealed.  *Duncan IV*, 970 F.3d at 1150.  These states

included Michigan (1927, repealed in 1959), Rhode Island (1927, repealed in 1975), and Ohio

(1933, repealed in 2014).  *Id*. at n.10.  It is important to note that the Rhode Island and

Michigan statutes applied only to weapons rather than magazines, and the Ohio statute was

interpreted to only forbid the simultaneous purchase of a firearm and compatible 18-round magazine. *Id.*

These anomalous laws not only were "short lived," *Bruen*, 142 S.Ct. at 2155, but emerged several decades after the isolated "late-19th-century" territorial laws that the Supreme Court found to be too few and too late to have meaningful historical relevance. *Id.* at 2154; *cf Heller II*, 670 F.3d at 1292 (Kavanaugh, J., dissenting) (six states not enough to make a "strong showing that such laws are common"). Here too, then, the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting law-abiding citizens to keep and bear arms with a firing capacity of more than 10 rounds.

The first state to restrict magazine capacity as such (New Jersey) did not do so until 1990 – more than two centuries after the founding.  As with "assault weapon" bans, that is far too late to demonstrate anything about the original meaning of the Second or Fourteenth Amendment.  The federal government did not restrict magazine capacity until 1994, and Congress allowed that law to expire in 2004.  Since 1990, when the first magazine capacity restriction was adopted, a total of 12 states have enacted such restrictions, with half of those restrictions enacted within the last decade.[8]  The Commonwealth thus cannot even identify a "well-established" tradition of restricting magazine capacity today, let alone identify any representative historical analogue that might justify its confiscatory magazine ban. *Bruen*, 142 S.Ct. at 2133 (emphasis omitted).

---

[8] The statutes and the year they were enacted are: N.J. Stat. Ann. §2C:39- l(y), - 3G) (**1990**); 1992 Haw. Sess. Laws 740, 742 (**1992**); Md. Code Ann., Crim. Law §4-305 (**1994**); Cal. Penal Code §§32310, 16740 (**1999**); Mass. Gen. Laws ch. 140 §§121, 131a (**1998**); N.Y. Penal Law §265.36 (**2000**); Colo. Rev. Stat. §18-12-302(1)) (**2013**); Conn. Gen. Stat. §53- 202w (**2013**); Vt. Stat. Ann. tit. 13, §4021 (**2017**); Wash. Rev. Code Ann. §§9.41.010, .370 (**2022**); 11 R.I. Gen. Laws Ann. § 11-47.1-3 (**2022**); Del. Code Ann. tit. 11, § 1469 (**2022**).

Yet, despite a long historical tradition of law-abiding citizens possessing these firearms for lawful purposes, there is no similar tradition of government regulation, let alone confiscation. To the contrary, the historical tradition of advancement in firearms technology reflects a steady trend toward increasing the firing capacity of the most popular and common arms, with no corresponding trend of government restrictions on firing capacity. The Commonwealth thus cannot possibly meet its burden of "affirmatively prov[ing] that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to enter an order preliminarily enjoining enforcement of the Statutes.

*/s/ Barry K. Arrington*
_____

Barry K. Arrington*
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com
*Pro Hoc Vice*

Thomas M. Harvey
Law Office of Thomas M. Harvey
22 Mill Street
Suite 408
Arlington, MA 02476-4744
617-710-3616
Fax: 781-643-1126
Email: tharveyesq@aol.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2022, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*

_____

Barry K. Arrington