UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL ASSOCIATION FOR GUN RIGHTS,
and JOSEPH R. CAPEN,

       Plaintiffs,

   v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
of Massachusetts,

       Defendant.

Civil Action No. 1:22-cv-11431-FDS

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ANDREA JOY CAMPBELL,
in her official capacity as Attorney General of the
Commonwealth of Massachusetts,

Julie E. Green, BBO # 645725
Grace Gohlke, BBO # 704218
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2085
(617) 963-2527
(617) 727-5785 (Facsimile)
Julie.Green@mass.gov
Grace.Gohlke@mass.gov

Date:  January 31, 2023

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................ 2

    I.    Statutory and Factual Background .......................................................... 2

        A.    The Federal Assault Weapons and Large Capacity Magazine Ban ................................................................... 2

        B.    The Massachusetts Assault Weapons and Large Capacity Magazine Ban ................................................................... 4

    II.    Procedural History ................................................................................. 5

LEGAL STANDARD .......................................................................................... 5

ARGUMENT ...................................................................................................... 6

    I.    Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits Because the Commonwealth's Ban on Civilian Possession of Assault Weapons and Large Capacity Magazines Comports with the Second Amendment. ........................................................................ 6

        A.    The Legal Framework for Second Amendment Claims ............... 6

        B.    Plaintiffs Cannot Establish the Act Prohibits Conduct Protected by the Text of the Second Amendment. ...................... 10

            1.    The Burden is on Plaintiffs to Establish Their Proposed Conduct is Protected by the Text of the Second Amendment. ...................................................... 10

            2.    LCMs Fall Outside the Text of the Second Amendment Because They Are Not "Bearable Arms." ....................................................................... 11

            3.    Assault Weapons and LCMs Fall Outside the Text of the Second Amendment Because Neither Are "Commonly Used" in Self-Defense. ............................... 14

                a.    The "Central Component" of the Supreme Court's Test for "Common Use" is Suitability for and Actual Use in Self-Defense. ............................................... 14

b.     Assaults Weapons and LCMs Are Not Suitable for Self-Defense and Are Instead Designed for Military Combat. ............................ 16

c.     Assault Weapons and LCMs Are Not Commonly Used in Self-Defensive Gun Cases ............................................................. 22

C.     The Act Is Consistent with the Nation's Tradition of Restricting Specific, Unusually Dangerous Weapons to Protect Public Safety. ........................................ 25

    1.     Because the Act Responds to Unprecedented Societal Concerns Created by Dramatic Technological Changes, It Need Only Be "Relevantly Similar" To a Historical Regulation. ............ 26

        a.     Semiautomatic Weapons Capable of Rapid Fire Represent a Dramatic Technological Change. ................................................. 27

        b.     Assault Weapons and LCMs Have Created a Societal Concern Without Precedent in the Nation's History. ...................................... 29

    2.     Governments Throughout the Nation's History Have Regulated Unusually Dangerous Weapons, Including by Banning Them Altogether. ......................... 30

        a.     Gunpowder, Trap Guns, and "Dangerous" and/or "Unusual" Weapons. .................................. 31

        b.     Bowie Knives, Pocket Pistols, and Other Concealable Types of Weapons. .......................... 33

        c.     Automatic and Semiautomatic Weapons Capable of Firing Multiple Shots Without Reloading ............................................... 38

    3.     The Act is Relevantly Similar to the Historical Regulations. ...................................................... 42

        a.     The Act's Minimal Burden on the Right of Armed Self-Defense is Comparable to, or Less Than, That of Other Historical Regulations. ......................................... 42

          b.      The Act Has a Comparable Justification of Protecting the Public From Unusually Lethal Weapons Disproportionately Used in Violent Crime........................................................ 45

II.      The Other Preliminary Injunction Factors Overwhelmingly Favor Denial of the Motion to Protect Public Safety During the Pendency of this Case................................................................................. 48

CONCLUSION............................................................................................................. 50

## INTRODUCTION

As of January 31, the United States has already experienced more mass shootings in 2023 than the number of days in the year so far.[1]  These horrific events leave communities across this country grieving the loss of loved ones, dealing with catastrophic and life-altering injuries, and coping with the trauma that such acts of terror provoke.  And in too many of these tragedies, the killer used an assault weapon, a large-capacity magazine, or both.  These combat-style weapons and accessories—intended for use on the battlefield and designed to inflict uniquely catastrophic injuries—pose an inordinate risk to the safety of the public and law enforcement officers, with no commensurate utility for individual armed self-defense.  In 1998, in recognition of the unique dangers posed by assault weapons and large-capacity magazines, Massachusetts enacted legislation to ban the sale and possession of these weapons and accessories.  G.L. c. 140, §§ 121, 131M.  Plaintiffs now challenge this decades-old law, arguing that it burdens their constitutional right to keep and bear "Arms" under the Second and Fourteenth Amendments in light of the Supreme Court's newest precedent.

Plaintiffs are wrong.  Under the "text-and-history" approach to Second Amendment claims announced last June in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022), it is Plaintiffs' burden to establish their proposed conduct falls within the text of the Second Amendment's protections.  But Plaintiffs cannot show that large-capacity magazines are even "Arms," where they are in fact accessories.  And they cannot show that large-capacity magazines and assault weapons are designed for, or actually facilitate, armed self-defense—the "central component" of the Second Amendment right.  *Bruen*, 142 S. Ct. at 2133.

---

[1] Gun Violence Archive, Mass Shootings in 2023 (51 shootings with at least 4 victims shot), available at https://www.gunviolencearchive.org/reports/mass-shooting (last accessed Jan. 31, 2023).

The First Circuit already determined in 2019 that assault weapons and large-capacity magazines are neither suitable for, nor used in, self-defense.  *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  And even if Plaintiffs could meet their burden, their claim would still fail because the challenged law stands firmly within this Nation's longstanding tradition of firearm regulation, which has always included regulating, and even prohibiting, unusually dangerous types of weapons that disproportionately contribute to violent crime—from eighteenth-century pocket pistols to twentieth-century Tommy guns.

As venerable as the Second Amendment is, so too is the judicial command that laws enacted by our democratically elected representatives be upheld unless they are unmistakably unconstitutional.  "The presumption, indeed, must always be in favour of the validity of laws, if the contrary is not clearly demonstrated."  *Cooper v. Telfair*, 4 U.S. 14, 18 (1800).  Plaintiffs ask this Court to enjoin the operation of this law designed to prevent unspeakable tragedies.  They do so with no showing of irreparable harm beyond the untested assertion that the law fails *Bruen*'s "text-and-history" analysis.  But at this preliminary stage, without the benefit of a fully developed factual or historical record, the Court should not deprive the people of the Commonwealth of an important public safety protection that they have relied on for twenty-five years.  The Motion should be denied.

## BACKGROUND

### I.    Statutory and Factual Background

#### A.  The Federal Assault Weapons and Large Capacity Magazine Ban

In the early 1990s, Congress determined it was necessary to restrict the spread of especially dangerous guns that were nearly identical to M16 automatic rifles and other military weapons.  These assault weapons, which were being marketed and sold to civilians, Declaration

of James Yurgealitis ¶ 26; Declaration of Grace Gohlke Ex. 1, at 21-26,[2] had enhanced "capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns."  Gohlke Ex. 2 (H.R. Rep. No. 103-489), at 19-20.  Congress found that "[p]ublic concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered."  *Id.* at 14.

The new law (hereinafter the "Federal Assault Weapons Ban" or "Federal AWB") "combine[d] two approaches . . . to control semiautomatic assault weapons."  *Id.* at 20.  The first approach, known as the Enumerated Weapons Test, banned the manufacture, transfer, and possession of 19 specific models of semiautomatic weapons, including the Colt AR-15, "or copies or duplicates of th[os]e firearms."  Gohlke Ex. 3 (108 Stat. 1796) at 1996-98; codified at 18 U.S.C. §§ 921(a)(30), 922(v) (1994).  The second approach, known as the Features Test, banned any semiautomatic rifle, pistol, or shotgun that had two or more combat-style features, and for rifles and pistols, that also had the ability to accept a detachable magazine.  *Id.* at 1996, 1998.  For rifles, these combat-style features included folding or telescoping stocks, flash suppressors, grenade launchers, bayonet mounts, and pistol grips that protrude beneath the action on the weapon.  *Id.*  The ban did not apply to assault weapons that were possessed lawfully before September 13, 1994.  *Id.* at 1997.  It also exempted many weapons, including hundreds of rifles and shotguns commonly used in hunting and target practice.  *Id.* at 1997, 2000-10.

Separately, the law banned "large capacity ammunition feeding devices," also called "large capacity magazines" or "LCMs," defined as "a magazine, belt, drum, feed strip, or similar

---

[2] All exhibits to the Gohlke Declaration are hereinafter cited as "Gohlke Ex. __." After the initial citation, all expert declarations attached hereto are cited as "Last Name ¶ __."

device" manufactured after September 13, 1994, that has "a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." *Id.* at 1998-99; codified at 18 U.S.C. §§ 921(a)(31), 922(w)(1) (1994).  Congress found LCMs "make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent," so that "a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes."  Gohlke Ex. 2, at 19.

### B.  The Massachusetts Assault Weapons and Large Capacity Magazine Ban

Four years after the Federal AWB went into effect, in 1998, the Massachusetts Legislature enacted a state law that similarly forbade the sale and possession of assault weapons and LCMs, except those lawfully owned before September 13, 1994 (the "Act").  St. 1998, c. 180, §§ 23, 47; codified at G.L. c. 140, §§ 128, 131M.  While the bill was pending in the House of Representatives, then-acting Governor Paul Cellucci, who later signed the Act into law, referred to the assault weapons prohibited by the bill as "weapons of mass destruction [that] are designed to kill people."  Gohlke Ex. 4.  The Legislature adopted virtually the same definition of "assault weapon" that Congress had employed in the Federal AWB.  Thus, the Act defined assault weapons to include the Enumerated Weapons and "copies or duplicates of th[os]e weapons."  G.L. c. 140, § 121.  By referencing the federal ban, the state law separately adopted the Features Test.  G.L. c. 140, § 121.  The law's definition of "large capacity feeding device" ("LCMs") and exemptions also tracked the federal ban.  G.L. c. 140, § 121.

In 2004, when the Federal AWB expired by its own terms, the Massachusetts Legislature made the ban on assault weapons and LCMs permanent.  St. 2004, c. 150, § 1.  In signing that bill, then-Governor Romney emphasized that "[d]eadly assault weapons have no place in Massachusetts" and "are not made for recreation or self-defense."  Gohlke Ex. 5.  "They are," he explained, "instruments of destruction with the sole purpose of hunting down and killing

people."  *Id.*  The Act made the state "safer," he added, while still preserving the rights of the Commonwealth's "great sportsmen."  Gohlke Ex. 6.

## II.    **Procedural History**

Plaintiffs filed a complaint in the present action on September 7, 2022, twenty-four years after the Act was first codified and eighteen years after its provisions were made permanent by the Legislature.  *See* ECF #1.  Plaintiffs bring a single claim for relief, alleging a violation of their right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution.  ECF #1, ¶¶ 33-37.  The individual plaintiff, Joseph Capen, alleges that, but for the credible threat of prosecution under the Act, he would purchase assault weapons and LCMs "to keep in his home for self-defense and other lawful purposes."  ECF #1, ¶ 2.  The organizational plaintiff, the National Association for Gun Rights, alleges that it has members who, but for the Act, would purchase assault weapons and LCMs "to keep in their homes for self-defense and other lawful purposes."  ECF #1, ¶ 1.

Two months after filing the complaint, Plaintiffs filed a motion for preliminary injunction, asking this Court to enjoin the decades-old Act. ECF #15 ("Mot.").  The motion argues Plaintiffs are likely to succeed on the merits of their Second Amendment claim and that, in doing so, the other factors for preliminary injunctions are inherently met.  Mot. at 4.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" that is "never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "To obtain a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest."  *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).  Likelihood

5

of success on the merits is the "main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). Further, the last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because Plaintiffs' motion fails at every step of the preliminary injunction analysis, it should be denied.

<u>**ARGUMENT**</u>

I.   **Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits Because the Commonwealth's Ban on Civilian Possession of Assault Weapons and Large Capacity Magazines Comports with the Second Amendment.**

Plaintiffs' motion should be denied because they have not shown that they are likely to succeed on the merits, with respect to either assault weapons or large-capacity magazines.

A.   **The Legal Framework for Second Amendment Claims**

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. Amend. II. In a trio of cases since 2008, the Supreme Court has established a "text-and-history" approach to analyzing claims under the Second Amendment, whose "central component" is the right to "keep and bear arms" that "facilitate armed self-defense." *See Bruen*, 142 S. Ct. at 2132-33.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized, for the first time, that the Second Amendment protects an "an individual right" to armed self-defense "unconnected with militia service," in striking down a Washington D.C. law that "totally ban[ned] handgun possession in the home." *Id.* at 599, 608; *see also id.* at 594 (Founding-era Americans "understood the right [to keep arms] to enable individuals to defend themselves"). In doing so, however, the Court emphasized that the Second Amendment is "not unlimited" and does not "protect the right of citizens to carry arms for *any sort* of confrontation." *Id.* at 595

6

(emphasis in original).  Though the Court did not "undertake an exhaustive historical analysis …
of the full scope of the Second Amendment," it underscored that the Second Amendment does
not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for
whatever purpose."  *Id.* at 626.  For example, the Court explained that "sophisticated arms that
are highly unusual in society at large," as opposed to "small arms" that are used commonly in
self-defense, would lie outside the protection of the operative clause of the Second Amendment.
*Id.* at 627-28.   As a result, "weapons that are most useful in military service—M-16 rifles and
the like—may be banned" consistent with the Second Amendment.  *Id.* at 627.

Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held
that the Second Amendment applies to the States through the Fourteenth Amendment because
the right secured by the Second Amendment is "fundamental to our scheme of ordered liberty."
*Id.* at 767.  Specifically, the Court explained that "[s]elf-defense is a basic right, recognized by
many legal systems from ancient times to the present day," and the Second Amendment's
"central component" is "individual self-defense."  *Id.* at 767; *see also id.* at 768 ("[T]he 1689
English Bill of Rights explicitly protected a right to keep arms for self-defense").

Most recently, in *Bruen*, the Supreme Court reiterated that the Second Amendment
guarantees an "individual right to possess and carry weapons *in case of confrontation*."  *Bruen*,
142 S. Ct. at 2135 (emphasis added) (quoting *Heller*, 554 U.S. at 592).  Building on the
foundations of *Heller* and *McDonald*, the Court in *Bruen* described the Second Amendment as
"'elevat[ing] above all other interests the right of law-abiding, responsible citizens to use arms'
*for self-defense*."  *Id.* at 2131 (quoting *Heller*, 554 U.S. at 635) (emphasis added).

The Court in *Bruen* began by setting out the proper methodology for analyzing Second
Amendment claims.  It declined to adopt the prevailing "two-step approach" applied by almost

all of the lower courts, including the First Circuit, that involved mean-ends scrutiny. *Id.* at 2126, 2128-29; *see, e.g.*, *Gould v. Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018), *abrogated by Bruen*, 142 S. Ct. 2111. Instead, it prescribed a test derived from *Heller*, as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Bruen*, 142 S. Ct. at 2129-30.

Second Amendment analysis thus begins with asking "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct." *Id.* at 2134. To answer this question, the Court looked at the "'textual elements' of the Second Amendment's operative clause," *i.e.*, that "the right of the people to keep and bear arms shall not be infringed." *Id.* (quoting *Heller*, 554 U.S. at 592; U.S. Const. amend. II). In analyzing the word "arms" at this textual stage, the Court wrote that "the Second Amendment's definition of 'arms' … covers modern instruments *that facilitate armed self-defense*." *Id.* at 2132 (emphasis added). Addressing the scope of the composite term "'bear' arms" at the textual stage, the Court reiterated that "self-defense is 'the *central* component of the [Second Amendment] right itself.'" *Id.* at 2135 (quoting *Heller*, 554 U.S. at 599). The Court then applied this framework to New York's challenged law, which required that an applicant for a concealed-carry permit show "proper cause," and determined that the "Second Amendment's plain text … presumptively guarantees [the petitioners] a right to 'bear' arms in public for self-defense." *Id.*

Having determined that the plain text of the Second Amendment covered the plaintiffs' "proposed course of conduct" to "carry[] handguns publicly for self-defense," the Court then examined whether the government had shown that the challenged law was consistent with "the Nation's historical tradition of firearm regulation." *Id.* The Court explained that, in some cases,

8

this inquiry would be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century."  *Id.* at 2131.  But in others — particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes" — this historical analysis requires a "more nuanced approach." *Id.* at 2132.  Governments can justify regulations of that sort by "reasoning by analogy," *i.e.*, showing that the challenged regulation is "'relevantly similar'" to a "well-established and representative historical analogue."  *Id.* at 2133 (citation and emphasis omitted).

Importantly, *Bruen* did not purport to overturn or call into question any aspect of *Heller*, and instead confirmed that its test was the same as the "test … set forth in *Heller*."  *Id.* at 2131; *see also id.* at 2134 ("Having made the constitutional standard endorsed in *Heller* more explicit, … ."). The Court cited approvingly language from *Heller* that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 2128 (*quoting Heller*, 554 U.S. at 626).  Similarly, Justice Kavanaugh's concurrence in *Bruen*, joined by the Chief Justice, reiterated that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the non-exhaustive litany of "presumptively lawful regulatory measures" identified in *Heller*, such as "prohibitions on the possession of firearms by felons and the mentally ill."  *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626-27 & n.26).  And Justice Alito, in his concurrence, underlined that the Court's decision did not "decide anything about the kinds of weapons that people may possess" or "disturb[] anything that we said in *Heller* or *McDonald*[], about restrictions that may be imposed on the possession or carrying of guns."  *Id.* at 2157.

**B.     Plaintiffs Cannot Establish the Act Prohibits Conduct Protected by the Text of the Second Amendment.**

**1.     The Burden is on Plaintiffs to Establish Their Proposed Conduct is Protected by the Text of the Second Amendment.**

Under *Bruen*'s "text-and-history" standard, the party challenging a restriction must first demonstrate that the law regulates conduct protected by the "plain text" of the Second Amendment.  *Bruen*, 142 S. Ct. at 2126; *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (absent a contrary allocation, "the ordinary default rule" is that "plaintiffs bear the risk of failing to prove their claims").  To establish that the plain text applies, a plaintiff must demonstrate that each of the "textual elements" of the Second Amendment's operative clause covers the proposed course of conduct.  *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).  Only after that showing does the burden shift to the government to show that the challenged regulation is consistent with the nation's history of firearms regulation.  *See Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *2 (D.R.I. Dec. 14, 2022) ("[T]he plaintiffs have failed in *their burden* to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text.") (emphasis added); *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-501-BLF, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then *shifts* to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation." (emphasis added)).

Placing the initial burden on the plaintiff is consistent with how the Supreme Court "protect[s] other constitutional rights," like the right of free speech under the First Amendment ("to which *Heller* repeatedly compared the right to keep and bear arms"), as to which the government bears the burden of justifying its actions only "[w]hen the Government restricts speech."  *Bruen*, 142 S. Ct. at 2130 (quotation marks and citation omitted).  Plaintiffs who assert

10

free speech claims are "oblig[ed]" to "demonstrate that the First Amendment even applies" to the "assertedly expressive conduct" in which they wish to engage.  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  The same is true in a free exercise challenge.  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2021) (plaintiff must show that the government "has burdened his sincere religious practice").  *Bruen* confirms that this same approach applies to the Second Amendment.  *See Bruen*, 142 S. Ct. at 2134 (government "d[id] not dispute" that the plain text of the Second Amendment covered plaintiffs' proposed conduct).

Plaintiffs cannot carry their burden here.  Whether a particular instrument, device, or weapon is protected by the Second Amendment's plain text involves an examination of whether it is a "bearable arm[]" at all, *Bruen* 142 S. Ct. at 2132, and, if so, whether it is "commonly used" for the purpose of self-defense, *id.* at 2134.  First, LCMs are not "bearable arms," and second, Plaintiffs cannot establish that either assault weapons or LCMs are in common use for self-defense.  Thus, their proposed conduct is not protected by the text of the Second Amendment.

## 2.    LCMs Fall Outside the Text of the Second Amendment Because They Are Not "Bearable Arms."

As *Heller* explained, the "object" of an individual's Second Amendment right is "Arms." *Heller*, 554 U.S. at 581.  Plaintiffs' assertion that "magazines are indisputably 'arms' protected by the Second Amendment" is incorrect.  *See* Mot. at 17.  LCMs are accessories, not arms, and fall outside the scope of the Second Amendment.

"Arms," as used in the Second Amendment, refers to weapons.  *Heller*, 554 U.S. at 581 (citing 1 Dictionary of the English Language 106 (4th ed.) (1773 edition of dictionary defining "arms" as "[w]eapons of offence, or armour of defence")).  Magazines, which are also called ammunition feeding devices, hold ammunition and enable a shooter to fire without reloading until the capacity of the magazine is spent.  Declaration of Ryan Busse ¶ 14.  As defined by

Massachusetts law, an LCM is a magazine with a capacity of more than 10 rounds.  G.L. c. 140, § 121.  Although LCMs can be used with certain firearms, LCMs cannot, by themselves, be used offensively or—more importantly for Second Amendment purposes—defensively.  *See Ocean State Tactical*, 2022 WL 17721175, at *11 ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'" (quoting *Heller*, 554 U.S. at 582); *see also Duncan v. Bonta*, 19 F.4th 1087, 1104-05 (9th Cir. 2021) (en banc), *judgment vacated on other grounds*, 142 S. Ct. 2895 (2022), *vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022) ("On its own, a magazine is practically harmless and poses no threat to life or limb").

The distinction between weapons and arms, on the one hand, and related accessories, on the other, would have been familiar to the founding generation.  Around the time of the Founding, there was a common phrase used for military equipage, "arms and accoutrements."  Declaration of Dennis Baron ¶ 30.  These terms identified distinct categories and were used in contrast with one another.  *Id*. ¶¶ 43, 46 ("arms and accoutrements are separate categories").  As an analysis of the meaning and usage of words from the Founding and Reconstruction Eras confirms, the term "arms" historically referred *only* to weapons, and did not encompass items like cartridge cases or boxes, scabbards, or flints, which were separately identified as "accoutrements"—"ancillary equipment associated with soldiering, or service in the military." *Id*. ¶¶ 10, 25.

Magazines, including LCMs, fall within the category of "accoutrements" and not "arms." Magazines, including LCMs, are the descendants of, and thus "analogous" to, cartridge boxes or cartridge cases of the founding era, which were understood to be "accoutrements," not "arms." Baron ¶¶ 10, 25, 34; *id*. ¶ 78 (finding "virtually no lexical data" that the term "arms" includes

"magazines").[3]  In a recent challenge to Rhode Island's LCM ban, the District Court credited the linguistic analysis presented here that differentiates "arms" and "accoutrements" and held LCMs do not qualify as "Arms."  *See Ocean State Tactical*, 2022 WL 17721175, at *13.  The Tenth Circuit has recognized this same distinction in the context of silencers, holding that silencers are not protected, bearable arms.  *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')" and thus "can't be a 'bearable arm' protected by the Second Amendment").

Plaintiffs' attempt to extend the term "arms" past its plain meaning with reference to out-of-circuit authority is unavailing.  Mot. at 17.  Although some courts have extended the Second Amendment's protections to accessories that are *necessary* to operate a firearm, such as ammunition, that extension beyond "bearable arms" does not apply where an accessory is *not* necessary to operate a firearm.  *See, e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 ("[T]he right to possess firearms for protection implies a corresponding right to obtain the bullets *necessary* to use them.") (internal citation omitted) (emphasis added); *Cox*, 906 F.3d at 1196 (Hartz, J., concurring) (noting that the Tenth Circuit's holding that silencers are not protected arms did not extend to "items that are not themselves bearable arms *but are necessary to the operation of a firearm* (think ammunition)" (emphasis added)).

LCMs are not necessary to use any firearm.  Busse ¶ 14 ("[A]ll firearms that can accept a large-capacity magazine can also accept a magazine that holds fewer rounds and still function

---

[3] Even today, firearms sellers list magazines under the "accessories" sections of their websites. *Compare* Firearms, Guns.com, https://www.guns.com/firearms (listing handguns, rifles, and shotguns for sale), *with* Accessories, Guns.com, https://www.guns.com/accessories (listing magazines for sale). *See also* Busse ¶ 15 (noting magazines are often produced by "accessory makers" who supply them to gun manufacturers).

precisely as intended."). Magazines come in a variety of sizes, and the LCMs barred by the Act are merely a capacity-based *subset* of these devices.  No firearm requires a large-capacity magazine; any ammunition feeding device of lesser capacity will work just as well.  *Id.* ¶ 14; Yurgealitis ¶ 61.  *See Ocean State Tactical*, 2022 WL 17721175, at *12 ("[A] firearm does not need a magazine containing more than ten rounds to be useful.").  In sum, LCMs are not arms covered by the plain text of the Second Amendment.

> **3.      Assault Weapons and LCMs Fall Outside the Text of the Second Amendment Because Neither Are "Commonly Used" in Self-Defense.**

Even if LCMs are considered "Arms," Plaintiffs still cannot show that either assault weapons or LCMs "facilitate armed self-defense," and so both are outside the scope of the Second Amendment's protections.  *Bruen*, 142 S. Ct. at 2132.

> **a.      The "Central Component" of the Supreme Court's Test for "Common Use" is Suitability for and Actual Use in Self-Defense.**

*Bruen* states that the Second Amendment's text protects "only" arms in "common use at the time."  *Id.* at 2143.  As stated above, "the Second Amendment's definition of 'arms' … covers modern instruments *that facilitate armed self-defense*."  *Id.* at 2132 (emphasis added).  It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626).  *Heller*, *McDonald*, and *Bruen* all describe "individual self-defense" as "'the *central component*' of the Second Amendment right."  *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, in turn quoting *Heller*, 554 U.S. at 599).  Plaintiffs avoid acknowledging this by artfully referring to use "for lawful purposes," *e.g.*, Mot. at 14, but that phrasing ignores the key component of the right.

As such, the test is common *use* in self-defense, not common *ownership*.  *See, e.g., Bruen*, 142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense" (emphasis

14

added)); *id.* at 2143 (noting handguns are "indisputably in 'common use' for self-defense today"); *id.* at 2156 (describing the "right to bear commonly *used* arms in public subject to certain reasonable, well-defined restrictions" (emphasis added)); *see also Heller*, 554 U.S. at 636 (striking down an "absolute prohibition of handguns held *and used* for self-defense" (emphasis added)). Plaintiffs would reduce the Supreme Court's "common use" test to a simple counting exercise. Mot. at 13, 18. But the phrase "in common use" as used in *Heller*, *McDonald*, and *Bruen* does not simply refer to a weapon's prevalence in society, or the quantities manufactured or sold. Instead, courts must consider whether the weapon "facilitate[s] armed self-defense," *Bruen*, 142 S. Ct. at 2132, which requires analysis of the suitability and the actual use of the weapon for self-defense.

Assessing "common use" based on ownership alone would be circular and inconsistent with *Heller*. *See Kolbe v. Hogan*, 849 F.3d 114, 141-42 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 ("[T]he *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman*, 922 F.3d at 35 n.5 ("[M]easuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical[.]" (citing *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015))). For example, under a bare popularity test, if the federal restriction on fully automatic weapons were repealed, and just one state allowed their sale, and some (unspecified) amount were sold, fully automatic M16 rifles could qualify for Second Amendment protection such that governments could not ban them. That outcome would flatly contradict the Supreme Court's observation that M16s "may be banned." *Heller*, 554 U.S. at 624, 627 (characterizing contrary view as "startling").

Such a standard would effectively give firearm manufacturers the power to decide what weapons receive constitutional protection, rather than requiring any principled analysis of a

weapon's connection to the Second Amendment's historical purpose. *See Kolbe*, 849 F.3d at 141 (under a popularity test, manufacturers would need only "flood[] … the market prior to any governmental prohibition in order to ensure it constitutional protection"); *see also* Declaration of John J. Donohue ¶ 126 (noting a purely statistical "common use" test would inappropriately tie constitutional protection to "how quickly gun manufacturers can sell their products before regulations can be put into place"). Far from endorsing the simplistic counting exercise proposed by Plaintiffs, *Heller*, *McDonald*, and *Bruen* all instruct courts to look at whether a challenged law burdens the Second Amendment's right to "individual self-defense." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, in turn quoting *Heller*, 554 U.S. at 599).[4]

**b.    Assaults Weapons and LCMs Are Not Suitable for Self-Defense and Are Instead Designed for Military Combat.**

Assault weapons and LCMs are not designed for and do not "facilitate" self-defense. *See id.* at 2132. To the contrary, they are military-grade weapons and accessories designed for combat, and so fall into a subset of "dangerous and unusual" weapons that "may be banned" consistent with the Second Amendment. *Heller*, 554 U.S. at 627.

The First Circuit squarely addressed the functional suitability of assault weapons and LCMs for self-defense only four years ago on a full summary judgment record. *See Worman*, 922 F.3d at 37.[5] The First Circuit determined that "semiautomatic assault weapons do not share

---

[4] Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), on which Plaintiffs rely, Mot. at 8-9, 16, similarly considered stun guns within the ambit of the Second Amendment because they are "widely owned and accepted as a *legitimate means of self-defense* across the country," unlike, for the reasons described herein, assault weapons. *See Caetano,* 577 U.S. at 420 (emphasis added).

[5] Although *Worman* examined this question to decide the appropriate level of scrutiny as part of an approach since rejected by *Bruen*, the court's analysis of the suitability of assault weapons in self-defense bears directly on the textual analysis of the "arms" protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2132.

the features that make handguns well-suited to self-defense in the home," as the Supreme Court described those features in *Heller*. *Id.* at 37 (noting a handgun is better suited to home defense than other firearms because "[i]t is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police" (citing *Heller*, 554 U.S. at 629)).

Other sources, including the expert declarations attached hereto, bear out *Worman*'s conclusion that assault weapons are ill-suited to individual self-defense. Compared to handguns, they are difficult to maneuver in close quarters and require more actions to become operable. Yurgealitis ¶¶ 85-86; Donohue ¶ 159. During inherently stressful situations where armed self-defense would be implicated, these characteristics render assault weapons a "poor choice for this task." Yurgealitis ¶ 86. Further, because of their high muzzle velocity—more than double that of a 9mm handgun—assault weapons over-penetrate typical building materials, posing a serious risk to bystanders. Yurgealitis ¶¶ 83-84; Donohue ¶ 155. In two guides to self-defense published by the National Rifle Association ("NRA") —one focused on self-defense in the home, one on self-defense outside the home—neither mentions any weapons covered by the Act as an appropriate choice for self-defense; instead, both focus on handguns. Gohlke Exs. 7 & 8. Plaintiffs' single citation to support the claim that assault weapons are in common use for self-defense is a 2021 survey, which does not appear to have been subject to peer review, that indicates certain gun owners self-report owning assault weapons for home defense. Mot. at 14. But even if those self-reports were all reliable, which seems doubtful, they do not establish that assault weapons are in fact functionally suited to (or actually used for, as discussed further below) that purpose.

17

Assault weapons are designed to be offensive weapons that are most suited for military combat purposes. *Heller* established that "M-16 rifles and the like," among other "sophisticated arms" that are "most useful in military service," "may be banned" consistent with the Second Amendment. *Heller*, 554 U.S. at 627; *see also Bruen*, 142 S. Ct. at 2127 (reaffirming *Heller*'s analysis of the operative clause of the Second Amendment). Today's semiautomatic assault weapons derive from and remain virtually indistinguishable from weapons used by military forces around the world. Yurgealitis ¶¶ 28-39, 46-47. Indeed, "[t]he very features that qualify a firearm as a banned assault weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines—'serve specific, combat-functional ends.'" *Kolbe*, 849 F.3d at 137; *see also* Busse Decl. ¶¶ 9-14 (describing military, rather than self-defense, value of assault weapon features). As Senator Mark Warner recently stated in reference to a new proposed federal assault weapons ban, "the features and tactical accessories that define assault weapons under this legislation were designed for a specific purpose—to give soldiers an advantage over the enemy, not to mow down students in school hallways." Donohue ¶ 64.

The AR-15 specifically was originally developed in the late 1950s to meet U.S. Army specifications and, after military testing proved its "phenomenal lethality," it was adopted for use by U.S. troops and renamed the M16. Donohue ¶ 106; Roth ¶ 49; Busse ¶ 16; Yurgealitis ¶¶ 27-39 (reviewing development of AR- and AK-platform rifles). The AR-15 was designed for "maximum wound effect." Donohue ¶ 108. When AR-15s were tested on the battlefield in Vietnam, they literally ripped opponents apart—for example, a single shot to the "bottom of the right foot" of an enemy soldier caused "the leg to split from the foot to the hip," resulting in

18

"instantaneous" death. *Id.* ¶¶ 104-05; *see also* Gohlke Ex. 9, at 27 ("One man was hit in the head; it looked like it exploded. A second man was hit in the chest, his back was one big hole.")

Functionally, modern AR-15s are virtually identical to M16s. *See Worman v. Healey*, 293 F. Supp. 3d 251, 264 (D. Mass. 2018), *affirmed on other grounds*, 922 F.3d 26 (1st Cir. 2019). They have the same muzzle velocity, range, construction, and configuration. Yurgealitis ¶ 64. They chamber the same caliber bullets, are made of the same materials, and their operational components, including their upper and lower receivers, are interchangeable. *Id.* ¶¶ 65-66. They generate the same types of catastrophic wounds, creating "both temporary and permanent large wound cavities" that are not typical of handgun wounds. *Id.* ¶¶ 42-43; *see also* Donohue ¶ 110 (linking to 60 Minutes segment with experiment that illustrates "the far more destructive impact on human tissue of being shot with an AR-15 than a handgun"). If anything, due to evolving technology, today's AR-15s are "more effective" than those originally developed according to military specifications in the 1960s. Busse ¶ 26. As Retired Army Major General Paul D. Eaton remarked, "For all intents and purposes, the AR-15 and rifles like it are weapons of war. … It is a very deadly weapon with the same basic functionality that our troops use to kill the enemy." Donohue ¶ 171.

Indeed, gun manufacturers market assault weapons as military-grade weapons intended for offensive use—the very terms "assault weapon" and "assault rifle" originated in the gun industry in the 1980s. *See* Declaration of Robert Spitzer ¶¶ 54-59. *Contra* Mot. at 2. Today, advertisements for AR-style rifles tell purchasers to arm themselves with what the military and the police use, *see, e.g.,* Busse ¶¶ 29-31 ("USE WHAT THEY USE"); Declaration of Saul Cornell ¶ 50 ("'Combat Customized' From the Factory"), and highlight the dangerous, offensive capabilities of these weapons, Busse ¶ 33 (advertising the "URBAN SUPER SNIPER"). And

advertisements even portray these weapons as tools of vigilante action—for example, showing vigilantes bearing assault weapons and dressed in tactical gear, confronting protesters. *Id.* ¶ 31 (ad with slogan "Berkeley · Portland · Charlottesville · Boston → NOT TODAY ANTIFA"); *see also id.* ¶ 32 (ad showing hooded man with assault weapon in front of sign reading "Enjoy Detroit" and slogan "WHEN CORRUPT POLITICS FAIL, OUR GUNS WON'T"). One company, "Rooftop Arms," highlights an association with snipers in its very name. *Id.* ¶ 34. This marketing belies a claim of use for self-defensive purposes.

The sole difference between AR-15s and M16s is that AR-15s are semiautomatic, firing one bullet with each pull of the trigger, while M16s are select-fire, meaning they can fire in semiautomatic, "three-round burst," or "fully automatic" mode. Busse ¶ 19. But this distinction is not "significant," as Plaintiffs contend, Mot. at 11, because it does not render AR-15s any less suited to combat purposes or any better suited to self-defense. First, semiautomatic fire can be even *more* lethal than fully automatic. The military trains soldiers to generally fire select-fire weapons, such as M16s and M4 carbine rifles, in semiautomatic mode to enhance accuracy, conserve ammunition, and maintain control. Busse ¶ 19; Gohlke Ex. 10 (Department of the Army, Rifle Marksmanship M16-/M4-Series Weapons), at 7-8 ("The most important firing technique during fast-moving, modern combat is rapid semiautomatic fire. It is the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple, or moving targets."). Second, semiautomatic assault weapons can be converted to simulate an automatic rate of fire, eliminating the technical difference between the weapons. Declaration of Randolph Roth ¶¶ 52-53; Busse ¶ 27. As Governor Romney emphasized when making the Act permanent in 2004, "[d]eadly assault weapons . . . are not made for recreation or self-defense," but are instead "instruments of destruction with the sole

purpose of hunting down and killing people."  Gohlke Ex. 5.  For that reason, the assault weapons prohibited by the Act fall outside the scope of the Second Amendment.

LCMs, too, are weapons accessories that are "most useful in military service."  *Heller*, 554 U.S. at 627; *see also Kolbe*, 849 F.3d at 137 ("[L]arge-capacity magazines are particularly designed and most suitable for military and law enforcement applications.")*; Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022) ("[W]hile large-capacity magazines are rarely used by civilians for self-defense, they are often used in law enforcement and military situations … [and] … are disproportionately used in crimes involving mass shootings.").  Like AR-15s, LCMs were originally designed and intended for military use.  Yurgealitis ¶ 60.  The basic characteristic of an LCM—its ability to enable guns to fire large quantities of bullets without reloading—results, as intended, in exceptional lethality that is suitable only for military combat purposes.  As the ATF recognized, "virtually all modern military firearms are designed to accept large, detachable magazines" so that soldiers have a "large ammunition supply and the ability to reload rapidly."  Gohlke Ex. 11, at 10.  LCMs "enable a shooter to hit multiple human targets very rapidly," *Kolbe*, 849 F.3d at 137, as required for combat or other mass killing purposes, but not for individual self-defensive gun use.  *See also Duncan*, 19 F.4th at 1105 ("Evidence supports the common-sense conclusion that the benefits of a large-capacity magazine are most helpful to a soldier[.]").

The ability to continually fire without reloading, while valuable in battlefield situations, renders LCMs dangerously ill-suited for civilian self-defense.  "[T]he tendency is for defenders [using an LCM] to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders."  *Heller v. District of Columbia,* 670 F.3d 1244, 1263–64 (D.C. Cir. 2011) ("*Heller II*"), *abrogated on other grounds by Bruen*, 142 S. Ct.

2111; *see also ANJRPC v. Att'y Gen. New Jersey*, 910 F.3d 106, 112 (3d Cir. 2018), *judgment vacated on other grounds sub nom., ANJRPC v. Bruck*, 142 S. Ct. 2894 (2022) ("[U]se of LCMs in self-defense can result in 'indiscriminate firing,' and 'severe adverse consequences for innocent bystanders.'").  At the same time, this ability renders them particularly attractive for mass murder, and particularly deadly.  Attacks with LCMs result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks."  *Heller II*, 670 F.3d at 1263 (cleaned up).  Unsurprisingly, semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history."  *Worman*, 922 F.3d at 39; *see also* Roth ¶¶ 56 ("[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semi-automatic handguns.").  LCMs also render handguns more suited to mass killings—handguns equipped with LCMs have been used in numerous mass shootings with double-digit death tolls.  *See Kolbe*, 849 F.3d at 120 (listing shootings).

Because the weapons prohibited by the Act are designed for military service and are most suitable for offensive combat, they fall outside the plain text of the Second Amendment's protections for arms that "facilitate armed self-defense," *id.* at 2132, and instead "may be banned" consistent with the Second Amendment, *Heller*, 554 U.S. at 627.

### c.   Assault Weapons and LCMs Are Not Commonly Used in Self-Defensive Gun Cases

Assault weapons and LCMs are not only ill-suited to lawful self-defense, but the evidence—even at this preliminary stage—confirms that, in practice, assault weapons and LCMs are rarely used for that purpose.  As a threshold matter, Plaintiffs' raw ownership statistics paint a misleading picture.  AR-platform rifles are not common in comparison to other types of firearms, making up only approximately 5.3% of all firearms in circulation in American society.

Declaration of Louis Klarevas ¶ 13 & n.8.  This figure is dwarfed by the number of handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629—in the United States, which total approximately 50% of the civilian stock of firearms in the United States, Klarevas ¶ 28.  And data further confirms AR-15-type weapons are a niche interest among gunowners.  AR-15 ownership is heavily concentrated:  on average, civilians who own rifles like the AR-15 own 3.8 of them.  *Id.* ¶ 27.

Even these comparatively small numbers of assault weapons are not used for the purpose of self-defense, the "central component" of the Second Amendment right.  *Bruen*, 142 S. Ct. at 2133.  *Worman* saw "no indication that the proscribed weapons have commonly been used for home self-defense purposes" and observed that, in fact, "not one of the plaintiffs or their six experts could identify even a single example of the use of an assault weapon for home self-defense."  *Worman*, 922 F.3d at 37.  Based on the record in that case, which included experts from both sides, the First Circuit described the idea of using an assault weapon for individual self-defense as "tantamount to using a sledgehammer to crack open the shell of a peanut."  *Id*.  Current data on defensive gun use confirms the First Circuit's conclusion.  According to information reported by the Heritage Foundation on defensive gun-uses, the use of *any* type of rifle in actual self-defense situations is quite rare—approximately 2-4% of all defensive gun uses.  Declaration of Lucy Allen Decl. ¶ 24.  In stark contrast, handguns were used in 41% of all incidents in the database and ***90%*** of incidents where the weapon type is known.  *Id*.  Plaintiffs offer no contrary evidence.

Similarly, there are vanishingly few examples of self-defensive gun uses where 10 or more shots were fired, such that an LCM could have been considered necessary.  *See Ocean State Tactical*, 2022 WL 17721175, at *14 ("There is simply no credible evidence in the record

to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not.").  The First Circuit noted that the plaintiffs' experts could not "identify even a single example of a self-defense episode in which ten or more shots were fired."  *Worman*, 922 F.3d at 37.  More recently, the District of Rhode Island cited testimony from a chief law enforcement officer that he was "unaware of any incident in which a civilian has ever fired as many as 10 rounds in self-defense" but that LCMs are "frequently" used in criminal conduct.  *Ocean State Tactical*, 2022 WL 17721175, at *14; *see also Oregon Firearms,* 2022 WL 17454829, at *9 ("Plaintiffs have not shown, at this stage, that magazines specifically capable of accepting more than ten rounds of ammunition are necessary to the use of firearms for self-defense.").

Statistical analyses likewise confirm that LCMs are not commonly used in self-defense – indeed, the discharge of more than 10 bullets in a self-defensive gun use is "extremely rare." Allen ¶ 6.  In the overwhelming majority of cases where a gun is "used" in self-defense—up to 98% according to national surveys—the gun is merely "brandished" and is not fired at all, let alone fired more than 10 times.  Donohue ¶¶ 151-53.  Furthermore, an analysis of incidents reported in the NRA Armed Citizens database compiled from January 2011 through May 2017 reveal that on average, only 2.2 shots were fired by individuals discharging a firearm to defend themselves.  Allen ¶ 9.  That same analysis found that more than 10 bullets were fired in only 2 out of 736 self-defense incidents in the United States.  *Id*.  An analysis of published news stories yielded a similar number of average shots per incident of self-defense (*i.e.*, 2.34).  *Id.* ¶¶ 18.  And it further found that in 97.3% of incidents the defender fired 5 or fewer shots, and that there were no incidents where the defender was reported to have fired more than 10 bullets.  *Id*.

Case 1:22-cv-11431-FDS   Document 21   Filed 01/31/23   Page 29 of 55


In short, as the First Circuit already held in *Worman*, the evidence at this early stage reflects that neither assault weapons nor LCMs are commonly used in self-defense. *Worman*, 922 F.3d at 37; *see also Hightower v. City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012) (concluding "large capacity weapons," a category that includes assault weapons and LCMs, are not "of the type characteristically used to protect the home"). Courts around the country have reached similar conclusions. *See, e.g.*, *Kolbe*, 849 F.3d at 127 ("The State has also underscored the lack of evidence that the banned assault weapons and large-capacity magazines are well-suited to self-defense."); *Duncan*, 19 F.4th at 1104–05 ("Plaintiffs have not pointed to a single instance in this record (or elsewhere) of a homeowner who was unable to defend himself or herself because of a lack of a large-capacity magazine."); *ANJRPC,* 910 F.3d at 118 ("The record here demonstrates that LCMs are not well-suited for self-defense."); *State v. Misch*, 214 Vt. 309, 356–57 (2021), *reargument denied* (Mar. 29, 2021); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020).[6]

Plaintiffs are unlikely to succeed on the merits because they cannot establish that their proposed conduct falls within the plain text of the Second Amendment, which is limited to protection for "arms" that "facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132.

### C.     The Act Is Consistent with the Nation's Tradition of Restricting Specific, Unusually Dangerous Weapons to Protect Public Safety.

Even if assault weapons and LCMs were "Arms" within the meaning of the Second Amendment, the Act is consistent with the nation's long tradition of protecting public safety by

---

[6] Many of these cases were abrogated by *Bruen* to the extent they applied means-end scrutiny. *Bruen*, 142 S. Ct. at 2127. But the Supreme Court's rejection of that analytical approach does not affect these courts' factual analysis of the utility of assault weapons and LCMs for self-defense.

regulating specific, unusually dangerous weapons while preserving citizens' access to firearms

for self-defense.  *Bruen*, 142 S. Ct. at 2135.

>    **1.    Because the Act Responds to Unprecedented Societal Concerns Created by Dramatic Technological Changes, It Need Only Be "Relevantly Similar" To a Historical Regulation.**

As described in Section I.A, above, the state satisfies its burden by showing that the

regulation at issue "is consistent with this Nation's historical tradition of firearm regulation."  *Id.*

*Bruen* contrasts two different types of cases:  cases involving "a general societal problem that

has persisted since the 18th century" entail a "fairly straightforward" analysis, whereas "cases

implicating unprecedented societal concerns or dramatic technological changes" call for a "more

nuanced approach."  *Id.* at 2131-32.  When confronting "modern regulations that were

unimaginable at the founding," *Bruen* directs courts to "reason[] by analogy," by examining

whether the modern regulation is "relevantly similar" to historical regulations.  *Id.* at 2132.

*Bruen* identifies "two metrics" by which regulations are to be compared:  "whether modern and

historical regulations impose a comparable burden on the right of armed self-defense" and

"whether that burden is comparably justified."  *Id.* at 2133.  This analogical inquiry is not a

"regulatory straightjacket," and does not require the state to identify a "historical *twin*," only a

"well-established and representative historical *analogue*";  the modern-day regulation need not

be a "dead ringer for historical precursors" to be "analogous enough to pass constitutional

muster."  *Id.* (emphasis in original).

As explained below, the Act is designed to prevent the unprecedented tragedies that have

been made possible only by the technological development of combat-style semiautomatic

weapons capable of rapid fire by a lone shooter without reloading.  While Plaintiffs contend that

firearms capable of firing multiple rounds have been "common" since well before the adoption

of the Fourteenth Amendment, the historical record shows otherwise.  And even Plaintiffs

concede that "semiautomatic rifle" technology has been available for only about a hundred years. Mot. at 12.

>   a.   **Semiautomatic Weapons Capable of Rapid Fire Represent a Dramatic Technological Change.**

The firearms available to citizens of the colonial and founding eras—mainly muskets and fowling pieces—were dramatically different from assault weapons and LCMs.  Roth ¶ 16.  As one historian summarizes it, "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles."  Spitzer ¶ 37. Muskets were heavy firearms with limited capabilities:  they could fire only a single shot at a time; they had to be reloaded manually between shots; reloading was time-consuming, taking at least half a minute; they had a short range; and they were difficult to keep loaded for any length of time because the powder absorbed corrosive moisture.  Roth ¶ 16.  Fowling pieces were similar, but designed to fire shot to hunt birds and control vermin.  *Id.* ¶ 15.  These limitations made them dramatically less lethal than guns developed later.  *Id.* ¶ 14-17; Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022) (comparing lethality of weapons through time using Dupuy Theoretical Lethality Index).

While Plaintiffs assert that firearms capable of firing more than 10 rounds have existed since 1580, Mot. at 19, what they omit is that these weapons were experimental curiosities that were "anything but common, ordinary, or found in general circulation."  Spitzer ¶ 38; *see id.* ¶¶ 38-53 (describing history of pre-20th century firearm technology); *Oregon Firearms*, 2022 WL 17454829, at *12 (LCMs "represent the kind of dramatic technological change envisioned by the *Bruen* court.").  For example, the sixteen-shot firearm from the 1500s, described in a book titled *Firearms Curiosa*, operated by setting off a series "Roman candle charges," like a fuse on a string of firecrackers.  Spitzer ¶ 38.  Multi-shot flintlock experiments, like the 1821 Jennings

multi-shot rifle, relied on a "fatally defective" multiple touchhole design that was "plagued or doomed" by technological problems like the problem of loose priming powder, and was never widely used. *Id.* ¶ 41.  The Girandoni air rifle, of which a single exemplar was taken on the Lewis and Clark expedition of 1804-06, was so complex and impractical for military or civilian use that few were ever made. *Id.* ¶ 42.

Multi-shot weapons did not become widely available until the end of the 19th century, with the proliferation of the Colt revolver and Winchester repeating rifle, but even these weapons were not semiautomatic weapons capable of rapid fire.  Spitzer ¶ 48; Roth ¶¶ 28, 31-33.  It was not until after World War I that automatic and semi-automatic guns, like the Tommy submachine gun, were developed and became widely commercially available, which "made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices."  Spitzer ¶ 30; Roth ¶¶ 44-46.

Assault weapons are a phenomenon of even more recent vintage.  Although the AR-15 was developed for the U.S. military in the late 1950s and put into service in the early 1960s, Donohue ¶¶ 103-106; Roth ¶ 49, it did not spread in large numbers among the civilian public until decades later.  Busse ¶¶ 23-25.  Sales were low during the period between 1964 and 1994, with an average of fewer than 27,000 units per year sold during that 30-year period. *Id*. ¶ 23.  In the late 2000s, the firearms industry began to heavily market AR-15-style rifles, publicly re-branding them as "modern sporting rifles" in an effort to make them more socially acceptable, after which sales began to rise, particularly after the 2012 mass shooting at Sandy Hook Elementary School in Newtown, Connecticut. *Id.* ¶¶ 7, 24-25.

   **b.**  **Assault Weapons and LCMs Have Created a Societal Concern Without Precedent in the Nation's History.**

  The spread of assault weapons and LCMs has created a modern phenomenon of mass shootings that would have been unimaginable to prior generations. *Oregon Firearms*, 2022 WL 17454829, at *12 (finding that LCMs implicate unprecedented societal change). There was no comparable problem in the founding era:  homicide rates among colonists were low, Roth ¶¶ 14-16; Cornell ¶¶ 19-21, and when homicides did occur, "[g]uns were not the weapons of choice in homicides that grew out of the tensions of daily life," because of the practical limitations of the heavy, single-shot manually loaded firearms of the time.  Roth ¶¶ 14-17; *see also* Cornell ¶ 19. And mass murder, when it existed, was a group activity:  "The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage," because the weaponry of the time "did not provide individuals or small groups of people the means to inflict mass casualties on their own."  Roth ¶ 41.

  Societal concerns began to change in the 19th century with rising murder rates in tandem with a revolution in the production of consumer goods that included deadly weapons, Roth ¶ 22-27; Cornell ¶ 22, and then changed dramatically in the early 20th century with the invention and commercial dissemination of automatic and semi-automatic guns.  Spitzer ¶¶ 13-22; *see also* Roth ¶¶ 44-46.  These new technologies for the first time gave individuals the "power to kill large numbers of people in a short amount of time."  Roth ¶¶ 44, 54-58 (statistics comparing fatalities in mass shootings with and without assaults weapons and LCMs).  The threat these weapons pose to public safety and law enforcement is "a modern phenomenon that has a direct correlation with mass murder and mass shootings."  *Id.* ¶ 54.  Recent decades have witnessed a horrifying acceleration of mass murder by lone shooters.  From 1776 to 1948, there were no shootings involving ten or more victims killed.  Klarevas ¶ 18 & n. 11 (collecting data, not

including large-scale inter-group violence). The first double-digit-fatality mass shooting

occurred in 1949, the next, 17 years later in 1966, followed by the third and fourth in 1975 and

1982. *Id.* ¶ 19 & Table 6, Figs. 9 & 10. The trend increased rapidly in the 1980s, interrupted by

a relative lull through the end of the Federal Assault Weapons Ban in 2004, followed by a

dramatic increase: in the 18 years since 2004, there have been at least 20 mass shootings with

double-digit fatalities, *id.* ¶ 21, and that number continues to climb. The cluster at the far right of

the chart below, showing mass shootings with double-digit fatalities across American history,

illustrates just how unprecedented this social change is.



*Id.* ¶ 19, Fig. 9.

> ### 2.   Governments Throughout the Nation's History Have Regulated Unusually Dangerous Weapons, Including by Banning Them Altogether.

Plaintiffs mischaracterize the inquiry and the historical record when they contend that

(1) *Bruen* and *Heller* have already conducted the "historical spadework" relevant to this case;

(2) *Bruen* and *Heller* identified only one analogous tradition, that of restricting "dangerous and

unusual" weapons; and (3) the term "dangerous and unusual" is synonymous with not "in

common use." Mot. at 7-8. Plaintiffs are wrong on all three points: (1) *Bruen* and *Heller* did

30

not involve assault weapons and LCMs, and did not purport to conduct the relevant historical "spadework"; (2) there is a substantial body of historical regulation analogous to the Act, well beyond the historical restrictions on "dangerous" and/or "unusual" weapons; and (3) numerous historical regulations did in fact restrict weapons and accessories that were in common use at the time, including gunpowder, pistols, revolvers, and fighting knives.

There is an established tradition throughout American history of targeting specific unusually dangerous weapons and accessories when they have contributed to rising homicide and other crime without a corresponding utility for self-defense.  The historical tradition of regulation follows a specific pattern:  first, new weapons technologies are developed; second, they spread into society, and create a public safety threat; and then governments start enacting regulations to dampen weapons-related criminality and violence.  Spitzer ¶¶ 8, 12.  In each period of United States history, specific weapons have been regulated consistent with this pattern.

> a.    **Gunpowder, Trap Guns, and "Dangerous" and/or "Unusual" Weapons**

In the 18th century, governments did not face the problem of unusually lethal new weapons technology, Spitzer ¶ 37; Roth ¶ 16, but the weapons-related regulations that they did enact demonstrate that they understood their police powers to permit restricting specific types of weapons and accessories that posed a threat to public safety.  Gunpowder created a major public safety problem at the time, principally due to the risk of fire or explosions, and as a result, was subject to numerous regulations.  Cornell ¶¶ 29-30.  Indeed, "the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history." *Id.* ¶ 30.  A 1783 Massachusetts law, for example, forbade any person to "take into any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store, Shop, or other Building, within the Town of *Boston*, any ... Fire-Arm, loaded with,

or having Gun-Powder," and permitted the seizure of any loaded firearm that "shall be found" there.  1782 Mass. Acts 119, ch. 46 (Gohlke Ex. 12).  Governments frequently set up communal magazines and required that individuals store their gunpowder in those locations, *see, e.g.,* 1706-7 Mass. Acts ch. 4 (Gohlke Ex. 13), and Maine went so far as to authorize town selectmen to enter buildings to search for gunpowder, 1821 Me. Laws 98, chap. 25, § 5 (Gohlke Ex. 14).  Individuals were not free to stockpile as much gunpowder and ammunition as they wished or to store it as they wished; because munitions posed a uniquely dangerous risk to society, the government could lawfully regulate them.  Cornell ¶¶ 29-30; *see Brown v. Maryland*, 25 U.S. 419, 443 (1827) ("The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States."), *abrogated on other grounds by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995).

Another public safety threat at the time was posed by the trap gun, a firearm rigged to fire remotely when triggered.  Spitzer ¶¶ 83-86.  Although trap guns were frequently used for defensive purposes—including the protection of businesses, property or possessions—founding-era governments understood them to be unacceptably lethal because they posed a serious threat to innocent people who encountered them.  *Id.* ¶ 84.  Sixteen states ultimately enacted anti-trap gun laws, beginning in 1771 and continuing through the early 20th century. *Id.* ¶ 86, Ex. B (years of enactment) & Ex. F (text of trap gun laws).

A third type of public threat came from carrying "dangerous" or "unusual" weapons to the terror of the people.  Blackstone, for example, wrote that "riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land[.]"  4 Blackstone, Commentaries on the Laws of England 148-149 (Oxford, England

1769), quoted in *Bruen*, 142 S. Ct. at 2143.[7]  Sometimes these restrictions specified particular *types* of weapons that could not be carried.  In 1686, New Jersey enacted restrictions on the concealed carrying of "any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons."  *An Act against wearing Swords, &c.*, Ch. IX (1686), *printed in* The Grants, Concessions, and Original Constitutions of the Province of New Jersey (1881) (Gohlke Ex. 15). *Bruen* indeed acknowledged that this law applied to certain weapons by type.  *Bruen*, 142 S. Ct. at 2143 (law applied to "certain 'unusual or unlawful weapons,' including 'pocket pistol[s]'").

These historical regulations illustrate that, even before unusually dangerous *new* technologies started proliferating in the 19th century, there was a well-established tradition of regulating specific *types* of weapons and accessories that posed particular danger to the public. The gunpowder regulations, in particular, demonstrate that the founding generation understood the police power could, when necessary to prevent a serious threat to public safety, impose a very substantial burden on the individual's access to loaded weapons and ammunition.

### b. Bowie Knives, Pocket Pistols, and Other Concealable Types of Weapons

During the founding era and antebellum period, societal concerns about public safety began to change dramatically due to increasing production of guns, knives, and other deadly weapons as part of the larger industrial revolution of the era.  Cornell ¶ 22; Roth ¶ 13.  This

---

[7] The phrase "dangerous or unusual" indicates that weapons need not have been *both* unusual *and* dangerous to come within this prohibition.  *Heller* used both a disjunctive and a conjunctive formulation, *see Heller*, 554 U.S. at 623 ("dangerous *or* unusual weapons"); *id.* at 627 ("dangerous *and* unusual weapons")), and this phrase was often rendered disjunctively as "dangerous *or* unusual" throughout American history, as Blackstone did.  *See* Cornell ¶ 8 & n. 8; *see also O'Neill v. State*, 16 Ala. 65, 67 (1849) ("deadly or unusual weapons"); *State v. Lanier*, 71 N.C. 288, 289 (1874) ("dangerous or unusual weapons"); *English v. State*, 35 Tex. 473, 476 (1872) ("dangerous or unusual weapons"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  The phrase may also have been a rhetorical form known as hendiadys, meaning the expression of a single idea with a single phrase, Cornell ¶ 8 & n. 8, and thus would refer to an "unusually dangerous" weapon.

technological development was accompanied by rising murder rates throughout the 19th century. Roth ¶¶ 22-23, 28-34.  States responded by singling out the specific weapons that posed a particular danger and were susceptible to criminal misuse.  Cornell ¶ 23; Declaration of Brennan Rivas ¶ 20.  In the early national period, States did not regulate rifles, muskets, or fowling pieces because these were not the weapons that "ruffians" used for violence, Rivas ¶ 20; *see also* Roth ¶ 30, and instead, States focused on restricting access to concealable fighting knives and concealable pistols, which were the "primary murder weapons" of the period.  Roth ¶¶ 24, 30.

The pocket pistol, a small pistol designed to be easily hidden within a pocket or beneath a coat, was a common subject of regulation in the early national period.  Rivas ¶¶ 14-16, 22-23; Roth ¶¶ 25-27.  At the beginning of the 19th century, most of the pistols available on the American consumer market would have been single-shot, muzzle-loading pistols modeled after designs that appeared in the 18th century.  Rivas ¶ 22.  Pistol technology changed, however, beginning in the 1820s, with the development and commercialization of a percussion-lock mechanism that avoided the need for corrosive black powder, which allowed pistols to be kept loaded and carried around for longer periods.  Roth ¶ 25. These new pistols were carried by people concealed on their person, and came to be used for criminal purposes, contributing to rising crime rates.  *Id.* ¶ 24.

Throughout the 19th century, States enacted regulations directed at specific concealable weapons that typically included pistols.  Spitzer Ex. C (years of enactment by weapon and state) & Ex. E (text of historical laws by state); Roth ¶¶ 26-28, 35-40; Rivas ¶¶ 32-39.  The modes of such regulations were usually restrictions on open or concealed carry, though some states also used taxes to discourage ownership.  Rivas ¶¶ 32-33.  At least two states, however, prohibited sale of pocket pistols.  Tennessee prohibited "any person to sell, or offer to sell, or bring into the

State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols." 1879 Tenn. Pub. Acts 81, *An Act to Preserve the Peace and to Prevent Homicide*, ch. 90, § 1 (Gohlke Ex. 16); Rivas ¶ 37; Roth ¶ 36. Arkansas followed suit but went even further by prohibiting the sale of pistol cartridges as well. Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) (Gohlke Ex. 17); Rivas ¶ 37; Roth ¶ 36.[8]

The Bowie knife was another weapon that states selected for regulation. Spitzer ¶¶ 64-73; Roth ¶¶ 26-27. The Bowie knife, like other similar "fighting knives" that appeared in this era, was designed expressly for fighting, with a long blade, a hand guard, and a clipped point. Spitzer ¶ 65; Roth ¶ 25. It was invented in the 1820s and proliferated rapidly during the 1830s. Spitzer ¶¶ 64-65. "[I]ntended for combat," these knives did indeed become widely used in fights, duels, brawls, and other criminal violence. Spitzer ¶¶ 65; Roth ¶ 24. For example, in language foreshadowing Governor Romney's description of assault weapons, Gohlke Ex. 5, the Tennessee Supreme Court, affirming a conviction for concealed carry of a Bowie knife, described these knives as "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." *Aymette v. State*, 21 Tenn. 154, 158 (1840).

---

[8] In addition, Georgia enacted a statute in 1837 that not only prohibited public carry of certain weapons (including Bowie knives and pistols except "horseman's pistols"), but also prohibited the *sale* of those weapons. William A. Hotchkiss, Codification of the Statute Law of Georgia (Savannah: J. M. Cooper, 1845), 739 ("Offenses against the Public Peace," Sec. III, Art. 73-76 (Gohlke Ex. 18); Rivas ¶¶ 40-42. Although the Georgia Supreme Court struck down the portion of the law that prohibited open carry, it did not address the sale prohibition. *Nunn v. State*, 1 Ga. 243, 251 (1846); Rivas ¶ 41.

States quickly responded by adopting laws barring or restricting these weapons: during the 19th century, 49 states plus the District of Columbia restricted Bowie knives.[9] Spitzer ¶ 71. These laws used a variety of regulatory modes: fifteen states barred carry, whether concealed or open—effectively banning them entirely from the public sphere; twenty-nine states barred concealed carry; seven states enacted enhanced criminal penalties for their use in a crime; four states imposed taxes on their commercial sale; three states imposed a tax on ownership; ten states barred their sale to specified groups of people (often minors); and four states enacted penalties for brandishing. Spitzer ¶ 72 & Ex. H (table of Bowie knife laws by state, date and mode of regulation).

Multi-shot revolvers, too, began contributing to rising crime late in the 19th century, and were regulated in similar fashion. Although the multi-shot revolver was first developed in the 1830s by Samuel Colt, multi-shot Colt-type revolvers and similar firearms did not catch on and proliferate in society until after the Civil War. Spitzer ¶ 47; Rivas ¶ 24; Roth ¶¶ 31-34. Earlier revolvers were of the "cap and ball" type, which required a delicate and time-consuming reloading process; it was not until after 1857 that revolvers started using individual cartridges that could be inserted much more quickly into the cylinder. Rivas ¶ 28; Roth ¶¶ 31-32. The spread of these weapons in society was accompanied by their rising use in crime, when "they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults." Roth ¶ 34. State legislatures responded by regulating revolvers in the same way as

---

[9] These statutes often included other weapons as well, such as clubs and other blunt weapons, including bludgeons, billy clubs, and slung shots. Slung shots, for example, "were invented and appeared in society during an identifiable period of time in the mid-19th century, sparking subsequent wide-ranging prohibitions." Spitzer ¶ 80. The regulation of these weapons was comparable to that of Bowie knives, and is not further discussed here. A full discussion appears at Spitzer ¶¶ 74-81.

pistols and Bowie knives, frequently in the same regulations.  Roth ¶¶ 35-40; Spitzer ¶ 50.  By the end of the 19th century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.  Spitzer ¶ 50.[10]

These laws demonstrate that, from the earliest days of the nation, the Second Amendment was not understood to guarantee unfettered access to one's weapon of choice.  State governments did not hesitate to restrict certain unusually lethal weapons that contributed to violence and criminality, even though those weapons could also theoretically be used for self-defense.

While Plaintiffs may attempt to discount the analogy to historical laws that regulated public carry, rather than sale and possession, that distinction is not determinative.  The focus on public carry as a tool of regulation reflected a policy choice influenced by specific historical circumstances.  The threat posed by these weapons related to their very concealability. Roth ¶¶ 27, 34; Rivas ¶ 14.  And, in an era when governments did not yet possess the tools and resources to implement bans, restricting public carry was more feasible, and more targeted to the particular safety threat that concerned 19th century legislatures.  Spitzer ¶ 73.

Further, by recognizing that the Second Amendment right extends to public carry, *Bruen* diminishes the significance of the distinction between public carry and possession in the home

---

[10] While Plaintiffs also point to repeating rifles like Winchesters as examples of multi-shot firearms that appeared in the 19th century, Mot. 19-20, these weapons were less widely used in the 19th century than is commonly supposed.  Spitzer ¶¶ 48-49; Declaration of Michael Vorenberg ¶¶ 50-69.  They were not semiautomatic firearms; they required the shooter to manipulate a lever in a forward-and-back motion before each shot.  Spitzer ¶ 48; Vorenberg ¶ 21. Florida made an early effort to regulate these weapons through a licensing system, Rivas ¶ 39, but otherwise these weapons did not attract much legislative attention due, at least initially, to their comparative lack of widespread use.  Vorenberg ¶ 10.  Access to them was limited during Reconstruction, albeit not through statutes, but through the policies and practices of the U.S. army and its auxiliary or allied units, such as the state-wide militias that operated as law enforcement bodies during Reconstruction.  Vorenberg ¶¶ 7-8.

for Second Amendment purposes.  *Bruen*, 141 S. Ct. at 2135 (noting that "[m]any Americans hazard greater danger outside the home than in it.").  Nothing in *Bruen* requires a historical regulation to use the same mode of regulation in order to qualify as an analogue.  Rather, *Bruen* looked at the degree of burden imposed.  *Id.* at 2145 (rejecting proffered analogues because none "imposed a substantial burden on public carry" like the challenged New York statute); *see also id.* at 2132 (citing Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993) (pointing out the "weakness in the view that analogical reasoning depends on deep social consensus")).  Interpreting *Bruen* otherwise would be inconsistent with the notion of an analogy: a pre-20th century regulation that used the same regulatory mode (a ban) to regulate the same thing (a specific weapon by name) would be more like a historical "twin" of the ban on assault weapons and LCMs, because nothing closer is possible—that is, a ban on assault weapons and LCMs *specifically* was impossible before the technology was invented in the 20th century.  Instead, *Bruen* requires only a historical "analogue," which looks at the degree of the *burden* rather than the *mode of regulation*.  *Bruen*, 142 S. Ct. at 2133.  As explained below in Section I.C.3.a, the Act imposes a burden on the right of armed self-defense that is comparable to, or less than, that of these 19th century public carry restrictions.

> ### c.  Automatic and Semiautomatic Weapons Capable of Firing Multiple Shots Without Reloading

It was not until the early 20th century that the specific societal concern of mass shootings emerged with the development and proliferation of weapons capable of rapid automatic or semiautomatic fire.  Roth ¶ 44.  The regulations that emerged in this era are significant because they evidence the earliest public response to the same societal concern addressed by the Act, and they demonstrate a strong tradition that such weapons may be heavily regulated and even banned to protect the public from their unique lethality.

The World War I era produced the first fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull.[11] Spitzer ¶ 13.  Toward the end of the war, a lighter-weight hand-held machine gun was developed, known as the Thompson submachine gun or "Tommy gun," and began to spread to civilians during the 1920s.  *Id.* ¶ 14.  The Browning Automatic Rifle ("BAR") was also developed during the war and made its way into civilian life in the 1920s and 1930s.  *Id.* ¶ 16.

Legislatures responded swiftly to these new weapons.  Because of the type of threat these weapons posed, these legislatures "widened their regulatory focus" beyond concealed carry. Roth ¶ 47.  Between 1925 and 1934, at least 32 states enacted anti-machine gun laws, which were promoted by the National Conference of Commissioners on Uniform State Laws (later known as the Uniform Law Commission).  Spitzer ¶ 23 & Exs. B & D.  In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and general circulation of fully automatic weapons, including a tax on the manufacture or sale of listed weapons, and a requirement to register listed weapons with the Treasury Department.  *Id.* ¶ 25.

Many of these regulations included semiautomatic weapons as well as fully automatic ones.  In 1923, the Commission organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms," and in 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots *semi-*

---

[11] The difference between automatic and semiautomatic guns lies in the number of shots that are fired by a single pull of the trigger.   Spitzer ¶ 29 & n. 39.  This is not to be confused with automatic *loading*.  Both automatic and semiautomatic guns automatically load a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and are thus capable of firing numerous rounds without reloading.  *Id.* ¶ 29 & n. 39.

*automatically* without reloading." Spitzer ¶ 23 (emphasis added). In 1932, Congress enacted a ban on machine guns and semiautomatic guns for the District of Columbia, which applied to "any firearm which shoots automatically *or semiautomatically* more than twelve shots *without reloading*," and which was endorsed by the National Rifle Association as a model for use throughout the United States. *Id.* ¶ 24 (emphasis added). Between seven and ten states plus the District of Columbia included semiautomatic weapons in their new laws that restricted fully automatic weapons. *Id.* ¶ 29 & Ex. B (table of hardware restrictions by state and date of enactment); Ex. D (text of automatic/semiautomatic weapon statutes).

Magazine capacity restrictions were also common in this period. Contrary to Plaintiffs' assertion that only a "handful" of state legislatures enacted capacity restrictions, Mot. at 21 (identifying Michigan, Ohio and Rhode Island), at least 23 states restricted ammunition magazines or similar feeding devices, and/or round capacity. Spitzer ¶¶ 31-33 & Table 1. Magazine capacity and/or firing limits were imposed in three categories of state laws. First, they appeared in laws in ten states (including Massachusetts) plus the District of Columbia regulating semi-automatic and fully automatic weapons. *Id.* ¶ 32 & n. 43 (citing statutes); *see also id.* Ex. D (text of automatic/semiautomatic weapon statutes). Eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices. Spitzer ¶ 32 & n. 44 (citing statutes) & Ex. D. And four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire them continuously in a fully automatic manner. *Id.* ¶ 32 & n. 45 (citing statutes); Ex. D.

These statutes provide close historical analogues to the statutes at issue here. While Plaintiffs discount the significance of 20th century history, Mot. at 12, the Supreme Court has

signaled that 20th century history is relevant, and indeed essential, in assessing the

constitutionality of firearms restrictions.  In *Heller* and *Bruen*, the Court explained that certain

laws, like laws banning felons from possessing firearms, are "presumptively lawful," even

though these laws first appeared in the 20th century.  *Heller*, 554 U.S. at 626-27 & n.26; *Bruen*,

142 S. Ct. at 2162 (Kavanaugh, J., concurring) (together with Chief Justice Roberts, reaffirming

that same language from *Heller*); *see United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir.

2010) (en banc) (explaining that "[t]he first federal statute disqualifying felons from possessing

firearms was not enacted until 1938; it also disqualified misdemeanants who had been convicted

of violent offenses," and the federal "ban on possession by *all* felons was not enacted until

1961").  Similarly, "*Heller* deemed a ban on private possession of machine guns to be obviously

valid," but "states didn't begin to regulate private use of machine guns until 1927."  *Friedman*,

784 F.3d at 408.  As the Seventh Circuit has explained, in light of *Heller*'s affirmation of the

constitutionality of laws that date to the early- and mid-20th century, "exclusions need not mirror

limits that were on the books in 1791" to be compatible with the Second Amendment.  *Skoien*,

614 F.3d at 641.

     Moreover, 20th-century history is uniquely probative in the analogic inquiry in this case,

because it is the earliest era in which comparable weapons appeared.  While portions of *Bruen*

discounted the probative value of the late-19th and early-20th century regulations adduced by

respondents in that case, those passages did so only because that evidence "contradict[ed]"

earlier historical evidence.  *Bruen*, 142 S. Ct. at 2154 & n. 28; *see also Heller II*, 670 F.3d at

1274 n.6 (Kavanagh, J., dissenting) (acknowledging relevance of post-ratification history and

tradition as long as not "inconsistent" with the original meaning of Second Amendment).  Here,

in contrast, these 20th century regulations stand firmly in a longstanding tradition of regulating

unusually dangerous weapons as they became widely available. *Oregon Firearms*, 2022 WL

17454829, at *14 (20th-century evidence "confirms earlier historical trends offered by

Defendants of legislative efforts to ban weapons that 'were developed with a focus on military

applications and supplying military needs,' 'spread to ... civilian markets and use,' and then

became commonly used for criminality rather than self-defense"). And unlike here, *Bruen*

involved a societal concern that existed from the Founding. *Cf. Bruen*, 142 S. Ct. at 2131-32.

### 3. The Act is Relevantly Similar to the Historical Regulations.

The Act is comparable to these historical traditions in terms of "how" and "why" it

burdens the right of armed self-defense, because it imposes only a minimal burden on the right of

self-defense in order to protect the public from the accelerating public safety threat created by

these unusually lethal combat-style weapons.

#### a. The Act's Minimal Burden on the Right of Armed Self-Defense is Comparable to, or Less Than, That of Other Historical Regulations.

The Act imposes little if any burden on weapons suited to self-defense, while specifically

impacting only a narrow group of particularly dangerous weapons and accessories that are

devastating when criminally misused. *Oregon Firearms*, 2022 WL 17454829, at *14 (finding

that LCM ban, which imposed "minimal" burden, "does not impose a greater burden on the right

to self-defense than did analogous historical regulations").

Unlike the statute struck down in *Bruen*, which "imposed a substantial burden" in

comparison to historical analogues, *Bruen*, 142 S.Ct. at 2145, the Act does not "heavily burden"

the right of armed self-defense. *Worman*, 922 F.3d at 37. Numerous appellate courts, examining

similar statutes in other states, have concurred. *Duncan*, 19 F.4th at 1104 ("only a minimal

burden"); *ANJRPC*, 910 F.3d at 117 (LCM statute "d[id] not severely burden right"); *Kolbe*, 849

F.3d at 138 (assault weapon and LCM ban did "not severely burden" right); *Heller II*, 670 F.3d at 1262 (assault weapons and LCM ban did not impose "substantial burden" on right).[12]

Several aspects of the Act make it substantially less burdensome than the handgun restrictions reviewed in *Bruen* and *Heller*.  First, the Act does not ban "an entire class of firearms"; "[i]nstead, it proscribes only a set of specifically enumerated semiautomatic assault weapons, magazines of a particular capacity, and semiautomatic assault weapons that have certain combat-style features."  *Worman*, 922 F.3d at 37; *see also New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015), a*brogated on other grounds by Bruen*, 142 S. Ct. 2111 (assault weapons ban was "substantially less burdensome" than handgun restriction because assault weapons are only "a limited subset of semiautomatic firearms"); *ANJRPC*, 910 F.3d at 117-18 (LCM ban did not "ban 'an entire class of 'arms,'"); *Kolbe*, 849 F.3d 138.  Indeed, Plaintiffs themselves admit that the Act applies only to "certain semi-automatic rifles."  ECF #1 ¶ 13.  Thus, in contrast to the handgun ban in *Heller*, the Act does not restrict "an entire class of 'arms' that is overwhelmingly chosen by American society" for self-defense purposes.  *Heller*, 554 U.S. at 628.  The Act leaves in place a wide range of other firearms, including many semiautomatic rifles, shotguns, and handguns, for armed self-

---

[12] These specific determinations remain relevant, even though they were made in the course of the now-abrogated means-end inquiry, because they address the same question now required by *Bruen*:  what burden does the challenged regulation place on the core right of self-defense? *Compare Bruen*, 142 S. Ct. at 2133 *with Worman*, 922 F.3d at 36 (determining "how heavily [the statute] burdens that right") (internal quotation omitted).

defense.[13]  *See also Friedman*, 784 F.3d at 411 (assault weapon and LCM ban left individuals with ample means of self-defense, including "most long guns plus pistols and revolvers").[14]

Second, the Act does not significantly burden the right of self-defense because assault weapons and LCMs are not suitable for self-defense, for the reasons discussed in Section I.B.3, above.  *Worman*, 922 F.3d at 37; *ANJRPC*, 910 F.3d at 117-18; *Kolbe*, 849 F.3d at 138.

Third, the LCM ban is even less burdensome:  it does not limit the amount of ammunition, or even the number of magazines, an individual can possess, but only the size of each magazine.  Thus, individuals remain free to "fire as many bullets as they would like for whatever lawful purpose they choose."  *Duncan*, 19 F.4th at 1104.  The restriction narrowly limits capacity of those ammunition feeding devices to a number of rounds that is more than sufficient for armed self-defense purposes, as several appellate courts have recognized. *Worman*, 922 F.3d at 37; *Duncan*, 19 F.4th at 1104-06; *ANJRPC*, 910 F.3d at 121 n.25.

For these reasons, the burden on the right of armed self-defense is comparable to, or even less than, that imposed by many historical statutes embodying the nation's tradition of gun regulation.  Like the Act, these other regulations restricted only specific types of weapons that were unusually lethal in their day and contributed disproportionately to rising violence.  In

---

[13] *See* examples listed in *Frequently Asked Questions about the Assault Weapons Ban Enforcement Notice*, available at https://www.mass.gov/guides/frequently-asked-questions-about-the-assault-weapons-ban-enforcement-notice#-are-there-examples-or-categories-of-weapons-that-are-not-copies-or-duplicates-of-assault-weapons?-  .

[14] *Heller* does not foreclose consideration of the availability of other weapons for self-defense. While *Heller* rejected an argument made by petitioners in that case that it is permissible "to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed," *Heller* rejected that argument because the restriction applied to *all handguns*.  *Heller*, 554 U.S. at 629 (responding "[i]t is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon … a *complete prohibition* of their use is invalid") (emphasis added).  The Act, in contrast, does not ban all rifles, nor does it even ban all semiautomatic rifles.  And, unlike the law invalidated in *Heller*, it certainly does not ban all handguns.

particular, the widespread prohibitions on automatic and semiautomatic weapons shortly after these weapons became available in the early 20th century provides a very close historical analogue.  Like assault weapons and LCMs, the weapons banned by those regulations had ready application in offensive (and military) settings, yet had limited application (in design and actual experience) to civilian self-defense.  The Act is likewise similar to the large category of regulations, dating back to the founding generation, restricting the carrying (and sometimes the sale and possession) of Bowie knives, pocket pistols and many other concealable weapons, which likewise targeted specific newly available weapons by name because of their damaging potential in offensive use while having limited self-defense function.  In one respect this category of 18th and 19th century laws was even more burdensome than the Act, because it typically swept in a wider array of weapons, from pistols to fighting knives, slung shots and clubs.  And while the 18th century did not experience the specific problem of new firearms technology, there were nevertheless regulations that imposed a comparable or greater burden.  Gunpowder regulations, in particular, significantly burdened the right of armed self-defense by preventing the keeping of loaded guns or limiting where and how much gunpowder could be kept in the home.  The LCM ban, which analogously focuses on ammunition, is less burdensome because it does not restrict the *amount* of ammunition an individual can own or access.

> **b.** **The Act Has a Comparable Justification of Protecting the Public From Unusually Lethal Weapons Disproportionately Used in Violent Crime.**

The Act is also justified by the same concern that has driven governmental regulation of weapons throughout history:  the State's responsibility to protect the public from the danger caused by weapons that create a particular public safety threat.  *See Oregon Firearms*, 2022 WL 17454829, at *14 (finding that LCM ban was justified by "the rise in mass shooting incidents and the connection between mass shooting incidents and large-capacity magazines").  As the

First Circuit recognized, the purpose of the Act is "to 'help keep the streets and neighborhoods of Massachusetts safe' by 'mak[ing] it harder for criminals to get their hands on these dangerous guns.'" *Worman*, 922 F.3d at 39.  Evidence shows that bans on assault weapons and LCMs save lives.  Klarevas ¶ 43; *see id.* ¶¶ 30-45 (detailing theoretical mechanisms and empirical evidence showing effectiveness of bans).

Assault weapons and LCMs pose a public safety threat different in kind from that of firearms suited to self-defense.  Mass shootings have become tragically commonplace over the last two decades, and "the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings." Klarevas ¶ 11.  Although the United States has only 5% of the world's population, it has experienced "roughly one-third of the public mass shootings across 171 countries since the late 1960s." Donohue ¶ 63.  Worse, the number of mass shootings is growing at an alarming rate. Klarevas ¶¶ 11-13.  The use of assault weapons and LCMs are major factors in the rise of mass shooting violence.  *Id.* ¶¶ 12-17 & Figs. 3-6.  The particular features of assault weapons, especially when combined with LCMs, pose "unique dangers," by "permit[ting] a shooter to fire multiple rounds very quickly, allowing him to hit more victims in a shorter period of time." *Worman*, 922 F.3d at 39; *see also* Roth ¶¶ 54-60.  These features make them "force multipliers" when used to perpetrate mass shootings:  in the last 32 years, the use of assault weapons and LCMs in high-fatality mass shootings has resulted, respectively, in 67% and 58% increases in average fatalities per incident.  Klarevas ¶¶ 15-17.

Because they were developed as offensive weapons for combat situations, *see* Section I.B.3.b, above, they are designed to inflict catastrophic injuries different in kind from the injuries inflicted by conventional semiautomatic firearms like 9mm handguns.  *Worman*, 922 F.3d at 39-

46

40; Gohlke Exs. 19-22.  Two design features of assault weapons make them unusually

destructive.  First, their extremely high bullet velocity (two to three times that of common 9 mm

or .38 caliber handguns) creates such enormous kinetic energy that, when they strike a human

body, they create a shock wave through the tissue along the bullet's trajectory. *See*, *e.g.*, Gohlke

Exs. 23 & 24.  The bullet creates an expanding, spindle-shaped temporary cavity around the

wound tract, and after it passes, the energy stored in displaced adjoining tissue causes a rippling

effect known as "cavitation" that damages organs, rip blood vessels, and fracture bones.  Gohlke

Ex. 23 at 181-82.  Second, the smaller-caliber bullets used in assault weapons begin tumbling

soon after they enter the human body, an effect known as "yawing," which exacerbates the

damage and can cause massive exit wounds. *Id.* at 181; *see also* Yurgealitis ¶ 42.  As one trauma

surgeon explains, "a typical 9 mm wound to the liver will produce a pathway of tissue

destruction in the order of 1 in to 2 in.," whereas "an AR 15 will literally pulverize the liver,"

like "dropping a watermelon onto concrete."  Gohlke Ex. 25; *see also Worman*, 922 F.3d at 39-

40.  And the injuries are not only physical.  A considerable body of scientific literature confirms

that "the horrors of mass shootings … have inflicted psychological distress far beyond the

contours of [the] small communities" where mass shootings have occurred.  Donohue ¶¶ 59-63.

The capabilities of assault weapons also pose a unique threat to law enforcement.

*Id.* ¶ 44.  They can penetrate the soft body armor customarily worn by law enforcement, and they

allow criminals to more effectively engage with responding police officers, even from a

significant distance. *Id.* ¶ 44; *see also* Yurgealitis ¶ 92.  Assault weapons are disproportionately

used to kill police officers.  Donohue ¶ 44.  The May 2022 mass shooting in Uvalde, Texas,

where police officers were unwilling or unable to enter the elementary school during the

shooting, vividly underscores how the police response can be impaired. *Id.*

The LCM ban is similarly justified.  LCMs "exacerbate" the dangers posed by assault weapons, "by allowing the shooter to fire more bullets without stopping to reload."  *Worman*, 922 F.3d at 39.  This characteristic "increases the lethality and effectiveness of small arms in combat," because "[l]ess time required to reload can equate to more time spent acquiring targets or shooting."  Yurgealitis ¶ 60.  Depriving criminals of large-capacity magazines can save lives during mass shootings, because pauses for reloading give victims more opportunities to flee, and others more opportunities to intervene.  *ANJRPC*, 910 F.3d at 120-21 (giving examples); *Heller II*, 670 F.3d at 1264 ("the 2 or 3 second pause during which a criminal reloads his firearm can be of critical benefit to law enforcement" (quotation marks omitted)).

The Act is thus "relevantly similar" to restrictions on firearms that have existed from the time of the Founding on through the 20th century.  *Bruen*, 142 S. Ct. at 2132-33.

## II.    The Other Preliminary Injunction Factors Overwhelmingly Favor Denial of the Motion to Protect Public Safety During the Pendency of this Case.

While failure to establish likelihood of success on the merits "is itself preclusive of the requested relief," *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 158 (1st Cir. 2021), Plaintiffs' request for preliminary relief should be denied for the additional reason that they have not made a "positive showing of irreparable harm."  *Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 43 (1st Cir. 2010).  Plaintiffs indeed make no factual showing at all: they have not presented any evidence that the Act has, at any time in its 25-year history, impaired their ability to defend themselves or their families.  The existence of such evidence is doubtful.  *Worman*, 922 F.3d at 37 (no evidence of self-defensive use of assault weapons or firing of ten or more shots); *Kolbe*, 849 F.3d at 127 (no evidence of "a single incident in which a Marylander has ... needed to fire more than ten rounds, to protect herself."); *Ocean State*

*Tactical*, 2022 WL 17721175, at *24 ("Rhode Island is not alone with no incidents of self-defense use of LCM-equipped firearms."); *Oregon Firearms*, 2022 WL 17454829, at *10-11.

Nor do Plaintiffs offer any argument beyond the bare assertion that "loss of constitutional freedoms, for even minimal periods of time" alone constitutes irreparable harm.  Mot. at 4 (citing *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)).  A claimed constitutional violation, without more, does not constitute "per se" irreparable harm.  *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (even in the First Amendment context, "every case depends on its own facts"); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009); *Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000).  While certain constitutional violations "are more likely to bring about irreparable harm," *Vaqueria*, 587 F.3d at 484 (identifying free speech, association and privacy), Plaintiffs do not show that Second Amendment claims are among them.  And the particular claim asserted here stands on an even weaker footing, because the Act has been in effect for 25 years and has already withstood a Second Amendment challenge in *Worman*; all that has changed is the legal analysis.  Given that the purpose of a preliminary injunction is to "preserve[] the court's ability to grant final relief," *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021), that purpose is best served here by preserving the status quo while the parties develop a complete factual record to permit application of the analysis prescribed by *Bruen*.

In contrast to the absence of irreparable harm to Plaintiffs, the remaining two factors — potential harm to the Commonwealth and the public interest—overwhelmingly favor denial of the Motion.  As the First Circuit has already recognized, the "decision of the Massachusetts legislature about how best to regulate the possession and use of the proscribed weapons … rests on a web of compelling governmental interests," supported by substantial evidence of "the

inordinate dangers associated with the proscribed weapons." *Worman*, 922 F.3d at 40-41. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).  The dangers that the Legislature seeks to avert—the mass killings of innocents, the gruesome injuries, the murder of police officers—are detailed above and are not repeated here.  "Suffice it to say that in very real terms," the potential harm claimed by Plaintiffs "pales in comparison to the unspeakable devastation caused by mass shooters wildly spraying bullets without end into a crowd of bystanders." *Ocean State Tactical*, 2022 WL 17721175, at *24.  The compelling interest in protecting the public from these weapons of mass murder weighs heavily against granting the Motion.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (ECF # 15) should be denied.

January 31, 2023                          Respectfully submitted,

ANDREA JOY CAMPBELL,
in her official capacity as Attorney General of the
Commonwealth of Massachusetts,

*s/ Julie E. Green*
Julie E. Green, BBO # 645725
Grace Gohlke, BBO # 704218
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2085
(617) 963-2527
(617) 727-5785 (Facsimile)
Julie.Green@mass.gov
Grace.Gohlke@mass.gov

50

## <u>CERTIFICATE OF SERVICE</u>

      I, Grace Gohlke, hereby certify that a true and correct copy of the foregoing document, including all exhibits attached hereto, was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 31, 2023.

                       *s/ Grace Gohlke*_____