UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

NATIONAL ASSOCIATION FOR GUN RIGHTS, and JOSEPH R. CAPEN,

        Plaintiffs,

    v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts,

        Defendant.

</td><td>

Civil Action No. 1:22-cv-11431-FDS

</td></tr>
</table>

## Declaration of Grace Gohlke

I, Grace Gohlke, hereby depose and state:

1.      I am an Assistant Attorney General at the Massachusetts Office of the Attorney General and am a member in good standing of the Massachusetts bar. I represent the Defendant in this matter.

2.      I make this declaration in opposition to the Plaintiffs' Motion for Preliminary Injunction. Unless stated otherwise, I have personal knowledge of the facts set forth herein and am competent to testify thereto.

3.      Attached as exhibits are true and correct copies of the following documents:

| EXHIBIT | EXHIBIT DESCRIPTION |
|---|---|
| 1 | Violence Policy Center, The Militarization of the U.S. Civilian Firearms Market (2011) (excerpt) |
| 2 | H.R. Rep. No. 103–489, Public Safety and Recreational Firearms Use Protection Act (May 2, 1994) |

| | |
|---|---|
| 3 | Pub. L. No. 103–322; 108 Stat. 1796 (1994) (excerpts) |
| 4 | Ellen J. Silberman, *Acting gov urging strong action vs. assault weapons*, BOSTON HERALD (June 18, 1998) |
| 5 | Press Release, *Romney signs off on permanent assault weapons ban* (July 1, 2004) |
| 6 | A. Lambiaso, *Romney Signs Assault Weapons Ban Extension, Changes in Gun Licensing*, STATE HOUSE NEWS SERVICE, (July 1, 2004) |
| 7 | National Rifle Association, THE BASICS OF PERSONAL PROTECTION IN THE HOME (2000) (excerpt) |
| 8 | National Rifle Association, NRA GUIDE TO PERSONAL PROTECTION OUTSIDE THE HOME (2006) (excerpt) |
| 9 | D. Long, The Complete AR-15/M16 Sourcebook (2d ed. 2001) (excerpt) |
| 10 | Department of the Army, *Rifle Marksmanship: M16-/M4-Series Weapons* (August 2008) (excerpts) |
| 11 | Bureau of Alcohol, Tobacco, and Firearms, *Study in the Importability of Certain Shotguns* (2011) |
| 12 | 1782 Mass. Acts 119, ch. 46, *An Act in addition to the several acts already made for the Prudent Storage of Gun Powder Within the Town of Boston* (Mar. 1, 1783) |
| 13 | 1706-7 Mass. Acts ch. 4, reprinted in Acts and Resolves Passed by the General Court 588 (1869) |
| 14 | 1821 Me. Laws 98, chap. 25, § 5, *An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder* |
| 15 | *An Act against wearing Swords, &c.*, Ch. IX (1686), printed in The Grants, Concessions, and Original Constitutions of the Province of New Jersey (1881) |
| 16 | 1879 Tenn. Pub. Acts 81, ch. 90, § 1, *An Act to Preserve the Peace and to Prevent Homicide* |
| 17 | Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) |

| 18 | *Offenses against the Public Peace*, Sec. III, Art. 73-76, William A. Hotchkiss, Codification of the Statute Law of Georgia, 739  (Savannah: J. M. Cooper, 1845) |
|----|------|
| 19 | H. Sher, *What I Saw Treating the Victims From Parkland Should Change the Debate on Guns*, THE ATLANTIC (Feb.22, 2018) ("The bullets fired by an AR-15 are different: They travel at a higher velocity and are far more lethal than routine bullets fired from a handgun.") |
| 20 | J. Henderson, *"There's Nothing to Repair":  Emergency Docs on Injuries from Assault Weapons*, MEDPAGE TODAY (May 31, 2022) |
| 21 | G. Kolata & C.J. Chivers, *Wounds from Military-Style Rifles? 'A Ghastly Thing to See'*, N.Y. TIMES (March 4, 2018) |
| 22 | T. Craig et al., *As the Wounded Kept Coming, Hospitals Dealt with Injuries Rarely Seen in U.S.*, WASH. POST (Oct. 3, 2017) |
| 23 | P. Stefanopoulos et al., *Gunshot Wounds: A Review of Ballistics Related to Penetrating Trauma*, 3 J. ACUTE DISEASE 178 (2014) |
| 24 | P. Rhee et al., *Gunshot Wounds:  A review of Ballistics, Bullets, Weapons and Myths*, 80 J TRAUMA ACUTE CARE SURG 6 (2016) |
| 25 | E. Moore, *Another Mass Shooting: Time to Ban the Assault Rifle*, 84 J TRAUMA ACUTE CARE SURG 6 (2018) |

I declare under penalty of perjury on this 31st day of January, 2023 that the foregoing is true and correct.


/s/ Grace Gohlke_____
Grace Gohlke

# EXHIBIT 1

JUNE 2011


**Violence Policy Center**

# The Militarization of the U.S. Civilian Firearms Market

WWW.VPC.ORG

# TABLE OF CONTENTS

**Key Findings** ................................................................................................................. 1

**"Militarization"—What is It?** ....................................................................................... 2

**Why Has the Gun Industry Militarized Its Market?** ................................................... 7

    Gun Industry Problem: Long-Term Decline ............................................................. 7

    Gun Industry Solution: Generating Demand with New and More Lethal Designs ... 9

    Appealing to the Soldier Within ............................................................................. 11

**How Has the Gun Industry Militarized Its Market?** ................................................. 14

    High-Capacity Handguns ....................................................................................... 14

        Handgun Militarization—High-Capacity Semiautomatic Pistols ....................... 15

        Handgun Militarization—High-Capacity "Anti-Terrorist" Vest-Busting Pistols ... 18

    Assault Rifles and Assault Pistols .......................................................................... 21

        Imports—AK-47 Variants ................................................................................... 23

        Domestic Production—AR-15 Variants of the M-16 ........................................... 25

        The 1994 Assault Weapons "Ban" and the Rise of Bushmaster ........................ 27

        Assault Pistols—UZI, Ingram, Intratec, and More ............................................. 28

    The Assault Weapons Hype Market ....................................................................... 29

        The 1980s Explosion ......................................................................................... 29

        The Y2K Exploitation ......................................................................................... 30

        Continuing Incitement ........................................................................................ 32

        The National Shooting Sports Foundation's Rebranding Campaign .................... 34

    50 Caliber Anti-Armor Sniper Rifles ...................................................................... 36

**Taxpayers Subsidize the Gun Industry** ..................................................................... 38

**The Result: Militarized Firearms Define the U.S. Civilian Firearms Market** ............ 40

**The Consequences of Militarization** ........................................................................ 41

    Increasing Attacks on Law Enforcement with Assault Weapons ............................ 41

    Trafficking of Military-Style Weapons from the United States ................................ 42

**What Can Be Done?** .................................................................................................. 43

**Endnotes** ................................................................................................................... 44

## ASSAULT RIFLES AND ASSAULT PISTOLS

In the mid-1980s, the industry found another niche market—semiautomatic assault weapons.

Semiautomatic assault weapons are civilian versions of automatic military assault rifles (like the AK-47, the M-16, and FN's high-tech P-90) and automatic military assault pistols (like the UZI).[28]

The military weapons "look" the same as the civilian weapons because they are functionally virtually identical. They differ only in one feature: military assault rifles are "machine guns." A machine gun fires continuously as long as its trigger is held back—until it runs out of ammunition. Civilian assault rifles are *semi*-automatic weapons. The trigger of a semiautomatic weapon must be pulled back separately for each round fired.

Because federal law has banned the sale of new machine guns to civilians since 1986,[29] and heavily regulates sales to civilians of pre-1986 machine guns, there is virtually no civilian market for military assault weapons. The gun industry introduced semiautomatic versions of these deadly military assault weapons in order to create and exploit civilian markets.



The next problem arises if you make a semiauto-only model of one of these selective-fire rifles. According to the purists, an assault rifle has to be selective fire. Yet, if you think about it, it's a little hard to accept the idea that firearms with extended magazines, pistol grip stock, etc.. cease to be assault rifles by changing a bit of metal.

In his 1986 book pro-gun author Duncan Long dismissed in the quote above the suggestion that semiautomatic civilian assault rifles were different in any substantial way from their military counterparts. The gun lobby has spent three decades trying to "rebrand" civilian assault rifles as mere sporting guns.

The world's armies developed assault weapons to meet specific combat needs. All assault weapons—military and civilian alike—incorporate specific features that were designed for laying down a high volume of fire over a wide killing zone. This is sometimes known as "hosing down" an area. Civilian assault weapons feature the specific military design features that make spray-firing easy and distinguish assault weapons from traditional sporting firearms.

The most important of these design features are—

■   High-capacity detachable ammunition magazines that hold as many as 75 rounds of ammunition.

■   A rear pistol grip (handle), including so-called "thumbhole stocks" and magazines that function like pistol grips.

■   A forward grip or barrel shroud. Forward grips (located under the barrel or the forward stock) give a shooter greater control over a weapon during firing.

A gun industry observer summed up the design in September 2009:

> From the minute you get your first modern, AR-style rifle, the first thing that you notice is the fact that it truly is one of the most ergonomic long guns you'll ever put to your shoulder. Makes sense, it was designed to take young men, many of whom had never fired a gun of any sort before, and quickly make them capable of running the rifle—effectively—in the most extreme duress, armed combat.[30]





Assault rifles are used for sustained fire action at relatively close range (under 100 meters being the norm). Here Russian troops engage targets with their AK-47/AKM assault rifles.



AK manual, gun magazine, and rifle book illustrate assault rifle "hosing down" technique.

**Imports—AK-47 Variants.** The Soviet Army's premier assault rifle, the AK-47, went into service in 1947. The AK-47 has been made in many variants since then. It is said to be the most widely-distributed rifle in the world.

China was directly responsible for the AK boom in the United States. The country exported few guns to the United States until 1987, when Chinese rifle imports—mostly semiautomatic versions of the AK-47—surged. The flood of Chinese rifles reached 64 percent of all rifles imported into the United States in 1993.[31]

The executive branch has clear, existing authority under the Gun Control Act of 1968 to completely prohibit the import of any "non-sporting" firearm, such as these military-derived weapons.[32] In 1989, the George H.W. Bush administration blocked the importation of foreign-made semiautomatic assault rifles such as the AK variants. After the gun industry devised ways to skate around this ban with minor design changes, the Clinton administration acted again to cut off the flood of so-called "rule beaters."

The George W. Bush administration, however, completely and surreptitiously abrogated the first Bush and Clinton import rules. The Obama administration has done nothing to reinstate the earlier tough rules. Accordingly, Eastern European gun manufacturers have taken the place of the Chinese gun makers. They are supplying millions of AK-47-type weapons to the U.S. civilian market through licensed importers.



*Guns & Ammo* ad for AK-type rifles from China in December 1985 (lower right). Since George W. Bush's administration opened the assault rifle floodgates again, AK-type rifles have poured in from Eastern Europe, as evidenced by this May 20, 2010, ad for J&G Sales from *Shotgun News*, which is typical of fare in the popular publication.

**Domestic Production—AR-15 Variants of the M-16.** After studying over three million casualty reports from World Wars I and II, and data from the Korean War, the U.S. Army concluded, "Marksmanship was not as important as volume." Accordingly, it decided in the 1960s to replace its M-14 battle rifle with the M-16 assault rifle.[33]

The gun industry quickly churned out civilian versions of the M-16, labeling the semiautomatic model the "AR-15" (the same designation as the prototype military assault rifle). "With the number of companies making those particular black rifles today, it's tough to keep up them [sic]," a gun industry insider wrote in 2009.[34]



The gun industry created a vast market for AR-15 civilian versions of the U.S. military's M-16 assault rifle.

Manufacturers have recently introduced assault rifles in 22 caliber, considerably cheaper than the .223 ammunition of the usual AR-15 semiautomatic assault rifle. The lighter weapons also provide an entry model for later transition to higher-caliber rifles. For example, in August 2009 Smith & Wesson began shipments of its M&P15-22 semiautomatic assault rifle. Here is how one gun writer enthused about the new model:

> ...the M&P15-22 might be the first .22 LR AR platform that actually is appropriate for consumers, law enforcement and military use that can be used to teach AR operations and basic marksmanship skills and know there will be no modifications necessary to transition to the myriad of other AR calibers available.[35]



The industry has lately pushed 22 caliber semiautomatic assault rifles.

**The 1994 Assault Weapons "Ban" and the Rise of Bushmaster.** In 1994, Congress passed a ban on the production of certain semiautomatic assault weapons as well as new high-capacity ammunition magazines that held more than 10 rounds. The law banned specific assault weapons by name and also classified as assault weapons semiautomatic firearms that could accept a detachable ammunition magazine and had two additional assault weapon design characteristics.[36]

Because the law listed merely cosmetic features (like bayonet mounts) and did not address the fundamental design of assault weapons, it was ineffective. The gun industry quickly made slight design changes in "post-ban" guns to evade the law, a tactic gunmakers dubbed "sporterization." One of the most aggressive of the manufacturers of "post-ban" ARs was Bushmaster Firearms. A Bushmaster XM15 M4 A3 assault rifle was used by the Washington, D.C.-area snipers to kill 10 and injure three in October 2002. A poster child for the industry's success at evading the ban, the snipers' Bushmaster was marketed as a "Post-Ban Carbine."

The 1994 law expired ("sunset") on September 13, 2004.

 

The Washington, D.C.-area "Beltway Snipers" used the Bushmaster semiautomatic assault rifle being shown at left above. Among Bushmaster's latest AR-type assault rifles is the "Adaptive Combat Rifle" featured on the cover of the NRA's May 2010 *American Rifleman*.

**Assault Pistols—UZI, Ingram, Intratec, and More.** A particularly deadly variant in the gun industry's marketing program has been the sale of civilian assault pistols, which are for the most part simply semiautomatic versions of submachine guns. Firearms expert Duncan Long explained the marketing basis of this trend in his book *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families*:

> As the militaries of the world increasingly rely on assault rifles to fill the submachine gun role, making money on a new submachine gun design becomes harder and harder....Citizens purchasing firearms for everything from plinking to self-defense have provided a lucrative market, especially in the United States. Those weapons produced for the civilian market are generally semiauto versions of the automatic weapons, often modified slightly to conform to U.S. firearms laws.[37]

A more recent development has been the introduction of AK-47 type pistols, which combine all the deadly design characteristics of the military-style assault rifle with the greater concealability of the handgun.



Gun dealers offer AK-47 type semiautomatic assault pistols, like the Draco above, through the Internet.

## THE ASSAULT WEAPONS HYPE MARKET

**The 1980s Explosion.** Assault weapons quickly became hot items on the civilian market in the 1980s for a variety of reasons. For manufacturers, assault weapons helped counter the mid-1980s decline in handgun sales. Criminals—especially drug traffickers—were drawn to assault weapons' massive firepower, useful for fighting police and especially competing traffickers. Survivalists—who envisioned themselves fending off a horde of desperate neighbors from within their bomb shelters—loved the combat features of high ammunition capacity and anti-personnel striking power of assault weapons. Right-wing paramilitary extremists, in their ongoing battle against the "Zionist Occupational Government," made these easily purchased firearms their gun of choice. And for gun enthusiast fans of popular entertainment—*Rambo* and *Miami Vice*—semiautomatic assault weapons offered the look and feel of the "real thing."

 

German manufacturer Heckler & Koch pushed the civilian version of its military assault rifle in a series of ads—like these from *Guns & Ammo* magazine—in the mid-1980s stressing "survivalist" themes.

**The Y2K Exploitation.** The gun industry has ever since poured its efforts into new assault weapons designs and into their heavy marketing. One example of the industry's cynicism was its deliberate exploitation of widespread fears of a "breakdown" in public order at the turn of the millennium ("Y2K").[38]

In the January 1999 issue of *Shooting Sports Retailer*, editor Bob Rogers predicted, "Amidst social turmoil and disintegrating economic underpinnings, you will sell more guns in 1999 than you've ever sold in your life."[39] *Shooting Industry*'s Russ Thurman asked readers, "Are you cashing in on the new millennium?"[40]

The prime danger, the gun industry luridly suggested, was that of rampaging humans: "...since the Have Nots won't hesitate to break in and take from the Haves, plan on close contact. And plan on being outnumbered. High-capacity rifles, pistols and shotguns are obvious choices."[41] But domestic pets could also become a threat to life in the gun industry's bizarre world: "One might also need to quickly stop a dog or dogs who through starvation revert to wild beasts. Dogs take a lot of killing, so a powerful round and good shot placement will be necessary should this distasteful task arise."[42]




Premier gun industry magazine *Shooting Industry* advised dealers in September 1999 (left) that "...taking advantage of the Y2K 'scare' is smart business...." In January 2000 the magazine reported that "...predictions of massive unrest...prompted gunowners to stock-up [sic] on ammunition."

*Gun World*'s Y2K Daisy Chain



*Gun World* magazine not only published its own article in 1999 about how to "survive Y2K"—it also referred its readers to its sister publication *American Survival Guide*, in which appeared another article of survival advice written by *Gun World* editor Jan Libourel.




Typical Y2K gun ads from 1999 are shown above.

**Continuing Incitement.** The gun industry, the NRA, and the gun press have exploited every real and imagined public fear since the 1980s—including the terror attacks of September 2001, Hurricane Katrina, "spillover" of border violence, and concerns about violent "illegal" immigrants. The industry's propaganda added fuel to the militia movement in the 1990s. Lethal confrontations occurred between federal law enforcement and civilians heavily armed with military-style weapons at Waco, Texas, and Ruby Ridge, Idaho. Barack Obama's election, and fears that he would push an anti-gun agenda, ignited growth in the "militia" movement and a disturbing trend of open display of assault weapons near Presidential speaking engagements.[43]



The ad for a Benelli shotgun on the left, from the NRA's 2010 annual meeting brochure, ostensibly speaks to a "revolution" in shotgun design. The ad for the "tactical" shotgun on the right, from the September 2010 *Guns & Ammo* magazine, links "homeland security" to "Iraq, Afghanistan, Your Livingroom."



The NRA pamphlet *Freedom in Peril* warns, "Second Amendment freedom today stands naked...." Laced with ugly stereotypes of the gun lobby's political enemies—a classic technique for dehumanizing "the other"—it suggests "towering waves" of danger from ethnic and racial gangs. "Sometimes," the brochure suggestively states, "any hope of prevailing rests in the hearts and hands of a very urgent few...."



# EXHIBIT 2

103D CONGRESS
2d Session } HOUSE OF REPRESENTATIVES { REPORT
103–489

# PUBLIC SAFETY AND RECREATIONAL FIREARMS USE PROTECTION ACT

---

MAY 2, 1994.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. BROOKS, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## SUPPLEMENTAL AND DISSENTING VIEWS

[To accompany H.R. 4296]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 4296) to make unlawful the transfer or possession of assault weapons, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

SEC. 2. RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMI-AUTOMATIC ASSAULT WEAPONS.

(a) RESTRICTION.—Section 922 of title 18, United States Code, is amended by adding at the end the following:

"(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

"(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) Paragraph (1) shall not apply to—

2

"(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

"(B) any firearm that—

"(i) is manually operated by bolt, pump, lever, or slide action;

"(ii) has been rendered permanently inoperable; or

"(iii) is an antique firearm;

"(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

"(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.

The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.

"(4) Paragraph (1) shall not apply to—

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) DEFINITION OF SEMIAUTOMATIC ASSAULT WEAPON.—Section 921(a) of such title is amended by adding at the end the following:

"(30) The term 'semiautomatic assault weapon' means—

"(A) any of the firearms, or copies or duplicates of the firearms, known as—

"(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

"(ii) Action Arms Israeli Military Industries UZI and Galil;

"(iii) Beretta Ar70 (SC–70);

"(iv) Colt AR–15;

"(v) Fabrique National FN/FAL, FN/LAR, and FNC;

"(vi) SWD M–10, M–11, M–11/9, and M–12;

"(vii) Steyr AUG;

"(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

"(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

"(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a bayonet mount;

"(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

"(v) a grenade launcher;

"(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—

"(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

"(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

"(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

"(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

"(v) a semiautomatic version of an automatic firearm; and

"(D) a semiautomatic shotgun that has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

3

"(iii) a fixed magazine capacity in excess of 5 rounds; and

"(iv) an ability to accept a detachable magazine.".

(c) PENALTIES.—

(1) VIOLATION OF SECTION 922(v).—Section 924(a)(1)(B) of such title is amended by striking "or (q) of section 922" and inserting "(r), or (v) of section 922".

(2) USE OR POSSESSION DURING CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME.—Section 924(c)(1) of such title is amended in the first sentence by inserting ", or semiautomatic assault weapon," after "short-barreled shotgun,".

(d) IDENTIFICATION MARKINGS FOR SEMIAUTOMATIC ASSAULT WEAPONS.—Section 923(i) of such title is amended by adding at the end the following: "The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured.".

## SEC. 3. RECORDKEEPING REQUIREMENTS FOR TRANSFERS OF GRANDFATHERED FIREARMS.

(a) OFFENSE.—Section 922 of title 18, United States Code, as amended by section 2(a) of this Act, is amended by adding at the end the following:

"(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

"(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

"(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.

"(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.

"(5) As used in this subsection, the term 'form 4473' means—

"(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or

"(B) any other form which—

"(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and

"(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).".

(b) PENALTY.—Section 924(a) of such title is amended by adding at the end the following:

"(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.".

## SEC. 4. BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES.

(a) PROHIBITION.—Section 922 of title 18, United States Code, as amended by sections 2 and 3 of this Act, is amended by adding at the end the following:

"(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

"(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) This subsection shall not apply to—

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

4

(b) DEFINITION OF LARGE CAPACITY AMMUNITION FEEDING DEVICE.—Section 921(a) of such title, as amended by section 2(b) of this Act, is amended by adding at the end the following:

"(31) The term 'large capacity ammunition feeding device'—

"(A) means—

"(i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and

"(ii) any combination of parts from which a device described in clause (i) can be assembled; but

"(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.".

(c) LARGE CAPACITY AMMUNITION FEEDING DEVICES TREATED AS FIREARMS.—Section 921(a)(3) of such title is amended in the first sentence by striking "or (D) any destructive device." and inserting "(D) any destructive device; or (E) any large capacity ammunition feeding device.".

(d) PENALTY.—Section 924(a)(1)(B) of such title, as amended by section 2(c) of this Act, is amended by striking "or (v)" and inserting "(v), or (x)".

(e) IDENTIFICATION MARKINGS FOR LARGE CAPACITY AMMUNITION FEEDING DEVICES.—Section 923(i) of such title, as amended by section 2(d) of this Act, is amended by adding at the end the following: "A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.".

**SEC. 5. STUDY BY ATTORNEY GENERAL.**

(a) STUDY.—The Attorney General shall investigate and study the effect of this Act and the amendments made by this Act, and in particular shall determine their impact, if any, on violent and drug trafficking crime. The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment of this Act.

(b) REPORT.—Not later than 30 months after the date of enactment of this Act, the Attorney General shall prepare and submit to the Congress a report setting forth in detail the findings and determinations made in the study under subsection (a).

**SEC. 6. EFFECTIVE DATE.**

This Act and the amendments made by this Act—

(1) shall take effect on the date of the enactment of this Act; and

(2) are repealed effective as of the date that is 10 years after that date.

**SEC. 7. APPENDIX A TO SECTION 922 OF TITLE 18.**

Section 922 of title 18, United States Code, is amended by adding at the end the following appendix:

"APPENDIX A

**Centerfire Rifles—Autoloaders**

Browning BAR Mark II Safari Semi-Auto Rifle
Browning BAR Mark II Safari Magnum Rifle
Browning High-Power Rifle
Heckler & Koch Model 300 Rifle
Iver Johnson M-1 Carbine
Iver Johnson 50th Anniversary M-1 Carbine
Marlin Model 9 Camp Carbine
Marlin Model 45 Carbine
Remington Nylon 66 Auto-Loading Rifle
Remington Model 7400 Auto Rifle
Remington Model 7400 Rifle
Remington Model 7400 Special Purpose Auto Rifle
Ruger Mini-14 Autoloading Rifle (w/o folding stock)
Ruger Mini Thirty Rifle

**Centerfire Rifles—Lever & Slide**

Browning Model 81 BLR Lever-Action Rifle
Browning Model 81 Long Action BLR
Browning Model 1886 Lever-Action Carbine
Browning Model 1886 High Grade Carbine
Cimarron 1860 Henry Replica
Cimarron 1866 Winchester Replicas
Cimarron 1873 Short Rifle
Cimarron 1873 Sporting Rifle
Cimarron 1873 30" Express Rifle
Dixie Engraved 1873 Rifle
E.M.F. 1866 Yellowboy Lever Actions

5

E.M.F. 1860 Henry Rifle
E.M.F. Model 73 Lever-Action Rifle
Marlin Model 336CS Lever-Action Carbine
Marlin Model 30AS Lever-Action Carbine
Marlin Model 444SS Lever-Action Sporter
Marlin Model 1894S Lever-Action Carbine
Marlin Model 1894CS Carbine
Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action
Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rilfe
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

**Centerfire Rifles—Bolt Action**

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle
KDF K15 American Bolt-Action Rifle
Krico Model 600 Bolt-Action Rifle
Krico Model 700 Bolt-Action Rifles
Mauser Model 66 Bolt-Action Rifle
Mauser Model 99 Bolt-Action Rifle
McMillan Signature Classic Sporter
McMillan Signature Super Varminter
McMillan Signature Alaskan
McMillan Signature Titanium Mountain Rifle
McMillan Classic Stainless Sporter
McMillan Talon Safari Rifle
McMillan Talon Sporter Rifle
Midland 1500S Survivor Rifle
Navy Arms TU–33/40 Carbine
Parker-Hale Model 81 Classic Rifle

6

Parker-Hale Model 81 Classic African Rifle
Parker-Hale Model 1000 Rifle
Parker-Hale Model 1100M African Magnum
Parker-Hale Model 1100 Lightweight Rifle
Parker-Hale Model 1200 Super Rifle
Parker-Hale Model 1200 Super Clip Rifle
Parker-Hale Model 1300C Scout Rifle
Parker-Hale Model 2100 Midland Rifle
Parker-Hale Model 2700 Lightweight Rifle
Parker-Hale Model 2800 Midland Rifle
Remington Model Seven Bolt-Action Rifle
Remington Model Seven Youth Rifle
Remington Model Seven Custom KS
Remington Model Seven Custom MS Rifle
Remington 700 ADL Bolt-Action Rifle
Remington 700 BDL Bolt-Action Rifle
Remington 700 BDL Varmint Special
Remington 700 BDL European Bolt-Action Rifle
Remington 700 Varmint Synthetic Rifle
Remington 700 BDL SS Rifle
Remington 700 Stainless Synthetic Rifle
Remington 700 MTRSS Rifle
Remington 700 BDL Left Hand
Remington 700 Camo Synthetic Rifle
Remington 700 Safari
Remington 700 Mountain Rifle
Remington 700 Custom KS Mountain Rifle
Remington 700 Classic Rifle
Ruger M77 Mark II Rifle
Ruger M77 Mark II Magnum Rifle
Ruger M77RL Ultra Light
Ruger M77 Mark II All-Weather Stainless Rifle
Ruger M77 RSI International Carbine
Ruger M77 Mark II Express Rifle
Ruger M77VT Target Rifle
Sako Hunter Rifle
Sako Fiberclass Sporter
Sako Safari Grade Bolt Action
Sako Hunter Left-Hand Rifle
Sako Classic Bolt Action
Sako Hunter LS Rifle
Sako Deluxe Lightweight
Sako Super Deluxe Sporter
Sako Mannlicher-Style Carbine
Sako Varmint Heavy Barrel
Sako TRG–S Bolt-Action Rifle
Sauer 90 Bolt-Action Rifle
Savage 110G Bolt-Action Rifle
Savage 110CY Youth/Ladies Rifle
Savage 110WLE One of One Thousand Limited Edition Rifle
Savage 110GXP3 Bolt-Action Rifle
Savage 110F Bolt-Action Rifle
Savage 110FXP3 Bolt-Action Rifle
Savage 110GV Varmint Rifle
Savage 112FV Varmint Rifle
Savage Model 112FVS Varmint Rifle
Savage Model 112BV Heavy Barrel Varmint Rifle
Savage 116FSS Bolt-Action Rifle
Savage Model 116FSK Kodiak Rifle
Savage 110FP Police Rifle
Steyr-Mannlicher Sporter Models SL, L, M, S, S/T
Steyr-Mannlicher Luxus Model L, M, S
Steyr-Mannlicher Model M Professional Rifle
Tikka Bolt-Action Rifle
Tikka Premium Grade Rifles
Tikka Varmint/Continental Rifle
Tikka Whitetail/Battue Rifle
Ultra Light Arms Model 20 Rifle
Ultra Light Arms Model 28, Model 40 Rifles
Voere VEC 91 Lightning Bolt-Action Rifle
Voere 2165 Bolt-Action Rifle
Voere Model 2155, 2150 Bolt-Action Rifles
Weatherby Mark V Deluxe Bolt-Action Rifle
Weatherby Lasermark V Rifle
Weatherby Mark V Crown Custom Rifles
Weatherby Mark V Sporter Rifle
Weatherby Mark V Safari Grade Custom Rifles
Weatherby Weathermark Rifle
Weatherby Weathermark Alaskan Rifle
Weatherby Classicmark No. 1 Rifle
Weatherby Weatherguard Alaskan Rifle
Weatherby Vanguard VGX Deluxe Rifle
Weatherby Vanguard Classic Rifle
Weatherby Vanguard Classic No. 1 Rifle
Weatherby Vanguard Weatherguard Rifle
Wichita Classic Rifle
Wichita Varmint Rifle
Winchester Model 70 Sporter
Winchester Model 70 Sporter WinTuff
Winchester Model 70 SM Sporter

7

Winchester Model 70 Stainless Rifle
Winchester Model 70 Varmint
Winchester Model 70 Synthetic Heavy Varmint Rifle
Winchester Model 70 DBM Rifle
Winchester Model 70 DBM–S Rifle
Winchester Model 70 Featherweight
Winchester Model 70 Featherweight WinTuff
Winchester Model 70 Featherweight Classic
Winchester Model 70 Lightweight Rifle
Winchester Ranger Rifle
Winchester Model 70 Super Express Magnum
Winchester Model 70 Super Grade
Winchester Model 70 Custom Sharpshooter
Winchester Model 70 Custom Sporting Sharpshooter Rifle

**Centerfire Rifles—Single Shot**

Armsport 1866 Sharps Rifle, Carbine
Brown Model One Single Shot Rifle
Browning Model 1885 Single Shot Rifle
Dakota Single Shot Rifle
Desert Industries G–90 Single Shot Rifle
Harrington & Richardson Ultra Varmint Rifle
Model 1885 High Wall Rifle
Navy Arms Rolling Block Buffalo Rifle
Navy Arms #2 Creedmoor Rifle
Navy Arms Sharps Cavalry Carbine
Navy Arms Sharps Plains Rifle
New England Firearms Handi-Rifle
Red Willow Armory Ballard No. 5 Pacific
Red Willow Armory Ballard No. 1.5 Hunting Rifle
Red Willow Armory Ballard No. 8 Union Hill Rifle
Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable
C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

**Drillings, Combination Guns, Double Rifles**

Baretta Express SSO O/U Double Rifles
Baretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifles
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling
Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

**Rimfire Rifles—Autoloaders**

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle

8

Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle
Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR-7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

**Rimfire Rifles—Lever & Slide Action**

Browning BL-22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM-321 Pump Rifle
Rossi Model 62 SA Pump Rifle
Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

**Rimfire Rifles—Bolt Actions & Single Shots**

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher Rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle
Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM-452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60-J-ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Espronceda IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT-22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU-KKW Training Rifle
Navy Arms TU-33/40 Carbine
Navy Arms TU-KKW Sniper Trainer
Norinco JW-27 Bolt-Action Rifle
Norinco JW-15 Bolt-Action Rifle
Remington 541-T
Remington 40-XR Rimfire Custom sporter
Remington 541-T HB Bolt-Action Rifle
Remington 581-S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light Arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

**Competition Rifles—Centerfire & Rimfire**

Anschutz 64-MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Intermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle

9

Anschutz 1910 Super Match II
Anschutz 54.18MS Silhouette Rifle
Anschutz Super Match 54 Target Model 2013
Anschutz Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP-1 ISU Standard Rifle
E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86–SR Specialty Rifle
McMillan M–86 Sniper Rifle
McMillan Combo M–87/M–88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M–89 Sniper Rifle
McMillan National Match Rifle
McMillan Long Range Rifle
Parker-Hale M–87 Target Rifle
Parker-Hale M–85 Sniper Rifle
Remington 40–XB Rangemaster Target Centerfire
Remington 40–XR KS Rimfire Position Rifle
Remington 40–XBBR KS
Remington 40–XC KS National Match Course Rifle
Sako TRG–21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG–UIT Rifle
Steyr-Mannlicher SSG P–I Rifle
Steyr-Mannlicher SSG P–III Rifle
Steyr-Mannlicher SSG P–IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

**Shotguns—Autoloaders**

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A–303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun
Browning Bea 10 Stalker Auto Shotgun
Browning A–500R Auto Shotgun
Browning A–500G Auto Shotgun
Browning A–500G Sporting Clays
Browning Auto-5 Light 12 and 20
Browning Auto-5 Stalker
Browning Auto-5 Magnum 20
Browning Auto-5 Magnum 12
Churchill Turkey Automatic Shotgun
Cosmi Automatic Shotgun
Maverick Model 60 Auto Shotgun
Mossberg Model 5500 Shotgun
Mossberg Model 9200 Regal Semi-Auto Shotgun
Mossberg Model 9200 USST Auto Shotgun
Mossberg Model 9200 Camo Shotgun
Mossberg Model 6000 Auto Shotgun
Remington Model 1100 Shotgun
Remington 11–87 Premier shotgun
Remington 11–87 Sporting Clays
Remington 11–87 Premier Skeet
Remington 11–87 Premier Trap
Remington 11–87 Special Purpose Magnum
Remington 11–87 SPS–T Camo Auto Shotgun
Remington 11–87 Special Purpose Deer Gun
Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun
Remington 11–87 SPS-Deer Shotgun
Remington 11–87 Special Purpose Synthetic Camo
Remington SP–10 Magnum-Camo Auto Shotgun
Remington SP–10 Magnum Auto Shotgun
Remington SP–10 Magnum Turkey Combo
Remington 1100 LT–20 Auto
Remington 1100 Special Field
Remington 1100 20-Gauge Deer Gun

**10**

Remington 1100 LT-20 Tournament Skeet
Winchester Model 1400 Semi-Auto Shotgun

## Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS Pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586-VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun
Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS-BG-Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun
Remington 879 SPS Special Purpose Magnum
Remington 870 SPS-T Camo Pump Shotgun
Remington 870 Special Field
Remington 870 Express Turkey
Remington 870 High Grades
Remington 870 Express
Remington Model 870 Express Youth Gun
Winchester Model 12 Pump Shotgun
Winchester Model 42 High Grade Shotgun
Winchester Model 1300 Walnut Pump
Winchester Model 1300 Slug Hunter Deer Gun
Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun
Winchester Model 1300 Turkey Gun
Winchester Model 1300 Ranger Pump Gun

## Shotguns—Over/Unders

American Arms/Franchi Falconet 2000 O/U
American Arms Silver I O/U
American Arms Silver II Shotgun
American Arms Silver Skeet O/U
American Arms/Franchi Sporting 2000 O/U
American Arms Silver Sporting O/U
American Arms Silver Trap O/U
American Arms WS/OU 12, TS/OU 12 Shotguns
American Arms WT/OU 10 Shotgun
Armsport 2700 O/U Goose Gun
Armsport 2700 Series O/U
Armsport 2900 Tri-Barrel Shotgun
Baby Bretton Over/Under Shotgun
Beretta Model 686 Ultralight O/U
Beretta ASE 90 Competition O/U Shotgun
Beretta Over/Under Field Shotguns
Beretta Onyx Hunter Sport O/U Shotgun
Beretta Model SO5, SO6, SO9 Shotguns
Beretta Sporting Clay Shotguns
Beretta 687EL Sporting O/U
Beretta 682 Super Sporting O/U
Beretta Series 682 Competition Over/Unders
Browning Citori O/U Shotgun
Browning Superlight Citori Over/Under
Browning Lightning Sporting Clays
Browning Micro Citori Lightning
Browning Citori Plus Trap Combo
Browning Citori Plus Trap Gun
Browning Citori O/U Skeet Models
Browning Citori O/U Trap Models
Browning Special Sporting Clays
Browning Citori GTI Sporting Clays
Browning 325 Sporting Clays
Centurion Over/Under Shotgun
Chapuis Over/Under Shotgun
Connecticut Valley Classics Classic Sporter O/U
Connecticut Valley Classics Classic Field Waterfowler
Charles Daly Field Grade O/U

11

Charles Daly Lux Over/Under
E.A.A./Sabatti Sporting Clays Pro-Gold O/U
E.A.A./Sabatti Falcon-Mon Over/Under
Kassnar Grade I O/U Shotgun
Krieghoff K–80 Sporting Clays O/U
Krieghoff K–80 Skeet Shotgun
Krieghoff K–80 International Skeet
Krieghoff K–80 Four-Barrel Skeet Set
Krieghoff K–80/RT Shotguns
Krieghoff K–80 O/U Trap Shotgun
Laurona Silhouette 300 Sporting Clays
Laurona Silhouette 300 Trap
Laurona Super Model Over/Unders
Ljutic LM–6 Deluxe O/U Shotgun
Marocchi Conquista Over/Under Shotgun
Marocchi Avanza O/U Shotgun
Merkel Model 200E O/U Shotgun
Merkel Model 200E Skeet, Trap Over/Unders
Merkel Model 203E, 303E Over/Under Shotguns
Perazzi Mirage Special Sporting O/U
Perazzi Mirage Special Four-Gauge Skeet
Perazzi Sporting Classic O/U
Perazzi MX7 Over/Under Shotguns
Perazzi Mirage Special Skeet Over/Under
Perazzi MX8/MX8 Special Trap, Skeet
Perazzi MX8/20 Over/Under Shotgun
Perazzi MX9 Single Over/Under Shotguns
Perazzi MX12 Hunting Over/Under
Perazzi MX28, MX410 Game O/U Shotguns
Perazzi MD20 Hunting Over/Under
Piotti Boss Over/Under Shotgun
Remington Peerless Over/Under Shotgun
Ruger Red Label O/U Shotgun
Ruger Sporting Clays O/U Shotgun
San Marco 12-Ga. Wildflower Shotgun
San Marco Field Special O/U Shotgun
San Marco 10-Ga. O/U Shotgun
SKB Model 505 Deluxe Over/Under Shotgun
SKB Model 685 Over/Under Shotgun
SKB Model 885 Over/Under Trap, Skeet, Sporting Clays
Stoeger/IGA Condor I O/U Shotgun
Stoeger/IGA ERA 2000 Over/Under Shotgun
Techni-Mec Model 610 Over/Under
Tikka Model 412S Field Grade Over/Under
Weatherby Athena Grade IV O/U Shotguns
Weatherby Athena Grade V Classic Field O/U
Weatherby Orion O/U Shotguns
Weatherby II, III Classic Field O/Us
Weatherby Orion II Classic Sporting Clays O/U
Weatherby Orion II Sporting Clays O/U
Winchester Model 1001 O/U Shotgun
Winchester Model 1001 Sporting Clays O/U
Pietro Zanoletti Model 2000 Field O/U

### Shotguns—Side by Sides

American Arms Brittany Shotgun
American Arms Gentry Double Shotgun
American Arms Derby Side-by-Side
American Arms Grulla #2 Double Shotgun
American Arms WS/SS 10
American Arms TS/SS 10 Double Shotgun
American Arms TS/SS 12 Side-by-Side
Arrieta Sidelock Double Shotguns
Armsport 1050 Series Double Shotguns
Ariaaga Model 31 Double Shotgun
AYA Boxlock Shotguns
AYA Sidelock Double Shotguns
Beretta Model 452 Sidelock Shotgun
Beretta Side-by-Side Field Shotguns
Crucelegui Hermanos Model 150 Double
Chapuis Side-by-Side Shotgun
E.A.A./Sabatti Saba-Mon Double Shotgun
Charles Daly Model Dss Double
Ferlib Model F VII Double Shotgun
Auguste Francotte Boxlock Shotgun
Auguste Francotte Sidelock Shotgun
Garbi Model 100 Double
Garbi Model 101 Side-by-Side
Garbi Model 103A, B Side-by-Side
Garbi Model 200 Side-by-Side
Bill Hanus Birdgun Doubles
Hatfield Uplander Shotgun
Merkel Model 8, 47E Side-by-Side Shotguns
Merkel Model 47LSC Sporting Clays Double
Merkel Model 47S, 147S Side-by-Sides
Parker Reproductions Side-by-Side
Piotti King No. 1 Side-by-Side
Piotti Lunik Side-by-Side
Piotti King Extra Side-by-Side
Piotti Piuma Side-by-Side

12

Precision Sports Model 600 Series Doubles
Rizzini Boxlock Side-by-Side
Rizzini Sidelock Side-by-Side
Stoeger/IGA Uplander Side-by-Side Shotgun
Ugarteches 10-Ga. Magnum Shotgun

**Shotguns—Bolt Actions & Single Shots**

Armsport Single Barrel Shotgun
Browning BT–99 Competition Trap Special
Browning BT–99 Plus Trap Gun
Browning BT–99 Plus Micro
Browning Recoilless Trap Shotgun
Browning Micro Recoilless Trap Shotgun
Desert Industries Big Twenty Shotgun
Harrington & Richardson Topper Model 098
Harrington & Richardson Topper Classic Youth Shotgun
Harrington & Richardson N.W.T.F. Turkey Mag
Harrington & Richardson Topper Deluxe Model 098
Krieghoff KS–5 Trap Gun
Krieghoff KS–5 Special
Krieghoff K–80 Single Barrel Trap Gun
Ljutic Mono Gun Single Barrel
Ljutic LTX Super Deluxe Mono Gun
Ljutic Recoilless Space Gun Shotgun
Marlin Model 55 Goose Gun Bolt Action
New England Firearms Turkey and Goose Gun
New England Firearms N.W.T.F. Shotgun
New England Firearms Tracker Slug Gun
New England Firearms Standard Pardner
New England Firearms Survival Gun
Perazzi TM1 Special Single Trap
Remington 90–T Super Single Shotgun
Snake Charmer II Shotgun
Stoeger/IGA Reuna Single Barrel Shotgun
Thompson/Center TCR '87 Hunter Shotgun.".

## SUMMARY AND PURPOSE

The purpose of this bill is to create criminal penalties for the manufacture, transfer, or possession of certain firearms within the category of firearms known as "semiautomatic assault weapons." It also creates such penalties for certain ammunition feeding devices, as well as any combination of parts from which such a device can be assembled.

In reporting legislation banning certain assault weapons last Congress, the Committee on the Judiciary said:

> The threat posed by criminals and mentally deranged individuals armed with semi-automatic assault weapons has been tragically widespread.[1]

Since then, the use of semiautomatic assault weapons by criminal gangs, drug-traffickers, and mentally deranged persons continues to grow.[2]

H.R. 4296 will restrict the availability of such weapons in the future. The bill protects the rights of persons who lawfully own such weapons on its date of enactment by a universal "grandfathering" clause and specifically exempts certain firearms traditionally used for hunting and other legitimate support. It contains no confiscation or registration provisions; however, it does establish record-keeping requirements for transfers involving grandfathered semiautomatic assault weapons. Such record-keeping is not required for transfers of grandfathered ammunition feeding devices

---

[1] "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102–242, October 7, 1991, at 202.
[2] See, e.g., Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 Firearms; Chief Sylvester Daughtry, President, International Association of Chiefs of Police; Mr. John Pitta, National Executive Director, Federal Law Enforcement Officers Association).

13

(or their component parts.) H.R. 4296 expires ("sunsets") on its own terms after 10 years.

BACKGROUND

A series of hearings over the last five years on the subject of semiautomatic assault weapons has demonstrated that they are a growing menace to our society of proportion to their numbers:[3] As this Committee said in its report to the last Congress:

> The carnage inflicted on the American people be criminals and mentally deranged people armed with Rambo-style, semi-automatic assault weapons has been overwhelming and continuing. Police and law enforcement groups all over the nation have joined together to support legislation that would help keep these weapons out of the hands of criminals.[4]

Since then, evidence continues to mount that these semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder.

Use in Crimes. On April 25, 1994, the Director of the Federal Bureau of Alcohol, Tobacco and Firearms testified that the percentage of semiautomatic assault weapons among guns traced because of their use in crime is increasing:

> In 1990, 5.9 percent of firearms traced were assault weapons. In 1993, that percentage rose to 8.1 percent. Since Justice Department studies have shown that assault weapons make up only about 1 percent of the firearms in circulation, these percentages strongly suggest that they are proportionately more often used in crimes.[5]

Law enforcement officials confirm this statistical evidence in accounts of the rising level of lethality they face from assault weapons on the street. For example, the representative of a national police officers' organization testified:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and

---

[3] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994; Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991; Hearing on Semiautomatic Assault Weapons, Part II, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, July 25, 1991; Hearing on H.R. 1190, Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5 and 6, 1989.

[4] "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102–242, October 7, 1991, at 203.

[5] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. John Magaw, Director, Bureau of Alcohol, Tobacco and Firearms).

14

preservation. The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon.[6]

A representative of federal law enforcement officers testified that semiautomatic assault weapons "dramatically escalate the firepower or the user" and "have become the weapon of choice for drug runners, hate groups and the mentally unstable."[7]

The TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals. Cities across the country confiscate more TEC–9s than any other assault pistol. The prototype for the TEC–9 was originally designed as a submachine gun for the South African government. Now it comes standard with an ammunition magazine holding 36 rounds of 9 mm cartridges. It also has a threaded barrel to accept a silencer, and a barrel shroud to cool the barrel during rapid fire. To any real sportsman or collector, this firearm is a piece of junk, yet is very popular among criminals.[8]

The Secretary of Housing and Urban Development testified that criminal gangs in Chicago routinely use semiautomatic assault weapons to intimidate not only residents but also security guards, forcing the latter to remove metal detectors installed to detect weapons.[9]

Use in Mass Killings and Killings of Law Enforcement Officers. Public concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered.

On April 25, 1994, the Subcommittee on Crime and Criminal Justice heard testimony about several incidents representative of such killings.

On February 22, 1994, Los Angeles (CA) Police Department rookie officer Christy Lynn Hamilton was ambushed and killed by a

---

[6] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Tony Loizzo, executive vice president, National Association of Police Organizations). See also, Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal Order of Police) (assault weapons "pose a grave and immediate threat to the lives of those sworn to uphold our laws"); Hearing on H.R. 1190, Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5, 1989 (Testimony of Daniel M. Hartnett, associate director, law enforcement, Bureau of Alcohol, Tobacco and Firearms) ("Fifteen years ago, police rarely encountered armed drug dealers. Today, firearms, especially certain types of semiautomatic weapons, are status symbols and tools of the trade for this country's most vicious criminals.")

[7] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[8] Hearing on H.R. 4296 and H.R. 3527, Public Safety and recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[9] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. Henry Cisneros, Secretary, Department of Housing and Urban Development).

15

drug-abusing teenager using a Colt AR–15. The round that killed Officer Hamilton penetrated a car door, skirted the armhole of her protective vest, and lodged in her chest. The teenager also killed his father, who had given him the gun, and took his own life as well. Officer Hamilton had been voted the most inspirational officer in her graduating class only weeks before her murder. Officer Hamilton's surviving brother testified about the impact of this murder.[10]

On December 7, 1993, a deranged gunman walked through a Long Island Railroad commuter train, shooting commuters. Six died and 19 were wounded. The gunman used a Ruger semiautomatic postol. Although the pistol itself would not be classified as an assault weapon under this bill, its 15 round ammunition magazine ("clip") would be banned. The gunman had several of these high capacity 15 round magazines and reloaded several times, firing between 30 to 50 rounds before he was overpowered while trying to reload yet again. The parents of one of the murdered victims, Amy Locicero Federici, testified about the impact of this murder.[11]

On February 28, 1993, 4 special agents of the Bureau of Alcohol, Tobacco and Firearms were killed and 15 were wounded while trying to serve federal search and arrest warrants at the Branch Davidian compound in Waco, Texas. The Branch Davidian arsenal included hundreds of assault weapons, including AR–15s, AK–47s, Street Sweepers, MAC10s and MAC–11s, along with extremely high capacity magazines (up to 260 rounds).[12]

Finally, on July 1, 1993, gunman Gian Luigi Ferri Killed 8 people and wounded 6 others in a San Francisco high rise office building. Ferri—who took his own life—used two TEC DC9 assault pistols with 50 round magazines, purchased from a gun dealer in Las Vegas, Nevada. Two witnesses, both of whom lost spouses in the slaughter, and one of whom was herself seriously injured, testified about this incident.[13]

Numerous other notorious incidents involving semiautomatic assault weapons have occurred. They include the January 25, 1993, slaying of 2 CIA employees and wounding of 3 others at McLean, VA, (AK–47), and the January 17, 1989 murder in a Stockton, CA, schoolyard of 5 small children, and wounding of 29 others (AK–47 and 75 round magazine, firing 106 rounds in less than 2 minutes).

Several witnesses who were victims themselves during such incidents testified in opposition to H.R. 4296/H.R. 3527, and in opposition to the banning of any semiautomatic assault weapons or ammunition feeding devices.

Dr. Suzanna Gratia witnessed the brutal murder, in Luby's cafeteria located in Killeen, Texas, of both of her parents who had just

[10] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ken Brondell, Jr.).

[11] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Jacob Locicero and Arlene Locicero).

[12] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[13] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Michelle Scully and Steve Sposato).

16

celebrated their 47 weeding anniversary. Just a few days before, she had removed her gun from her purse and left it in her car to comply with a Texas law which does not allow concealed carrying of a firearm. Dr. Gratia testified:

> I am mad at my legislators for legislating me out of a right to protect myself and my family. I would much rather be sitting in jail with a felony offense on my head and have my parents alive. As far as these so-called assault weapons, you say that they don't have any defense use. You tell that to the guy that I saw on a videotape of the Los Angeles riots standing on his rooftop protecting his property and his life from an entire mob with one of these so-called assault weapons. Tell me that he didn't have a legitimate self-defense use.[14]

Ms. Jacquie Miller was shot several times with a semiautomatic assault weapon and left for dead at her place of employment with the Standard Gravure Printing Company in Louisville, Kentucky, when a fellow employee went on a killing spree. Now permanently disabled, Ms. Miller testified:

> It completely enrages me that my tragedy is being used against me to deny me and all the law abiding citizens of this country to the right of the firearm of our choosing. I refuse in return to use my tragedy for retribution against innocent people just to make myself feel better for having this misfortune. Enforce the laws against criminals already on the books. After all, there are already over 20,000 of them.[15] More won't do a thing for crime control * * * You cannot ban everything in the world that could be used as a weapon because you fear it, don't understand it, or don't agree with it.
>
> This is America, not Lithuania or China. Our most cherished possession is our Constitution and Bill of Rights. Let's not sell those down the river or we could one day find ourselves in a boat without a paddle against the criminals who think we are easy pickings.[16]

Mr. Phillip Murphy used his lawfully-possessed Colt AR–15 H-BAR Sporter semiautomatic rifle—a gun which would be specifically banned by H.R. 4296—to capture one of Tucson, Arizona's most wanted criminals who was attempting to burglarize the home of Mr. Murphy's parents. The 19-year old criminal he captured was

---

[14] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on crime and Criminal Justice, April 25, 1994 (State of Dr. Suzanna Gratia, Copperas Cove, Texas)

[15] The Committee notes that, under the Gun Control Act of 1968 as amended in 1986, it is a Federal felony for a convicted felon to be in possession of any firearm, including an assault weapon, under 18 U.S.C. 922(g)(1). Violations carry up to five years imprisonment and a $250,000 fine. If a criminal—whether previously convicted or not—is carrying an assault weapon and is involved in a drug trafficking crime, that criminal is subject to a mandatory minimum of 5 years imprisonment and a $250,000 fine under 18 U.S.C. 924(c)(1). Any criminal who has three prior violent felony and/or serious drug offenses convictions and is in possession of a firearm is subject to a mandatory minimum of 15 years imprisonment and a $250,000 fine under 18 U.S.C. 924(e)(1).

[16] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ms. Jacquie Miller, Louisville, Kentucky).

17

a three-time loser with 34 prior convictions who was violating his third adult State parole for a knife assault. Mr. Murphy testified:

> I respectfully urge this Committee and the Congress of the United States to restrain themselves from forcing tens of millions of law-abiding Americans like me to choose between the law and their lives.[17]

The Characteristics of Military-Style Semiautomatic Assault Weapons. The question of what constitutes an assault weapon has been studied by the Congress and the executive branch as the role of these guns in criminal violence has grown.

A Bureau of Alcohol, Tobacco and Firearms working group formed under the Bush administration to consider banning foreign imports of such semiautomatic assault weapons conducted the most recent comprehensive study of military assault weapons and the civilian firearms that are modelled after them.[18] The working group formulated a definition of the civilian version, and a list of the assault weapon characteristics that distinguish them from sporting guns. That technical work has to a large extent been incorporated into H.R. 4296.[19]

The working group settled on the term "semiautomatic assault" for the civilian firearms at issue. That term distinguishes the civilian firearms from the fully automatic military weapons (machineguns)[20] after which they are modelled and often simply adapted by eliminating the automatic fire feature. The group determined that "semiautomatic assault rifles * * * represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle."[21]

The group elaborated on the nature of those characteristics as follows:

> The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK–47, is a weapon designed for killing or disabling the enemy and * * * has characteristics designed to accomplish this purpose.
>
> We found that the modern military assault rifle contains a variety of physical features and characteristics designed

---

[17] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Mr. Phillip Murphy, Tucson, Arizona).

[18] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989.

[19] The ultimate question of law upon which the working group was advising the Secretary of the Treasury was whether these import firearms met a "sporting purpose" test under 18 U.S.C. Code section 925(d). He held that they did not. Although that legal question is not directly posed by this bill, the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features.

[20] An automatic gun fires a continuous stream as long as the trigger is held down, until it has fired all of the cartridges ("rounds" or "bullets") in its magazine (or "clip"). Automatic firearms are also known as machineguns. A semi-automatic gun fires one round, then loads a new round, each time the trigger is pulled until its magazine is exhausted. Manually operated guns require the shooter to manually operate a bolt, slide, pump, or lever action to extract the fired round and load a new round before pulling the trigger.

[21] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

for military applications which distinguishes it from tradi-
tional sporting rifles. These military features and charac-
teristics (other than selective fire) are carried over to the
semiautomatic versions of the original military rifle.[22]

The "selective fire" feature to which the working group referred
is the ability of the military versions to switch from fully automatic
to semiautomatic fire at the option of the user. Since Congress has
already banned certain civilian transfer or possession of machine-
guns,[23] the civilian models of these guns are produced with semi-
automatic fire capability only. However, testimony was received by
the Subcommittee on Crime and Criminal Justice that it is a rel-
atively simple task to convert[24] a semiautomatic weapon to auto-
matic fire[25] and that semiautomatic weapons can be fired at rates
of 300 to 500 rounds per minute, making them virtually indistin-
guishable in practical effect from machineguns.[26]

The 1989 Report's analysis of assault characteristics which dis-
tinguish such firearms from sporting guns was further explained
by an AFT representative at a 1991 hearing before the Subcommit-
tee on Crime and Criminal Justice:

> We found that the banned rifles represented a distinc-
> tive type of rifle characterized by certain military features
> which differentiated them from the traditional sporting ri-
> fles. These include the ability to accept large capacity de-
> tachable magazines, bayonets, folding or telescoping
> stocks, pistol grips, flash suppressors, bipods, grenade
> launchers and night sights, and the fact that they are
> semiautomatic versions of military machineguns.[27]

Proponents of these military style semiautomatic assault weap-
ons often dismiss these combat-designed features as merely "cos-
metic." The Subcommittee received testimony that, even if these
characteristics were merely "cosmetic" in effect, it is precisely those
cosmetics that contribute to their usefulness as tools of intimida-
tion by criminals.[28]

However, the expert evidence is that the features that character-
ize a semiautomatic weapon as an assault weapon are not merely
cosmetic, but do serve specific, combat-functional ends. By facilitat-

---

[22] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and
Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Ri-
fles," July, 1989, p. 6.

[23] 18 U.S. Code, section 922(o).

[24] The Committee notes that such conversion is a Federal felony that carries penalties of up
to 10 years imprisonment and a $250,000 fine under 26 U.S.C. 5861.

[25] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the
Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey
R. Stokes, National President, Fraternal order of Police).

[26] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the
Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey
R. Stokes, National President, Fraternal order of police).

[27] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the
Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard
Cook, Chief, Firearms Divisions, Bureau of Alcohol, Tobacco and Firearms) at 268.

[28] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms, Use Protec-
tion Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and
Criminal Justice, April 25, 1994 (Statements of Hon. Henry Cisneros, Secretary, Department of
Housing and Urban Development and John Pitta, National Executive Vice President, Federal
Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of
Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice,
June 12, 1991 (Statement of Paul J. McNulty, Principal Deputy Director. Office of Policy devel-
opment, Department of Justice) at 288.

19

ing the deadly "spray fire" of the weapon or enhancing its portability—a useful attribute in combat but one which serves to enhance the ability to conceal the gun in civilian life.[29]

High-capability magazine, for example, make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent.[30] Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds. Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds. Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. As noted above, tests demonstrate that semiautomatic guns can be fired at very high rates of fire. In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities—from 3 to 5.

Because of the greater enhanced lethality—numbers of rounds that can be fired quickly without reloading—H.R. 4296 also contains a ban on ammunition magazines which hold more than 10 rounds, as well as any combination of parts from which such a magazine can be assembled.

Barrel shrouds also serve a combat-functional purpose.[31] Gun barrels become very hot when multiple rounds are fired through them quickly. The barrel shroud cools the barrel so that it will not overheat, and provides the shooter with a convenient grip especially suitable for spray-firing.

Similar military combat purposes are served by flash suppressors (designed to help conceal the point of fire in night combat), bayonet mounts, grenade launchers, and pistol grips engrafted on long guns.[32]

The net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond

[29] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard Cook, Chief, Firearms Division, Bureau of Alcohol, Tobacco and Firearms); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[30] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[31] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[32] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

20

that of other firearms in general, including other semiautomatic guns.[33]

## BRIEF EXPLANATION OF H.R. 4296

H.R. 4296 combines two approaches which have been followed in the past in legislation proposed to control semiautomatic assault weapons—the so-called "list" approach and the "characteristics" approach.

The bill does not ban any semiautomatic assault weapons nor large capacity ammunition feeding device (or component parts) otherwise lawfully possessed on the date of enactment. However, records must be kept by both the transferor and the transferee involved in any transfer of these weapons, but not of the feeding devices (or combination of parts).

The bill explicitly exempts all guns with other than semiautomatic actions—i.e., bolt, slide, pump, and lever actions. In addition, it specifically exempts by make and model 661 long guns most commonly used in hunting and recreational sports,[34] making clear that these semiautomatic assault weapons are not and cannot be subject to any ban.

Section 2(z) of the bill lists 19 specific semiautomatic assault weapons—such as the AK–47, M–10, TEC–9, Uzi, etc.—that are banned.[35] It also defines other assault weapons by specifically enumerating combat style characteristics and bans those semiautomatic assault weapons that have 2 or more of those characteristics.[36]

The bill makes clear that the list of exempted guns is not exclusive. The fact that a gun is not on the exempted list may not be construed to mean that it is banned. Thus, a gun that is not on the list of guns specifically banned by name would only be banned if it met the specific characteristics set out in the characteristics test. No gun may be removed from the exempted list.

H.R. 4296 also bans large capacity ammunition feeding devices—clips that accept more than 10 rounds of ammunition—as well as

---

[33] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement and testimony of Dr. David Milzman, Associate Director, Trauma Services, Georgetown University Medical Center, Washington, DC); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[34] See H.R. 4296, Appendix A, for the list.

[35] H.R. 4296 bans the following semiautomatic assault weapons by name (as well as any copies or duplicates, in any caliber): All AK–47 type; Beretta AR–70; Colt AR–15; DC9, 22; FNC; FN-FAL/LAR; Galil; MAC 10, MAC 11–type; Steyr AUG; Street Sweeper, Striker 12; TEC–9; Uzi.

[36] While noting that its list is not all-inclusive, the Bureau of Alcohol, Tobacco, and Firearms has listed the following semi-automatic firearms that would be banned based on their general characteristics:

1. Semi-automatic Rifles: AA Arms AR9 semi-automatic rifle; AMT Lightning 25 rifle; Auto Ordnance Thompson Model 1927 carbines (finned barrel versions); Calico M100 carbine; Colt Sporter Rifle (all variations); Federal XC900 carbine; Federal XC450 carbine; Grendel R31 carbine; Iver Johnson M1 carbine (version w/collapsible stock and bayonet mount); Springfield M1A rifle.

2. Pistols: AA Arms AP9 pistol; Australian Automatic Arms pistol; Auto Ordnance Model 1927A5 pistol; American Arms Spectra pistol; Calico Model M950 pistol; Calico Model 110 pistol; All Claridge Hi-Tec pistol; D Max auto pistol; Grendel P–31 pistol; Heckler & Koch SP89 pistol; Wilkinson Linda pistol.

3. Shotguns: Benelli M1 Super 90 Defense shotgun; Benelli M3 Super 90 shotgun; Franchi LAW 12 shotgun; Franchi SPAS 12 shotgun; USAS 12 shotgun.

21

any combination of parts from which such a device can be assembled.

The bill exempts all semiautomatic assault weapons and large capacity ammunition feeding devices (as well as any combination of parts) that are lawfully possessed on date of enactment. Owners of such semiautomatic assault weapons need do nothing under the bill unless they wish to transfer the semiautomatic assault weapon.

H.R. 4296 differs significantly from previously-proposed legislation—it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns. Most significantly, the ban in the 1991 proposed bill gave the Bureau of Alcohol, Tobacco, and Firearms authority to ban any weapon which "embodies the same configuration" as the named list of guns. The current bill, H.R. 4296 does not contain any such general authority. Instead, it contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons.

## 102D CONGRESS

The Subcommittee on Crime and Criminal Justice held hearings on semiautomatic assault weapons on June 12 and July 25, 1991. A ban on certain semiautomatic assault weapons was included as Subtitle A of Title XX in H.R. 3371, the Omnibus Crime Control Act of 1991. A ban on large capacity ammunition feeding devices was included in the same bill. The bill was reported out of the Judiciary Committee on October 7, 1991. The provisions dealing with semiautomatic assault weapons and large capacity ammunition feeding devices were struck by the House of Representatives by a vote of 247–177 on October 17, 1991.

## 103D CONGRESS

The Subcommittee on Crime and Criminal Justice held hearings on H.R. 4296 and its predecessor, H.R. 3527, which ban semiautomatic assault weapons, on April 25, 1994. The Subcommittee reported favorably on an amendment in the nature of a substitute to H.R. 4296 on April 26, 1994, by a recorded vote of 8–5.

## COMMITTEE ACTION

The Committee on the Judiciary met on April 28, 1994 to consider H.R. 4296, as amended. Two amendments were adopted during the Committee's consideration.

An amendment was offered to provide that the absence of a firearm from the list of guns specifically exempted from the ban may not be construed as evidence that the semiautomatic assault weapon is banned, and that no gun may be removed from the exempt list so long as the Act is in effect. This amendment was adopted by voice vote.

An amendment was offered to delete a provision that barred from owning any firearms those persons convicted of violating the recordkeeping requirements relating to grandfathered weapons. This amendment was adopted by voice vote.

22

A reporting quorum being present, the Committee on the Judiciary, by a roll call vote of 20 to 15, ordered H.R. 4296, as amended, favorably reported to the House.

SECTION-BY-SECTION ANALYSIS

SECTION 1—SHORT TITLE

This section provides that the Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

SECTION 2—RESTRICTION ON MANUFACTURE, TRANSFER, AND
POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS

Subsection 2(a) makes it unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon (including any "copies or duplicates.")

The ban on transfer and possession does not apply to (1) weapons otherwise lawfully possessed on the date of enactment; (2) any of the firearms (or their replicas or duplicates) listed in Appendix A; (3) any manually operated (bolt, pump, slide, lever action), permanently inoperable, or antique firearms; (4) semiautomatic rifles that cannot accept a detachable magazine that holds more than 5 rounds; or, a semiautomatic shotgun that cannot hold more than 5 rounds in a fixed or detachable magazine.

The fact that a gun is not listed in Appendix A may not be construed to mean that it is banned. No gun listed in Appendix A may be removed from that exempted list so long as the Act is in effect.

Federal departments and agencies and those of States and their subdivisions are exempted. Law enforcement officers authorized to purchase firearms for official use are exempted, as are such officers presented with covered weapons upon retirement who are not otherwise prohibited from receiving such a weapon. Finally, weapons made, transferred, possessed, or imported for the purposes of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 2(b) defines semiautomatic assault weapons, both by name and by characteristics. It lists by name specific firearms, including "copies or duplicates" of such firearms.[37] Characteristics of covered semiautomatic rifles, pistols, and shotguns are defined by separate subsections applicable to each. In the case of rifles and pistols, in addition to being semiautomatic, a gun must be able to accept a detachable magazine and have at least 2 listed characteristics.

In the case of rifles, those characteristics are: (1) folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a bayonet mount; (4) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (5) a grenade launcher.

In the case of pistols, the characteristics are: (1) a magazine that attaches to the pistol outside of the pistol grip; (2) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (3) a barrel shroud that permits the

---

[37] H.R. 4296 bans the following semiautomatic assault weapons by name (as well as any copies or duplicates, in any caliber): All AK–47 type; Beretta AR–70; Colt AR–15; DC9, 22; FNC; FN-FAL/LAR; Galil; MAC 10, MAC 11-type; Steyr AUG; Street Sweeper; Striker 12; TEC–9; Uzi

23

shooter to hold the firearm without being burned; (4) an unloaded manufactured weight of 50 ounces or more; and (5) a semiautomatic version of an automatic firearm.

In the case of shotguns, covered weapons must have at least 2 of the following four features: (1) a folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a fixed magazine capacity in excess of 5 rounds; and (4) an ability to accept a detachable magazine.

The section provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban on manufacture, transfer and possession. It also adds use of a semiautomatic assault weapon to the crimes covered by the mandatory minimum of 5 years under 18 USC Section 924(c)(1) for use in a federal crime of violence or drug trafficking crime.

Finally, the section requires that semiautomatic assault weapons manufactured after the date of enactment must clearly show the date on which the weapon was manufactured.

## SECTION 3—RECORDKEEPING REQUIREMENTS FOR TRANSFERS OF GRANDFATHERED FIREARMS

This section makes it unlawful to transfer a grandfathered semiautomatic assault weapon unless both the transferor and the transferee complete and retain a copy of federal form 4473 (or its successor). Within 90 days of enactment, the Secretary of the Treasury must issue regulations ensuring the availability of the form to owners of semiautomatic assault weapons. The Committee expects the Secretary to make such forms easily and readily available to such gun owners. The Committee further expects the Secretary to maintain the confidentiality of the requester and to ensure the destruction of any and all information pertaining to any request for such forms immediately upon complying with the request. The Committee does not expect the Secretary to release any such information to any other Department of the Federal, State or local Governments or to use the information in any way other than to comply with the requests for the form. The Committee would consider failure to comply with these expectations a very serious breach.

A person who knowingly violates the recordkeeping requirement shall be fined not more than $1,000, imprisoned for not more than 6 months or both.

## SECTION 4—BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES

Subsection 4(a) makes it unlawful for a person to transfer or possess a large capacity ammunition feeding device (which is defined to include any combination of parts from which such a device can be assembled.)

The ban on transfer and possession does not apply to (1) devices (or component parts) otherwise lawfully possessed on the date of enactment; (2) Federal departments and agencies and those of States and their subdivisions; (3) law enforcement officers authorized to purchase ammunition feeding devices for official use; devices transferred to such officers upon retirement who are not otherwise prohibited from receiving them; and (3) devices (or combination of parts) made, transferred, possessed, or imported for the pur-

24

pose of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 4(b) defines large capacity ammunition feeding device to mean a magazine, belt, drum, feed strip, or similar device that has a capacity of more than 10 rounds, or can be readily restored or converted to accept more than 10 rounds. It includes any combination of parts from which such a device can be assembled. It exempts an attached tubular device designed to accept and capable of operating only with .22 caliber rimfire ammunition.

Subsection 4(c) adds large capacity ammunition feeding devices to the definition of "firearm" under 18 US Code section 921(a)(3).

Subsection 4(d) provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban.

Subsection 4(e) requires that large capacity ammunition feeding devices manufactured after the date of enactment be identified by a serial number that clearly shows the device was manufactured after the date or imported after the date of enactment, and such other identification as the Secretary of the Treasury may by regulation prescribe.

### SECTION 5—STUDY BY ATTORNEY GENERAL

This section requries the Attorney General to study and report to the Congress no later than 30 months after its enactment the effects of the Act, particularly with regard to its impact—if any— on violent and drug-trafficking crime.

The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment.

### SECTION 6—EFFECTIVE DATE

The Act and the amendment made by the Act take effect on the date of enactment and are repealed effective as of the date that is 10 years after that date.

### SECTION 7—APPENDIX A TO SECTION 922 OF TITLE 18

This section adds, as Appendix A, a list of firearms that are specifically exempted from the ban on semiautomatic assault weapons.

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

### COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

25

## NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 4296 will have no significant inflationary impact on prices and costs in the national economy.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill H.R. 4296, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE.
*Washington, DC, May 2, 1994.*

Hon. JACK BROOKS,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, as ordered reported by the House Committee on the Judiciary on April 28, 1994. We estimate that enactment of the bill would result in costs to the federal government over the 1995–1999 period of less than $500,000 from appropriated amounts. In addition, we estimate that enactment of H.R. 4296 would lead to increases in receipts of less than $10 million a year from new criminal fines. Such receipts would be deposited in the Crime Victims Fund and spent in the following year. Because the bill could affect direct spending and receipts, pay-as-you-go procedures would apply. The bill would not affect the budgets of state or local governments.

H.R. 4296 would ban the manufacture, transfer, and possession of certain semiautomatic assault weapons not lawfully possessed as of the date of the bill's enactment. The bill also would ban the transfer and possession of certain large-capacity ammunition feeding devices not lawfully possessed as of the date of enactment. In addition, H.R. 4296 would establish recordkeeping requirements for transfers of grandfathered weapons and would direct the Attorney General to conduct a study of the bill's impact. Finally, the bill would create new federal crimes and associated penalties—prison sentences and criminal fines—for violation of its provisions.

The new recordkeeping requirements and the impact study would increase costs to the Department of the Treasury and the Department of Justice, respectively, but we estimate that these costs would be less than $500,000 over the next several years from appropriated amounts. The imposition of new criminal fines in H.R. 4296 could cause governmental receipts to increase through greater

26

penalty collections. We estimate that any such increase would be less than $10 million annually. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

ROBERT D. REISCHAUER, *Director.*

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## CHAPTER 44 OF TITLE 18, UNITED STATES CODE

\*       \*       \*       \*       \*       \*       \*

## CHAPTER 44—FIREARMS

### §921. Definitions

(a) As used in this chapter—

(1) \* \* \*

\*       \*       \*       \*       \*       \*       \*

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; [or (D) any destructive device.] *(D) any destructive device; or (E) any large capacity ammunition feeding device.* Such term does not include an antique firearm.

\*       \*       \*       \*       \*       \*       \*

*(30) The term "semiautomatic assault weapon" means—*

*(A) any of the firearms, or copies or duplicates of the firearms, known as—*

*(i) Norinco, Mitchell, and Poly Technologies Automat Kalashnikovs (all models);*

*(ii) Action Arms Israeli Military Industries UZI and Galil;*

*(iii) Beretta Ar70 (SC–70);*

*(iv) Colt AR–15;*

*(v) Fabrique National FN/FAL, FN/LAR, and FNC;*

*(vi) SWD M–10, M–11, M–11/9, and M–12;*

*(vii) Steyr AUG;*

*(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and*

*(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;*

*(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—*

*(i) a folding or telescoping stock;*

27

   (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
   (iii) a bayonet mount;
   (iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and
   (v) a grenade launcher;
  (C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—
   (i) an ammunition magazine that attaches to the pistol outside of the pistol grip;
   (ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;
   (iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;
   (iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and
   (v) a semiautomatic version of an automatic firearm; and
  (D) a semiautomatic shotgun that has at least 2 of—
   (i) a folding or telescoping stock;
   (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
   (iii) a fixed magazine capacity in excess of 5 rounds; and
   (iv) an ability to accept a detachable magazine.
 (31) The term "large capacity ammunition feeding device"—
  (A) means—
   (i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and
   (ii) any combination of parts from which a device described in clause (i) can be assembled; but
  (B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

## § 922. Unlawful acts

 (a) It shall be unlawful—

   *  *  *  *  *  *  *

 (v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.
 (2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.
 (3) Paragraph (1) shall not apply to—
  (A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;
  (B) any firearm that—
   (i) is manually operated by bolt, pump, lever, or slide action;
   (ii) has been rendered permanently inoperable; or

28

    *(iii) is an antique firearm;*

    *(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or*

    *(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.*

*The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.*

    *(4) Paragraph (1) shall not apply to—*

    *(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;*

    *(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;*

    *(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or*

    *(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.*

    *(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.*

    *(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.*

    *(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.*

    *(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.*

    *(5) As used in this subsection, the term "form 4473" means—*

    *(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or*

    *(B) any other form which—*

    *(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and*

    *(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).*

29

*(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.*

*(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.*

*(3) This subsection shall not apply to—*

*(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;*

*(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;*

*(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or*

*(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.*

## APPENDIX A

### *Centerfire Rifles—Autoloaders*

*Browning BAR Mark II Safari Semi-Auto Rifle*
*Browning BAR Mark II Safari Magnum Rifle*
*Browning High-Power Rifle*
*Heckler & Koch Model 300 Rifle*
*Iver Johnson M–1 Carbine*
*Iver Johnson 50th Anniversary M–1 Carbine*
*Marlin Model 9 Camp Carbine*
*Marlin Model 45 Carbine*
*Remington Nylon 66 Auto-Loading Rifle*
*Remington Model 7400 Auto Rifle*
*Remington Model 7400 Rifle*
*Remington Model 7400 Special Purpose Auto Rifle*
*Ruger Mini-14 Autoloading Rifle (w/o folding stock)*
*Ruger Mini Thirty Rifle*

### *Centerfire Rifles—Lever & Slide*

*Browning Model 81 BLR Lever-Action Rifle*
*Browning Model 81 Long Action BLR*
*Browning Model 1886 Lever-Action Carbine*
*Browning Model 1886 High Grade Carbine*
*Cimarron 1860 Henry Replica*
*Cimarron 1866 Winchester Replicas*
*Cimarron 1873 Short Rifle*
*Cimarron 1873 Sporting Rifle*
*Cimarron 1873 30" Express Rifle*
*Dixie Engraved 1873 Rifle*
*E.M.F. 1866 Yellowboy Lever Actions*
*E.M.F. 1860 Henry Rifle*
*E.M.F. Model 73 Lever-Action Rifle*
*Marlin Model 336CS Lever-Action Carbine*
*Marlin Model 30AS Lever-Action Carbine*
*Marlin Model 444SS Lever-Action Sporter*
*Marlin Model 1894S Lever-Action Carbine*
*Marlin Model 1894CS Carbine*

30

Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action
Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rifle
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

### Centerfire Rifles—Bolt Action

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle

Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable
C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

### Drillings, Combination Guns, Double Rifles

Baretta Express SSO O/U Double Rifles
Baretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifle
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling
Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

### Rimfire Rifles—Autoloaders

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle
Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle

34

Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR-7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

### Rimfire Rifles—Lever & Slide Action

Browning BL-22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM-321 Pump Rifle
Rossi Model 62 SA Pump Rifle
Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles—Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher Rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle
Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM-452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60-J-ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Espronceda IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT-22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU-KKW Training Rifle
Navy Arms TU-33/40 Carbine
Navy Arms TU-KKW Sniper Trainer
Norinco JW-27 Bolt-Action Rifle
Norinco JW-15 Bolt-Action Rifle
Remington 541-T
Remington 40-XR Rimfire Custom Sporter
Remington 541-T HB Bolt-Action Rifle
Remington 581-S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light Arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

31

*KDF K15 American Bolt-Action Rifle*
*Krico Model 600 Bolt-Action Rifle*
*Krico Model 700 Bolt-Action Rifles*
*Mauser Model 66 Bolt-Action Rifle*
*Mauser Model 99 Bolt-Action Rifle*
*McMillan Signature Classic Sporter*
*McMillan Signature Super Varminter*
*McMillan Signature Alaskan*
*McMillan Signature Titanium Mountain Rifle*
*McMillan Classic Stainless Sporter*
*McMillan Talon Safari Rifle*
*McMillan Talon Sporter Rifle*
*Midland 1500S Survivor Rifle*
*Navy Arms TU–33/40 Carbine*
*Parker-Hale Model 81 Classic Rifle*
*Parker-Hale Model 81 Classic African Rifle*
*Parker-Hale Model 1000 Rifle*
*Parker-Hale Model 1100M African Magnum*
*Parker-Hale Model 1100 Lightweight Rifle*
*Parker-Hale Model 1200 Super Rifle*
*Parker-Hale Model 1200 Super Clip Rifle*
*Parker-Hale Model 1300C Scout Rifle*
*Parker-Hale Model 2100 Midland Rifle*
*Parker-Hale Model 2700 Lightweight Rifle*
*Parker-Hale Model 2800 Midland Rifle*
*Remington Model Seven Bolt-Action Rifle*
*Remington Model Seven Youth Rifle*
*Remington Model Seven Custom KS*
*Remington Model Seven Custom MS Rifle*
*Remington 700 ADL Bolt-Action Rifle*
*Remington 700 BDL Bolt-Action Rifle*
*Remington 700 BDL Varmint Special*
*Remington 700 BDL European Bolt-Action Rifle*
*Remington 700 Varmint Synthetic Rifle*
*Remington 700 BDL SS Rifle*
*Remington 700 Stainless Synthetic Rifle*
*Remington 700 MTRSS Rifle*
*Remington 700 BDL Left Hand*
*Remington 700 Camo Synthetic Rifle*
*Remington 700 Safari*
*Remington 700 Mountain Rifle*
*Remington 700 Custom KS Mountain Rifle*
*Remington 700 Classic Rifle*
*Ruger M77 Mark II Rifle*
*Ruger M77 Mark II Magnum Rifle*
*Ruger M77RL Ultra Light*
*Ruger M77 Mark II All-Weather Stainless Rifle*
*Ruger M77 RSI International Carbine*
*Ruger M77 Mark II Express Rifle*
*Ruger M77VT Target Rifle*
*Sako Hunter Rifle*
*Sako Fiberclass Sporter*
*Sako Safari Grade Bolt Action*
*Sako Hunter Left-Hand Rifle*
*Sako Classic Bolt Action*
*Sako Hunter LS Rifle*
*Sako Deluxe Lightweight*
*Sako Super Deluxe Sporter*
*Sako Mannlicher-Style Carbine*
*Sako Varmint Heavy Barrel*
*Sako TRG–S Bolt-Action Rifle*
*Sauer 90 Bolt-Action Rifle*
*Savage 110G Bolt-Action Rifle*
*Savage 110CY Youth/Ladies Rifle*
*Savage 110WLE One of One Thousand Limited Edition Rifle*
*Savage 110GXP3 Bolt-Action Rifle*
*Savage 110F Bolt-Action Rifle*
*Savage 110FXP3 Bolt-Action Rifle*

*Savage 110GV Varmint Rifle*
*Savage 112FV Varmint Rifle*
*Savage Model 112FVS Varmint Rifle*
*Savage Model 112BV Heavy Barrel Varmint Rifle*
*Savage 116FSS Bolt-Action Rifle*
*Savage Model 116FSK Kodiak Rifle*
*Savage 110FP Police Rifle*
*Steyr-Mannlicher Sporter Models SL, L, M, S. S/T*
*Steyr-Mannlicher Luxus Model L, M, S*
*Steyr-Mannlicher Model M Professional Rifle*
*Tikka Bolt-Action Rifle*
*Tikka Premium Grade Rifles*
*Tikka Varmint/Continental Rifle*
*Tikka Whitetail/Battue Rifle*
*Ultra Light Arms Model 20 Rifle*
*Ultra Light Arms Model 28, Model 40 Rifles*
*Voere VEC 91 Lightning Bolt-Action Rifle*
*Voere Model 2165 Bolt-Action Rifle*
*Voere Model 2155, 2150 Bolt-Action Rifles*
*Weatherby Mark V Deluxe Bolt-Action Rifle*
*Weatherby Lasermark V Rifle*
*Weatherby Mark V Crown Custom Rifles*
*Weatherby Mark V Sporter Rifle*
*Weatherby Mark V Safari Grade Custom Rifles*
*Weatherby Weathermark Rifle*
*Weatherby Weathermark Alaskan Rifle*
*Weatherby Classicmark No. 1 Rifle*
*Weatherby Weatherguard Alaskan Rifle*
*Weatherby Vanguard VGX Deluxe Rifle*
*Weatherby Vanguard Classic Rifle*
*Weatherby Vanguard Classic No. 1 Rifle*
*Weatherby Vanguard Weatherguard Rifle*
*Wichita Classic Rifle*
*Wichita Varmint Rifle*
*Winchester Model 70 Sporter*
*Winchester Model 70 Sporter WinTuff*
*Winchester Model 70 SM Sporter*
*Winchester Model 70 Stainless Rifle*
*Winchester Model 70 Varmint*
*Winchester Model 70 Synthetic Heavy Varmint Rifle*
*Winchester Model 70 DBM Rifle*
*Winchester Model 70 DBM-S Rifle*
*Winchester Model 70 Featherweight*
*Winchester Model 70 Featherweight WinTuff*
*Winchester Model 70 Featherweight Classic*
*Winchester Model 70 Lightweight Rifle*
*Winchester Ranger Rifle*
*Winchester Model 70 Super Express Magnum*
*Winchester Model 70 Super Grade*
*Winchester Model 70 Custom Sharpshooter*
*Winchester Model 70 Custom Sporting Sharpshooter Rifle*

### Centerfire Rifles—Single Shot

*Armsport 1866 Sharps Rifle, Carbine*
*Brown Model One Single Shot Rifle*
*Browning Model 1885 Single Shot Rifle*
*Dakota Single Shot Rifle*
*Desert Industries G-90 Single Shot Rifle*
*Harrington & Richardson Ultra Varmint Rifle*
*Model 1885 High Wall Rifle*
*Navy Arms Rolling Block Buffalo Rifle*
*Navy Arms #2 Creedmoor Rifle*
*Navy Arms Sharps Cavalry Carbine*
*Navy Arms Sharps Plains Rifle*
*New England Firearms Handi-Rifle*
*Red Willow Armory Ballard No. 5 Pacific*
*Red Willow Armory Ballard No. 1.5 Hunting Rifle*
*Red Willow Armory Ballard No. 8 Union Hill Rifle*

35

### Competition Rifles—Centerfire & Rimfire

Anschutz 64–MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Intermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle
Anschutz 1910 Super Match II
Anschutz 54.18MS Silhouette Rifle
Anschutz Super Match 54 Target Model 2013
Anschutz Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP–1 ISU Standard Rifle
E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86–SR Specialty Rifle
McMillan M–86 Sniper Rifle
McMillan Combo M–87/M–88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M–89 Sniper Rifle
McMillan National Match Rifle
McMillan Long Range Rifle
Parker-Hale M–87 Target Rifle
Parker-Hale M–85 Sniper Rifle
Remington 40–XB Rangemaster Target Centerfire
Remington 40–XR KS Rimfire Position Rifle
Remington 40–XBBR KS
Remington 40–XC KS National Match Course Rifle
Sako TRG–21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG–UIT Rifle
Steyr-Mannlicher SSG P–I Rifle
Steyr-Mannlicher SSG P–III Rifle
Steyr-Mannlicher SSG P–IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

### Shotguns—Autoloaders

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A–303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun

36

Browning Bsa 10 Stalker Auto Shotgun
Browning A–500R Auto Shotgun
Browning A–500G Auto Shotgun
Browning A–500G Sporting Clays
Browning Auto-5 Light 12 and 20
Browning Auto-5 Stalker
Browning Auto-5 Magnum 20
Browning Auto-5 Magnum 12
Churchill Turkey Automatic Shotgun
Cosmi Automatic Shotgun
Maverick Model 60 Auto Shotgun
Mossberg Model 5500 Shotgun
Mossberg Model 9200 Regal Semi-Auto Shotgun
Mossberg Model 9200 USST Auto Shotgun
Mossberg Model 9200 Camo Shotgun
Mossberg Model 6000 Auto Shotgun
Remington Model 1100 Shotgun
Remington 11–87 Premier Shotgun
Remington 11–87 Sporting Clays
Remington 11–87 Premier Skeet
Remington 11–87 Premier Trap
Remington 11–87 Special Purpose Magnum
Remington 11–87 SPS–T Camo Auto Shotgun
Remington 11–87 Special Purpose Deer Gun
Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun
Remington 11–87 SPS–Deer Shotgun
Remington 11–87 Special Purpose Synthetic Camo
Remington SP–10 Magnum-Camo Auto Shotgun
Remington SP–10 Magnum Auto Shotgun
Remington SP–10 Magnum Turkey Combo
Remington 1100 LT–20 Auto
Remington 1100 Special Field
Remington 1100 20-Gauge Deer Gun
Remington 1100 LT–20 Tournament Skeet
Winchester Model 1400 Semi-Auto Shotgun

### Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS Pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586–VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun
Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS–BG-Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun

*Remington 879 SPS Special Purpose Magnum*
*Remington 870 SPS-T Camo Pump Shotgun*
*Remington 870 Special Field*
*Remington 870 Express Turkey*
*Remington 870 High Grades*
*Remington 870 Express*
*Remington Model 870 Express Youth Gun*
*Winchester Model 12 Pump Shotgun*
*Winchester Model 42 High Grade Shotgun*
*Winchester Model 1300 Walnut Pump*
*Winchester Model 1300 Slug Hunter Deer Gun*
*Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun*
*Winchester Model 1300 Turkey Gun*
*Winchester Model 1300 Ranger Pump Gun*

### Shotguns—Over/Unders

*American Arms/Franchi Falconet 2000 O/U*
*American Arms Silver I O/U*
*American Arms Silver II Shotgun*
*American Arms Silver Skeet O/U*
*American Arms/Franchi Sporting 2000 O/U*
*American Arms Silver Sporting O/U*
*American Arms Silver Trap O/U*
*American Arms WS/OU 12, TS/OU 12 Shotguns*
*American Arms WT/OU 10 Shotgun*
*Armsport 2700 O/U Goose Gun*
*Armsport 2700 Series O/U*
*Armsport 2900 Tri-Barrel Shotgun*
*Baby Bretton Over/Under Shotgun*
*Beretta Model 686 Ultralight O/U*
*Beretta ASE 90 Competition O/U Shotgun*
*Beretta Over/Under Field Shotguns*
*Beretta Onyx Hunter Sport O/U Shotgun*
*Beretta Model SO5, SO6, SO9 Shotguns*
*Beretta Sporting Clay Shotguns*
*Beretta 687EL Sporting O/U*
*Beretta 682 Super Sporting O/U*
*Beretta Series 682 Competition Over/Unders*
*Browning Citori O/U Shotgun*
*Browning Superlight Citori Over/Under*
*Browning Lightning Sporting Clays*
*Browning Micro Citori Lightning*
*Browning Citori Plus Trap Combo*
*Browning Citori Plus Trap Gun*
*Browning Citori O/U Skeet Models*
*Browning Citori O/U Trap Models*
*Browning Special Sporting Clays*
*Browning Citori GTI Sporting Clays*
*Browning 325 Sporting Clays*
*Centurion Over/Under Shotgun*
*Chapuis Over/Under Shotgun*
*Connecticut Valley Classics Classic Sporter O/U*
*Connecticut Valley Classics Classic Field Waterfowler*
*Charles Daly Field Grade O/U*
*Charles Daly Lux Over/Under*
*E.A.A./Sabatti Sporting Clays Pro-Gold O/U*
*E.A.A./Sabatti Falcon-Mon Over/Under*
*Kassnar Grade I O/U Shotgun*
*Krieghoff K-80 Sporting Clays O/U*
*Krieghoff K-80 Skeet Shotgun*
*Krieghoff K-80 International Skeet*
*Krieghoff K-80 Four-Barrel Skeet Set*
*Krieghoff K-80/RT Shotguns*
*Krieghoff K-80 O/U Trap Shotgun*
*Laurona Silhouette 300 Sporting Clays*
*Laurona Silhouette 300 Trap*
*Laurona Super Model Over/Unders*
*Ljutic LM-6 Deluxe O/U Shotgun*

38

*Marocchi Conquista Over/Under Shotgun*
*Marocchi Avanza O/U Shotgun*
*Merkel Model 200E O/U Shotgun*
*Merkel Model 200E Skeet, Trap Over/Unders*
*Merkel Model 203E, 303E Over/Under Shotguns*
*Perazzi Mirage Special Sporting O/U*
*Perazzi Mirage Special Four-Gauge Skeet*
*Perazzi Sporting Classic O/U*
*Perazzi MX7 Over/Under Shotguns*
*Perazzi Mirage Special Skeet Over/Under*
*Perazzi MX8/MX8 Special Trap, Skeet*
*Perazzi MX8/20 Over/Under Shotgun*
*Perazzi MX9 Single Over/Under Shotguns*
*Perazzi MX12 Hunting Over/Under*
*Perazzi MX28, MX410 Game O/U Shotguns*
*Perazzi MX20 Hunting Over/Under*
*Piotti Boss Over/Under Shotgun*
*Remington Peerless Over/Under Shotgun*
*Ruger Red Label O/U Shotgun*
*Ruger Sporting Clays O/U Shotgun*
*San Marco 12-Ga. Wildflower Shotgun*
*San Marco Field Special O/U Shotgun*
*San Marco 10-Ga. O/U Shotgun*
*SKB Model 505 Deluxe Over/Under Shotgun*
*SKB Model 685 Over/Under Shotgun*
*SKB Model 885 Over/Under Trap, Skeet, Sporting Clays*
*Stoeger/IGA Condor 1 O/U Shotgun*
*Stoeger/IGA ERA 2000 Over/Under Shotgun*
*Techni-Mec Model 610 Over/Under*
*Tikka Model 412S Field Grade Over/Under*
*Weatherby Athena Grade IV O/U Shotguns*
*Weatherby Athena Grade V Classic Field O/U*
*Weatherby Orion O/U Shotguns*
*Weatherby II, III Classic Field O/Us*
*Weatherby Orion II Classic Sporting Clays O/U*
*Weatherby Orion II Sporting Clays O/U*
*Winchester Model 1001 O/U Shotgun*
*Winchester Model 1001 Sporting Clays O/U*
*Pietro Zanoletti Model 2000 Field O/U*

### *Shotguns—Side by Sides*

*American Arms Brittany Shotgun*
*American Arms Gentry Double Shotgun*
*American Arms Derby Side-by-Side*
*American Arms Grulla #2 Double Shotgun*
*American Arms WS/SS 10*
*American Arms TS/SS 10 Double Shotgun*
*American Arms TS/SS 12 Side-by-Side*
*Arrieta Sidelock Double Shotguns*
*Armsport 1050 Series Double Shotguns*
*Arizaga Model 31 Double Shotgun*
*AYA Boxlock Shotguns*
*AYA Sidelock Double Shotguns*
*Beretta Model 452 Sidelock Shotgun*
*Beretta Side-by-Side Field Shotguns*
*Crucelegui Hermanos Model 150 Double*
*Chapuis Side-by-Side Shotgun*
*E.A.A./Sabatti Saba-Mon Double Shotgun*
*Charles Daly Model Dss Double*
*Ferlib Model F VII Double Shotgun*
*Auguste Francotte Boxlock Shotgun*
*Auguste Francotte Sidelock Shotgun*
*Garbi Model 100 Double*
*Garbi Model 101 Side-by-Side*
*Garbi Model 103A, B Side-by-Side*
*Garbi Model 200 Side-by-Side*
*Bill Hanus Birdgun Doubles*
*Hatfield Uplander Shotgun*

*Merkell Model 8, 47E Side-by-Side Shotguns*
*Merkel Model 47LSC Sporting Clays Double*
*Merkel Model 47S, 147S Side-by-Sides*
*Parker Reproductions Side-by-Side*
*Piotti King No. 1 Side-by-Side*
*Piotti Lunik Side-by-Side*
*Piotti King Extra Side-by-Side*
*Piotti Piuma Side-by-Side*
*Precision Sports Model 600 Series Doubles*
*Rizzini Boxlock Side-by-Side*
*Rizzini Sidelock Side-by-Side*
*Stoeger/IGA Uplander Side-by-Side Shotgun*
*Ugartechea 10-Ga. Magnum Shotgun*

### *Shotguns—Bolt Actions & Single Shots*

*Armsport Single Barrel Shotgun*
*Browning BT–99 Competition Trap Special*
*Browning BT–99 Plus Trap Gun*
*Browning BT–99 Plus Micro*
*Browning Recoilless Trap Shotgun*
*Browning Micro Recoilless Trap Shotgun*
*Desert Industries Big Twenty Shotgun*
*Harrington & Richardson Topper Model 098*
*Harrington & Richardson Topper Classic Youth Shotgun*
*Harrington & Richardson N.W.T.F. Turkey Mag*
*Harrington & Richardson Topper Deluxe Model 098*
*Krieghoff KS–5 Trap Gun*
*Krieghoff KS–5 Special*
*Krieghoff K–80 Single Barrel Trap Gun*
*Ljutic Mono Gun Single Barrel*
*Ljutic LTX Super Deluxe Mono Gun*
*Ljutic Recoilless Space Gun Shotgun*
*Marlin Model 55 Goose Gun Bolt Action*
*New England Firearms Turkey and Goose Gun*
*New England Firearms N.W.T.F. Shotgun*
*New England Firearms Tracker Slug Gun*
*New England Firearms Standard Pardner*
*New England Firearms Survival Gun*
*Perazzi TM1 Special Single Trap*
*Remington 90–T Super Single Shotgun*
*Snake Charmer II Shotgun*
*Stoeger/IGA Reuna Single Barrel Shotgun*
*Thompson/Center TCR '87 Hunter Shotgun.*

## § 923. Licensing

(a) * * *

  *  *  *  *  *  *  *

 (i) Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer. *The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured. A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.*

**40**

### § 924. Penalties

(a)(1) Except as otherwise provided in this subsection, subsection (b), (c), or (f) of this section, or in section 929, whoever—

(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

(B) knowingly violates subsection (a)(4), (a)(6), (f), (k), [or (q) of section 922] *(r), (v), or (x) of section 922*;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun, *or semiautomatic assault weapon,* to imprisonment for ten years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to life imprisonment without release. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried. No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed herein.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## SUPPLEMENTAL VIEWS OF HON. DAN GLICKMAN

I supported this bill because it is a narrowly crafted bill focused on specific weapons that have no business being on our streets. It is aimed at rapid fire weapons that have the sole purpose of killing people, and it is aimed at weapons that are more suited for the battlefield than the target range.

I believe that violence in our nation is getting out of hand. It is devastating to read that a student killed a student with a semi-automatic weapon. But it is equally devastating to hear of students killing students with anyone. What we really need to focus on is why students are engaging in violence in the first place. For this reason, I think this legislation must be viewed as part of the effort to reduce crime—in conjunction with the comprehensive crime bill that increases penalties, calls for tougher sentencing, provides for more jails and police officers, and provides for prevention programs.

But we must not abrogate the Second Amendment rights that are provided for in the Constitution. We must be extremely careful that in this legislation and in any legislation in the future, that we are not taking away guns that truly are used for sports, hunting, or self-defense.

I don't believe that this bill is the first step in a long road to banning guns. However, some of my constituents have expressed their fear that the Congress is moving slowly toward banning all guns for all people. We must be absolutely clear that this narrowly crafted legislation is not that first step and is not just a precursor to further, broader federal gun control and federal gun bans. Sport shooters and hunters tell me that they don't want assault weapons on the streets and in the hands of gang members any more than anyone else. But what they don't want is for Congress to take the short step to saying that the hunting rifles are being used on the streets, and should be taken away. And then the handguns are being used on the streets and should be taken away.

I want to make sure that what we are doing has a purpose—that it gets at the weapons that are being used by gang members and others in killing sprees or other random violence. I want to be able to assure the hunters, sport shooters and folks who want to be prepared for self-defense that we're not going to turn around and tell these gun owners that their sporting guns are illegal. This is a good bill, but let's tread very carefully before going any further.

Finally, because I want to make sure that there is no mistake about which guns are banned and which are exempt, especially guns that will be developed in the future, I offered an amendment during Committee markup that was accepted by the Committee. This amendment clarifies that simply because a gun is not on the list of specifically exempted guns, does not mean that that firearm is banned. A firearm must meet the specific criteria set out in the

(41)

42

bill, or be specifically named as a banned gun before it can be
banned. In other words, the exempted gun list is not exhaustive.
  Furthermore, my amendment makes clear that no gun may be
taken off the list of specifically exempted guns as long as the act
is in effect. In this way, it is absolutely clear that the intent of Con-
gress is that exempted guns remain exempted.

## DISSENTING VIEWS OF HON. F. JAMES SENSENBRENNER, JR., HON. GEORGE GEKAS, HON. LAMAR S. SMITH, HON. BILL McCOLLUM, HON. HOWARD COBLE, HON. STEVE SCHIFF, AND HON. BOB GOODLATTE

We strongly oppose H.R. 4296 which would ban a variety of guns. The primary problem with this bill is that it targets law abiding citizens. If this bill passes, simply possessing a shotgun or rifle could land you in jail. You don't have to shoot anybody. You don't have to threaten anyone, just leaving it in the hall closet is enough to land you in jail. Even if you use the gun for self-defense, you can go to jail.

It is already a federal crime for convicted criminals to possess these weapons, or any other gun for that matter. The laws aimed at these criminals should be fully enforced before we start going into the homes of law-abiding citizens and arresting them.

Another problem with this legislation is that simple, cosmetic changes to certain guns would turn those guns from being illegal to, all of a sudden being legal. For example, simply by removing a pistol grip, or a bayonet mount from a rifle saves the owner from going to jail, but leaves the gun's performance unaffected.

Finally, the problem of these guns has been greatly exaggerated. Although semiautomatic weapons are used in the most high profile killings that make it on the nightly news, in fact, more than 99 percent of killers eschew assault rifles and use more prosaic devices. According to statistics from the Justice Department and reports from local law enforcement, five times as many people are kicked or beaten to death than are killed with assault rifles.

Passing this legislation is an excuse to avoid the real issues of violent crime, and threatens the rights of law-abiding citizens. Therefore, we oppose H.R. 4296.

F. JAMES SENSENBRENNER, Jr.
GEORGE W. GEKAS.
LAMAR SMITH.
BILL McCOLLUM.
HOWARD COBLE.
STEVE SCHIFF.
BOB GOODLATTE.

## DISSENTING VIEWS OF HON. JACK BROOKS

I am strongly opposed to H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, because it misidentifies the causes of violent crime in the United States; diverts national priorities away from meaningful solutions to the problem of violent crime; punishes honest American gun owners who buy and use firearms for legitimate, lawful purposes such as, but not necessarily limited to, self-defense, target shooting, hunting, and firearms collection; fails to focus the punitive powers of government upon criminals. Most fundamentally, a prohibition on firearms violates the right of individual Americans to keep and bear arms, protected by the Second Amendment to the Constitution of the United States—a stark fact of constitutional life that the proponents of H.R. 4296 conveniently overlook in their zeal to abridge the rights of law-abiding citizens.

Reasons claimed to justify a prohibition on the firearms that would be affected by H.R. 4296 include the assertion that those particular firearms are used often in the commission of violent crimes. Data on the use of the firearms H.R. 4296 labels as "assault weapons" is not comprehensive, but such data as do exist consistently show that "assault weapons" are involved in a small percentage of violent crimes.

Most of the firearms labelled as "assault weapons" in H.R. 4296 are rifles—yet rifles are the general category of firearms used least often in the commission of violent crimes. The FBI Uniform Crime Reports, 1992, the most recent comprehensive data available, shows that rifles of any description are used in 3.1 percent of homicides, for example, while knives are used in 14.5 percent, fists and feet are used in 5 percent, and blunt objects are used in another 5 percent.

Professor Gary Kleck, of Florida State University, the 1993 recipient of the American Society of Criminology's Hindelang Award, estimates that one-half of 1 percent of violent crimes are committed with "assault weapons." University of Texas criminologist Sheldon Ekland-Olson estimates that one-quarter of rifle-related homicides may involve rifles chambered for military cartridges, which would include not only so-called "assault" type semi-automatic rifles, but non-semiautomatic rifles as well.

Since 1980, rifle-related homicides have declined by more than a third. According to the Metropolitan Police of Washington, D.C., the city which has the highest per capita rate of homicides of any major city in the United States, between 1980–1993 there occurred only 4 rifle-related homicides out of a total of more than 4,200 homicides in the period. The last rifle homicide during the period was recorded in 1984. Other data from D.C. police show that rifles are used in about one-tenth of 1 percent of robberies and assaults.

45

The California Department of Justice surveyed law enforcement agencies in the state in 1990, as the state's legislature addressed "assault weapon" ban legislation there. The California Department of Justice found that only 3.7 percent of the firearms that are used in homicides and assaults were "assault weapons," defined there to include even more firearms than are defined as "assault weapons" in H.R. 4296.

Connecticut State Police report that less than 2 percent of firearms seized by police in the state are "assault weapons"; the Massachusetts State Police report that "assault" type rifles were used in one-half of 1 percent of homicides between 1985–1991.

I believe the proponents of H.R. 4296 are in error in claiming that the Bureau of Alcohol, Tobacco and Firearms (BATF) has traced a large number of "assault weapons" to crime. This claim has been effectively contradicted by both the BATF itself and the Congressional Research Service's (CRS) report on the BATF firearms tracing system. The BATF has stated that it "does not always know if a firearm being traced has been used in a crime." For instance, sometimes a firearm is traced simply to determine the rightful owner after it is found by a law enforcement officer.

Each year, the BATF traces about 50,000 firearms, yet only about 1 percent of these traces relate to "assault weapons" that have been seized by police in the course of investigations of violent crimes. Most "assault weapons" traced relate not to violent crime but to property violations, such as stolen guns being traced so that they may be returned to their lawful owners, violations of the Gun Control Act, and other non-violent circumstances.

As noted by BATF and by CRS in its report to Congress entitled "Assault Weapons: Military-Style Semiautomatic Firearms Facts and Issues" (1992) that firearms traces are not intended to "trace guns to crime," that few "assault weapons" traced relative to violent crime investigations, and that available state and local law enforcement agency data shows relatively little use of "assault weapons" are used frequently in violent crimes.

"Assault weapons" function in the same manner as any other semi-automatic firearm. They fire once with each pull of the trigger, like most firearms. They use the same ammunition as other firearms, both semi-automatic and not. Therefore, "assault weapons" are useful for target shooting, self-defense, hunting, and other legitimate purposes, just as other firearms are.

H.R. 4296 would prohibit rifles that are commonly used for competitive shooting, such as the Springfield N1A and the Colt "AR–15."

Accessories found on some models of "assault weapons," such as folding stocks, flash suppressors, pistol grips, bayonet lugs, and detachable magazines may look menacing to persons unfamiliar with firearms, but there is absolutely no evidence that any of these accessories provide any advantage to a criminal. As has been demonstrated on many occasions, firearms which H.R. 4296 specifically exempts from its prohibition, firearms not equipped with those accessories, can be fired at the same rate, with the same accuracy, and with the same power as "assault weapons."

Time and again, supporters of H.R. 4296 have claimed that "assault weapons" can be "spray-fired from the hip"; but this is simply

46

not true. The firearms targeted in H.R. 4296 are not machineguns. Machineguns are restricted under the National Firearms Act of 1934. H.R. 4296's guns are semi-automatic, and fire only one shot at a time.

H.R. 4296's limitation on the capacity of ammunition feeding devices would do nothing to reduce the number of rounds available to a criminal. It has been demonstrated frequently that such devices can be switched in less than a second, so a criminal determined to have available a number of rounds greater than H.R. 4296 would permit in a single magazine would need only to possess additional smaller magazines. However, police have reportedly consistently that when criminals fire shots, they rarely discharge more than 2–5 rounds, well below the number of rounds H.R. 4296 would permit in a single magazine.

Most fundamentally, to impinge upon the constitutionally-protected rights of honest, law-abiding Americans on the basis of myth, misinformation, and newspaper headlines is a crime in and of itself. To protect against such a mockery of our Constitution and the infliction of such harm upon our citizens, I intend to oppose H.R. 4296 vigorously on the House floor in the hope that careful reflection will permit cooler heads and the light of reason to prevail.

○

# EXHIBIT 3

108 STAT. 1796        PUBLIC LAW 103–322—SEPT. 13, 1994

Public Law 103–322
103d Congress

## An Act

Sept. 13, 1994
[H.R. 3355]

Violent Crime
Control and Law
Enforcement
Act of 1994.
Inter-
governmental
relations.
42 USC 13701
note.

To control and prevent crime.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Violent Crime Control and Law Enforcement Act of 1994".

**SEC. 2. TABLE OF CONTENTS.**

The following is the table of contents for this Act:

Sec. 1. Short title.
Sec. 2. Table of contents.

TITLE I—PUBLIC SAFETY AND POLICING

Sec. 10001. Short title.
Sec. 10002. Purposes.
Sec. 10003. Community policing; "Cops on the Beat".

TITLE II—PRISONS

Subtitle A—Violent Offender Incarceration and Truth in Sentencing Incentive Grants

Sec. 20101. Grants for correctional facilities.
Sec. 20102. Truth in sentencing incentive grants.
Sec. 20103. Violent offender incarceration grants.
Sec. 20104. Matching requirement.
Sec. 20105. Rules and regulations.
Sec. 20106. Technical assistance and training.
Sec. 20107. Evaluation.
Sec. 20108. Definitions.
Sec. 20109. Authorization of appropriations.

Subtitle B—Punishment for Young Offenders

Sec. 20201. Certain punishment for young offenders.

Subtitle C—Alien Incarceration

Sec. 20301. Incarceration of undocumented criminal aliens.

Subtitle D—Miscellaneous Provisions

Sec. 20401. Prisoner's place of imprisonment.
Sec. 20402. Prison impact assessments.
Sec. 20403. Sentences to account for costs to the Government of imprisonment, re-
         lease, and probation.
Sec. 20404. Application to prisoners to which prior law applies.
Sec. 20405. Crediting of "good time".
Sec. 20406. Task force on prison construction standardization and techniques.
Sec. 20407. Efficiency in law enforcement and corrections.
Sec. 20408. Amendments to the Department of Education Organization Act and the
         National Literacy Act of 1991.
Sec. 20409. Appropriate remedies for prison overcrowding.
Sec. 20410. Congressional approval of any expansion at Lorton and congressional
         hearings on future needs.

Sec. 20411. Awards of Pell Grants to prisoners prohibited.
Sec. 20412. Education requirement for early release.
Sec. 20413. Conversion of closed military installations into Federal prison facilities.
Sec. 20414. Post-conviction release drug testing—Federal offenders.
Sec. 20415. Reporting of cash received by criminal court clerks.
Sec. 20416. Civil rights of institutionalized persons.
Sec. 20417. Notification of release of prisoners.
Sec. 20418. Correctional job training and placement.

TITLE III—CRIME PREVENTION

Subtitle A—Ounce of Prevention Council

Sec. 30101. Ounce of Prevention Council.
Sec. 30102. Ounce of prevention grant program.
Sec. 30103. Definition.
Sec. 30104. Authorization of appropriations.

Subtitle B—Local Crime Prevention Block Grant Program

Sec. 30201. Payments to local governments.
Sec. 30202. Authorization of appropriations.
Sec. 30203. Qualification for payment.
Sec. 30204. Allocation and distribution of funds.
Sec. 30205. Utilization of private sector.
Sec. 30206. Public participation.
Sec. 30207. Administrative provisions.
Sec. 30208. Definitions.

Subtitle C—Model Intensive Grant Programs

Sec. 30301. Grant authorization.
Sec. 30302. Uses of funds.
Sec. 30303. Program requirements.
Sec. 30304. Applications.
Sec. 30305. Reports.
Sec. 30306. Definitions.
Sec. 30307. Authorization of appropriations.

Subtitle D—Family and Community Endeavor Schools Grant Program

Sec. 30401. Community schools youth services and supervision grant program.
Sec. 30402. Family and community endeavor schools grant program.
Sec. 30403. Authorization of appropriations.

Subtitle G—Assistance for Delinquent and At-Risk Youth

Sec. 30701. Grant authority.
Sec. 30702. Authorization of appropriations.

Subtitle H—Police Recruitment

Sec. 30801. Grant authority.
Sec. 30802. Authorization of appropriations.

Subtitle J—Local Partnership Act

Sec. 31001. Establishment of payment program.
Sec. 31002. Technical amendment.

Subtitle K—National Community Economic Partnership

Sec. 31101. Short title.

CHAPTER 1—COMMUNITY ECONOMIC PARTNERSHIP INVESTMENT FUNDS

Sec. 31111. Purpose.
Sec. 31112. Provision of assistance.
Sec. 31113. Approval of applications.
Sec. 31114. Availability of lines of credit and use.
Sec. 31115. Limitations on use of funds.
Sec. 31116. Program priority for special emphasis programs.

CHAPTER 2—EMERGING COMMUNITY DEVELOPMENT CORPORATIONS

Sec. 31121. Community development corporation improvement grants.
Sec. 31122. Emerging community development corporation revolving loan funds.

CHAPTER 3—MISCELLANEOUS PROVISIONS

Sec. 31131. Definitions.

108 STAT. 1798          PUBLIC LAW 103–322—SEPT. 13, 1994

Sec. 31132. Authorization of appropriations.
Sec. 31133. Prohibition.

Subtitle O—Urban Recreation and At-Risk Youth

Sec. 31501. Purpose of assistance.
Sec. 31502. Definitions.
Sec. 31503. Criteria for selection.
Sec. 31504. Park and recreation action recovery programs.
Sec. 31505. Miscellaneous and technical amendments.

Subtitle Q—Community-Based Justice Grants for Prosecutors

Sec. 31701. Grant authorization.
Sec. 31702. Use of funds.
Sec. 31703. Applications.
Sec. 31704. Allocation of funds; limitations on grants.
Sec. 31705. Award of grants.
Sec. 31706. Reports.
Sec. 31707. Authorization of appropriations.
Sec. 31708. Definitions.

Subtitle S—Family Unity Demonstration Project

Sec. 31901. Short title.
Sec. 31902. Purpose.
Sec. 31903. Definitions.
Sec. 31904. Authorization of appropriations.

CHAPTER 1—GRANTS TO STATES

Sec. 31911. Authority to make grants.
Sec. 31912. Eligibility to receive grants.
Sec. 31913. Reports.

CHAPTER 2—FAMILY UNITY DEMONSTRATION PROJECT FOR FEDERAL PRISONERS

Sec. 31921. Authority of the Attorney General.
Sec. 31922. Requirements.

Subtitle T—Substance Abuse Treatment in Federal Prisons

Sec. 32001. Substance abuse treatment in Federal prisons.

Subtitle U—Residential Substance Abuse Treatment for State Prisoners

Sec. 32101. Residential substance abuse treatment for State prisoners.

Subtitle V—Prevention, Diagnosis, and Treatment of Tuberculosis in Correctional
Institutions

Sec. 32201. Prevention, diagnosis, and treatment of tuberculosis in correctional in-
stitutions.

Subtitle X—Gang Resistance Education and Training

Sec. 32401. Gang resistance education and training projects.

TITLE IV—VIOLENCE AGAINST WOMEN

Sec. 40001. Short title.

Subtitle A—Safe Streets for Women

Sec. 40101. Short title.

CHAPTER 1—FEDERAL PENALTIES FOR SEX CRIMES

Sec. 40111. Repeat offenders.
Sec. 40112. Federal penalties.
Sec. 40113. Mandatory restitution for sex crimes.
Sec. 40114. Authorization for Federal victim's counselors.

CHAPTER 2—LAW ENFORCEMENT AND PROSECUTION GRANTS TO REDUCE VIOLENT
CRIMES AGAINST WOMEN

Sec. 40121. Grants to combat violent crimes against women.

CHAPTER 3—SAFETY FOR WOMEN IN PUBLIC TRANSIT AND PUBLIC PARKS

Sec. 40131. Grants for capital improvements to prevent crime in public transpor-
tation.

PUBLIC LAW 103–322—SEPT. 13, 1994      108 STAT. 1799

Sec. 40132. Grants for capital improvements to prevent crime in national parks.
Sec. 40133. Grants for capital improvements to prevent crime in public parks.

CHAPTER 4—NEW EVIDENTIARY RULES

Sec. 40141. Sexual history in criminal and civil cases.

CHAPTER 5—ASSISTANCE TO VICTIMS OF SEXUAL ASSAULT

Sec. 40151. Education and prevention grants to reduce sexual assaults against women.
Sec. 40152. Training programs.
Sec. 40153. Confidentiality of communications between sexual assault or domestic violence victims and their counselors.
Sec. 40154. Information programs.
Sec. 40155. Education and prevention grants to reduce sexual abuse of runaway, homeless, and street youth.
Sec. 40156. Victims of child abuse programs.

Subtitle B—Safe Homes for Women

Sec. 40201. Short title.

CHAPTER 1—NATIONAL DOMESTIC VIOLENCE HOTLINE

Sec. 40211. Grant for a national domestic violence hotline.

CHAPTER 2—INTERSTATE ENFORCEMENT

Sec. 40221. Interstate enforcement.

CHAPTER 3—ARREST POLICIES IN DOMESTIC VIOLENCE CASES

Sec. 40231. Encouraging arrest policies.

CHAPTER 4—SHELTER GRANTS

Sec. 40241. Grants for battered women's shelters.

CHAPTER 5—YOUTH EDUCATION

Sec. 40251. Youth education and domestic violence.

CHAPTER 6—COMMUNITY PROGRAMS ON DOMESTIC VIOLENCE

Sec. 40261. Establishment of community programs on domestic violence.

CHAPTER 7—FAMILY VIOLENCE PREVENTION AND SERVICES ACT AMENDMENTS

Sec. 40271. Grantee reporting.
Sec. 40272. Technical amendments.

CHAPTER 8—CONFIDENTIALITY FOR ABUSED PERSONS

Sec. 40281. Confidentiality of abused person's address.

CHAPTER 9—DATA AND RESEARCH

Sec. 40291. Research agenda.
Sec. 40292. State databases.
Sec. 40293. Number and cost of injuries.

CHAPTER 10—RURAL DOMESTIC VIOLENCE AND CHILD ABUSE ENFORCEMENT

Sec. 40295. Rural domestic violence and child abuse enforcement assistance.

Subtitle C—Civil Rights for Women

Sec. 40301. Short title.
Sec. 40302. Civil rights.
Sec. 40303. Attorney's fees.
Sec. 40304. Sense of the Senate concerning protection of the privacy of rape victims.

Subtitle D—Equal Justice for Women in the Courts Act

Sec. 40401. Short title.

CHAPTER 1—EDUCATION AND TRAINING FOR JUDGES AND COURT PERSONNEL IN STATE COURTS

Sec. 40411. Grants authorized.
Sec. 40412. Training provided by grants.

Sec. 40413. Cooperation in developing programs in making grants under this title.
Sec. 40414. Authorization of appropriations.

CHAPTER 2—EDUCATION AND TRAINING FOR JUDGES AND COURT PERSONNEL IN
FEDERAL COURTS

Sec. 40421. Authorizations of circuit studies; education and training grants.
Sec. 40422. Authorization of appropriations.

Subtitle E—Violence Against Women Act Improvements

Sec. 40501. Pre-trial detention in sex offense cases.
Sec. 40502. Increased penalties for sex offenses against victims below the age of 16.
Sec. 40503. Payment of cost of testing for sexually transmitted diseases.
Sec. 40504. Extension and strengthening of restitution.
Sec. 40505. Enforcement of restitution orders through suspension of Federal
benefits.
Sec. 40506. National baseline study on campus sexual assault.
Sec. 40507. Report on battered women's syndrome.
Sec. 40508. Report on confidentiality of addresses for victims of domestic violence.
Sec. 40509. Report on recordkeeping relating to domestic violence.

Subtitle F—National Stalker and Domestic Violence Reduction

Sec. 40601. Authorizing access to Federal criminal information databases.
Sec. 40602. Grant program.
Sec. 40603. Authorization of appropriations.
Sec. 40604. Application requirements.
Sec. 40605. Disbursement.
Sec. 40606. Technical assistance, training, and evaluations.
Sec. 40607. Training programs for judges.
Sec. 40608. Recommendations on intrastate communication.
Sec. 40609. Inclusion in national incident-based reporting system.
Sec. 40610. Report to Congress.
Sec. 40611. Definitions.

Subtitle G—Protections for Battered Immigrant Women and Children

Sec. 40701. Alien petitioning rights for immediate relative or second preference sta-
tus.
Sec. 40702. Use of credible evidence in spousal waiver applications.
Sec. 40703. Suspension of deportation.

TITLE V—DRUG COURTS

Sec. 50001. Drug courts.
Sec. 50002. Study by the General Accounting Office.

TITLE VI—DEATH PENALTY

Sec. 60001. Short title.
Sec. 60002. Constitutional procedures for the imposition of the sentence of death.
Sec. 60003. Specific offenses for which death penalty is authorized.
Sec. 60004. Applicability to Uniform Code of Military Justice.
Sec. 60005. Death penalty for murder by a Federal prisoner.
Sec. 60006. Death penalty for civil rights murders.
Sec. 60007. Death penalty for the murder of Federal law enforcement officials.
Sec. 60008. New offense for the indiscriminate use of weapons to further drug con-
spiracies.
Sec. 60009. Foreign murder of United States nationals.
Sec. 60010. Death penalty for rape and child molestation murders.
Sec. 60011. Death penalty for sexual exploitation of children.
Sec. 60012. Murder by escaped prisoners.
Sec. 60013. Death penalty for gun murders during Federal crimes of violence and
drug trafficking crimes.
Sec. 60014. Homicides and attempted homicides involving firearms in Federal fa-
cilities.
Sec. 60015. Death penalty for the murder of State or local officials assisting Fed-
eral law enforcement officials and State correctional officers.
Sec. 60016. Protection of court officers and jurors.
Sec. 60017. Prohibition of retaliatory killings of witnesses, victims, and informants.
Sec. 60018. Death penalty for murder of Federal witnesses.
Sec. 60019. Offenses of violence against maritime navigation or fixed platforms.
Sec. 60020. Torture.
Sec. 60021. Violence at airports serving international civil aviation.
Sec. 60022. Terrorist Death Penalty Act.

PUBLIC LAW 103–322—SEPT. 13, 1994          108 STAT. 1801

Sec. 60023. Weapons of mass destruction.
Sec. 60024. Enhanced penalties for alien smuggling.
Sec. 60025. Protection of jurors and witnesses in capital cases.
Sec. 60026. Appointment of Counsel.

### TITLE VII—MANDATORY LIFE IMPRISONMENT FOR PERSONS CONVICTED OF CERTAIN FELONIES

Sec. 70001. Mandatory life imprisonment for persons convicted of certain felonies.
Sec. 70002. Limited grant of authority to Bureau of Prisons.

### TITLE VIII—APPLICABILITY OF MANDATORY MINIMUM PENALTIES IN CERTAIN CASES

Sec. 80001. Limitation on applicability of mandatory minimum penalties in certain cases.

### TITLE IX—DRUG CONTROL

#### Subtitle A—Enhanced Penalties and General Provisions

Sec. 90101. Enhancement of penalties for drug trafficking in prisons.
Sec. 90102. Increased penalties for drug-dealing in "drug-free" zones.
Sec. 90103. Enhanced penalties for illegal drug use in Federal prisons and for smuggling drugs into Federal prisons.
Sec. 90104. Clarification of narcotic or other dangerous drugs under RICO.
Sec. 90105. Conforming amendments to recidivist penalty provisions of the Controlled Substances Act and the Controlled Substances Import and Export Act.
Sec. 90106. Advertising.
Sec. 90107. Violent crime and drug emergency areas.

#### Subtitle B—National Narcotics Leadership Act Amendments

Sec. 90201. Implementation of National Drug Control Strategy.
Sec. 90202. Report on reprogramming; office personnel restriction.
Sec. 90203. National Drug Control Strategy outcome measures.
Sec. 90204. Counter-Drug Technology Assessment Center.
Sec. 90205. Special Forfeiture Fund amendments.
Sec. 90206. Authorization of appropriations.
Sec. 90207. Adequate staffing of the Office of National Drug Control Policy.
Sec. 90208. Termination of Office of National Drug Control Policy.

### TITLE X—DRUNK DRIVING PROVISIONS

Sec. 100001. Short title.
Sec. 100002. State laws applied in areas of Federal jurisdiction.
Sec. 100003. Driving while intoxicated prosecution program.

### TITLE XI—FIREARMS

#### Subtitle A—Assault Weapons

Sec. 110101. Short title.
Sec. 110102. Restriction on manufacture, transfer, and possession of certain semi-automatic assault weapons.
Sec. 110103. Ban of large capacity ammunition feeding devices.
Sec. 110104. Study by Attorney General.
Sec. 110105. Effective date.
Sec. 110106. Appendix A to section 922 of title 18.

#### Subtitle B—Youth Handgun Safety

Sec. 110201. Prohibition of the possession of a handgun or ammunition by, or the private transfer of a handgun or ammunition to, a juvenile.

#### Subtitle C—Licensure

Sec. 110301. Firearms licensure and registration to require a photograph and fingerprints.
Sec. 110302. Compliance with State and local law as a condition to license.
Sec. 110303. Action on firearms license application.
Sec. 110304. Inspection of firearms licensees' inventory and records.
Sec. 110305. Reports of theft or loss of firearms.
Sec. 110306. Responses to requests for information.
Sec. 110307. Notification of names and addresses of firearms licensees.

#### Subtitle D—Domestic Violence

Sec. 110401. Prohibition against disposal of firearms to, or receipt of firearms by, persons who have committed domestic abuse.

Subtitle E—Gun Crime Penalties

Sec. 110501. Enhanced penalty for use of a semiautomatic firearm during a crime
        of violence or a drug trafficking crime.
Sec. 110502. Enhanced penalty for second offense of using an explosive to commit
        a felony.
Sec. 110503. Smuggling firearms in aid of drug trafficking.
Sec. 110504. Theft of firearms and explosives.
Sec. 110505. Revocation of supervised release after imprisonment.
Sec. 110506. Revocation of probation.
Sec. 110507. Increased penalty for knowingly making false, material Statement in
        connection with the acquisition of a firearm from a licensed dealer.
Sec. 110508. Possession of explosives by felons and others.
Sec. 110509. Summary destruction of explosives subject to forfeiture.
Sec. 110510. Elimination of outmoded language relating to parole.
Sec. 110511. Prohibition against transactions involving stolen firearms which have
        moved in interstate or foreign commerce.
Sec. 110512. Using a firearm in the commission of counterfeiting or forgery.
Sec. 110513. Enhanced penalties for firearms possession by violent felons and seri-
        ous drug offenders.
Sec. 110514. Receipt of firearms by nonresident.
Sec. 110515. Theft of firearms or explosives from licensee.
Sec. 110516. Disposing of explosives to prohibited persons.
Sec. 110517. Increased penalty for interstate gun trafficking.
Sec. 110518. Firearms and explosives conspiracy.
Sec. 110519. Definition of armor piercing ammunition.

TITLE XII—TERRORISM

Sec. 120001. Extension of the statute of limitation for certain terrorism offenses.
Sec. 120002. Jurisdiction over crimes against United States nationals on certain
        foreign ships.
Sec. 120003. Counterfeiting United States currency abroad.
Sec. 120004. Sentencing guidelines increase for terrorist crimes.
Sec. 120005. Providing material support to terrorists.

TITLE XIII—CRIMINAL ALIENS AND IMMIGRATION ENFORCEMENT

Sec. 130001. Enhancement of penalties for failing to depart, or reentering, after
        final order of deportation.
Sec. 130002. Criminal alien tracking center.
Sec. 130003. Alien witness cooperation and counterterrorism information.
Sec. 130004. Deportation procedures for certain criminal aliens who are not perma-
        nent residents.
Sec. 130005. Expeditious deportation for denied asylum applicants.
Sec. 130006. Improving border controls.
Sec. 130007. Expanded special deportation proceedings.
Sec. 130008. Authority to accept certain assistance.
Sec. 130009. Passport and visa offenses penalties improvement.
Sec. 130010. Asylum.

TITLE XIV—YOUTH VIOLENCE

Sec. 140001. Prosecution as adults of certain juveniles for crimes of violence.
Sec. 140002. Commencement of juvenile proceeding.
Sec. 140003. Separation of juvenile from adult offenders.
Sec. 140004. Bindover system for certain violent juveniles
Sec. 140005. Amendment concerning records of crimes committed by juveniles.
Sec. 140006. Increased penalties for employing children to distribute drugs near
        schools and playgrounds.
Sec. 140007. Increased penalties for Travel Act crimes involving violence and con-
        spiracy to commit contract killings.
Sec. 140008. Solicitation of minor to commit crime.

TITLE XV—CRIMINAL STREET GANGS

Sec. 150001. Criminal street gangs.
Sec. 150002. Adult prosecution of serious juvenile offenders.
Sec. 150003. Addition of anti-gang Byrne grant funding objective.
Sec. 150006. Mentoring program.
Sec. 150007. Juvenile anti-drug and anti-gang grants in federally assisted low-in-
        come housing.
Sec. 150008. Gang investigation coordination and information collection.
Sec. 150009. Multijurisdictional gang task forces.

TITLE XVI—CHILD PORNOGRAPHY

Sec. 160001. Penalties for international trafficking in child pornography.

PUBLIC LAW 103–322—SEPT. 13, 1994          108 STAT. 1803

Sec. 160002. Sense of Congress concerning State legislation regarding child pornog-
          raphy.
Sec. 160003. Confirmation of intent of Congress in enacting sections 2252 and 2256
          of title 18, United States Code.

TITLE XVII—CRIMES AGAINST CHILDREN

Subtitle A—Jacob Wetterling Crimes Against Children and Sexually Violent
Offender Registration Act

Sec. 170101. Establishment of program.

Subtitle B—Assaults Against Children

Sec. 170201. Assaults against children.

Subtitle C—Missing and Exploited Children

Sec. 170301. Short title.
Sec. 170302. Purpose.
Sec. 170303. Establishment of task force.

TITLE XVIII—RURAL CRIME

Subtitle A—Drug Trafficking in Rural Areas

Sec. 180101. Authorizations for rural law enforcement agencies.
Sec. 180102. Rural crime and drug enforcement task forces.
Sec. 180103. Rural drug enforcement training.
Sec. 180104. More agents for the Drug Enforcement Administration.

Subtitle B—Drug Free Truck Stops and Safety Rest Areas

Sec. 180201. Drug free truck stops and safety rest areas.

Subtitle C—Sense of Congress Regarding Funding for Rural Areas

Sec. 180301. Funding for rural areas.

TITLE XIX—FEDERAL LAW ENFORCEMENT

Sec. 190001. Federal judiciary and Federal law enforcement.

TITLE XX—POLICE CORPS AND LAW ENFORCEMENT OFFICERS TRAINING
AND EDUCATION

Subtitle A—Police Corps

Sec. 200101. Short title.
Sec. 200102. Purposes.
Sec. 200103. Definitions.
Sec. 200104. Establishment of office of the police corps and law enforcement edu-
          cation.
Sec. 200105. Designation of lead agency and submission of State plan.
Sec. 200106. Scholarship assistance.
Sec. 200107. Selection of participants.
Sec. 200108. Police corps training.
Sec. 200109. Service obligation.
Sec. 200110. State plan requirements.
Sec. 200111. Assistance to States and localities employing police corps officers.
Sec. 200112. Authorization of appropriations.
Sec. 200113. Reports to congress.

Subtitle B—Law Enforcement Scholarship Program

Sec. 200201. Short title.
Sec. 200202. Definitions.
Sec. 200203. Allotment.
Sec. 200204. Establishment of program.
Sec. 200205. Scholarships.
Sec. 200206. Eligibility.
Sec. 200207. State application.
Sec. 200208. Local application.
Sec. 200209. Scholarship agreement.
Sec. 200210. Authorization of appropriations.

TITLE XXI—STATE AND LOCAL LAW ENFORCEMENT

Subtitle A—Byrne Program

Sec. 210101. Extension of Byrne Grant funding.

108 STAT. 1804          PUBLIC LAW 103–322—SEPT. 13, 1994

Subtitle B—Law Enforcement Family Support

Sec. 210201. Law enforcement family support.

Subtitle C—DNA Identification

Sec. 210301. Short title.
Sec. 210302. Funding to improve the quality and availability of DNA analyses for
              law enforcement identification purposes.
Sec. 210303. Quality assurance and proficiency testing standards.
Sec. 210304. Index to facilitate law enforcement exchange of DNA identification in-
              formation.
Sec. 210305. Federal Bureau of Investigation.
Sec. 210306. Authorization of appropriations.

Subtitle D—Police Pattern or Practice

Sec. 210401. Cause of action.
Sec. 210402. Data on use of excessive force.

Subtitle E—Improved Training and Technical Automation

Sec. 210501. Improved training and technical automation.

Subtitle F—Other State and Local Aid

Sec. 210601. Reauthorization of Office of Justice Programs.
Sec. 210602. Federal assistance to ease the increased burdens on State court sys-
              tems resulting from enactment of this Act.
Sec. 210603. Availability of violent crime reduction trust fund to fund activities au-
              thorized by the Brady Handgun Violence Prevention Act and the
              National Child Protection Act of 1993.

TITLE XXII—MOTOR VEHICLE THEFT PREVENTION

Sec. 220001. Short title.
Sec. 220002. Motor vehicle theft prevention program.
Sec. 220003. Altering or removing motor vehicle identification numbers.

TITLE XXIII—VICTIMS OF CRIME

Subtitle A—Victims of Crime

Sec. 230101. Victim's right of allocution in sentencing.
Sec. 230102. Sense of the Senate concerning the right of a victim of a violent crime
              or sexual abuse to speak at an offender's sentencing hearing and
              any parole hearing.

Subtitle B—Crime Victims' Fund

Sec. 230201. Allocation of funds for costs and grants.
Sec. 230202. Relationship of crime victim compensation to certain Federal pro-
              grams.
Sec. 230203. Administrative costs for crime victim compensation.
Sec. 230204. Grants for demonstration projects.
Sec. 230205. Administrative costs for crime victim assistance.
Sec. 230206. Maintenance of effort.
Sec. 230207. Change of due date for required report.
Sec. 230208. Amendment of the Victims of Crime Act.

TITLE XXIV—PROTECTIONS FOR THE ELDERLY

Sec. 240001. Missing Alzheimer's Disease Patient Alert Program.
Sec. 240002. Crimes against the elderly.

TITLE XXV—SENIOR CITIZENS AGAINST MARKETING SCAMS

Sec. 250001. Short title.
Sec. 250002. Enhanced penalties for telemarketing fraud.
Sec. 250003. Increased penalties for fraud against older victims.
Sec. 250004. Rewards for information leading to prosecution and conviction.
Sec. 250005. Authorization of appropriations.
Sec. 250006. Broadening application of mail fraud statute.
Sec. 250007. Fraud and related activity in connection with access devices.
Sec. 250008. Information network.

TITLE XXVI—COMMISSION MEMBERSHIP AND APPOINTMENT

Sec. 260001. Commission membership and appointment.
Sec. 260002. Conforming amendment.

TITLE XXVII—PRESIDENTIAL SUMMIT ON VIOLENCE AND NATIONAL
COMMISSION ON CRIME PREVENTION AND CONTROL

Sec. 270001. Presidential summit.
Sec. 270002. Establishment; committees and task forces; representation.
Sec. 270003. Purposes.
Sec. 270004. Responsibilities of the Commission.
Sec. 270005. Administrative matters.
Sec. 270006. Staff and support services.
Sec. 270007. Powers.
Sec. 270008. Report; termination.
Sec. 270009. Authorization of appropriations.

TITLE XXVIII—SENTENCING PROVISIONS

Sec. 280001. Imposition of sentence.
Sec. 280002. Technical amendment to mandatory conditions of probation.
Sec. 280003. Direction to United States Sentencing Commission regarding sentenc-
            ing enhancements for hate crimes.
Sec. 280004. Authorization of probation for petty offenses in certain cases.
Sec. 280005. Full-time vice chairs of the United States Sentencing Commission.
Sec. 280006. Cocaine penalty study.

TITLE XXIX—COMPUTER CRIME

Sec. 290001. Computer Abuse Amendments Act of 1994.

TITLE XXX—PROTECTION OF PRIVACY OF INFORMATION IN STATE MOTOR
VEHICLE RECORDS

Sec. 300001. Short title.
Sec. 300002. Prohibition on release and use of certain personal information from
            State motor vehicle records.
Sec. 300003. Effective date.

TITLE XXXI—VIOLENT CRIME REDUCTION TRUST FUND

Sec. 310001. Creation of Violent Crime Reduction Trust Fund.
Sec. 310002. Conforming reduction in discretionary spending limits.
Sec. 310003. Extension of authorizations of appropriations for fiscal years for which
            the full amount authorized is not appropriated.
Sec. 310004. Flexibility in making of appropriations.

TITLE XXXII—MISCELLANEOUS

Subtitle A—Increases in Penalties

Sec. 320101. Increased penalties for assault.
Sec. 320102. Increased penalties for manslaughter.
Sec. 320103. Increased penalties for civil rights violations.
Sec. 320104. Penalties for trafficking in counterfeit goods and services.
Sec. 320105. Increased penalty for conspiracy to commit murder for hire.
Sec. 320106. Increased penalties for arson.
Sec. 320107. Increased penalties for drug trafficking near public housing.
Sec. 320108. Task force and criminal penalties relating to the introduction of
            nonindigenous species.
Sec. 320109. Military medals and decorations.

Subtitle B—Extension of Protection of Civil Rights Statutes

Sec. 320201. Extension of protection of civil rights statutes.

Subtitle C—Audit and Report

Sec. 320301. Audit requirement for State and local law enforcement agencies re-
            ceiving Federal asset forfeiture funds.
Sec. 320302. Report to Congress on administrative and contracting expenses.

Subtitle D—Coordination

Sec. 320401. Coordination of substance abuse treatment and prevention programs.

Subtitle E—Gambling

Sec. 320501. Clarifying amendment regarding scope of prohibition against gam-
            bling on ships in international waters.

Subtitle F—White Collar Crime Amendments

Sec. 320601. Receiving the proceeds of extortion or kidnapping.

Sec. 320602. Receiving the proceeds of a postal robbery.
Sec. 320603. Crimes by or affecting persons engaged in the business of insurance
               whose activities affect interstate commerce.
Sec. 320604. Miscellaneous amendments to title 18, United States Code.
Sec. 320605. Federal Deposit Insurance Act amendment.
Sec. 320606. Federal Credit Union Act amendments.
Sec. 320607. Addition of predicate offenses to financial institutions rewards statute.
Sec. 320608. Definition of "savings and loan association" for purposes of the offense
               of bank robbery and related offenses.
Sec. 320609. Definition of 1-year period for purposes of the offense of obstruction
               of a Federal audit.

Subtitle G—Safer Streets and Neighborhoods

Sec. 320701. Short title.
Sec. 320702. Limitation on grant distribution.

Subtitle H—Recreational Hunting Safety

Sec. 320801. Short title.
Sec. 320802. Obstruction of a lawful hunt.
Sec. 320803. Civil penalties.
Sec. 320804. Other relief.
Sec. 320805. Relationship to State and local law and civil actions.
Sec. 320806. Regulations.
Sec. 320807. Rule of construction.
Sec. 320808. Definitions.

Subtitle I—Other Provisions

Sec. 320901. Wiretaps.
Sec. 320902. Theft of major artwork.
Sec. 320903. Addition of attempted robbery, kidnapping, smuggling, and property
               damage offenses to eliminate inconsistencies and gaps in coverage.
Sec. 320904. Gun-free school zones.
Sec. 320905. Interstate wagering.
Sec. 320906. Sense of Congress with respect to violence against truckers.
Sec. 320907. Sense of the Senate regarding a study on out-of-wedlock births.
Sec. 320908. Sense of the Senate regarding the role of the United Nations in inter-
               national organized crime control.
Sec. 320909. Optional venue for espionage and related offenses.
Sec. 320910. Undercover operations.
Sec. 320911. Misuse of initials "DEA".
Sec. 320912. Definition of livestock.
Sec. 320913. Asset forfeiture.
Sec. 320914. Clarification of definition of a "court of the United States" to include
               the district courts for Guam, the Northern Mariana Islands, and the
               Virgin Islands.
Sec. 320915. Law enforcement personnel.
Sec. 320916. Authority to investigate violent crimes against travelers.
Sec. 320917. Extension of statute of limitations for arson.
Sec. 320918. Sense of Congress concerning child custody and visitation rights.
Sec. 320919. Edward Byrne Memorial Formula Grant Program.
Sec. 320920. Sense of the Senate regarding Law Day, U.S.A.
Sec. 320921. First time domestic violence offender rehabilitation program.
Sec. 320922. Display of flags at halfstaff.
Sec. 320923. Financial institution fraud.
Sec. 320924. Definition of parent for the purposes of the offense of kidnapping.
Sec. 320926. Hate Crime Statistics Act.
Sec. 320927. Exemption from Brady background check requirement of return of
               handgun to owner.
Sec. 320928. Amendment of the National Child Protection Act of 1993.
Sec. 320929. Tennessee Valley Authority law enforcement personnel.
Sec. 320932. Assistant United States attorney residency.
Sec. 320933. Labels on products.
Sec. 320934. Non-dischargeability of payment of restitution order.
Sec. 320935. Admissibility of evidence of similar crimes in sex offense cases.

TITLE XXXIII—TECHNICAL CORRECTIONS

Sec. 330001. Amendments relating to Federal financial assistance for law enforce-
               ment.
Sec. 330002. General title 18 corrections.
Sec. 330003. Corrections of erroneous cross references and misdesignations.
Sec. 330004. Repeal of obsolete provisions in title 18.

PUBLIC LAW 103–322—SEPT. 13, 1994          108 STAT. 1807

Sec. 330005. Correction of drafting error in the Foreign Corrupt Practices Act.
Sec. 330006. Elimination of redundant penalty provision in 18 U.S.C. 1116.
Sec. 330007. Elimination of redundant penalty.
Sec. 330008. Corrections of misspellings and grammatical errors.
Sec. 330009. Other technical amendments.
Sec. 330010. Correction of errors found during codification.
Sec. 330011. Problems related to execution of prior amendments.
Sec. 330012. Amendment to section 1956 of title 18 to eliminate duplicate predicate crimes.
Sec. 330013. Amendments to part V of title 18.
Sec. 330014. Update of cross reference.
Sec. 330015. Correction of error in amendatory language.
Sec. 330016. Correction of misleading and outmoded fine amounts in offenses under title 18.
Sec. 330017. Technical corrections to title 31 crimes.
Sec. 330018. Repeal of superfluous statute of limitation and transfer of child abuse statute of limitation.
Sec. 330019. Technical errors in section 1956.
Sec. 330020. Technical error.
Sec. 330021. Conforming spelling of variants of "kidnap".
Sec. 330022. Margin error.
Sec. 330023. Technical corrections relating to section 248 of title 18, United States Code.
Sec. 330024. Technical amendments necessitated by the enactment of the Domestic Chemical Diversion Control Act of 1993.
Sec. 330025. Victims of Crime Act.

# TITLE I—PUBLIC SAFETY AND POLICING

Public Safety Partnership and Community Policing Act of 1994.

## SEC. 10001. SHORT TITLE.

42 USC 3711 note.

This title may be cited as the "Public Safety Partnership and Community Policing Act of 1994".

## SEC. 10002. PURPOSES.

42 USC 3796dd note.

The purposes of this title are to—

(1) substantially increase the number of law enforcement officers interacting directly with members of the community ("cops on the beat");

(2) provide additional and more effective training to law enforcement officers to enhance their problem solving, service, and other skills needed in interacting with members of the community;

(3) encourage the development and implementation of innovative programs to permit members of the community to assist State, Indian tribal government, and local law enforcement agencies in the prevention of crime in the community; and

(4) encourage the development of new technologies to assist State, Indian tribal government, and local law enforcement agencies in reorienting the emphasis of their activities from reacting to crime to preventing crime,

by establishing a program of grants and assistance in furtherance of these objectives, including the authorization for a period of 6 years of grants for the hiring and rehiring of additional career law enforcement officers.

## SEC. 10003. COMMUNITY POLICING; "COPS ON THE BEAT".

(a) IN GENERAL.—Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3711 et seq.) is amended—

(1) by redesignating part Q as part R;

108 STAT. 1996          PUBLIC LAW 103–322—SEPT. 13, 1994

Drunk Driving
Child Protection
Act of 1994.
18 USC 1 note.

# TITLE X—DRUNK DRIVING PROVISIONS

### SEC. 100001. SHORT TITLE.

This title may be cited as the "Drunk Driving Child Protection Act of 1994".

### SEC. 100002. STATE LAWS APPLIED IN AREAS OF FEDERAL JURISDIC-TION.

Section 13(b) of title 18, United States Code, is amended—
(1) by striking "For purposes" and inserting "(1) Subject to paragraph (2) and for purposes"; and
(2) by adding at the end the following new paragraph:
"(2)(A) In addition to any term of imprisonment provided for operating a motor vehicle under the influence of a drug or alcohol imposed under the law of a State, territory, possession, or district, the punishment for such an offense under this section shall include an additional term of imprisonment of not more than 1 year, or if serious bodily injury of a minor is caused, not more than 5 years, or if death of a minor is caused, not more than 10 years, and an additional fine of not more than $1,000, or both, if—
"(i) a minor (other than the offender) was present in the motor vehicle when the offense was committed; and
"(ii) the law of the State, territory, possession, or district in which the offense occurred does not provide an additional term of imprisonment under the circumstances described in clause (i).
"(B) For the purposes of subparagraph (A), the term 'minor' means a person less than 18 years of age.".

### SEC. 100003. DRIVING WHILE INTOXICATED PROSECUTION PROGRAM.

Section 501(b) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3751) is amended—
(1) by striking "and" at the end of paragraph (20);
(2) by striking the period at the end of paragraph (21) and inserting "; and"; and
(3) by adding at the end the following new paragraph:
"(22) programs for the prosecution of driving while intoxi-cated charges and the enforcement of other laws relating to alcohol use and the operation of motor vehicles.".

# TITLE XI—FIREARMS

## Subtitle A—Assault Weapons

Public Safety
and Recreational
Firearms Use
Protection Act.
18 USC 921 note.

### SEC. 110101. SHORT TITLE.

This subtitle may be cited as the "Public Safety and Rec-reational Firearms Use Protection Act".

### SEC. 110102. RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS.

(a) RESTRICTION.—Section 922 of title 18, United States Code, is amended by adding at the end the following new subsection:
"(v)(1) It shall be unlawful for a person to manufacture, trans-fer, or possess a semiautomatic assault weapon.

"(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed under Federal law on the date of the enactment of this subsection.

"(3) Paragraph (1) shall not apply to—

"(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

"(B) any firearm that—

"(i) is manually operated by bolt, pump, lever, or slide action;

"(ii) has been rendered permanently inoperable; or

"(iii) is an antique firearm;

"(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

"(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine. The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this subsection is in effect.

"(4) Paragraph (1) shall not apply to—

"(A) the manufacture for, transfer to, or possession by the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State, or a transfer to or possession by a law enforcement officer employed by such an entity for purposes of law enforcement (whether on or off duty);

"(B) the transfer to a licensee under title I of the Atomic Energy Act of 1954 for purposes of establishing and maintaining an on-site physical protection system and security organization required by Federal law, or possession by an employee or contractor of such licensee on-site for such purposes or off-site for purposes of licensee-authorized training or transportation of nuclear materials;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) DEFINITION OF SEMIAUTOMATIC ASSAULT WEAPON.—Section 921(a) of title 18, United States Code, is amended by adding at the end the following new paragraph:

"(30) The term 'semiautomatic assault weapon' means—

"(A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as—

"(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

"(ii) Action Arms Israeli Military Industries UZI and Galil;

"(iii) Beretta Ar70 (SC–70);

"(iv) Colt AR–15;

"(v) Fabrique National FN/FAL, FN/LAR, and FNC;

"(vi) SWD M–10, M–11, M–11/9, and M–12;

"(vii) Steyr AUG;

"(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

"(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

"(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a bayonet mount;

"(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

"(v) a grenade launcher;

"(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—

"(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

"(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

"(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

"(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

"(v) a semiautomatic version of an automatic firearm; and

"(D) a semiautomatic shotgun that has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a fixed magazine capacity in excess of 5 rounds; and

"(iv) an ability to accept a detachable magazine.".

(c) PENALTIES.—

(1) VIOLATION OF SECTION 922(v).—Section 924(a)(1)(B) of such title is amended by striking "or (q) of section 922" and inserting "(r), or (v) of section 922".

(2) USE OR POSSESSION DURING CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME.—Section 924(c)(1) of such title is amended in the first sentence by inserting ", or semiautomatic assault weapon," after "short-barreled shotgun,".

(d) IDENTIFICATION MARKINGS FOR SEMIAUTOMATIC ASSAULT WEAPONS.—Section 923(i) of such title is amended by adding at the end the following: "The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured.".

**SEC. 110103. BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES.**

(a) PROHIBITION.—Section 922 of title 18, United States Code, as amended by section 110102(a), is amended by adding at the end the following new subsection:

"(w)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

"(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on or before the date of the enactment of this subsection.

"(3) This subsection shall not apply to—

"(A) the manufacture for, transfer to, or possession by the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State, or a transfer to or possession by a law enforcement officer employed by such an entity for purposes of law enforcement (whether on or off duty);

"(B) the transfer to a licensee under title I of the Atomic Energy Act of 1954 for purposes of establishing and maintaining an on-site physical protection system and security organization required by Federal law, or possession by an employee or contractor of such licensee on-site for such purposes or off-site for purposes of licensee-authorized training or transportation of nuclear materials;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

"(4) If a person charged with violating paragraph (1) asserts that paragraph (1) does not apply to such person because of paragraph (2) or (3), the Government shall have the burden of proof to show that such paragraph (1) applies to such person. The lack of a serial number as described in section 923(i) of title 18, United States Code, shall be a presumption that the large capacity ammunition feeding device is not subject to the prohibition of possession in paragraph (1).".

(b) DEFINITION OF LARGE CAPACITY AMMUNITION FEEDING DEVICE.—Section 921(a) of title 18, United States Code, as amended by section 110102(b), is amended by adding at the end the following new paragraph:

"(31) The term 'large capacity ammunition feeding device'—

"(A) means a magazine, belt, drum, feed strip, or similar device manufactured after the date of enactment of the Violent Crime Control and Law Enforcement Act of 1994 that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; but

"(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.".

(c) PENALTY.—Section 924(a)(1)(B) of title 18, United States Code, as amended by section 110102(c)(1), is amended by striking "or (v)" and inserting "(v), or (w)".

(d) IDENTIFICATION MARKINGS FOR LARGE CAPACITY AMMUNITION FEEDING DEVICES.—Section 923(i) of title 18, United States Code, as amended by section 110102(d) of this Act, is amended by adding at the end the following: "A large capacity ammunition

108 STAT. 2000        PUBLIC LAW 103–322—SEPT. 13, 1994

feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.".

18 USC 921 note.   **SEC. 110104. STUDY BY ATTORNEY GENERAL.**

(a) STUDY.—The Attorney General shall investigate and study the effect of this subtitle and the amendments made by this subtitle, and in particular shall determine their impact, if any, on violent and drug trafficking crime. The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment of this Act.

(b) REPORT.—Not later than 30 months after the date of enactment of this Act, the Attorney General shall prepare and submit to the Congress a report setting forth in detail the findings and determinations made in the study under subsection (a).

18 USC 921 note.   **SEC. 110105. EFFECTIVE DATE.**

This subtitle and the amendments made by this subtitle—
(1) shall take effect on the date of the enactment of this Act; and
(2) are repealed effective as of the date that is 10 years after that date.

**SEC. 110106. APPENDIX A TO SECTION 922 OF TITLE 18.**

Section 922 of title 18, United States Code, is amended by adding at the end the following appendix:

"**APPENDIX A**

**Centerfire Rifles—Autoloaders**

Browning BAR Mark II Safari Semi-Auto Rifle
Browning BAR Mark II Safari Magnum Rifle
Browning High-Power Rifle
Heckler & Koch Model 300 Rifle
Iver Johnson M–1 Carbine
Iver Johnson 50th Anniversary M–1 Carbine
Marlin Model 9 Camp Carbine
Marlin Model 45 Carbine
Remington Nylon 66 Auto-Loading Rifle
Remington Model 7400 Auto Rifle
Remington Model 7400 Rifle
Remington Model 7400 Special Purpose Auto Rifle
Ruger Mini-14 Autoloading Rifle (w/o folding stock)
Ruger Mini Thirty Rifle

**Centerfire Rifles—Lever & Slide**

Browning Model 81 BLR Lever-Action Rifle
Browning Model 81 Long Action BLR
Browning Model 1886 Lever-Action Carbine
Browning Model 1886 High Grade Carbine
Cimarron 1860 Henry Replica
Cimarron 1866 Winchester Replicas
Cimarron 1873 Short Rifle
Cimarron 1873 Sporting Rifle
Cimarron 1873 30" Express Rifle
Dixie Engraved 1873 Rifle
E.M.F. 1866 Yellowboy Lever Actions
E.M.F. 1860 Henry Rifle
E.M.F. Model 73 Lever-Action Rifle
Marlin Model 336CS Lever-Action Carbine
Marlin Model 30AS Lever-Action Carbine
Marlin Model 444SS Lever-Action Sporter
Marlin Model 1894S Lever-Action Carbine

PUBLIC LAW 103-322—SEPT. 13, 1994          108 STAT. 2001

Marlin Model 1894CS Carbine
Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action
Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rilfe
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

### Centerfire Rifles—Bolt Action

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle
KDF K15 American Bolt-Action Rifle
Krico Model 600 Bolt-Action Rifle

Krico Model 700 Bolt-Action Rifles
Mauser Model 66 Bolt-Action Rifle
Mauser Model 99 Bolt-Action Rifle
McMillan Signature Classic Sporter
McMillan Signature Super Varminter
McMillan Signature Alaskan
McMillan Signature Titanium Mountain Rifle
McMillan Classic Stainless Sporter
McMillan Talon Safari Rifle
McMillan Talon Sporter Rifle
Midland 1500S Survivor Rifle
Navy Arms TU–33/40 Carbine
Parker-Hale Model 81 Classic Rifle
Parker-Hale Model 81 Classic African Rifle
Parker-Hale Model 1000 Rifle
Parker-Hale Model 1100M African Magnum
Parker-Hale Model 1100 Lightweight Rifle
Parker-Hale Model 1200 Super Rifle
Parker-Hale Model 1200 Super Clip Rifle
Parker-Hale Model 1300C Scout Rifle
Parker-Hale Model 2100 Midland Rifle
Parker-Hale Model 2700 Lightweight Rifle
Parker-Hale Model 2800 Midland Rifle
Remington Model Seven Bolt-Action Rifle
Remington Model Seven Youth Rifle
Remington Model Seven Custom KS
Remington Model Seven Custom MS Rifle
Remington 700 ADL Bolt-Action Rifle
Remington 700 BDL Bolt-Action Rifle
Remington 700 BDL Varmint Special
Remington 700 BDL European Bolt-Action Rifle
Remington 700 Varmint Synthetic Rifle
Remington 700 BDL SS Rifle
Remington 700 Stainless Synthetic Rifle
Remington 700 MTRSS Rifle
Remington 700 BDL Left Hand
Remington 700 Camo Synthetic Rifle
Remington 700 Safari
Remington 700 Mountain Rifle
Remington 700 Custom KS Mountain Rifle
Remington 700 Classic Rifle
Ruger M77 Mark II Rifle
Ruger M77 Mark II Magnum Rifle
Ruger M77RL Ultra Light
Ruger M77 Mark II All-Weather Stainless Rifle
Ruger M77 RSI International Carbine
Ruger M77 Mark II Express Rifle
Ruger M77VT Target Rifle
Sako Hunter Rifle
Sako Fiberclass Sporter
Sako Safari Grade Bolt Action
Sako Hunter Left-Hand Rifle
Sako Classic Bolt Action
Sako Hunter LS Rifle
Sako Deluxe Lightweight
Sako Super Deluxe Sporter
Sako Mannlicher-Style Carbine
Sako Varmint Heavy Barrel
Sako TRG–S Bolt-Action Rifle
Sauer 90 Bolt-Action Rifle
Savage 110G Bolt-Action Rifle
Savage 110CY Youth/Ladies Rifle
Savage 110WLE One of One Thousand Limited Edition Rifle
Savage 110GXP3 Bolt-Action Rifle
Savage 110F Bolt-Action Rifle
Savage 110FXP3 Bolt-Action Rifle
Savage 110GV Varmint Rifle
Savage 112FV Varmint Rifle
Savage Model 112FVS Varmint Rifle
Savage Model 112BV Heavy Barrel Varmint Rifle
Savage 116FSS Bolt-Action Rifle
Savage Model 116FSK Kodiak Rifle

PUBLIC LAW 103–322—SEPT. 13, 1994      108 STAT. 2003

Savage 110FP Police Rifle
Steyr-Mannlicher Sporter Models SL, L, M, S, S/T
Steyr-Mannlicher Luxus Model L, M, S
Steyr-Mannlicher Model M Professional Rifle
Tikka Bolt-Action Rifle
Tikka Premium Grade Rifles
Tikka Varmint/Continental Rifle
Tikka Whitetail/Battue Rifle
Ultra Light Arms Model 20 Rifle
Ultra Light Arms Model 28, Model 40 Rifles
Voere VEC 91 Lightning Bolt-Action Rifle
Voere Model 2165 Bolt-Action Rifle
Voere Model 2155, 2150 Bolt-Action Rifles
Weatherby Mark V Deluxe Bolt-Action Rifle
Weatherby Lasermark V Rifle
Weatherby Mark V Crown Custom Rifles
Weatherby Mark V Sporter Rifle
Weatherby Mark V Safari Grade Custom Rifles
Weatherby Weathermark Rifle
Weatherby Weathermark Alaskan Rifle
Weatherby Classicmark No. 1 Rifle
Weatherby Weatherguard Alaskan Rifle
Weatherby Vanguard VGX Deluxe Rifle
Weatherby Vanguard Classic Rifle
Weatherby Vanguard Classic No. 1 Rifle
Weatherby Vanguard Weatherguard Rifle
Wichita Classic Rifle
Wichita Varmint Rifle
Winchester Model 70 Sporter
Winchester Model 70 Sporter WinTuff
Winchester Model 70 SM Sporter
Winchester Model 70 Stainless Rifle
Winchester Model 70 Varmint
Winchester Model 70 Synthetic Heavy Varmint Rifle
Winchester Model 70 DBM Rifle
Winchester Model 70 DBM–S Rifle
Winchester Model 70 Featherweight
Winchester Model 70 Featherweight WinTuff
Winchester Model 70 Featherweight Classic
Winchester Model 70 Lightweight Rifle
Winchester Ranger Rifle
Winchester Model 70 Super Express Magnum
Winchester Model 70 Super Grade
Winchester Model 70 Custom Sharpshooter
Winchester Model 70 Custom Sporting Sharpshooter Rifle

### Centerfire Rifles—Single Shot

Armsport 1866 Sharps Rifle, Carbine
Brown Model One Single Shot Rifle
Browning Model 1885 Single Shot Rifle
Dakota Single Shot Rifle
Desert Industries G–90 Single Shot Rifle
Harrington & Richardson Ultra Varmint Rifle
Model 1885 High Wall Rifle
Navy Arms Rolling Block Buffalo Rifle
Navy Arms #2 Creedmoor Rifle
Navy Arms Sharps Cavalry Carbine
Navy Arms Sharps Plains Rifle
New England Firearms Handi-Rifle
Red Willow Armory Ballard No. 5 Pacific
Red Willow Armory Ballard No. 1.5 Hunting Rifle
Red Willow Armory Ballard No. 8 Union Hill Rifle
Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable

C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

### Drillings, Combination Guns, Double Rifles

Beretta Express SSO O/U Double Rifles
Beretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifle
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling
Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

### Rimfire Rifles—Autoloaders

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle
Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle
Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR–7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

### Rimfire Rifles—Lever & Slide Action

Browning BL–22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM–321 Pump Rifle
Rossi Model 62 SA Pump Rifle

Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles—Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher Rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle
Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM–452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60–J–ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Espronceda IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT–22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU–KKW Training Rifle
Navy Arms TU–33/40 Carbine
Navy Arms TU–KKW Sniper Trainer
Norinco JW–27 Bolt-Action Rifle
Norinco JW–15 Bolt-Action Rifle
Remington 541–T
Remington 40–XR Rimfire Custom Sporter
Remington 541–T HB Bolt-Action Rifle
Remington 581–S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light Arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

### Competition Rifles—Centerfire & Rimfire

Anschutz 64–MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Intermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle
Anschutz 1910 Super Match II
Anschutz 54.18MS Silhouette Rifle
Anschutz Super Match 54 Target Model 2013
Anschutz Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP–1 ISU Standard Rifle

E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86–SR Specialty Rifle
McMillan M–86 Sniper Rifle
McMillan Combo M–87/M–88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M–89 Sniper Rifle
McMillan National Match Rifle
McMilan Long Range Rifle
Parker-Hale M–87 Target Rifle
Parker-Hale M–85 Sniper Rifle
Remington 40–XB Rangemaster Target Centerfire
Remington 40–XR KS Rimfire Position Rifle
Remington 40–XBBR KS
Remington 40–XC KS National Match Course Rifle
Sako TRG–21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG-UIT Rifle
Steyr-Mannlicher SSG P–I Rifle
Steyr-Mannlicher SSG P–III Rifle
Steyr-Mannlicher SSG P–IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

### Shotguns—Autoloaders

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A–303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun
Browning BSA 10 Stalker Auto Shotgun
Browning A–500R Auto Shotgun
Browning A–500G Auto Shotgun
Browning A–500G Sporting Clays
Browning Auto-5 Light 12 and 20
Browning Auto-5 Stalker
Browning Auto-5 Magnum 20
Browning Auto-5 Magnum 12
Churchill Turkey Automatic Shotgun
Cosmi Automatic Shotgun
Maverick Model 60 Auto Shotgun
Mossberg Model 5500 Shotgun
Mossberg Model 9200 Regal Semi-Auto Shotgun
Mossberg Model 9200 USST Auto Shotgun
Mossberg Model 9200 Camo Shotgun
Mossberg Model 6000 Auto Shotgun
Remington Model 1100 Shotgun
Remington 11–87 Premier Shotgun
Remington 11–87 Sporting Clays
Remington 11–87 Premier Skeet

PUBLIC LAW 103–322—SEPT. 13, 1994          108 STAT. 2007

Remington 11–87 Premier Trap
Remington 11–87 Special Purpose Magnum
Remington 11–87 SPS–T Camo Auto Shotgun
Remington 11–87 Special Purpose Deer Gun
Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun
Remington 11–87 SPS-Deer Shotgun
Remington 11–87 Special Purpose Synthetic Camo
Remington SP–10 Magnum-Camo Auto Shotgun
Remington SP–10 Magnum Auto Shotgun
Remington SP–10 Magnum Turkey Combo
Remington 1100 LT–20 Auto
Remington 1100 Special Field
Remington 1100 20-Gauge Deer Gun
Remington 1100 LT–20 Tournament Skeet
Winchester Model 1400 Semi-Auto Shotgun

### Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS Pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586–VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun
Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS–BG-Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun
Remington 879 SPS Special Purpose Magnum
Remington 870 SPS–T Camo Pump Shotgun
Remington 870 Special Field
Remington 870 Express Turkey
Remington 870 High Grades
Remington 870 Express
Remington Model 870 Express Youth Gun
Winchester Model 12 Pump Shotgun
Winchester Model 42 High Grade Shotgun
Winchester Model 1300 Walnut Pump
Winchester Model 1300 Slug Hunter Deer Gun
Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun
Winchester Model 1300 Turkey Gun
Winchester Model 1300 Ranger Pump Gun

### Shotguns—Over/Unders

American Arms/Franchi Falconet 2000 O/U
American Arms Silver I O/U
American Arms Silver II Shotgun
American Arms Silver Skeet O/U
American Arms/Franchi Sporting 2000 O/U
American Arms Silver Sporting O/U
American Arms Silver Trap O/U

American Arms WS/OU 12, TS/OU 12 Shotguns
American Arms WT/OU 10 Shotgun
Armsport 2700 O/U Goose Gun
Armsport 2700 Series O/U
Armsport 2900 Tri-Barrel Shotgun
Baby Bretton Over/Under Shotgun
Beretta Model 686 Ultralight O/U
Beretta ASE 90 Competition O/U Shotgun
Beretta Over/Under Field Shotguns
Beretta Onyx Hunter Sport O/U Shotgun
Beretta Model SO5, SO6, SO9 Shotguns
Beretta Sporting Clay Shotguns
Beretta 687EL Sporting O/U
Beretta 682 Super Sporting O/U
Beretta Series 682 Competition Over/Unders
Browning Citori O/U Shotgun
Browning Superlight Citori Over/Under
Browning Lightning Sporting Clays
Browning Micro Citori Lightning
Browning Citori Plus Trap Combo
Browning Citori Plus Trap Gun
Browning Citori O/U Skeet Models
Browning Citori O/U Trap Models
Browning Special Sporting Clays
Browning Citori GTI Sporting Clays
Browning 325 Sporting Clays
Centurion Over/Under Shotgun
Chapuis Over/Under Shotgun
Connecticut Valley Classics Classic Sporter O/U
Connecticut Valley Classics Classic Field Waterfowler
Charles Daly Field Grade O/U
Charles Daly Lux Over/Under
E.A.A./Sabatti Sporting Clays Pro-Gold O/U
E.A.A./Sabatti Falcon-Mon Over/Under
Kassnar Grade I O/U Shotgun
Krieghoff K-80 Sporting Clays O/U
Krieghoff K-80 Skeet Shotgun
Krieghoff K-80 International Skeet
Krieghoff K-80 Four-Barrel Skeet Set
Krieghoff K-80/RT Shotguns
Krieghoff K-80 O/U Trap Shotgun
Laurona Silhouette 300 Sporting Clays
Laurona Silhouette 300 Trap
Laurona Super Model Over/Unders
Ljutic LM-6 Deluxe O/U Shotgun
Marocchi Conquista Over/Under Shotgun
Marocchi Avanza O/U Shotgun
Merkel Model 200E O/U Shotgun
Merkel Model 200E Skeet, Trap Over/Unders
Merkel Model 203E, 303E Over/Under Shotguns
Perazzi Mirage Special Sporting O/U
Perazzi Mirage Special Four-Gauge Skeet
Perazzi Sporting Classic O/U
Perazzi MX7 Over/Under Shotguns
Perazzi Mirage Special Skeet Over/Under
Perazzi MX8/MX8 Special Trap, Skeet
Perazzi MX8/20 Over/Under Shotgun
Perazzi MX9 Single Over/Under Shotguns
Perazzi MX12 Hunting Over/Under
Perazzi MX28, MX410 Game O/U Shotguns
Perazzi MX20 Hunting Over/Under
Piotti Boss Over/Under Shotgun
Remington Peerless Over/Under Shotgun
Ruger Red Label O/U Shotgun
Ruger Sporting Clays O/U Shotgun
San Marco 12-Ga. Wildflower Shotgun
San Marco Field Special O/U Shotgun
San Marco 10-Ga. O/U Shotgun
SKB Model 505 Deluxe Over/Under Shotgun
SKB Model 685 Over/Under Shotgun
SKB Model 885 Over/Under Trap, Skeet, Sporting Clays
Stoeger/IGA Condor I O/U Shotgun

PUBLIC LAW 103–322—SEPT. 13, 1994        108 STAT. 2009

Stoeger/IGA ERA 2000 Over/Under Shotgun
Techni-Mec Model 610 Over/Under
Tikka Model 412S Field Grade Over/Under
Weatherby Athena Grade IV O/U Shotguns
Weatherby Athena Grade V Classic Field O/U
Weatherby Orion O/U Shotguns
Weatherby II, III Classic Field O/Us
Weatherby Orion II Classic Sporting Clays O/U
Weatherby Orion II Sporting Clays O/U
Winchester Model 1001 O/U Shotgun
Winchester Model 1001 Sporting Clays O/U
Pietro Zanoletti Model 2000 Field O/U

### Shotguns—Side by Sides

American Arms Brittany Shotgun
American Arms Gentry Double Shotgun
American Arms Derby Side-by-Side
American Arms Grulla #2 Double Shotgun
American Arms WS/SS 10
American Arms TS/SS 10 Double Shotgun
American Arms TS/SS 12 Side-by-Side
Arrieta Sidelock Double Shotguns
Armsport 1050 Series Double Shotguns
Arizaga Model 31 Double Shotgun
AYA Boxlock Shotguns
AYA Sidelock Double Shotguns
Beretta Model 452 Sidelock Shotgun
Beretta Side-by-Side Field Shotguns
Crucelegui Hermanos Model 150 Double
Chapuis Side-by-Side Shotgun
E.A.A./Sabatti Saba-Mon Double Shotgun
Charles Daly Model Dss Double
Ferlib Model F VII Double Shotgun
Auguste Francotte Boxlock Shotgun
Auguste Francotte Sidelock Shotgun
Garbi Model 100 Double
Garbi Model 101 Side-by-Side
Garbi Model 103A, B Side-by-Side
Garbi Model 200 Side-by-Side
Bill Hanus Birdgun Doubles
Hatfield Uplander Shotgun
Merkel Model 8, 47E Side-by-Side Shotguns
Merkel Model 47LSC Sporting Clays Double
Merkel Model 47S, 147S Side-by-Sides
Parker Reproductions Side-by-Side
Piotti King No. 1 Side-by-Side
Piotti Lunik Side-by-Side
Piotti King Extra Side-by-Side
Piotti Piuma Side-by-Side
Precision Sports Model 600 Series Doubles
Rizzini Boxlock Side-by-Side
Rizzini Sidelock Side-by-Side
Stoeger/IGA Uplander Side-by-Side Shotgun
Ugartechea 10-Ga. Magnum Shotgun

### Shotguns—Bolt Actions & Single Shots

Armsport Single Barrel Shotgun
Browning BT–99 Competition Trap Special
Browning BT–99 Plus Trap Gun
Browning BT–99 Plus Micro
Browning Recoilless Trap Shotgun
Browning Micro Recoilless Trap Shotgun
Desert Industries Big Twenty Shotgun
Harrington & Richardson Topper Model 098
Harrington & Richardson Topper Classic Youth Shotgun
Harrington & Richardson N.W.T.F. Turkey Mag
Harrington & Richardson Topper Deluxe Model 098
Krieghoff KS–5 Trap Gun
Krieghoff KS–5 Special
Krieghoff K–80 Single Barrel Trap Gun
Ljutic Mono Gun Single Barrel

Ljutic LTX Super Deluxe Mono Gun
Ljutic Recoilless Space Gun Shotgun
Marlin Model 55 Goose Gun Bolt Action
New England Firearms Turkey and Goose Gun
New England Firearms N.W.T.F. Shotgun
New England Firearms Tracker Slug Gun
New England Firearms Standard Pardner
New England Firearms Survival Gun
Perazzi TM1 Special Single Trap
Remington 90–T Super Single Shotgun
Snake Charmer II Shotgun
Stoeger/IGA Reuna Single Barrel Shotgun
Thompson/Center TCR '87 Hunter Shotgun.".

# Subtitle B—Youth Handgun Safety

### SEC. 110201. PROHIBITION OF THE POSSESSION OF A HANDGUN OR AMMUNITION BY, OR THE PRIVATE TRANSFER OF A HANDGUN OR AMMUNITION TO, A JUVENILE.

(a) OFFENSE.—Section 922 of title 18, United States Code, as amended by section 110103(a), is amended by adding at the end the following new subsection:

"(x)(1) It shall be unlawful for a person to sell, deliver, or otherwise transfer to a person who the transferor knows or has reasonable cause to believe is a juvenile—

"(A) a handgun; or

"(B) ammunition that is suitable for use only in a handgun.

"(2) It shall be unlawful for any person who is a juvenile to knowingly possess—

"(A) a handgun; or

"(B) ammunition that is suitable for use only in a handgun.

"(3) This subsection does not apply to—

"(A) a temporary transfer of a handgun or ammunition to a juvenile or to the possession or use of a handgun or ammunition by a juvenile if the handgun and ammunition are possessed and used by the juvenile—

"(i) in the course of employment, in the course of ranching or farming related to activities at the residence of the juvenile (or on property used for ranching or farming at which the juvenile, with the permission of the property owner or lessee, is performing activities related to the operation of the farm or ranch), target practice, hunting, or a course of instruction in the safe and lawful use of a handgun;

"(ii) with the prior written consent of the juvenile's parent or guardian who is not prohibited by Federal, State, or local law from possessing a firearm, except—

"(I) during transportation by the juvenile of an unloaded handgun in a locked container directly from the place of transfer to a place at which an activity described in clause (i) is to take place and transportation by the juvenile of that handgun, unloaded and in a locked container, directly from the place at which such an activity took place to the transferor; or

"(II) with respect to ranching or farming activities as described in clause (i), a juvenile may possess and use a handgun or ammunition with the prior written approval of the juvenile's parent or legal guardian and at the direction of an adult who is not prohibited

# EXHIBIT 4

NewsRoom

6/18/98 Boston Herald 18
1998 WLNR 276454

Boston Herald (MA)
Copyright (c) 1998 Boston Herald. All rights reserved.

June 18, 1998

Section: News

Acting gov urging strong action vs. assault weapons

Ellen J. Silberman

With the House scheduled to vote today on a bill regulating assault weapons, acting Gov. Paul Cellucci yesterday called on the Legislature to pass a "tough and effective" law.

"These weapons of mass destruction are designed to kill people," said Cellucci, as a state trooper displayed a TEC-9 and an Uzi, two assault weapons Cellucci wants banned.

"No one, not kids, not adults should have access to these deadly weapons," said Cellucci, whose running mate, Jane Swift, helped scuttle an assault weapons ban when she was a state senator from North Adams.

Swift changed her position when she signed up with Cellucci this winter.

Although Cellucci pushed his own bill, he declined to say whether he would sign the House bill, which some gun control opponents have criticized because it regulates the sale of older assault weapons rather than banning them outright.

An assault weapons ban has already passed the Senate.

"My hope is that we get a bill that is tough and effective," said Cellucci. His gun control bill includes a compete ban on large-magazine assault style weapons.

The assault weapons bill enjoys strong support among Democrats in both the House and Senate, which easily passed a weapons ban two years ago.

But the measure died in the conference called to reconcile the House and Senate versions of the bill.

House Speaker Thomas M. Finneran (D-Mattapan), who opposes an outright ban, is often credited with killing the bill as a reward to House Republicans who helped elect him speaker.

Cellucci said he planned to make phone calls to Republicans to urge them to support a total gun ban, but he couldn't say whether any member of the GOP would offer his version of the legislation.

Acting gov urging strong action vs. assault weapons, 1998 WLNR 276454

---- **Index References** ----

News Subject: (Government (1GO80); Economics & Trade (1EC26))

Language: EN

Other Indexing: (GOP; HOUSE; HOUSE AND SENATE; HOUSE REPUBLICANS; REPUBLICANS; SENATE) (Cellucci; Jane Swift; Paul Cellucci; Swift; Thomas M. Finneran)

Edition: All

Word Count: 345

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

NewsRoom

EXHBIT 5



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE DEPARTMENT
STATE HOUSE ● BOSTON, MA 02133
(617) 725-4000

**mitt romney**
governor

**kerry healey**
lieutenant governor

**FOR IMMEDIATE RELEASE:**
July 1, 2004

**CONTACT:**
Shawn Feddeman
Nicole St. Peter
(617) 725-4025

### ROMNEY SIGNS OFF ON PERMANENT ASSAULT WEAPONS BAN
*Legislation also makes improvements to gun licensing system*

In a move that will help keep the streets and neighborhoods of Massachusetts safe, Governor Mitt Romney today signed into law a permanent assault weapons ban that forever makes it harder for criminals to get their hands on these dangerous guns.

"Deadly assault weapons have no place in Massachusetts," Romney said, at a bill signing ceremony with legislators, sportsmen's groups and gun safety advocates.  "These guns are not made for recreation or self-defense.  They are instruments of destruction with the sole purpose of hunting down and killing people."

Like the federal assault weapons ban, the state ban, put in place in 1998, was scheduled to expire in September.  The new law ensures these deadly weapons, including AK-47s, UZIs and Mac-10 rifles, are permanently prohibited in Massachusetts no matter what happens on the federal level.

"We are pleased to mark an important victory in the fight against crime," said Lieutenant Governor Kerry Healey.  "The most important job of state government is ensuring public safety.  Governor Romney and I are determined to do whatever it takes to stop the flood of dangerous weapons into our cities and towns and to make Massachusetts safer for law-abiding citizens."

The new law also makes a number of improvements to the current gun licensing system, including:

- Extending the term of a firearm identification card and a license to carry firearms from four years to six years;
- Granting a 90-day grace period for holders of firearm identification cards and licenses to carry who have applied for renewal; and
- Creating a seven-member Firearm License Review Board to review firearm license applications that have been denied.

"This is truly a great day for Massachusetts' sportsmen and women," said Senator Stephen M. Brewer.  "These reforms correct some serious mistakes that were made during the gun debate in 1998, when many of our state's gun owners were stripped of their long-standing rights to own firearms.  I applaud Senate President Travaglini for allowing the Senate to undertake this necessary legislation."

"I want to congratulate everyone that has worked so hard on this issue," said Representative George Peterson.  "Because of their dedication, we are here today to sign into law this consensus piece of legislation.  This change will go a long way toward fixing the flaws created by the 1998 law.  Another key piece to this legislation addresses those citizens who have applied for renewals.  If the government does not process their renewal in a timely fashion, those citizens won't be put at risk because of the 90 day grace period that is being adopted today."

"Never before has there been such bi-partisan cooperation in the passage of gun safety legislation of this magnitude in this nation," said John Rosenthal, co-founder and chair of Stop Handgun Violence.  "I applaud the leadership of the Governor, Senate President, House Speaker and entire Legislature for passage of this assault weapons ban renewal.  They have shown that Massachusetts can continue to lead the nation in protecting the public and law enforcement from military style assault weapons."

<div align="center">###</div>

# EXHIBIT 6

Case 1:22-cv-11431-FDS Document 21-1 Filed 01/31/23 Page 102 of 295



# STATE HOUSE
# NEWS SERVICE

http://www.statehousenews.com

**ROMNEY SIGNS ASSAULT WEAPONS BAN EXTENSION, CHANGES IN GUN LICENSING (7-1-2004)**

By Amy Lambiaso

STATE HOUSE NEWS SERVICE

STATE HOUSE, BOSTON, JULY 1, 2004.....Gov. Mitt Romney today hailed the Legislature's bipartisan work as he signed into law a permanent ban on deadly assault weapons, such as the AK-47 and Uzi, made or sold in Massachusetts.

The current state ban, passed in 1998, is tied to a federal law that is set to expire Sept. 13 unless Congress re-authorizes the ban. President Bush has signaled he would sign a bill extending the ban, but state officials here fear Congress may not approve a new bill before the current federal law expires.

"These guns are not made for recreation or self-defense," Romney said. "They are instruments of destruction with the sole purpose of hunting down and killing people."

Activists say Massachusetts is the first state to extend the ban on so-called assault weapons. During a bill-signing press conference, John Rosenthal, co-founder and chair of Stop Handgun Violence, joined Romney in praising the Legislature and administration for "de-polarizing and de-politicizing" the issue.

"We're not taking guns away from anyone except assault weapons and cheaply made Saturday night specials," Rosenthal said. "This is the model for the nation."

Rosenthal called on other states to pass similar permanent bans, especially New Hampshire and Maine - states that he said have weaker gun laws. If the federal ban expires, people will be able to purchase and sell assault weapons in other states and the weapons may end up in Massachusetts, he said.

In addition to making the state ban on assault weapons permanent, the new law instructs the state to issue firearms identification cards (FID) and license to carry a firearm (LTC) cards the size of a driver's license and extends the term to carry the license from four to six years. The law also creates a 90-day grace period for a gun license holder in the renewal process; waives the licensing fee for police officers applying for a LTC, and requires police officers to keep an inventory and receipt of all confiscated guns.

Romney also praised creation of a new Firearms Licensing Review Board to review all applicants for a FID or LTC that have been denied because of a prior misdemeanor conviction. The board has the discretion to award a license to the applicant if they are no longer deemed dangerous. Up to $50,000 of licensing fees collected are to be directed from the General Fund and spent on the board's operations.

"I think it's terrific," Romney said, flanked by Sens. Stephen Brewer (D-Barre) and Joanne Sprague (R-Walpole), Reps. George Peterson (R-Grafton) and Michael Coppola (R-Foxborough). "A new law - we're safer and we also have some great sportsmen to enjoy it."

The law does not address what some lawmakers called a "loophole" that allows assault weapons made before 1994 - when the federal ban took effect - to be bought and sold. Sen. Jarrett Barrios (D-Cambridge) had pushed to close that loophole. "An AK-47 made in 1992 kills just as many people as those made in 1997," Barrios said. ^Z

www.statehousenews.com

© Copyright 1997-2016 State House News Service

# EXHIBIT 7

# THE BASICS OF PERSONAL PROTECTION IN THE HOME

Produced by the Education & Training Division

A Publication of the National Rifle Association of America





First Edition—September 2000

©2000 The National Rifle Association of America

International Standard Book Number (ISBN):  0-935998-99-3

All rights reserved. Printed in the United States of America. This book may not be reprinted or reproduced in whole or in part by mechanical means, photocopying, electronic reproduction, scanning, or any other means without prior express written permission. For information, write: Training Department, Education & Training Division, National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

ES 26828 8/05

## WARNING

The NRA expressly disclaims any and all liabilities, losses, costs, claims, demands, suits or actions of any type or nature whatsoever, arising from or in any way related to: this manual; the use of this manual; any representation, drawing or statement made in this manual; or any claim that a particular action is in compliance or performed according or pursuant to this manual.

This manual is under no circumstances to be viewed as a restatement of the law in any jurisdiction or to assure compliance with any applicable federal, state or local laws, ordinances, rules or regulations. You must consult a local attorney to ascertain compliance with all applicable federal, state or local laws, ordinances, rules or regulations and to advise you of the applicable duty of care required of firearms owners in your jurisdiction.

Discharging firearms in poorly ventilated areas, cleaning firearms, or handling ammunition or lead-containing reloading components may result in exposure to lead, a substance known to cause birth defects, reproductive harm and other serious physical injury. Have adequate ventilation at all times. Wash hands after exposure.

Great pains have been taken to make this book as complete as possible; however, it is designed to be used in conjunction with the classroom and firing range instruction of the NRA Basic Personal Protection in the Home Course. Reading this guide is not, in itself, sufficient to confer proficiency in the many techniques of personal protection in the home. The reader of this guide is strongly advised to obtain additional knowledge and hands-on training. Contact the NRA Education & Training Division at (703) 267-1430 for a list of NRA Certified Instructors.

# PART VI:
# SELECTING FIREARMS, AMMUNITION AND ACCESSORIES FOR PERSONAL PROTECTION

# CHAPTER 20

# SELECTING A FIREARM FOR PERSONAL PROTECTION

Choosing to own a handgun for personal protection requires careful consideration of a number of factors. The selection of a specific firearm and ammunition for self-defense can be just as critical, and should entail the same comprehensive deliberation.

A firearm is a tool for delivering energy at a distance. This energy can be used to do various tasks—to harvest game, punch a hole through a paper target, or, in the case of a defensive arm, stop a criminal attack.

## GUN FIT

One of the most important factors contributing to a shooter's ability to shoot quickly and accurately is gun fit. *Gun fit* refers to how comfortably and naturally the firearm fits the hand—how well the firearm's grip size, grip angle, location of controls, length, size and other characteristics fit a particular shooter. Related to gun fit is *gun ergonomics*, a term that relates to the convenience and efficiency of the positioning of controls and gripping surfaces. Gun fit is highly individual: for example, guns that are suited for those with large, fleshy hands may not fit those having small, bony hands, and vice versa.

Good gun fit allows you to



Fig. 111. Good gun fit is critical to fast, accurate defensive shooting. Photos A and B show proper hand and trigger finger placement, made possible through proper gun fit, while C shows the gap between the trigger finger and frame that should exist when the gun fits the hand and fingers correctly.

183

maintain a consistent grip, positions your trigger finger in the proper location on the trigger, and facilitates your assumption of a stable shooting position. Before you purchase a gun, you should test-fire a number of different models to determine which fits you best. Guidance on gun fit can be provided by NRA Certified Instructors.

Test-firing a variety of handguns also will give you the opportunity to experience different action mechanisms. While there are a variety of handgun types, including single- and double-action revolvers, single-action, double-action and double-action-only semi-automatics, derringers and even single-shots, the novice defensive shooter will be best served by either a double-action revolver or a double-action semi-automatic.

## REVOLVER OR SEMI-AUTOMATIC?

Among firearm instructors, gun writers and other authorities, both revolvers and semi-autos have their passionate adherents. Each type has strengths and limitations.

The *double-action revolver* often is recommended for new shooters because of its simplicity of operation and reliability. Once its cylinder is loaded, it is fired simply by pulling the trigger; no safety levers need be disengaged. Because the revolver does not depend upon the recoil generated by the cartridge for operation, it is capable of handling a wide variety of loadings in a particular chambering. Moreover,



*Fig. 112. A typical double-action revolver, showing some of the major features and components.*

the revolver's mechanism confers at least a theoretical reliability edge.

The main drawback to the revolver as a defensive arm is its limited ammunition capacity. Most defensive center-fire revolvers have a cylinder capacity of only 5 or 6 rounds—considerably less than the magazine capacity of most semi-automatic pistols. The revolver is also slow to reload, even with speedloaders (devices which allow the quick, simultaneous insertion of all the rounds into the cylinder). Additionally, each shot with the revolver must be fired using a long, relatively heavy trigger pull that some shooters find detrimental to accuracy.

The *semi-automatic pistol* (sometimes called a *self-loader*) has, in recent years, largely superseded the revolver as the handgun of choice for law enforcement officers and other armed professionals. Semi-autos have always had wide popularity among civilian shooters.

The popularity of semi-automatic arms stems from several factors. First, they generally have considerably greater cartridge capacity than revolvers of similar size, allowing more shots to be fired before reloading is necessary. When reloading is required, the semi-automatic can be reloaded with a full magazine much more quickly than a revolver's cylinder can be filled, even with speedloaders. Also, although the initial shot from a typical double-action semi-automatic is fired using a long and heavy trigger pull similar to that of a double-action revolver, each subsequent shot is fired by a short, light, single-action pull, which is generally considered to contribute to accuracy. (This advantage is negated on double-action-only semi-automatics, in which every shot is fired in double-action



*Fig. 113. A typical semi-automatic pistol, showing some of the major features and components.*

mode.) Lastly, the semi-auto generally is narrower in width than the revolver—a factor when concealment or cramped gun storage space is a concern.

Semi-automatics have several limitations, however. They are more ammunition-sensitive than revolvers, as they require cartridges within a certain power range to ensure that their recoil-operated mechanisms function properly. Also, their rapidly-moving parts make them somewhat more jam-prone than revolvers (although the reliability of today's semi-autos generally is excellent). Semi-automatic mechanisms usually include safety levers, decocking levers and/or slide release levers, making them initially less intuitive to operate. Furthermore, on virtually all semi-automatics, the slide must be manually retracted and released to chamber a round. The stiffness of the recoil springs on many semi-autos makes these pistols difficult to use by those with low hand and arm strength, arthritis or other physical limitations. Such individuals also may find it difficult to hold the semi-automatic pistol rigidly enough to ensure reliable operation.

## CARTRIDGE SELECTION

For either type of firearm, there is a wide range of cartridges to choose from. The effectiveness of a self-defense firearm is related, to some extent, to the amount of energy it can deliver. This energy is usually expressed in terms of a measure called *kinetic energy* or *muzzle energy*, which is calculated using both bullet weight and bullet velocity, and is expressed in foot-pounds. Different cartridges are capable of generating different levels of kinetic energy, and thus vary in their ability to stop an assailant.



*Fig. 114. These photographs reflect the difference between a cartridge generating a low level of recoil and flash (above) and a cartridge producing considerable recoil and flash. Note the height of muzzle flip in the photo at right; this would make fast, accurate follow-up shots difficult to perform.*

Cartridge characteristics also influence the ability of the shooter to place shots precisely and rapidly on the target and to handle recoil.

As a general rule, you should select the most powerful cartridge that you can handle effectively—that is, one that does not produce flinching or excessive recoil, and allows you to apply follow-up shots quickly and accurately. This is determined primarily by test-firing handguns chambered for different cartridges. If possible, try handguns of different weights and sizes in the same chambering. If you find it difficult to handle the recoil generated by the .38 Special cartridge in a small, lightweight revolver, you might more easily control a heavier, bigger gun chambered for the same cartridge.

As a broad generalization, most firearm authorities recommend a minimum of 9 mm Parabellum (also known as 9 mm Para, 9 mm Luger, or 9x19 mm) for semi-automatic pistols, and .38 Special for revolvers. However, there are some shooters whose recoil sensitivity or lack of hand strength do not permit them to handle even these rather moderate-power cartridges. Such individuals should not feel themselves hopelessly under-gunned with a pistol or revolver in .38 S&W, .380 Auto, .32 Auto, .25 Auto or even .22 Long Rifle. With proper bullet placement, even such low-powered rounds have proven effective for self-defense.

More detailed information on cartridge selection will be presented in Chapter 21: Selecting Ammunition for Personal Protection.

## ADDITIONAL FACTORS

In addition to gun fit and chambering, other factors may influence handgun selection. *Gun size* is significant if the firearm may also be used for concealed carry purposes or if firearm storage space is minimal. *Safety features* are always of concern, particularly when the gun is used or stored in an environment in which there are children or other persons unauthorized to handle firearms. *Manufacturer's reputation* and *price* usually also play a part in any gun's purchase. An NRA Certified Instructor can assist the prospective gun owner in evaluating these factors.

# CHAPTER 21

# SELECTING AMMUNITION FOR PERSONAL PROTECTION

After the caliber, type of firearm, and specific firearm model are selected, the defensive-oriented shooter must still choose a particular load (a specific combination of bullet weight, bullet design, and muzzle velocity) among the variety of loads commercially available in that gun's chambering.

Ammunition intended for defensive firearms can be evaluated in terms of five major criteria: *reliability, controllability, stopping power, accuracy* and *muzzle flash*.

## RELIABILITY

*Reliability* refers to the ability of a firearm to consistently chamber, fire, extract and eject a particular load without malfunctions. Reliability is the single most important factor in selecting defensive ammunition. Most loads are more reliable in some guns than in others, so the only way to determine ammunition reliability is to test-fire a number of rounds through the gun being used for self-defense. Ensure that the gun is clean and well-lubricated before performing reliability testing. There's no hard and fast rule for the number of rounds that should be fired without malfunctions for the gun/ammunition combination to be considered reliable. A single box of ammunition—50 rounds—is probably not quite enough; 500 rounds might be excessive to many. Many gunsmiths recommend a defensive handgun



*Fig. 115. A full-metal jacket (FMJ) cartridge (left) and a hollow-point cartridge. Many semi-automatic pistols are more reliable with FMJ ammunition than with hollow-point ammunition.*

189

be capable of firing at least 150-200 rounds with no stoppages. The greater the number of trouble-free shots fired during reliability testing, the smaller the chance the gun will become inoperable during a confrontation. The individual gun owner must be responsible for determining the reliability standard he or she is comfortable with. A firearm that doesn't achieve that standard with at least one of the appropriate ammunition choices may need gunsmith attention.

Often, however, reliability problems in semi-automatic pistols stem from the magazine, and have little or nothing to do with the ammunition being used. By using numbered magazines, you can identify problem magazines that can be set aside, or used only for practice. Magazine-related problems may also be cured simply by trying another brand of magazine, which may be made to different tolerances or a slightly different design than the troublesome unit.

The majority of semi-automatic pistols function best with full-metal-jacket (ball) ammunition; the round-nose jacketed bullets used in such loads, however, are not the best choice for a defensive encounter. As discussed below, hollow-point bullets are the best choice for use in personal protection handguns. Hollow-points having a profile similar to that of a full-metal-jacket bullet will feed best in a self-loading pistol.

## CONTROLLABILITY

*Controllability* is directly linked to the amount of recoil produced by a cartridge. As a general rule, the less recoil a load generates, the more controllable it will be. Controllability is important because, in defensive shooting situations, you may need more than one round to stop a violent con-



*Fig. 116. Ammunition that is more controllable allows a shooter to fire quick, accurate shots. Note spent case above shooter's head and in ejection port.*

frontation. This is particularly true in the case of multiple-assailant situations. The more rapidly you can make hits on an assailant, the more quickly he or she may cease the attack.

Controllability may be evaluated simply by firing several different loads and noting which one felt the softest. You may also use a shooting partner to observe the level of muzzle jump each ammunition type and brand produces; a video cam-

era will suffice in the absence of such an observer. Additionally, timed multiple-shot drills may reveal which load allows the fastest recovery time.

## STOPPING POWER

One of the most talked-about and hotly debated aspects of defensive loads, *stopping power* can be defined as the ability of a cartridge to quickly incapacitate an assailant, or otherwise cause that assailant to stop his attack. Comparisons of stopping power among different cartridges and bullet types are often made on the basis of the effects of a single well-placed shot—the often-cited "one shot stop." Despite the claims made for different bullet designs, there is a lack of complete consensus among gun authorities regarding the exact cartridge characteristics giving the best stopping power performance.



Nonetheless, some broad generalizations can be made. Hollow-point bullets usually are preferred over other types because they are designed to open up and expand in diameter upon impact. This expansion both transfers energy more efficiently to the target and also prevents overpenetration (complete penetration of the target) that could endanger the lives of others. Also, all other

*Fig. 117. The expansion of hollow-point bullets makes them more effective for defensive use than other bullet types.*

factors being equal, there is a rough correlation between the amount of energy the bullet has upon impact and its effectiveness in stopping an assailant.

Fortunately, you need not become a firearms expert to pick the proper ammunition. Results derived from reports of police and civilian shootings in which a single shot stopped an attacker show that virtually all of today's premium hollow-point defensive loads are adequately effective. The proper selection strategy is to pick the most reliable, controllable and accurate brand from among the variety of premium hollow-point loadings available.

## ACCURACY

Although of primary importance in a gun used for target shooting or hunting, *accuracy* is only a moderately significant factor in the effectiveness of defensive handgun ammunition. This is so primarily because most defensive firearm uses take place at very close range (7 yards and under). Some authorities suggest that the ability to produce a 2-inch group at 7

 

*Fig. 118. Since most defensive encounters take place at relatively close range, extreme accuracy is not required. Adequate defensive accuracy is achieved when rapidly-fired shots at seven yards are reasonably centered on an 8½" by 11" piece of paper (right). The groups at left show the groups resulting from firing too slowly (top) and too quickly.*

yards is adequate for defensive purposes; the vast majority of gun and ammunition combinations will easily meet or exceed that standard. Note also that the dynamics typical of a defensive shooting situation—low light, moving targets, and a rapid firing rate—generally make any attempt at pinpoint accuracy impractical.

With fixed-sight guns, good accuracy implies more than just tight grouping; it also involves the ability of the gun and ammunition combination to shoot to the point of aim indicated by the sights. Fixed-sight arms often may be roughly adjusted for windage by drifting the rear sight laterally; elevation adjustments usually require gunsmith intervention. It is more important that defensive ammunition for such guns shoot to the point of aim; tight grouping is secondary.

## MUZZLE FLASH

The *muzzle flash* generated by a load upon firing can influence the outcome of a self-defense situation, particularly at night. Under conditions of darkness, excessive flash will temporarily rob you of your night vision—the accommodation the eye has made to the low light level. The muzzle flash may also illuminate your defensive position, giving an armed attacker something to aim at.



*Fig. 119. In darkness, the muzzle flash from a .357 Rem. Mag. cartridge fired from a 2"-barrel revolver would cause a loss of night vision.*

## SECONDARY FACTORS

In addition to the five major criteria described above, additional secondary factors should be considered in evaluating any defensive load, including its tendency to leave combustion residues, or fouling, in the barrel; whether its case can be reloaded to make a fresh cartridge (a factor of importance to reloaders); price; and availability. It is also worth noting that certain types of ammunition—particularly unusual or unconventional ammunition, or ammunition having an inflammatory or provocative brand name—have been mis-characterized by some prosecutors in an attempt to show that the person shooting in self-defense was actually eager to engage in combat and thus, inferentially, likely to shoot another person without sufficient cause.

An NRA Certified Instructor can assist you in selecting the proper defensive load for your needs.

## CLEANING KIT

For proper gun maintenance, a complete cleaning kit is essential. Such a kit should contain at least the following items:
- cloth patches;
- cleaning rod with cleaning rod attachments, including bore brush and an assortment of cleaning rod tips to hold patches;
- a small brush for cleaning tight spots and crevices;
- gun cleaning solvent (bore cleaner);
- gun oil;
- a soft cloth for wiping exterior gun surfaces; and
- eye protection.



*Fig. 121. The elements of a basic gun cleaning kit, including (clockwise from bottom center): (A) bronze bore brush and slotted tip for holding patches; (B) cleaning rod; (C) small brush; (D) cotton patches; (E) gun oil; (F) gun cleaning solvent; (G) soft cloth; and (H) eye protection. Also shown are thin rubber gloves, which may help protect the skin from prolonged exposure to dirt, oil and solvent.*

These items may be purchased separately, or together in a kit. See Appendix A: Firearm Maintenance for more information on the tools and techniques to keep your firearm clean.

## GUN STORAGE DEVICES

It is every gun owner's responsibility to ensure that his or her firearms are stored so that they are inaccessible to all persons unauthorized to han-



*Fig. 122. Gun storage devices, including (top l.) a steel gun box with a Simplex®-type lock, (l.) a plastic case secured with a padlock, and a gun safe.*



dle them. Each gun owner must make the individual choice of how that is best accomplished. In some jurisdictions, firearm storage methods are not determined by individual decision, but by local ordinance or state law. Consult a knowledgeable attorney for the legal requirements in your area.

Those gun owners who choose, or are compelled by law, to lock their firearms in gun safes or gun boxes can choose from a wide variety of sizes and types, from lightweight portable plastic cases to steel-sided gun safes that may be permanently attached to walls, cabinets and the like. Some cases have combination or keyed locks, while others, such as Simplex® locks, have numbered buttons that may be pressed in a specific sequence to allow access. This latter type of lock is often preferred for gun safes or lockboxes that are used to store personal protection firearms, because it is easier to open in the dark or under stress.

In addition to providing firearm security in a home or business, a lockable case may be required when a firearm is transported inside a vehicle, such as to a shooting range or gunsmith shop. Again, consult your attorney for the laws in your city, county or state.

## SPEEDLOADERS

Speedloaders—devices that hold a cylinder-full of cartridges in position to be quickly inserted in the cylinder's chamber—afford the fastest means

of recharging the chambers of a revolver cylinder. Revolver shooters should have several speedloaders to facilitate speedy reloading.

Several extra speedloaders will also permit you to practice reloading drills with one or two of the devices while retaining the remainder for an actual defensive situation. It is important to keep the practice speedloaders separate from those used for defensive purposes, because the practice units may become worn and thus less reliable from frequent use.



Fig. 123. Speedloaders reduce the time required to reload a revolver. Knob (arrow) is turned to release the cartridges when they are aligned with the chambers.

## SPARE MAGAZINES

If your defensive handgun is a semi-automatic, it is important to have several extra magazines for it. Additional magazines will allow you to speedily recharge your pistol with a fresh supply of ammunition, in the event the initial magazine is exhausted.

Furthermore, it is recognized that the magazine is the weak link in any semi-automatic handgun design, as it is easy for thin-walled magazine bodies to become dented, misshapen, or otherwise nonfunctional in normal use. A supply of extra magazines allows you to have several that are employed only in practice sessions, while others can be kept in reserve only for actual defensive use. As with speedloaders, it is important to keep the practice magazines separate from those reserved for defensive purposes, as the practice units may become worn or damaged, and thus less reliable, from frequent practice use.

## DUMMY ROUNDS/SNAP CAPS

Dummy rounds or snap caps (a type of dummy ammunition that uses a spring-loaded or soft plastic pad to cushion firing pin fall) are useful for dry-fire and gun-handling exercises. With certain gun designs, dry-firing can cause damage to action components; snap caps will prevent this. Consult the firearm owner's manual for more information on the recommended dry-fire procedure.

Snap caps can be used for certain live-fire exercises as well, such as the ball-and-dummy drill, in which dummy cartridges are mixed in with live rounds in a sequence not known to the shooter. The movement of the gun

when the trigger is pulled on the dummy round often reveals a tendency to flinch or otherwise anticipate the shot.

Dummy rounds and snap caps typically come in colors that clearly distinguish them from live ammunition. Plastic dummies are often in bright red or orange, and metal dummy rounds frequently feature a completely black cartridge case or a solid copper body.

Dummy rounds and snap caps can help improve the shooting fundamentals and are also useful in many gun-handling drills, such as speed reloading drills.



*Fig. 124. Above, snap caps and dummy rounds in different calibers. The inset at right shows the three major types of these devices: left, a plastic snap cap with a brass head containing a spring-loaded plunger to cushion firing pin impact; center, a solid plastic dummy round; and right, a metal dummy round approximating the weight and feel of a live cartridge.*

# EXHIBIT 8

# NRA GUIDE
## TO THE
# BASICS OF PERSONAL
# PROTECTION
# OUTSIDE THE HOME



Suggested Retail $27.95

# NRA GUIDE
# TO
# PERSONAL
# PROTECTION
# OUTSIDE
# THE HOME

Produced by the Education & Training Division

A Publication of the National Rifle Association of America

Case 1:22-cv-11431-FDS   Document 21-1   Filed 01/31/23   Page 126 of 295



First Edition—April 2006
©2006 The National Rifle Association of America

International Standard Book Number (ISBN): 978-0-935998-25-2

All rights reserved. Printed in the United States of America. This book
may not be reproduced in whole or in part by mechanical means, photo-
copying, electronic reproduction, scanning, or any other means without
written permission. For information, write: Training Department,
Education & Training Division, National Rifle Association of America,
11250 Waples Mill Road, Fairfax, VA 22030.

NR40830ES30000 07/08

# TABLE OF CONTENTS

Introduction..................................................................................................vii
Safety Note...................................................................................................ix

**PART I: SAFETY**
Chapter 1: Basic Firearm Safety.................................................................3
Chapter 2: Defensive Shooting Safety Outside the Home...............................7
Chapter 3: Safe Firearm Storage................................................................13

**PART II: STRATEGIES FOR PERSONAL SAFETY
OUTSIDE THE HOME**
Chapter 4: Awareness..............................................................................29
Chapter 5: The Defensive Mindset.............................................................35
Chapter 6: Avoiding Confrontations Outside the Home...............................39
Chapter 7: Responding to an Attack Outside the Home...............................49
Chapter 8: If You Must Shoot....................................................................63
Chapter 9: The Aftermath of a Defensive Shooting Outside
                        the Home....................................................................77

**PART III: CARRYING A CONCEALED HANDGUN AND
PRESENTING THE HANDGUN FROM CONCEALMENT**
Chapter 10: Handgun Carry: Holsters, Fanny Packs and
                        Holster Purses.............................................................87
Chapter 11: Principles of Concealed Carry.................................................105
Chapter 12: Presenting the Handgun from Concealment..............................115
Chapter 13: Special Concealment Situations..............................................139

**PART IV: DEVELOPING BASIC DEFENSIVE
SHOOTING SKILLS**
Chapter 14: Defensive Shooting Concepts..................................................147
Chapter 15: Basic Defensive Shooting Skills...............................................153
Chapter 16: Shooting Positions.................................................................159
Chapter 17: Aiming and Firing Techniques.................................................179

**PART V: DEVELOPING CONCEALED CARRY
SHOOTING SKILLS FOR USE OUTSIDE THE HOME**
Chapter 18: Utilizing Cover and Concealment Outside the
                        Home........................................................................191
Chapter 19: Presentation and Fire from Different Positions..........................203
Chapter 20: Presentation, Movement and Fire from Different
                        Positions...................................................................213
Chapter 21: Handgun Retention................................................................225

*v*

**PART VI: SPECIAL DEFENSIVE SHOOTING
TECHNIQUES**

Chapter 22: Strong- and Weak-Hand Shooting..............................................237
Chapter 23: Point Shooting..........................................................................241
Chapter 24: Instinctive Shooting...................................................................247
Chapter 25: Engaging Multiple Targets..........................................................253
Chapter 26: Engaging Targets at Extended Range...........................................263
Chapter 27: Engaging Targets in Low Light Conditions...............................269

**PART VII: CONCEALED CARRY, SELF-DEFENSE
AND THE LAW**

Chapter 28: Firearms, Self-Defense and the Law...........................................281
Chapter 29: Legal Aspects of Concealed Carry..............................................291
Chapter 30: The Legal Aftermath of a Shooting Outside the Home.............297

**APPENDIXES**

Appendix A: Gun Handling...........................................................................305
Appendix B: Gun Cleaning............................................................................329
Appendix C: Opportunities for Skills Enhancement.......................................339
Appendix D: Information and Training Resources...........................................345
Appendix E: Facts About the NRA................................................................349

Index.............................................................................................................353

# INTRODUCTION

As of early 2006, 38 of the 50 United States permit law-abiding citizens the right to carry a concealed firearm. Millions of people have taken advantage of this right, creating a need for a comprehensive course that covers the full spectrum of issues and information relating to concealed carry and self-defense. This includes not only techniques for properly carrying, presenting and shooting a concealed firearm, but also strategies for preventing violent encounters, and the legal ramifications of using lethal force in self-defense outside the home. The NRA's Personal Protection Outside the Home Course was designed to meet this need.

For many, the term "personal protection" immediately evokes images of martial-arts techniques or a handgun in a nightstand. In truth, however, the use of force is only one of many methods that you can employ to defend life and limb, and is used only as a last resort, when other methods have failed. *For myriad ethical, legal and practical reasons, it is always preferable to escape, evade, deter or otherwise avoid an attack rather than be forced to counter it with force.* Even when planning and skill give you an overwhelming advantage over an assailant, sidestepping a violent confrontation is always the best course. This is especially true when you are legally carrying a concealed handgun in public. Not only is retreat or flight from a confrontation outside the home the most sensible alternative, it is required by statute in most states (as long as you can retreat safely).

There are times, however, when circumstances allow no other option but the use of force to save your life or the lives of others. When you are confronted with such circumstances outside the home, a concealed handgun is unquestionably the most effective defensive tool available, if it is used properly. The ability to draw a handgun from concealment and shoot accurately is not something you are born with; it must be developed through the mastery of a series of interlocking skills, and then must be reinforced through frequent practice.

Note that, in many defensive situations, merely presenting the firearm will deter the threat, without the need for the gun to be fired. The NRA Personal Protection Outside the Home course will help prepare you to make decisions regarding the level of firearm use that is necessary to protect your life or the lives of others.

The main focus of the *NRA Guide to Personal Protection Outside the Home* is on the effective use of a concealed handgun for self-defense outside the home. Included are chapters on concealment techniques and devices, presenting the handgun from concealment, utilizing cover and concealment outside the home, presentation and movement, point shooting, instinctive shooting, low-light shooting, engaging multiple targets, and one-hand shooting. These skills and others presented in this book form the core shooting skills used to counter a

life-threatening attack outside the home.

For those who do not wish to incorporate a handgun into their personal protection plans, or who may not always be able to carry a handgun outside the home, the book also presents techniques and strategies to help you avoid, deter, repel or escape an attack without the use of a firearm. Included are ways to make you seem like less of a target to potential attackers. Additionally, the NRA course, Refuse to Be a Victim®, can help you create a personal security plan that does not include firearms.

The *NRA Guide to Personal Protection Outside the Home* is divided into seven parts: Safety; Strategies for Personal Safety Outside the Home; Carrying a Concealed Handgun and Presenting the Handgun from Concealment; Developing Basic Defensive Shooting Skills; Developing Concealed Carry Defensive Shooting Skills for Use Outside the Home; Special Defensive Shooting Techniques; and Concealed Carry, Self-Defense and the Law. Also included are appendixes on resources for additional information, and facts about the NRA.

Although this book has a wealth of information on virtually every aspect of concealed carry and personal protection outside the home, it is meant to be used within the framework of the NRA Personal Protection Outside the Home Course, a hands-on program encompassing 14 hours of classroom and range instruction. (Mastery of the shooting skills taught in the NRA Basic Pistol Course and the NRA Basic Personal Protection in the Home Course are both prerequisites for this course.) You should understand that merely reading a book—any book—will not, in and of itself, make you proficient at the various skills involved in concealed handgun carry and armed self-defense outside the home. For more information on the NRA Personal Protection Outside the Home Course or any other NRA course, call (703) 267-1423.

---

### A Gun Owner's Responsibilities

Americans enjoy a right that citizens of many other countries do not--the right to own firearms. But with this right come responsibilities. It is the gun owner's responsibility to store, operate and maintain his or her firearms safely. It is the gun owner's responsibility to ensure that unauthorized or untrained individuals cannot gain access to his or her firearms. And it is the gun owner's responsibility to learn and obey all applicable laws that pertain to the purchase, possession and use of a firearm in his or her locale. Guns are neither safe nor unsafe by themselves. When gun owners learn and practice responsible gun ownership, guns are safe.

---

*viii*

# EXHIBIT 9

# THE COMPLETE

# AR-15/M16 SOURCEBOOK

## What Every Shooter Needs to Know

### REVISED AND UPDATED EDITION







## Duncan Long

### PALADIN PRESS • BOULDER, COLORADO

**Other books by Duncan Long:**

AK47: The Complete Kalashnikov Family of Assault Rifles
AR-15/M16 Super Systems
The AR-15/M16: A Practical Guide
Combat Rifles of the 21st Century
Hand Cannons: The World's Most Powerful Handguns
The Mini-14: The Plinker, Hunter, Assault, and Everything Else Rifle
Mini-14 Super Systems
Modern Combat Ammunition
Modern Sniper Rifles
The Poor Man's Fort Knox: Home Security with Inexpensive Safes
Ruger .22 Automatic Pistol: Standard/Mark I/Mark II Series
Streetsweepers: The Complete Book of Combat Shotguns, Revised and Updated Edition
The Sturm, Ruger 10/22 Rifle and .44 Magnum Carbine
Super Shotguns: How to Make Your Shotgun Into a Do-Everything Weapon
The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families

*The Complete AR-15/M16 Sourcebook:*
*What Every Shooter Needs to Know, Revised and Updated Edition*
by Duncan Long

Copyright © 1992, 2001 by Duncan Long

ISBN 13: 978-0-87364-687-1
Printed in the United States of America

Published by Paladin Press, a division of
Paladin Enterprises, Inc.
Gunbarrel Tech Center
7077 Winchester Circle
Boulder, Colorado 80301 USA
+1.303.443.7250

Direct inquiries and/or orders to the above address.

PALADIN, PALADIN PRESS, and the "horse head" design
are trademarks belonging to Paladin Enterprises and
registered in United States Patent and Trademark Office.

All rights reserved. Except for use in a review, no portion of this book may
be reproduced, stored in or introduced into a retrieval system, or
transmitted in any form without the express written permission of the
publisher. The scanning, uploading and distribution of this book by the
Internet or any other means without the permission of the publisher is
illegal and punishable by law. Please respect the author's rights and do not
participate in the any form of electronic piracy of copyrighted material.

Neither the author nor the publisher assumes any responsibility
for the use or misuse of information contained in this book.

Visit our website at www.paladin-press.com

# Contents

Introduction                                    1

Chapter 1:
Beginnings                                      3

Chapter 2:
Colt Firearms                                   23

Chapter 3:
Failures, Problems, and Solutions               39

Chapter 4:
Colt's AR-15 Variations                         63

Chapter 5:
Grenades, Launchers, Ammunition,
Miscellany                                      107

Chapter 6:
Armalite Rises Again                            125

Chapter 7:
Bushmaster                                      135

Chapter 8:
Innovations, Spinoffs, and Copycats             149

Chapter 9:
Replacing the Warhorse                          181

Chapter 10:
Operation of the AR-15                          205

Chapter 11:
Cleaning and Disassembly of the AR-15   213

Chapter 12:
Assembling the AR-15                            223

Chapter 13:
Accessories for the AR-15                       245

Chapter 14:
Selective-Fire Conversions                      307

Chapter 15:
Troubleshooting the AR-15                       315

Appendix                                        321

# Chapter 2

# Colt Firearms

Too many times, excellent firearms designs have gone into the dustbin of history simply because there was no market for the gun. This might easily have been the case with the AR-15 had Colt's Firearms Corporation not also been having economic problems at the same time that Armalite was. Instead, what appeared to be the death knell for the AR-15 became the chain of events that would make this firearm one of the success stores of the 20th century and put it into the hands of troops around the world (as well as those of numerous civilian and police users).

Colt's Firearms Corporation was created in the mid-1800s by Samuel Colt, who secured a patent for the first successful revolver mechanism in 1836. Although his business was not as successful as sometimes pictured (in part due to the intense competition for business from Smith & Wesson and other gunmakers), Colt guns have always captured the imagination. They even inspired the post-Civil War slogan, "Abe Lincoln may have freed all men, but Sam Colt made them equal." Colt guns did just that, doing away with the brawn that was often called for when a single-shot weapon failed to do its work, instead giving a shooter several follow-up shots to deal with a single enemy, or even a band of outlaws or renegades.

Colt died at the early age of 47, but his business continued, flourishing in large part through military sales of firearms created by and licensed from John Moses Browning. Business was especially good during World War I, World War II, and the Korean War, thanks to the military contracts needed to win these conflicts.

Following the Korean conflict, the company began doing some serious belt tightening. Although civilian sales were a major part of Colt's operation, its bread and butter often came through major sales to the U.S. government. The firm had seen money roll in from military contracts almost from the day Samuel Colt had started his firearms operation. At one time or another, Colt had made Gatling guns, single- and double-action revolvers, various automatic pistols (including the 1911

adopted by the U.S. military), the BAR, and several styles of Browning machine guns.

This came to an abrupt halt when the U.S. Army decided to adopt the M14 rifle and Colt failed to obtain the contract to make the new guns. Meanwhile, orders for the weapons it had been making were cut back with an eye toward phasing in guns like the BAR. Colt undoubtedly realized it was hurting and things were only going to get worse if it didn't add a new product that could add military sales to its lineup.

In September 1955, Colt's management had formed a conglomerate with Leopold D. Silberstein's Penn-Texas Corporation, becoming a wholly owned subsidiary of the holding company based in New York. This arrangement continued until 1959, when a group of investors gained control of the company, dismissed Silberstein, and renamed his company Fairbanks Whitney.

When it learned that the license to build the AR-15 was up for grabs in 1959, Colt's management jumped at the chance to obtain the rights and, in the process, secured the rights for manufacturing the AR-10 as well.

## SELLING THE PRODUCT

After Colt signed the contract with Armalite, its aggressive sales techniques enabled it to sell a number of the rifles to several small Southeast Asian countries. (The rifle was much easier for Asian soldiers to control since it was lighter and offered less recoil—both important considerations for the smaller physique of the average oriental trooper.)

Eugene Stoner, who was soon working for Colt in marketing, accompanied gun exporter Bobby Macdonald through Southeast Asia, demonstrating the AR-15 and AR-10 to potential governmental buyers in Burma, India, Indonesia, Malaya, Australia, and the Philippines. While none of those who saw the AR-10 were much interested, the AR-15 was loved by nearly every government representative who fired it. When word of the AR-10's

failure to attract a potential buyer reached Colt, the company suspended all plans to produce the larger-caliber rifle, even though more than $100,000 had been spent in tooling for it.

(NOTE: The AR-10 nearly got another lease on life as the U.S. Army's sniper rifle when it was one of six rifles tested at the Aberdeen Proving Ground in 1977. The Rock Island Arsenal modified the rifle, removing the front sight assembly and the rear sight/handle and incorporating a scope base and ART scope. But the tests were inconclusive and only pointed to the need for a better ranging system and more accurate ammunition. Again, the AR-10 failed to be adopted for military use.)

In December 1959, Colt produced its first run of 300 AR-15 rifles, which was broken into small lots and sent for testing to many of the countries Stoner and Macdonald had visited. Some of the governments expressed interest, but sales were blocked to most of them because the mutual-aid funds the U.S. government was offering required that firearms be standard issue with the U.S. military. The AR-15 wasn't issued to U.S. troops, so the U.S. government wouldn't provide funds for its purchase. With funds running low and a lack of actual buyers, Colt was getting close to serious problems and Armalite was not receiving the royalties it had been hoping for from AR-15 sales.

Then both companies had a stroke of luck.

## RIVALRY TO THE RESCUE

Boutelle, president of Fairchild, had maintained his friendship with General LeMay during the years since the development of the AR-5 survival rifle. During a skeet shoot on his farm, Boutelle demonstrated an AR-15 to the general, firing at a ripe watermelon, which exploded spectacularly when struck by the burst of high-velocity bullets. LeMay was very impressed with what he saw, thus setting in motion a chain of events that would eventually bail both Armalite and Colt out of their financial woes.

Problems had been brewing between the air force and the army since the former had rejected the latter's M14 as too heavy and awkward. The army then turned around and refused to supply parts for the M1 Garand the air force had retained, claiming the spare parts for the World War II-vintage rifle had been scrapped when the M14 was adopted. Consequently, air bases with nuclear weapons were being guarded by security forces armed with the outdated M1 carbine, a weapon never noted for the effectiveness of its cartridge or reliability with automatic fire. Thus the air force was forced to either make due with the M1 carbine or adopt a rifle it viewed as being no great improvement on World War II-vintage rifles.

And then LeMay saw the demonstration of a rifle that fit the bill for the air force's needs, firing a potent little bullet while still being almost as lightweight as the M1 carbine and pounds lighter than either the M1 Garand or the M14.

At LeMay's prompting, the U.S. Air Force started its own tests of the AR-15 at Lackland Air Force Base in Texas. The tests suggested the new rifle was everything the service had hoped for. In 1960, the air force asked for an analysis of the weapon by the Army Ordnance Corps in order for the AR-15 to be granted candidate rifle status for more air force tests.

The army's test and evaluation was conducted at Aberdeen Proving Ground, and the AR-15 proved nothing short of phenomenal. The rifles fired by army personnel proved capable of 10-round groups of 1.5 inches at 100 yards using iron sights and 10-shot groups of 1.1 inches with scopes—as good as many target rifles.

It didn't end there, however. The rifle not only was accurate, it was tough and reliable. During endurance tests of 18,000 rounds fired, only 10 parts broke and the average malfunction rate was only 2.5 rounds per 1,000—an excellent figure for a gun that had hardly gone into production. Of course, the "not-invented-here" syndrome appears to have been alive and well during the tests; the army final report begrudgingly concluded that the AR-15 was "reasonably satisfactory"—an understatement if ever there was one.

The air force followed up with more tests of the AR-15 at Lackland, this time comparing it with the M14 (perhaps to show the army how well a reasonably satisfactory gun would do in contrast to the army-designed M14). When the smoke cleared, 43 percent of the shooters firing the AR-15 could qualify as expert marksmen, whereas only 22 percent of those shooting the M14 could reach this level of skill.

The air force had found its rifle.

But there were hurdles to be jumped before the acquisition process could be started to get the rifles. Most important was the need for appropriations from Congress, which routed funds to what it felt were more urgent needs (at least in terms of constituents). Only after fighting for 2 years to get approval for the purchase was the air force finally able to procure 8,500 AR-15s in 1962.

## GOOD NEWS, BAD NEWS

Ironically, the air force order for the firearms would pave the road for future sales of the guns to both the air force and foreign countries but would fail to bring financial success for Colt and Armalite employees involved in laying the groundwork for the deal. During the 2-year wait for the deal to be finalized, both Colt and Fairchild were taken over by larger corporations. During the

COLT FIREARMS



Although the AK47 family of weapons are tough and reliable, the cartridge they were chambered for was definitely second best when compared with the .223 Remington.

reorganization of the two companies, Boutelle got fired, and both companies' personnel who had been involved in marketing sample guns to foreign companies, which would soon be buying quantities of the rifles, were also laid off.

Yet a few AR-15s continued to be sold to various military users around the world; and those guns were gaining users who had nothing but good words for what was becoming known as "the little black rifle." Limited testing in Asia, especially in the South Vietnamese combat arena, showed just how lethal the lightweight rifle and the .223 bullet it fired were (and proved the ALCLAD requirements for an ideal combat rifle had been on the mark). Wanting to put the best weapon

possible in the hands of its troops, Army of the Republic of South Vietnam (ARVN) placed an order for 1,000 AR-15s in December 1961, and, since the rifle had been approved for use by the air force (even though it hadn't been funded), the way was cleared for sales to Vietnam.

Meanwhile, U.S. army troops were slugging it out with communist guerrillas in Vietnam. And just as the its tests had suggested in 1959, the army was finding that the M14 was too heavy for easy handling and that automatic fire was so haphazard that most guns were being modified to fire only in the semiauto mode. Compounding the problem was an occasional blowup of an M14 receiver that had apparently been improperly

25



The AK47 was heavier and less user friendly than the M16; it also had inferior sights, but most important, its ammunition was inferior ballistically to that of the AR-15.

heat-treated. Although the latter event was rare, soon Colt representatives were pointing out such problems to potential buyers and paving the way for the future sales of the AR-15 and rejection of the M14.

### PLAYING THE GOLDEN ARPA

Perhaps recognizing the problems the M14 would present in jungle warfare, the U.S. Army purchased 8,500 AR-15 rifles to test in 1961. In 1962 Colt persuaded the DOD's Advanced Research Project Agency (ARPA) to test an additional 1,000 in its Project AGILE, which was aimed toward finding a better weapon for use in Vietnam.

The ARPA tests again silenced many critics of the AR-15. Among the findings were the following:

- A squad armed with AR-15s had five times the level of overall kill potential than a squad armed with M14s.
- AR-15s could be produced at a lower cost and with a higher degree of quality control than the M14.
- The AR-15 was more reliable, durable, rugged, and easier to care for than the M14 under the adverse conditions often found in combat.
- Soldiers learned to shoot better and more quickly with the AR-15 (than with the M14).

- Three times as many rounds could be carried by a soldier with an AR-15 (in contrast to the M14) when the weight of both the weapon and the ammunition was taken into account.

Equally arresting findings came from the AGILE tests involving Vietnamese troops and U.S. advisors who used the rifles in actual combat. Here again, the AR-15 proved extremely durable and reliable. Not only that, the round used by the rifle showed itself to be highly potent against enemy targets.

Up until the time the AR-15 was fielded in Vietnam, the wounds created by small-arms fire tended to be through-and-through wounds resulting from the bullet's momentum and stability. This was true of the AK47 and SKS used by the Vietcong and North Vietnamese as well as the M14 and M1 carbine. Such penetrating wounds were the most common unless bullets were deflected somewhere in their paths by obstacles or through a collision with hard tissue in the target.

This situation changed with the AR-15, whose bullet was light, fast moving, and unstable—a combination that proved deadly in the battlefield.

One of the U.S. advisors who had seen the AR-15 used in combat wrote,

At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic, hitting one VC with 3 rounds with the first burst. One round in the head took it completely off. Another in the right arm took it completely off, too. One round hit him in the right side, causing a hole about 5 inches in diameter.

Another soldier in the field gave an equally graphic account of the effectiveness of the new rifle:

On 9 June a Ranger Platoon from the 40th Infantry Regiment was given the mission of ambushing an estimated VC Company. . . . Back wound, which caused the thoracic cavity to explode. . . . Stomach wound, which caused the abdominal cavity to explode. . . . Heel wound; the projectile entered the bottom of the right foot, causing the leg to split from the foot to the hip. . . . These deaths were inflicted by the AR-15 and all were instantaneous except [for a] buttock wound. He lived for approximately five minutes.

As another reported, "Range was 50 meters. One man was hit in the head; it looked like it exploded. A second man was hit in the chest, his back was one big hole."

But it didn't end there. Troops in Vietnam also discovered that rifle grenades fired from the AR-15



The M16 rifle version of the AR-15 proved popular among U.S. troops—when it functioned properly—not always a given due to ammunition that wasn't formulated for it and lack of cleaning kits. (Courtesy of U.S. Army.)

enabled them to lay down what was similar to their own mortar fire. Furthermore, troops cared for the weapon and treated it more carefully than the M1 carbine because they had greater respect for it.

In short, the little black rifle fielded in Vietnam was everything its designers had promised—and more. The troops not only liked the rifle, they also were chalking up serious body counts with it. The weapon enabled those using it to "own the battlefield," not only becoming deadly opponents to Vietcong troops, but also becoming more aggressive as they learned the capabilities of the rifle they carried.

## CHANGES AT COLT

Colt continued to do well turning out AR-15 rifles for the U.S. military as well as reviving a number of older guns, such as its black-power revolvers and Sharps rifle, as Western movies and TV fueled the civilian market for guns of the Old West. However, changes came again in 1964 when the company reorganized under the name Colt Industries and the firearms section became a subsidiary called Colt's Inc., Firearms Division.

Colt aggressively sought to broaden its market by continuing to sell revolvers of all and the .45 semiauto 1911 pistol to the public through the 1960s and 1970s and into the 1980s. In addition, it created its Colt Custom Gun Shop, which made special target handguns as well as offering engraving on all of its firearms. Nevertheless, the company's bread and butter continued to be sales of its AR-15 rifle to military, police, and civilian buyers around the world.

## MEANWHILE, BACK AT ARMALITE

With its engineers gone and large sales of the AR-10 and other rifles failing to materialize (except for the AR-15, the rights to which Armalite had sold to Colt's Firearms without realizing as much profit as could have been, given later sales), Armalite and its parent company, Fairchild, were in financial trouble in 1961. This led Sullivan and the other original owners of Armalite to buy the company back from Fairchild along with the rights and title to all

firearms designs except the AR-10 and AR-15, which had been licensed to Colt. The goal of this reorganized company was still to create firearms, but with an eye toward actually making some serious money in the process; finding financial backing was not impossible due to the track record of Armalite. Funding was supplied by Capital Southwest Corporation of Dallas (with Charles Dorchester and Richard Klotzly later acquiring the majority common stock position in Armalite by buying out Capital Southwest Corporation late in 1971).

This new business entity became "Armalite, Inc." and except for the change of ownership was run by the same key personnel. Armalite worked from 1962 through 1971 without meeting with any great financial success.

Since Armalite had failed to experience any great wealth flowing in from its deal with Colt, the company needed a new rifle that might gain acceptance by those not interested in the AR-15 and thereby bring in much-needed capital. Since Colt now owned the rights to the gas system used on both the AR-10 and AR-15, this new rifle also could not employ this or other features found on the AR-15.

This task wasn't as daunting as it might otherwise have been because a rifle design meeting this criterion was actually on the shelf at Armalite. All that was needed was some modifications to the design. Thus, from 1962 to 1964, engineers at Armalite worked on modifying the AR-16 rifle to the .223 Remington cartridge in much the same way that the AR-10 had been modified to create the AR-15. This new rifle was designated the AR-18, and Armalite pinned nearly all of its hopes for financial success on the new gun. (Although the AR-18 was marketed after Stoner had left the Armalite Company, according to Burton T. Miller, who was the vice president of Armalite during this time, Stoner was nevertheless responsible for much of the development of the AR-18 before its introduction, having taken part in the development of the AR-16.)

Due to its being chambered for the more compact .223 cartridge, the AR-18 was slightly shorter than the AR-16. But it continued the overall construction design of mostly sheet-metal stampings that were easy and cheap to produce. Internally, the gun employed a gas piston similar to that of the Soviet Tokarev to move the bolt and its carrier rearward, in the process keeping the trigger group clean of powder residue, a fact that gave the AR-18 the potential to be slightly more reliable than the AR-15, and most certainly making cleaning and maintenance of the rifle easier. Unlike the AR-15, which had a large recoil spring in the stock, the AR-18 used twin recoil springs and guides located within the rear of the receiver; this made possible a folding stock (and later bullpup designs when this system was adopted by other rifles).

Soon this new rifle was in competition against its AR-15 sister in military trials around the world. Although it is arguable whether the AR-18 was a better rifle than the AR-15, one thing is almost certain: the AR-18 never really got a fair trial against its competitor during U.S. military trials. This was because of a disastrous business arrangement Armalite made in selling the manufacturing rights of the new rifle to the Howa Machinery Company of Nagoya, Japan.

Sadly for both companies, this coincided with the Japanese government's efforts to force an end to the war in Vietnam. To bring pressure on those involved with the conflict, the Japanese government refused to grant an export license to Howa for the shipment of AR-18s to any country even remotely involved in the fighting. What appeared to be a lucrative market was suddenly out of reach to those wanting to sell and demonstrate the AR-18.

This problem was compounded when the U.S. Army started searching for a gun that would be even more reliable than the AR-15. One potential choice was the AR-18. The Japanese government's refusal to allow the guns out of the country left Armalite no choice but to supply the army with hand-built AR-18s from the Armalite factory, which were undoubtedly less reliable than those produced at the Howa plant. Thus both firms both missed yet another chance. The U.S. Army became committed to purchasing the more expensive—but readily available—AR-15 manufactured by Colt. (And by the time the Vietnam War was over, the U.S. military was fully committed to the AR-15, which pretty well had all the bugs worked out of its design and was as reliable as anyone could ever have hoped for, far outperforming most similar rifles that were available.)

### Testing the AR-18

Exactly why the few AR-18s produced by hand at Armalite for limited testing by the U.S. military failed to live up to expectations is a matter of some debate. Armalite had earlier arranged for exhaustive tests by the independent H.P. White Laboratory in Belair, Maryland, which verified Armalite's claims that the AR-18 was both tough and reliable. Yet this wasn't the result seen in the military tests subsequently conducted by the U.S. Army. What was going on?

Some Armalite officials later claimed these tests were less than fair, again suggesting that the army was protecting its new rifle just as it had earlier done with the M14. According to Burton T. Miller, some tests the army conducted with the 10 available AR-18s employed the wrong type of ammunition and a defective magazine. If so, this undoubtedly resulted in failures of the rifle because ammunition was fed poorly into the chamber.

To make matters intolerable, the Japanese

government outlawed export of the rifle even to nations that weren't tied to the Vietnam War. This unfortunate turn of events occurred when the Irish Republican Army was found to have illegally acquired a number of Howa AR-18s made in the early 1970s. Thus, in 1973 the Japanese government halted all rifle exports. In all, Howa produced only 3,927 semiauto and selective-fire AR-18s between October 1970 and February 1974.

### The British Ministry of Defence

Added to the growing list of Armalite's near misses was its experience with the British Ministry of Defence, which was looking for a compact rifle for its elite troops and perhaps even its entire military. With an eye toward potentially large sales, Armalite submitted sample AR-18s to the British in March 1966.

The tests found the firearm to be lighter and more compact than the currently issued FN FAL. Additionally, it was concluded that the gun would be considerably easier to manufacture, needing far fewer machining operations in the creation of its receiver assembly. However, British testers felt the rifle had some key, albeit minor, weaknesses as well, including lack of a gas adjustment valve, weak stock hinge, less than ideal accuracy in automatic fire, and the lack of a buffer system (which might cause excessive receiver breakage over the long term). Finally, and perhaps the greatest drawback, there was unsatisfactory performance when the AR-18 was exposed to mud and sand.

Armalite quickly made a series of modifications to the gun to deal with the majority of these problems. Key changes were a beefed-up hinge, addition of an ejection port cover, and creation of an improved muzzle brake/flash suppressor. These were incorporated into new test rifles submitted to the United Kingdom in August 1966 for more testing.

The modified rifles did well but still failed the sand and mud tests. And the lack of a buffer (which Armalite had not added to the gun for some reason) was also a point of contention. In January 1969 Howa versions were submitted for evaluation. Again, the guns failed the mud and sand tests.

Armalite officials came to feel that the Ministry of Defense tests were far from objective. Like their U.S. counterparts, British testers were representatives of the government arms factory. Not only was the Royal Small Arms Factory the source of the FN FAL rifles used by the British military, but it also had some rifle designs of its own that were contenders for adoption by the British military. As if this weren't bad enough, there was bad blood between the Royal Small Arms Factory and Armalite's British

representative company, the Sterling Armament Company in Dagenham, England.

(NOTE: This rivalry and possible lack of objectivity would take another amazing twist years later when the new 5.56mm battle rifle the United Kingdom adopted would actually be based on the AR-18. Although it has a much different layout and exterior, the SA-80, which became the British L85 rifle, lifted such features as the gas system, bolt carrier, and others directly from the AR-18 design. Equally ironic is that the British gun has come to be known as one of the worst designs of the 20th century. Generally unreliable and prone to breakage, it is often found in the field held together with wire and duct tape.)

### The AR-180

With the rights to the military markets closed because of its contract with Howa and the actions of the Japanese government, Armalite next tried to gain sales of rifles to the police and civilian markets. It modified the AR-18 for semiauto fire only and designated the model the AR-180. This semiauto rifle was intended for law enforcement and sporting use, especially for shooters in the United States.

The guns were manufactured in the pilot plant Armalite opened in mid-1968 in Costa Mesa, California. During the time the plant was in operation, it produced 1,171 AR-18s and 4,018 A-180s from July 1969 through June 1972. In addition to the standard rifle, Armalite experimented with carbine and "submachine gun" versions of the AR-18, though, like the parent rifle, these never saw any financial success and never went much beyond the prototype stage.

With the usual misfortune in timing that seemed to plague Armalite, the Japanese government picked this time to ease it restrictions on Howa, allowing it to export semiauto versions of the AR-18 (as the AR-180) to the United States. Production of these guns continued into the late 1970s before the gun was finally discontinued.

The Japanese government had dealt Armalite a terrific blow. On one hand it had permitted AR-180s to be sold in the United States in direct competition with Armalite; on the other it continued its restrictions on export of the AR-18, making it impossible for the company to have a supplier should it find a military buyer for the gun. Having worked with the Sterling Armament Company in England earlier during the military trials of the AR-18, Armalite entered into a business agreement in 1974 to move its production machinery to England and licensed Sterling to produce the firearms.

With the moving process sapping resources, it was nearly 15 months before a single firearm could be

THE COMPLETE AR-15/M16 SOURCEBOOK



The AR-18 family of guns, including experimental carbine and a stockless "submachine gun" version of the rifle.

**COLT FIREARMS**



The AR-18 (top) was modified into a semiauto version that was marketed as the AR-180 (center). Sterling designers also created (and advertised) a prototype wooden-stocked version that was eventually nixed by Armalite.

produced. Once production commenced, Armalite imported the Sterling rifles into the United States for civilian sales. Both Sterling and Armalite attempted to market the firearms worldwide but met with little success. Sterling is believed to have produced 12,362 AR-180s between the 1975 and 1983, exporting some 10,946 of these to the United States.

It should be noted that during the late 1970s, Sterling advertised a wooden-stocked version of the AR-180 for police and other buyers. Although a prototype was made and apparently a number of the stocks were produced by Sile (Italy), the "home office" in Costa Mesa would eventually veto this variant. Thus, even though advertising for this gun appeared and more than one gun writer assumed it was available (this writer included), the variant was never actually produced in any numbers;

most likely only the original prototype was actually assembled. What happened to the wooden stocks is somewhat of a mystery, though it appears they were destroyed shortly after the order was given to quit marketing this version.

In addition to nearly producing this unauthorized version of the AR-18, the Sterling Armament Company also seems to have had quality control problems, with many guns apparently being less than ideal in terms of fit and finish. When Sterling ceased its production in 1983, Armalite next offered the manufacturing rights to companies in the Philippines. However, by this point the market for the AR-180 had all but dried up as more and more buyers flocked to the AR-15 offered by Colt as the semiauto AR-15 Sporter, which had captured the American police and civilian markets.

The final irony of Armalite's tale of woe is that it was eventually purchased by the Philippine conglomerate that was manufacturing the AR-180s for the American company. Having failed to see any military sales of the AR-18, and considering the growing preference of police and civilian shooters for the AR-15 over the AR-180, Armalite's owners sold the rights and machinery to Elisco Tool Manufacturing Company in the Philippines in 1983.

### Elisco Tools

The Armalite Division of Elisco Tool brought the original Armalite to a rather inglorious end. The operation was headed by Bruce Swain, an Englishman brought in by Elisco to run the operation. He was later replaced by John Ugarte, with Joe Armstrong acting as vice president of marketing.

Elisco Tool had been producing M16 rifles for the Philippine government under a license issued by Colt's Firearms. However, when Colt and Elisco failed to reach an agreement on renewing this license, Elisco needed another rifle to sell. Its solution was to buy Armalite and thereby gain the right to manufacture the AR-18, which was arguably a better gun than the AR-15.

Initially Elisco didn't actually manufacture its AR-18s; instead the guns were simply assembled from parts made by Sterling earlier and sold to Armalite. Thus, the tooling and machinery sent from Sterling's plant to the Philippines with the sale of Armalite was never actually used in making any of the guns being sold.

At this point, the government of Ferdinand Marcos was overturned and the president went into exile. With his exit went Elisco's connections for selling firearms to the Philippine government. Actual production of the AR-18 never took place in the Philippines other than through the assembly of parts that came with the inventory shipped from Sterling. U.S. branches of Armalite were closed in 1987, and for all practical purposes the company ceased to exist except on paper, its machinery sitting idle, slowly deteriorating in the humid Philippine climate.

### FLYING HIGH

If Armalite and the AR-18 are a tale of woe, Colt and the AR-15 make for a success story unlike few others in the history of gun manufacturing, marked by good fortune at every turn.

In 1962 the U.S. Air Force finally got the go ahead to purchase some AR-15s. After conducting additional tests, it suggested some minor design modifications and then ordered 1,000 AR-15s from Colt for further testing, which proved the AR-15 to be very reliable. During one test in which 27 of the rifles were fired with 6,000 rounds apiece, the malfunction rate averaged only once per 3,000 rounds fired, and part breakage occurred only once per 6,200 rounds fired. Following these final tests, the U.S. Air Force chose the AR-15 as its standard-issue rifle, designating it the M16 Rifle.

Meanwhile, the U.S. Army was under pressure from President Kennedy and Defense Secretary McNamara's "whiz kids" to buy the high-tech gun that appealed to those wanting to remake the U.S. military into an efficient operation modeled after corporate America. Thus, it began purchasing more AR-15 rifles in limited numbers for use by special forces in Vietnam. (It should be noted that "special forces" is a rather generic term that generally encompasses several elite groups in the U.S. military, including the Army Rangers, Marine Force Recon, and Navy SEALs, as well as the Green Berets and lesser known groups.)

As mentioned earlier, when the first 1,000 AR-15s reached the ARVN in 1962, the reports that came back couldn't have been better if they'd been written by Colt's advertising staff itself. The rifles had a fantastic record of reliability in the hands of the Vietnamese and continued to be very lethal in combat.

Yet the U.S. Army was still dragging its heels, apparently for mostly political reasons. The M14 rifle had been produced by the army for the army, and a number of officers had vested interests in keeping it as the standard weapon. Furthermore, in developing the rifle, U.S. Army personnel had virtually ignored all the U.S. and British military studies showing that the battle rifles from World War I through the Korean War had too much power for the job they were called upon to do. Flying in the face of such facts, army designers had created the T65 cartridge, a shortened version of the old .30-'06 round. The round was more powerful than necessary for the limited range at which ALCLAD studies suggested most combat occurred; this too powerful cartridge made the weapon nearly uncontrollable, unlike other lightweight automatic-weapons' rounds.

One can only surmise that many of the officers involved in creating the M14 didn't want to admit their mistakes and possibly ruin their careers in the process. (This is not to say that this was the case with all those involved. Many also had legitimate concerns that the ALCLAD conclusions might somehow have been flawed. The ideal rifle that could hit anything as far as the eye can see seems logical enough and was at odds with the idea that combat almost always took place within very short ranges.)

### TALES OF WOE

With the Soviet Union and communism becoming a

growing menace following World War II, the push was on for NATO to adopt a standard round in order to simplify supplying troops in the field. More than a few problems had arisen during World War II because of the hodgepodge of cartridges the Allied troops had required. With the possibility of yet another world war in Europe, military leaders were calling for one cartridge that could be used in rifles, light machine guns, and squad automatic weapons—hand-held machine guns similar to the World War II vintage BAR carried by U.S. troops.

The British .280/30 was undoubtedly a superior round. It was light and fired a bullet that—as would later be shown by the .223 cartridge in the AR-15—might have become super deadly on the battlefield.

Friction between the militaries of various NATO countries started to become apparent during the Comparison Test of United Kingdom and U.S. Lightweight Rifles at Aberdeen range on February 16, 1950. Here the British EM2 bullpup rifle and the new Belgian FN FAL, both chambered in .280/30 were tested side by side with the U.S. Army's prototype T25 rifle chambered for the new T65 cartridge. Despite the T25's performing miserably in the tests, the final report concluded (with what many suggested was a painful twist of logic) that the T25 was superior, even though the powerful cartridge was in large part what had made the rifle nearly impossible to control during automatic fire.

Had the U.S. Army been realistic about testing and the needs of soldiers on the battlefield, the FN FAL might have become the rifle that U.S. soldiers would carry for the next few decades. And had the army adopted the .280/30 cartridge or one like it rather than the T65, it seems likely that the M14 and M16 rifles might never have been created (or of course seen action in Vietnam).

That scenario wasn't to be, however, because the United States browbeat its NATO partners into adopting the T65 round.

Doing this wasn't easy. The British Parliament, perhaps smarting from the idea that the Yanks had bailed the Brits out of World War II, wanted to demonstrate the country's ability to arm itself and create an effective rifle from a domestically produced design; Defence Minister Emanuel Shinwell announced that the EM2 and the .280/30 cartridge would be adopted as the official British military rifle and cartridge.

Washington cried foul, pointing to an agreement among the United States, Canada, and Britain that there would be a standardization of rifles and ammunition in an effort to bring a large segment of NATO under one umbrella. Britain, U.S. politicians claimed, couldn't adopt its own rifle and ammunition. It would have to adopt the same cartridge and weapon that the United States and Canada did.

Both sides trotted out their "experts" in an effort to gain the upper hand in what was seen as a choice market for the company holding the manufacturing rights to the firearm adopted. British military experts claimed that while the U.S. round was effective to 1,000 yards, the British .280/30 cartridge was effective to 2,000. U.S. experts scoffed at the idea that the puny British round could be nearly as effective as the larger, more powerful cartridge.

### Churchill Returns

Long a proponent of strong U.S.-British ties, Winston Churchill became the new prime minister in 1951. And one of his first tasks was to undo the wrangling between the United States and Britain over NATO rifles and ammunition. He immediately countermanded the adoption of the EM2 rifle and .280/30 cartridge as the official British round, thereby putting an end to much of the squabbling between British and U.S. NATO leaders.

The Americans didn't accept the olive branch, and not without reason. More than American or British pride was now on the line. The Korean War was heating up and more rifles were needed. Since no one had demonstrated a rifle that was as reliable as the old M1 Garand, orders for that gun were placed with International Harvester as well as the Springfield Armory.

Following the Korean conflict, NATO leaders knew they were facing a formidable enemy in Cold War communism. The need was greater than ever for standardized equipment against a foe that might—without any great stretch of the imagination—soon be invading NATO member countries.

The U.S. military held demonstrations for the press showing the ability of older weapons like the BAR, 1919A4 Browning LM, to chamber and operate on the new .308 cartridge it had created. Included in these demonstrations were the T47 and T44 rifles. The army, the press was told, was on the verge of selecting one of these guns to replace the M1 rifle.

Things weren't quite that simple. Soon the British and Belgians were presenting versions of their rifles, chambered for the T65, and asking for more ordnance trials per their NATO agreements. More trials took place, and with them came new controversy.

### Trials and Politics

The trials pitted the new U.S. rifles against the Belgian FN FAL and British EM2 rifles late in 1952. The FN FAL had gone from being a so-so contender to a robust firearm, while the EM2 had been all but abandoned by the British and did poorly in the tests. That left only two players in the game: the United States with its T25, T44, and T47 rifles and Belgium with the FN



U.S. T48 rifle.

FAL. During these trials the T25 and T47 both did poorly. But the T44 displayed the reliability and robustness needed in military rifles, as did the FN FAL.

The U.S military decided to put the FN FAL rifles under an extended test, ordering a small quantity of the guns. By 1953, the tests had gone so well that the military ordered work on the M44 and recommended that the FN FAL be adopted as the new U.S. rifle. The army ordered 3,303 of the rifles from the Fabrique Nationale, designating them the Rifle Caliber .30 T48 FN.

At this point the FN FAL/T48 appeared to be a shoo-in. But it still had a few more trials to go, including the torturous Arctic conditions testing.

In December 1953, the rifles were sent to Alaska for tests under arctic conditions. Unfortunately for supporters of the FN FAL, the tests appear to have been somewhat rigged.

Perhaps this should not come as a surprise. Army designers at the Springfield Armory weren't happy that their T44 hadn't been adopted as the next U.S. rifle. Even though their work on the rifle was supposed to have been discontinued, workers secretly kept refining the design, hoping the FN FAL would somehow fail, thereby giving their in-house gun another shot at being chosen as the next U.S. rifle.

The Alaskan tests gave the U.S. designers their chance (just as the same type of tests would later be employed to blackball the AR-18). Working in the "cold chamber" at the armory, the designers tuned their guns so they would work with the low pressures created when the cartridges were fired in extremely cold conditions. The catch, of course, was that these guns would be horribly unreliable, if not dangerous, should they be fired in a hot climate. This was not a standard battle rifle that would work in all climates, but rather a highly modified design created solely to prevail in the upcoming tests in cold-weather conditions. Once the guns were modified to operate at peak efficiency in such conditions, the magazines and other parts were polished by hand to



The T48 had the ability to be loaded from a clip that could recharge an empty magazine.

improve their operation even further.

The tests began as the Springfield Armory's "standard" rifles were submitted to compete against unmodified FN FAL/T48 rifles. Not surprisingly—to those who knew what was going on, at least—the tuned T44s functioned reliably and the standard-issue FN FALs had troubles.

With the modifications made to the T44 kept hidden from those conducting the tests, early word was leaked to military decision-makers that the T44, though only the equal of the FN FAL in previous tests, was definitely the better gun in arctic conditions. In the

34

**COLT FIREARMS**



U.S. T48E1.

meantime, representatives of the Fabrique Nationale sent their designer, Ernest Vervier, to Alaska hoping the engineer could solve the problems that arose by modifying the rifles.

His solution was less than elegant. He simply opened up the gas ports of the FN FAL rifles to improve functioning with the low gas pressure produced by the ammunition in cold weather. This made the rifles function a bit better but also caused excessive wear and tended to tear the rims off cartridges, leaving the empty behind to jam the gun. This latter effect caused new functioning problems to crop up.

As the trials were completed, the sure-fire winner was not the FN FAL/T48 (which many had expected), but rather the T44. Those in command would not learn about the secret fine-tuning of the test guns until much later.

### Problems in NATO

Despite the apparent failure of the FN FAL to match the T44 in arctic conditions, there was pressure on the United States to adopt the FN FAL since it was the rifle that the other NATO allies were choosing one by one. This demand grew more vocal as NATO members pointed out that the United States had more or less agreed to adopt the same rifle that other NATO members chose.

Knowing that the politicians might soon be adopting the FN FAL as the standard U.S. rifle, and perhaps having recently learned of the Springfield Armory's adjustments to the rifles involved in the Alaska tests, the U.S. military hired High Standard (a large U.S. manufacturer that made a variety of small arms) to create drawings of the FN FAL calibrated in inches rather than in metric dimensions (used by the Belgian designers). The goal of this project was to enable the U.S. government to make its own FN FALs should the rifle be adopted by the army. Additionally, the military contracted with High Standard to fabricate 12 rifles from the English measurement drawings.

After testing the High Standard rifles and finding them reliable, the U.S. Army contracted for more guns, this time to be built by Harrington & Richardson (H&R) under the supervision of the Boston Ordnance District (by now it was felt that the Springfield Armory wasn't the place to have these guns built—no doubt because the word was out about how the Alaska tests had been rigged).

The contract awarded to H&R called for 500 FN FALs, designated T48s, while Springfield Armory created 500 T44 rifles it had been promoting.

When H&R designers started examining the drawings created by High Standard, they found them to be less than perfect. Realizing that the Canadian government had already produced drawings for their manufacture of the FN FAL, H&R worked through various channels to take advantage of the fact that both countries were NATO allies. Soon the H&R team had access to the Canadian drawings as well.

This was important because these new drawings contained changes dictated by Canadian, British, and Australian testing. U.S. designers incorporated these into the T48 design to create a more reliable weapon without spending a cent on actual research or field trials.

Not surprisingly, these guns proved to be extremely reliable and passed a new round of arctic-conditions tests, which took place from 1953 through 1954. Only now there was a new problem: the guns were built to such close tolerances that they failed to do well in the desert conditions conducted by the army early in 1955. However, this proved a minor problem; U.S. engineers conferring with British learned of a simple modification that would overcome it. After a small debacle caused by oversizing the bore of test rifles (causing poor accuracy), the H&R rifles were fitted with new barrels, modified for desert use, and once again proved themselves to be of excellent design.

The catch was that by now the army had tooled up to produce its T44 rifle. Creating the tooling and buying the

right to manufacture the FN FAL would put a big dent in the U.S. budget, not to mention its loss of face in having to arm troops with a foreign-designed rifle for the first time since the Revolutionary War.

Not surprisingly, then, despite the fact that the FN FAL was most likely a superior rifle, the United States decided to adopt the Springfield Armory's T44 instead. Only later was it discovered that the T44 would also require new tooling and, as would be shown in a series of mishaps, wasn't as "debugged" as designers had thought. However, by then the die was cast. The T44 soon was being carried by U.S. soldiers as the new M14 rifle with a heavy-barrel version, the M15, that proved so unreliable during automatic fire that it was rarely if ever seen in the field.

### Angry Politicians

If American pride had won the day with the selection of the T44, in Britain national pride was not faring so well. First the British military, still smarting from having to import U.S. weapons during World War II, had been forced to adopt the 7.62mm NATO cartridge instead of the arguably superior round created by British designers. Then the British EM2, although excellent in concept, proved to be vastly inferior to both the U.S. and Belgian contenders for standard-issue rifle.

Now, to add insult to injury, after the British had swallowed their pride and adopted the FN FAL, the Americans announced that they would not do the same. This was added to the fact that the Americans had, by some accounts, verbally agreed that if NATO adopted the T65 cartridge they would go along with the gun chosen by U.S. allies.

How firm this agreement was varies by who tells the story. U.S. politicians would claim it was just casual, not at all firm. And they pointed out that there were no formal written agreements between the United States and its allies that the FN FAL would be adopted by all parties involved.

But things got worse. Before long, the 7.62mm NATO cartridge the United States had forced everyone to adopt would soon be put aside by the U.S. Army in favor of the smaller, more effective round the AR-15 was chambered for.

### The M14's Tale of Woe

One of the arguments presented by supporters of the T44, adopted as the U.S. Army's M14, was that it would be cheaper to produce than the FN FAL. The theory behind this was that M1 Garand tooling left over from World War II could be converted to manufacture the similar M14.

In fact the machinery was so outdated as to be useless. Furthermore, the new rifle had so many design specification changes that most of the tooling would have

required replacement even if it could have been employed to make the new rifle. Thus, the savings promised by the adoption of the M14 evaporated once actual production was under way.

Nor was the M14 able to act as the do-it-all weapon that army salesmen had contended it would. While the rifle was supposedly a lightweight replacement for the BAR as well as the standard M1 Garand, in actual use it was not. The M14 wasn't light in weight, not at 12.75 pounds. Yet even with that much mass, it still proved to be nearly uncontrollable in auto mode thanks to the powerful recoil of the 7.62mm NATO round. With egg on their faces, military designers attempted to create a new version of the rifle with a pistol grip and straight-back stock design coupled with a muzzle brake. This "new" rifle was designated the M14E2 and later adopted as the M14A1. In theory, these modifications made the rifle more controllable in automatic fire, but in practice the improvements were marginal.

In addition, because the gun lacked a detachable barrel and only held 20 rounds in its magazine, it lacked the firepower to handle many machine gun roles. And even if the magazines could be inserted fast enough to do the job, then there were problems with the barrel overheating.

However, the United States was now committed to the M14 rifle, and manufacture of the gun went ahead despite the need for new tooling. As with most weapons, the design was gradually perfected as actual use revealed minor flaws that could be fixed with internal changes and parts modifications. Gradually the gun became easier to manufacture, and greater design tolerances made the gas piston less apt to lock up and bend if it became fouled.

But these changes did little to overcome the basic problems the rifle had in terms of both its weight and its inability to handle automatic fire, even in the M14A1 configuration.

At this point the AR-15 appeared on the scene, with glowing reports coming back to the United States about its use in Vietnam.

### AR-15 ARMY TESTS

Under pressure to adopt the AR-15 (and perhaps mindful of the sleight of hand that had enabled the M14 to win out over the FN FAL), those in the U.S. military who thought the M14 was a good rifle proposed—what else?—a series of tests conducted by the Army Materiel Command that would pit the AR-15 against the M14.

Not surprisingly, even though the AR-15 had done very well in previous tests and had an amazing record in the hands of Vietnamese troops using it in combat, when the smoke cleared U.S. military trials "proved" the M14

**COLT FIREARMS**



Even with a modified stock and bipod, the M14E2 proved unsuitable for military use due to its weight and poor control during automatic fire.

to be notably *superior* to the AR-15.

With the questionable procedures used in previous testing having become common knowledge, the secretary of the army smelled a rat and had the army's inspector general look into the Materiel Command's tests to be sure they were aboveboard. The inspector general found that, far from being fair, the tests had indeed been all but rigged. Among his findings were the following:

- Those involved in the testing had handpicked target-grade M14 rifles, whereas AR-15s were chosen at random without consideration as to how well they shot.
- Ranges of 800 yards were used in the tests, even though 500 yards had been established as the maximum range for combat rifles (and the ALCLAD studies suggested 300 yards was a more realistic maximum).
- Testers had conducted a "dry run" before the official tests to see how the two models would do. They then conducted the official test, omitting any parts in which the AR-15 had done well during the dry run.

So the results of the rigged test were ignored by military decision-makers, and by 1963 large numbers of AR-15 rifles were finding their way into the hands of U.S. troops. The Green Berets purchased 85,000, and army airborne units purchased large numbers as well, as did CIA. The air force purchased an additional 19,000.

Secretary of Defense Robert McNamara continued to be impressed with how well the AR-15s were working on the battlefield and in January 1963 announced the suspension of M14 production. This was done with the understanding that the AR-15 would only be a stopgap until the SPIW program bore fruit—something the army kept promising was on the horizon but in fact would never materialize.

Then, just as the superdependable AR-15 was gaining acceptance, it suddenly became a rifle that was consistently *un*reliable.

# EXHIBIT 10

**FM 3-22.9**

# RIFLE MARKSMANSHIP
# M16-/M4-SERIES WEAPONS



# August 2008

**DISTRIBUTION RESTRICTION: Approved for public release; distribution is unlimited.**

# HEADQUARTERS
# DEPARTMENT OF THE ARMY

This publication is available at
Army Knowledge Online (www.us.army.mil) and
General Dennis J. Reimer Training and Doctrine
Digital Library at (www.train.army.mil).

Change 1

Headquarters
Department of the Army
Washington, DC, 10 February 2011

# Rifle Marksmanship
# M16-/M4-Series Weapons

1.  Change FM 3-22.9, 12 August 2008, as follows:

| Remove old pages: | Insert new pages: |
|---|---|
| No pages | Summary of Changes |
| i through xiv | i through xiv |
| 5-3 through 5-4 | 5-3 through 5-4 |
| 5-17 through 5-42 | 5-17 through 5-38 |
| 6-19 through 6-20 | 6-19 through 6-20 |
| 7-57 through 7-70 | 7-57 through 7-74 |
| 8-27 through 8-28 | 8-27 through 8-28 |
| B-1 through B-6 | B-1 through B-6 |
| F-1 through F-8 | F-1 through F-12 |
| Index-1 to Index-16 | Index-1 to Index-14 |
| DA Form 5789-R | DA Form 5789-R |
| DA Form 5790-R | DA Form 5790-R |
| No pages | DA Form 7682-R |

2.  A star (*) marks new or changed material.

3.  File this transmittal sheet in front of the publication.

**DISTRIBUTION RESTRICTION:** Approved for public release; distribution is unlimited.

By Order of the Secretary of the Army:

**GEORGE W. CASEY, JR.**
General, United States Army
*Chief of Staff*

Official:

**JOYCE E. MORROW**
*Administrative Assistant to the
Secretary of the Army*
1034702

**DISTRIBUTION:** Active Army, Army National Guard, and U.S. Army Reserve: To be distributed in accordance with initial distribution number 110187, requirements for FM 3-22.9.

**Field Manual**
No. 3-22.9

**\*FM 3-22.9**

Headquarters
Department of the Army
Washington, DC, 12 August 2008

# Rifle Marksmanship
# M16-/M4-Series Weapons

# Contents

                                                                                              Page

PREFACE.................................................................................................. xiv

Chapter 1    MARKSMANSHIP TRAINING ..................................................................1-1
             **Section I. Training Strategy ............................................................1-1**
             Objectives .......................................................................................1-1
             Marksmanship Training Strategy......................................................1-1
             Training Phases...............................................................................1-5
             **Section II. Unit Marksmanship Training Program .............................1-8**
             Mission-Essential Tasks ..................................................................1-9
             Training Assessment .......................................................................1-9
             Trainers.........................................................................................1-11
             Trainer Certification Program .........................................................1-13
             Qualification Training .....................................................................1-15
             Unit Live-Fire Exercises .................................................................1-17

Chapter 2    WEAPON CHARACTERISTICS, ACCESSORIES, AND AMMUNITION ...............2-1
             **Section I. Rifles and Carbines............................................................2-1**
             Characteristics of M16-/M4-Series Weapons.....................................2-1
             M4-Series Carbine............................................................................2-2
             M16A2/A3 Rifle................................................................................2-5
             M16A4 Rifle ....................................................................................2-7
             M16A1 Rifle ....................................................................................2-9
             **Section II. Accessory Mounting ......................................................2-10**
             M4/M5 Adapter Rail System............................................................2-10
             Rail Grabbers .................................................................................2-13
             **Section III. Accessories ..................................................................2-16**
             M68 Close Combat Optic ................................................................2-17
             AN/PAQ-4B/C Infrared Aiming Light ................................................2-19
             AN/PEQ-2A/B Target Pointer/Illuminator/Aiming Light .....................2-21
             AN/PEQ-15 Advanced Target Pointer/Illuminator Aiming Light ............2-24
             AN/PAS-13B/C/D (V1) Light Weapon Thermal Sight and AN/PAS-13B/C/D
                 (V3) Heavy Weapon Thermal Sight .................................................2-26
             AN/PVS-4 Night Vision Sight...........................................................2-28

---

**DISTRIBUTION RESTRICTION: Approved for public release; distribution is unlimited.**

**\*This publication supercedes FM 3-22.9, 24 April 2003.**

Backup Iron Sight..................................................................................... 2-30

Advanced Combat Optical Gunsight.......................................................... 2-31

**Section IV. 10-Meter Boresight and 25-Meter Zero Offset** ................. **2-33**

Borelight ................................................................................................... 2-33

10-Meter Boresight.................................................................................... 2-34

25-Meter Zero Offset ................................................................................ 2-34

**Section V. Ammunition** .......................................................................... **2-35**

Authorized Ammunition ............................................................................. 2-35

Trajectory ................................................................................................. 2-37

Storage ..................................................................................................... 2-39

Chapter 3    TROUBLESHOOTING AND DESTRUCTION ......................................... 3-1

Stoppages ................................................................................................. 3-1

Malfunctions .............................................................................................. 3-2

Destruction Procedures ............................................................................. 3-7

Chapter 4    PRELIMINARY MARKSMANSHIP INSTRUCTION.................................. 4-1

Section I. Introduction to Basic Rifle Marksmanship and Mechanical Training ............4-1

Clearing .................................................................................................... 4-2

Cycles of Functioning................................................................................ 4-4

Modes of Fire ............................................................................................ 4-11

Peer Coaching .......................................................................................... 4-12

**Section II. Marksmanship Fundamentals I** ........................................... **4-14**

Interceptor Body Armor ............................................................................. 4-15

Four Fundamentals ................................................................................... 4-16

Dominant Eye Training .............................................................................. 4-24

Basic Firing Positions ............................................................................... 4-24

Training Devices and Exercises................................................................. 4-28

**Section III. Marksmanship Fundamentals II** .......................................... **4-29**

Engagement Skills Trainer 2000 ............................................................... 4-29

Laser Marksmanship Training System....................................................... 4-30

Chapter 5    DOWNRANGE FEEDBACK.................................................................... 5-1

**Section I. Grouping Procedures** ............................................................ **5-1**

Concept ..................................................................................................... 5-2

Organization of a 25-Meter Grouping Range ............................................ 5-2

Conduct of a 25-Meter Grouping Firing .................................................... 5-2

*Shot Group Marking ................................................................................. 5-3

Single Shot Group Analysis ...................................................................... 5-4

Multiple Shot Group Analysis .................................................................... 5-7

Troubleshooting the Fundamentals ........................................................... 5-14

**Section II. Zeroing Procedures** .............................................................. **5-14**

Purpose .................................................................................................... 5-15

Sight Variance........................................................................................... 5-15

Organization of a 25-Meter Zero Range...........................................................5-15
Conduct of a 25-Meter Zero Firing.................................................................5-15
**Section III. Known Distance Range .........................................................5-19**
Concept.........................................................................................................5-19
*Known Distance Target Description...............................................................5-20
*Marking Known Distance Range Targets .......................................................5-21
Known Distance Shot Grouping Analysis.........................................................5-22
*Known Distance Zeroing...............................................................................5-23
*Conduct of a Standard Known Distance Range ...............................................5-23
*Known Distance Record Fire Range ...............................................................5-24
*Modified Field Fire Range .............................................................................5-24
*Record of Performance .................................................................................5-25
*25-Meter Zero Standard ...............................................................................5-26
***Section IV. Effects of Wind and Gravity................................................5-26**
*Effects of Gravity .........................................................................................5-26
*Effects of Wind ............................................................................................5-27
***Section V. Ballistics ...............................................................................5-33**
*Internal Ballistics .........................................................................................5-33
*External Ballistics ........................................................................................5-35
*Terminal Ballistics ........................................................................................5-37
*Bullet Dispersion at Range ...........................................................................5-37

**Chapter 6       FIELD FIRE .............................................................................................6-1**
**Section I. Target Detection .......................................................................6-1**
Locating Targets.............................................................................................6-1
Marking Targets..............................................................................................6-4
Range Determination......................................................................................6-5
**Section II. Field Fire Training ...................................................................6-6**
Conduct of a Field Fire Range ........................................................................6-7
Field Fire I (Single Timed Target)....................................................................6-8
Field Fire II (Multiple or Single Timed Targets) ...............................................6-9
**Section III. Record Qualification .............................................................6-10**
Practice Record Fire I and II ...........................................................................6-10
Record Fire ....................................................................................................6-13
**Section IV. Alternate Qualification Courses ...........................................6-16**
Known Distance Record Fire Range .................................................................6-17
25-Meter Scaled Target Alternate Course........................................................6-18
15-Meter Scaled Target Alternate Course........................................................6-20

**Chapter 7       ADVANCED RIFLE MARKSMANSHIP ...................................................7-1**
**Section I. Advanced Firing Positions .......................................................7-1**
Kneeling Supported Firing Position ..................................................................7-2
Standing Unsupported Firing Position...............................................................7-3
Standing Supported Firing Position Around Obstacles ......................................7-4

Modified Firing Positions ........................................................................... 7-5

Urban Operations Firing Positions ............................................................. 7-6

**Section II. Combat Fire Techniques ............................................... 7-8**

Rapid Semiautomatic Fire .......................................................................... 7-8

Automatic or Burst Fire ............................................................................ 7-12

Suppressive Fire ...................................................................................... 7-16

Quick Fire ................................................................................................ 7-19

**Section III. Chemical, Biological, Radiological, and Nuclear Firing ............... 7-24**

Mission-Oriented Protective Posture Equipment Fire............................... 7-24

**Section IV. Night Fire Training.................................................... 7-30**

Unassisted Night Fire Training.................................................................. 7-30

Artificial Illumination Training................................................................... 7-35

**Section V. Moving Target Engagements ...................................... 7-36**

Modifications for Moving Target Engagements ........................................ 7-36

Moving Target Live-Fire Exercise ............................................................ 7-41

**Section VI. Short-Range Marksmanship Training ......................... 7-41**

Conduct of Short-Range Marksmanship Training..................................... 7-41

Fundamentals of Short-Range Marksmanship ......................................... 7-42

Preliminary Short-Range Marksmanship Instruction ................................ 7-47

Phase I—Reflexive Fire Training .............................................................. 7-51

Phase II—Target Discrimination Training ................................................. 7-53

Phase III—Short-Range Marksmanship Qualification .............................. 7-55

Phase IV—Shotgun and Automatic or Burst Firing Familiarization ......... 7-57

**\*Section VII. Combat field fire ................................................... 7-57**

\*Concept ................................................................................................. 7-57

\*Conduct ................................................................................................. 7-58

\*Record of Performance .......................................................................... 7-62

**\*Section VIII. Squad Designated Marksman Training..................... 7-62**

\*Mission of the Squad Designated Marksman .......................................... 7-62

\*Selection ................................................................................................ 7-63

\*Squad Designated Marksman Skills Progression ................................... 7-63

**Chapter 8**      **ADVANCED OPTICS, LASERS, AND IRON SIGHTS ........................... 8-1**

**Section I. Borelight ..................................................................... 8-1**

Concept ..................................................................................................... 8-2

Zeroing the Borelight................................................................................. 8-2

Boresighting .............................................................................................. 8-6

**Section II. Training Strategies and Qualification Standards ........... 8-11**

Backup Iron Sight..................................................................................... 8-11

M68 Close Combat Optic ......................................................................... 8-12

Advanced Combat Optical Gunsight......................................................... 8-16

AN/PAS-13B/C/D (V1) Light Weapon Thermal Sight and AN/PAS-13B/C/D
    (V3) Heavy Weapon Thermal Sight..................................................... 8-20

AN/PAQ-4B/C and AN/PEQ-2A/B Infrared Aiming Lasers ..................... 8-23

AN/PVS-4 Night Vision Device ......................................................................8-28
*Appendix A    TRAINING AIDS, DEVICES, AND EXERCISES .............................................. A-1
Appendix B    SCORECARDS ..................................................................................................... B-1
Appendix C    NIGHT FIGHTING ............................................................................................... C-1
Appendix D    RANGE SAFETY AND RISK MANAGEMENT....................................................D-1
Appendix E    RANGE PROCEDURES AND RANGE OPERATIONS CHECKLIST....................E-1
*Appendix F    10-METER TARGET OFFSETS AND 25-METER ZERO OFFSETS......................F-1
*Glossary ....................................................................................................................... Glossary-1
References ................................................................................................................ References-1
*Index ................................................................................................................................. Index-1

# Figures

Figure 1-1. Initial entry training marksmanship training strategy............................................1-2
Figure 1-2. Unit marksmanship sustainment strategy............................................................1-3
Figure 1-3. Active Army home station marksmanship training strategy. ...............................1-4
Figure 1-4. National Guard home station marksmanship training strategy............................1-4
Figure 1-5. Army Reserve home station marksmanship training strategy. ...........................1-5
Figure 1-6. Deployed unit marksmanship training strategy. ...................................................1-5
Figure 2-1. M4/M4A1 carbine with accessories. ...................................................................2-2
Figure 2-2. M4 MWS with accessories....................................................................................2-3
Figure 2-3. M4/M4A1 and M4/M4A1 MWS.............................................................................2-3
Figure 2-4. M4/M4A1 or M4 MWS mechanical zero. .............................................................2-4
Figure 2-5. M4/M4A1 or M4 MWS battlesight zero. ..............................................................2-4
Figure 2-6. M16A2/A3 rifle with accessories. ........................................................................2-5
Figure 2-7. M16A2/A3 mechanical zero. ................................................................................2-6
Figure 2-8. M16A2/A3 battlesight zero....................................................................................2-6
Figure 2-9. M16A4 rifle with accessories. ..............................................................................2-7
Figure 2-10. M16A4 mechanical zero. ....................................................................................2-8
Figure 2-11. M16A4 battlesight zero. ......................................................................................2-8
Figure 2-12. M16A1 rifle.........................................................................................................2-9
Figure 2-13. M16A1 mechanical zero. ....................................................................................2-9
Figure 2-14. M16A1 battlesight zero. ....................................................................................2-10
Figure 2-15. Adapter rail system. ..........................................................................................2-11
Figure 2-16. M5 rail covers/heat shields. ..............................................................................2-11
Figure 2-17. Address markings on the adapter rail system....................................................2-12
Figure 2-18. Vertical pistol grip..............................................................................................2-13
Figure 2-19. Insight rail grabber. ...........................................................................................2-14
Figure 2-20. Insight rail grabber MILES training extender. ....................................................2-15
Figure 2-21. Picatinny rail grabber. .......................................................................................2-15
Figure 2-22. M68 close combat optic. ....................................................................................2-17

Figure 2-23. Mounting the M68 on an M16A4 rifle or M4-series carbine. ........................... 2-17

Figure 2-24. Mounting the M68 on an M16A1/A2/A3 rifle.................................................. 2-18

Figure 2-25. Mounting the M68/AN/PVS-14 combination on an M4 MWS......................... 2-19

Figure 2-26. AN/PAQ-4B/C infrared aiming light. ............................................................. 2-19

Figure 2-27. Mounting the AN/PAQ-4B/C on the M4 MWS top or left. .............................. 2-20

Figure 2-28. Mounting the AN/PAQ-4B/C on the M16A1/A2/A3 rifle and M4 carbine......... 2-21

Figure 2-29. AN/PEQ-2A/B target pointer/illuminator/aiming light....................................... 2-22

Figure 2-30. Mounting the AN/PEQ-2A/B on the M16A4 rifle and M4 MWS...................... 2-22

Figure 2-31. Mounting the AN/PEQ-2A/B on M16A1/A2/A3 rifles and M4 carbines. .......... 2-23

Figure 2-32. MILES training extender bracket installation on
                      M16-/M4-series weapons. ................................................................... 2-24

Figure 2-33. AN/PEQ-15 advanced target pointer illuminator aiming light. ........................ 2-25

Figure 2-34. AN/PEQ-15 mounted on M4 carbine. .......................................................... 2-25

Figure 2-35. AN/PAS-13B/C/D (V1) light weapon thermal sight and
                      AN/PAS-13B/C/D (V3) heavy weapon thermal sight....................................... 2-26

Figure 2-36. Mounting the TWS on M16A4 rifle or M4 carbine. ........................................ 2-26

Figure 2-37. Mounting the TWS on an M16A1/A2/A3 rifle.................................................. 2-27

Figure 2-38. AN/PVS-4 night vision sight....................................................................... 2-28

Figure 2-39. Mounting the AN/PVS-4 on an M4 carbine or M4 MWS. ............................... 2-28

Figure 2-40. Mounting the AN/PVS-4 on an M16A1/A2/A3 rifle. ....................................... 2-29

Figure 2-41. Backup iron sight. ....................................................................................... 2-30

Figure 2-42. Backup iron sight in the stowed position. ..................................................... 2-30

Figure 2-43. Advanced combat optical gunsight............................................................... 2-31

Figure 2-44. Mounting the ACOG on M16A4 rifle and M4 carbine. .................................... 2-31

Figure 2-45. Mounting the ACOG on an M16A1/A2/A3 rifle................................................ 2-32

Figure 2-46. ACOG locking screw. .................................................................................. 2-33

Figure 2-47. Borelight with a 5.56-millimeter mandrel. ..................................................... 2-33

Figure 2-48. 10-meter boresighting target and 25-meter zero offset. ................................. 2-34

Figure 2-49. M855 drop during 25-meter zeroing (M16A2 at 8/3+1, M4 at 6/3)................. 2-37

Figure 2-50. Bullet drop of M855 ammunition with M16A2 (8/3). ...................................... 2-37

Figure 2-51. Bullet drop of M855 ammunition with M4 (6/3)............................................. 2-38

Figure 2-52. M4 carbine and M16A2 rifle bullet trajectory comparison. ............................. 2-38

Figure 2-53. Bullet drop of M4/M855 during 25-meter zeroing on 6/3............................... 2-39

Figure 3-1. Failure to feed, chamber, or lock. ................................................................. 3-2

Figure 3-2. Failure to fire. ............................................................................................. 3-4

Figure 3-3. Other possible malfunctions. ........................................................................ 3-7

Figure 4-1. Clearing. ..................................................................................................... 4-3

Figure 4-2. Feeding. ...................................................................................................... 4-4

Figure 4-3. Chambering. ................................................................................................ 4-5

Figure 4-4. Locking. ....................................................................................................... 4-6

Figure 4-5. Firing. .......................................................................................................... 4-7

Figure 4-6. Unlocking. .................................................................................................... 4-8

Figure 4-7. Extracting. ........................................................................................................4-8

Figure 4-8. Ejecting. ...........................................................................................................4-9

Figure 4-9. Cocking. .........................................................................................................4-10

Figure 4-10. Semiautomatic and automatic fire mode selector positions. ...........................4-11

Figure 4-11. Burst fire mode selector position...................................................................4-11

Figure 4-12. Prone position of coach (right-handed firer). ..................................................4-14

Figure 4-13. Interceptor body armor..................................................................................4-15

Figure 4-14. Steady position. ............................................................................................4-17

Figure 4-15. Correct sight alignment. ................................................................................4-19

Figure 4-16. Focus of the eye and correct sight picture......................................................4-20

Figure 4-17. Side aiming technique. ..................................................................................4-21

Figure 4-18. Breath control for engaging single targets. ....................................................4-22

Figure 4-19. Breath control for engaging short-exposure targets. .......................................4-22

Figure 4-20. Individual foxhole supported firing position....................................................4-25

Figure 4-21. Basic prone unsupported firing position.........................................................4-26

Figure 4-22. Alternate prone unsupported firing position. ..................................................4-26

Figure 4-23. Basic prone supported firing position.............................................................4-27

Figure 4-24. Alternate prone supported firing position. ......................................................4-27

Figure 4-25. Kneeling unsupported firing position..............................................................4-28

Figure 5-1. 25-meter range................................................................................................5-2

Figure 5-2. Shot group marking...........................................................................................5-4

Figure 5-3. Central point of an odd-shaped group. ..............................................................5-4

Figure 5-4. 25-meter match grade performance. .................................................................5-5

Figure 5-5. Shot groups with no firer error. .........................................................................5-5

Figure 5-6. Shot groups with minor shooting error. ..............................................................5-6

Figure 5-7. Shot groups with considerable shooting error. ...................................................5-6

Figure 5-8. Shot groups with major shooting error. ..............................................................5-7

Figure 5-9. Central point of three shot groups.....................................................................5-8

Figure 5-10. Acceptable shot grouping performance. ..........................................................5-8

Figure 5-11. Shot groups with inconsistent aiming..............................................................5-9

Figure 5-12. Shot groups with consistent aiming and major shooting error........................5-10

Figure 5-13. Shot groups with inconsistent aiming and major shooting error. .....................5-11

Figure 5-14. Shot groups with improper vertical placement................................................5-12

Figure 5-15. Improper shot groups on the edge of the target. ............................................5-13

Figure 5-16. Correct aiming (A), initial shot group results (B). ............................................5-16

Figure 5-17. Final shot group results..................................................................................5-16

Figure 5-18. M16A1 25-meter zero target. ........................................................................5-17

Figure 5-19. M16A2 and M4 25-meter zero target. ............................................................5-18

*Figure 5-20. Downrange feedback targets........................................................................5-21

Figure 5-21. Target marking with spotters (markers). .........................................................5-21

Figure 5-22. Comparison of firing performance..................................................................5-22

*Figure 5-23. Known distance range. .................................................................................5-25

*Figure 5-24. 25-meter zero standard....................................................................... 5-26

*Figure 5-25. M16-/M4-series weapon aiming points. ................................................ 5-27

*Figure 5-26. Determine wind value using the clock method....................................... 5-28

*Figure 5-27. Determine wind speed using the flag method......................................... 5-29

*Figure 5-28. Determine wind speed using the pointing method................................... 5-30

*Figure 5-29. Calculate the adjusted point of aim based on wind speed........................ 5-31

*Figure 5-30. M16-/M4-series weapons adjusted point of aim based on wind speed. ....... 5-32

*Figure 5-31. Projectile differences. ........................................................................ 5-33

*Figure 5-32. Ammunition impact comparison. .......................................................... 5-34

*Figure 5-33. Minute of angle. ................................................................................ 5-38

*Figure 5-37. Increase in shot group size as range increases. .................................... 5-38

Figure 7-1. Kneeling supported firing position. ......................................................... 7-2

Figure 7-2. Standing unsupported firing position. ...................................................... 7-3

Figure 7-3. Standing supported firing position around obstacles. ................................. 7-4

Figure 7-4. Modified supported prone firing position. ................................................. 7-5

Figure 7-5. Firing over a rooftop. ............................................................................ 7-6

Figure 7-6. Firing around an obstacle. ..................................................................... 7-7

Figure 7-7. Firing from a window. ........................................................................... 7-8

Figure 7-8. Landscape target. ................................................................................ 7-18

Figure 7-9. Aimed quick fire. ................................................................................. 7-20

Figure 7-10. Pointed quick fire. .............................................................................. 7-21

Figure 7-11. Sight picture when canting the rifle while wearing a protective mask
             (75-meter target)................................................................................ 7-26

Figure 7-12. Engagement of 175-meter target. ......................................................... 7-27

Figure 7-13. Engagement of 300-meter target. ......................................................... 7-27

Figure 7-14. Lower weapon—target alignment........................................................... 7-32

Figure 7-15. Daytime field of view using pinpoint focus.............................................. 7-33

Figure 7-16. Nighttime field of view using off-center vision. ....................................... 7-33

Figure 7-17. Night-fire target. ................................................................................ 7-34

Figure 7-18. Lead requirement based on distance and approach angle.......................... 7-37

Figure 7-19. Sight-target relationship for the single-lead rule...................................... 7-38

Figure 7-20. Lead increasing at greater ranges......................................................... 7-38

Figure 7-21. Target movement (distance) at various angles. ....................................... 7-39

Figure 7-22. High ready position............................................................................. 7-43

Figure 7-23. Low ready position.............................................................................. 7-44

Figure 7-24. Lethal zone. ...................................................................................... 7-46

Figure 7-25. Incapacitation zone. ........................................................................... 7-46

Figure 7-26. Right-side parallel magazine changing method. ...................................... 7-49

Figure 7-27. Left-side parallel magazine changing method.......................................... 7-49

Figure 7-28. Right-side L-shaped magazine changing method. .................................... 7-50

Figure 7-29. Left-side L-shaped magazine changing method. ...................................... 7-51

Figure 7-30. Dimensions and placement of bowling pin targets.................................... 7-51

*Figure 7-31. Combat field fire barricade.. ................................................................. 7-59

*Figure 7-32. Combat field fire—kneeling unsupported position. .............................. 7-60

*Figure 7-33. Combat field fire—barricade supported position.. ............................... 7-60

*Figure 7-34. Combat field fire—prone unsupported position.. ................................. 7-61

*Figure 7-35. Bullet trajectory comparison. ............................................................... 7-71

*Figure 7-36. Windage effects of a 10-mph crosswind. ............................................ 7-72

Figure 8-1. Example of a zeroing mark. .................................................................... 8-3

Figure 8-2. Borelight in the START POINT position. .................................................. 8-4

Figure 8-3. Borelight in the HALF-TURN position. .................................................... 8-4

Figure 8-4. Example of a start point, half-turn, and reference point. ......................... 8-5

Figure 8-5. Close combat optic, 25-meter zeroing target. ......................................... 8-15

Figure 8-6. Width of horizontal hash marks. .............................................................. 8-18

Figure 8-7. Advanced combat optical gunsight reticle point of aim at 100 meters. ... 8-18

Figure 8-8. Advanced combat optical gunsight reticle point of aim at 25 meters. ...... 8-19

Figure 8-9. Example of thermal weapon sight zeroing adjustments. .................. ....... 8-22

Figure 8-10. Example of shot group adjustment with strike zone. ............................. 8-26

Figure A-1. Engagement skills trainer (five-lane configuration). ............................... A-1

Figure A-2. Exercise 1. .............................................................................................. A-8

Figure A-3. Exercise 2. .............................................................................................. A-10

Figure A-4. Exercise 3. .............................................................................................. A-11

Figure A-5. Exercise 4. .............................................................................................. A-12

Figure A-6. M15A1 aiming card. ................................................................................ A-15

Figure A-7. Riddle sighting device. ............................................................................ A-16

Figure A-8. M16 sighting device. ............................................................................... A-17

Figure A-9. Blank firing attachment. .......................................................................... A-18

Figure A-10. Weaponeer set up in the standing supported position. ......................... A-21

Figure A-11. Replay of shot. ...................................................................................... A-22

Figure A-12. Weaponeer printouts. ............................................................................ A-23

Figure A-13. Target box exercise. .............................................................................. A-24

Figure A-14. Rifle-holding device (TA-G-12A). .......................................................... A-25

Figure A-15. Staked rifle holding box. ........................................................................ A-25

Figure A-16. Paper being placed on a stationary object. ........................................... A-26

Figure A-17. Target box paddle (DVC-T-7-86). .......................................................... A-27

Figure B-1. Example of completed DA Form 5239-R
(100-, 200-, and 300-Meter Downrange Feedback Scorecard). ......................... B-2

Figure B-2. Example of completed DA Form 3601-R (Single Target—Field Fire I Scorecard). ....... B-2

Figure B-3. Example of completed DA Form 5241-R
(Single and Multiple Targets—Field Fire II Scorecard). ...................................... B-3

Figure B-4. Example of completed DA Form 3595-R (Record Fire Scorecard). .................... B-3

*Figure B-5. Example of DA Form 5789-R (Record Fire Scorecard—
Known Distance Course). .................................................................................... B-4

*Figure B-6. Example of completed DA Form 5790-R
(Record Fire Scorecard—Scaled Target Alternate Course). .............................. B-4

Figure B-7. Example of completed DA Form 7489-R (Record Night Fire Scorecard). .......... B-5
Figure B-8. Example of completed DA Form 7649-R
(Squad Designated Marksman—Record Fire I and II). ....................................... B-5
*Figure B-9. Example of completed DA Form 7682-R (Combat Field Fire Scorecard). ........ B-6
Figure D-1a. Sample DA Form 7566 (Composite Risk Management Worksheet). .............. D-8
Figure D-1b. Sample DA Form 7566 (Composite Risk Management Worksheet)(page 2). ........ D-9
Figure E-1. Rifle/machine gun zero range (17801). ............................................................ E-11
Figure E-2. Automated field fire range (17803). ................................................................ E-12
Figure E-3. Automated record fire range (17805). ............................................................. E-13
Figure E-4. Modified record fire range (17806). ................................................................ E-14
Figure E-5. Qualification training range (17809). ............................................................... E-15
Figure F-1. 10-meter target offset symbols. ...................................................................... F-1
Figure F-2. Blank 10-meter target offset. .......................................................................... F-3
Figure F-3. M16A2 10-meter boresighting target/25-meter zeroing target offsets. .............. F-4
Figure F-4. M4 MWS 10-meter boresighting target/25-meter zeroing target offsets. ........... F-4
Figure F-5. M4/M4A1 10-meter boresighting target/25-meter zeroing target offsets. .......... F-5
Figure F-6. M16A4 MWS 10-meter boresighting target/25-meter zeroing target offsets........... F-5
*Figure F-7. 200-meter zero of the back-up iron sights for M4 carbine. ............................... F-9
*Figure F-8. 200-meter zero of the iron sights/back-up iron sights
for M16-series weapons. .............................................................................. F-10
*Figure F-9. 200-meter zero of the close combat optic for M16-series weapons. ............... F-10
*Figure F-10. 300-meter zero of the advanced combat optical gunsight. ............................. F-11
*Figure F-11. Advanced combat optical gunsight points of aim (100 to 300 meters). .......... F-11

# Tables

Table 1-1. Training simulators, devices, and exercises. ..................................................... 1-17
Table 2-1. Characteristics of M16-/M4-series weapons. .................................................... 2-1
Table 2-2. Point of impact for the M4/M4A1 and M4 MWS. ................................................ 2-5
Table 2-3. Point of impact for the M16A2/A3 rifle. ............................................................. 2-7
Table 2-4. Point of impact for the M16A4 rifle. .................................................................. 2-9
Table 2-5. Point of impact for the M16A1 rifle. .................................................................. 2-10
Table 2-6. Accessory compatibility and mounting. ............................................................. 2-16
Table 2-7. Characteristics of various accessories. ............................................................. 2-16
Table 2-8. Authorized ammunition. ................................................................................... 2-35
Table 2-8. Authorized ammunition (continued). ................................................................. 2-36
Table 3-1. Other malfunctions. ......................................................................................... 3-6
Table 3-2. Methods of destruction and their applications. ................................................... 3-8
Table 4-1. Introduction to basic rifle marksmanship and mechanical training. ...................... 4-1
Table 4-2. Marksmanship Fundamentals I training program. ............................................... 4-14
Table 4-3. Marksmanship Fundamentals II training program. .............................................. 4-29

Table 5-1. Grouping procedures. .......................................................................................5-1

Table 5-2. Techniques used to identify errors in Soldiers' application of the fundamentals.................................................................................5-14

Table 5-3. Zeroing procedures. .......................................................................................5-14

*Table 5-4. Downrange feedback. ....................................................................................5-20

*Table 5-5. M16A2/3 and front sightpost of an M16A4. ..................................................5-23

*Table 5-6. M4/M4A1 and windage of an M16A4. ...........................................................5-31

*Table 5-7. Drift for 10 mile-per-hour wind using M855 ammunition.................................5-32

Table 6-1. Field Fire I and II training program. ................................................................6-1

Table 6-2. Number of rounds that must be fired from each position during Field Fire I.........6-8

Table 6-3. Field Fire I firing tables. ..................................................................................6-9

Table 6-4. Number of rounds that must be fired from each position during Field Fire II. .......6-10

Table 6-5. Field Fire II firing tables. .................................................................................6-10

Table 6-6. Practice Record Fire I and II training program. ...............................................6-11

Table 6-7. Number of rounds that must be fired from each position during Practice Record Fire I and II. .....................................................................6-11

Table 6-8. Qualification ratings for Practice Record Fire I and II. .....................................6-12

Table 6-9. Record Fire training program. .........................................................................6-13

Table 6-10. Probability of hits. ........................................................................................6-14

Table 6-11. Results from an adequate unit training program. ...........................................6-14

Table 6-12. Number of rounds that must be fired from each position during Record Fire. ....6-14

Table 6-13. Qualification ratings for Record Fire................................................................6-16

Table 6-14. Known distance record fire range firing tables and related information............6-17

Table 6-15. Qualification ratings for the known distance record fire range.........................6-18

*Table 6-16. 25-meter scaled target alternate course firing tables and related information. ..........................................................................................6-19

Table 6-17. Qualification ratings for the 25-meter scaled target alternate course. ..............6-20

Table 7-1. Rapid semiautomatic fire training program. .....................................................7-11

Table 7-2. Rapid semiautomatic fire training and related information.................................7-11

Table 7-3. Automatic or burst fire training program...........................................................7-15

Table 7-4. Automatic or burst fire training and related information. ...................................7-15

Table 7-5. Suppressive fire training program. ..................................................................7-18

Table 7-6. Suppressive fire training and related information...............................................7-19

Table 7-7. Quick fire training program. .............................................................................7-24

Table 7-8. Quick fire training and related information.........................................................7-24

Table 7-9. Chemical, Biological, Radiological, and Nuclear fire training program. ............7-28

Table 7-10. Unassisted night fire training program. ..........................................................7-30

Table 7-11. Artificial illumination training program. ..........................................................7-35

Table 7-12. Moving target engagement training program. .................................................7-36

Table 7-13. Modifications for a steady position when firing at moving targets....................7-37

Table 7-14. Angle of target movement. ............................................................................7-39

Table 7-15. Target angle when dead center; hits occur using the single-lead rule..............7-40

Table 7-16. Short-range marksmanship training program. .................................................. 7-42

Table 7-17. Preliminary SRM tasks and explanation. ......................................................... 7-48

Table 7-18. Familiarization (stationary). ............................................................................. 7-52

Table 7-19. Familiarization (moving). ................................................................................. 7-53

Table 7-20. Record and practice fire. .................................................................................. 7-55

Table 7-21. Barricade transition fire. ................................................................................... 7-57

*Table 7-22. Combat field fire training program ................................................................. 7-58

*Table 7-23. Targets fired from the kneeling unsupported position .................................... 7-60

*Table 7-24. Targets fired from the barricade supported position--Set 1 ........................... 7-61

*Table 7-25. Targets fired from the barricade supported position--Set 2 ........................... 7-61

*Table 7-26. Targets fired from the prone unsupported position--Set 1 ............................. 7-61

*Table 7-27. Targets fired from the prone unsupported position--Set 2 ............................. 7-62

*Table 7-28. Ratings for combat field fire. ........................................................................... 7-62

*Table 7-29. Zero/zero confirmation firing event. ............................................................... 7-66

*Table 7-30. Elevation knob, M16A2/3 and front sightpost, M16A4. ................................. 7-70

*Table 7-31. Elevation knob, M4/M4A1 and windage, M16A4. .......................................... 7-70

*Table 7-32. Known distance (mech. adj.) firing event. ...................................................... 7-70

*Table 7-33. Calculated adjusted point of aim based on wind speed (full value). .............. 7-72

*Table 7-34. Drift for 10-mph wind using M855 ammunition when fired from M16A2
             rifle with 300-meter battlesight zero. ............................................................. 7-73

*Table 7-35. Firing event, known distance (hold off). ......................................................... 7-73

*Table 7-36. Firing event, Record Fire I and II. ................................................................... 7-73

Table 8-1. Weapon/aided-vision device combinations. ...................................................... 8-1

Table 8-2. Borelight training program. ................................................................................ 8-2

Table 8-3. Backup iron sights training program. ................................................................. 8-11

Table 8-4. M68 close combat optic training program. ......................................................... 8-13

Table 8-5. Advanced combat optical gunsight training program. ....................................... 8-17

Table 8-6. AN/PAS-13B/C/D thermal weapon sight training program. ............................... 8-20

Table 8-7. AN/PAQ-4B/C or AN/PEQ-2A/B infrared aiming laser training program. .......... 8-24

Table 8-8. AN/PVS-4 night vision device training program. ............................................... 8-28

Table A-1. Laser marksmanship training strategy parts list. .............................................. A-5

Table A-1. Laser marksmanship training strategy parts list (continued). ........................... A-6

Table A-2. Action, conditions, and standards for a reflective target exercise. ................... A-8

Table A-3. Action, conditions, and standards for an interactive dry-fire exercise. ............. A-9

Table A-4. Action, conditions, and standards for a grouping and zeroing exercise. .......... A-10

Table A-5. Action, conditions, and standards for a laser marksmanship training
            strategy prequalification exercise. ................................................................. A-11

Table A-6. Training aids and devices. ................................................................................. A-13

Table A-7. Target ordering numbers. .................................................................................. A-14

Table D-1. Five levels of probability. ................................................................................... D-4

Table D-2. Four levels of severity. ...................................................................................... D-5

Table D-3. Risk assessment matrix. .................................................................................... D-5

Table D-4. Four levels of risk................................................................................................ D-6
Table D-5. Worksheet instructions ....................................................................................... D-10
Table E-1. Primary/alternate range selection. ......................................................................E-10
Table F-1. Offset mounting...................................................................................................F-6
Table F-1. Offset mounting (continued)................................................................................F-7
Table F-1. Offset mounting (continued)................................................................................F-8

*FIRING FROM WINDOWS*

7-11. When firing from windows, Soldiers should stay in the shadows and make sure that the weapon's muzzle does not protrude out of the opening (Figure 7-7).



**Figure 7-7. Firing from a window.**

## SECTION II. COMBAT FIRE TECHNIQUES

Combat is the ultimate test of a Soldier's ability to apply the fundamentals of marksmanship and firing skills. Soldiers must apply the marksmanship skills mastered during training, practice, and record fire exercises to many combat situations (for example, attack, assault, ambush, or UO). Although these situations present problems, basic techniques and fundamentals require only two modifications: changes to the rate of fire and alterations in weapon/target alignment.

> **NOTE:** The necessary changes are significant and must be thoroughly taught and practiced before performing LFXs.

# RAPID SEMIAUTOMATIC FIRE

7-12. The most important firing technique during fast-moving, modern combat is rapid semiautomatic fire. It is the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple, or moving targets. To apply rapid semiautomatic fire, the Soldier intentionally fires a quick series of shots into the target area to ensure a high probability of a hit.

> **NOTE:** Increased speed and volume should be sought only after the Soldier has demonstrated expertise and accuracy during slow semiautomatic fire.

### EFFECTIVENESS AND CONTROL OF RAPID SEMIAUTOMATIC FIRE

7-13. With proper training, Soldiers can select the appropriate mode of fire: semiautomatic fire, rapid semiautomatic fire, or automatic/burst fire.

---

**NOTE:** Leaders must ensure that Soldiers apply proper fire discipline at all times. Even in training, unaimed fire must never be tolerated, especially unaimed automatic fire.

---

7-14. While Soldiers sacrifice some degree of accuracy to deliver a greater volume of fire, it is surprising how devastatingly accurate rapid semiautomatic fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit. Proper training and repeated practice increases the degree of accuracy.

7-15. Rapid application of the four fundamentals will result in a well-aimed shot every one or two seconds. This technique of fire allows a unit to place the most effective volume of fire in a target area while conserving ammunition. It is the most accurate means of delivering suppressive fire.

### MODIFICATIONS FOR RAPID SEMIAUTOMATIC FIRE

7-16. Trainers must consider the impact of the increased rate of fire on the Soldier's ability to properly apply the fundamentals of marksmanship and other combat firing skills, such as immediate action procedures.

## Marksmanship Fundamentals

7-17. The following paragraphs describe the modifications necessary for Soldiers to apply the four fundamentals when firing in the rapid semiautomatic fire mode.

### Steady Position

7-18. Consider the following modifications to achieve a steady position:

- Make sure that the weapon is well-supported to improve accuracy and reduce recovery time between shots.
- Grip the handgrip tightly to reduce recovery time and rapidly shift or distribute fire to subsequent targets.
- When possible, pivot the weapon where the nonfiring hand meets the support.
- Avoid changing the position of the nonfiring hand on the support; it is awkward and time-consuming when rapidly firing a series of shots.

### Aiming

7-19. Consider the following recommendations to properly aim the weapon:

- Do not change sighting and stock weld during rapid semiautomatic fire. Keep the cheek on the stock for every shot, align the firing eye with the rear aperture, and focus on the front sightpost.
- When using slow semiautomatic fire, seek a stable sight picture.
- In the fast-moving situations that require rapid semiautomatic fire, accept target movement and unsteady sight picture, and keep firing into the target area until the target is down or there is no chance of a hit.
- Aim every shot.

### Breath Control

7-20. Breath control must be modified because the Soldier does not have time to take a complete breath between shots. Consider the following modifications to achieve proper breath control:

- Hold your breath at some point in the firing process.
- Take shallow breaths between shots.

*Trigger Squeeze*

7-21. To maintain the desired rate of fire, the Soldier has a brief period of time to squeeze the trigger. The firer must cause the weapon to fire in about half of a second or less and still not anticipate the precise moment of firing. Consider the following modifications to achieve proper trigger squeeze:

- Apply initial trigger pressure as soon as a target is identified and while the front sightpost is being brought to the desired point of aim.
- When the front sightpost reaches the point of aim, apply final pressure to cause the weapon to fire almost at once. Apply this additional pressure, also known as final trigger squeeze, without disturbing the lay of the weapon.
- Increase the firing rate by firing, releasing enough trigger pressure to reset the sear, and then immediately firing the next shot. This technique is called rapid trigger squeeze. It eliminates the time used in fully releasing pressure on the trigger and allows the firer to rapidly deliver subsequent rounds.

**NOTE:** Training and practice sessions are required for Soldiers to become proficient in the technique of rapid trigger squeeze.

7-22. Repeated dry-fire training using simulators, such as the EST 2000 and LMTS, and live-fire practice ensure that the Soldier can squeeze the trigger and maintain a rapid rate of fire consistently and accurately.

## Immediate Action Procedures

7-23. To maintain an increased rate of suppressive fire, Soldiers must apply immediate action quickly. Repeated dry-fire practice using blanks or dummy rounds, followed by live-fire training and evaluation, ensures that Soldiers can rapidly apply immediate action procedures while other Soldiers initiate fire.

## RAPID SEMIAUTOMATIC FIRE TRAINING

**NOTE:** Soldiers should be well-trained in all aspects of slow semiautomatic firing before attempting any rapid semiautomatic fire training. Those who display a lack of knowledge of fundamental marksmanship skills should not advance to rapid semiautomatic fire training until these skills are learned and mastered.

7-24. Initial training should focus on the modifications to the fundamentals and other basic combat skills necessary during rapid semiautomatic firing.

**NOTE:** See Table 7-1 for the current training program.

Table 7-1. Rapid semiautomatic fire training program.

| RAPID SEMIAUTOMATIC FIRE TRAINING PROGRAM |
| --- |
| |
| **Instructional Intent** |
| • Soldiers learn to engage targets using rapid semiautomatic fire and practice rapid magazine changes. |
| **Special Instructions** |
| Ensure that—<br>• The M16A2/A3/A4 rifle's or M4 carbine's rear sight is set on the 0-2 aperture.<br>• The M16A1's rear sight is set on the unmarked aperture.<br>• Soldiers use a 25-meter alternate course C qualification target.<br>• Each Soldier is given four 5-round magazines of 5.56-millimeter ball ammunition.<br>• Soldiers use rapid semiautomatic fire to engage targets.<br>• Each Soldier fires one round at each of the 10 silhouettes on the alternate course C qualification target.<br>• Each Soldier does a rapid magazine change after each magazine is fired.<br>• The first iteration of 10 rounds is fired within a time limit of 40 seconds.<br>• The second iteration of 10 rounds is fired within a time limit of 30 seconds.<br>• Each target is inspected, and the results are posted after each iteration. |
| **Observables** |
| • Coaches continuously analyze the firer's application of the fundamentals.<br>• Each Soldier obtains 14 hits out of 20 silhouette target exposures. |

## Conduct

7-25. Each Soldier receives four 5-round magazines of 5.56-millimeter ball ammunition. Using rapid semiautomatic fire, the Soldier fires one round at each of the 10 silhouettes on the alternate course C qualification target. Soldiers fire two iterations, performing a rapid magazine change after each magazine is fired. The targets are inspected, and the results are posted after each iteration. Each Soldier must obtain 14 hits out of 20 silhouette target exposures.

7-26. Table 7-2 depicts the two iterations and provides related information, such as time constraints, number of rounds that must be fired, type of target that must be used, and the distance away from the firer that the target must be placed.

Table 7-2. Rapid semiautomatic fire training and related information.

| ITERATION | TIME CONSTRAINTS | NUMBER OF ROUNDS | TYPE OF TARGET | DISTANCE (m) |
| --- | --- | --- | --- | --- |
| 1 | 40 sec | 10 | 25-m alternate course C qualification target | 25 |
| 2 | 30 sec | 10 | 25-m alternate course C qualification target | 25 |

## Dry-Fire Exercises

7-27. Repeated dry-fire exercises are the most efficient means to ensure that Soldiers can apply modifications to the fundamentals. Multiple dry-fire exercises are needed, emphasizing a rapid shift in position and point of aim, followed by breath control and fast trigger squeeze.

**NOTES:** 1. Blanks or dummy rounds may be used to train rapid magazine changes and immediate action procedures.

2. The Soldier should display knowledge and skill during dry-fire exercises before attempting LFXs.

## Live-Fire Exercises

7-28.  There are two types of LFXs:
- Individual.
- Collective.

### Individual

7-29.  To conduct an individual LFX—
- Ensure that the emphasis is on each Soldier maintaining a heavy volume of accurate fire.
- Keep weapon downtime (during immediate action and rapid magazine changes) to a minimum.
- Begin by firing at shorter ranges, progressing to longer ranges as Soldiers display increased proficiency.
- Shorten exposure or engagement times and increase the number of rounds to simulate the need for a heavy volume of fire.
- Provide downrange feedback to determine the accuracy of fire.

### Collective

7-30.  Rapid semiautomatic fire should be the primary means of delivering fire during a collective LFX. To conduct a collective LFX, ensure that the emphasis is on performing staggered rapid magazine changes, maintaining a continuous volume of fire, and conserving ammunition.

# AUTOMATIC OR BURST FIRE

**NOTE:** Automatic or burst fire should be trained only after the Soldier has demonstrated expertise during slow and rapid semiautomatic fire.

7-31.  When applying automatic or burst fire, Soldiers deliver the maximum number of rounds (one to three rounds per second) into a designated target area while rapidly applying the four fundamentals. This specialized technique of delivering suppressive fire may not apply to most combat engagements.

**NOTE:** The M16A1/A3 rifle and M4A1 carbine have fully automatic settings. The M16A2/A4 rifle and M4 carbine use a three-round burst capability.

## EFFECTIVENESS AND CONTROL OF AUTOMATIC OR BURST FIRE

7-32.  Automatic or burst fire is inherently less accurate than semiautomatic fire. The first fully automatic shot fired may be on target, but recoil and a high cyclic rate of fire often combine to place subsequent rounds far from the desired point of impact. Even controlled (three-round burst) automatic or burst fire may place only one round on the target. Because of these inaccuracies, it is difficult to evaluate the effectiveness of automatic or burst fire, and even more difficult to establish absolute guidelines for its use.

## FACTORS FOR USE OF SEMIAUTOMATIC VERSUS AUTOMATIC OR BURST FIRE

7-33.  Trainers must ensure that Soldiers understand the capabilities and limitations of automatic or burst fire. They must know when it should and should not be used.

## Semiautomatic Fire

7-34.  M16 rifles and M4 carbines should normally be employed in the semiautomatic fire mode.

7-35.  Depending on the tactical situation, Soldiers should employ the semiautomatic fire mode in the following conditions:

- Ammunition is in short supply, or resupply may be difficult.
- Single targets are being engaged.
- Widely spaced multiple targets are being engaged.
- The target is located more than 50 meters away.
- The effect of bullets on the target cannot be observed.
- Artificial support is not available.
- Targets may be effectively engaged using semiautomatic fire.

## Automatic or Burst Fire

7-36.  In some combat situations, the use of automatic or burst fire can improve survivability and enhance mission accomplishment. Clearing buildings, final assaults, FPF, and ambushes may require limited use of automatic or burst fire.

7-37.  Depending on the tactical situation, Soldiers should employ automatic or burst fire in the following conditions:

- Ammunition is readily available, and there are no problems with resupply.
- Closely spaced multiple targets are located 50 meters away or less.
- Maximum fire is immediately required at an area target.
- Tracers or some other means can be used to observe the effect of bullets on the target.
- Leaders can maintain adequate control over weapons firing in the automatic fire mode.
- Good artificial support is available.
- The initial sound of gunfire disperses closely spaced enemy targets.

### MODIFICATIONS FOR AUTOMATIC OR BURST FIRE

7-38.  Automatic or burst fire is inherently less accurate than semiautomatic fire. Trainers must consider the impact of recoil and the high cyclic rate of fire on the Soldier's ability to properly apply the fundamentals of marksmanship and other combat firing skills, such as immediate action procedures and rapid magazine changes.

## Marksmanship Fundamentals

7-39.  The following paragraphs describe the modifications necessary for Soldiers to apply the four fundamentals when firing in the automatic fire mode.

### Steady Position

7-40.  Consider the following modifications to achieve a steady position:

- Make sure that the weapon is well-supported.
- Grip the weapon a little more firmly and pull it into the shoulder a little tighter than when in the semiautomatic fire mode.

---

**NOTE:** This support and increased grip help offset the progressive displacement of weapon/target alignment caused by recoil.

---

- To provide maximum stability, assume the modified supported prone firing position (Figure 7-4).

---

**NOTE:** If the weapon is equipped with the ARS, use the vertical pistol grip to further increase control of the weapon.

---

### Aiming

*7-41.* Consider the following recommendations to properly aim the weapon:

- Do not change sighting and stock weld during automatic or burst fire. Keep the cheek on the stock for every shot, align the firing eye with the rear aperture, and focus on the front sightpost.
- Although recoil may disrupt this process, try to apply the aiming techniques throughout recoil.

### Breath Control

7-42. Breath control must be modified because the Soldier does not have time to take a complete breath between shots. Consider the following modifications to achieve proper breath control:

- Hold your breath at some point in the firing process.
- Take shallow breaths between shots.

### Trigger Squeeze

7-43. Training and repeated dry-fire practice aid the Soldier in applying proper trigger squeeze during automatic firing. LFXs enable him to improve this skill.

### M16A2/3/4 Rifles and M4 Carbines

7-44. Until the weapon fires, trigger squeeze is applied in the normal manner. To use the burst fire mode—

(1) Hold the trigger to the rear until three rounds are fired.
(2) Release pressure on the trigger until it resets.
(3) Reapply pressure for the next three-round burst.

---

**NOTES:** 1. Do not slap or jerk the trigger. Squeeze it, and then quickly release pressure.

2. Depending on the position of the burst can when the selector is moved to the burst fire mode, the weapon may fire one, two, or three rounds when the trigger is held to the rear for the first time. If the weapon fires only one or two rounds, quickly release pressure on the trigger and squeeze again, holding it to the rear until a three-round burst is completed.

---

### M16A1 Rifles

7-45. Until the weapon fires, trigger squeeze is applied in the normal manner. Because three-round bursts are the most effective rate of fire, pressure on the trigger should be released as quickly as possible. To use the burst fire mode, keep the index finger on the trigger, but quickly release pressure to prevent an excessive number of rounds from being fired in one burst. With much dry-fire practice, the Soldier can become proficient at delivering three-round bursts with the squeeze/release technique.

## Immediate Action

7-46. To maintain an increased rate of suppressive fire, Soldiers must apply immediate action quickly. Repeated dry-fire practice using blanks or dummy rounds, followed by live-fire training and evaluation, ensures that Soldiers can rapidly apply immediate action procedures.

## Rapid Magazine Changes

7-47. Rapid magazine changes are vital in maintaining automatic or burst fire. Rapid magazine changes must be correctly taught and practiced during dry-fire and live-fire exercises until the Soldier becomes proficient.

## AUTOMATIC OR BURST FIRE TRAINING

**NOTE:** Soldiers should be well-trained in all aspects of slow semiautomatic firing before attempting any automatic training. Those who display a lack of knowledge of fundamental skills should not advance to automatic or burst fire training until these skills are learned.

7-48. Initial training should focus on the modifications to the fundamentals and other basic combat skills necessary during automatic firing.

7-49. Unit training is vital to properly applying this technique. Soldiers must be taught the advantages and disadvantages of automatic and burst firing so they know when it should be used. Without this knowledge, Soldiers tend to switch to the automatic or burst fire mode in life-threatening situations.

**NOTE:** See Table 7-3 for the current training program.

**Table 7-3. Automatic or burst fire training program.**

| AUTOMATIC OR BURST FIRE TRAINING PROGRAM |
|---|
|  |
| **Instructional Intent** |
| • Soldiers learn the advantages and disadvantages of automatic or burst fire. |
| **Special Instructions** |
| Ensure that— |
| • The M16A2/A3/A4 rifle's or M4 carbine's rear sight is set on the 0-2 aperture. |
| • The M16A1's rear sight is set on the unmarked aperture. |
| • Soldiers use a 25-meter alternate course C qualification target. |
| • Each Soldier is in a proper modified automatic/burst firing position. |
| • Each Soldier is given two 15-round magazines of 5.56-millimeter ball ammunition. |
| • Each Soldier fires one 3-round burst at each of the 10 silhouettes on the alternate course C qualification target. |
| • Each Soldier does a rapid magazine change after each magazine is emptied. |
| **Observables** |
| • Each Soldier obtains five target hits. |
| • Soldiers demonstrate control of the weapon in the automatic/burst fire mode. |

## Conduct

7-50. Each Soldier receives two 15-round magazines of 5.56-millimeter ball ammunition. Each Soldier fires one 3-round burst at each of the 10 silhouettes on the alternate course C qualification target, performing a rapid magazine change after each magazine is emptied. Each Soldier must obtain five target hits.

7-51. Table 7-4 depicts automatic or burst fire training and provides related information, such as number of rounds that must be fired, type of target that must be used, and the distance away from the firer that the target must be placed.

**Table 7-4. Automatic or burst fire training and related information.**

| FIRING POSITION | NUMBER OF ROUNDS | TYPE OF TARGET | DISTANCE (m) |
|---|---|---|---|
| Modified automatic/burst firing position | 30, one 3-round burst at each of the 10 silhouettes | Alternate course C qualification target | 25 |

**Dry-Fire and Live-Fire Exercises**

7-52. Repeated dry-fire exercises are the most efficient means to ensure that Soldiers can apply modifications to the fundamentals. Multiple dry-fire exercises are needed, emphasizing a stable position and point of aim, followed by breath control and appropriate trigger squeeze.

| NOTES: | 1. | Blanks or dummy rounds may be used to train trigger squeeze, rapid magazine changes, and immediate action procedures. |
|---|---|---|
| | 2. | The Soldier should display knowledge and skill during dry-fire exercises before attempting LFXs. |

# SUPPRESIVE FIRE

7-53. Suppressive fire is precisely aimed at a definite point or area target. Some situations may require a Soldier to place suppressive fire into a wide area (for example, wood line, hedgerow, or small building) while, at other times, the target may be a smaller area (for example, a bunker or window). Suppressive fire is used to control the enemy and the area he occupies. It is employed to kill the enemy or to prevent him from observing the battlefield, effectively using his weapons, or moving.

## EFFECTIVENESS AND CONTROL OF SUPPRESSIVE FIRE

7-54. Many Soldiers have difficulty delivering effective suppressive fire when they cannot see a definite target, only likely locations or general areas where the enemy is known to exist. Even though definite targets cannot be seen, most suppressive fire should be well-aimed.

7-55. When controlling suppressive fires, two factors must be considered:
- Point of aim.
- Rate of fire.

### Point of Aim

7-56. Suppressive fire should be well-aimed, sustained, semiautomatic fire. Although lacking a definite target, the Soldier must be taught to control and accurately deliver fire within the limits of the suppressed area. As when engaging a point target, the weapon sights are used, with the front sightpost placed so each shot impacts within the desired area.

### Rate of Fire

7-57. During most phases of live-fire training (for example, grouping, zeroing, qualifying), shots are delivered using slow semiautomatic fire (one round every 3 to 10 seconds). During training, this allows a slow and precise application of the fundamentals. Successful suppressive fire requires a faster, but sustained, rate of fire. Soldiers may need to fire full automatic or bursts (13 rounds per second) for a few seconds to gain initial fire superiority. Rapid semiautomatic fire (one round every one or two seconds) allows the firer to sustain a large volume of accurate fire while conserving ammunition.

## MODIFICATIONS FOR SUPPRESSIVE FIRE

7-58. The tactical situation dictates the most useful rate of fire, but the following must be considered:
- Marksmanship fundamentals.
- Rapid magazine changes.
- Ammunition conservation.

**FM 3-22.9**
**12 August 2008**

By Order of the Secretary of the Army:

**GEORGE W. CASEY, JR.**
*General, United States Army*
*Chief of Staff*

Official:

JOYCE E. MORROW
*Administrative Assistant to the*
*Secretary of the Army*
0820409

**DISTRIBUTION:**

*Active Army, Army National Guard, and U.S. Army Reserve:* To be distributed in accordance with the initial distribution number (IDN) 110187 requirements for FM 3-22.9.

# EXHIBIT 11

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF
## Study on the Importability of Certain Shotguns



**Firearms and Explosives Industry Division**

**January 2011**

TABLE OF CONTENTS

Page

1.  Executive Summary…………………………………………….        ii

2.  Study on the Importability of Certain Shotguns……………..…….      1

3.  Background on Shotguns…………………………………………..        1

4.  Background on Sporting Suitability……………………….…………      1

5.  Methodology……………………………………………………        5

6.  Analysis………………………………………………………...      7

        Scope of Sporting Purpose……………………………..…..        7

        Suitability for Sporting Purposes……………………….……      8

7.  Conclusion……………………………………………………      13

8.  Exhibits

        1.  Shotgun Stock Style Comparison

        2.  State Laws

        3.  Sample Drum Magazine

        4.  Integrated Rail System

        5.  Bulk Measurements

        6.  Forward Pistol Grip

ii

## Study on the Importability of Certain Shotguns

### Executive Summary

The purpose of this study is to establish criteria that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) will use to determine the importability of certain shotguns under the provisions of the Gun Control Act of 1968 (GCA).

The Gun Control Act of 1968 (GCA) generally prohibits the importation of firearms into the United States.[1]  However, pursuant to 18 U.S.C. § 925(d), the GCA creates four narrow categories of firearms that the Attorney General must authorize for importation.  Under one such category, subsection 925(d)(3), the Attorney General shall approve applications for importation when the firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes (the "sporting purposes test").

After passage of the GCA in 1968, a panel was convened to provide input on the sporting suitability standards which resulted in factoring criteria for handgun importations.  Then in 1989, and again in 1998, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) conducted studies to determine the sporting suitability and importability of certain firearms under section 925(d)(3).  However, these studies focused mainly on a type of firearm described as "semiautomatic assault weapons."  The 1989 study determined that assault rifles contained a variety of physical features that distinguished them from traditional sporting rifles.  The study concluded that there were three characteristics that defined semiautomatic assault rifles.[2]

The 1998 study concurred with the conclusions of the 1989 study, but included a finding that "the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989."[3]  Further, both studies concluded that the scope of "sporting purposes" did not include all lawful activity, but was limited to traditional sports such as hunting, skeet shooting, and trap shooting.  This effectively narrowed the universe of firearms considered by each study because a larger number of firearms are "particularly suitable for or readily adaptable to a sporting purpose" if plinking[4] and police or military-style practical shooting competitions are also included as a "sporting purpose."[5]

Although these studies provided effective guidelines for determining the sporting purposes of rifles, ATF recognized that no similar studies had been completed to determine the sporting

---

[1] Chapter 44, Title 18, United States Code (U.S.C.), at 18 U.S.C. § 922(l).

[2] These characteristics were:  (a) a military configuration (ability to accept a detachable magazine, folding/telescoping stocks, pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights); (b) a semiautomatic version of a machinegun; and (c) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.  *1989 Report and Recommendation on the Importability of Certain Semiautomatic Rifles (1989 Study)* at 6-9.

[3] *1998 Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Rifles (1998 Study)* at 2.

[4] "Plinking" is shooting at random targets such as bottles and cans.  1989 Report at 10.

[5] *1989 Report* at 8-9; *1998 Study* at 18-19.

suitability of shotguns.  A shotgun study working group (working group) was assigned to perform a shotgun study under the § 925(d)(3) sporting purposes test.  The working group considered the 1989 and 1998 studies, but neither adopted nor entirely accepted findings from those studies as conclusive as to shotguns.

<u>Sporting Purpose</u>

Determination of whether a firearm is generally accepted for use in sporting purposes is the responsibility of the Attorney General (formerly the Secretary of the Treasury).  As in the previous studies, the working group considered the historical context of "sporting purpose" and that Congress originally intended a narrow interpretation of sporting purpose under § 925(d)(3).

While the 1989 and 1998 studies considered all rifles in making their recommendations, these studies first identified firearm features and subsequently identified those activities believed to constitute a legitimate "sporting purpose."  However, in reviewing the previous studies, the working group believes that it is appropriate to first consider the current meaning of "sporting purpose" as this may impact the "sporting" classification of any shotgun or shotgun features.  For example, military shotguns, or shotguns with common military features that are unsuitable for traditional shooting sports, may be considered "particularly suitable for or readily adaptable to sporting purposes" if military shooting competitions are considered a generally recognized sporting purpose.  Therefore, in determining the contemporary meaning of sporting purposes, the working group examined not only the traditional sports of hunting and organized competitive target shooting, but also made an effort to consider other shooting activities.

In particular, the working group examined participation in and popularity of practical shooting events as governed by formal rules, such as those of the United States Practical Shooting Association (USPSA) and International Practical Shooting Confederation (IPSC), to determine whether it was appropriate to consider these events a "sporting purpose" under § 925(d)(3).  While the number of members reported for USPSA is similar to the membership for other shotgun shooting organizations,[6] the working group ultimately determined that it was not appropriate to use this shotgun study to determine whether practical shooting is "sporting" under § 925(d)(3).  A change in ATF's position on practical shooting has potential implications for rifle and handgun classifications as well.  Therefore, the working group believes that a more thorough and complete assessment is necessary before ATF can consider practical shooting as a generally recognized sporting purpose.

The working group agreed with the previous studies in that the activity known as "plinking" is "primarily a pastime" and could not be considered a recognized sport for the purposes of

---

[6] Organization websites report these membership numbers:  for the United States Practical Shooting Association, approx. 19,000; Amateur Trapshooting Association,  over 35,000 active members; National Skeet Shooting Association, nearly 20,000 members; National Sporting Clays Association, over 22,000 members; Single Action Shooting Society, over 75,000 members.

importation.[7]  Because almost any firearm can be used in that activity, such a broad reading of "sporting purpose" would be contrary to the congressional intent in enacting section 925(d)(3). For these reasons, the working group recommends that plinking not be considered a sporting purpose.  However, consistent with past court decisions and Congressional intent, the working group recognized hunting and other more generally recognized or formalized competitive events similar to the traditional shooting sports of trap, skeet, and clays.

<u>Firearm Features</u>

In reviewing the shotguns used for those activities classified as sporting purposes, the working group examined State hunting laws, rules, and guidelines for shooting competitions and shooting organizations; industry advertisements and literature; scholarly and historical publications; and statistics on participation in the respective shooting sports.  Following this review, the working group determined that certain shotgun features are <u>not</u> particularly suitable or readily adaptable for sporting purposes.  These features include:

> (1) Folding, telescoping, or collapsible stocks;
> (2) bayonet lugs;
> (3) flash suppressors;
> (4) magazines over 5 rounds, or a drum magazine;
> (5) grenade-launcher mounts;
> (6) integrated rail systems (other than on top of the receiver or barrel);
> (7) light enhancing devices;
> (8) excessive weight (greater than 10 pounds for 12 gauge or smaller);
> (9) excessive bulk (greater than 3 inches in width and/or greater than 4 inches in depth);
> (10) forward pistol grips or other protruding parts designed or used for gripping the shotgun with the shooter's extended hand.

Although the features listed above do not represent an exhaustive list of possible shotgun features, designs or characteristics, the working group determined that shotguns with any one of these features are most appropriate for military or law enforcement use.  Therefore, shotguns containing any of these features are not particularly suitable for nor readily adaptable to generally recognized sporting purposes such as hunting, trap, sporting clay, and skeet shooting. Each of these features and an analysis of each of the determinations are included within the main body of the report.

---

[7] 1989 Study at 10; 1998 Study at 17.

## Study on the Importability of Certain Shotguns

The purpose of this study is to establish criteria that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) will use to determine the importability of certain shotguns under the provisions of the Gun Control Act of 1968 (GCA).

## Background on Shotguns

A shotgun is defined by the GCA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger."[8]

Shotguns are traditional hunting firearms and, in the past, have been referred to as bird guns or "fowling" pieces.  They were designed to propel multiple pellets of shot in a particular pattern that is capable of killing the game that is being hunted.  This design and type of ammunition limits the maximum effective long distance range of shotguns, but increases their effectiveness for small moving targets such as birds in flight at a close range.  Additionally, shotguns have been used to fire slugs.  A shotgun slug is a single metal projectile that is fired from the barrel. Slugs have been utilized extensively in areas where State laws have restricted the use of rifles for hunting.  Additionally, many States have specific shotgun seasons for deer hunting and, with the reintroduction of wild turkey in many States, shotguns and slugs have found additional sporting application.

Shotguns are measured by *gauge* in the United States.  The gauge number refers to the "number of equal-size balls cast from one pound of lead that would pass through the bore of a specific diameter."[9]  The largest commonly available gauge is 10 gauge (.0775 in. bore diameter). Therefore, a 10 gauge shotgun will have an inside diameter equal to that of a sphere made from one-tenth of a pound of lead.  By far, the most common gauges are 12 (0.729 in. diameter) and 20 (0.614 in. diameter).  The smallest shotgun that is readily available is known as a ".410," which is the diameter of its bore measured in inches.  Technically, a .410 is a 67 gauge shotgun.

## Background on Sporting Suitability

The GCA generally prohibits the importation of firearms into the United States.[10]  However, the statute exempts four narrow categories of firearms that the Attorney General shall authorize for importation.  Originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968,[11] and amended by Title I of the GCA[12] enacted that same year, this section provides, in pertinent part:

---

[8] 18 U.S.C. § 921(a)(5).
[9] The Shotgun Encyclopedia at 106.
[10] 18 U.S.C. § 922(l).
[11] Pub. Law 90-351 (June 19, 1968).
[12] Pub. Law 90-618 (October 22, 1968).

the Attorney General shall authorize a firearm . . . to be imported or brought into the United States . . . if the firearm . . . (3) is of a **type** that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and **is generally recognized as particularly suitable for or readily adaptable to sporting purposes**, excluding surplus military firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.[13] (Emphasis added)

This section addresses Congress' concern that the United States had become a "dumping ground of the castoff surplus military weapons of other nations,"[14] in that it exempted only firearms with a generally recognized sporting purpose. In recognizing the difficulty in implementing this section, Congress gave the Secretary of the Treasury (now the Attorney General) the discretion to determine a weapon's suitability for sporting purposes. This authority was ultimately delegated to what is now ATF. Immediately after discussing the large role cheap imported .22 caliber revolvers were playing in crime, the Senate Report stated:

> [t]he difficulty of defining weapons characteristics to meet this target without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.[15]

Indeed, Congress granted this discretion to the Secretary even though some expressed concern with its breadth:

> [t]he proposed import restrictions of Title IV would give the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes. If this authority means anything, it permits Federal officials to differ with the judgment of sportsmen expressed through consumer preference in the marketplace….[16]

Since that time, ATF has been responsible for determining whether firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes under the statute.

---

[13] 18 U.S.C. § 925(d)(3). In pertinent part, 26 U.S.C. § 5845(a) includes "a shotgun having a barrel or barrels of less than 18 inches in length."
[14] 90 P.L. 351 (1968).
[15] S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).
[16] S. Rep. No. 1097, 90th Cong. 2d. Sess. 2155 (1968) (views of Senators Dirksen, Hruska, Thurmond, and Burdick). In Gun South, Inc. v. Brady, 877 F.2d 858, 863 (11th Cir. 1989), the court, based on legislative history, found that the GCA gives the Secretary "unusually broad discretion in applying section 925(d)(3)."

On December 10, 1968, the Alcohol and Tobacco Tax Division of the Internal Revenue Service (predecessor to ATF) convened a "Firearm Advisory Panel" to assist with defining "sporting purposes" as utilized in the GCA.   This panel was composed of representatives from the military, law enforcement, and the firearms industry.  The panel generally agreed that firearms designed and intended for hunting and organized competitive target shooting would fall into the sporting purpose criteria.  It was also the consensus that the activity of "plinking" was primarily a pastime and therefore would not qualify.  Additionally, the panel looked at criteria for handguns and briefly discussed rifles.   However, no discussion took place on shotguns given that, at the time, all shotguns were considered inherently sporting because they were utilized for hunting or organized competitive target competitions.

Then, in 1984, ATF organized the first large scale study aimed at analyzing the sporting suitability of certain firearms.  Specifically, ATF addressed the sporting purposes of the Striker-12 and Streetsweeper shotguns.  These particular shotguns were developed in South Africa as law enforcement, security and anti-terrorist weapons.  These firearms are nearly identical 12-gauge shotguns, each with 12-round capacity and spring-driven revolving magazines.  All 12 rounds can be fired from the shotguns within 3 seconds.

In the 1984 study, ATF ruled that the Striker-12 and the Streetsweeper were not eligible for importation under 925(d)(3) because they were not "particularly suitable for sporting purposes." In doing this, ATF reversed an earlier opinion and specifically rejected the proposition that police or combat competitive shooting events were a generally accepted "sporting purpose." This 1984 study adopted a narrow interpretation of organized competitive target shooting competitions to include the traditional target events such as trap and skeet.  ATF ultimately concluded that the size, weight and bulk of the shotguns made them difficult to maneuver in traditional shooting sports and, therefore, these shotguns were not particularly suitable for or readily adaptable to these sporting purposes.  At the same time, however, ATF allowed importation of a SPAS-12 variant shotgun because its size, weight, bulk and *modified* configuration were such that it was particularly suitable for traditional shooting sports.[17]  The Striker-12 and Streetsweeper were later classified as "destructive devices" pursuant to the National Firearms Act.[18]

In 1989, and again in 1998, ATF conducted studies to determine whether certain rifles could be imported under section 925(d)(3).  The respective studies focused primarily on the application of the sporting purposes test to a type of firearm described as a "semiautomatic assault weapon."  In both 1989 and 1998, ATF was concerned that certain semiautomatic assault weapons had been approved for importation even though they did not satisfy the sporting purposes test.

---

[17] Private letter Ruling of August 9, 1989 from Bruce L. Weininger, Chief, Firearms and Explosives Division.
[18] *See* ATF Rulings 94-1 *and* 94-2.

<u>1989 Study</u>

In 1989, ATF announced that it was suspending the importation of several semiautomatic assault rifles pending a decision on whether they satisfied the sporting criteria under section 925(d)(3). The 1989 study determined that assault rifles were a "type" of rifle that contained a variety of physical features that distinguished them from traditional sporting rifles. The study concluded that there were three characteristics that defined semiautomatic assault rifles:

(1) a military configuration (ability to accept a detachable magazine, folding/telescoping stocks, pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights);
(2) semiautomatic version of a machinegun;
(3) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.[19]

The 1989 study then examined the scope of "sporting purposes" as used in the statute.[20] The study noted that "[t]he broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test.[21] The 1989 study concluded that a broad interpretation would render the statute useless. The study therefore concluded that neither plinking nor "police/combat-type" competitions would be considered sporting activities under the statute.[22]

The 1989 study concluded that semiautomatic assault rifles were "designed and intended to be particularly suitable for combat rather than sporting applications."[23] With this, the study determined that they were not suitable for sporting purposes and should not be authorized for importation under section 925(d)(3).

<u>1998 Study</u>

The 1998 study was conducted after "members of Congress and others expressed concern that rifles being imported were essentially the same as semiautomatic assault rifles previously determined to be nonimportable" under the 1989 study.[24] Specifically, many firearms found to be nonimportable under the 1989 study were later modified to meet the standards outlined in the study. These firearms were then legally imported into the country under section 925(d)(3). ATF commissioned the 1998 study on the sporting suitability of semiautomatic rifles to address concerns regarding these modified firearms.

---

[19] 1989 Report and Recommendation on the ATF Working Group on the Importability of Certain Semiautomatic Rifles (1989 Study).
[20] Id. at 8.
[21] Id.
[22] *Id.* At 9.
[23] *Id.* At 12.
[24] 1998 Study at 1.

The 1998 study identified the firearms in question and determined that the rifles shared an important feature—the ability to accept a large capacity magazine that was originally designed for military firearms.  The report then referred to such rifles as Large Capacity Military Magazine rifles or "LCMM rifles."[25]

The study noted that after 1989, ATF refused to allow importation of firearms that had any of the identified non-sporting features, but made an exception for firearms that possessed only a detachable magazine.  Relying on the 1994 Assault Weapons Ban, the 1998 study noted that Congress "sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting."[26]  The study concluded by adopting the standards set forth in the 1989 study and by reiterating the previous determination that large capacity magazines are a military feature that bar firearms from importation under section 925(d)(3).[27]

<u>Present Study</u>

While ATF conducted the above mentioned studies on the sporting suitability of rifles, to date, no study has been conducted to address the sporting purposes and importability of shotguns. This study was commissioned for that purpose and to ensure that ATF complies with it statutory mandate under section 925(d)(3).

<div align="center"><u>Methodology</u></div>

To conduct this study, the working group reviewed current shooting sports and the sporting suitability of common shotguns and shotgun features.  At the outset, the working group recognized the importance of acknowledging the inherent differences between rifles, handguns and shotguns.  These firearms have distinct characteristics that result in specific applications of each weapon.  Therefore, in conducting the study, the working group generally considered shotguns without regard to technical similarities or differences that exist in rifles or handguns.

The 1989 and 1998 studies examined particular features and made sporting suitability determinations based on the generally accepted sporting purposes of *rifles*.  These studies served as useful references because, in recent years, manufacturers have produced shotguns with features traditionally found only on rifles.  These features are typically used by military or law enforcement personnel and provide little or no advantage to sportsmen.

Following a review of the 1989 and 1998 studies, the working group believed that it was necessary to first identify those activities that are considered legitimate "sporting purposes" in the modern era.  While the previous studies determined that only "the traditional sports of hunting and organized competitive target shooting" would be considered "sporting,"[28] the working group recognized that sporting purposes may evolve over time.  The working group felt

---

[25] 1998 Study at 16.
[26] 1998 Study at 3.
[27] The 1994 Assault Weapons Ban expired Sept. 13, 2004, as part of the law's sunset provision.
[28] 1998 Study at 16

that the statutory language supported this because the term "generally recognized" modifies, not only firearms used for shooting activities, but also the shooting activities themselves. This is to say that an activity is considered "sporting" under section 925(d)(3) if it is generally recognized as such.[29] Therefore, activities that were "generally recognized" as legitimate "sporting purposes" in previous studies are not necessarily the same as those activities that are "generally recognized" as sporting purposes in the modern era. As stated above, Congress recognized the difficulty in legislating a fixed meaning and therefore gave the Attorney General the responsibility to make such determinations. As a result, the working group did not simply accept the proposition that sporting events were limited to hunting and traditional trap and skeet target shooting. In determining whether an activity is now generally accepted as a sporting purpose, the working group considered a broad range of shooting activities.

Once the working group determined those activities that are generally recognized as a "sporting purpose" under section 925(d)(3), it examined numerous shotguns with diverse features in an effort to determine whether any particular firearm was particularly suitable for or readily adaptable to those sports. In coming to a determination, the working group recognized that a shotgun cannot be classified as sporting merely because it may be used for a sporting purpose. During debate on the original bill, there was discussion about the meaning of the term "sporting purposes." Senator Dodd stated:

> Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event . . . . As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons.[30]

In making a determination on any particular feature, the working group considered State hunting laws, currently available products, scholarly and historical publications, industry marketing, and rules and regulations of organization such as the National Skeet Shooting Association, Amateur Trapshooting Association, National Sporting Clays Association, Single Action Shooting Society, International Practical Shooting Confederation (IPSC), and the United States Practical Shooting Association (USPSA). Analysis of these sources as well as a variety of shotguns led the working group to conclude that certain shotguns were of a type that did not meet the requirements of section 925(d)(3), and therefore, could not lawfully be imported.

---

[29] ATF previously argued this very point in <u>Gilbert Equipment Company , Inc. v. Higgins</u>, 709 F.Supp. 1071, 1075 (S.D. Ala. 1989). The court agreed, noting, "according to Mr. Drake, the bureau takes the position…that an event has attained general recognition as being a sport before those uses and/or events can be 'sporting purposes' or 'sports' under section 925(d)(3). *See also* Declaration of William T. Drake, Deputy Director, Bureau of Alcohol, Tobacco and Firearms.
[30] 114 Cong. Rec. 27461-462 (1968).

Analysis

A. Scope of Sporting Purposes

In conducting the sporting purposes test on behalf of the Attorney General, ATF examines the physical and technical characteristics of a shotgun and determines whether those characteristics meet this statutory requirement.  A shotgun's suitability for a particular sport depends upon the nature and requirements inherent to that sport.  Therefore, determining a "sporting purpose" was the first step in this analysis under section 925(d)(3) and is a critical step of the process.

A broad interpretation of "sporting purposes" may include any lawful activity in which a shooter might participate and could include any organized or individual shooting event or pastime.  A narrow interpretation of "sporting purposes" would clearly result in a more selective standard governing the importation of shotguns.

Consistent with previous ATF decisions and case law, the working group recognized that a sport or event must "have attained general recognition as being a 'sport,' before those uses and/or events can be 'sporting purposes' or 'sports' under Section 925(d)(3)."[31]  The statutory language limits ATF's authority to recognize a particular shooting activity as a "sporting purpose," and therefore requires a narrow interpretation of this term.  As stated however, the working group recognized that sporting purposes may change over time, and that certain shooting activities may become "generally recognized" as such.

At the present time, the working group continues to believe that the activity known as "plinking" is not a generally recognized sporting purpose.  There is nothing in the legislative history of the GCA to indicate that section 925(d)(3) was meant to recognize every conceivable type of activity or competition that might employ a firearm.  Recognition of plinking as a sporting purpose would effectively nullify section 925(d)(3) because it may be argued that *any* shotgun is particularly suitable for or readily adaptable to this activity.

The working group also considered "practical shooting" competitions.  Practical shooting events generally measure a shooter's accuracy and speed in identifying and hitting targets while negotiating obstacle-laden shooting courses.  In these competitions, the targets are generally stationary and the shooter is mobile, as opposed to clay target shooting where the targets are moving at high speeds mimicking birds in flight.  Practical shooting consist of rifle, shotgun and handgun competitions, as well as "3-Gun" competitions utilizing all three types of firearm on one course.  The events are often organized by local or national shooting organizations and attempt to categorize shooters by skill level in order to ensure competitiveness within the respective divisions.  The working group examined participation in and popularity of practical shooting events as governed under formal rules such as those of the United States Practical Shooting Association (USPSA) and International Practical Shooting Confederation (IPSC) to see

---

[31] Gilbert *at 1085.*

if it is appropriate to consider these events a legitimate "sporting purpose" under section 925(d)(3).

The USPSA currently reports approximately 19,000 members that participate in shooting events throughout the United States.[32]   While USPSA's reported membership is within the range of members for some other shotgun shooting organizations,[33] organizations involved in shotgun hunting of particular game such as ducks, pheasants and quail indicate significantly more members than any of the target shooting organizations.[34]   Because a determination on the sporting purpose of practical shooting events should be made only after an in-depth study of those events, the working group determined that it was not appropriate to use this shotgun study to make a definitive conclusion as to whether practical shooting events are "sporting" for purposes of section 925(d)(3).   Any such study must include rifles, shotguns and handguns because practical shooting events use all of these firearms, and a change in position by ATF on practical shooting or "police/combat-type" competitions may have an impact on the sporting suitability of rifles and handguns.   Further, while it is clear that shotguns are used at certain practical shooting events, it is unclear whether shotgun use is so prevalent that it is "generally recognized" as a sporting purpose.   If shotgun use is not sufficiently popular at such events, practical shooting would have no effect on any sporting suitability determination of shotguns. Therefore, it would be impractical to make a determination based upon one component or aspect of the practical shooting competitions.

As a result, the working group based the following sporting suitability criteria on the traditional sports of hunting, trap and skeet target shooting.

B.   Suitability for Sporting Purposes

The final step in our review involved an evaluation of shotguns to determine a "type" of firearm that is "generally recognized as particularly suitable or readily adaptable to sporting purposes." Whereas the 1989 and 1998 studies were conducted in response to Congressional interest pertaining to a certain "type" of firearm, the current study did not benefit from a mandate to focus upon and review a particular type of firearm.   Therefore, the current working group determined that it was necessary to consider a broad sampling of shotguns and shotgun features that may constitute a "type."

Whereas rifles vary greatly in size, function, caliber and design, historically, there is less variation in shotgun design.   However, in the past several years, ATF has witnessed increasingly diverse shotgun design.   Much of this is due to the fact that some manufacturers are now applying rifle designs and features to shotguns.   This has resulted in a type of shotgun that has

---

[32] *See* www.uspsa.org.

[33] Organization websites report these membership numbers: for the United States Practical Shooting Association, approx. 19,000; Amateur Trapshooting Association,  over 35,000 active members; National Skeet Shooting Association,  nearly 20,000 members; National Sporting Clays Association, over 22,000 members; Single Action Shooting Society, over 75,000 members.

[34] Organization websites report these membership numbers:  Ducks Unlimited, U.S adult 604,902 (Jan. 1, 2010); Pheasants/Quail Forever, over 130,000 North American members (2010) http://www.pheasantfest.org/page/1/PressReleaseViewer.jsp?pressReleaseId=12406.

features or characteristics that are based on tactical and military firearms.  Following a review of numerous shotguns, literature, and industry advertisements, the working group determined that the following shotgun features and design characteristics are particularly suitable for the military or law enforcement, and therefore, offer little or no advantage to the sportsman.  Therefore, we recognized that any shotgun with one or more of these features represent a "type" of firearm that is not "generally recognized as particularly suitable or readily adaptable to sporting purposes" and may not be imported under section 925(d)(3).

(1) <u>Folding, telescoping or collapsible stock</u>.

Shotgun stocks vary in style, but sporting stocks have largely resembled the traditional design.[35] Many military firearms incorporate folding or telescoping stocks. The main advantage of this feature is portability, especially for airborne troops.  These stocks allow the firearm to be fired from the folded or retracted position, yet it is difficult to fire as accurately as can be done with an open or fully extended stock.  While a folding stock or telescoping stock makes it easier to carry the firearm, its predominant advantage is for military and tactical purposes.  A folding or telescoping stock is therefore not found on the traditional sporting shotgun.  Note that certain shotguns may utilize adjustable butt plates, adjustable combs, or other designs intended only to allow a shooter to make small custom modifications to a shotgun.  These are not intended to make a shotgun more portable, but are instead meant to improve the overall "fit" of the shotgun to a particular shooter.  These types of adjustable stocks are sporting and are, therefore, acceptable for importation.

(2) <u>Bayonet Lug</u>.

A bayonet lug is generally a metal mount that allows the installation of a bayonet onto the end of a firearm.  While commonly found on rifles, bayonets have a distinct military purpose. Publications have indicated that this may be a feature on military shotguns as well.[36]  It enables soldiers to fight in close quarters with a knife attached to their firearm.  The working group discovered no generally recognized sporting application for a bayonet on a shotgun.

(3) <u>Flash Suppressor</u>.

Flash suppressors are generally used on military firearms to disperse the muzzle flash in order to help conceal the shooter's position, especially at night.  Compensators are used on military and commercial firearms to assist in controlling recoil and the "muzzle climb" of the shotgun. Traditional sporting shotguns do not have flash suppressors or compensators.  However, while compensators have a limited benefit for shooting sports because they allow the shooter to quickly reacquire the target for a second shot, there is no particular benefit in suppressing muzzle flash in

---

[35] Exhibit 1.
[36] *A Collector's Guide to United States Combat Shotguns* at 156.

sporting shotguns.  Therefore, the working group finds that flash suppressors are not a sporting characteristic, while compensators are a sporting feature.  However, compensators that, in the opinion of ATF, actually function as flash suppressors are neither particularly suitable nor readily adaptable to sporting purposes.

(4) <u>Magazine over 5 rounds, or a Drum Magazine</u>.

A magazine is an ammunition storage and feeding device that delivers a round into the chamber of the firearm during automatic or semiautomatic firing.[37]  A magazine is either integral (tube magazine) to the firearm or is removable (box magazine). A drum magazine is a large circular magazine that is generally detachable and is designed to hold a large amount of ammunition.

The 1989 Study recognized that virtually all modern military firearms are designed to accept large, detachable magazines.  The 1989 Study noted that this feature provides soldiers with a large ammunition supply and the ability to reload rapidly.  The 1998 Study concurred with this and found that, for rifles, the ability to accept a detachable large capacity magazine was not a sporting feature.  The majority of shotguns on the market today contain an integral "tube" magazine.  However, certain shotguns utilize removable box magazine like those commonly used for rifles.[38]

In regard to sporting purposes, the working group found no appreciable difference between integral tube magazines and removable box magazines.  Each type allowed for rapid loading, reloading, and firing of ammunition.  For example, "speed loaders" are available for shotguns with tube-type magazines.  These speed loaders are designed to be preloaded with shotgun shells and can reload a shotgun with a tube-type magazine in less time than it takes to change a detachable magazine.

However, the working group determined that magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law enforcement applications.  The majority of state hunting laws restrict shotguns to no more than 5 rounds.[39]  This is justifiable because those engaged in sports shooting events are not engaging in potentially hostile or confrontational situations, and therefore do not require the large amount of immediately available ammunition, as do military service members and police officers.

Finally, drum magazines are substantially wider and have considerably more bulk than standard clip-type magazines.  They are cumbersome and, when attached to the shotgun, make it more difficult for a hunter to engage multiple small moving targets.  Further, drum magazines are generally designed to contain more than 5 rounds.  Some contain as many as 20 or more

---

[37] Steindler's New Firearms Dictionary at 164.
[38] See Collector's Guide to United States Combat Shotguns at 156-7, noting that early combat shotguns were criticized because of their limited magazine capacity and time consuming loading methods.
[39] Exhibit 2.

rounds.[40]  While such magazines may have a military or law enforcement application, the working group determined that they are not useful for any generally recognized sporting purpose. These types of magazines are unlawful to use for hunting in most states, and their possession and manufacture are even prohibited or restricted in some states.[41]

(5) Grenade Launcher Mount.

Grenade launchers are incorporated into military firearms to facilitate the launching of explosive grenades.  Such launchers are generally of two types.  The first type is a flash suppressor designed to function as a grenade launcher.  The second type attaches to the barrel of the firearm either by screws or clamps. Grenade launchers have a particular military application and are not currently used for sporting purposes.

(6) Integrated Rail Systems.[42]

This refers to a mounting rail system for small arms upon which firearm accessories and features may be attached.  This includes scopes, sights, and other features, but may also include accessories or features with no sporting purpose, including flashlights, foregrips, and bipods. Rails on the sides and underside of shotguns—including any accessory mount—facilitate installation of certain features lacking any sporting purpose.  However, receiver rails that are installed on the top of the receiver and barrel are readily adaptable to sporting purposes because this facilitates installation of optical or other sights.

(7) Light Enhancing Devices.

Shotguns are generally configured with either bead sights, iron sights or optical sights, depending on whether a particular sporting purpose requires the shotgun to be pointed or aimed.[43]  Bead sights allow a shooter to "point" at and engage moving targets at a short distance with numerous small projectiles, including birds, trap, skeet and sporting clays.  Iron and optical sights are used when a shooter, firing a slug, must "aim" a shotgun at a target, including deer, bear and turkeys.[44]  Conversely, many military firearms are equipped with sighting devices that utilize available light to facilitate night vision capabilities. Devices or optics that allow illumination of a target in low-light conditions are generally for military and law enforcement purposes and are not typically found on sporting shotguns because it is generally illegal to hunt at night.

---

[40] Exhibit 3.
[41] See, e.g.,  Cal Pen Code § 12020; N.J. Stat. § 2C:39-9.
[42] Exhibit 4.
[43] NRA Firearms Sourcebook at 178.
[44] Id.

(8) <u>Excessive Weight</u>.[45]

Sporting shotguns, 12 gauge and smaller, are lightweight (generally less than 10 pounds fully assembled),[46] and are balanced and maneuverable.  This aids sportsmen by allowing them to carry the firearm over long distances and rapidly engage a target.  Unlike sporting shotguns, military firearms are larger, heavier, and generally more rugged.  This design allows the shotguns to withstand more abuse in combat situations.

(9) <u>Excessive Bulk</u>.[47]

Sporting shotguns are generally no more than 3 inches in width or more than 4 inches in depth. This size allows sporting shotguns to be sufficiently maneuverable in allowing hunters to rapidly engage targets.  Certain combat shotguns may be larger for increased durability or to withstand the stress of automatic fire.  The bulk refers to the fully assembled shotgun, but does not include magazines or accessories such as scopes or sights that are used on the shotgun.  For both width and depth, shotguns are measured at the widest points of the action or housing on a line that is perpendicular to the center line of the bore.  Depth refers to the distance from the top plane of the shotgun to the bottom plane of the shotgun.  Width refers to the length of the top or bottom plane of the firearm and measures the distance between the sides of the shotgun.  Neither measurement includes the shoulder stock on traditional sporting shotgun designs.

(10) <u>Forward Pistol Grip or Other Protruding Part Designed or Used for Gripping the Shotgun with the Shooter's Extended Hand</u>.[48]

While sporting shotguns differ in the style of shoulder stock, they are remarkably similar in fore-end design.[49]  Generally, sporting shotguns have a foregrip with which the shooter's forward hand steadies and aims the shotgun.  Recently, however, some shooters have started attaching forward pistol grips to shotguns.  These forward pistol grips are often used on tactical firearms and are attached to those firearms using the integrated rail system.  The ergonomic design allows for continued accuracy during sustained shooting over long periods of time.  This feature offers little advantage to the sportsman.  Note, however, that the working group believes that pistol grips for the trigger hand are prevalent on shotguns and are therefore generally recognized as particularly suitable for sporting purposes.[50]

While the features listed above are the most common non-sporting shotgun features, the working group recognizes that other features, designs, or characteristics may exist.  Prior to importation, ATF will classify these shotguns based upon the requirements of section 925(d)(3).  The working

---

[45] *See generally* <u>Gilbert</u>.
[46] Shotgun Encyclopedia 2001 at 264.
[47] Exhibit 5.
[48] Exhibit 6.
[49] *See* Exhibit 1.  *See generally* NRA Firearms Sourcebook at 121-2.
[50] See Exhibit 1.

group expects the continued application of unique features and designs to shotguns that may include features or designs based upon traditional police or military tactical rifles.  However, even if a shotgun does not have one of the features listed above, it may be considered "sporting" only if it meets the statutory requirements under section 925(d)(3).   Further, the simple fact that a military firearm or feature *may* be used for a generally recognized sporting purposes is not sufficient to support a determination that it is sporting under 925(d)(3).  Therefore, as required by section 925(d)(3), in future sporting classifications for shotguns, ATF will classify the shotgun as sporting only if there is evidence that its features or design characteristics are generally recognized as particularly suitable for or readily adaptable to generally recognized sporting purposes.

The fact that a firearm or feature was initially designed for military or tactical applications, including offensive or defensive combat, may indicate that it is not a sporting firearm.  This may be overcome by evidence that the particular shotgun or feature has been so regularly used by sportsmen that it is generally recognized as particularly suitable for or readily adaptable to sporting purposes.  Such evidence may include marketing, industry literature and consumer articles, scholarly and historical publications, military publications, the existence of State and local statutes and regulations limiting use of the shotgun or features for sporting purposes, and the overall use and the popularity of such features or designs for sporting purposes according to hunting guides, shooting magazines, State game commissioners, organized competitive hunting and shooting groups, law enforcement agencies or organizations, industry members and trade associations, and interest and information groups.  Conversely, a determination that the shotgun or feature was originally designed as an improvement or innovation to an existing sporting shotgun design or feature will serve as evidence that the shotgun is sporting under section 925(d)(3).  However, any new design or feature must still satisfy the sporting suitability test under section 925(d)(3) as outlined above.

The Attorney General and ATF are not limited to these factors and therefore may consider any other factor determined to be relevant in making this determination.  The working group recognizes the difficulty in applying this standard but acknowledges that Congress specifically intended that the Attorney General perform this function.  Therefore, the working group recommends that sporting determinations for shotguns not specifically addressed by this study be reviewed by a panel pursuant to ATF orders, policies and procedures, as appropriate.

<u>Conclusion</u>

The purpose of section 925(d)(3) is to provide a limited exception to the general prohibition on the importation of firearms without placing "any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms...."[51]  Our determinations will in no way preclude the importation of true sporting shotguns.  While it will certainly prevent the importation of certain shotguns, we believe that

---

[51] 90 P.L. 351 (1968).

- 14 -

those shotguns containing the enumerated features cannot be fairly characterized as "sporting" shotguns under the statute.  Therefore, it is the recommendation of the working group that shotguns with any of the characteristics or features listed above not be authorized for importation.

<u>Shotgun Stock Style Comparison</u>

Exhibit 1

"Straight" or "English" style stock (Ruger Red Label):



"Pistol grip" style stock (Browning Citori):



"Pistol grip" style stock (Mossberg 935 Magnum Turkey):



"Thumbhole" style stock (Remington SP-10):



Stock with Separate Pistol Grip



Exhibit 2

## Hunting Statutes by State

| State | Gauge | Mag Restriction / plugged with one piece filler requiring disassembly of gun for removal | Attachments | Semi-Auto | Other |
|---|---|---|---|---|---|
| **Alabama** | 10 gauge or smaller; | (Species specific) 3 shells | | | 1 |
| **Alaska** | 10 gauge or smaller | | | | |
| **Arizona** | 10 gauge or smaller | 5 shells | | | |
| **Arkansas** | ≤ 10 gauge; some zones ≥ .410; ≥ 20 gauge for bear | (Species specific) 3 shells | | | |
| **California** | ≤ 10 gauge; Up to 12 gauge in some areas | (Species specific) 3 shells | | | |
| **Colorado** | ≥ 20 gauge; Game Mammals ≤ 10 gauge | 3 shells | | | |
| **Connecticut** | ≤ 10-gauge | (Species specific) 3 shells | telescopic sights | | |
| **Delaware** | 20, 16, 12, 10 gauge | 3 shells | Muzzleloaders may be equipped with scopes | | 2 |
| **Florida** | Muzzleloading firing ≥ 2 balls ≥ 20-gauge; Migratory birds ≤ 10-gauge; opossums - single-shot .41 -gauge shotguns | (Species specific) 3 shells | | | |
| **Georgia** | ≥ 20-gauge; Waterfowl ≤ 10-gauge | 5 shells | Scopes are legal | | |
| **Hawaii** | ≤ 10 gauge | (Species specific) 3 shells | | | |
| **Idaho** | | | some scopes allowed | | 3 |
| **Illinois** | 20 - 10 gauge; no .410 or 28 gauge allowed | 3 shells | | | |
| **Indiana** | | (Species specific) 3 shells | Laser sights are legal | | |

Exhibit 2

## Hunting Statutes by State

| State | Gauge | Shells | Sights | Restrictions |
|---|---|---|---|---|
| Iowa | 10-, 12-, 16-, and 20-gauge | | | |
| Kansas | ≥ 20 gauge; ≤ 10 gauge, | (Species specific) 3 shells | | |
| Kentucky | up to and including 10-gauge, includes .410- | (Species specific) 3 shells | Telescopic sights (scopes) | |
| Louisiana | ≤ 10 gauge | 3 shells | Nuisance Animals; infrared, laser sighting devices, or night vision devices | |
| Maine | 10 - 20 gauge | (Species specific) 3 shells | may have any type of sights, including scopes | Auto-loading illegal if hold more than 6 cartridges |
| Maryland | Muzzle loading ≥ 10 gauge ; Shotgun ≤ 10-gauge | (Species specific) 3 shells | may use a telescopic sight on muzzle loading firearm | |
| Massachusetts | ≤ 10 gauge | (Species specific) 3 shells | | |
| Michigan | any gauge | (Species specific) 3 shells | | Illegal: semi-automatic holding > 6 shells in barrel and magazine combined |
| Minnesota | ≤ 10 gauge | (Species specific) 3 shells | | |
| Mississippi | any gauge | (Species specific) 3 shells | Scopes allowed on primitive weapons | |
| Missouri | ≤ 10 gauge | (Species specific) 3 shells | | |
| Montana | ≤ 10 gauge | (Species specific) 3 shells | | |
| Nebraska | ≥ 20 gauge | (Species specific) 3 shells | | Illegal: semi-automatic holding > 6 shells in barrel and magazine combined |
| Nevada | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | | |
| New Hampshire | 10 - 20 gauge | (Species specific) 3 shells | | |
| New Jersey | ≤ 10 gauge; ≥ 20 gauge; or .410 caliber | (Species specific) 3 shells | Require adjustable open iron, peep sight or scope affixed if hunting with slugs. Telescopic sights Permitted | |
| New Mexico | ≥ 28 gauge, ≤ 10 gauge | (Species specific) 3 shells | scopes allowed | |
| New York | Big game ≥ 20 gauge | | | No semi-automatic firearm with a capacity to hold more than 6 rounds |

Exhibit 2

## Hunting Statutes by State

| State | Gauge | Shells | Notes |
|---|---|---|---|
| **North Carolina** | ≤ 10 gauge | (Species specific) 3 shells | |
| **North Dakota** | ≥ 410 gauge; no ≤ 10 gauge | 3 shells (repealed for migratory birds) | |
| **Ohio** | ≤ 10 gauge | (Species specific) 3 shells | |
| **Oklahoma** | ≤ 10 gauge | (Species specific) 3 shells | |
| **Oregon** | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | Scopes (permanent and detachable), and sights allowed for visually impaired |
| **Pennsylvania** | ≤ 10 gauge; ≥ 12 gauge | (Species specific) 3 shells | |
| **Rhode Island** | 10, 12, 16, or 20-gauge | 5 shells | |
| **South Carolina** | | (Species specific) 3 shells | |
| **South Dakota** | (Species specific) ≤ 10 gauge | 5 shells | No auto-loading firearm holding > 6 cartridges |
| **Tennessee** | Turkey: ≥ 28 gauge | (Species specific) 3 shells | May be equipped with sighting devices |
| **Texas** | ≤ 10 gauge | (Species specific) 3 shells | scoping or laser sighting devices used by disabled hunters |
| **Utah** | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | |
| **Vermont** | ≥ 12 gauge | (Species specific) 3 shells | |
| **Virginia** | ≤ 10 gauge | (Species specific) 3 shells | |
| **Washington** | ≤ 10 gauge | (Species specific) 3 shells | |
| **West Virginia** | | | |
| **Wisconsin** | 10, 12, 16, 20 and 28 gauge; no .410 shotgun for deer/bear | (Species specific) 3 shells | |
| **Wyoming** | | | [4] |

1   Shotgun/rifle combinations (drilling) permitted

2   large game training course - Students in optional proficiency qualification bring their own pre-zeroed, ≥ .243, scoped shotgun

3   no firearm that, in combination with a scope, sling and/or any attachments, weighs more than 16 pounds

4   no relevant restrictive laws concerning shotguns

Exhibit 2

## General Firearm Statutes by State

| State | Source | Semi-Auto Restrictions | Attachments | Prohibited* (in addition to possession of short-barrel or sawed-off shotguns by non-authorized persons, e.g., law enforcement officers for official duty purposes) |
|---|---|---|---|---|
| **Alabama** | Alabama Code, title 13: | | | |
| **Alaska** | Alaska Statutes 11.61.200.(h) | | | |
| **Arizona** | Arizona Rev. Statutes 13-3101.8. | single shot | silencer prohibited | |
| **Arkansas** | Arkansas Code Title 5, Chapter 73. | | | |
| **California** | California Penal Code, Part 4,12276. and San Diego Municipal Code 53.31. | San Diego includes under "assault weapon," any shotgun with a magazine capacity of more than 6 rounds | | "Assault weapons": Franchi SPAS 12 and LAW 12; Striker 12; Streetsweeper type S/S Inc.; semiautomatic shotguns having both a folding or telescoping stock and a pistol grip protruding conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip; semiautomatic shotguns capable of accepting a detachable magazine; or shotguns with a revolving cylinder. |
| **Colorado** | 2 CCR 406-203 | | | |
| **Connecticut** | Connecticut Gen. Statutes 53-202a. | | | "Assault weapons": Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns |
| **D.C** | 7-2501.01. | | | |

Exhibit 2

## General Firearm Statutes by State

| State | Citation | | |
|---|---|---|---|
| Delaware | 7.I.§ 711. | | 7.I.§ 711. Hunting with automatic-loading gun prohibited; penalty (a) No person shall hunt for game birds or game animals in this State, except as authorized by state-sanctioned federal depredation/conservation orders for selected waterfowl species, with or by means of any automatic-loading or hand-operated repeating shotgun capable of holding more than 3 shells, the magazine of which has not been cut off or plugged with a filler incapable of removal through the loading end thereof, so as to reduce the capacity of said gun to not more than 3 shells at 1 time, in the magazine and chamber combined. (b) Whoever violates this section shall be guilty of a class C environmental misdemeanor. (c) Having in one's possession, while in the act of hunting game birds or game animals, a gun that will hold more than 3 shells at one time in the magazine and chamber combined, except as authorized in subsection (a) of this section, shall be prima facie evidence of violation of this section. |
| Florida | Florida statutes, Title XLVI.790.001. | | |
| Georgia | | | |
| Hawaii | Hawaii Rev. Statutes, Title 10, 134-8. | silencer prohibited | |
| Idaho | Idaho Code, 18-3318. | | |
| Illinois | Code of Ordinances, City of Aurora 29-43. | Aurora includes under "assault weapon," any shotgun with a magazine capacity of more than 5 rounds | "Assault weapons": Street Sweeper and Striker 12 revolving cylinder shotguns or semiautomatic shotguns with either a fixed magazine with a capacity over 5 rounds or an ability to accept a detachable magazine and has at least a folding / telescoping stock or a pistol grip that protrudes beneath the action of firearm and which is separate and apart from stock |

Exhibit 2

General Firearm Statutes by State

| | | |
|---|---|---|
| **Indiana** | Indiana Code 35-47-1-10. and Municipal Code of the City of South Bend 13-95. | South Bend under "assault weapon" firearms which have threads, lugs, or other characteristics designed for direct attachment of a silencer, bayonet, flash suppressor, or folding stock; as well as any detachable magazine, drum, belt, feed strip, or similar device which can be readily made to accept more than 15. rounds |
| | | South Bend includes under "assault weapon," any shotgun with a magazine capacity of more than 9 rounds |
| **Iowa** | Iowa Code, Title XVI. 724.1. | Includes as an offensive weapon, "a firearm which shoots or is designed to shoot more than one shot, without manual reloading, by a single function of the trigger" |
| **Kansas** | | |
| **Kentucky** | Kentucky Revised Statutes- 150.360 | |
| **Louisiana** | Louisiana RS 56:116.1 | |
| **Maine** | Maine Revised Statutes 12.13.4.915.4.§11214. F. | |
| **Maryland** | Maryland Code 5-101. | "Assault weapons": F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun; Steyr-AUG-SA semi-auto; Holmes model 88 shotgun; Mossberg model 500 Bullpup assault shotgun; Street sweeper assault type shotgun; Striker 12 assault shotgun in all formats; Daewoo USAS 12 semi-auto shotgun |

Exhibit 2

## General Firearm Statutes by State

| State | Statute | | |
|---|---|---|---|
| **Massachusetts** | Massachusetts Gen L. 140.121. | under "assault weapon": any shotgun with (fixed or detachable) magazine capacity of more than 5 rounds | "Assault weapons": revolving cylinder shotguns, e.g., Street Sweeper and Striker 12; also "Large capacity weapon" includes any semiautomatic shotgun fixed with large capacity feeding device (or capable of accepting such), that uses a rotating cylinder capable of accepting more than 5 shells |
| **Michigan** | II.2.1. (2) | | |
| **Minnesota** | Minnesota Statutes 624.711 | | "Assault weapons": Street Sweeper and Striker-12 revolving cylinder shotgun types as well as USAS-12 semiautomatic shotgun type |
| **Mississippi** | Mississippi Code 97-37-1. | silencer prohibited | |
| **Missouri** | Code of State Regulations 10-7.410(1)(G) | | |
| **Montana** | | | |
| **Nebraska** | Nebraska Administrative Code Title 163 Chapter 4 001. | | |
| **Nevada** | Nevada Revised Statutes 503.150 1. | | |
| **New Hampshire** | | | |
| **New Jersey** | New Jersey Statutes 23:4-13.  and  23:4-44. and New Jersey Rev. Statutes 2C39-1.w. | magazine  capacity of no more than 5 rounds | "Assault weapons": any shotgun with a revolving cylinder, e.g. "Street Sweeper" or "Striker 12" Franchi SPAS 12 and LAW 12 shotguns or USAS 12 semi-automatic type shotgun; also any semi–automatic shotgun with either a magazine capacity exceeding 6 rounds, a pistol grip, or a folding stock |
| **New Mexico** | New Mexico Administrative Code 19.31.6.7H., 19.31.11.10N., 19.31.13.10M. and 19.31.17.10N. | | |

Exhibit 2

## General Firearm Statutes by State

| State | Citation | magazine capacity | sighting device / silencer | Assault weapon definition |
|---|---|---|---|---|
| New York | New York Consolidated Laws 265.00. 22. and Code of the City of Buffalo 1801B. | magazine capacity of no more than 5 rounds | sighting device making a target visible at night may classify a shotgun as an assault weapon | "Assault weapons": Any semiautomatic shotgun with at least two of the following:folding or telescoping stock;pistol grip that protrudes conspicuously beneath the action of the weapon;fixed magazine capacity in excess of five rounds;an ability to accept a detachable magazine; or any revolving cylinder shotguns, e.g., Street Sweeper and Striker 12; Buffalo 1801B. Assault Weapon;(2) A center-fire rifle or shotgun which employs the force of expanding gases from a discharging cartridge to chamber a fresh round after each single pull of the trigger, and which has:(a) A flash suppressor attached to the weapon reducing muzzle flash;(c) A sighting device making a target visible at night;(d) A barrel jacket surrounding all or a portion of the barrel, to dissipate heat therefrom; or(e) A multi-burst trigger activator.(3) Any stockless pistol grip shotgun. |
| North Carolina | North Carolina Gen. Statutes 14-288.8. | | silencer prohibited | |
| North Dakota | North Dakota Century Code 20.1-01-09, Section 20.1-04-10, SHOTGUN SHELL-HOLDING CAPACITY RESTRICTION, repealed/eliminated | | | |
| Ohio | Ohio Rev. Code 2923.11. and Columbus City Codes 2923.11. | magazine capacity of no more than 5 rounds | | semiautomatic shotgun that was originally designed with or has a fixed magazine or detachable magazine with a capacity of more than five rounds. Columbus includes under "Assault weapon" any semi-automatic shotgun with two or more of the following: pistol grip that protrudes conspicuously beneath the receiver of the weapon; folding, telescoping or thumbhole stock; fixed magazine capacity in excess of 5 standard 2-3/4, or longer, rounds; or ability to accept a detachable magazine; also any shotgun with revolving cylinder |
| Oklahoma | | | | |
| Oregon | Oregon Rev. Statutes 166.272. | | silencer prohibited | |
| Pennsylvania | Title 34 Sec. 2308. (a)(4) and (b)(1) | | | |
| Rhode Island | Rule 7, Part III, 3.3 and 3.4 | | | |
| South Carolina | SECTION 50-11-310. (E) and ARTICLE 3. SUBARTICLE 1. 123 40 | | | |

Exhibit 2

## General Firearm Statutes by State

| State | | | |
|---|---|---|---|
| South Dakota | South Dakota Codified Laws 22.1.2, (8) | silencer prohibited | |
| Tennessee | | | |
| Texas | | | |
| Utah | Utah Administrative Code R657-5-9. (1), R657-6-6. (1) and R657-9-7. | | |
| Vermont | | | |
| Virginia | Virginia Code 18.2-308. | magazine capacity no more than 7 rounds (not applicable for hunting or sport shooting) | |
| Washington | Washington Administrative Code 232-12-047 | | |
| West Virginia | West Virginia statute 8-12-5a. | | |
| Wisconsin | Wisconsin Administrative Code – NR 10.11 and NR 10.12 | | |
| Wyoming | Wyoming Statutes, Article 3. Rifles and Shotguns [Repealed] and 23-3-112. | silencer prohibited | "Assault weapons": Striker 12's commonly called a "streetsweeper," or any semi-automatic folding stock shotgun of like kind with a spring tension drum magazine capable of holding twelve shotgun shells prohibited |

Exhibit 3

Drum Magazine



Integrated Rail System                                          Exhibit 4

Sporting



Sporting



Non-Sporting                              Non-Sporting

                      

<u>Bulk Measurements</u>                                                      Exhibit 5

Depth refers to the distance from the top plane of the shotgun to the bottom plane of the shotgun. Depth measurement "A" below is INCORRECT; it includes the trigger guard which is not part of the frame or receiver.  Depth measurement "B" below is CORRECT; it measures only the depth of the frame or receiver:



Width refers to the length of the top or bottom pane of the firearm and measures the distance between the sides of the shotgun. Width measurement "A" below is CORRECT; it measures only the width of the frame or receiver.  Width measurement "B" below is INCORRECT; it includes the charging handle which is not part of the frame or receiver:



Forward Pistol Grip                                                     Exhibit 6





[PAGE INTENTIONALLY LEFT BLANK]

# EXHIBIT 12

## 1782. — CHAPTER 46.

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the Authority of the same,* That a Sum not exceeding *Two Thousand Pounds* be raised by a Lottery or Lotteries, for and to the Purpose of re-building the said Mills; and that *John Pitts* and *John White,* Esquires, and Mr. *William Paine,* or any two of them, shall be Managers of the said Lottery or Lotteries, who shall be sworn to the faithful Performance of their Trust; which said Managers shall make and publish in such News Papers as they shall judge proper, a Scheme for the said Lottery or Lotteries, as soon as may be; and they shall also publish therewith all necessary Rules and Regulations for the Management thereof. And all Prizes which may be drawn in the said Lottery or Lotteries, shall be paid without any Deduction, provided they are demanded within Six Months after the Drawing of the said Lottery or Lotteries, otherwise the Money arising from such Prizes, shall be appropriated to the Purpose aforesaid. *£2000 to be raised by Lottery.* *Names of the Managers.*

*And be it further enacted,* That if any Person shall forge, counterfeit, or alter any Lottery Ticket issued by Virtue of this Act, or shall pass or utter any such forged, counterfeited or altered Ticket, knowing the same to be false, forged, counterfeited or altered, or shall advise or assist in forging, altering, or counterfeiting the same, every Person so offending, and being thereof convicted before the Supreme Judicial Court of this Commonwealth, shall be punished by being set on the Gallows for the Space of one Hour, with a Rope round his Neck, or shall pay a Fine not exceeding *One Hundred Pounds,* to the Use of this Commonwealth, or suffer not more than Twelve Months Imprisonment, nor less than Two, or be publicly whipped, not exceeding Thirty-nine Stripes, at the Discretion of the said Supreme Judicial Court, according to the Nature and Circumstances of the Offence. *Persons guilty of Forgery.* *Penalty.*

*February 26, 1783.*

---

## 1782. — Chapter 46.

[January Session, ch. 13.]

AN ACT IN ADDITION TO THE SEVERAL ACTS ALREADY MADE FOR THE PRUDENT STORAGE OF GUN POWDER WITHIN THE TOWN OF *BOSTON.* *Chap.* 46

*Whereas the depositing of loaded Arms in the Houses of the Town of* Boston, *is dangerous to the Lives of those who* *Preamble.*

120                    1782. — CHAPTER 46.

*are disposed to exert themselves when a Fire happens to
break out in the said Town:*

*Be it enacted by the Senate and House of Representa-
tives in General Court assembled, and by the Authority
of the same,* That if any Person shall take into any
Dwelling House, Stable, Barn, Out House, Ware House,
Store, Shop, or other Building within the Town of
*Boston,* any Cannon, Swivel, Mortar, Howitzer, Co-
horn, or Fire Arm, loaded with, or having Gun Powder
in the same, or shall receive into any Dwelling House,
Stable, Barn, Out House, Store, Ware House, Shop, or
other Building, within the said Town, any Bomb, Gren-
ade, or other Iron Shell, charged with, or having Gun
Powder in the same, such Person shall forfeit and pay
the Sum of *Ten Pounds,* to be recovered at the Suit of
the Firewards of the said Town, in an Action of Debt,
before any Court proper to try the same ; one Moiety
thereof to the Use of the said Firewards, and the other
Moiety to the Support of the Poor of the Town of *Boston.*

*And be it further enacted by the Authority aforesaid,*
That all Cannon, Swivels, Mortars, Howitzers, Cohorns,
Fire Arms, Bombs, Granades, and Iron Shells of any
Kind, that shall be found in any Dwelling House, Out
House, Stable, Barn, Store, Ware House, Shop, or other
Building, charged with, or having in them any Gun
Powder, shall be liable to be seized by either of the
Firewards of the said Town : And upon Complaint made
by the said Firewards to the Court of Common Pleas, of
such Cannon, Swivels, Mortars, or Howitzer, being so
found, the Court shall proceed to try the Merits of such
Complaint by a Jury ; and if the Jury shall find such
Complaint supported, such Cannon, Swivel, Mortar, or
Howitzer, shall be adjudged forfeit, and be sold at public
Auction ; and one Half of the Proceeds thereof shall be
disposed of to the Firewards, and the other Half to the
Use of the Poor of the Town of *Boston.*   And when any
Fire Arms, or any Bomb, Granade, or other Shell, shall
be found in any House, Out House, Barn, Stable, Store,
Warehouse, Shop, or other Building, so charged, or having
Gun Powder in the same, the same shall be liable to be
seized in Manner aforesaid ; and on Complaint thereof,
made and supported before a Justice of the Peace, shall
be sold and disposed of as is above provided for Cannon.

*Be it further enacted,* That Appeals shall be allowed in
Prosecutions upon this Act as is usual in other Cases.

                                        *March 1, 1783.*

**Marginal notes:**

Persons prohibited taking into their Dwellings, &c. any piece of Ordnance loaded with Gun Powder.

Penalty.

Pieces of Ordnance charged with Gun Powder found in any Dwelling-House, &c. liable to be seized.

How disposed of in Cases of Forfeiture.

Appeals allowed.

# EXHIBIT 13

Case 1:22-cv-11431-FDS   Document 21-1   Filed 01/31/23   Page 216 of 295

## CHAPTER 4.

#### AN ACT FOR ERECTING OF A POWDER-HOUSE WITHIN THE TOWN OF BOSTON.

WHEREAS, for the better securing and safe keeping of the publick stock of gunpowder, and preventing the great loss and danger by casualties befalling the same, and considering the imminent hazard of keeping powder in storehouses with other goods and merchandises, or in or near to dwelling-houses, the government have thought it necessary to order the erecting and building of a publick magazine or powder-house on the common or training-field in Boston,—

*Be it therefore enacted by His Excellency the Governour, Council and Representatives in General Court assembled, and by the authority of the same,*

Penalty of lodging powder in other place but the public powder-house.

[SECT. 1.]  That from and after the building and fitting the said house for the receiving and lodging of gunpowder, all gunpowder imported and landed at the port of Boston shall be brought to and lodged in the said magazine or store, and not elsewhere, on pain of confiscation of all powder put or kept in any other house or place, one moiety thereof to and for the use and supply of the publick store of the province, and the other moiety to the informer, to be recovered by bill, plaint or information in any of her majesty's courts of record within the same : *saving,* nevertheless, the ordinary town stocks of Boston and Charlestown from time to time, the fortifications and garrisons immediately under the governour's command, the quantity of fifty pounds at a time in a shop for sale, and such part of the publick stores as shall be directed by the governour and council, from time to time, to be lodged in other place or places.

Saving.

*And be it further enacted by the authority aforesaid,*

Payment for merchants' powder.

[SECT. 2.]  That for all powder belonging to merchants or other private persons put into the said magazine, there shall be paid to the use of the province, one shilling per barrel at the receipt thereof, and sixpence per barrel per month for three months next after the first, and then fourpence per barrel per month during it's lying there, out of which (if there be sufficient to answer it), the charge of looking after the said house, and the powder lodged there, shall be defreyed, from time to time ; the governour and council to give necessary instructions and orders from time to time, as they shall think fit, for regulating the keeping of all powder put into the said magazine, for the preserving thereof, and that it be turned once a month at the least.

Governour and council to give instructions, &c.

Keeper of the house to attend.

[SECT. 3.]  And the keeper of the said house shall duely attend at proper hours to be assign'd by the governour and council, for the receiving and delivering out of merchants' powder.

How the charge of keeping the house is to be defrayed.

[SECT. 4.]  And if at any time the payment for merchants' powder (an accompt whereof shall be rendred on oath) will not defrey the charge of looking after the said house, so much as is wanting shall be paid out of the publick treasury.  [*Passed July* 9; *published July* 15.

---

## CHAPTER 5.

#### AN ACT FOR THE BETTER PREVENTING OF CRIMINALS AVOIDING OF JUSTICE.

*Be it declared and enacted by His Excellency the Governour, Council and Representatives in General Court assembled, and by the authority of the same,*

# EXHIBIT 14

 

DATE DOWNLOADED: Fri Jan 27 13:50:59 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Laws of the State of Maine (1830).

ALWD 7th ed.
. Ls of the State of Maine (1830).

APA 7th ed.
(1830). Laws of the State of Maine. Hallowell, Glazier, Master & Co.

Chicago 17th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co.

McGill Guide 9th ed.
Ls of the State of Maine (Hallowell: Glazier, Master & Co., 1830)

AGLC 4th ed.
Laws of the State of Maine (Glazier, Master & Co., 1830

MLA 9th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co. HeinOnline.

OSCOLA 4th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

cial Court, to parties and witnesses, as are allowed in the regular Courts of law ; and that the said two Justices, *quorum unus*, shall have the same fees, and be allowed the same sums for the trial aforesaid, as are allowed to Justices in the process of forcible entry and detainer.

[*Approved March* 8, 1821.]

## CHAPTER XXV.

An Act for the prevention of damage by Fire, and the safe keeping of Gunpowder.

SEC. 1. **B**E *it enacted by the Senate and House of Representatives, in Legislature assembled,* That the Selectmen of each town within this State, containing not less than fifteen hundred inhabitants, be, and they hereby are, authorized and empowered to make rules and regulations, from time to time, in conformity with which, all gunpowder which is or may be within such town, shall be kept, had or possessed therein ; and no person or persons shall have, keep or possess within such town, any gunpowder, in any quantity, manner, form or mode, other than may be prescribed by the rules and regulations aforesaid.

*Selectmen to make regulations as to the keeping of gunpowder in certain towns.*

SEC. 2. *Be it further enacted,* That any person or persons who shall keep, have or possess any gunpowder, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding one hundred dollars, for each and every offence, to be recovered by action of debt in any Court proper to try the same.

*Penalty for violating such regulations.*

*Mode of recovery.*

SEC. 3. *Be it further enacted,* That all gunpowder which shall be had, kept or possessed, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, may be seized by any one or more of the Selectmen of such town, and shall within twenty days next after the seizure thereof, be libelled, by filing with any Justice of the Peace in such town, a libel, stating the time, place and cause of seizure, and the time and place when and where trial shall be had before said Justice, and a copy of said libel shall be served by the Sheriff, or his deputy, on the person or persons, in whose possession the said gunpowder shall have been seized by delivering a copy thereof to each such person, or leaving such copy at his or her usual place of abode, seven days at least, before the time which shall be specified in said libel, for the trial thereof, that such person may appear, and show cause why the gunpowder, so seized or taken, should not be adjudged forfeit ; and if any person shall appear to show cause why the same should not be adjudged forfeit, such ap-

*Powder kept contrary to regulations may be seized and libelled.*

*Proceedings on such libel.*

Case 1:22-cv-11431-FDS   Document 21-1   Filed 01/31/23   Page 220 of 295

pearance shall be entered on record, by said Justice ; and
if the gunpowder, seized as aforesaid, shall be adjudged for-
feit, the person or persons, whose appearance shall have been
recorded as aforesaid, shall pay all costs of prosecution, and
execution shall issue therefor :   *Provided however*, That the
person or persons, whose appearance shall have been record- *Appeal from*
ed, may appeal from the judgment rendered by said Justice *Justice's judg-*
of the Peace, to the next Court of Common Pleas to be holden *ment,*
for the County where such town is  situated : and the party
so appealing, before such appeal shall be allowed, shall  re-
cognize, with sufficient surety or sureties to the libellant, to
prosecute his said appeal and to pay all such costs  as may
arise after said appeal ; and no further  proceedings shall be
had upon the judgment appealed from ; and in case the
party appealing shall neglect to enter  his appeal, the Court
appealed to, may, upon complaint, proceed to affirm the *after proceed-*
judgment of the Justice, with additional costs.          *ings,*

Sec. 4.  *Be it further enacted*, That any person who shall *Persons dam-*
suffer injury by the explosion of any gunpowder,  had  or *aged by explo-*
possessed, or being within any town, contrary to the rules and *illegally kept,*
regulations which shall be established in such town, accord- *may obtain re-*
ing to the provisions of this Act, may have an action of the *dress.*
case in any Court proper to try the same, against the  owner
or owners of such gun powder, or against any other  person
or persons, who may have had the possession or custody  of
such  gunpowder, at the time of the explosion thereof, to re-
cover reasonable damages for the injury sustained.

Sec. 5.  *Be it further enacted*, That it shall, and may  be *Selectmen may*
lawful for any one or more of the Selectmen of any town to *enter buildings*
enter any building, or other place, in  such  town, to  search *powder.*
for  gunpowder, which they may have reason to suppose  to
be concealed or kept, contrary to the rules and regulations
which shall be established in such town, according to the
provisions of this Act, first having obtained a search warrant
therefor according to law.

Sec. 6.  *Be it further enacted*, That when any stove, chim- *Penalty for suf-*
ney or stove pipe, within any town containing not less  than *fering stoves,*
fifteen hundred inhabitants, shall be defective, or out of re- *stove pipes to*
pair, or so constructed or placed, that any building, or other *be defective,*
property shall be in danger of fire therefrom, the Selectmen *&c.*
of said town shall give notice in writing, to the possessor or
possessors  of  such stove, chimney or stove pipe, to  remove
or repair the same ; and if such possessor shall for the  term
of six days after the giving of such notice, unnecessarily neg-
lect to remove, or effectually repair such stove,  chimney or
stove pipe, such possessor shall, for each and every  such
neglect, forfeit and pay a fine of not  less  than ten dollars,
nor more than fifty dollars, to be recovered by action of the *Action of case.*
case, in any Court proper to try the same.

Sec. 7.  *Be it further enacted*, That the fines, forfeitures

*Appropriation of fines, &c.* and penalties, which shall arise under this Act, shall accrue, one moiety thereof to the use of the town within which the offence shall be committed, and the other moiety to the use of the person who shall prosecute or sue for the same.

*Above regulations not to be in force till published by Selectmen, &c.* SEC. 8. *Be it further enacted,* That the rules and regulations, which shall be established in any town, according to the provisions of this Act, shall be of no force or effect, until such rules and regulations, together with this Act, shall have been published by the Selectmen of such town, three weeks successively, by printing in some newspaper printed within the County, or by posting up attested copies in three several public places in said town.

[*Approved March* 19, 1821.]

## CHAPTER XXVI.

An Act to prevent damage from firing Crackers, Squibs, Serpents and Rockets, within this State.

**B**E *it enacted by the Senate and House of Representatives, in Legislature assembled,* That if any person shall offer for sale, set fire to, or throw any lighted cracker, squib, rocket or serpent within this State, without the license of the Selectmen of the several towns, respectively, first obtained therefor, he shall forfeit, for every such offence, the sum of five dollars ; one moiety to the use of the poor of that town, in which the offence shall be committed, and the other moiety to the use of the prosecutor ; to be recovered by action of debt, or by information before any Justice of the Peace of the County, in which the offence shall be committed, with the costs of suit.

*Crackers, squibs, &c. not to be fired without license.*

*Punishment.*

[*Approved February* 20, 1821.]

## CHAPTER XXVII.

An Act more effectually to secure Fire Engines from being injured.

**B**E *it enacted by the Senate and House of Representatives, in Legislature assembled,* That if any person shall wantonly or maliciously, spoil, break, injure, damage or render useless, any engine, or any of the apparatus thereto belonging, prepared by any town, society, person or persons, for the extinguishment of fire, and shall be convicted thereof, before the Supreme Judicial Court, he shall be punished by a fine not exceeding five hundred dollars, or by imprisonment, not exceeding two years, at the discretion of the Court ; and be further ordered to recognize, with sufficient surety or sureties, for his good behaviour for such term as the Court shall order.

*Persons wantonly injuring fire engines,*

*punished on conviction in S. J. Court.*

[*Approved March* 2, 1821.]

# EXHIBIT 15

THE

# GRANTS, CONCESSIONS,

AND

## ORIGINAL CONSTITUTIONS

OF THE PROVINCE OF

# NEW JERSEY

THE

# A C T S

Passed during the Proprietary Governments, and other
material Transactions before the Surrender
thereof to Queen Anne.

The Instrument of Surrender, and her formal Accept-
ance thereof

Lord CORNBURY'S COMMISSION and Instructions Conse-
quent thereon.

Collected by some Gentlemen employed by the General Assembly.
And afterwards

Published by virtue of an Act of the Legislature of the said Province

With proper Tables alphabetically Digested, containing the prin-
cipal Matters in the Book.

*New Jersey (Colony)*

By AARON LEAMING and JACOB SPICER.

PHILADELPHIA:

Printed by W. BRADFORD, Printer to the King's Most Excellent
Majesty for the Province of New Jersey.

ny persons as they shall think fit, not exceeding seven, to make orders from time to time, such as may be suitable and beneficial for every town, village, hamlet, or neighbourhood, for preventing all harms by swine, in town, meadows, pastures and gardens, in any respect, and to impose penalties according to their best discretions.

### Chap. VIII.

## An Act appointing some new Commissioners of the Highways.

WHEREAS there was an act made in the year 1682, for the county of Monmouth, to enable Col. Lewis Morris, John Bound, and Joseph Parker, to lay out highways, passages, ferry's, and making bridges and such like; there being three of those persons disenabled for the true performance of the said services, *be it therefore enacted* by the Governor, Council and Deputies now met and assembled, and by the authority of the same, that John Frogmerton, John Slocame, and Nicholas Brown, in the stead and room of Col. Lewis Morris, John Bound, and Joseph Parker, be made capable and hereby invested with the same power to all intents and purposes in the said premises, as the aforesaid Col. Lewis Morris, John Bound, and Joseph Parker, were by the said acts.

### Chap. IX.

## An Act against wearing Swords, &c.

WHEREAS there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilladoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. *Be it therefore enacted* by the Governor, and Council, and Deputies now met in General Assembly, and by authority of the same, that no person or persons within this Province, presume to send any challenge in writing, by word of mouth,

19

or message, to any person to fight, upon pain of being imprisoned during the space of six months, without bail or mainprize, and forfeit ten pounds; and whosoever shall except of such challenge, and not discover the same to the Governor, or some publick officer of the peace, shall forfeit the sum of ten pounds; the one moiety of the said forfeiture to be paid unto the Treasurer for the time being, for the public use of the Province, and the other moiety to such person or persons as shall discover the same, and make proof thereof in any court of record within this Province, to be recovered by the usual action of debt, in any of the said courts. *And be it further enacted* by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed (upon proof thereof before any justice of the peace) to the common gaol, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. *And be it further enacted* by the authority aforesaid, that no planter shall ride or go armed with sword, pistol, or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably.

# EXHIBIT 16

 

DATE DOWNLOADED: Fri Jan 27 15:29:18 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1879 135 .

ALWD 7th ed.
, , 1879 135 .

Chicago 17th ed.
"," Tennessee - 41st General Assembly, 1st Session : 135-136

AGLC 4th ed.
" Tennessee - 41st General Assembly, 1st Session 135

OSCOLA 4th ed.
" 1879 135

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

[   135   ]

## CHAPTER XCV.

AN ACT to change the day in which the Criminal Docket shall be taken up for Marshall County, Tennessee.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That an Act passed March 22nd, 1877, entitled, "An Act to repeal the Act establishing a Criminal Court in the counties of Williamson, Maury, Giles and Marshall," be so amended that Section 5 of said Act shall hereafter read, that the Criminal Docket shall be taken up on the second Monday of the term of court, instead of the first Thursday of the term, as heretofore fixed by said Act, and that the second Monday of the term shall be the day on which the criminal part of said term of court shall commence for said Marshall County hereafter.

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.

Passed March 14, 1879.

H. P. FOWLKES,
*Speaker of the House of Representatives.*

J. R. NEAL,
*Speaker of the Senate.*

Approved March 17, 1879.

ALBERT S. MARKS,
*Governor.*

————

## CHAPTER XCVI.

AN ACT to Prevent the Sale of Pistols.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That it shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the

[ 136 ]

State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol ;  *Provided* that this Act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license.

**Sale of pistols forbidden.**

SEC. 2. *Be it further enacted,* That any person guilty of a violation of this Act, shall be subject to presentment or indictment, and on conviction, shall pay a fiue of not less than twenty-five nor more than one hundred dollars, and be imprisoned at the discretion of the court.

**Penalty.**

SEC. 3. *Be it further enacted,* That it shall be the duty of the Criminal and Circuit Judges, and other Judges whose courts have criminal jurisdiction, to give this Act specially in charge to the grand jury at each term of the court.

**Judges to charge.**

SEC. 4. *Be it further enacted,* That it shall be the duty of the grand juries to send for witnesses, in all cases where they have good reason to believe, that the provisions of this Act have been violated.   And upon satisfactory evidence of its violation, they shall make presentments of the same without a prosecutor.

**Grand jury powers.**

SEC. 5. *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

SEC. 6. *Be it further enacted,* That this Act shall take effect from and after its passage, the public welfare requiring it.

Passed March 14, 1879.

H. P. FOWLKES,
*Speaker of the House of Representatives.*
J. R. NEAL,
*Speaker of the Senate.*

Approved March 17, 1879.

ALBERT S. MARKS,
*Governor.*

———

## CHAPTER XCVII.

### AN ACT to amend the Law Taxing Wagons.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That sub-Section 38 of Section 553a

# EXHIBIT 17

 

DATE DOWNLOADED: Fri Jan 27 14:31:22 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1881 191 .

ALWD 7th ed.
, , 1881 191 .

Chicago 17th ed.
"," Arkansas - 23rd General Assembly, Regular Session : 191-192

AGLC 4th ed.
" Arkansas - 23rd General Assembly, Regular Session 191

OSCOLA 4th ed.
" 1881 191

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

buildings and grounds shall hereafter be used exclusively for State purposes, the title to the same being in the State.

Sec. 2. That this act take effect and be in force thirty days after its passage, allowing that time for said county to vacate said rooms, &c.

Approved, April 1st, 1881.

----

## No. XCVI.

AN ACT To Preserve the Public Peace and Prevent Crime.

SECTION

1 Carrying of certain weapons constituted a misdemeanor; *proviso*, excepting officers, and persons journeying.
2 Carrying such weapons otherwise than in the hand, a misdemeanor.
3 Selling or disposing of such weapons, a misdemeanor.
4 Violation of act punishable by fine from $50 to $200.
5 Justices of the Peace knowing of violations of provisions of act and refusing to proceed, to be fined and removed.
6 Same penalty denounced any other officer knowing of such offense.
7 Violators of act how proceeded against.
8 Conflicting laws repealed; act in force 90 days after passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor; *Provided*, That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises.

Sec. 2. Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as in [is] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be deemed guilty of a misdemeanor.

Sec. 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

Sec. 4. Any person convicted of a violation of any of the provisions of this act, shall be punished by a fine of not less than fifty nor more than two hundred dollars.

Sec. 5. Any justice of the peace in this State, who, from his own knowledge, or from legal information, knows, or has reasonable grounds to believe, any person guilty of the violation of the provisions of this act, and shall fail or refuse to proceed against such person, shall be deemed guilty of a nonfeasance in office, and upon conviction thereof, shall be punished by the same fines and penalties as provided in section four of this act, and shall be removed from office.

Sec. 6. Any officer in this State, whose duty it is to make arrests, who may have personal knowledge of any person carrying arms contrary to the provisions of this act, and shall fail or refuse to arrest such person and bring him to trial, shall be punished, as provided in section four of this act.

Sec. 7. All persons violating any of the provisions of this act may be prosecuted in any of the courts of this State, having jurisdiction to try the same.

Sec. 8. All laws or parts of laws, in conflict with the provisions of this act are hereby repealed, and this act to take effect and be in force ninety days after its passage.

Approved, April 1st, 1881.

# EXHIBIT 18

 

DATE DOWNLOADED: Sat Jan 28 19:04:05 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
William A. Hotchkiss. Codification of the Statute Law of Georgia, including the
English Statutes of Force (1845).

ALWD 7th ed.
Hotchkiss, William A. Codification of the Statute L of Georgia, including the English
Statutes of Force (1845).

APA 7th ed.
Hotchkiss, W. (1845). Codification of the Statute Law of Georgia, including the
English Statutes of Force. Savannah, J.M. Cooper.

Chicago 17th ed.
Hotchkiss William A. Codification of the Statute Law of Georgia, including the
English Statutes of Force. Savannah, J.M. Cooper.

McGill Guide 9th ed.
William A. Hotchkiss, Codification of the Statute L of Georgia, including the English
Statutes of Force (Savannah: J.M. Cooper., 1845)

AGLC 4th ed.
William A. Hotchkiss, Codification of the Statute Law of Georgia, including the
English Statutes of Force (J.M. Cooper., 1845

MLA 9th ed.
Hotchkiss, William A. Codification of the Statute Law of Georgia, including the
English Statutes of Force. Savannah, J.M. Cooper. HeinOnline.

OSCOLA 4th ed.
Hotchkiss, William A. Codification of the Statute Law of Georgia, including the
English Statutes of Force. Savannah, J.M. Cooper.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

A

# CODIFICATION

OF THE

# STATUTE LAW OF GEORGIA,

INCLUDING THE

## ENGLISH STATUTES OF FORCE:

IN FOUR PARTS.

TO WHICH IS PREFIXED A

## COLLECTION OF STATE PAPERS,

OF

ENGLISH, AMERICAN, AND STATE ORIGIN;

TOGETHER WITH AN

## APPENDIX, AND INDEX.

COMPILED, DIGESTED, AND ARRANGED, BY

### WILLIAM A. HOTCHKISS,

BY AUTHORITY OF THE LEGISLATURE.

SAVANNAH:
PUBLISHED BY JOHN M. COOPER.
NEW-YORK:
JOHN F. TROW & CO., PRINTERS,
No. 33 Ann-street.
MDCCCXLV.

ENTERED, according to Act of Congress, in the year 1845, by

ALMERIN  HOTCHKISS,

in the Clerk's Office of the District Court of the Southern District of New-York.

## SEC. III.   DEADLY WEAPONS.

73. *Carrying deadly weapons prohibited.*—It shall not be lawful for any merchant, or vender of wares or merchandise in this state, or any other person or persons whatsoever, to sell, or offer to sell, or to keep or have about their person or elsewhere, any of the hereinafter described weapons, to wit: bowie, or any other kind of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.

74. *Punishment for carrying deadly weapons.*—Any person or persons within the limits of this state violating the provisions of this act, except as hereafter excepted, shall for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars, at the discretion of the court; and upon a second conviction, and every after conviction of like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the court.

75. *Duty of civil officers and grand juries.*—It shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as grand jurors to make presentments of each and every offence under this act which shall come under their knowledge.

76. *Application of fines; persons exempted.*—All fines and forfeitures arising under this act shall be paid into the county treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to sheriffs, deputy sheriffs, marshals, constables, overseers, or patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons shall be found guilty of violating the before recited act who shall openly wear, externally, bowie knives, dirks, toothpicks, spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale any of the aforesaid weapons, before the first day of March next.

## SEC. IV.   LIBELS.

77. *Libel defined; how punished.*—[§ ix.] A libel is a malicious defamation, expressed either by printing or writing, or signs, pictures, and the like, tending to blacken the memory of one who is dead, or the honesty, virtue, integrity, or reputation of one who is alive, and thereby expose him or her to public hatred, contempt or ridicule; every person

73. Dec. 25, 1837, sec. 1, *Pam.* 90.   75. Dec. 25, 1837, sec. 3, *Pam.* 90.
74.     Ib.     sec. 2,  ib.          76.     Ib.     sec. 4,  ib.

# EXHIBIT 19



What I Saw Treating the Victims From Parkland Should Change the Debate on Guns - The Atlantic

Give a Gift

POLITICS

# What I Saw Treating the Victims From Parkland Should Change the Debate on Guns

They weren't the first mass-shooting victims the Florida radiologist saw—but their wounds were radically different.

By Heather Sher



Lisa Marie Pane / AP

FEBRUARY 22, 2018                                        SHARE ⌄

As I opened the CT scan last week to read the next case, I was baffled. The history simply read "gunshot wound." I have been a radiologist in one of the busiest trauma centers in the United States for 13 years, and have diagnosed thousands of handgun injuries to the brain, lung, liver, spleen, bowel, and other vital organs. I thought that I

knew all that I needed to know about gunshot wounds, but the specific pattern of injury on my computer screen was one that I had seen only once before.

In a typical handgun injury, which I diagnose almost daily, a bullet leaves a laceration through an organ such as the liver. To a radiologist, it appears as a linear, thin, gray bullet track through the organ. There may be bleeding and some bullet fragments.

I was looking at a CT scan of one of the mass-shooting victims from Marjory Stoneman Douglas High School, who had been brought to the trauma center during my call shift. The organ looked like an overripe melon smashed by a sledgehammer, and was bleeding extensively. How could a gunshot wound have caused this much damage?

The reaction in the emergency room was the same. One of the trauma surgeons opened a young victim in the operating room, and found only shreds of the organ that had been hit by a bullet from an AR-15, a semiautomatic rifle that delivers a devastatingly lethal, high-velocity bullet to the victim. Nothing was left to repair— and utterly, devastatingly, nothing could be done to fix the problem. The injury was fatal.

A year ago, when a gunman opened fire at the Fort Lauderdale airport with a 9 mm semiautomatic handgun, hitting 11 people in 90 seconds, I was also on call. It was not until I had diagnosed the third of the six victims who were transported to the trauma center that I realized something out of the ordinary must have happened. The gunshot wounds were the same low-velocity handgun injuries that I diagnose every day; only their rapid succession set them apart. And all six of the victims who arrived at the hospital that day survived.

## RECOMMENDED READING



Why the AR-15 Is So Lethal

JAMES FALLOWS





Letters: The Toll of High-Velocity Bullets



Trump's Hollow Gesture on Guns

ELAINE GODFREY

Routine handgun injuries leave entry and exit wounds and linear tracks through the victim's body that are roughly the size of the bullet. If the bullet does not directly hit something crucial like the heart or the aorta, and the victim does not bleed to death before being transported to our care at the trauma center, chances are that we can save him. The bullets fired by an AR-15 are different: They travel at a higher velocity and are far more lethal than routine bullets fired from a handgun. The damage they cause is a function of the energy they impart as they pass through the body. A typical AR-15 bullet leaves the barrel traveling almost three times faster than—and imparting more than three times the energy of—a typical 9mm bullet from a handgun. An AR-15 rifle outfitted with a magazine with 50 rounds allows many more lethal bullets to be delivered quickly without reloading.

I have seen a handful of AR-15 injuries in my career. Years ago I saw one from a man shot in the back by a SWAT team. The injury along the path of the bullet from an AR-15 is vastly different from a low-velocity handgun injury. The bullet from an AR-15 passes through the body like a cigarette boat traveling at maximum speed through a tiny canal. The tissue next to the bullet is elastic—moving away from the bullet like waves of water displaced by the boat—and then returns and settles back. This process is called cavitation; it leaves the displaced tissue damaged or killed. The high-velocity bullet causes a swath of tissue damage that extends several inches from its path. It does not have to actually hit an artery to damage it and cause catastrophic bleeding. Exit wounds can be the size of an orange.

With an AR-15, the shooter does not have to be particularly accurate. The victim does not have to be unlucky. If a victim takes a direct hit to the liver from an AR-15, the damage is far graver than that of a simple handgun-shot injury. Handgun injuries to the liver are generally survivable unless the bullet hits the main blood supply to the

liver. An AR-15 bullet wound to the middle of the liver would cause so much bleeding that the patient would likely never make it to the trauma center to receive our care.

One of my ER colleagues was waiting nervously for his own children outside the school. While the shooting was still in progress, the first responders were gathering up victims whenever they could and carrying them outside the building. Even as a physician trained in trauma situations, there was nothing he could do at the scene to help save the victims who had been shot with the AR-15. Most of them died on the spot; they had no fighting chance at life.

As a doctor, I feel I have a duty to inform the public of what I have learned as I have observed these wounds and cared for these patients. It's clear to me that AR-15 and other high-velocity weapons, especially when outfitted with a high-capacity magazine, have no place in a civilian's gun cabinet. I have friends who own AR-15 rifles; they enjoy shooting them at target practice for sport and fervently defend their right to own them. But I cannot accept that their right to enjoy their hobby supersedes my right to send my own children to school, a movie theater, or a concert and to know that they are safe. Can the answer really be to subject our school children to active-shooter drills—to learn to hide under desks, turn off the lights, lock the door, and be silent—instead of addressing the root cause of the problem and passing legislation to take AR-15-style weapons out of the hands of civilians?

In the aftermath of this shooting, in the face of specific questioning, our government leaders did not want to discuss gun control even when asked directly about the issue. Senator Marco Rubio of Florida warned not to "jump to conclusions that there's some law we could have passed that could have prevented it." A reporter asked House Speaker Paul Ryan about gun control, and he replied, "As you know, mental health is often a big problem underlying these tragedies." And on Tuesday, Florida's state legislature voted against considering a ban on AR-15-type rifles, 71 to 36.

If politicians want to back comprehensive mental-health reform, I am all for it. As a medical doctor, I've witnessed firsthand the toll that mental-health issues take on families and on individuals themselves who have no access to satisfactory long-term mental-health care. But the president and Congress should not use this issue as an excuse to deliberately overlook the fact that the use of AR-15 rifles is the common denominator in many mass shootings.

A medical professor taught me about the dangers of drawing incorrect conclusions from data, using the example of gum chewing, smokers, and lung cancer. He said smokers may be more likely to chew gum to cover bad breath, but one cannot look at the data and decide that gum chewing causes lung cancer. It is the same type of erroneous logic that focuses on mental health after mass shootings, when banning the sale of semiautomatic rifles would be a far more effective means of preventing them.

Banning the AR-15 should not be a partisan issue. No consensus may exist on many questions of gun control, but there seems to be broad support for removing high-velocity, lethal weaponry and high-capacity magazines from the market, which would drastically reduce the incidence of mass murders. Every constitutionally guaranteed right that we are blessed to enjoy comes with responsibilities. Even our right to free speech is not limitless. Second Amendment gun rights must respect the same boundaries.

The Centers for Disease Control and Prevention is the appropriate agency to review the potential impact of banning AR-15-style rifles and high-capacity magazines on the incidence of mass shootings. The agency was effectively barred from studying gun violence as a public-health issue in 1996, by a statutory provision known as the Dickey Amendment. This provision needs to be repealed so that the CDC can study this issue and make sensible gun-policy recommendations to Congress.

The Federal Assault Weapons Ban (AWB) of 1994 included language that prohibited semiautomatic rifles such the AR-15, and also large-capacity magazines with the ability to hold more than 10 rounds. The ban was allowed to expire on September 13, 2004, after 10 years. The mass murders that have followed the ban's lapse make clear that it must be reinstated.

On Wednesday night, Rubio said at a town-hall event hosted by CNN that it is impossible to create effective gun regulations because there are too many "loopholes," and that a "plastic grip" can make the difference between a gun that is legal and one that is illegal. But if we can see the different impacts of high- and low-velocity rounds clinically, then the government can also draw such distinctions.

As a radiologist, I have now seen high-velocity AR-15 gunshot wounds firsthand, an experience that most radiologists in our country will never have. I pray that these are the last such wounds I have to see, and that AR-15-style weapons and high-capacity magazines are banned for use by civilians in the United States, once and for all.

Heather Sher is a radiologist.

## RELATED VIDEOS



Sandy Hook and Pulse First Responders Speak Up

## MOST POPULAR

The Line That *Velma* Crossed

SHIRLEY LI



How ChatGPT Will Destabilize White-Collar Work

ANNIE LOWREY



What the Longest Study on Human Happiness Found Is the Key to a Good Life

ROBERT WALDINGER AND MARC SCHULZ



## The Oscars Contenders You Need to See

ISABEL FATTAL



## What the Tech and Media Layoffs Are Really Telling Us About the Economy

DEREK THOMPSON



## There's Snow on Mars

MARINA KOREN



## He's Tweeting for His Life

JUDITH SHULEVITZ



## A Grim New Low for Internet Sleuthing

MEGAN GARBER



## Why I Hope to Die at 75

EZEKIEL J. EMANUEL



## How Joe Biden Wins Again

FRANKLIN FOER



## Make your inbox more interesting.

Each weekday evening, get an overview of the day's biggest news, along with fascinating ideas, images, and people. <u>See more newsletters</u>

Enter your email

Sign Up

1/21/23, 1:24 PM
What I Saw Treating the Victims From Parkland Should Change the Debate on Guns - The Atlantic
Case 1:22-cv-11431-FDS Document 21-1 Filed 01/31/23 Page 247 of 295



## Ideas that matter.

Subscribe and support over 160 years of independent journalism.

Subscribe

**ABOUT**

**CONTACT**

**PODCASTS**

**SUBSCRIPTION**

**FOLLOW**

Privacy Policy    Do Not Sell My Personal Information    Advertising Guidelines    Terms Conditions    Responsible Disclosure    Site Map

TheAtlantic.com Copyright (c) 2023 by The Atlantic Monthly Group. All Rights Reserved.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply

# EXHIBIT 20

Special Reports   >   Exclusives

# 'There's Nothing to Repair': Emergency Docs on Injuries From Assault Weapons

— "You have to see the damage ... to really respect and understand how dangerous these weapons are"

by Jennifer Henderson, Enterprise & Investigative Writer, MedPage Today
May 31, 2022



Last Tuesday, Christopher Colwell, MD, chief of emergency medicine at Zuckerberg San Francisco General Hospital and Trauma Center, was looking forward to a rare dinner that his entire family of five would be able to attend.

He had left his shift at the emergency department and drove straight home, listening to music in the car rather than the news. But when he arrived, he knew something terrible had happened. His wife, as well as his

daughter, who is in high school, and his two sons, who are in college, were sitting on the couch waiting for him. They had heard about the horrific mass shooting in Uvalde, Texas, in which 19 children and two teachers were killed. And they knew the emotional impact it would have on Colwell, who responded to the scene at Columbine High School 23 years ago.

In fact, since the mass shooting at Columbine, during which 12 students and a teacher were killed, Colwell has also witnessed the brutal aftermath of two other similar tragedies -- the Aurora movie theater shooting in 2012, in which 12 people were killed and dozens of others wounded, and the San Francisco UPS shooting in 2017, in which three workers were killed and several more injured.

"I've gone through different iterations of this," Colwell told *MedPage Today*. "In 1999, it felt kind of lonely. There weren't that many medical folks who had dealt with mass shootings. You just didn't see events like Columbine. At that point, it felt relatively unique. As time has gone on, reliving some of this, it's painful each time and becoming more so, knowing that it's no longer lonely."

The medical professionals who experienced the aftermath of the two most recent mass shootings -- in Uvalde, and the killing of 10 Black, mostly elderly, people in a Buffalo, New York, supermarket -- are going to have to live with that for the rest of their careers, he said.

Colwell and other physicians said that one reason the U.S. is seeing more and deadlier mass shootings is the prevalence and accessibility of AR-15-style weapons. Now, the nation is in a "far, far worse place" than in 1999, when there was still a federal ban on assault weapons, Colwell noted.

"You have to see the damage that these weapons do to really respect and understand how dangerous these weapons are," he said, adding that he's not arguing that a .22 pistol can't end a life, but there's a reason why you don't see them used in mass shootings today.

**Medical News from Around the Web**

BBC

Robot snake could be used in cancer surgery in 10 years

NBC NEWS

Tennessee says it's cutting federal HIV funding. Will other states follow?

New 'concerning' strain of drug-resistant gonorrhea found in U.S. for 1st time

"There's no way to cause the type of havoc that these people are looking to cause without something of the power and speed of an assault weapon," he continued. "Assault weapons are specifically designed to more rapidly eject bullets, and the power that they have, and the speed that they have, there is no question ... most of the devastating injuries happen in the first minutes of the event."

Colwell went to Columbine High after the horrific events unfolded, hoping to find someone alive. However, all of the carnage had happened almost immediately.

"The primary way you can cause that kind of damage in that amount of time is with a weapon shooting that powerful of a ballistic that quickly," he pointed out. "Over and over again, what are they using? I've never seen the number of devastating wounds when you're not dealing with assault weapons -- the number of victims and the number of wounds."

Colwell's memories of the young victims at Columbine have stayed with him.

"I vividly remember seeing one of the victims at Columbine [who] had a text book that I had in high school," he recalled. "It really did put me back in our high school library."

"They barely had a chance to hide," he added.

There's no way a shooter could have done that with a pistol or non-semi-automatic weapon, he said. Seeing the wounds, the facial expressions of the victims, and the way they were lying at the scene, the emotional impact lasts forever, he noted.

William Begg, MD, vice president of medical affairs at Vassar Brothers Medical Center in Poughkeepsie, New York, and an emergency medicine physician at Danbury Hospital in Connecticut, has also seen the horror of mass shootings firsthand.

He attended to young patients in the aftermath of the 2012 shooting at Sandy Hook Elementary School in the Newtown, Connecticut borough, in which 20 children and six adults lost their lives. The fact that it happened again in Uvalde struck him especially hard.

"The more closely a mass casualty relates to one you've already been involved in ... the more you're affected," Begg told *MedPage Today*. "This tragedy in Uvalde disproportionately affected my institution and myself compared to all the other mass shootings over the years because we could so closely identify with the pain and sadness and anger that those healthcare workers are dealing with presently."

Though hospitals and communities across the nation experience other disasters, natural ones like hurricanes and tornadoes aren't self-induced, he said.

"This was a self-inflicted injury from our country's culture," he noted. "And it was preventable."

"It's a public health issue somewhat unique to the U.S.," he added. "If you look at all the other developed countries ... no country in the world has even close to the number of mass shootings. When you have a public health crisis, you have options to respond. And we in our country have not taken all the options to respond."

Begg said that the use of assault weapons by those who are not military or law enforcement is completely unnecessary, as is the allowance of high-capacity magazines. Not having background checks related to gun purchases is also a failure.

When you have a child that is hit with between three and 11 high-capacity bullets that explode inside their body, "it's not a survivable event," he noted. "That's why all these children died at the scene."

Regular handgun bullets come out one at a time, he pointed out. With the lower velocity, the survival rate is significantly higher, both for children and adults. And that is why there are scarce data on those who are shot with assault weapons -- because, most of the time, no one survives.

The only survivors of Sandy Hook were those who were shot in the arms or legs, he said, as opposed to those who were shot in the head, neck, abdomen, or pelvis. Sadly and similarly, those in Uvalde who were shot multiple times in the center of the body did not survive.

In previously testifying before Congress, Begg recalled using a simulation video to show the difference between damage inflicted by a regular bullet and an assault weapon bullet. The regular bullet went in and out of an artificial block representing a human body. However, the assault weapon bullet went through what would have been organs, like the liver or heart, and completely blew them apart.

Without prevention efforts, Begg predicts that the U.S. will have "more and more shooters" who "become more brazen."

There comes a point where a great infrastructure for trauma and resuscitation has already been developed, he added. "The biggest opportunity is prevention."

Mark Kline, MD, chief medical officer and physician-in-chief at Children's Hospital New Orleans, concurred.

"I've worked in children's hospitals and pediatric trauma centers long enough to have seen a lot of the physical damage -- there's too much of it, and there has been a long time," Kline told *MedPage Today*. "It really has reached epidemic proportions, I think. It's not just mass shootings ... it's accidental shootings in the home, it's kids caught in crossfire. There's just too darn many guns, and it just seems to me that the least we can do, as we debate the role of mental health issues and gang violence and video games ... is try to restrict access to the high-power guns that hold big magazines that can shoot however many rounds per minute, and inflict the kind of damage that we saw in Uvalde."

"They're weapons of war," he added of assault weapons. "They really have no purpose in civil society."

The explosive power and velocity from the projectiles "disintegrate organs," and "there's nothing to repair," he added.

The people of Uvalde will never be the same, from the families who lost children, to the children who witnessed the horrific event, and to the entire community and to the first responders, Kline said.

For Colwell, he feels that speaking out is the only way to bring about change.

"We have to, as a medical community, make our political leaders as uncomfortable or more uncomfortable facing us than gun lobbyists," he said. "That, in my mind, has to change."

"We can continue to talk about how we can prepare for these things," he added. "But there's no way you're going to prepare for something that has my family waiting in the living room 23 years later. Until our voices are heard ... these events are not only going to keep happening, but keep happening more frequently."

 Jennifer Henderson joined MedPage Today as an enterprise and investigative writer in Jan. 2021. She has covered the healthcare industry in NYC, life sciences and the business of law, among other areas.

111 Comments

## Recommended For You



**Special Reports**

AI Passes U.S. Medical Licensing Exam



**Special Reports**

Medical Board Takes Action Against Misinformation Doc



## Mayo Settles Nude Photos Lawsuit; Doc Exposed Himself to Minor? Co-Pay Coupon Scam



**Special Reports**

## NIH Project Aims to Make Gene Therapy 'Playbook' Public



**Special Reports**

## Harvard Pulls Out of Med School Rankings



**Special Reports**

## Whistleblower Conflicts of Interest; Maternity Services Cut; Tobacco's Latest Tactic

## Medical News From Around the Web

**BBC**
Robot snake could be used in cancer surgery in 10 years

**NBC NEWS**
Tennessee says it's cutting federal HIV funding. Will other states follow?

**LIVE SCIENCE**
New 'concerning' strain of drug-resistant gonorrhea found in U.S. for 1st time

**ASSOCIATED PRESS NEWS**
Before HIV grant cut, Tenn. tried to oust Planned Parenthood

**JOURNAL OF CLINICAL ONCOLOGY**
Dexrazoxane and Long-Term Heart Function in Survivors of Childhood Cancer.

**BLOOD**
Spotlight on vaccine-induced thrombosis and thrombocytopenia (VITT).

EXHIBIT 21

Case 1:22-cv-11431-FDS Document 21-1 Filed 01/31/23 Page 257 of 295

## Wounds From Military-Style Rifles? 'A Ghastly Thing to See'

Trauma surgeons tell what it is really like to try to repair such devastating injuries. "Bones are exploded, soft tissue is absolutely destroyed," one said.

 

**By Gina Kolata and C. J. Chivers**

March 4, 2018

 

Left, an X-ray of a leg showing a bullet wound delivered by an assault rifle used in combat. Right, an X-ray of a leg that sustained a bullet wound from a low-energy bullet, inflicted by a weapon like a handgun in Philadelphia. via Dr. Jeremy W. Cannon

Perhaps no one knows the devastating wounds inflicted by assault-style rifles better than the trauma surgeons who struggle to repair them. The doctors say they are haunted by their experiences confronting injuries so dire they struggle to find words to describe them.

At a high school in Parkland, Fla., 17 people were recently killed with just such a weapon — a semiautomatic AR-15. It was legal there for Nikolas Cruz, 19, the suspect in the shooting, to buy a civilian version of the military's standard rifle, while he would have had to be 21 to buy a less powerful and accurate handgun.

Many factors determine the severity of a wound, including a bullet's mass, velocity and composition, and where it strikes. The AR-15, like the M4 and M16 rifles issued to American soldiers, shoots lightweight, high-speed bullets that can cause grievous bone and soft tissue wounds, in part by turning sideways, or "yawing," when they hit a person. Surgeons say the weapons produce the same sort of horrific injuries seen on battlefields.

Civilian owners of military-style weapons can also buy soft-nosed or hollow-point ammunition, often used for hunting, that lacks a full metal jacket and can expand and fragment on impact. Such bullets, which can cause wider wound channels, are proscribed in most military use.

Wounds From Military-Style Rifles? 'A Ghastly Thing to See' - The New York Times

A radiologist at the hospital that treated victims of the Parkland attack wrote in The Atlantic about a surgeon there who "opened a young victim in the operating room and found only shreds of the organ that had been hit."

What follows are the recollections of five trauma surgeons. Three of them served in the military, and they emphasized that their opinions are their own and do not represent those of the armed forces. One has treated civilian victims of such weapons in American cities. And a pediatric surgeon treated victims of a Texas church shooting last year.

### Dr. Jeremy Cannon, the University of Pennsylvania's Perelman School of Medicine.
**He served in Iraq and Afghanistan and is a lieutenant colonel in the Air Force Reserve.**



Dr. Jeremy Cannon in the trauma center at Penn Presbyterian Medical Center Advanced Care Pavilion in Philadelphia  Mark Makela for The New York Times

"The tissue destruction is almost unimaginable. Bones are exploded, soft tissue is absolutely destroyed. The injuries to the chest or abdomen — it's like a bomb went off." If a bullet hits an arm or a leg, he said, the limb often hangs at an unnatural angle. Such victims can need a dozen surgeries over months. "Some eventually decide to undergo an amputation if there is severe pain in the limb and it is dysfunctional," he said.

"Bystanders are traumatized just seeing the victims. It's awful, terrible. It's just a ghastly thing to see."

Dr. Cannon recalled the aphorism by José Narosky, the Argentine writer: "In war, there are no unwounded soldiers."

His corollary: "In mass shootings, there are no unwounded victims."

Case 1:22-cv-11431-FDS Document 31-1 Filed 01/31/23 Page 259 of 295

### Dr. Martin Schreiber, Oregon Health & Science University.

**He was an Army reservist who served in Iraq in 2005 and in Afghanistan in 2010 and 2014.**



Dr. Martin Schreiber  Gabriella Marks for The New York Times

What makes injuries from these rifles so deadly, he said, is that the bullets travel so fast. Those from an M16 or AR-15 can depart the muzzle at a velocity of more than 3,000 feet per second, while bullets from many common handguns move at less than half or a third that speed. The result: "The energy imparted to a human body by a high velocity weapon is exponentially greater" than that from a handgun.

"You will see multiple organs shattered. The exit wounds can be a foot wide."

"I've seen people with entire quadrants of their abdomens destroyed."

Case 1:22-cv-11431-FDS Document 21-1 Filed 01/31/23 Page 260 of 295

### Dr. Jeffrey Kerby, the University of Alabama at Birmingham.

**He was formerly an Air Force surgeon.**



Dr. Jeffrey Kerby  Bob Miller for The New York Times

Dr. Kerby will never forget the first victim of a high velocity bullet wound he treated when he was serving in the Southern Philippines 16 years ago. The soldier had been shot in the outer thigh. His first thought was that the wound did not look so bad. There was just a tiny hole where the bullet went in. Then he looked where the bullet had exited. The man's inner thigh, he said, "was completely blown out."

Later he came to expect the telltale pattern. "You will typically see a small penetrating wound. Then you roll the patient over and you see a huge exit wound."

The high energy bullet creates a blast wave around the bullet. And the yaw can contribute to the larger exit wound. Striking bone can also cause bone fragments that radiate outward, cutting tissue in each fragment's path.

"Then the bullet starts tumbling, causing more and more destruction." Even a bullet that misses bone can result in surprising damage; as the blast wave travels through the body, it pushes tissues and organs aside in a temporary cavity larger than the bullet itself. They bounce back once the bullet passes. Organs are damaged, blood vessels rip and many victims bleed to death before they reach a hospital. Those who survive long enough are whisked to operating rooms, but often the injuries cannot be repaired.

"If they are shot in the torso, there often is not a whole lot we can do," he said.

With a handgun, the bullets mostly damage tissues and organs in their direct path. Eventually, the bullets may be slowed and stopped by the body. Emergency surgery often can save handgun victims.

Dr. Kerby said it used to be that surgeons like him saw victims of assault rifle shootings only in the military. No more. Now, though the wounds are still rare on the streets of Birmingham, he operates on occasional victims — that is, those who survive long enough to reach the hospital.

"These weapons are meant to kill people," he said.

Case 1:22-cv-11431-FDS Document 21-1 Filed 01/31/23 Page 261 of 295



An X-ray of a rifle bullet wound to an arm.  via Dr. Jeremy W. Cannon

### Dr. Alok Gupta, Beth Israel Deaconess Medical Center in Boston.

Dr. Gupta never served in the military, but he has treated victims of assault-style weapons in New York and Baltimore. Attacks using AR-15-style weapons are still rare, he emphasized. He sees mostly handgun wounds and some from shotguns.

"A single wound from a handgun follows a narrow path, pretty much the direct path the bullet took," Dr. Gupta said. "It is easier to figure out what is injured." Even a bullet wound to the heart can be repaired, he said, if the patient survives long enough to get to the hospital.

But like other trauma surgeons, Dr. Gupta has been struck by the devastation modern rifle bullets produce. The wide swath of damage makes it difficult to determine the extent of the injuries, and even more difficult to repair them. And if the bullet strikes the heart or other major organ, the victim usually cannot be saved.

"What we hear about in the news are the mass shootings," Dr. Gupta said.

The victims of military-style weapons that Dr. Gupta has treated in American cities are the silent victims.

### Dr. Lillian Liao, University Hospital and UT Health in San Antonio

**She operated on children shot in Sutherland Springs, Tex., at the First Baptist Church. Twenty-six churchgoers were killed and 20 others were wounded in a mass shooting carried out with an AR-15 rifle.**

Nine of the victims made it to her hospital that day. Four were children, one of whom died.

Dr. Liao was initially clinical in describing the wounds during an interview. "Muscles and skin and fat surrounding skin can be sheared off. We saw holes in intestines and bladders."

Asked about the emotional impact of the killings, she said she thought she had moved on. Then came the Parkland shootings, and the horror came flooding back.

*Lauren Katzenberg and Thomas Gibbons-Neff contributed to this article.*

1/21/23, 1:18 PM
Worlds From Guns to Style Rules? Already Dying to See 'AR' Sewn Into the New York Times
Case 1:22-cv-11431-FDS Document 21-1 Filed 01/31/23 Page 262 of 295



A memorial at the First Baptist Church in Sutherland Springs, Tex., in December.   Ruth Fremson/The New York Times

_____

Follow @NYTHealth on Twitter. | Sign up for the Science Times newsletter.

EXHIBIT 22

# The Washington Post

**Health & Science**

# As the wounded kept coming, hospitals dealt with injuries rarely seen in the U.S.

By **Tim Craig**, **Felicia Mello** and **Lena H. Sun**    October 3 at 8:13 PM

LAS VEGAS — As trauma nurse Renae Huening rushed into Sunrise Hospital and Medical Center on Sunday night, she "followed a trail of blood indoors."

Dozens of patients already were crammed into the waiting area, hallways and rooms of the hospital's emergency department. Some were "red-tagged," meaning they needed attention immediately. Names were being assigned randomly because there was no time to register people or find IDs.

Huening could smell the blood.

"The air smells like iron," she recalled Tuesday, barely 24 hours after hundreds of doctors and nurses throughout Las Vegas treated more than 500 victims of the worst mass shooting in modern U.S. history.

"You're standing in a pool of blood trying to care for your patient, slipping and sliding," Huening said. "Soon you're covered in blood yourself."

As investigators fill in the details of Stephen Paddock's rampage during a country music festival along the Las Vegas Strip, doctors, nurses and paramedics are recounting injuries they say are rarely seen in this country. And even the hardiest medical professionals acknowledged being rattled.

With Paddock perched on the 32nd floor of the Mandalay Bay Resort and Casino and firing military-style rifles onto the crowd of concertgoers below, the scale and degree of physical damage were extreme.

So many patients poured into the city's hospitals that pediatric surgeons were operating on adults and obstetricians were attending to trauma patients.

Many of the most critically wounded patients arrived at the 541-bed University Medical Center of Southern Nevada, the state's only Level One trauma center. Over about four hours, it received 104 patients. More than 80 percent were gunshot victims.

Douglas R. Fraser, the hospital's chief of trauma surgery, struggled with other doctors there to deal with bullet wounds in torsos and limbs that had shredded human flesh into "unusual patterns," caused "extreme fractures" and bounced through bodies with horrific force.

"These were quite large wounds that we saw," he said Tuesday. "The fractured shrapnel created a different pattern and really injured bone and soft tissue very readily. This was not a normal pattern of injuries."

Gun deaths are this nation's third-leading cause of injury-related fatalities, with the most recent data showing that firearms accounted for more than 36,200 deaths in 2015. Over a nine-year period, according to data from the Centers for Disease Control and Prevention, almost 971,000 people were hurt or killed by firearms in the United States — with a just-released study finding that such injuries cost nearly $25 billion in hospital emergency and inpatient care from 2006 to 2014.

The devastation that semiautomatic rifles cause to the human body is extreme because they put vastly more energy behind bullets than handguns do.

The velocity of a bullet fired from a typical 9mm handgun is 1,200 feet per second. From an AR-15 semiautomatic, the bullet travels roughly three times faster, and the body must absorb all of that energy.

If a 9mm bullet strikes someone in the liver, for example, that person might suffer a wound perhaps an inch wide, said Ernest E. Moore, a longtime trauma surgeon at Denver Health and editor of the Journal of Trauma and Acute Care Surgery. "But if you're struck in the liver with an AR-15, it would be like dropping a watermelon onto the cement. It just is disintegrated."

Survival generally depends on several factors: the position of the body when it was struck and its distance from the weapon; the velocity of the bullet and the type used; and the location of the entry wound and path the bullet follows before it exits — if it exits at all.

Once inside the body, a high-velocity bullet causes a shock wave as it blasts through tissue. The reverberations expand outward, causing more harm.

"When that happens, it stretches all the blood vessels and tears them, and you lose blood supply to the entire area," said Faran Bokhari, chairman of the Trauma and Burn Unit at Cook County Health and Hospitals System in Chicago, which sees 1,000 gunshot victims a year.

By contrast, even a grievous knife wound damages only the organs and tissues directly in its path.

About half of the victims taken to University Medical Center suffered graze wounds, probably from bullets that ricocheted off the ground, Fraser said. Other patients may have been struck by bullets that passed through other victims. Some were hurt as they tried to flee — or were trampled in the panic.

But 30 were in critical condition after suffering direct hits, he said.

Across the city, hospital administrators called in their entire staffs within minutes of hearing of the shooting and mass casualties. Elite neurosurgeons were mobilized. Environmental technicians were tasked with cleaning up blood.

And the patients just kept coming — by ambulance, in the beds of pickup trucks, in the backs of SUVs.

Of those who arrived at University Medical Center, Fraser believes, doctors were unable to revive only one — someone who had been shot in the head.

"A lot of the injuries were gunshots to the chest," Fraser said. He spoke Tuesday as a professional, matter of fact rather than emotional. "Many did not require surgery but required chest tubes to the chest so they could breathe better. The other patients had surgery to remove holes to their bowels and intestines."

For hours, some patients were in danger of suffocating on their own blood. So many wounds resembled those most often seen on battlefields that the hospital quickly contacted four Air Force trauma surgeons who happened to be participating in a visiting-fellow program there.

"They are used to seeing those things," Fraser said.

At one point early Monday, surgeons were conducting five operations simultaneously. "They just came in by the dozens — some of them in a bed, some on a seat — and we just tried to make room for these folks," said Syed Saquib, who was the chief surgeon on duty.

About five miles away at Sunrise Hospital, 214 patients were treated in three hours — nearly the number typically seen in a day.

Scott Scherr, the director of emergency medicine, got to his hospital about 30 minutes after the attack began, breaking "every traffic law in Las Vegas" along the way.

The scene inside stunned him. He remembers blood pouring off gurneys.

"That moment was shocking, but as soon as that moment passed, I knew I had a job to do," Scherr said. He would end up working 20 straight hours.

Hospital staffers gave each patient red or green triage tags identifying the degree of their injuries. When beds filled up, some of the less injured sat on the floor.

Identifying the most critical wasn't always easy. Bullets can tumble as they pierce a body, meaning that even a patient with a small hole in a shoulder could have a tear in a lung or aorta, too.

"They look okay, but they can turn in a heartbeat," said Huening, the trauma nurse.

The surgeries were back to back and seemingly endless. Anesthesiologist Dean Polce was involved in 27 operations. Twenty-six of the patients lived, he said Tuesday, breaking down as he spoke.

"I wish we could have done more," Polce said, lowering his eyes as he choked up. "Where that bullet goes in the body is really hard to guess."

There weren't enough X-ray machines at times, given the volume. Some supplies ran low. At one point, the emergency room ran out of chest tubes, and staff from nearby MountainView Hospital drove over with a pickup truck full of them.

Certified nursing assistant Jacqueline Rodriguez said she can't forget one patient, clearly very scared, who needed a chest tube inserted quickly.

"I saw the look of terror in her eyes. I said, 'Squeeze my hand, scream, do whatever you need to do. It's going to hurt, but years later, you're going to look back at this, and you're going to be alive.' "

*Sun reported from Washington. Heather Long and Lynh Bui in Las Vegas contributed to this report.*

Tim Craig is a national correspondent on the America Desk. He previously served as head of The Post's Afghanistan-Pakistan Bureau, based in Islamabad and Kabul. He's also reported from Iraq, the District and Baltimore. 🐦 Follow @timcraigpost

Lena H. Sun is a national reporter for The Washington Post, focusing on health.
🐦 Follow @bylenasun

EXHIBIT 23

178                                    Journal of Acute Disease (2014)178–185



Contents lists available at ScienceDirect

## Journal of Acute Disease

journal homepage: www.jadweb.org



Document heading             doi: 10.1016/S2221–6189(14)60041–X

# Gunshot wounds: A review of ballistics related to penetrating trauma

Panagiotis K. Stefanopoulos[1]★, Georgios F. Hadjigeorgiou[2], Konstantinos Filippakis[3], Dimitrios Gyftokostas[4]

[1]Colonel (Ret.), Private practice (maxillofacial surgery), Athens, Greece

[2]Resident, Department of Neurosurgery, Red Cross Hospital, Athens, Greece

[3]Brigadier, Department of ENT–Head and neck surgery, 401 Army Hospital, Athens, Greece

[4]Vascular surgeon

## ARTICLE INFO

Article history:
Received
Received in revised form
Accepted
Available online
Keywords:
Wound ballistics
Gunshot wounds
Penetrating trauma
Firearms

## ABSTRACT

Civilian gunshot injuries from handgun and rifle ammunition vary in severity depending on the anatomic location involved and the different effects from the ballistic properties of the penetrating projectiles. Ballistic factors such as the impact velocity and energy should not be considered in isolation, as their specific effects are determined by the interaction between the projectile and tissues. Increased tissue damage can result from tumbling of non–deforming rifle bullets and deformation of expanding bullets. Both of these mechanisms increase substantially the energy transfer to the wound and its diameter, also producing a pulsating temporary cavity associated with pressure changes within tissue.

## 1. Introduction

Since the introduction of the term "wound ballistics"[1,2] indicating the study of the wounding mechanisms of missiles [3], extensive experimental research on this field has beenconductedby investigators with a military background [4–7]. In the context of wound ballistics, the term missile is used to denote various types of small projectiles, such as bullets and fragments, that have enough kinetic energy to penetrate a living target[8]. Civilian gunshot injuries have been studied to a lesser extentin connection to ballistic aspects [9–10], with major contributions by two influential forensic scientists, Beat Kneubuehl [11] in Europe, and Vincent DiMaio[12] in the US.

Whereas the severity of any penetrating injury is eventually related to the vicinity of the wound track to vital organs and large vessels, the nature of gunshot wounds (GSW)is influenced by the dynamics of the projectile and the local reaction of the penetrated tissue [13–16].These two aspects reflect the complex projectile–tissue interaction which takes place during the penetration process [14,17,18], accounting for the scientific approach to these injuries both from a physical (ballistic) and biological ("wound") point of view[16]. Therefore, a complete understanding of this process requires a basicknowledge of the ballistic factors implicated in tissue wounding. This paper reviews ballistics of GSW inflicted by handgun and rifle ammunition. Shotgun injuries are not included in the

Corresponding author: Panagiotis K. Stefanopoulos, 88 Pontou Str., Athens 11527, Greece.
Tel: +302710224908, +302107713894
E–mail: pan.stefanopoulos@gmail.com

Panagiotis K. Stefanopoulos et al./ Journal of Acute Disease (2014)178–185

present discussion as they differ from bullet injuries from a ballistic point of view.

## 2. Ballistic behavior of the bullet

The common characteristic of all firearms is a tube of variable length called barrel, with a chamber attached that receives the cartridge (the unit of ammunition) containing the bullet, the propellant, and the primer. The bullet is accelerated down the barrel to a final muzzle velocity under the high pressures built up by the expanding gases from the combustion of the propellant [19,20]. During this phase, the bullet attains a simultaneous rotatory movement (spin) as it is engaged by the spiral grooving of the interior of the gun barrel. This is an important feature called rifling, which necessitates that the diameter (caliber) of the bullet matches the internal diameter of the barrel. Since bullets are essentially axisymmetric bodies designed to afford the minimum area of presentation combined with the maximum possible mass, the spin is necessary for appropriate orientation of the bullet during flight with its tip (nose) pointing forward [2].

Projectiles are customarily classified as "low–" or "high–velocity", roughly corresponding to the two main categories of small arms, handguns and rifles [4,21]. While low velocity is generally considered synonymous to subsonic(less than 350 m/s) [4,21], the high velocity range is less well defined. In the context of wound ballistics, high velocity is considered to start approximately at 600–700 m/s, above which "explosive effects" are commonly seen[4]. Medium or intermediate velocities (350–600 m/s) [4] are achieved by more powerful handguns, such as those using Magnum ammunition [21].

The nose contour and the mass of the bullet are important for the maintenance of its velocity and energy during flight [22]. Based on the measurements published in ballistic tables [23], the muzzle energy is considered to decrease significantly beyond 45 m for most handgun bullets, and beyond 100 m for rifle bullets [21].Unfortunately, most civilian GSW are inflicted from an average of 10 m [24].

Modern military (assault) rifles launch their projectiles at700–960m/s. Military rifle bullets have a slender streamlined profile with a so–called spitzer (pointed) nose (Figure 1), which improves their ballistic performance at the supersonic velocity range. With the exception of the newest lead–free designs, these bullets have the typical composition of a lead ("soft") core protected against friction from the barrel by a shell ("jacket") of harder metal such as a copper alloy or plated steel, which completely covers the lead core at the nose (but remains open at the base for manufacturing purposes) in order to prevent deformation during soft tissue penetration, a construction designated as full metal–jacketed (FMJ) [13,20,25]. FMJ handgun bullets have round or flat nose.



**Figure 1.** Examples of modern military rifle cartridges: 7.62 mm NATO (left), 5.56 mm NATO (chambered in the M16 rifle) (middle), 7.62 × 39AK–47 (Kalashnikov) (right). Military ammunition terminology uses metric system with bullet diameter expressed in mm.

During flight, bullets are subjected initially to the destabilizing effects of the escaping gases from the muzzle of the gun [26], and thereafter to the drag forces from the air resistance which increase with bullet velocity [4]. Because these forces concentrate on the anterior part of the bullet while its center of mass is located towards its rear, an overturning moment emerges, most prominent on spitzer bullets, which causes the bullet's longitudinal axis to diverge from the line of trajectory [13,26–28]. This divergence is called yaw and is expressed by the angle between the bullet's axis and the velocity vector [2,19,25,29,30]. Because of the spin, yawing results in a complex spiral revolution of the bullet's tip in space about its center of mass, which

isknown as precession, similar to the disturbance of a spinning top knocked sideways[26] (Figure 2). However, under the gyroscopic stabilization by the spinprecession displays a declining amplitude with distance [26].



**Figure 2.** Condensed drawing demonstrating bullet yaw with precession (left),proceeding to tumbling (right). Arrow indicates direction of bullet movement.

When an FMJ bullet penetrates tissue, the resistance encountered resulting in its retardation affects its stability and occasionally its integrity, because tissue density is about 800 times greater than that of air and the spin can no longer maintain the bullet's previous orientation [29]. Over a certain distance, which varies depending on the type of the bullet, yawing becomes irreversible, and within a sufficiently long path tumbling eventually occurs, thereafter the bullet advancing base–forward [16,17,30] (Figure 2).



**Figure 3.** Different handgun bullet construction: semi–jacketed hollow–point (SJHP) on the left, and full metal–jacketed round nose (FMJ RN) on the right. Both cartridges are 9 mm Luger.

The other major type of bullet construction is the deforming or expanding bullet which sustains an increase in diameter within the target. This includes solid lead bullets, and the specifically designed partially jacketed bullets which have the tip of the lead core either simply left exposed (jacketed soft–point bullets, JSP) or hollowed (semi–jacketed hollow–point bullets, SJHP). Upon impact

tissue resistance causes these bullets to become flattened or deform into a mushroom shape [13]. Deformed bullets do not yaw [16].Hollow–point rifle bullets are mandatory for hunting purposes in order to produce instant "humane" killing of the animal [13], but are strictly prohibited for military purposes under the Hague Convention of 1899 as they cause "excessive" wounding [14].Hollow–point handgun bullets (Figure 3) are in use by some police forces, because deformation of a low–velocity projectile prevents over penetration of the target, which otherwise could result in accidental wounding of bystanders.

## 3. Energy transfer characteristics of gunshot wounds

Several authors [13,15,18,31] have discussed the fallacy of describing the severity of GSW by means of the velocity characteristics of the penetrating missile. In the context of wound ballistics, "low–velocity" and "high–velocity" can only refer to the circumstances of wounding, indicating wounds from handguns and rifles respectively [32]. However, the use of such terms as estimates of the wound itself is inaccurate and potentially misleading, as it is based on the erroneous impression that theextent of wounding is directly proportional to the impact energy of the projectile, which is greatly influenced by its velocity according to the familiar kinetic energy formula (KE=1/2mv2) [33]. In fact, it is only the energy deposited to the tissues that is transformed to work resulting in tissue disruption [8,14,28]. Although the effects of rifle bullets can be far more destructive compared to handguns because of their higher energy[32], almost all of these so–called "explosive" effects can be traced to the phenomenon of cavitation [3], a prominent manifestation of high–energy transfer, as described below. At the other extreme, a non–deforming(FMJ) rifle bullet traversingin stable flight a limited width of soft tissue will spend only a small fraction of itsenormous kinetic energy [4]. Therefore, it is more appropriate to think in terms of energy transfer (or deposition)to the wound in order to outline its extent and severity rather than concentrating on the physical properties of the missile [4,15,29].

Moreover, the extent of tissue damage along the wound track may varyas a result of non–linear energy deposition [14,34]. The rate of energy transfer to the wound

Panagiotis K. Stefanopoulos et al./ Journal of Acute Disease (2014)178–185

is determined by the tissue resistance to penetration, which is affected by the frontal surface area of the bullet "presented" to the tissue[14,30]. The critical factor leading to higher amounts of energy deposition along the missile track is any increase in the presented area, which invites drag forces of greater magnitude. There are two main mechanisms responsible for such an occurrence. With yawing, the presented area of the bullet can only enlarge; as the yaw angle approaches 90 degrees both the energy transfer and the resulting wounding effect increase markedly [35], as the bullet essentially severs tissue with all its length [13,36]. The small−caliber bullets of the M16 and Kalashnikov AK−74 assault rifles yaw and tumble significantly earlier than the twice heavier bullet used by the ubiquitous AK−47 rifle, thus creating large wounds early in their path [13]. The other mechanism increasing the presented area of the projectile,and alsothe diameter of the wound track, is bullet deformation [15,37].

## 4. Mechanisms of gunshot injuries

A bullet retained within the tissues has delivered all its energy, creating a blind woundwith only an entrance aperture. Alternatively, a perforating(through−and−through) wound may be produced, with the bullet leaving the body through an exit wound [4]. Although a low−velocity bullet may exit the wound depending on the width and density of the tissues traversed, it has been stated that at high impact velocities, above 550 m/s, a military rifle bullet will always exit an animal the size of a man, following a relatively straight course [38]. Exit wounds tend to be larger and more irregular than entrance wounds, typically as a result of bullet tumbling [18,30].

GSWare considered a special form of blunt trauma [39]. They do not consist simply in plain tissue penetration, since they involve crushing due to overpressure in front of the projectile, and also indirect damage from temporary cavity formation in its wake region [4,12,15,18,34,40,41]. These mechanisms can be interpreted as a sequence of fluid dynamic phenomena [40], with the bullet viewed as an immersed body and the surrounding tissue with its high water content as "flowing" backwards around the projectile's surface [41,42]. In addition, in contact or close range GSW, the injury is aggravated by the blast effect of the escaping propellant gases into the tissue [12,31,43]. Tissue burning [4] also occurs with bullets retained in the wound.

### 4.1. Direct tissue damage

Crush injury followed by rupture of the tissue encountered by the leading edge of the advancing bullet leads to the formation of the wound track [4,7,13,18,41,43]. This combination has been called prompt damage as it occurs immediately in the direct vicinity of the projectile[44] representing the predominant mechanism of tissue injury in low−energy GSW.

The residual wound trackwhich remains after the passage of the projectile is commonly referred to as the permanent cavity [2,4,7], although the term "cavity" should probably be reserved for the temporary cavitation phenomenon. The more comprehensive terms"permanent wound channel"[16] and "permanent wound tract" [7] have been used indicatingthe central defect(permanent "cavity") together with any surrounding area of irreversible tissue damage[7], the latter resulting from the crushing effect of the overpressure mechanism and the potential disruption from cavitation. Irreversibly damaged tissue subsequently undergoes necrosis and slough contributing to the permanent "cavity" formation [4]. It is surrounded by an outer hemorrhagic area termed the extra vasation zone, which is characterized by interstitial bleeding but absence of macroscopically evident tissue destruction [4,16].

### 4.2. Cavitation

As the projectile is moving forward, tissue detaches from the projectile−tissue interface, as a result of boundary flow separation, and is subsequently accelerated radially, the same way as a speedboat displaces water [30], while the momentum imparted to tissue particles results in the formation of a vacuum[3,16,41,42]. The underlying process called cavitation becomes clinically important at impact velocities exceeding 600 m/s[45], thus considered the most important feature in wound ballistics of high−velocity projectiles[15,16,25].   Cavitation is an extremely dynamic

Panagiotis K. Stefanopoulos et al./ Journal of Acute Disease (2014)178–185

phenomenon, which exceeds the capacity of the soft tissue to yield to the pressurechanges created by the penetrating missile. Because of this inertia, tissue displacement lags behind the bullet, and the resultant deformity, known as the temporary cavity, reaches maximum size within several milliseconds after its passage [3,4,34,45]. Subsequently, the energy stored in any displaced tissue with enough elasticity cause the cavity walls to collapse, with a few cycles of expansion and contraction ("pulsations") following in a waning fashion, until tissue settles in the form of the residual wound track. This short–lived character of the cavity is emphasized by the name "temporary"[16,40].



**Figure 4.** Idealized drawing of temporary cavity formation (dotted line) by military rifle bullet. The cavity expands in spindle–shaped fashion as the bullet yaws and tumbles, after the initial narrow channel. The residual wound track (permanent "cavity") appears in solid line.Arrow indicates direction of bullet movement.

The magnitude of the cavitation phenomenon is related to the rate of energy deposition. The study of military rifle bullets in synthetic materials simulating muscle tissue suggests that as long as the bullet moves within the target without significant yawing, thus sustaining little retardation, the wound track remains "narrow", a little wider than the bullet diameter [16]. Although this so–called narrow channel also involves a minor temporary cavitational effect [46], an expanding spindle–shaped cavity becomes evidentas the yaw angle increases irreversibly, and becomes maximum in cross section when the bullet yaws at 90 degrees causing wide separation of tissue "flow" (Figure 4), consistent with a dramatic increase in energy transfer. FMJ handgun bullets may also yaw within tissue but do not elicit significant cavitation because these bullets are shorter than rifle bullets and their presented area increases only negligibly with yawing [16]. On the other hand, deforming handgun bullets depending on their velocity give rise torelatively large temporary cavities [9,47].

The damage produced by cavitation results from stretching due to tensile strain, but also from compression of the surrounding tissue as well as shearing of fascial interfaces within it [3,40]. Although controversy still exists regarding the relative importance of these effects and the extent of the resultant necrosis in muscle tissue [4,7,34,35,48], cavitation is clearly devastating in susceptible organs such as the brain and liver [4,7]. In the extra vasation zone tissue injury results from tearing of the elements most sensitive to tensile forces, namely the capillaries [4,16], and there is a direct relationship between the size of the temporary cavity and the width of the extravasation zone [16].Moreover, the vacuum created during the expansion of the cavity causes suction of foreign material and debris into the wound [49],on top of the contamination already present from the bullet surface, which is not sterilized from heating as commonly believed[13,26].The clinical picture of a wound channel which is bordered by contused and potentially necrosing tissue inoculated with bacteria represents the hallmark of high–energy gunshot injury [25,37,50].The external appearance of such a wound may be deceptive with respect to the damage produced deep in the tissues. As previously mentioned, however, a military rifle bullet may induce a low–energy wound in case ofa perforating wound track no longer than the narrow channel simulated for that type of bullet [46].

## 4.3. Bone injuries

Ballistic bone injury is a more complex process than penetration of soft tissue [51]. In general, bone tissue causes marked retardation of the penetrating bullet [4,15,18], as expected by its greater density compared to soft tissue and its related mechanical properties, particularly its hardness [52,53], which may also cause the bullet to deform or break up [18,54].

Drill–hole defects, which are characteristic of low–energy ballistic penetration, are more common in the metaphyseal region of long bones because of the greater proportion of cancellous bone and the associated energy absorptive capacity which limits the extension of fracture lines [55,56]. High–energy ballistic impacts typically produce comminuted fractures[56,57]from the explosive effects of cavitation associatedwiththe fluid properties of bone marrow [3,16,52].Bone comminution is not uncommonwith

Panagiotis K. Stefanopoulos et al./ Journal of Acute Disease (2014)178–185

handgun injuries [56,57] and may resemble radiologically a high−energy fracture, but the latter involves a much more severely damaged zone of soft tissue[58].

### 4.4. Head injuries

The impact energy of the projectile, the angle of interaction with the bony surface, and the underlying bone thickness are important determinants of skull penetration [12,20]. Tangential bullet wounds of the skull are known as "gutter" wounds; they may involve only the outer table or the full thickness of the bone [30]. Bullets capable of entering the skull usually have enough remaining energy to reach the opposite side either perforating through it or becoming arrested without exiting[20]. This is commonly associated with early destabilization or deformation of the penetrating projectile, and also creation of bone fragments which may act as secondary missiles [40]. FMJ bullets are more likely to perforate the skull and this likelihood increases with the caliber. However, the size of the permanent wound channelin the brain bears no relationship to the caliber or muzzle energy of the bullet[12].

The head representsa particular structure from a wound ballistics point of view [59]. The pressure buildup by the expansion of the temporary cavity within it can only be relieved by bursting of the skull [30], as demonstrated with high−velocity projectiles penetratingeither intact animal heads[3] or human skulls filled with gelatin to simulate the brain substance [50]. By contrast, in the absence of a non−compressible content with fluid properties to transmit the pressure to the braincase, the only defects produced by the same types of projectiles in the empty skull were neat entrance and exit holes with no shattering of bone [3,50]. The same mechanism of hydraulic pressure is responsible for indirect fractures of the thin orbital plates almost invariably produced by handgun bullets penetrating the head[16,30,40].

Brain tissue has little tolerance to sudden increases in pressure as it is firmly enclosed within an unyielding case, and this appears to enhance the consequences of cavitation produced even by low−velocity projectiles. Parenchymal changesextending for some distance around the permanent wound channel have been observed with fatal handgun injuries, most likely attributed to temporary cavitation [60].

Large temporary cavities from FMJ handgun bullets have been demonstrated in experimental models of ballistic brain injury[61]. Moreover, autopsy findings [62] and previous animal studies suggest that the "ordinary" pressure waves [63] associated with cavitation, rather than theearly ballistic pressure wave ("shock wave"), may be important causes in the pathogenesisofrespiratoryarrestfollowinglow−velocity ballistic trauma of the head,in the absence of significant mass effect or direct involvement of brainstem structures by the missile track.

## 5. Conclusion

The damage produced by penetrating bullets depends on the amount of their impact energy that is delivered to the tissues, the rate at which this occurs, and the local response of the tissue zone subjected to cavitational effects from high−energy injuries. Although the complex interactions of the projectile with the various tissuesresult in a wide range of ballistic injury patterns, awareness of the specific mechanisms that cause increased tissue destruction, namely bullet tumbling and deformation, will assist recognition of the less common injuries involving high energy transfer, which are also associated with a higher risk of infectious complications.

## Conflict of interest statement

We declare that we have no conflict of interest

## References

[1] Callender GR, French RW. Wound ballistics: studies in the mechanism of wound production by rifle bullets. *Mil Surg* 1935;**77**(4):177–201.

[2] French RW, Callender GR. Ballistic characteristics of wounding agents. In: Beyer JC.(ed.) Wound ballistics. Washington, D.C.: Office of the Surgeon General, *Department of the Army*; 1962, p. 91–141.

[3] Harvey EN, McMillen JH, Butler EG, Puckett WO. Mechanism

*Panagiotis K. Stefanopoulos et al./ Journal of Acute Disease (2014)178–185*

of wounding. In: Beyer JC. (ed.) Wound ballistics. Washington, D.C.: Office of the Surgeon General, *Department of the Army*;1962,p.143–235.

[4] Bellamy RF, Zajtchuk R. Conventional warfare:ballistic, blast, and burn injuries. Washington, DC: Walter Reed Army Medical Center, *Office of the Surgeon General*; 1991, p.107–162.

[5] Wang ZG, Jiang J. Thinking on wound ballistics research. *Int Rev Armed Forces Med Serv* 2000;**73**(1): 3–6.

[6] Payne LD. Military wound ballistics: history and renaissance. *J R Army Med Corps* 2013; **159**(4): 256–258.

[7] Breeze J, Sedman AJ, James GR, Newbery TW, Hepper AE. Determining the wounding effects of ballistic projectiles to inform future injury models: a systematic review. *J R Army Med Corps* 2014;**160**(4):273–278.

[8] Haywood IR. Missile injury. *Probl Gen Surg* 1989;**6**(2):330–347.

[9] Yoganandan N, Pintar FA, Kumaresan S, Maiman DJ, Hargarten SW. Dynamic analysis of penetrating trauma. *J Trauma* 1997;**42**(2):266–272.

[10] Zhang J, Yoganandan N, Pintar FA, Genarelli TA. Temporary cavity and pressure distribution in a brain simulant following ballistic penetration. *J Neurotrauma* 2005; **22**(11): 1335–1347.

[11] Kneubuehl BP, Coupland RM, Rothschild MA, Thali MJ. Wundballistik: Grundlagen und Anwendungen.3rd ed.Heidelberg:Springer; 2008.

[12] DiMaio VJ.Gunshot wounds: practical aspects of firearms, ballistics, and forensic techniques. 2nd ed. Boca Raton, FL: CRC Press; 1999.

[13] Hollerman JJ, Fackler ML, Coldwell DM, Ben–Menachem Y. Gunshot wounds: 1. Bullets, ballistics, and mechanisms of injury. *AJR Am J Roentgenol*1990;**155**(4): 685–690.

[14] Coupland RM, Kneubuehl BP, Rowley DI, Bowyer GW. Wound ballistics, surgery and the law of war. *Trauma* 2000; **2**(1): 1–10.

[15] Griffiths D, Clasper J. Bullet and blast injuries: (iii) Military limb injuries/ballistic fractures. *Curr Orthop* 2006; **20**(5): 346–353.

[16] Kneubuehl BP. General wound ballistics.In: Kneubuehl BP, Coupland RM, Rothschild MA, Thali MJ. (eds.) Wound ballistics: basics and applications(Translation of the revised 3rd German edition). Berlin: Springer;2011,p.87–161.

[17] Fackler ML, Malinowski JA. The wound profile: a visual method for quantifying gunshot wound components. *J Trauma* 1985; **25**(6): 522–529.

[18] Janzon B, Hull JB, Ryan JM. Projectile–material interactions: soft tissue and bone. In: Cooper GJ, Dudley HA, Gann DS,

Little RA, Maynard RL. (eds.) Scientific foundations of trauma. Oxford: Butterworth–Heinemann;1997,p.37–52.

[19] Moss GM, Leeming DW, Farrar CL. Military ballistics: a basic manual. London: Brassey's; 1995,p.9–22.

[20] Jandial R, Reichwage B, Levy M, Duenas V, Sturdivan L. Ballistics for the neurosurgeon. *Neurosurgery* 2008; **62**(2): 472–480.

[21] Gugala Z, Lindsey RW. Classification of gunshot injuries in civilians. *Clin Orthop Relat Res* 2003; **408**: 65–81.

[22] DeMuth WE, Jr. Bullet velocity as applied to military rifle wounding capacity. *J Trauma* 1969; **9**(1): 27–38.

[23] Appendix A. Tables. In: Kneubuehl BP, Coupland RM, Rothschild MA, Thali MJ. (eds.) Wound ballistics: basics and applications(Translation of the revised 3rd German edition). Berlin: Springer; 2011, p. 345–404.

[24] Ordog GJ, Balasubramanium S, Wasserberger J, Kram H, Bishop M, Shoemaker W. Extremity gunshot wounds: Part one – identification and treatment of patients at high risk of vascular injury. *J Trauma* 1994; **36**(3): 358–368.

[25] Gyftokostas D, Komborozos B. The mechanism of firearm injury [article in Greek]. *Iatrika Chronika* 1986; **9**(1): 17–26.

[26] Hopkinson DA, Marshall TK. Firearm injuries. *Br J Surg* 1967; **54**(5): 344–353.

[27] Peters CE, Sebourn CL, Crowder HL. Wound ballistics of unstable projectiles. Part I: projectile yaw growth and retardation. *J Trauma* 1996; **40**(Suppl 3): S10–S15.

[28] Kneubuehl BP. Basics. In: Kneubuehl BP, Coupland RM, Rothschild MA, Thali MJ. (eds.) Wound ballistics: basics and applications(Translation of the revised 3rd German edition). Berlin: Springer; 2011, p. 3–85.

[29] Janzon B. Projectile–material interactions: simulants. In: Cooper GJ, Dudley HA, Gann DS, Little RA, Maynard RL. (eds.) Scientific foundations of trauma. Oxford: Butterworth–Heinemann; 1997, p. 26–36.

[30] DiMaio VJM, Dana SE. Handbook of forensic pathology. 2nd ed. Boca Raton, FL:CRC Press; 2006, p. 121–154.

[31] Fackler ML. Civilian gunshot wounds and ballistics: dispelling the myths. *Emerg Med Clin North Am* 1998; **16**(1): 17–28.

[32] Kneubuehl BP. Wound ballistics of bullets and fragments. In: Kneubuehl BP, Coupland RM, Rothschild MA, Thali MJ. (eds.) Wound ballistics: basics and applications(Translation of the revised 3rd German edition). Berlin: Springer; 2011, p. 163–252.

[33] Santucci RA, Chang YJ. Ballistics for physicians: myths about wound ballistics and gunshot injuries. *J Urol* 2004; **171**(4):

1408–1414.

[34] Janzon B, Seeman T. Muscle devitalization in high−energy missile wounds, and its dependence on energy transfer. *J Trauma* 1985; **25**(2): 138–144.

[35] Dziemian AJ, Mendelson JA, Lindsey D. Comparison of the wounding characteristics of some commonly encountered bullets. *J Trauma* 1961; **1**: 341–353.

[36] Bono CM, Heary RF. Gunshot wounds to the spine. *Spine J* 2004; **4**(2): 230–240.

[37] Bellamy RF. The medical effects of conventional weapons. *World J Surg* 1992; **16**(5): 888–892.

[38] DeMuth WE, Jr, Smith JM. High−velocity bullet wounds of muscle and bone: the basis of rational early treatment. *J Trauma* 1966; **6**(6): 744–755.

[39] Pollak S, Saukko PJ. Gunshot wounds. In: Jamieson A, Moenssens A. (eds.) Wiley encyclopedia of forensic science. West Sussex: Wiley; 2009, p. 1380–1401.

[40] Karger B. Forensic ballistics. In: Tsokos M. (ed.) Forensic pathology reviews. Volume 5. Totowa, NJ: Humana Press; 2008,p.139–172.

[41] Davidson PL,Taylor MC,Wilson SJ,Walsh KAJ,KieserJA. Physical components of soft−tissue ballistic wounding and their involvement in the generation of blood backspatter. *J Forensic Sci* 2012; **57**(5): 1339–1342.

[42] Felsmann MZ, Szarek J, Felsmann M, Babinska I. Factors affecting temporary cavity generation during gunshot wound formation in animals − new aspects in the light of flow mechanics: a review. *Veterinarni Medicina* 2012; **57**(11): 569–574.

[43]Dougherty PJ, Fackler ML. Wound ballistics: the pathophysiology of wounding. In: Dougherty PJ. (ed.) Gunshot wounds. Rosemont, IL: AAOS; 2011, p. 11–18.

[44] Peters CE, Sebourn CL. Wound ballistics of unstable projectiles. Part II: temporary cavity formation and tissue damage. *J Trauma* 1996; **40**(Suppl 3): S16–S21.

[45] Scott R. Pathology of injuries caused by high−velocity missiles. *Clin Lab Med* 1983; **3**(2): 273–294.

[46] Giannou C, Baldan M. War surgery: working with limited resources in armed conflict and other situations of violence. Volume 1. Geneva: International Committee of the Red Cross; 2009,p.53–78.

[47] Bolliger SA, Thali MJ, Bolliger MJ, Kneubuehl BP. Gunshot energy transfer profile in ballistic gelatin, determined with computed tomography using the total crack length method. *Int J Legal Med* 2010; **124**(6): 613–616.

[48] Fackler ML, Breteau JP, Courbil LJ, Taxit R, Glas J, Flevet JP. Open wound drainage versus wound excision in treating the modern assault rifle wound. *Surgery* 1989; **105**(5): 576–584.

[49] Große Perdekamp M, Kneubuehl BP, Serr A, Vennemann B, Pollak S. Gunshot−related transport of micro−organisms from the skin of the entrance region into the bullet path. *Int J Legal Med* 2006; **120**(5): 257–264.

[50] Owen−Smith MS. High velocity missile wounds. London: Edward Arnold; 1981, p. 15–42.

[51] Molde Å, Gray R. Letter to the editor. *Injury* 1995; **26**(2): 131.

[52] Huelke DF, Buege LJ, Harger JH. Bone fractures produced by high velocity impacts. *Am J Anat* 1967; **120**(1): 123–131.

[53] Bartlett CS. Clinical update: gunshot wound ballistics. *Clin Orthop Relat Res* 2003;**408**: 28–57.

[54] Stefanopoulos PK, Filippakis K, Soupiou OT, Pazarakiotis VC. Wound ballistics of firearm−related injuries−Part 1: missile characteristics and mechanisms of soft tissue wounding. *Int J Oral Maxillofac Surg* 2014; **43**(12): 1445–1458.

[55]Huelke DF, Harger JH, Buege LJ, Dingman HG, Harger DR. An experimental study in bio−ballistics: femoral fractures produced by projectiles. *J Biomech* 1968; **1**(2): 97–105.

[56]Rose SC, Fujisaki CK, Moore EE. Incomplete fractures associated with penetrating trauma: etiology, appearance, and natural history. *J Trauma* 1988; **28**(1): 106–109.

[57]Leffers D, Chandler RW. Tibial fractures associated with civilian gunshot injuries. *J Trauma* 1985; **25**(11): 1059–1064.

[58]Bowyer GW, Rossiter ND. Management of gunshot wounds of the limbs. *J Bone Joint Surg Br* 1997; **79**(6): 1031–1036.

[59]Rothschild MA. Wound ballistics and forensic medicine. In: Kneubuehl BP, Coupland RM, Rothschild MA, Thali MJ. (eds.) Wound ballistics: basics and applications. Translation of the revised 3rd German edition. Berlin: Springer; 2011, p. 252–303.

[60]Oehmichen M, Meissner C, König HG. Brain injury after gunshot wounding: morphometric analysis of cell destruction caused by temporary cavitation. *J Neurotrauma* 2000; **17**(2): 155–162.

[61]Zhang J, Yoganandan N, Pintar FA, Guan Y, Gennarelli TA. Experimental model for civilian ballistic brain injury biomechanics quantification. *J Biomech* 2007; **40**(10): 2341–2346.

[62]OehmichenM, Meissner C, König HG, Gehl HB. Gunshot injuries to the head and brain caused by low−velocity handguns and rifles: a review. *Forensic Sci Int* 2004; **146**(2–3): 111–120.

[63]Carey ME. Experimental missile wounding of the brain. *Neurosurg Clin North Am* 1995; **6**(4): 629–642.

EXHIBIT 24

REVIEW ARTICLE

# Gunshot wounds: A review of ballistics, bullets, weapons, and myths

**Peter M. Rhee, MD, MPH, Ernest E. Moore, MD, Bellal Joseph, MD, Andrew Tang, MD, Viraj Pandit, MD, and Gary Vercruysse, MD,** Tucson, Arizona

In the United States, someone experiences a gunshot wound every 4 minutes 44 seconds, and a person dies as a result each 16 minutes. Annually, this means that approximately 111,000 Americans are shot and 33,800 die as a result of these injuries, which equates to 93 deaths caused by firearms every day.[1,2] In contrast, the war in Iraq and Afghanistan has resulted in less than 200 deaths per year from gunshot wounds during the height of the conflict (Table 1). Gunshot wound injuries are a preventable epidemic in the United States. This silent epidemic is largely deaf to the American public because we are so accustomed to these injuries that they rarely make the news. Gun violence leading to homicide may get some attention, but an even greater toll is placed on the survivors who must live with the loss of loved ones or are burdened by the costs associated with the temporary or permanent disability caused by these wounds. Gunshot wounds not only hurt the body and mind of the victim but also burden the family of the victim and the society, both mentally and from a financial perspective. It is not unusual to have survivors accumulate hospital costs of more than $1 million per year, and some have total hospital and recovery costs of more than $10 million. Since most do not have the money to afford these enormous costs, the burden then falls on the society and ultimately the taxpayers. Additional societal costs that are harder to quantify are the costs associated with the permanent disabling and unemployment seen not infrequently in the victims of gunshot wounds. Whether these injuries are intentional or unintentional, the patients are in our health care system. These costs have been estimated to range from $100 to $174 billion annually.[3]

Furthermore, there has been an alarming escalation in the numbers of mass shootings throughout the United States (which leads the world in mass shootings), with 265 individuals killed and 269 wounded in the past 16 years[4] (Table 2).[5] Recent terrorist-related mass shootings have reignited vigorous and volatile public debate over access to weapons designed for inflicting mass casualties.[6] The predictable reflex response to these mass shootings has been in several forms, of which one is

in the call for reviving and funding research on gun violence and inadequate recognition and treatment of mental illness that warrants federal and state tax support.[7,8] As health care providers for trauma care, we have witnessed the ravages of gun-related violence and, thus, should become proactive in the ongoing national debate as it is our duty.

The numbers of gunshot wounds are increasing in the United States, although the gun-related homicide rates remain relatively stable.[9] Guns are ubiquitous in the United States, and it is known that where there are guns, there will be gunshot wounds.[10,11] In other countries, it has been shown that gun law reforms were associated with a decrease in the numbers of mass shootings and firearm deaths.[12–14] Canada, with their strict handgun control, has one-third fewer gunshot wounds than the United States. Australia and the United Kingdom have less than half of the deaths from gunshot wounds seen in Canada.[10] The United States, which constitutes approximately 5% of the world's population, owns between 35% and 50% of its guns. Legislation regarding firearms differs within the United States, but what is certain is that gunshot wounds are a daily part of our society and will remain a part of it for a very long time. While any topic relating to firearms remains volatile in our country, the fact is that where there are guns, people will be shot. The real tragedy is that with as many gunshot wounds occurring daily in the United States, even collection of the basic data, scientific inquiry, policy formation and analysis, and rigorous evaluation are limited. Firearm research is difficult because of politically motivated constraints. A blue ribbon commission appointed by the National Academy of Sciences concluded that very little is currently known about effective ways to reduce gun violence and injury within the United States because it is rarely studied.[15] While mortality rates from every major cause of death have declined dramatically during the past half century,[16] the homicide and gunshot wound rates in America are the same as those in 1950. Without challenging the Second Amendment of the Constitution, we can still work toward some semblance of regulation and control. The costs of inaction are more gunshot wounds to both intended and unintended victims. The cost of total freedom to bear arms is measured not only in terms of the financial burden to the society but also in terms of lives and lives ruined. The cost to life and the society is too enormous to ignore. The costs are generally to the taxpayers because it is costly to the court system, police system, and health care system. By promoting discussions on this topic and synergy of collaboration, we can at least attempt to make effectual progress.

Despite gunshot wounds being an epidemic, many health care providers' understanding of ballistics, bullets, and guns

Submitted: January 14, 2016, Revised: February 8, 2016, Accepted: March 10, 2016, Published online: March 15, 2016.

From the Division of Trauma, Critical Care, Burns and Emergency Surgery (P.M.R., B.J., A.T., V.P., G.V.), Department of Surgery, University of Arizona, Tucson, Arizona; and Department of Surgery (E.E.M.), University of Colorado, Denver, Denver, Colorado.

Address for reprints: Peter M. Rhee, MD, MPH, Division of Trauma, Critical Care, Burns and Emergency Surgery, University of Arizona, Department of Surgery, 1501 N Campbell Ave, Room 5411, PO Box 245063 Tucson, AZ 85724; email: prhee@email.arizona.edu.

DOI: 10.1097/TA.0000000000001037

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6

*Rhee et al.*

**TABLE 1.** US Military Combat Casualty Deaths

| | Total Deaths | Deaths per Year | US Population | Deaths per Year per 100,000 |
|---|---|---|---|---|
| Revolution (1775–1783) | 8,000 | 1,000 | 3,929,884 | 25.6 |
| War of 1812 (1812–1815) | 2,260 | 565 | 7,036,509 | 8.0 |
| Mexican War (1846–1848) | 1,733 | 577 | 17,019,678 | 3.4 |
| Civil War (1861–1865) | 213,000 | 42,400 | 30,383,684 | 139.5 |
| Spanish-American War (1898) | 385 | 385 | 61,116,815 | 0.6 |
| World War I (1917–1918) | 53,402 | 58,258 | 91,641,186 | 29.1 |
| World War II (1941–1945) | 291,557 | 81,080 | 130,962,661 | 44.5 |
| Korean War (1950–1953) | 36,574 | 9,144 | 149,895,183 | 6.1 |
| Vietnam War (1964–1975) | 47,424 | 4,311 | 178,554,916 | 2.4 |
| War on Terror (March 19, 2001–2015)* | 5,281 | 352 | 321,216,397 | 0.11 |
| 2014 US firearm deaths | 32,800 | 32,800 | 321,216,397 | 10.2 |

*The Iraq War excludes the nonbattle injury deaths, and firearm deaths are approximately 50% of the battle-related deaths.

**TABLE 2.** Mass Shootings in the United States 2000 to 2015

| Date | Location | Killed | Wounded |
|---|---|---|---|
| December 26, 2000 | Wakefield, Massachussetts; office | 7 | 0 |
| March 5, 2001 | Santee, California; school* | 2 | 13 |
| October 28, 2002 | Tucson, Arizona; university | 3 | 0 |
| July 8, 2003 | Meridian, Mississippi; workplace | 5 | 9 |
| March 21, 2005 | Red Lake Indian Res, Minnesota; school* | 9 | 7 |
| January 30, 2006 | Goleta, California; post office | 6 | 0 |
| October 2, 2006 | Nickel Mines, Pennsylvania; school | 5 | 5 |
| February 12, 2007 | Salt Lake City, Utah; shopping mall* | 5 | 4 |
| April 16, 2007 | Blacksburg, Virginia; university | 32 | 17 |
| December 5, 2007 | Omaha, Nebraska; shopping mall | 8 | 4 |
| February 14, 2008 | Dekalb, Illinois; university | 5 | 16 |
| April 3, 2009 | Binghamton, New York; immigration services center | 13 | 4 |
| November 5, 2009 | Fort Hood, Texas; military base | 13 | 32 |
| February 12, 2010 | Huntsville, Alabama; university | 3 | 3 |
| August 3, 2010 | Manchester, Connecticut; court | 8 | 2 |
| January 8, 2011 | Tucson, Arizona; shopping center | 6 | 13 |
| October 12, 2011 | Seal Beach, California; hair salon | 8 | 1 |
| April 2, 2012 | Oakland, California; university | 7 | 3 |
| July 20, 2012 | Aurora, Colorado; movie theater | 12 | 58 |
| August 5, 2012 | Oak Creek, Wisconsin; temple | 6 | 3 |
| September 28, 2012 | Minneapolis, Minnesota; offices | 6 | 2 |
| October 21, 2012 | Brookfield, Wisconsin; salon | 3 | 4 |
| December 14, 2012 | Newtown, Connecticut; school | 27 | 1 |
| June 7, 2013 | Santa Monica, California; home | 5 | 0 |
| September 16, 2013 | Washington, District of Columbia; Navy yard | 12 | 3 |
| April 2, 2014 | Fort Hood, Texas; military base | 3 | 16 |
| May 23, 2014 | Isla Vista, California; neighborhood | 6 | 7 |
| June 18, 2015 | Charleston, South Carolina; church | 9 | 0 |
| July 16, 2015 | Chattanooga, Tennessee; military centers | 5 | 3 |
| October 1, 2015 | Roseburg, Oregon; college | 9 | 9 |
| November 29, 2015 | Colorado Springs, Colorado; planned parenthood clinic | 3 | 9 |
| December 2, 2015 | San Bernardino, California; workplace | 14 | 21 |
| | Total | 265 | 269 |

*Teen shooters. Total number of mass shootings defined as more than two victims and does not count the assailant whether they were killed or committed suicide. In comparison with the previous 16 years, from 1984 to 1999, the total number of deaths was 135, and wounded was 156.

© 2016 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6

are falsely propagated because of media, uneducated beliefs, and urban legends.[17–19] Therefore, the purpose of this review was to provide the fundamental facts regarding gunshot wounds, ballistics, bullets, and weapons.

## BALLISTICS

Ballistics is defined as the science of mechanics that deals with the flight, behavior, and effects of projectiles discharged from guns. The severity of a bullet wound depends on the characteristics of the bullet (mass, velocity), orientation of the bullet, and the tissue that is impacted. Ballistics is broadly classified into three categories as follows: internal ballistics, external ballistics, and terminal ballistics. Firearms can be weapons, but not all weapons are firearms. However, for the purposes of this review, they will be used interchangeably, and guns and firearms may be referred to as weapons, and vice versa.

### Internal Ballistics

Internal (initial) ballistics is the study of the propulsion of a projectile within a weapon from the propellant's ignition until the projectile exits the barrel. In addition, it involves understanding the acceleration of the bullet within the weapon and the related processes. Internal ballistics is of importance to designers of weapons. It is determined by the type of propellant (gun powder), the chamber (where the cartridge rests before it is fired), and the barrel (rifling and length) of the weapon. Rifling or the groove carved inside the barrel determines the amount of spin imparted to the exiting bullet, which stabilizes flight.







**Figure 1.** Ballistics and trajectory of bullet including pitch, roll, and yaw of the bullet.

### External Ballistics

External ballistics addresses the path (trajectory) of a projectile in flight. It includes the time frame from when a projectile is fired until it reaches its target. Intrinsic factors depending on the type and size of both bullet and weapon along with extrinsic factors such as wind and gravity are key components of external ballistics. After a bullet is fired, the flight of the bullet determines the amount of energy transferred to the object upon impact of the bullet. Gravity and bullet drag caused by friction are the main forces acting on the projectile during its path through the air. Both gravity and friction cause the projectile to lose energy during flight, which in turn affects the ultimate path of the bullet.

The effect of gravity on the trajectory of the bullet in space is commonly known as bullet drop. A bullet commonly travels in a parabolic shaped trajectory whose vertex and distance are determined by the energy of the bullet. As a result, bullets fired at a longer distance need to be fired at a positive angle of elevation (inclination angle) to the line of the target. The path followed by the bullet in space is commonly termed *ballistic trajectory*, which is determined by the energy potential at which the bullet exits the barrel of the weapon (muzzle energy), gravity, and the aerodynamic resistance (ballistic coefficient) on the bullet. Shooters routinely use the knowledge of bullet drop trajectory to accurately hit an intended target at distance. The bullet in flight also experiences yaw, roll, and pitch (Fig. 1).

### Terminal Ballistics

The effects of a projectile on a target are known as terminal ballistics. The type of weapon, type of bullet (size, shape, material), and the type of tissue injured are the most important factors, which determine the terminal ballistics of a weapon.

## UNDERSTANDING THE BASIC PHYSICS BEHIND FIREARM BALLISTICS

There are several important laws of physics that should be considered when discussing the ballistics of firearm injuries.

### Law of Kinetic Energy

The kinetic energy of an object is defined as the ½ mass times the velocity squared

$$KE = \frac{1}{2}mv^2$$

Thus, both mass and velocity contribute to the energy of the projectile. Mass or size of the bullet is directly proportional to the resulting energy, while the square of its velocity is directly related to the overall energy of the projectile. As a result, for a constant velocity, if the mass is doubled, then the energy is doubled. However, the velocity of the bullet is a more important determinant of tissue injury because if the velocity of the bullet is doubled, the energy increases four times (Table 3). Gunshot wounds are classified according to the speed of the projectile, as low, medium, or high velocity. Generally, a low-velocity projectile is defined as 1,200 ft/s, medium as 1,200 ft/s to 2,500 ft/s, and high as greater than 2,500 ft/s.[20] Bullets from handguns are

© 2016 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6

Rhee et al.

**TABLE 3.** Typical Bullet Characteristics of Handgun Rounds and US Big Game Hunting Rifles

| Caliber | Bullet Weight, Grains | Velocity, ft/s | Muzzle Energy, ft lb |
|---|---|---|---|
| .22LR | 38 | 1,000 | 100 |
| .380 | 90 | 1,000 | 200 |
| .38 special | 115 | 900 | 220 |
| 9 mm | 115 | 1,200 | 400 |
| .357 | 125 | 1,500 | 624 |
| 10 mm | 155 | 1,265 | 550 |
| .40 | 115 | 1,180 | 479 |
| .44 mag | 180 | 1,550 | 850 |
| .45 ACP | 185 | 970 | 386 |
| .45 colt | 225 | 800 | 250 |
| .308 | 150 | 2,820 | 2,648 |
| 270 Win | 150 | 2,900 | 2,801 |
| 30-06 | 150 | 2,920 | 2,839 |
| 7 mm | 165 | 2,950 | 3,190 |
| 300 Win Mag | 180 | 2,960 | 3,500 |
| 300 WBY Mag | 180 | 3,190 | 4,005 |
| 375 H + H Mag | 300 | 2,830 | 4,265 |
| 458 Win Mag | 2,380 | 2,380 | 5,030 |

generally less than 1,000 ft/s, while bullets from rifles exceed 2,500 ft/s. The US military commonly uses 5.56-mm bullets, which have a relatively low mass as compared with other bullets; however, the speed of these bullets is relatively fast (Table 4). As a result, they produce a larger amount of kinetic energy, which after contact with the target is transmitted to these tissues.

Muzzle velocity is defined as the speed at which the bullet leaves the barrel of the weapon and is used to calculate the muzzle energy, which equates to wounding potential. It is important to keep in mind that bullets do not accelerate after leaving the barrel of the weapon. A bullet discharged downward does technically accelerate because of forces of gravity, but friction has more of a negative effect on the bullet than the positive effect of gravity. Thus, the kinetic energy of the bullet generally decreases after firing at a logarithmic rate. As a result, the energy of impact on the target object is also determined by the distance of the target object from the muzzle of the gun. The farther an object is from the muzzle of the weapon, the less energy is imparted to that object.

The ballistic coefficient is the efficiency of a bullet in delivering potential energy through the air to its target. Variables that affect the ballistic coefficient include the bullets mass, cross-sectional diameter, density of the bullet, and shape of the bullet, which all determine bullet drag. The bullets' ability to have yaw, pitch, and roll also has some effect on this coefficient. Factors involved in determining the path of a bullet toward its target are many and varied.

### Newton's Third Law of Motion

According to the Newton's third law of motion, for every action, there is an equal but an opposite reaction. When a person is shot at point blank range, the energy felt by the person being shot is the same as the energy of the gun during its recoil. The effect of Newton's third law is on the person shooting the gun who gets a "kick" or "recoil," which is equal and opposite to the direction of the muzzle energy. Typically, in movies, directors often depict the person being shot as absorbing more energy than the shooter (by flying backward through the air) and that is physically not possible.

## AMMUNITION

A round, shell, or cartridge is ammunition for the gun. Modern-day rounds consist of a casing, a primer, propellant, and a projectile. The anatomy of the projectile consists of its material and shape and if it has an outer lining or jacket. The nomenclature of a cartridge is variable and often based on the unique characteristics; for example, the .30-06 Springfield is a 0.30-in-wide military round that was designed at Springfield, Arsenal, Massachusetts, in the year 1906.[21] However, there are considerable variations in the cartridge nomenclature based on the country of use, type of organization, and company manufacturing the cartridge. Generally, in the United States, the caliber (diameter) of a round is measured in hundredths of an inch (0.30 cal = 30/100ths of an inch), whereas in the rest of the world, it is measured in millimeters (5.56 cal = 5.56 mm). Modern-day ammunition thus typically has a brass casing with a primer that detonates upon impact with the firing pin and results in a small explosion. This in turn causes the smokeless powder in the cartridge to burn very quickly, thus producing pressurized hot gasses, which propel the projectile or bullet through the barrel of the gun and out of the muzzle (the open end of the barrel).

**TABLE 4.** Typical Military Weapons and Their Ammunition Specifications

| Military Weapon | Caliber | Bullet Weight, Grains | Velocity, ft/s | Muzzle Energy, ft lb |
|---|---|---|---|---|
| M1 Garand | .30-06 Springfield | 150 | 29,100 | 2,820 |
| M14 | 7.76 NATO | 144 | 2,749 | 2,437 |
| M16 | 5.56 × 45 NATO | 62 | 3,251 | 1,303 |
| M4 | 5.56 × 45 NATO | 62 | 3,251 | 1,303 |
| AR15 | 5.56 × 45 NATO | 62 | 3,251 | 1,303 |
| AK47 | 7.76 NATO | 144 | 2,749 | 2,437 |
| AK74 | 5.45 × 39 NATO | 53 | 2,900 | 979 |

M1 Garand was preplaced by the M14, which was replaced by the M16, which was replaced by the M4. The M4 is similar in capability and function to the M16, but the stock is collapsible. The AR15 is the civilian version of the military assault rifles and does not come from the manufacturer with autocapacity or the three-round burst option. AK47 is Avtomat Kalashnikova. The prototype was developed in 1947 in the Soviet Union by Major Mikhail Kalashnikov, and he also developed the AK74—Avtomat Kalishikov developed in 1974.

© 2016 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6



**Figure 2.** Ammunition, round, shell, or cartridge. 1 indicates bullet; 2, casing; 3, propellant; 4, rim; and 5, primer cap.

## Casing

The casing is typically made from brass, steel, aluminum (or plastic in the case of shotgun shells) containing a propellant, which is a smokeless gunpowder, and the projectile or bullet, which is fit tightly at the end. The neck size, overall length, case body diameter, rim type, case body tapering, bullet weight, and caliber are critical specifications that are specific for a particular type of cartridge. Cartridges are available in various sizes or shapes but are commonly cylindrical with a taper toward the head of the cartridge.

## Primer

Opposite the projectile, the primer is a type of a blasting cap that ignites the smokeless gunpowder when struck by a small metal firing pin (Fig. 2). This initial spark causes a conflagration that results in rapidly expanding gasses and the propulsion of the bullet down the barrel of the weapon. Centerfire and rimfire are the two common designs of a cartridge based on the location of the primer in the cartridge. In a centerfire cartridge, the primer is located in the center of the cartridge in the back of the cartridge, while in a rimfire, the primer is located on the edge. Centerfire cartridges are safer, are more reliable, and can withstand higher amount of pressure without disintegrating in comparison with rimfire cartridges.

## Propellant

The discovery of gunpowder was revolutionary and directly related to the evolution of firearms. Black powder (the first type of gunpowder) was made from mixing sulfur, charcoal, and potassium nitrate. This invention forever changed the civilized world. Black powder was initially used for the creation of fireworks first described in the seventh to the ninth century.[22] The explosive power was used in many ways but soon found its way into weaponry and the creation of guns, cannons, and rockets. In the 13th century, the first primitive firearm was the fire lance, which was made from bamboo or a

metal tube that shots projectiles such as metal objects, pieces of broken porcelain, or darts and arrows. The Chinese used it against the Mongols who then spread the use of gunpowder across Asia, and soon, it spread worldwide through the Middle East and eventually into Europe.

Gunpowder is the most important component of a cartridge that determines the power or energy. Gunpowder was difficult to use because it was messy and dangerous. Large plumes of black smoke had obvious disadvantages, especially for the shooter, as reloading was not very efficient. In 1846, Christian Schönbein,[23] a German chemist, was conducting experiments at his home (against his wife's wishes) when he spilled a mixture of strong nitric and sulfuric acids in his kitchen. He wiped up the mess with his wife's cotton apron and hung it over the stove to dry. This apron ignited and disappeared almost instantly, leaving behind no ashes. What he discovered was nitrocellulose. This material provides less heat and smoke and has much more explosive force per gram compared with black powder. This new "guncotton" was notoriously unstable and thus underwent several generations of changes. During this evolution, scientists also developed the primer, which when compressed, would explode. This invention enabled the modern cartridge to be developed. In 1887, Alfred Nobel obtained a patent for a smokeless gunpowder that he called *Ballistite*.[24] It is believed that the criticism Alfred Nobel bore because of his leading role in the manufacture and sales of weaponry spurred him to donate his wealth to science, both creating the prize that bears his name and simultaneously improving his reputation.

## Projectile/Bullet

The projectile or bullet is the part of the cartridge that exits the weapon and comes in every imaginable shape and size. Bullets are an important part of the damaging potential of a weapon because they affect the kinetic energy imparted to the target tissue. It depends not only on the size and weight



**Figure 3.** Various sizes of bullets and rounds. Variety of cartridges or rounds, from 0.22 cal handgun round, 9-mm hollow point handgun round, 5.56-mm rifle round, 7.63 rifle rounds, 0.50 cal rifle round, average pen for comparison.

© 2016 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 80, Number 6*

Rhee et al.



**Figure 4.** Fully jacketed bullets, on the top row, retain their shape when traversing tissue. Partially jacketed bullets are designed to expand upon entering tissue and thus deliver more of their potential energy to their target.

(density) of the bullet but the on composition of the bullet. The center of the modern bullet is typically made of soft lead because it is cheap, easy to work with, and readily available. The modern-day bullet comes in precise diameters, lengths, mass, shape, and outer jacket, all of these factors help determine the energy and tissue damage imparted to the target (Fig. 3).

## Jacket on the Bullet

The bullet is often covered by a metal jacket that is typically copper, cupronickel, or steel alloy. A full metal jacket round typically refers to the bullet with a soft lead inner core where the front and sides are completely covered by a thin metal. Full metal jacket bullets reduce lead vapor generation, which is better suited for indoor firing ranges. A full metal jacket results in less expansion, fragmentation, and deformation of a bullet when the target is hit reducing tissue injury.[25] The design of the outer jacket of the bullet is central in determining the magnitude of tissue injury and has been a focus of international, military consensus meetings during the past 120 years. The jacket is essential for the bullet traveling more than 2,000 ft/s to prevent deformation and melting from the high temperatures in the barrel. Full metal jacket bullets also reduce vapor generation, which is important for indoor firing ranges. Conceptually, a full metal jacket bullet with less expansion, deformation, and fragmentation may traverse tissue imparting only a portion of its kinetic energy, whereas a partially jacketed bullet deforms and fragments upon entering tissue, increasing retention and transferring more kinetic energy to the tissue (Fig. 4). This concept is relevant because bullets are used in wide circumstances from police handgun bullets, to assault rifles, to small game and big game hunting. Handguns often have semijacketed, hollow point, ballistic tip bullets, which are discussed later in this review. On the other hand, military experts have agreed to minimize devastating tissue injuries by prohibiting bullets that are not fully jacketed. Often attributed to the "Geneva Conventions," the Czar of Russia proposed and arranged a meeting at The Hague in 1899 that included representatives from 26 nations (including the United States). The result was a "Declaration Respecting the Prohibition of the Use of Expanding Bullets"

that is, "abstaining from the use of bullets which expanded or flattened easily in the body." The Hague Convention of 1987 reaffirmed forbidding projectiles that "cause unnecessary suffering."[20]

## Shape

The shape of the bullet determines the flight character, penetration capability, and the behavior of the bullet once it enters the target. The bullet penetrates the body easily due to the laws of physics as the point of the bullet is relatively small. The bullet shape and surface area of the bullet are what determines penetration. Although a pointy bullet or "Spitzer bullet" (from the German word Spitzgeschoss, which means "pointy bullet") confers an aerodynamic advantage, at short range, this is less of an issue. The pointy bullet has a lower drag coefficient, decelerates less, and is more accurate because it is less affected by crosswinds and is more stable in flight. For rifle bullets, there are many configurations such as flat nose, Spitzer, and boat tails, which affect how the bullet acts during flight and in the tissue, as the ballistic coefficient variables such as sectional density and drag are affected by the shape and material. Instability in flight is also important because bullets do have some tendency to pitch and yaw during flight and once in the tissue. The roll or the spin caused by rifling in the barrel helps reduce the instability and highly affects the flight characteristics. Boat-tailed bullets have a sloping end narrowing gently at the base, which reduces the vacuum behind the bullet and thus reduces drag. This reduction in drag will help retain velocity because it is more aerodynamic and is used for long-range shots. Although it is mainly designed to affect the flight characteristics, some falsely believe that it increases the tumbling of the bullet once the target is hit.

Another important variable of shape is the hollow point bullets designed for handguns (Fig. 5). Handguns are for short range, and thus, the flight characteristics are less important. One of the design intents of hollow point bullets is that the hollow point will result in more deformation of the bullet on impact, and thus, more tissue injury will occur, but the main design characteristic is that the deformed bullet is less likely to pass through the body, minimizing the potential of bystander injury.[26] If the bullet deforms and does not pass through the victim, then the entire kinetic energy of the bullet is imparted



**Figure 5.** .380 caliber round next to 9-mm hollow point round next to 9-mm round next to .380 round. When compared side to side, the rounds are different, but when comparing them from the back, the diameter of the rounds is similar.

858

*© 2016 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6

Rhee et al.

TABLE 5. Caliber of Bullets in English and Metric

| Caliber in inches | Conversion to Millimeter | Similar Metric Round | Type of Firearm |
|---|---|---|---|
| .22 | 5.59 | | Handgun and rifle |
| .223 | 5.66 | 5.56 | Rifle |
| .30 | 7.62 | 7.62 | Rifle and machine gun |
| .357 | 9.07 | 9 | Handgun |
| .38 special | 9.65 | | Handgun |
| .380 ACP | 9.65 | | Handgun |
| .40 | 10.16 | 10 | Handgun |
| .44 mag | 11.18 | 11 | Handgun |
| .45 ACP | 11.43 | | Handgun |
| .45 colt | 11.43 | | Handgun |
| 0.50 | 12.7 | | Rifle and machine gun |

ACP, Automatic Colt Pistol.

to the victim. The goal of transferring all of the kinetic energy is in hopes of knocking down the person or "dropping" the person. This is known as "stopping power." Some hollow point bullets are so well designed that the expansion is precise and reproducible such as the "black talon" bullet. This type of modification to enhance wounding capacity is not modern. One of the earliest reports was in 1897 when the British scored the bullets externally to promote fragmentation to stop fanatical Indian Tribesman. The "dum-dum" bullet was developed by the British by removing the jacket at the nose of the bullet to expand (mushroom) on impact to limit penetration and produce a larger-diameter wound for increased incapacitation. At the British military facility, Captain Neville Bertie-Clay developed the Mark IV cartridge, the so-called *dum-dum bullet* (Dum Dum is a city in West Bengal, India). These were the types of bullets that have been banned in warfare by the Hague Convention. During World War I, the Germans also similarly altered their ammunition. A more recent modification highlighted by the shooting of President Regan is the explosive bullet, designed to detonate after the bullet was imbedded in the victim's tissues.[27] The earliest report is attributed to the British in 1822, who designed the bullet with delayed ignition of powder magazines, and these bullets were used in the Civil War. The modern version of this concept is referred to as "Devastator" brand cartridges, which contained small aluminum and lead azide explosive charges designed to explode on contact, and this was used by John Hinckley when he tried to assassinate President Regan in 1981.[28] Hinckley used a Rohm RG-14 0.22 long rifle blue steel revolver and fired six rounds in 1.7 seconds.

## Caliber

The outer diameter of the bullet is the caliber. It can be confusing because nomenclature is large. The system is somewhat cumbersome because English or metric systems are used. The English system measures bullets in hundredths of an inch, and the metric system uses millimeters. A .22LR, L, or S caliber bullet is 22/100th of an inch in diameter. The abbreviations after the diameter stand for long rifle, long, or short, respectively, and denote the power charge and size of the casing

behind the bullet. The .22lr caliber handgun round (the most popular of the .22 caliber cartridges) can be shot in revolvers or semiautomatic handguns or rifles and is a very-low-energy round with a very small bullet. In contrast, the typical round used in military assault rifles are the .223 round (metric system, 5.56 mm). The rifle rounds are either 22.3/100th of an inch or 5.56 mm in diameter (Table 5). Although the caliber of the .223 assault rifle round is similar to the .22 handgun round in diameter, the bullet mass and length are larger and contain much more propellant or smokeless gunpowder. The result is that the assault rifle round has more than four times the muzzle velocity compared with the handgun round and more mass and thus significantly more kinetic energy, even though the calibers are similar (Tables 3 and 4). Similarly, the 9-mm bullets from the most common handgun are 9 mm in diameter. The .380 and .357 bullets (using English dimensions) are similar in caliber to the 9-mm bullet (Fig. 6). Table 1 shows various sizes of the bullets in inches with comparable metric equivalent.

The common English nomenclature handgun rounds are the .22, .38, .357, .40, .44, and .45. Grain is an older standard measure of mass and can refer to the amount of propellant behind the bullet. One grain is equal to 64.79891 mg. Although the .38 special is a common round used in revolvers by the police in the 1960s and 1970s, this round is vastly different from the .357 magnum because of the amount of propellant, even though the diameter of the bullet is similar. President Lincoln was assassinated with a .44 caliber Derringer revolver, President Garfield was assassinated with a .44 caliber Webley Bulldog revolver, and President McKinley was assassinated with a .32 caliber Iver Johnson "Safety Automatic" revolver that was purchased for $4.50.

The .380 is a round used in a semiautomatic handgun that is most well-known for its use by James Bond in the 007 movies. The .380 bullet is similar in diameter to the 9-mm semiautomatic handgun used by law enforcement and the military. Although the diameter may be similar among various bullets, the length and weight of the bullet and the amount of propellant are not normally distinguished in the nomenclature. Ultimately, this equates to the muzzle kinetic energy being different between the .380 and the 9-mm round (Fig. 5).



**Figure 6.** Handgun ammunition is considered low velocity and designed for short-range targets. The bullets vary widely in design; the left is a 50 cal magnum; the right, a 22 cal short.

© 2016 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 80, Number 6*

*Rhee et al.*

It seems that in recent modern era, the kinetic energy of handguns continues to increase.[29]

## THE ANATOMY OF WEAPONS

Modern-day firearms are available in a variety of shapes and sizes and are routinely classified based on their caliber (bore diameter) and the type of used action (revolver, semi-automatic, automatic, bolt action, muzzle loader, etc). Guns are traditionally defined as low velocity and high velocity. Most handguns are considered low velocity, and most rifles are considered high velocity.

### Handguns

Handguns are designed to be handheld. They were conceived as compact weapons primarily to be used for self-defense. Legally, handguns are considered concealable and governed by strict legislations across various states in the United States. Handguns are also considered low velocity. Single-shot pistols, revolvers, and semiautomatic are the three common types of handguns.

### Single-Shot Pistols

Single-shot pistols are capable of holding only a single round of ammunition and are required to be reloaded after each shot. These are a very simple type of handguns that were used regularly in the 19th century. However; currently, these have been largely replaced by revolvers.

### Revolvers

Revolvers have a revolving cylinder containing multiple chambers[5,6] that are capable of firing multiple rounds with a single load. Revolvers are of two types, namely, single action and double action. The single-action pistol requires the hammer to be manually pulled back against a spring with the thumb with the first action. The second action of the trigger being pulled sends the hammer forward striking the firing pin, which strikes the primer of the round in the chamber causing the bullet to fire. Every time the hammer of the revolver is cocked, the revolving cylinder realigns itself to the next chamber and is ready to fire the next round. The double-action revolver enables



**Figure 8.** Semiautomatic pistols. Top gun is Baretta 92FS Brigadier, similar to the weapon used in the military. Bottom gun is Walther PPK, which is small and concealable, popularized in Ian Fleming's novels featuring James Bond 007.

the shooter to pull the trigger (long pull), which cocks the hammer and fires the gun, performing a double action with just one pull of the trigger. A double-action revolver can also function as a single-action revolver when the hammer is cocked back against the spring and the pull of the trigger (short pull) sends the hammer forward striking the pin.

The modern-day revolver such as the .44 magnum (Fig. 7) is a double-action handgun, and all six bullets can be fired with only six pulls of the hammer. In comparison, the single-action revolver such as the Colt 45 peacemaker western style gun used in western movies requires the cocking of the hammer in between every pull of the trigger. Revolvers are simple in design, are cheaper to manufacture, have less moving parts, and are more reliable in performance and operation as compared with semiautomatic handguns. On the other hand, revolvers are limited to five or six cartridges when fully loaded.

### Semiautomatic Pistols

Semiautomatic pistols are a third group of handguns that have a single fixed firing chamber that is located in the rear of the barrel and a magazine so they can be used to fire multiple rounds without the requirement of reloading after each round (Fig. 8). This gun requires a manual chambering of the first bullet to be fired, which is stored in the magazine or clip. The magazine can typically hold 7 to 17 rounds stacked one on top of the other and have a spring to push the rounds upward. The slide of the gun is pulled back against a spring, and this cocks the hammer and loads the first round into the chamber of the gun. When the trigger is pulled (short pull), the hammer strikes a pin that strikes the primer of the round. With the expansion of the gas caused by the conflagration of the propellant, the bullet is propelled forward through the barrel and sends the slide backward, cocking the hammer again, ejecting the expelled



**Figure 7.** This is a 44 magnum revolver handgun, also known as "Dirty Harry," and known for its relatively high muzzle velocity.

*© 2016 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

Case 1:22-cv-11431-FDS   Document 21-1   Filed 01/31/23   Page 287 of 295



**Figure 9.** Bolt action rifle, 300 Weatherby magnum rifle, typically used for wapiti hunting.

shell, and loading the next round into the chamber and barrel. Modern-day semiautomatic pistols have a double-action capability. If a round has been chambered already and the hammer is in the uncocked position, a long pull of the trigger in one action will cock the hammer and send it forward with one long pull. After discharging the first round, the gun is then ready to be fired with a short pull as the discharging and recoiling process cocks the hammer and loads the next round simultaneously. Thus, with a semiautomatic handgun, all the rounds in the bullet can be fired as fast as the trigger can be pulled until the rounds in the magazine are spent. High-capacity magazines that can hold more than 10 rounds were federally banned from manufacture in the United States in 1994, but this ban was allowed to expire and has not been legislatively renewed at the federal level. Eight states currently have bans on these magazines. Consequently, most pistols sold in the United States can hold 7 to 17 rounds, but high-capacity magazines holding up to 30 rounds are easily available.

## Long Arms

Long arms are the category of firearms with longer barrel. These weapons are required to be fired using both hands braced against the shoulder or hips. The barrel length commonly ranges between 10 in and 36 in and is mounted on a stock (wooden, plastic, or metal) that provides the grip while firing the gun. Long arms provide the user more hand grip because of the longer barrel and also higher precision and stability while aiming at a target in comparison with handguns. Rifles and shotguns are the two most commonly available types of long arms.

## Rifles

A rifle is a type of long arm that has helical groove or a distinct pattern of grooves (rifling) cut into the barrel walls. As a result of this pattern of grooving, the term *rifle* was coined to this design of a long arm. Within the barrel, a rifle has raised areas of the rifling commonly called as lands. These lands after coming in contact with the projectile impart a spin or roll to the projectile around an axis corresponding to the orientation

of the gun. This provides gyroscopic stability to the projectile in space and minimizes the projectile from tumbling or deviating from its ballistic path. In addition, this also allows for aerodynamic efficiency of the projectile and helps improve range and accuracy of the gun. The rifling typically is one full twist per foot. This is termed 1:12, but the modern-day assault rifles will come with 1:7 to 1:14.

Rifles come as single shot, bolt action, or semiautomatic or automatic. Traditional hunting rifles were loaded at the breach and had to be reloaded after each shot. Newer hunting rifles and sniper rifles are typically bolt action rifles (Fig. 9). They have a bolt with a handle that is lifted to allow the bolt to come back exposing the chamber, and the round can be placed into the chamber from either above or below with the use of a magazine holding the rounds in a stacked manner. Each round fired requires a manual process of reloading by manually pulling the bolt back, which also cocks the striker against a spring and the forward push of the bolt, and then, twisting and locking the bolt into position readies the rifle to be fired with a short pull of the trigger. Hunting rifles are designed to kill big game animals with ideally a single shot, and thus, the ammunition is relatively bigger compared with handgun ammo (Fig. 10). Muzzle loading rifles are single shot, usually with a .45 or .50 caliber slug (bullet) that is loaded via the end of a barrel.

The semiautomatic rifle, like the semiautomatic handgun, uses the recoil of the fired round to load the next round into the chamber. The semiautomatic rifle fires a round each time the trigger is fired until the magazine or clip is empty. Assault rifles are semiautomatic or fully automatic. An assault rifle is shoulder fired and uses intermediate-sized cartridges in a clip or magazine and may have selective fire between semiautomatic,



**Figure 10.** Big game hunting and military ammunition are high velocity and designed to retain bullet stability for delivering major destructive kinetic energy at longer distances. The top row is typical big game hunting ammunition, ranging on the left a 300 Weatherby magnum to the right a 30.06 Springfield. On the bottom row is typical military ammunition, on the left, an AK47; the middle, an M-4; and the right, an AR15 with a Teflon jacketed bullet.

© 2016 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 80, Number 6*

Rhee et al.

automatic, or even burst fire, which is typically three rounds. Burst fire was developed to save ammunition because typically only the first three rounds will be near the intended target as the recoil aims the gun elsewhere than intended (Fig. 11). A *machine gun* typically refers to an automatic rifle that has its ammunition belt fed. This rifle will shoot continuously as long as the trigger is pulled and stops when the trigger is released or the rounds have been expended. A *submachine gun* is an automatic, magazine-fed weapon that is typically bigger than a handgun but shoots handgun rounds. The effect of being shot with a submachine gun is the same as being shot with a handgun.

## Shotguns

Shotguns are a smooth bore long arms that fire a variety of projectiles from small spherical pellets (birdshot) to large spherical pellets (buckshot) to solid lead projectiles (slugs). Shotguns have an external appearance similar to rifles but differ in the lack of rifling inside the barrel. They exist in breach load, pump (rounds are ejected and the weapon rearmed from a magazine with a pump of the forearm mechanism), lever action (works much like a pump shotgun but uses a lever to extract and chamber shells), and semiautomatic varieties. These have a wide caliber range, from 5.5 mm to approximately 2 cm (Fig. 12). Gauge is the caliber of the shotgun. It is determined by the number of lead balls of equal size that make one pound. A 12-gauge shotgun is the most popular hunting weapon that has a bore diameter equal to the size of 12-lead balls that add up to one pound. As the gauge of the shotgun increases, the caliber





**Figure 12.** *A,* Shotgun ammunition usually contains multiple pellets, varying considerably in number and size, which are designed for short-range targets. On the right are 50 cal lead slugs used in muzzle loading rifles. *B,* Sears-Roebuck semiautomatic shotgun.

of the barrel decreases (Table 6). The most commonly used shotgun shell is the "birdshot" consisting of hundreds of small lead pellets. "OO" double ought buckshot contains only nine pellets, and each has the potential wounding equivalent of a small handgun round, and a "slug" is one large projectile.

Tissue injury is dependent on the kinetic energy of the shotgun shell and the distance between the weapon and the victim.[30] When shotgun wounds occur at close range (<3 yards), the pellets act as a single large projectile. These injuries can be devastating mainly because of the transfer of energy.[31] The energy of the pellets is reduced dramatically over relatively short distances. Compared with the energy measured at the muzzle, at 50 yards, this energy is reduced to approximately 30% to 50% and even more when pellets are used. Shotgun pellets are not aerodynamically efficient or stable. In intermediate range shotgun injuries (3–7 yards), the pellets will spread apart and no longer act as a single projectile. Typically, at this distance, spread will be approximately 12 in, and fascial penetration and multiple solid and hollow viscus injuries are typical. Long-range (>7 yards) shotgun injuries with bird (small) shot will present with many skin wounds over a large area (the whole back, or the entire abdomen and chest) and do not often penetrate the fascia.[32]

Given the relatively large amount of energy imparted to each pellet in a buckshot cartridge as compared with the small amount of energy imparted to each pellet in a birdshot cartridge,





**Figure 11.** *A,* Semiautomatic assault rifle with adjustable stock, scope, heads up sighting system, and laser targeting device. *B,* Same rifle with a different handguard, lighting system, and sling.

**TABLE 6.** US Shotguns

| Caliber | Pellet/Grains | Velocity, ft/s | Muzzle Energy, ft lb |
|---|---|---|---|
| .410 | 88 | 1,825 | 650 |
| 20 gauge | 273 | 1,600 | 1,565 |
| 16 gauge | 383 | 1,500 | 2,000 |
| 12 gauge | 545 | 1,330 | 2,145 |
| 12 gauge | 700 | 1,320 | 2,725 |

*© 2016 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6

*Rhee et al.*

patients shot with buckshot should be thought of as having been shot multiple times with a low-velocity weapon (Table 6). The vast majority of these patients will have visceral injuries requiring surgery even after a long-range buckshot injury, and conservative management is not recommended.[33] Shotguns are commonly used for hunting fast moving birds and smaller animals at intermediate ranges.

## TISSUE DAMAGE

Overall, the effect of tissue injury depends not only on the muzzle kinetic energy, the distance from the muzzle to the victim, and the dissipation of the kinetic energy, that is, whether the bullet is retained or passes through the tissue, but also on the type of tissue encountered by the bullet.

As the bullet hits the target object, the kinetic energy of the bullet is transferred to the target tissue. In addition to the characteristics of the bullet, the type of tissue is key in determining the extent of injury. Skin and lung tissue has low density but is elastic and therefore is injured less compared with muscle, which has higher density and only some elasticity. Similarly, the liver, spleen, and brain have minimal elasticity and thus are more severely injured by a bullet of similar energy. Fluid-filled organs such as the bladder, heart, great vessels, and bowel can transmit kinetic energy more because they are not compressible and can result in bursting the organ. Bullets usually cause fracture and fragmentation of bone because they have minimal to no elasticity and may even produce secondary fragments, which can act as another missile resulting in injury to adjacent tissues.

### Types of Tissue Damage

#### Laceration and Crushing

Laceration or crushing type of injury patterns are generated by shear forces. Bullets do not typically follow a perfect straight line to the target. Rotational forces keep the bullet off a straight axis of flight. Yaw angle is the angle between the longitudinal axis of the projectile and the path of the projectile. When the bullet is travelling with its front end forward, the yaw angle is zero. However, if the bullet yaws 90 degrees, the entire longitudinal axis of the bullet crushes a larger tissue area at point of impact.[34] There are myths that bullets tumble in tissue and that all wounds have undergone similar distortions of gelatin blocks exploding. The tissue that is injured determines the path of the bullet and what it does in the body. It is highly variable.

In contrast to popular opinion, bullets also do not bounce around in the body. In general, bullets do not tumble when the skin is pierced, but high-energy rounds may begin to tumble as energy is dissipated upon travel through deeper tissue. The natural tendency is that the high-energy bullets will become unstable as they decelerate. These bullets may pitch and yaw, and the back end of the bullet may become the leading edge. During this distance, the energy of the projectile is absorbed by the surrounding tissue, causing stretching and tearing of tissue.

In contrast to high-velocity rounds, handgun bullets will generally travel in a relatively straight line and will either traverse the body in a straight line or make one turn if a bone is

hit, in which case the bullet will typically fragment, and trail of fragments and bone can be seen in the general direction of the resulting path. Lacerations are also highly dependent on the deformation of the bullet as with hollow point bullets, which can be designed to splay out with multiple sharp edges, which can slow the bullet down to stop in the tissues, thus transferring all of the kinetic energy and causing more tissue injury because of the sharp edges (Fig. 4).

### Cavitation

A bullet with sufficient energy will have a cavitation effect in addition to the penetrating track injury.[35,36] As the bullet passes through the tissue, initially crushing then lacerating, the space left by the tissue forms a cavity, and this is called *the permanent cavity*. Higher-velocity bullets create a pressure wave that forces the tissues away, creating not only a permanent cavity the size of the caliber of the bullet but also a temporary cavity or secondary cavity, which is often many times larger than the bullet itself (Fig. 13). This temporary cavity depends not only on the energy imparted by the bullet to





**Figure 13.** *A*, Gunshot wound to the posterior neck with large tissue defect. *B*, Wound with surgeons hand in it.

© *2016 Wolters Kluwer Health, Inc. All rights reserved.*

**863**

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 80, Number 6*

Rhee et al.

the tissues but also on the density and elasticity of the tissue that it passes through, causing stretches and tears.[37] This is commonly referred to as blast injury, but the correct terminology is cavitation injury. Skin, muscles, and intestines are absorbers of energy and hence are highly resistant to the development of secondary cavitation. Organs such as the liver, spleen, kidney, and brain, which have relatively low tensile strength, are likely to split or shatter because of the development of temporary cavitation.[38] If the muzzle of the weapon is close enough to the skin (close range), gases from the conflagration of the propellant gunpowder can be blown into the tissue causing additional cavitation with expansion of tissues. High-velocity rounds are much more likely to have significant cavitation injury (Fig. 13). Although the distance traveled by the bullet is relatively short, this high-velocity wound to the back of the neck results in a large tissue defect. Most agree that the more solid and less elastic the tissue, the more profound is the cavitation. Thus, an injury to the thorax will have less cavitation than an injury to the liver. In injuries to the thorax, severe lung injury, when seen, is most likely caused by secondary missiles created by bullet impact and shattering of ribs and the resulting bleeding around the bullet track. When a chest computed tomography is obtained in cases of a gunshot wound to the chest, the fluid-filled tract is caused more by hemorrhage than by cavitation injury. Figure 14 is a transaxial abdominal gunshot wound with a high-velocity weapon; on the patient's right side, the entry wound is barely noticeable, but the exit wound on the left side of the abdomen was approximately 3 cm, and the cavitation effect resulted in evisceration of bowel.

## MYTHS AND FACTS

### Stopping Power

Stopping power is the ability to wound enough to incapacitate the victim where they stand. This is in contrast to lethality, which is killing power. A lethal gunshot wound may



**Figure 14.** Evisceration of bowel through 3-cm exit wound on the left side of the abdomen created by high-velocity weapon (AK47), probably caused by cavitation effect.

take seconds, minutes, or days to kill a person. It is obvious that rapid lethality is determined by what is injured by the bullet such as the brain, heart, or major vessels. Injuries to the spinal column can be lethal if the injury is high enough on the spinal column.[39] Lethal wounds do not necessarily incapacitate immediately. In general, the bigger the bullet, the bigger the gun. However, even the largest handgun does not have the kinetic energy to knock down an average adult. If a person was shot and the bullet did not exit, then all the kinetic energy of the bullet is transferred or absorbed by the person. The energy of the bullet simply does not have enough energy to knock back a person significant distances as portrayed in movies. Because of Newton's third law of physics, if the energy of the bullet was sufficient to cause a victim to be blown backward after being shot, then similarly, the shooter would also be blown back because for every action, there is an opposite and equal reaction. The Hollywood examples of people being shot out of a window as they are blown back are fiction and propagated by continued Hollywood productions. The stopping power of a weapon depends more on where the target was hit than on the energy of the bullet.[40] Videos of people being shot during common convenient store robberies show that the robber or clerk shot through the chest or abdomen can be shot numerous times but can still run a distance before falling. A bullet fracturing a femur would drop a person no matter the size of the bullet. The thought that bigger bullets will have a better stopping power is most likely for the larger-caliber bullets being used in civilian urban settings.[29]

### Big Guns Kick, Little Guns Don't

The "kick" of the handgun (known as recoil) does not knock down the shooter. In general, weapons with larger muzzle energy kick more than lower-energy weapons. However, the kick of the gun depends both on the round that is shot as well as on the weight of the weapon (heavier weapons kick less.) The kick or recoil of the weapon is dissipated as this energy is transmitted in a spring-like fashion to the arms and joints of the shooter. When a hunter shoots a rifle, the energy felt by the shooter is dissipated because of the body's ability to absorb this shock. In addition, most hunting rifles have recoil pads to absorb some of this energy. The shooter of the rifle who shoots a round from standing absorbs the energy, and the energy or recoil is felt in the shoulder. If lying down in a prone position, the energy in the shoulder is higher and felt more than when the shooter is standing because the forces of friction between the shooter and the ground as well as the weight and position of the prone shooter does not allow for as much movement of the body. Thus, a stronger impact on the shoulder is felt. If the hunter were to stand against a big tree or a wall to stabilize themselves with the shoulder against the stationary stabilizer (not recommended), the hunter shooting the rifle would feel the entire force of the energy imparted to the rifle. The effect will be like a hammer impacting an anvil. The shooter who discharges the rifle with his shooting shoulder against an immovable object can have enough energy to cause injury to the shoulder. This type of injury to the shoulder with dislocations and fractures is seen in inexperienced hunters. Handguns dissipate the energy of recoil of the gun at the hands,

© *2016 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

J Trauma Acute Care Surg
Volume 80, Number 6

Rhee et al.

wrist, elbow, and shoulder and will not have as noticeable a kick as a rifle or shotgun.

## Large-Caliber Weapons Are More Lethal Than Small-Caliber Weapons

Lethality depends more on the number of "rounds on target" rather than what gun you are shooting.[41,42] Most experienced trauma surgeons will testify that what part of the body is hit by that gun is more important than the size of the gun. Some enthusiasts believe that a smaller bullet and power can deliver more precision and accuracy. This equates to more "rounds on target." More rounds on target equates to more chances of "knocking down" someone. The larger handguns that impart more energy will generate more recoil as well and thus require more effort to aim and thus affects the number of "rounds on target" with precision and accuracy compared with a smaller weapon with less recoil. The 44 magnum, the gun used by "Dirty Harry" gun (popularized by the actor Clint Eastwood), has a bullet with a diameter of .44 in (Fig. 7) and is similar to the 45 but normally comes with much more grains of gunpowder in the cartridge and has one of the highest amounts of recoil because it has one of the most amount of muzzle energy in a handgun (Table 3). Knock down power thus is affected by what is hit and how many times much more than the caliber of the weapon. It is conceivable that a person charging at the shooter that is shot in the heart may continue with their charge until the cardiac output from the heart is sufficiently reduced. To stop or incapacitate a person immediately, the person has to be shot in the brain, high spinal cord, or bones of the leg, resulting in the person being knocked down or stopping the person in their tracks.[43]

## The Ideal Home Defense Weapon Exists

Much controversy exists regarding which weapon is best for protection. The optimal home defense weapon would incapacitate the desired target yet never cause collateral damage. This weapon does not exist. The typically used 9-mm handgun has been continually challenged as experience has shown that a person shot with this gun does not necessarily stop immediately. The military for years issued a .45 caliber handgun known as the Colt 1911. This gun was made by the Colt firearms company in the year 1911, and thus, the synonym commonly used is the 1911-.45. This handgun was the standard issue during World War I, World War II, Korean War, and the Vietnam Conflict. The Colt 45 or the "peace maker" is a revolver with the same caliber used in most western movies. It is the single-action 45 revolver. This is the gun used by "Billy the Kid" and "The Lone Ranger." The diameters of the western revolver and the semiautomatic pistol are the same and so are the kinetic energy in general as shown in Table 4. Approximately three decades ago, the US military opened up to handgun manufacturers to compete for the contract to replace the Colt 1911 semiautomatic. The winner of the bidding process was Beretta who won the competition with the semiautomatic 9-mm handgun called the *Brigade*. Complaints followed, but many feel that the key issue was that the Beretta was not a US-owned company. However, Beretta 9-mm Brigade has passed the test of time and has been an extremely reliable handgun. Some felt that the gun was not big enough, and many law enforcement including the Federal Bureau of Investigation and the military's Special Forces experimented with the 10 mm, which is equal to the 40 caliber. Although the muzzle energy is greater in the 10-mm round, the difference is not significant enough to change the stopping power. The ability of the bullet to enter but not exit is dependent to a degree on the bullet shape such as the hollow point bullets, but even if retained, it does not have the energy to stop a person.

In military and law enforcement, shotguns are used as close-range combat weapons or as a weapon for self-defense. In fact, it could be argued that the shotgun is the optimal weapon for home defense for individuals with less experience with guns. A shotgun at short range is easier to aim and hit a target, and the delivered wound can be equivalent to an assault rifle (Tables 3 and 4).

## Trauma Surgeons Are Experts in Ballistics and Should Be Expert Witnesses in Court

As seen in this lengthy article, ballistics is an ever-changing and difficult field to master. For example, defining the entrance versus exit wounds of a bullet or multiple bullet injuries can be difficult. Study with trauma specialists found that fatal or exiting gunshot wounds were misinterpreted 52% of the time.[44] Thus, when describing gunshot wounds, it is important to characterize the wounds but not label them as entry and exit wounds (Fig. 14). If the bullet fragments, it is possible that only one part of the fragmented bullet may exit the patient. In these cases, the exit may be smaller than the entry. In scenarios when the bullet enters the skull, the entry may be large, depending on how close of a range the person was shot. It is common that, if the energy of the bullet is sufficient, the entry of the bullet into the brain causes fragmentation of the skull, and this impact causes cavitation, and the entry wound may be larger than the diameter of the bullet.

In addition to entrance and exit wound errors, trauma surgeons often use the word "shrapnel" to describe bullet fragments. This is a misnomer. Shrapnel injuries technically refer to those injured by a Shrapnel shell. These shells, invented by Major-General Henry Shrapnel (1761–1842), a British Army officer and inventor, have not been used since World War I. Thus, no one has been injured by shrapnel in almost 100 years. The shrapnel shell was an antipersonnel artillery munition that has individual bullets or balls that are ejected out of the front when close to the target. There are variants of this used currently such as the beehive munitions and the antiballistic missiles.

## SUMMARY

Gunshot wounds are, by any definition, an epidemic in the United States. We as health care providers need to know about the truths regarding guns, their ballistic bullets, and gunshot wounds. We have to address this silent injury as we seem to ignore it because of its common daily occurrence. Suicides by guns are a major factor in the number of deaths from guns. People attempt suicides everywhere in the world but are particularly successful in the United Stated because guns are ubiquitous.

The statement "*Guns don't kill people, people kill people*" may be true; however, it is difficult to kill with an

© 2016 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6

Rhee et al.

ineffective weapon. Availability of a potentially lethal weapon will increase injury severity. The United States has more guns available than most of the other countries in the world and has more gunshot wounds per annum than any other country in the world not involved in a war within its borders. It is indisputable that where there are guns, there will be gunshot wounds, and where there are more guns, there are more gunshot wounds than where there are no guns. More than 33,800 deaths are reported because of firearm-related injuries in the United States per year, making it one of the top 10 causes of mortality in our country. The rate of firearm ownership per capita in the United States is the highest in the world, which is almost double that of the second highest country on earth.[45,46] In addition, firearm-related injuries also negatively burden the financial system, costing US citizens approximately $100 billion annually. A relative lack of firearm legislation in the United States has been thought to contribute to the burden of firearm-related injuries. The understanding of why our country has so many firearms and what the effects in comparison with other countries and societies is hampered by the (some may say intentional) lack of funding on this topic. Because of concerns regarding increased government controls on freedom and guns, federal-funded research that attempts to understand this problem, firearm injury, epidemiology, violence, and injury prevention is minimal. Pressure exerted by the National Rifle Association, the gun lobby, and even some gun owners apparently is highly effective in preventing research to study or any effective legislation to help understand and perhaps change the course of this epidemic.

People do kill people, but guns are a major factor in this ability. We have to address numerous issues to prevent gunshot wounds including the costs, regulation of weapons, mental health issues, and better enforcement of current regulations while balancing these needs with citizen's rights. As firearms are ubiquitous in our country, knowledge of their wounding power is paramount in the care of the wounded patient.

## DISCLOSURE

The authors declare no conflicts of interest.

## REFERENCES

1. CDC/National Center for Health Statistics. All Injuries (Web site). Available at: http://www.cdc.gov/nchs/fastats/injury.htm. Accessed March 10, 2016.
2. Fowler KA, Dahlberg LL, Haileyesus T, Annest JL. Firearm injuries in the United States. *Prev Med*. 2015;79:5–14.
3. Cook PJ, Luswig J. *Gun Violence: The Real Costs*. New York: Oxford Press; 2002.
4. Los Angeles Times Staff. Deadliest U.S. mass shootings, 1984–2015. *Los Angeles Times*. December 2, 2015. Available at: http://timelines.latimes.com/deadliest-shooting-rampages/. Accessed March 10, 2016.
5. Palazzolo J, Flynn A. U.S. leads world in mass shootings. *The Wall Street Journal*. 2015. Available at: http://www.wsj.com/articles/u-s-leads-world-in-mass-shootings-1443905359. Accessed March 10, 2016.
6. Malina D, Morrissey S, Campion EW, Hamel MB, Drazen JM. Rooting out gun violence. *N Engl J Med*. 2016;374:175–176.
7. Steinhauer J. Mass shootings stoke ideological fighting in Congress. *The New York Times*. 2015. Available at: http://www.nytimes.com/2015/12/04/us/politics/congress-shifts-attention-to-americas-role-in-the-world.html?_r=0. Accessed March 10, 2016.
8. Saks CA. In memory of Daniel—reviving research to prevent gun violence. *N Engl J Med*. 2015;372:874–875.
9. Jena AB, Sun EC, Prasad V. Does the declining lethality of gunshot injuries mask a rising epidemic of gun violence in the United States? *J Gen Intern Med*. 2014;29(7):1065–1069.
10. Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. *J Trauma*. 2002;52(2):267–275.
11. Grinshteyn E, Hemenway D. Violent death rates: the United States compared to other high-income OECD countries, 2010. *Am J Med*. 2016; 129(3):266–273.
12. Chapman S, Alpers P, Agho K, Jones M. Australia's 1996 gun law reforms: faster falls in firearm deaths, firearm suicides, and a decade without mass shootings. *Inj Prev*. 2015;21(5):355–362.
13. Ozanne-Smith J, Ashby K, Newstead S, Stathakis VZ, Clapperton A. Firearm related deaths: the impact of regulatory reform. *Inj Prev*. 2004; 10(5):280–286.
14. Kapusta ND, Etzersdorfer E, Krall C, Sonneck G. Firearm legislation reform in the European Union: impact on firearm availability, firearm suicide and homicide rates in Austria. *Br J Psychiatry*. 2007;191:253–257.
15. Wellford CF, Pepper JV, Petrie CV. *Firearms and Violence: A Critical Review*. Washington, DC: National Academics Press; 2004.
16. Rhee P, Joseppth B, Pandit V, Aziz H, Vercruysse G, Kulvatunyou N, Friese RS. Increasing trauma deaths in the United States. *Ann Surg*. 2014; 260(1):13–21.
17. Haferteen SC, Davis JW, Townsend RN, Sue LP, Kaups KL, Cagle KM. Myths and misinformation about gunshot wounds may adversely affect proper treatment. *World J Surg*. 2015;39:1840–1847.
18. Fackler ML. Civilian gunshot wounds and ballistics: dispelling the myths. *Emerg Med Clin North Am*. 1998;16(1):17–28.
19. Fackler ML. Wound ballistics. A review of common misconceptions. *JAMA*. 1988;259(18):2730–2736.
20. Ragsdale BD. Gunshot wounds: a historical perspective. *Mil Med*. 1984; 149:301–305.
21. .30-06 Springfield [Web page]. Available at: http://www.m1-garand-rifle.com/30-06/. Accessed March 10, 2016.
22. Helmenstine AM. Gunpowder Facts and History. About.com. Available at: http://chemistry.about.com/od/historyofchemistry/a/gunpowder.htm. Updated February 26, 2016. Accessed March 10, 2016.
23. Anonymous. Schonbein, Christian Fredrich. In *The Encyclopædia Britannica*. 11th ed. Vol 24. 1911. Available at: https://en.wikisource.org/wiki/1911_Encyclop%C3%A6dia_Britannica/Sch%C3%B6nbein,_Christian_Friedrich. Accessed March 10, 2016.
24. Oliver FGH. *Artillery: Its Origin, Heyday and Decline*. Hamden, CT: Archon Books; 1969:289–292.
25. von See C, Stuehmer A, Gellrich NC, Blum KS, Bormann KH, Rücker M. Wound ballistics of injuries caused by handguns with different types of projectiles. *Mil Med*. 2009;174(7):757–761.
26. Padrta JC Jr, Barone JE, Reed DM, Wheeler G. Expanding handgun bullets. *J Trauma*. 1997;43(3):516–520.
27. Sykes LN, Champion HR, Fouty WJ. Dum-dums, hollow-points, and devastators: techniques designed to increase wounding potential of bullets. *J Trauma*. 1988;28(5):618–623.
28. Taubman P. Explosive Bullet Struck Reagan, F.B.I. Discovers. *The New York Times*, 1981. Available at: http://www.nytimes.com/1981/04/03/us/explosive-bullet-struck-reagan-fbi-discovers.html?pagewanted=all. Accessed March 10, 2016.
29. Adibe OO, Caruso RP, Swan KG. Gunshot wounds: bullet caliber is increasing, 1998–2003. *Am Surg*. 2004;70(4):322–325.
30. Velmahos G, Safaoui M, Demetriades D. Management of shotgun wounds: do we need classification systems? *Int Surg*. 1999;84(2):99–104.
31. Flint LM, Cryer HM, Howard PA, Richardson JD. Approaches to the management of shotgun injuries. *J Trauma*. 1984;24(5):415–419.
32. Beekley A, Blackbourne L, Sebesta J, McMullin N, Mullenix PS, Holcomb JB; 31st Combat Support Hospital Research Group. Selective nonoperative management of penetrating torso injury from combat fragmentation wounds. *J Trauma*. 2008;64:S108–S117.
33. Wilson JM. Shotgun ballistics and shotgun injuries (Trauma Rounds-San Francisco General Hospital). *West J Med*. 1978;129:149–155.
34. Knudsen PJ, Sorensen OH. The initial yaw of some commonly encountered military rifle bullets. *Int J Legal Med*. 1994;107(3):141–146.

© 2016 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 80, Number 6

35. Stefanopoulos PK, Pinialidis DE, Hadjigeorgiou GF, Filippakis KN. Wound ballistics 101: the mechanisms of soft tissue wounding by bullets. *Eur J Trauma Emerg Surg*. 2015. [Epub ahead of print].

36. Stefanopoulos PK, Soupiou OT, Pazarakiotis VC, Filippakis K. Wound ballistics of firearm-related injuries—part 2: mechanisms of skeletal injury and characteristics of maxillofacial ballistic trauma. *Int J Oral Maxillofac Surg*. 2015;44(1):67–78.

37. Thierauf A, Glardon M, Axmann S, Kneubuehl BP, Kromeier J, Pircher R, Pollak S, Große Perdekamp M. The varying size of exit wounds from center-fire rifles as a consequence of the temporary cavity. *Int J Legal Med*. 2013;127(5):931–936.

38. Oehmichen M, Meissner C, König HG. Brain injury after gunshot wounding: morphometric analysis of cell destruction caused by temporary cavitation. *J Neurotrauma*. 2000;17(2):155–162.

39. Karger B. Penetrating gunshots to the head and lack of immediate incapacitation. I. Wound ballistics and mechanisms of incapacitation. *Int J Legal Med*. 1995;108(2):53–61.

40. Maiden N. Ballistics reviews: mechanisms of bullet wound trauma. *Forensic Sci Med Pathol*. 2009;5(3):204–209.

41. Yetiser S, Kahramanyol M. High-velocity gunshot wounds to the head and neck: a review of wound ballistics. *Mil Med*. 1998;163(5):346–351.

42. Stefanopoulos PK, Filippakis K, Soupiou OT, Pazarakiotis VC. Wound ballistics of firearm-related injuries—part 1: missile characteristics and mechanisms of soft tissue wounding. *Int J Oral Maxillofac Surg*. 2014;43(12):1445–1458.

43. Hanna TN, Shuaib W, Han T, Mehta A, Khosa F. Firearms, bullets, and wound ballistics: an imaging primer. *Injury*. 2015;46(7):1186–1196.

44. Collins KA, Lantz PE. Interpretation of fatal, multiple, and exiting gunshot wounds by trauma specialists. *J Forensic Sci*. 1994;39:94–99.

45. Monteaux MC, Lee LK, Hemenway D, Mannix R, Fleegler EW. Firearm ownership and violent crime in the U.S.: an ecologic study. *Am J Prev Med*. 2015;49(2):207–214.

46. Masters J. US gun policy: global comparisons. Council on Foreign Relations 2016. Available at: http://www.cfr.org/society-and-culture/us-gun-policy-global-comparisons/p29735. Accessed March 30, 2016.

*© 2016 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2016 Wolters Kluwer Health, Inc. All rights reserved.

# EXHIBIT 25

CURRENT OPINION

# Another mass shooting: Time to ban the assault rifle

**Ernest E. Moore, MD**

Another mass shooting wrenches the gut of America, and again we ask … why? As a trauma surgeon for 40 years (and avid hunter for much longer), I am dismayed we remain paralyzed over preventive measures. Mass shootings are fundamentally the net result of a deranged individual, who wants to end the lives of random humans, and the ability for that individual to access an assault rifle. Thus, strategies to mitigate mass shootings should logically focus on these root causes. Few would debate the need for improved mental health care in the United States, but the typical mass shooter is usually not recognized as mentally ill in the community. The increasing threat of terrorists further limits the effectiveness of identifying the deranged shooter prior to the event. Consequently, we are left with the alternative strategy of limiting access to assault rifles.

An assault rifle, by design, is intended to deliver fatal wounds to multiple individuals within a short time period. The recent shootings in Las Vegas testify to the effectiveness of this weapon for this intended purpose. The AR 15, the most commonly used rifle in United States mass shootings, is the civilian version of the military assault rifle (M16 or M4). The effectiveness of the AR 15 is based on the ability to deliver small-sized high-velocity bullets in rapid sequence. A brief review why the physics of firearm ballistics assists with understanding why the AR 15 is devastating in mass shootings.[1] The killing potential of a gun is primarily based on the amount of energy imparted by the bullet when it strikes the body. The bullet energy (kinetic energy [KE]) is equal to one half of bullet weight (mass) times the speed of the bullet when fired (velocity) squared (i.e., $KE = \frac{1}{2} MV^2$). Thus, velocity is the dominant factor in determining the killing potential. The 9 mm handgun is generally regarded as an effective weapon; its bullet travels at 1,200 ft/s and delivers a KE of 400 ft lb. By comparison, the AR 15 bullet travels at 3,251 ft/s and delivers 1,300 ft lb. Tissue destruction of the AR 15 is further enhanced by the phenomenon referred to as cavitation, which is the capacity to destroy tissue beyond the direct pathway of the bullet, and well documented to occur with high velocity (>2,500 ft/s) bullets. For example, a typical 9 mm wound to the liver will produce a pathway of tissue destruction in the order of 1 in to 2 in. In comparison, an AR 15 will literally pulverize the liver, perhaps best described as dropping a watermelon onto concrete.

A confusing but critical concept to those unfamiliar with firearms is the major difference in the energy between an AR 15 and a typical hunting rifle. The KE of a fired bullet will be exerted on the shooter as recoil because of Newton's third law of motion (every action has an equal and opposite reaction). The AR 15 bullet carries 1,300 ft lb, whereas the typical hunting rifle is between 2,600 ft lb and 4,000 ft lb. The excessive recoil of a hunting rifle precludes rapid firing on target because of the obligatory motion of the gun and its impact on the shooter. Thus, while providing ample bullet speed to inflict a lethal wound, the moderate energy of the AR 15 allows shooting on target literally as rapidly as the trigger can be pulled. The efficiency of the AR 15 is further compounded by large capacity ammunition magazines that permit feeding 30 or more bullets into the rifle without reloading. The incredible efficiency of an AR 15 has been well described by survivors of mass shootings.

How do we convince our society that the assault rifle should be banned from public access and limited to military and law enforcement? A common argument is that this weapon is essential for self-defense, particularly for those individuals who lack experience with handguns. However, a shotgun is superior at short range (<15 ft); the typical 12 gauge shotgun will deliver 2,200 ft lb. In fact, for this reason, military and law enforcement use shotguns for close-range encounters. Another argument is that we will be unable to eliminate the AR 15 rifles already in existence in our society. A recent study from Australia[2] reported that a ban on assault rifles in 1996 resulted in no further mass shootings in the ensuing 20 years.

To mitigate the epidemic of mass causality shootings in the United States, a logical first step is the elimination of the assault rifle. This should not be a political issue, but rather a common sense decision based on what is good for society.

### REFERENCES
1. Rhee PM, Moore EE, Joseph B, Tang A, Pandit V, Vercruysse G. Gunshot wounds: a review of ballistics, bullets, weapons, and myths. *J Trauma Acute Care Surg*. 2016;80(6):853–867.
2. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979–2013. *JAMA*. 2016;316(3): 291–299.

Submitted: December 30, 2017, Revised: January 8, 2018, Accepted: January 12, 2018.
From the Department of Surgery, Denver Health Medical Center; and University of Colorado Denver, Denver, Colorado.
Address for reprints: Ernest E. Moore, MD, Department of Surgery, Denver Health Medical Center, 777 Bannock St, Denver, CO 80204; email: ernest.moore@dhha.org.

DOI: 10.1097/TA.0000000000001863

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.