UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

NATIONAL ASSOCIATION FOR GUN RIGHTS,
and JOSEPH R. CAPEN,

        Plaintiffs,

   v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
of Massachusetts,

        Defendant.

Civil Action No. 1:22-cv-11431-FDS

---

### Declaration of John J. Donohue

I, John J. Donohue, hereby depose and state:

1. I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

2. I have attached a copy of an expert report I have prepared, together with a copy of my curriculum vitae. The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my report in this declaration as if set forth in full.

I declare under penalty of perjury on this 25th day of January, 2023 that the foregoing is true and correct.

*John J. Donohue III*

_____

John J. Donohue

## EXPERT REPORT AND AFFIDAVIT OF JOHN J. DONOHUE

I, John J. Donohue, being duly sworn, hereby depose and state as follows, based on my personal knowledge:

1.    I am a citizen of the United States and a Resident of California.

2.     I am over 21 years of age.

### BACKGROUND AND QUALIFICATIONS

3.    I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School.  (A copy of my complete cv is attached as Exhibit A.) After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986.  I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School.  I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), Tel Aviv University, and Renmin University (Beijing).

4.    For a number of years, I have been teaching at Stanford a course on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, and St. Gallen University School of Law in Switzerland. Since gun crime is such an important aspect of American criminal justice, my courses evaluate both the nature of gun regulation in the United States and the impact of gun regulation (or the lack thereof) on crime, which is an important part of my research, about which I have published extensively (as reflected in my c.v.).  I have also consistently taught courses on law and statistics for two decades.

5.    I am a Research Associate of the National Bureau of Economic Research, and an elected member of the American Academy of Arts and Sciences.  I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01 and served as the co-editor (handling empirical articles) of the *American Law and Economics Review* for six years.  I have also served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies.

6.    From October 2011 – December 2018, I served on the Committee on Law and Justice of the National Research Council ("NRC"), which "reviews, synthesizes, and proposes research related to crime, law enforcement, and the administration of justice, and provides an

intellectual resource for federal agencies and private groups."  (See http://www7.national-academies.org/claj/ online for more information about the NRC.)

7.      I filed an expert declaration in each of two cases involving a National Rifle Association ("NRA") challenge to city restrictions on the possession of large-capacity magazines:  *Fyock v. City of Sunnyvale*, United States District Court (N.D. Cal.), January 2014; *Herrera v. San Francisco*, United States District Court (N.D. Cal.), January 2014.

8.      I also filed an expert declaration in a case involving an NRA challenge to Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v. O'Malley*, United States District Court (District of Maryland), February 2014.

9.      In all these cases, the relevant gun regulations have (ultimately) been sustained in the relevant federal appellate courts.

10.      I also filed (June 1, 2017) an expert declaration in a case involving a challenge to California's restrictions on carrying of weapons in public in *Flanagan v. Becerra*, United States District Court (C.D. Cal.), Case No. 2:16-cv-06164-JAK-AS and expert declarations on June 4, 2017 and June 16, 2017 in two separate cases challenging California's ban on the possession of large-capacity magazines: *Duncan v. Becerra*, United States District Court (S.D. Cal.), Case No. 17-cv-1017-BEN-JLB and *Weise v. Becerra*, United States District Court (E.D. Cal.), Case No. 2:17-cv-00903-WBS-KJN.  I filed a supplemental declaration in Duncan (now *Duncan v. Bonta*) on November 8, 2022.

11.      I filed an expert declaration, and provided expert testimony, in a case involving a challenge to New Jersey's restrictions on large-capacity magazines in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:18–cv–10507–PGS–LHG (D.N.J.)

12.      I filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

13.      At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising out of the Sutherland Springs mass shooting that killed 26 in November 2017: *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.).  On December 9, 2020, I submitted an expert report on behalf of the City of San Francisco in a wrongful conviction lawsuit, *Caldwell v. City of San*

*Francisco*, Case No. 12-cv-1892 DMR, United States District Court, Northern District of California, Oakland Division.

14.     I was the main author of the Brief of Amici Curiae Social Scientists and Public Health Researchers in Support of Respondents, which was submitted to the United States Supreme Court on September 21, 2021 in *New York State Rifle & Pistol Association v. Bruen*, Case No. 20-843.

15.     On January 24, 2022, I submitted an expert declaration in *Worth v. Harrington*, a lawsuit in the District of Minnesota (Case No. 21-cv-1348) challenging how Minnesota regulates the concealed carry of firearms by individuals aged 18 to 20.  I was deposed in this case on March 28, 2022.

16.     On May 31, 2022, I submitted an expert declaration in *Meyer v. Raoul*, a lawsuit in the Southern District of Illinois (Case No. 21-cv-518-SMY) challenging how Illinois regulates the concealed carry of firearms by individuals aged 18 to 20.

17.     On September 14, 2022, I submitted an expert declaration in *Viramontes v. The County of Cook*, a lawsuit in the Northern District of Illinois (Case No. 1:21-cv-04595) challenging the Blair Holt Assault Weapons Ban enacted by Cook County, Illinois in 2006.

18.     On October 13, 2022, I submitted an expert declaration in *Miller v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB) challenging how California regulates assault weapons.  This report supplemented my earlier wok in that case which involved submission of an expert declaration on January 23, 2020, followed by testimony on October 23, 2020. during an evidentiary hearing on the Plaintiffs' motion for a preliminary injunction.

19.     On January 6, 2023, I submitted an expert declaration in *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE) challenging how California regulates assault weapons.

20.     On January 6, 2023, I submitted an expert declaration in *State of Vermont v. Misch*, Criminal Division, Docket No. 173-2-19 Bncr in a case challenging magazine-size restrictions for handguns and long-guns.

## SUMMARY OF CONCLUSIONS

21.     It is a sound, evidenced-based, and longstanding harm-reducing strategy virtually uniformly embraced throughout the developed world for governments to place constraints on the

harm that weapons can inflict.  Restrictions on assault weapons and the size of large-capacity magazines (LCMs) sit comfortably in this appropriate regulatory approach and can be expected to reduce deaths and injury from gun violence.

22.    A ban on assault weapons and LCMs would be expected to have little or no effect on the ability of individuals to possess weapons for self-defense in the home but should have a restraining impact on the effectiveness of those who have the criminal intent to kill as many individuals as possible.  The restrictions imposed by the state of Massachusetts that are challenged in this litigation are well-tailored to limit the behavior of criminals engaging in the most dangerous forms of violent criminal behavior, and at the same time are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

23.    The problem of public mass shootings in the United States is a serious and worsening national problem that imposes substantial burdens on the American public far beyond the growing numbers of dead and injured victims that are besieged every year. Since so many of these shootings are committed (or made possible) by previously "law-abiding" citizens with no basis under current law to prevent them from possessing firearms and since such a large proportion of the mass shooters die in the course of their deadly massacres, improved background checks and increased criminal penalties alone cannot adequately address this growing problem.  Moreover, the empirical evidence indicates that another possible policy response – allowing increased gun carrying by the untrained public – rarely generates any benefit by stopping public mass shootings and is indeed self-defeating since it generates substantial increases in violent crime.[1]

---

[1] See Donohue, John, Abhay Aneja, and Kyle Weber, 2019, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," *Journal of Empirical Legal Studies*, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.  The amicus brief submitted to the United States Supreme Court on behalf of "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, September 21, 2021, further discusses the evidence that right-to-carry laws increase violent crime, citing 14 studies that have so found in the last five years. Since that brief was submitted, three additional empirical studies have confirmed the conclusion that increased gun carrying leads to higher violent crime: Van Der Wal, W. M. (2022). Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime. *Statistics and Public Policy*, 9(1):163–174.; Doucette, M. L., Ward, J. A., McCourt, A. D., Webster, D., and Crifasi, C. K. (2022). Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020. *Journal of Urban Health*, pages 1–12.; Donohue, J. J., Cai, S. V., Bondy, M. V., and Cook, P. J. (2022). More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities. Working paper no. 30190, National Bureau of Economic Research.

24.     Indeed, gun massacres fell substantially during the ten years of the federal assault weapons ban, which curtailed the proliferation of both assault weapons and high-capacity magazines, and then rose sharply when the ban was lifted in 2004.  FBI data show that the problem of active shooters inflicting mayhem on the public has been rising substantially since the end of the federal ban. State laws restricting assault weapons and high-capacity magazines have also been shown to reduce mass shooting deaths and overall casualties.

25.     The Plaintiffs' Motion for Preliminary Injunction in this case makes an array of absurd claims about the nature of weaponry over time, but the important point to note is that when the problem of mass shooting began to emerge in the United States, state and federal governments began responding to this growing menace with lawful, appropriate, and effective restrictions on the type of weaponry that both facilitated mass shootings and was attractive to mass shooters. As we learned from the repeal of the federal assault weapons ban, any backsliding on these wise restraints that promote the health, safety, and freedom of Americans would be costly in lives and in devastating firearm injuries.

## DISCUSSION

26.     The Plaintiffs' Motion for Preliminary Injunction states on page 9 that "the Banned Firearms and the Banned Magazines are 'typically possessed by law-abiding citizens for lawful purposes.' Under Heller and Bruen, that is the end of the analysis." While the comment is either intentionally or unintentionally ambiguous, it is important to clarify that the typical law-abiding citizen does not possess any firearm --whether an assault weapon or not, and whether it has a high-capacity magazine or not.  The clear majority of Americans do not own any firearm.

27.     By a wide margin, most Americans do not own guns, and most Americans who do own guns do not own assault weapons.  Both statements are particularly true for Massachusetts residents.

28.     70 percent of all American adults do not own any firearm according to recent survey data.[2] Moreover, many of the 30 percent of Americans who do own firearms, only possess shotguns, hunting rifles, and revolvers and do not possess assault weapons or firearms

---

[2] This is the finding of a June 2021 survey of 10,606 adults by the Pew Research Center. https://www.pewresearch.org/fact-tank/2021/08/04/wide-differences-on-most-gun-policies-between-gun-owners-and-non-owners-but-also-some-agreement/.

equipped with high-capacity magazines of the type covered by the federal assault weapons ban from 1994-2004.

29.    Since assault weapons are only a small fraction of the overall gun supply in the United States, it is clear that only a relatively small minority of Americans owns assault weapons, and most Americans recognize that assault weapons are not important to their self-defense.

30.    The majority of Americans have consistently supported bans on assault weapons for years.  A poll conducted for the *New York Times* from June 17-20, 2016 among a national sample of 1975 registered voters found that 67 percent of Americans favored such a ban.

31.    Less than a year later, a Pew Research Center survey among 3,930 adults (conducted from March 13-27 and April 4-18, 2017) again showed broad opposition to assault weapons.[3]

32.    The Pew survey results released on October 18, 2018 again showed that 67 percent of Americans favored bans on assault weapons and on high-capacity magazines.[4]  The same Pew survey based on interviews from September 3 – 15, 2019 showed that 69 percent of Americans supported a ban on assault weapons.[5] A national survey by Pew Research Center, conducted from April 5-11, 2021 among 5,109 adults found that 63 percent of Americans supported a ban on assault weapons.[6]

33.    Importantly, the *New York Times* also polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy" to ask them what measures would be most effective in dealing with

---

[3] Ruth Igielnik and Anna Brown, "Key takeaways on Americans' views of guns and gun ownership," Pew Research Center, June 22, 2017, http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/.  The authors noted that this poll was conducted *prior* to two of the five deadliest mass shootings in modern US history, which occurred in October and November of 2017: "a staggering [59] people were killed and more than 500 were hurt when [Steven Paddock] opened fire on a Las Vegas concert and at least 26 people were killed in a Texas church" only five weeks later.
[4] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.
[5] Katherine Schaeffer, "Share of Americans who favor stricter gun laws has increased since 2017," https://www.pewresearch.org/fact-tank/2019/10/16/share-of-americans-who-favor-stricter-gun-laws-has-increased-since-2017/ (October 16, 2019).
[6] https://www.pewresearch.org/politics/2021/04/20/amid-a-series-of-mass-shootings-in-the-u-s--gun-policy-remains-deeply-divisive/.

America's mass shooting problem, and an assault weapons ban was deemed overall by this panel to have the highest level of effectiveness among the 20 evaluated measures.[7]

34.  Similarly, American adults consistently support bans on such high-capacity magazines, because it is widely recognized that such accoutrements threaten public security and have little utility for personal defense.  A national survey by Pew Research Center, conducted from April 5-11, 2021 among 5,109 adults found that almost two-thirds of Americans -- 64 percent -- supported a ban on magazines with greater than 10 rounds.[8] This is a consistent and persistent finding:  The Pew survey results released on October 18, 2018 similarly found that 67 percent of Americans favored bans on high-capacity magazines.[9]

**The Growing Problem of Public Mass Shootings**

35.  Although the long-term (pre-pandemic) secular trend in overall crime over the last 25 years has been benign, the opposite is true for the trend in public mass shootings since the end of the Federal Assault Weapons Ban in 2004. As the Third Circuit stated in upholding New Jersey's restrictions on high-capacity magazines, "plaintiffs attempt to discount the need for [governmental weaponry restrictions] by describing mass shootings as rare incidents" gives insufficient weight "to the significant increase in the frequency and lethality of these incidents." Association Of New Jersey Rifle and Pistol Clubs v. Attorney General of New Jersey (3d Cir., December 5, 2018).

36.  According to a report of the Congressional Research Service, there were an average of 2.7 public mass shootings per year in the 1980s rising to an average of 4.5 events per year from 2010 to 2013.[10] Since then things have only gotten worse.

---

[7] The list of 32 academics included not only me, but also many strong gun-rights supporters, including John Lott, Gary Kleck, David Kopel, Carlisle E. Moody, and Eugene Volokh. See, Margot Sanger-Katz And Quoctrung Bui, "How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws," *New York Times*, October 5, 2017, https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html.

[8] https://www.pewresearch.org/politics/2021/04/20/amid-a-series-of-mass-shootings-in-the-u-s--gun-policy-remains-deeply-divisive/.

[9] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.

[10] William J. Krouse & Daniel J. Richardson, Cong. Research Serv., R44126, Mass Murder with Firearms: Incidents and Victims, 1999-2013, at 14-15 (2015), http://fas.org/sgp/crs/misc/R44126.pdf [http://perma.cc/RC4C-SP48]; Mark Follman, "Yes, Mass Shootings Are Occurring More Often," *Mother Jones* (Oct. 21, 2014, 5:05 am), http://www.motherjones.com/politics/2014/10/mass-shootings-rising-harvard.

37.     Writing in May 2018, Louis Klarevas, an Associate Lecturer of Global Affairs at the University of Massachusetts–Boston, noted:

> "Last week's school shooting in Texas marks a new milestone in American history. It's the first time we have ever experienced four gun massacres resulting in double-digit fatalities within a 12-month period. In October 2017, [60] were killed at a concert in Las Vegas. A month later, 26 were killed at a church in Sutherland Springs, Texas. Earlier this year, 17 people lost their lives at a high school in Parkland, Fl. And to this list we can now add the 10 people who lost their lives at a high school in Santa Fe, Texas."[11]

Sadly, the mayhem did not let up in 2019.  In May of that year, 12 were killed in <u>Virginia Beach</u> by a shooter equipped with high-capacity magazines.  In August 2019, a gunman again took advantage of the enhanced lethality of high-capacity magazines to kill <u>23 were killed in El Paso, Texas</u>.  Just 13 hours later, rapid action by police stopped a similarly equipped mass shooter in Dayton, Ohio, limiting the body count to <u>nine killed and 27 wounded</u>.  That same month, 7 were killed and 25 were wounded – again facilitated by high-capacity magazines – in Odessa, Texas.

38.     In response to the growing list of gun tragedies, President Obama signed into law in 2013 the Investigative Assistance for Violent Crimes Act of 2012, which granted authority to the U.S. Attorney General to assist in the investigation of "violent acts and shootings occurring in a place of public use" and in the investigation of "mass killings and attempted mass killings."[12]

39.     To better understand the nature of these threats, the Federal Bureau of Investigation (FBI) in 2014 initiated a study of "active shooter" incidents designed to identify the prevalence of and trend in these events, how they unfolded, what brought them to an end, and other details that would be of assistance to law enforcement (Id.).[13]

40.     In 2018, the FBI announced that the active shooter problem in the United States was growing ominously, as illustrated in Figure 1 below.[14] At that time, I stressed that this

---

[11] Louis Klarevas, "After the Santa Fe massacre, bury the 'good guy with a gun' myth: Armed staffers won't deter shooters or keep kids safe," *New York Daily News*, May 22, 2018, http://www.nydailynews.com/opinion/santa-fe-massacre-bury-good-guy-gun-myth-article-1.4003952.

[12] Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014, at 4.

[13] Note that if an active shooter bent on inflicting widespread casualties is stopped quickly enough, this incident would not appear in a count of "public mass shootings" that required, say, at least four individuals to be shot and killed, not counting the shooter (which is a standard, although not the only, definition of a mass shooting).

[14] https://www.usatoday.com/story/news/2018/06/20/fbi-most-active-shooters-dont-have-mental-illness-get-guns-legally/718283002/.

problem would only be getting worse if significant action was not taken to address it. Sadly, my predictions based on the growing lethality of weaponry in the United States have been fulfilled. As bad as the active shooter problem looked in 2018, it is considerably worse today, as seen in the same FBI active shooter data now extended through 2021 in Figure 2.  Last year, the 61 active shooter incidents were more than double the previous high of 30 in 2017!

**Figure 1**





SOURCE FBI data and the FBI's report on active shooter incidents in the United States in 2016 and 2017

41.     The ominous and steep upward trend in the FBI data charting the growth in active shooter incidents is unmistakable.  Not surprisingly, the number of mass shootings clearly is higher following the termination of the federal assault weapons ban in 2004.  In that year, the

FBI counted 4 active shooter incidents in which 14 died.  Since then, the mayhem has accelerated so much that in 2021 the FBI counted 61 active shooter incidents killing 103.[15]

**Figure 2**



Active Shooter Incidents, 2000-2021

42.    Just in the last two years, the United States has experienced numerous, devastating mass shootings with firearms equipped with high-capacity magazines, including the March 16, 2021 Atlanta spa shootings (8 killed), the March 22, 2021 shooting at King Soopers supermarket in Boulder, Colorado (10 killed); the April 15, 2021 shooting at an Indianapolis FedEx warehouse (8 killed); the May 26, 2021 shooting at a transportation authority facility in San Jose, California (9 killed);[16] the May 14, 2022 supermarket shooting in Buffalo, New York (10 killed); the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children

---

[15]  FBI, "Active Shooter Incidents in the United States in 2021," https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-052422.pdf/view.

[16]  Woolfolk, John; Salonga, Robert; Savidge, Nico; Baron, Ethan (May 27, 2021). "San Jose shooting: VTA gunman was 'highly disgruntled,' had 32 illegal high-capacity magazines". *East Bay Times*. Walnut Creek, California.

and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed), the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded, and the November 22, 2022 shooting at a Virginia Walmart that left 7 dead. These figures do not reflect the countless people injured, both physically and emotionally, and the devastation inflicted on the communities in which they occurred. For example, during the July 4 mass shooting in Highland Park, Illinois, an 8-year-old boy was paralyzed and may never walk again after a bullet severed his spinal cord.[17]

43.     The consequences for the shooter are also severe.  Tellingly, the 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter—a Bushmaster XM-15 semiautomatic rifle—had written, "I am well aware that my actions will effectively ruin my life.  If I'm not killed during the attack, I will go to prison for an inevitable life sentence." [18]

44.     Assault weapons also pose particular dangers and problems to law enforcement. Because of the types of rounds typically fired by assault weapons as well as the muzzle velocities they tend to have, assault weapons are "capable of penetrating the soft body armor customarily worn by law enforcement."[19]  The ability to fire rapidly also allows criminals to more effectively engage with responding police officers, even from a significant distance.[20]  Empirical research by the Violence Policy Center shows that "one in five law enforcement officers slain in the line of duty was killed with an assault weapon," despite the relative rarity of assault weapon use in crime in general.[21]  Christopher S. Koper et al. find that assault weapons, virtually all of which were assault rifles, "accounted for 13.2% of the firearms used in [police murders]" from 2009-2013 (note that this excludes cases involving the officer's own firearm).[22]  Many law

---

[17] NBC Chicago, *Cooper Roberts, Boy, 8, Paralyzed in Highland Park Shooting, Continues to Push Forward, Mother Says*, Dec. 19, 2022, https://www.nbcchicago.com/news/local/cooper-roberts-8-year-old-paralyzed-in-highland-park-shooting-continues-to-push-forward-mother-says/3026490/.

[18] Ashley Parker, Tyler Pager, and Colby Itkowitz, "From Sandy Hook to Buffalo and Uvalde: Ten years of failure on gun control," *Washington Post*, May 22, 2022; Jesse McKinley, Jonah E. Bromwich, Andy Newman and Chelsia Rose Marcius, "Buffalo Suspect Planned Attack for Months, Online Posts Reveal," *The New York Times*, May 16, 2022; Craig Whitlock, David Willman, and Alex Horton, "Massacre Suspect Said He Modified Bushmaster Rifle to Hold More Ammunition," *Washington Post*, May 15, 2022.

[19] Brown Decl. ¶ 23, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).
[20] Kyes Decl. ¶ 15-17, *Worman v. Healy*, 293 F. Supp. 3d 251 (D. Mass. 2018).
[21] Violence Policy Center, *Officer Down: Assault Weapons and the War on Law Enforcement,* May 2003, *available at* http://www.vpc.org/studies/officer%20down.pdf (last visited Oct. 12, 2018) at 5.
[22] Christopher S. Koper et al. 2017, Finding at 317.

enforcement officers and agencies report that the possibility of encountering criminals with assault weapons necessitates that they spend a great deal of time and resources preparing for such encounters.[23] Both the February 2018 mass killing at Parkland High School and the May 2022 mass killing in Uvalde, Texas – where police delayed entering the school during a shooting – vividly underscored how police responses to violence are impaired when the officers are confronted by a shooter armed with an assault rifle.

### The Importance of the Instrumentality Effect

45.    Decades of research has shown that there is a considerable variation in the survivability of a gun assault depending on the instrumentality employed.  A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would survive."[24]

46.    A meticulous study by Anthony Braga and Phil Cook in 2018 has powerfully confirmed this instrumentality effect.  Braga and Cook examined the files of 511 gunshot victims kept by the Boston Police Department and found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound.  Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased—even though the caliber was not correlated with observable indicators of the intent and determination to kill by the shooter.  The shooter's use of a medium caliber handgun (.38, .380, and 9 mm) more than doubled the odds that the wounded victim would die compared to small caliber handguns (.22, .25, and .32).  Large caliber handguns (.357 magnum, or greater) more than doubled the odds of death compared to medium caliber handguns.

47.    The authors conclude that:

> The results here support the view that the intrinsic power and lethality of the weapon had a direct effect on the likelihood that a victim of a criminal shooting died.  For Boston, in the period studied here, simply replacing larger-caliber guns with small-caliber guns with no change in location or number of wounds would have reduced the gun homicide rate by 39.5 percent.  It is

---

[23]Brady Center to Prevent Gun Violence 2008 at 4-6.
[24] The description of the Zimring study comes from Braga and Cook (2018), infra, note 6.

plausible that larger reductions would be associated with replacing all types of guns with knives or clubs (p.8, Braga and Cook 2018).[25]

48.    Of course, the conclusion of the Braga and Cook study—that switching to less deadly firearm options could reduce firearm deaths—applies directly to bans on assault weapons and high-capacity magazines.  The greater the lethality of the weapon, the more killed and injured in active shooter incidents.  This was clearly illustrated in a study for the *Journal of the American Medical Association* that examined deaths and injuries documented in the FBI Active Shooter Database from 2000-2017.[26]  The authors found that deaths and injuries were substantially higher for the 61 active shooter incidents using a semiautomatic rifle versus the 187 episodes using some other firearm.  Specifically, in the incidents in which the shooter employed a semi-automatic rifle the average number killed or wounded was 9.72 versus only 5.47 killed or wounded when other firearms were used.  (Note that the authors excluded the horrific Las Vegas shooting from the numbers above, since that case was so extreme, with 60 killed and almost 500 wounded—all with semi-automatic rifles.)

49.    Indeed, if one looks at the deadliest acts of intentional mass violence in the United States since 9/11, they all share one feature.  The killer in every case used an assault weapon and/or a firearm equipped with a high-capacity magazine.  Table 1 provides a list of these most deadly mass violence incidents, with the numbers killed ranging from 13 – 60 in these mass shooting spasms of violence aided by the greater lethality afforded by these weapons and accessories formerly banned by the federal government and currently banned under Massachusetts law.  (Eleven incidents are listed because there were two killings tied for tenth with 13 killed.)

---

[25] Anthony A. Braga and Philip J. Cook, "The Association of Firearm Caliber with Likelihood of Death from Gunshot Injury in Criminal Assaults," *JAMA Network Open*. 2018; 1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536.

[26] Elzerie de Jager, et al., "Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States," *JAMA*. 2018;320(10):1034-1035. doi:10.1001/jama.2018.11009, https://jamanetwork.com/journals/jama/fullarticle/2702134.

**Table 1. The 11 Deadliest Acts of Intentional Violence in the U.S. since 9/11**

| Deaths | Date | Location | Used Assault Weapons and/or High-Capacity Magazines |
|--------|------|----------|-----------------------------------------------------|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ |
| 32 | April 16, 2007 | Blacksburg, VA | ✓ |
| 27 | December 14, 2012 | Newtown, CT | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ |
| 23 | August 3, 2019 | El Paso, TX | ✓ |
| 21 | May 24, 2022 | Uvalde, TX | ✓ |
| 17 | February 14, 2018 | Parkland, FL | ✓ |
| 14 | December 2, 2015 | San Bernardino, CA | ✓ |
| 13 | April 3, 2009 | Binghamton, NY | ✓ |
| 13 | November 5, 2009 | Fort Hood, TX | ✓ |

50.     In addition to the well-documented increase in overall public mass shootings in the United States, there has been an equally dramatic rise of these events in school settings.[27] Indeed, the authors of a study on mass school shootings – written before the May 2022 shooting at Robb Elementary School in Uvalde, Texas left 21 dead – concluded in 2018 that "More people have died or been injured in mass school shootings in the US in the past 18 years than in the entire 20th century."[28] The impact of the elevated stress experienced by students and parents across the country as the reality of America's tragic mass shooting problem penetrates their consciousness

---

[27] Antonis Katsiyannis, Denise K. Whitford, Robin Parks Ennis. Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society. *Journal of Child and Family Studies*, 2018; DOI: 10.1007/s10826-018-1096-2.

[28] Springer, "Rapid rise in mass school shootings in the United States, study shows: Researchers call for action to address worrying increase in the number of mass school shootings in past two decades." *ScienceDaily*, 19 April 2018. <www.sciencedaily.com/releases/2018/04/180419131025.htm>.

is undeniable. While these horrendous gun massacres are relatively rare, each one harms tens of millions beyond those killed or wounded at the scene.

51.     Indeed, consider the impact of the following student response to a recent mass shooting at a Texas high school:

> "It's been happening everywhere," student Paige Curry said after a gunman's attack at Santa Fe High School … killed [ten and wounded ten]. Asked if there was a moment where she felt as though the shooting could not be real, could not be actually happening at her school, Paige shook her head. "No, there wasn't," she said with a small hitch in her voice.  "I've always kind of felt like eventually it was going to happen here, too," she said. "So, I don't know. I wasn't surprised, I was just scared."[29]

This is the reality of modern America: fear over the prospect of mass shootings for millions of students and their parents throughout the U.S.  While mass shootings are rare, each one harms tens of millions if not hundreds of millions beyond those killed or wounded at the scene.

52.     The FBI's analysis of active shooters over age 18 found that 65 percent had no adult convictions prior to the active shooting event.[30]  Moreover, the FBI report found that only a tiny fraction would have qualified as "adjudicated mental defectives" that would have been barred from possessing weapons.[31]  In other words, the lack of a basis for prohibiting gun ownership under current law for most active shooters means that tighter background checks would not have likely blocked their homicidal objectives.

53.     The *Wall Street Journal* analyzed data from the 32 school shootings since 1990 with at least three victims dead or injured.[32]  In 25 cases, the shooters were in their teens or younger. Of the 20 cases in which information was available, 17 of the shooters obtained their guns from their home or a relative.  In other words, law-abiding citizens who possess weapons

---

[29] Adam Carlson, "'I've Always Felt Like Eventually It Was Going to Happen Here, Too,' Says Texas Shooting Survivor," People, May 18, 2018, https://www.yahoo.com/entertainment/apos-ve-always-felt-eventually-174424389.html.

[30] Silver, J., Simons, A., & Craun, S. (2018). A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 – 2013. Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 20535.

[31] The Gun Control Act of 1968 prohibits gun possession by felons and adjudicated "mental defectives" (18 U.S.C. §922 (d) (4) 2016).

[32] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," (April 5, 2018), https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600.

equipped with high-capacity magazines can and do unwittingly assist their young children and relatives who take their lethal weaponry to commit mass shootings.

54.     Nor can we hope to limit these horrific crimes by elevating the probability of apprehending mass shooters once their crime is completed since almost all mass killers are either captured, commit suicide, or are killed at the scene.[33]  Tellingly, the recent 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter — a <u>Bushmaster XM-15</u> semiautomatic rifle equipped with high-capacity magazines – had written, "I am well aware that my actions will effectively ruin my life. If I'm not killed during the attack I will go to prison for an inevitable life sentence."

55.     Note the contrast of a school attack in China that occurred only hours before Adam Lanza used an assault weapon armed with 30-round magazines to kill 26:  while 22 children and an adult were injured in the attack in China, no one died – a likely result, at least in part, of the attacker using a knife instead of an assault weapon.[34]

56.     Consider the assassination attempt on the life of Ronald Reagan by John Hinckley on March 30, 1981. Hinckley fired six shots with a six-shot .22 caliber revolver – striking Reagan and three others (White House Press Secretary James Brady in the head, Metropolitan Police Officer Thomas Delahanty in the neck, and Special Agent Tim McCarthy in the abdomen as he turned to shield the president).  Hinckley was tackled after he had emptied his gun, and all four of the wounded victims survived the attack.[35]

57.     A similar attempt today would likely by far more devastating -- as a modern semi-automatic pistol with 15 or more bullets would have enabled the assassin to fire off many more rounds, hitting many more victims and delaying the opportunity to stop his attack.  Moreover, as careful research has demonstrated, a typical 9 mm pistol round would have been far more lethal

---

[33] According to the FBI, in 156 of the 160 episodes, the mass shooter was either captured, committed suicide (64 cases), or was killed (30 cases). Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014.  Of course, those who are captured alive are already punished as severely as the law allows, and the abundant number of mass shootings in Texas and Florida highlights the inefficacy of the death penalty in addressing this problem.

[34] Mallory Ortberg, "Man Arrested in China After Knife Attack on Students," http://gawker.com/5968740/man-arrested-in-china-after-knife-attack-on-students.

[35] U.S Secret Service, Forty Years Since the Assassination Attempt on President Reagan, https://www.secretservice.gov/reagan40thanniversary.

than a .22 caliber round[36] and the likelihood that individual victims would suffer more bullet wounds – which occurs with high-capacity magazines -- would also enhance the risk of death.

**The Far-Reaching Costs of Public Mass Shootings**

58.    The large number of overall gun homicides compared with mass shootings should not obscure that major public mass shootings cause profound social damage.  This harm of course includes the tragic deaths and extraordinarily devastating injuries, but extends far beyond these mere statistical counts of the fatal and non-fatal casualties. Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. Horrific mass shootings – such as those perpetrated by Adam Lanza at Sandy Hook School (killing 26), Stephen Paddock in Las Vegas (killing 59 and shooting 422 others), or by ISIS sympathizers at Inland Regional Center in San Bernardino (killing 14)[37] and at Pulse in Orlando (killing 49)[38] or at various houses of worship in Charleston, South Carolina (killing 9), Sutherland Springs, Texas (killing 26), and Pittsburgh, Pennsylvania (killing 11) – although small in number compared to the total number of homicides, have generated widespread apprehension and increased demand for effective responses from government.  It is abundantly clear that the horrors of mass shootings -- such as the killing of 20 students and 6 teachers at Sandy Hook Elementary School in Newtown, Connecticut in December 2012; the killing of 19 elementary school students and two teachers in Uvalde, Texas; and 10 individuals who died in a

---

[36] An inspired study by Anthony Braga and Phil Cook in 2018 that examined the files of 511 gunshot victims kept by the Boston Police Department found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound.  Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased – a victim was twice as likely to die from a wound from a 9 mm pistol than from a .22 caliber revolver.

Two studies have found that the fatality rates of those victims hit by more than 1 bullet were more than 60% higher than the fatality rates of gunshot wound victims who were hit by only a single bullet. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. Arch Surg. 1992;127(6): 694–698;  Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. J Quant Criminology. 2001; 17(1):81–88.

Not surprisingly, analyses of gunshot wound victims at level I trauma centers suggest that high-capacity magazines are associated with higher rates of multiple bullet wounds per victim. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. J Trauma Acute Care Surg. 2014;76(1):2–9; Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. J Trauma Acute Care Surg. 2017;84(1):58–65.

[37] Christine Hauser, San Bernardino Shooting: The Investigation So Far, N.Y. Times (Dec. 4, 2015), http://www.nytimes.com/2015/12/05/us/san-bernardino-shooting-the-investigation-so-far.html (noting fourteen were killed in December 2015).

[38] Gregor Aisch et al., What Happened Inside the Orlando Nightclub, N.Y. Times (June 12, 2016), http://www.nytimes.com/interactive/2016/06/12/us/what-happened-at-the-orlando-nightclub-shooting.html (noting a gunman killed forty-nine in a June 2016 attack).

hate crime in Buffalo, New York, both in May 2022 -- have inflicted psychological distress far beyond the contours of those small communities and indeed caused suffering throughout the entire country (and the world).

59.     A considerable scientific literature has documented the significant emotional and mental health harms that mass shootings inflict on survivors, community members, wounded victims, active responders, and children. The consistent finding of these studies is that mass shootings can lead to increased levels of post-traumatic stress disorder (PTSD), anxiety, and depression.[39] For example, on February 14, 2008, Steven Kazmierczak opened fire in a crowd of Northern Illinois University students, killing 5 people and wounding 17 more before killing himself. This shooting led to dramatic increases in the levels of post-traumatic stress (PTS) symptoms in a sample of Northern Illinois University students.[40]

60.     Similar findings of the broad social damage from mass shootings were also documented in three studies of the broader harm from the 2011 Norway shooting, when Anders Breivik killed 68 people at a Youth Camp and wounded at least 32. Four to five months following the shooting, survivors were six times more likely to exhibit elevated PTS symptoms compared to an age- and gender-adjusted sample derived from the overall population.[41] But the psychic trauma was not limited to the victims and survivors of mass shootings.  Two additional studies, which focused on the broader harm to the surrounding community following the Breivik shooting in Norway, found measurable increases in stress reactions in the general population, with the effects especially strong for young people with a prior history of trauma.[42] Sadly, we

---

[39] Shultz, James M., Siri Thoresen, Brian W. Flynn, et al. 2014. "Multiple Vantage Points on the Mental Health Effects of Mass Shootings." *Current Psychiatry Reports.* 16:469.  To complete this meta-analysis of the scientific literature from 2010 to early 2014, the authors searched the PUBMED, SCOPUS, PILOTS, PSYCINFO, and CINAHL databases using combinations of terms for mass shooting incidents with MeSH (Medical Subject Heading) vocabulary on mental health.

[40] Bardeen, Joseph R., Mandy J. Jumpula, and Holly K. Orcutt. 2013. "Emotional regulation difficulties as a prospective predictors of posttraumatic stress symptoms following a mass shooting." *Journal of Anxiety Disorders* 27, no.2 (March): 188-196. This longitudinal study assessed the presence of PTS symptoms in a sample of female undergraduates at Northern Illinois University at three time points: T1, the starting period (pre-shooting) (n=1,045), T2, short term post-shooting (17-100 days post-shooting, n=691), and T3, roughly 7-8 months post-shooting (n=588). In the sample of 691 students that were assessed at T1 and T2, clinically significant levels of PTS rose from 20% pre-shooting to almost 50% post-shooting.

[41] Dyb, Grete, Tine K. Jensen, Egil Nygaard, et al. 2014. "Post-traumatic stress reactions in survivors of the 2011 massacre on Utoya Island, Norway." *The British Journal of Psychiatry* 204, no. 5 (May): 361-367. Of the 490 survivors from the Utoya shooting invited to participate in the study, 325 agreed. Semi-structured face-to-face interviews were conducted by health personnel approximately 4-5 months after the shooting.

[42] Thoresen, Siri, Helene Flood Aakvaag, Tore Wentzel-Larsen, et al. 2012. "The day Norway cried: Proximity and

must remember that Breivik wrote in his manifesto that he was grateful that he was able to purchase ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him since these were not available to him in Europe.

61.     More generally, survivors of serious gunshot injuries and multiple victim incidents involving intentionally inflicted harm are at higher risk of experiencing PTS symptoms.[43]

62.     Not surprisingly, those who have experienced previous trauma or psychological disorders are especially vulnerable to potential mental health problems after a mass shooting.[44] Moreover, children are more susceptible experiencing PTS symptoms following a mass shooting. For example, a study of 320 students who survived a mass public shooting at a Danish high school found that seven months later 35 percent of students reported PTS symptoms and 7 percent had PTSD.[45]

---

distress in Norwegian citizens following, 22nd July 2011 terrorist attacks in Oslo and on Utoya Island." *European Journal of Traumatology* 3, (Nov). The study drew a representative sample from the Norwegian Population Registry. A total of 465 individuals living in Oslo and 716 individuals living in other parts of Norway were interviewed over the phone 4-5 months after the Breivik attacks.

Nordanger, Dag, Kyrre Breivik, Bente Storm Haugland, et al. 2014. "Prior adversities predict posttraumatic stress reactions in adolescents following the Oslo terror events 2011." *European Journal of Traumatology* 5, (May). The study was based on a survey of 10,220 Norwegian high school students that was conducted 7 months after the Oslo and Utoya terrorist attacks. It collected information both on adverse life experiences (e.g. exposure to sexual trauma, violence, etc.) and the exposure and reactions to the Breivik attacks.

[43] Greenspan, Arlene I., and Arthur L. Kellerman. 2002. "Physical and Psychological Outcomes 8 Months After Serious Gunshot Injury." The Journal of Trauma: Injury, Infection and Critical Care 53, no.4 (Oct): 709-716. This study interviewed 60 patients who were admitted to a Level 1 trauma center for firearm-related injuries, first, at the time of their hospitalization, and second, 8 months after they were discharged. Most respondents indicated symptoms of PTS 8-months post-discharge, with 39% reporting severe symptoms of intrusion and 42% reporting severe avoidance behaviors.

Santiago, Patcho N., Robert J. Ursano, Christine L. Gray, et al. 2013. "A Systematic Review of PTSD Prevalence and Trajectories in DSM-5 Defined Trauma Exposed Populations: Intentional and Non-Intentional Traumatic Events." *PLoS One* 8, no. 4 (April). The authors identified 2,537 articles published from January 1, 1998 to December 31, 2010 and covering longitudinal studies of directly exposed trauma populations. Of these articles, they closely surveyed 58 articles that met the DSM-5 definition of having experienced a traumatic event and assessed PTSD symptoms at two or more time points within a 12-month window. The authors found that in the 5 studies with sufficient data, a median of 37.5% of individuals exposed to intentional traumatic events developed PTSD.

[44] See Shultz et al (2014), supra note 39, and Littleton, Heather, Amie E. Grills-Taquechel, Danny Axsom, et al. 2012. "Prior Sexual Trauma and Adjustment Following the Virginia Tech Campus Shooting: Examination of the Mediating Role of Schemas." *Journal of Psychological Trauma* 4, no.6 (Nov): 579-586. This study had interviewed 215 Virginia Tech college women prior to the school's mass shooting and then followed up with them two months and then one year after the shooting. The authors compared the post-shooting PTSD and depression symptoms of women with and without a history of sexual trauma.  The authors found that women who had experienced sexual trauma reported significantly higher levels of depression (p=0.006) and shooting-related PTSD symptoms (p=0.04) in the post-shooting interview.

[45] Elklit, Ask, and Sessel Kurdahl. 2013. "The psychological reactions after witnessing a killing in public in a Danish high school." *European Journal of Traumatology* 4, (Jan). Seven months after the mass public shooting, researchers administered the Harvard Trauma Questionnaire to Danish students in the second and third grade of high school (this is roughly equivalent to the final two years of high school in the US system). The questionnaire was also

63.     A recent study of broad scope by Maya Rossin-Slater et al (2019) tries to estimate the impact on mental health of the over 240,000 American students who experienced and survived a school shooting in the last two decades. Using large-scale prescription data from 2006 to 2015, the authors examined the effects of 44 school shootings on youth antidepressant use in a difference-in-difference framework. Their main finding was that local exposure to fatal school shootings increased youth antidepressant use by 21.4 percent in the following two years.[46] Given such evidence, any notion that the problem of public mass shootings in the U.S. is relatively minor is untenable. With only 5 percent of the world's population, the U.S. has roughly one-third of the public mass shootings across 171 countries since the late 1960s.[47]

**Banning Assault Weapons Saves Lives and Reduces Injuries**

64.     The objective of Massachusett's assault weapons ban is to reduce the prevalence of weapons that will be most attractive to mass killers and most effective for committing mass murder or the type of rapid, sustained deadly fire that would be most advantageous for criminal purposes.  In other words, there are two dimensions of assault weapons that are highly problematic in civilian hands: their dangerous symbolic and cosmetic features as well as their capacity to assist in mass killing. The zealous, pro-gun Texas politician Jerry Patterson – author of the 1995 Texas law that first allowed concealed carry of handguns – recognized the importance of the symbolic and cosmetic appeal of these weapons when he acknowledged that the primary value of an AR-15 in civilian life is to be "a look-at-me gun."[48] Unfortunately, no one desires this symbolic feature more than mass shooters, who frequently express the view that assault weapons will finally make others realize they are powerful.  Moreover, as Senator Mark Warner noted in referring to a new proposed federal assault weapons ban, we must "recognize that the features and tactical accessories that define assault weapons under this legislation were designed for a specific purpose — to give soldiers an advantage over the enemy, not to mow

---

mailed to parents' addresses of students who had graduated in June. Of the 415 students enrolled at the time of the shooting, 320 students returned the questionnaire.

[46] Maya Rossin-Slater, Molly Schnell, Hannes Schwandt, Sam Trejo, Lindsey Uniat, Local Exposure to School Shootings and Youth Antidepressant Use, NBER Working Paper No. 26563 (December 2019), https://www.nber.org/papers/w26563.  See also, "My son survived Sandy Hook. It's changed me as a parent," *The Washington Post,* December 13, 2019,  https://www.washingtonpost.com/lifestyle/2019/12/13/i-cry-high-school-meets-how-sandy-hook-changed-me-parent/.

[47] Lankford, Adam, "Public Mass Shooters and Firearms: A Cross-National Study of 171 Countries," *Violence and Victims,* Vol 31, Issue 2, DOI: 10.1891/0886-6708.VV-D-15-00093, http://connect.springerpub.com/content/sgrvv/31/2/187.

[48] Rachel Monroe, "Are Texas Republicans Budging on Gun Control?" *The New Yorker* (June 16, 2022).

down students in school hallways."[49] The ominous and growing problem of mass public shootings since 2013 convinced the Virginia Senator to reverse his prior opposition to an assault weapons ban.

65.     Rifles that incorporate military-style features add to their capacity to enhance the death toll in a public mass shooting event:  pistol grips and thumbhole stocks enable easier spray-firing; a collapsible or folding stock allows the weapon to be shortened and more easily concealed;[50] and barrel shrouds are essential for mass shooters to continuously fire their weapons without suffering discomfort from an overheated barrel.[51] As a consequence, these attributes make these weapons particularly appealing to mass shooters, drug traffickers, and people who may want to exchange fire with law enforcement.[52]

66.     Assault weapons, at least of the long gun variety, tend to have higher muzzle velocities than ordinary handguns.[53] They also tend to utilize .223 rounds designed to fragment and mushroom in a person's body, as illustrated in the 60 Minutes video referenced below at footnote 85.[54] These two factors in conjunction mean that injuries from being shot by assault weapons tend to cause more complex damage to the body in ways that make these wounds more dangerous and deadly in both the short and long term.[55]

---

[49] Mark Warner, "I voted against an assault weapons ban. Here's why I changed my mind," *The Washington Post*, October 1, 2018,
https://www.washingtonpost.com/opinions/i-voted-against-an-assault-weapons-ban-heres-why-i-changed-my-mind/2018/10/01/3bfa76a0-c594-11e8-9b1c-a90f1daae309_story.html.

[50]Erica Goodejan, "Even Defining 'Assault Rifles' Is Complicated," *The New York Times* January 16, 2013, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

[51]*See* Rovella Aff. ¶¶ 34-38, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); H.R. Rep. No. 103-489 (1994) at 18-19.

[52] *See* H.R. Rep. No. 103-489 (1994) at 14-16; Brady Center to Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem*, October 7, 2008, *available at* http://www.bradycampaign.org/resources/assault-weapons-mass-produced-mayhem (last visited Oct. 12, 2018) at 3; Batts Decl. ¶¶ 33, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017).

[53]*See* Defs' Stmt. Docket Entry 63 ¶¶ 44–45, 58–59, 61, 64–65, *Worman v. Healey*,1-17-CV-10107, 293 F. Supp. 3d 251 (D. Mass. 2018).

[54]*See* Batts Decl. ¶¶ 44-45, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017); Rovella Aff. ¶¶ 39, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); Duncan Long, *The Complete AR-15/M16 Sourcebook* (2d ed.), 2001 at 50; Colwell Decl. at 2-4, *Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018).

[55] *See* Colwell Decl. in Supp. of Defs.' Opp. to Mot. for Prelim. Inj. ¶ 8.

**Banning High-Capacity Magazines Saves Lives and Reduces Injuries**

67.    Louis Klarevas, the author of Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016), has become the primary authority on research concerning mass shootings in the United States. Klarevas finds that the use of large-capacity magazines leads to more bullet wounds for victims (thereby substantially increasing the death toll of those who are shot), results in more shots fired (thus increasing the number of individuals who are shot) and reduces the capacity of potential victims to flee to safety or take effective defensive action.

68.    Klarevas was the first to highlight that the ten-year federal ban on assault weapons and high-capacity magazines reduced the toll from mass shootings. Klarevas illustrated that the pattern of the deadliest mass shootings changed over the period from 1984-2014.  Examining gun massacres in which at least six were killed, Klarevas found that these incidents and the number of resulting deaths fell during the decade in which the federal assault weapons ban was in place and then rebounded when the ban was lifted in 2004.

69.    Specifically, Klarevas found that, from 1994-2004, there were only 12 incidents – slightly over one per year – due to assault weapons, resulting in 89 deaths.  In the following decade, when the federal assault weapons ban was no longer in place, there was a dramatic surge in both the number of gun massacres and the total death toll: From 2004-2014, the number of gun massacres rose from 12 to 34 and the number of gun deaths jumped from 89 to 302. Moreover, since overall crime was trending down over this period, the link between the expansion of high-capacity magazines following the lapse in the federal assault weapon ban and the increased number of gun massacres is further buttressed.

**Figure 3**



# Gun massacres fell during the assault weapons ban

Gun massacre (6+ deaths) incidents and fatalities in the decades before, during and after the federal assault weapons ban of 1994

Source: Louis Klarevas
THE WASHINGTON POST

70.     Since the Klarevas data ended in 2014, I conducted my own study both to verify the accuracy of his findings and then to extend the analysis forward to the present.  In implementing his definition of a gun massacre as a mass shooting incident in which 6 or more people died, Klarevas notes in his book that "It doesn't matter if there is one gunman or several gunmen. It doesn't need to occur in public. It can be for any reason whatsoever." In my study, I chose to use the *Mother Jones* database, which does limit the gun crimes to killings occurring in a public place and omits killings related to armed robbery, gang activity, or domestic violence in accord with recent FBI practice.  I augmented the Mother Jones data whenever I found it had missed relevant mass shootings that appeared in other mass shooting databases.

71.     Figure 4 below shows the number of incidents of such gun massacres and the deaths resulting therefrom based on these criteria.[56] The figure illustrates clearly that the number and deadliness of these mass shootings dropped during the ten years of the federal assault weapons ban from September 1994 through 2004 and rose sharply after the federal ban was lifted.[57] Although the number of incidents is too limited to highlight the 25 percent drop in gun massacres, the 40 percent drop in overall fatalities during the period of the federal ban is substantial and noteworthy.

72.     After the federal ban lapsed in 2004, the gun market was flooded with increasingly more powerful weaponry that allowed mass killers to kill ever more quickly with predictable results.  The decade after the ban elapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward (reflected in the dotted line in Figure 4).  In other words, my independent assessment confirms the pattern first revealed by Louis Klarevas: gun massacres fell during the assault weapons ban and rose sharply when it was removed in 2004.

73.     What has happened since 2014 is even more alarming. In five years, the number of fatalities in these gun massacres has already topped the previous high that occurred during the first decade after the federal assault weapon ban was removed. This murderous leap has occurred at the same time that overall violent crime persisted on a downward trend, as the dotted line in Figure 4 confirms.[58] If we continue at the post-2014 pace until 2024, the last column of Figure 4 shows that we will have an astonishing order of magnitude increase in gun massacre deaths over a 20-year period.[59]

---

[56] Figures 1 and 2 are replicated from John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV and discussed further in John Donohue, "The Swerve to 'Guns Everywhere:' A Legal and Empirical Analysis," *Law and Contemporary Problems*, (forthcoming, February 2020).  See also the earlier piece: John Donohue and Theodora Boulouta, "That Assault Weapon Ban? It Really Did Work," *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html.

[57] The Federal Assault Weapons Ban took effect September 13, 1994, and expired on September 13, 2004, due to a sunset provision that enabled the law to lapse after President George W. Bush reneged on his campaign promise to support retention of the federal ban.

[58] This downward trend in violent crime even as mass shootings rise after 2004 is important evidence of the harmful impact of ending the federal assault weapons ban.  Without that evidence one might mistakenly think that the overall violent crime drop of roughly 14 percent during the decade of the federal assault weapons ban was simply part of downward crime which itself explains the drop in mass shooting deaths. The experience after 2004 undermines that view.

[59] Note that the numbers of mass shootings would be substantially larger using alternative definitions, such as the Gun Violence Archive definition of *four individuals wounded by gunfire in a single incident*.  Using that more

74.     The evident effectiveness of the ten-year federal ban in reducing mass shooting deaths is exactly what we would expect, since during that decade mass killers could not simply enter a gun store and buy a weapon with a large capacity magazine, as they can do in most of the U.S. today.[60]

75.     Figure 5 illustrates the average number of fatalities in each mass shooting for the same four periods shown in Figure 4.  The pattern is the same:  fatalities per incident fell during the federal assault weapon ban and have risen sharply thereafter.  With the weaponry available to citizens getting increasingly more potent and plentiful, the average number of people who die in every incident has increased by 90 percent since the decade after elimination of the federal assault weapons ban.

76.     Assault weapons and/or high-capacity magazines were used in all 15 gun massacres since 2014 in which at least six were killed (other than the shooter) shown in Figure 4; all 272 people who died in these 15 gun massacres were killed by weaponry prohibited under the federal assault weapons ban (as well as the comparable Massachusetts ban).[61]

---

capacious definition, there have been 366 mass shootings in the first 318 days of 2019, killing 408 and injuring 1477. https://www.insider.com/number-of-mass-shootings-in-america-this-year-2019-8.

[60] With the adoption of a new law in Illinois this week, 9 states and the District of Columbia ban assault weapons and all of those states plus Colorado and Vermont restrict the permissible size of ammunition magazines.

[61] After Figure 4 was created another victim of the Las Vegas shooting died after two horrendous and agonizing years as a quadriplegic, which elevates to 272 the number of deaths form public gun massacres in the last five years. The following article highlights some of the devastating injuries that result from being shot by an assault rifle, such as that used by the Las Vegas shooter. https://www.kptv.com/news/vancouver-woman-says-sister-injured-in-las-vegas-shooting-has/article_af9198c6-099c-11ea-87c1-37de7096726f.html.

**Figure 4**



Gun Massacres Were Less Frequent And Less Deadly During The Federal Assault Weapons Ban
(six or more killed, not including perpetrator)

Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place, except for the last column, which ends in 9/2/2019. Violent crime rate data from UCR;  dots mark ten-year averages, except for the last dot, which ends in 6/2018.

**Figure 5**



77.     This instrumentality effect was further demonstrated in an article I authored with Phil Cook since my 2019 Report, demonstrating that the federal assault weapons ban—which banned both new semi-automatic assault rifles with certain features that made them attractive to mass shooters *and* new ammunition magazines that could hold more than ten rounds— suppressed deaths in public mass shootings.[62]  Figure 6 below shows that the deaths that occurred from these public mass shootings over the period from 1985-2019 in five year increments.  The Figure highlights that by the second half of the ten-year existence of the federal assault weapons ban (1999-2004), fatalities from public mass shootings using banned weaponry had virtually been cut in half (falling from 30 down to 16).  Conversely, there was no decline in public mass shooting deaths over this period with non-banned weaponry.

---

[62] Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," *JAMA*. 2022; 328(12):1191-1192. https://jamanetwork.com/journals/jama/fullarticle/2796675.

**Figure 6**



Victim Counts for Mass Public Shootings in the United States, 1985 - 2019
Using Assault Weapons and/or High-Capacity Magazines versus Other Firearms

in the last five year period, the 18 incidents with the more lethal weapons were far more deadly than the 14 incidents with the less lethal firearms.

78.     After the federal ban lapsed in 2004, the deaths from public mass shootings using the previously banned weaponry rose sharply:  rising from 16 in the last five years of the federal ban to 271 in the five-year span from 2015-2019—with the latter figure 17 times as high as the former.  Meanwhile, there was relatively little movement in public mass shooting deaths using the less-lethal weaponry (neither an assault weapon nor a high-capacity magazine).  Indeed, as Figure 6 illustrates, there was roughly the same number of deaths from less lethal weaponry in the five-years prior to the federal assault weapons ban (1990-1994) as there was from 2015-2019—specifically 83 in the pre-ban period and 81 in the final period.

79.     Figure 6 also highlights that while there was a roughly comparable *number of incidents* of public mass shootings that used either the most lethal (previously federally banned) weaponry or less lethal firearms not subject to the federal ban, the incidents involving assault weapons and/or high-capacity magazines were far more lethal.  Specifically, the 18 public mass shootings conducted with the most lethal weapons killed 271 (roughly 15 deaths per episode),

while the 14 public mass shootings with the less lethal firearms killed 81 (about 5.8 deaths per episode).

**Restrictions on Assault Weapons Reduce Mass Shooting Deaths and Casualties**

80.     Table 2 provides an original econometric analysis of Mother Jones mass shootings data from 1982-2019 to assess empirically whether assault weapons bans at the state and federal level have limited mass shootings deaths and overall casualties.  This analysis reveals that such bans do generate statistically significant reductions in mass shooting deaths and casualties.

81.      This panel data analysis simultaneously examines data from all 50 states and the District of Columbia from 1982-2019 to ascertain what happens when federal or state bans on assault weapons and/or high-capacity magazines go into effect or are eliminated.  The statistical model specifically controls for national influences on mass shootings that occur each year ("year effects") as well as the stable differences in mass shooting rates across states ("state effects").[63] This panel data model also controls for a variety of criminal justice, socio-economic, and demographic factors that could also influence violent crime.[64]

82.     Table 2 indicates that having an assault weapon ban (whether at the state or federal level) and/or high-capacity magazine ban in place in a given state is associated with a statistically significant decrease in per capita rates of deaths and casualties due to mass shootings.[65]  Overall, this analysis serves to further reinforce and expand upon earlier findings that bans on assault weapons and high-capacity magazines save lives.

---

[63] This is a population-weighted, state-level two-way fixed effects regression.

[64] The controls include the lagged incarceration rate in each state for each year, the lagged police employee rate, real per capita personal income, the unemployment rate, poverty rate, beer consumption, the percentage of the population living in MSAs, and six demographic variables (based on different age-sex-race categories).  This statistical model is described in greater details in Donohue, John, Abhay Aneja, and Kyle Weber, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

[65] The model also suggests that these gun safety restrictions suppress the rate of mass shooting incidents and injuries, although the evidence is statistically weaker for these dependent variables although the injury-alone effect is statistically significant at the .10 level.

**Table 2**

*The Effect of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings,*
*1982-2019*

|  | Mass Shooting [a] *Incidents* per 10,000,000 Population | Mass Shooting *Deaths* per 1,000,000 Population | Mass Shooting *Injuries* per 1,000,000 Population | Mass Shooting *Casualties* [b] per 1,000,000 Population |
|---|---|---|---|---|
| Assault Weapon or High-Capacity Magazine Ban [c] | -.07 (0.05) | -.09** (0.04) | -.22* (0.12) | -.31** (0.15) |

Notes: Outcome variables are based on *Mother Jones*' database of mass shootings in the 50 states plus Washington DC from 1982 to 2019. The OLS regressions also included the socioeconomic control variables used in DAW 2019 as well as state and year fixed effects. The coefficients on these variables were omitted from this table to conserve space. Regressions are weighted by each state's 1999 population, and standard errors are clustered at the state level.

[a] Mass shootings are defined as attacks in public places in which four or more victims were killed.

[b] Casualties are defined as people who were either injured or killed during a mass shooting.

[c] The variable "Assault Weapon or High-Capacity Magazine Ban" is assigned a value of 1 for each state-year for which either an assault weapon ban or high-capacity magazine ban was active, and 0 for all other state-years.

* p<0.1; ** p<0.05; *** p<0.01

83.     One of the unfortunate consequences of the continuing advances in the lethality and power of modern firearms is that without appropriate government action the dangers posed by civilian weaponry will continue to outpace any legitimate crime-reducing benefit that firearms might provide.  The lesson of the November 2017 massacre at the Sutherland Springs Baptist

Church in Texas highlights the growing dangers.  The killer in that case used an AR-15 that was modified to include a laser scope and features that could allow large capacity magazines to be more quickly reloaded to maintain a relentless barrage.  The killer stood outside the church and fired straight through the walls of the church as he strafed along at just above the top of the levels of the church pews, allowing him to shoot 254 shots from **outside** the church in a matter of minutes on his way to killing 26 men, women, and children.  No portable weapon in civilian hands at the time of the adoption of the Second Amendment could possibly generate this degree of destruction so rapidly.  The evident social harms will only grow as gun technology increases firearm lethality.

84.    The tragedy that first brought mass shootings into the public consciousness is often thought to be the 1966 reign of death from the top of the University of Texas memorial tower when Charles Whitman used scoped hunting rifles to kill 14 and wound 32.  Whitman was an expert Marine marksman, perched in a very protected space to continue his barrage, and it took him 90 minutes to produce this level of mayhem.  Fast forward to November 5, 2009, and Nidal Hasan, an inexperienced shooter, was able to fire 214 times at Fort Hood in less than 10 minutes with a faster shooting handgun equipped with high-capacity magazines, killing 13 and also wounding 32.[66]  The August 4, 2019 attack targeting a Dayton, Ohio bar district lasted only 32 seconds, yet armed with a 100 round drum magazine, the shooter was still able to kill nine and shoot 17 others.[67]

85.    By 1981, as we saw with the Hinckley attempted assassination of Reagan, the US had not moved into the era of pervasive possession of modern weaponry, which was launched by both the increased advertising of assault rifles and the move towards modern pistols with high-capacity magazines that was catalyzed by the advent of the Glock 9 mm semiautomatic pistol, introduced into the U.S. market in 1986.  These developments were accompanied by the U.S. gun market's fixation on ever bigger magazines and growing military-style appearance and enhanced lethality, turning mass shootings from once in a decade events in the 1960s and 1970s

---

[66] Lee Hancock, The gun Nidal Hasan used to kill at Fort Hood, Jun 17, 2011, https://www.dallasnews.com/opinion/commentary/2011/06/17/lee-hancock-the-gun-nidal-hasan-used-to-kill-at-fort-hood/.

[67] Although the shooter had previously been suspended from high school for making hit lists of students he wanted to rape and kill, he met the gun industry definition of a responsible, law-abiding citizen who should be able to purchase the weaponry he employed to commit mass murder. Biesecker, Michael; Carr Smyth, Julie (August 5, 2019). "Classmates: Ohio shooter kept a 'hit list' and a 'rape list'". Associated Press.

into the growing menace that they have become today. As the problem grew in the 1980s, government efforts at the state and federal level began, with the only serious national effort designed to address the problem coming in 1994 with the passage of the federal prohibition of new assault weapons and high-capacity magazines.  While the ten years in which this federal ban was in place did restrict mass shootings, the lapsing of the federal ban and the continued expansion of these weapons has correlated tightly with the growing menace of mass shootings.

86.     The dramatic increases in gun massacre incidents and fatalities closely tracks the growth in U.S. sales of previously federally banned weaponry that was ignited by the expiration of the federal assault-weapons ban in 2004, the removal of potential liability on the part of gun merchants, and intense advertising of the militarized upgrades, ranging from high-capacity magazines to flash suppressors, that stimulated the demand for this highly dangerous consumer product. Josh Sugarmann, executive director of the Violence Policy Center, notes that "The end of the assault-weapons ban allowed for the customization and modification of these weapons to make them look even more militaristic, even more grand in the eyes of their owners."[68]

87.     Research published following the mass shootings in Buffalo, New York and Uvalde, Texas killing a total of 31 in May 2022 further confirms these findings.[69]  Specifically, an analysis of mass shooting data by a group of injury epidemiologists and trauma surgeons reached the following conclusion:

> We calculated that the risk of a person in the U.S. dying in a mass shooting was 70% lower during the period in which the assault weapons ban was active. The proportion of overall gun homicides resulting from mass shootings was also down, with nine fewer mass-shooting-related fatalities per 10,000 shooting deaths.

88.     Another empirical study that examined high-fatality mass shootings killing at least six victims between 1990 and 2017 similarly concluded that "LCM bans have been effective at saving lives" by reducing the incidence of and deaths in these mass shootings.[70]  The authors found that:

---

[68] Quoted in Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

[69] Klein, Michael, 2022. Did the assault weapons ban of 1994 bring down mass shootings? Here's what the data tells us, *The Conversation*, June 8, 2022, https://theconversation.com/did-the-assault-weapons-ban-of-1994-bring-down-mass-shootings-heres-what-the-data-tells-us-184430.

[70] Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *Am J Public Health*. 2019;109(12):1754-61. doi: 10.2105/ajph.2019.305311.

89.     Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

**Industry Advertising Appeals to Potential Mass Shooters**

90.     A year after the lapsing of the federal assault weapons ban, the Protection of Lawful Commerce in Arms Act (PLCAA) was passed, which provided gun manufacturers with near-blanket immunity from suits based on the criminal misuse of their products.  This emboldened a torrent of consumer advertising designed to highlight the battlefield appeal of modern assault weapons, and sales soared in response.  The dramatic rises in gun massacres followed.

91.     These advertising campaigns reveal exactly how the gun industry sought to market assault weapons:  they are hawked with explicit depictions of combat and phrases like "The closest you can get without having to enlist."[71]

92.     Unsurprisingly, a growing number of mass killers turn to these assault rifles when they launch their deadly onslaughts. Moreover, an industry survey of civilian assault-rifle ownership "reveals that the average civilian assault-rifle owner keeps a small arsenal, owning three or more of the guns; 27 percent of owners have bought four or more. [Unfortunately,] many civilian assault-rifle owners fail to secure their arms; nearly one owner in five does not lock up his rifle, and more than 30 percent take no care to secure their ammunition."[72] In other words, a very substantial fraction of owners of assault rifles act irresponsibly, thereby exposing their weapons to loss or theft and resulting criminal misuse. For example, the weapons used by Adam Lanza to kill his mother, Nancy Lanza, and in the Newtown shooting were owned by his mother – a pattern that has repeated itself all too often as the *Wall Street Journal* noted (see footnote 32, above).

---

[71] *Id.*

[72] The NSSF periodically conducts research on civilian assault rifles intended for gun sellers, and these figures are from their latest survey. Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

93.     The makers of the Bushmaster assault rifle Nancy Lanza owned and that her son Adam Lanza used to gun down first-graders and teachers in Newtown was sold under the slogan "Forces of opposition, bow down." While such weapons are designed for and appropriately used by trained military personnel and law enforcement, they are exceedingly dangerous when wielded by mentally unstable civilians.

94.     While the United States does not have a higher rate of mental illness than other advanced industrialized nations, it certainly has a higher rate of public mass shootings. This is in part because young men are saturated in a gun culture created by advertising designed to exploit their weaknesses.

95.     In their Motion for Preliminary Injunction, the Plaintiffs quote the oft-repeated but clearly erroneous gun industry assertion that "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." Stenberg v. Carhart, 530 U.S. 914, 1001 (2000) at n. 16 (Thomas, J., dissenting). The truth is exactly the opposite.

96.     Throughout the 1980s the gun industry marketed AR-type rifles as "assault" weapons because this marketing promoted sales. The image below of a Guns & Ammo magazine cover highlighting assault rifles in July 1981 is just one of the numerous such advertisements and gun industry publications concerning assault weapons that one can find on the web throughout the 1980s.[73] Only when the increase in civilian ownership of these weapons was followed by outrage over (and fears of potential tort liability for) prominent mass shootings did the industry shift away from that direct terminology in its advertisements (while continuing to market guns with appeals to their military character).

---

[73] See, https://www.democraticunderground.com/126210025.

**Figure 7**

Cover of the July 1981 Issue of Guns & Ammo[74]



97.    Consider the following Bushmaster advertisement for the gun that Adam Lanza used, and imagine the impact it could have on someone struggling with substantial mental health problems:

---

[74] Reproduced from the *New York Times*, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

**Figure 8**



98.    Notably, while Lanza used a Savage Mark II bolt-action .22-caliber rifle to kill his sleeping mother, he chose the much more dangerous Bushmaster assault weapon with 30-round magazines that enabled him to fire 154 bullets over the 264 seconds in his lethal rampage at Sandy Hook School.[75] We can surmise that if he had only a bolt action hunting rifle, he could not have fired as many bullets and many lives would have been spared.

99.    The impact of the gun industry's efforts to exploit messages about assault weapons directed at those with deep insecurities and even mental health issues showed up in another recent mass shooting.

---

[75] Coalition to Stop Gun Violence, "What Adam Lanza Took, and Didn't Take, to Sandy Hook Elementary," https://www.csgv.org/adam-lanza-took-didnt-take-sandy-hook-elementary/ (last visited on October 22, 2018).

**Figure 9**



100.    The nineteen-year old killer of 17 at Parkland High School (on February 14, 2018) was moved to post the above NRA image on his Instagram account.  He stated in a recording that he had had enough of being told what to do and was tired of being called "an idiot." "I am nothing. I am no one, my life is nothing and meaningless. With the power of the A.R., you will know who I am."

101.    Industry advertisements of guns "for the 'warrior' in you" undoubtedly enhance sales, but they convey an entirely inappropriate message to a civilian population.[76] The marketing strategy of gun sellers that exploits the fantasies of young men leads troubled individuals like the Sutherland Springs mass shooter to highlight their attachment to their weapons:  he posted a picture of his AR-15 with the heading "She's a bad bitch" shortly before he killed 26 in Texas in 2017.[77]

---

[76] E-mail advertisement by the U.S. Concealed Carry Association, September 8, 2022.

[77] Seventeen-year-old Kyle Rittenhouse was drawn to the illegal purchase of the AR-15-style rifle he used to kill two and maim one because it "looked cool." Donohue, "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," *The Conversation*, December 6, 2021, https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-

102.    Of course, banning assault weapons does not eliminate the threat from troubled individuals, but since these weapons are particularly attractive to troubled potential mass killers and specifically designed to facilitate the most rapid and effective annihilation of all intended targets, bans on assault weapons is not only prudent but indeed indispensable in any governmental effort designed to effectively address the mass shooting problem in America.  A brief discussion of how and why the AR-15 came to be chosen as the primary military combat weapon used by the U.S. in Vietnam explains why.

**The Army Adopts the AR-15 for Battlefield Use**

103.    In 1957, the Army invited Armalite's chief gun designer, Eugene Stoner, to produce a lightweight, high-velocity rifle, that could operate in both semi- and full-automatic modes with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards." Stoner devised the AR-15 to meet these specifications. The Advanced Research Projects Agency (ARPA) –today known as DARPA – was so impressed with the AR-15's value as a combat weapon that it pushed to have 1,000 rifles shipped for use by South Vietnamese troops and their American special-forces trainers in 1961.

104.    The performance of this new assault weapon was assessed in a confidential ARPA report in July 1962, stating "The AR-15 Armalite rifle has been subjected to a comprehensive field evaluation under combat conditions in Vietnam."[78] The report noted that "The lethality of the AR-15 and its reliability record were particularly impressive."[79] The wounds generated by this weapon were prodigious: "At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC [(Viet Cong)] with 3 rounds [of Caliber .223] with the first burst. One round in the head-took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter. It cannot be determined which round killed the VC but it can be assumed that *any one of the three would have caused death*."[80]

105.    The report enumerated the wounds in a Ranger ambush of a Viet Cong position, including: a back wound that "caused the thoracic cavity to explode"; a buttock wound that

---

the-rittenhouse-verdict-172741.

[78] Advanced Research Projects Agency, Office of the Secretary of Defense, *Field Test Report, AR-15 Armalite Rifle*, at 4 (July 31,1962,). Retrieved October 12, 2018 from http://www.dtic.mil/dtic/tr/fulltext/u2/343778.pdf
[79] Id. at 15.
[80] Id. at 22 (emphasis added).

"destroyed all tissue of both buttocks"; and finally "a heel wound," where "the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip." All the deaths were "instantaneous," "except the buttock wound. He lived approximately five minutes."[81]

106.    The "phenomenal lethality" of the AR-15 described by ARPA led the Army in December 1963 to adopt the AR-15 – rebranding it the M16.

107.    Of course, the civilian AR-15 lacks the fully automatic (and burst) mode of the M16, but it still retains all the other aspects that made it such a valuable lethal weapon for deadly combat. In fact, the Army's own Field Manual states that semi-automatic fire is the "most important firing technique during fast-moving, modern combat," noting, "It is surprising how devastatingly accurate rapid semi-automatic fire can be."[82] In other words, saying that this semi-automatic assault weapon is not a weapon of war because it doesn't have fully automatic capacity is like saying that a conventional bomber is not a war plane because it isn't carrying a nuclear payload.  Indeed, the ability to convert a civilian AR-15 into a fully automatic weapon – or the near fully-automatic capacity that Stephen Paddock used in the Las Vegas shooting of a year ago – is yet an additional factor that renders it unusually dangerous.

108.    According to one of its designers, the AR-15 assault rifle was originally engineered to generate "maximum wound effect." "It's a perfect killing machine," says Dr. Peter Rhee, a trauma surgeon and retired Navy captain.[83]

109.    Rhee was the doctor who saved the life of Arizona Rep. Gabby Giffords after she was shot in the head with a handgun fired during a mass shooting in 2011. According to Rhee: "A handgun [wound] is simply a stabbing with a bullet. It goes in like a nail. [But with the AR-15,] it's as if you shot somebody with a Coke can."

110.    The identical message was conveyed by one of the emergency room doctors who treated some of the pulverized victims of AR-15 wounds inflicted during the catatostrophic Parkland shooting that killed 17 and wounded 17 others in a span of four minutes.[84]  The CBS show 60 Minutes also provided a dramatic experiment to illustrate the far more destructive

---

[81] Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/
[82] Id.
[83] Id.

[84] Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic*, February 2018, https://www.theatlantic.com/amp/article/553937/

impact on human tissue of being shot with an AR-15 than a handgun, as seen in the referenced video "What Makes the AR-15 so Deadly?"[85]

**The Allure of and Value to Mass Shooters of Assault Weapons**

111.    It is not surprising that mass shooters employing these particularly lethal weapons are able to kill so many so quickly:  Adam Lanza was able to slaughter 26 in less than five minutes with his Bushmaster AR-15. James Holmes used a Smith & Wesson "Military & Police" (M&P) AR-15 fitted with a 100-round magazine to kill 12 and wound 58 in a Colorado movie theater. The ISIS-inspired San Bernardino, California, shooters used a pair of AR-15s to kill 14. Orlando shooter Omar Mateen unleashed Sig Sauer's concealable "next-generation AR" to leave 49 dead and dozens more injured at the Pulse nightclub.

112.    In July 2016, incensed by police shootings of unarmed black men, Gavin Long used a rifle with a 40-round magazine to shoot six police officers in Baton Rouge, Louisiana, killing three before he himself was killed by a police sniper. Long used a TAVOR assault rifle – which the manufacturer describes as "the ultimate weapon of the 21st century" employed by armed forces around the globe.  Israel Weapon Industries notes on its webpage that this particular weapon, developed in co-operation with the Israeli Defense Forces, was "especially created" in response to "dynamic changes in the modern battlefield, the threats of global terrorism and the demands of ever-changing combat situations."[86]

113.    Moreover, there is not the slightest evidence that the federal restrictions on assault weapons that was enacted in 1994 (and lapsed ten years later) compromised the safety of law-abiding citizens.  Since these weapons are useful for those bent on mass killing, further limiting their availability should have a beneficial effect on the active shooter and mass shooting problems that are serious and worsening in the United States.

114.    Hundreds of law-abiding citizens have been killed in mass shootings and the problem of mass shootings is getting worse.  Since the value of assault weapons over non-assault weapons for legitimate self-defense is virtually non-existent, the primary impact of removing such weapons from circulation will be to decrease the prospect that a law-abiding citizen will be confronted by a criminal with such weaponry.

---

[85] https://www.cbsnews.com/news/ar-15-used-mass-shootings-weapon-of-choice-60-minutes-2019-06-23/.
[86] James Gill, "Civilians carrying 'ultimate weapon' Gavin Long used in Baton Rouge would be regarded worldwide as insane," The New Orleans Advocate, August 10, 2016.

115.    "[L]aw-abiding citizens" whose guns are lost or stolen each year are one of the most important sources of weapons for criminals in the United States. The best current estimates are that roughly 400,000 guns move into the hands of criminals this way each year in the United States.[87]   In other words, it is orders of magnitudes more likely that a criminal will steal a gun of a law-abiding citizen than a law-abiding citizen will fire an assault weapon in lawful self-defense.  More assault weapons in the hands of law-abiding citizens like Nancy Lanza means more assault weapons in the hands of criminals such as Adam Lanza.

116.    Further, many of the most horrific mass shootings in America were perpetrated by previously law-abiding citizens.  The list, which is too long to recite, includes Stephen Paddock, who killed 59 in Las Vegas; Omar Mateen, who killed 49 in the Pulse nightclub in Orlando; Adam Lanza, who killed 26 in Newtown, Connecticut; and the Batman killer in Aurora, Colorado, who killed 12, as well as the Buffalo and Uvalde, Texas shootings in May 2022, where 10 and 21 died, respectively, after being shot with assault weapons equipped with high-capacity magazines.

117.    The empirical evidence supports the conclusion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, many of the gun tragedies of recent years would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States.  It is also my opinion that Massachusetts' ban on high-capacity magazines is one tool in the important governmental effort to reduce the likelihood that residents of the state will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip weapons with lethal accoutrements that are both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

---

[87]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers), "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts. See, Freskos, Brian. 2017c. "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen." *The Trace*. 4/11/2017. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/ and Freskos, Brian. 2017b. "Missing Pieces." *The Trace*. 11/20/2017. https://www.thetrace.org/features/stolen-guns-violent-crime-america/.

**Gun Control Dramatically Reduced Mass Shootings in Australia**

118.     In this regard, consider what happened in Australia after a gunman shot and killed 35 people in Port Arthur, Tasmania in 1996.  The Australian federal government persuaded all states and territories to implement tough new gun control laws. Under the National Firearms Agreement (NFA), firearms legislation was tightened throughout the country, national registration of guns was imposed, and it became illegal to hold certain long guns that might be used in mass shootings. The effect was that both while there were 7 public mass shootings in Australia during the seventeen-year period 1979–96 (a per capita rate that was higher than in the U.S. at the time), there have been none in the 23 years since (in contrast to the bleak trend in public mass shootings in the United States[88]).  Adjusting for the relative populations of the two countries, it would be as though there were 103 separate mass shooting events in the 18 years prior to the massive Australian gun buyback and none in the 23 years since.[89]

119.     The important point of the Australian experience for present purposes is that by depriving disturbed individuals of the vehicle by which they imagined they would unleash their murderous impulses, Australia showed that strong gun control measures such as bans on semiautomatic rifles could dramatically reduce the number of mass shootings – even if guns are still widely available, as they remain in Australia.

120.     Although the ban was highly controversial when enacted in 1996, the results have been so unambiguously positive for the country that there is now overwhelming support for it throughout Australia, as repeatedly shown in public opinion polls.  For example, a survey by Essential Research in 2016 confirmed that 44 percent thought Australians gun restrictions were "about right" and 45 percent thought the laws were "not strong enough."[90]  Against this 89 percent in support of gun restrictions, only 6 percent thought the laws were "too strong." Significantly, the poll specifically noted that these views were now consistent regardless of political party voting tendency for Labor, Coalition, or Greens voters.

---

[88] Dan Diamond, "**Mass Shootings Are Rising. Here's How To Stop Them,**" *Forbes*, June 18, 2015 (depicting the accelerating trend in the U.S. versus the benign trend in Australia), https://www.forbes.com/sites/dandiamond/2015/06/18/charleston-deaths-are-an-american-tragedy-mass-shootings-are-rising/#12bd32ef787b.

[89] The population of Australia in 1996 was 18.3 million and the population of the US in the same year was 269.4 million, according to data from the World Bank.

[90] Essential Research, "Gun laws", 1 November 2016.

121.    New Zealand followed the Australian lead after a horrific mass murder with an assault rifle,[91] and Canada announced in May 2022 its plans for a similar gun buyback for its current stock of assault weapons after its own horrendous mass shooting prompted the enactment of a ban on assault weapons in 2020.[92] Tellingly, in announcing an array of stringent gun safety measures, Canadian Prime Minister Justin Trudeau showed that he has learned from the lamentable experience of mass killings in the United States: "We need only look south of the border to know that if we do not take action, firmly and rapidly, it gets worse and worse and more difficult to counter."

## High-Capacity Magazines Enhance The Danger from Firearms, Which Can be Curtailed by Regulation

122.    While defensive gun ownership is designed to prevent violence, the intent of the public mass shooter is to kill as many people as possible. Accordingly, the lethal capacity of the weapon will influence that toll of these homicidal events (as opposed to the defensive setting when brandishing typically achieves its goal).  As Klarevas, Koper, and courts have observed, assault weapons with large capacity magazines are disproportionately used in mass shootings.[93] When such weapons are deployed in mass shootings, they "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'"[94] Among the mass shootings identified in a 2016 study by Everytown for Gun Safety, use of a large capacity magazine, or assault weapon that likely included a large capacity magazine, was associated with more than twice as many people being shot and nearly 50 percent more people being killed.[95]

---

[91] Associated Press, "New Zealanders hand in 50,000 guns after assault weapon ban," Dec. 21, 2019, https://www.nbcnews.com/news/world/new-zealanders-hand-50-000-guns-after-assault-weapon-ban-n1106081 ("The government banned the most lethal types of semi-automatic weapons less than a month after a lone gunman in March [2019] killed 51 worshippers at two Christchurch mosques. The police then launched a six-month program to buy the newly banned weapons from owners.")

[92] The Prime Minister also announced that magazine size would be restricted to five rounds in long guns. Justin Trudeau, "Further strengthening our gun control laws,' (May 30, 2022), https://pm.gc.ca/en/news/news-releases/2022/05/30/further-strengthening-our-gun-control-laws. Amanda Coletta, "Canada vows to 'freeze' handgun sales, buy back assault-style weapons," *The Washington Post* (May 30, 2022)("[T]he government banned 1,500 makes and models of "military-style assault weapons" in 2020, after a gunman posing as a police officer charged across rural Nova Scotia, killing 22 people, including a Royal Canadian Mounted Police officer, in the country's deadliest mass shooting.")

[93] Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Washington Post, February 15, 2018, https://www.washingtonpost.com/news/wonk/wp/2018/02/15/its-time-to-bring-back-the-assault-weapons-ban-gun-violence-experts-say/;  Koper 2004 Assessment at 14, 18.

[94] *N.Y.S. Rifle*, 804 F.3d at 264 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011)).

[95] Mass Shootings in the United States: 2009 – 2016,  Appendix of Shootings Profiled, https://everytownresearch.org/documents/2017/03/appendix-mass-shootings-united-states-2009-2016.pdf.

123.    The argument that the federal assault weapons ban could not be effective since it only limited acquisitions of newly acquired weapons, but did not by itself reduce the stock of assault weapons or high-capacity magazines turned out to be incorrect.  Figure 10 shows data from Chris Koper's investigation in six cities of the percent of guns recovered at crime scenes that were assault weapons, documenting how this percentage changed after the federal assault weapons ban went into effect. The figure clearly shows that the prevalence of assault weapons found at crime scenes fell in all six cities when the ban went into effect.

**Figure 10**



Time periods for data for each city vary based on when data was collected.

Source: Christopher Koper, 2004 National Institute of Justice study                    THE WASHINGTON POST

124.    Subsequent research by Koper et al (2017: 319) further highlights both the increased danger from assault weapons (AWs) and firearms with large-capacity magazines (LCM firearms):

> LCM firearms, which include AWs as well as other high-capacity semiautomatics,
> appear to account for 22 to 36% of crime guns in most places, with some estimates

upwards of 40% for cases involving serious violence. These estimates are comparable to or higher than earlier estimates of LCM use. …

Consistent with prior research, this study also finds that AWs and LCM firearms are more heavily represented among guns used in murders of police and mass murders. AWs account for 13–16% of guns used in murders of police, while LCM weapons overall account for about 41% of these weapons. Estimates for firearm mass murders are very imprecise due to lack of data on the guns and magazines used in these cases, but available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of such incidents. Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts.

Importantly, trend analyses suggest that LCM firearms have grown substantially as a share of crime guns since the expiration of the federal ban on AWs and LCMs.[96]

125.    In other words, the use of banned firearms and magazines by criminals fell during the federal AWB and rose when it lapsed.  These weapons also account for a major share of murders of police and overall crime, as well as for firearm mass murder.

126.    As the Fourth Circuit held in upholding Maryland's assault weapons ban in 2017: "the issue is whether the banned assault weapons and large-capacity magazines possess an amalgam of features that render those weapons and magazines like M16s and most useful in military service. The uncontroverted evidence … is that they do.[97] Indeed, the industry is constantly striving to find new ways to increase the lethality of their merchandise, so the notion that some threshold of "common use" erects a constitutional impediment that can obstruct governmental initiatives to promote citizen safety is wholly misguided. The ability and right of citizens to enact safety promoting measures designed to deal with the serious and growing problem of public mass shootings should not be affected by how quickly gun manufacturers can sell their products before regulations can be put into place.

---

[96] Koper, Christopher et al. (2017), Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources, J Urban Health (2018) 95:313–321, DOI 10.1007/s11524-017-0205-7.  The authors summarized their findings based on crime data from Minneapolis from January - August 2014  as follows:This study has highlighted the potential value of LCM restrictions for reducing HVG cases, which pose clear public dangers (nearly all HVG cases in this study occurred in public or outdoor settings). The findings underscore the concern that criminal use of semiautomatic weapons with large ammunition magazines facilitates particularly dangerous and injurious HVG incidents that contribute to a notable share of gunshot victimisations. Koper, Christopher et al. (2018), "Gunshot victimisations resulting from high-volume gunfire incidents in Minneapolis: findings and policy implications,"
[97] *Kolbe v. Hogan*, (4th Circuit Court of Appeals, February 21, 2017), https://cases.justia.com/federal/appellate-courts/ca4/14-1945/14-1945-2017-02-21.pdf?ts=1487707284.

127.    In 2016, fourteen-year old Jesse Osborne of South Carolina wanted to top the death toll of Adam Lanza, and he made numerous attempts to get his father's assault weapon from a gun safe as he planned a school shooting at a nearby elementary school.  When that failed, he took his father's loaded handgun from his bed dresser and killed his father before heading to the school where he opened fire on the playground, killing a 6-year-old boy before his gun jammed.  As the *Wall Street Journal* study referenced above found, a sizeable proportion of students aged 12-18 had access to firearms without adult permission.  For students and others who harbor homicidal fantasies similar to Jesse Osborne, the most powerful and deadly weapons will be most helpful for their criminal designs.[98]

128.    As stated above, an enormous source of guns used by teens in school shootings come from the home and the ability to kill is greatly enhanced if the gun at home is an assault weapon with a high-capacity magazine (see footnote 32, above).  Adam Lanza could not have made this point any more powerfully when he used his mother's assault rifle to kill 26 (also killing himself as the police closed in).  Of course, this is part of the larger problem of the enormous rates of gun thefts in the United States each year – in the neighborhood of 400,000 stolen.  The more assault weapons lying around in the home of law-abiding citizens, the more will be made available to criminals via these enormous rates of theft.

129.    My empirical evaluation of data through 2019 has emphasized that restrictions on high-capacity magazines are essential if one wants to reduce the risk of Las Vegas style killings that enable hundreds of individuals to be shot.[99]  The evidence that the federal assault weapons bans reduced deaths from public mass shootings is powerful and unrefuted.

**Gun Ownership Is Becoming More Concentrated in a Declining Portion of the Population**

130.A discussion of the social science literature concerning gun ownership rates must begin with the General Social Science Survey (GSS), which is an annual survey conducted by the National Opinion Research Center, headquartered at the University of Chicago.  The GSS is widely regarded by social science researchers as the most reliable indicator of national social trends, in part because of its professional implementation of face-to-face interviews using a very large sample size (the latest GSS data comes from 2,867 respondents versus roughly 1000 in a

---

[98] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," *The Wall Street Journal*, https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600, April 5, 2018.
[99] John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV.

typical telephone survey) with a high response rate (always in excess of 70 percent versus telephone survey responses which have fallen below 10 percent in recent surveys).  See Pew Research Center, "Assessing the Representativeness of Public Opinion Surveys," (May 15, 2012); http://www.people-press.org/2012/05/15/assessing-the-representativeness-of-public-opinion-surveys/.

131.    GSS data from 2016, the most recent year that data is available, states that 30.8% of American households have at least one gun, and that 20.5% of adults personally own a gun.  See Donohue & Rabbani, "Recent Trends in American Gun Prevalence," (attached as Exhibit B).   A carefully executed 2015 national survey showed that 34% of households owned guns, and that ownership of private firearms is highly concentrated among a small percentage of gun owners.[100]

132.    The evidence that gun ownership is concentrated is strong and uncontradicted. Researchers analyzing the results of a 2015 national survey found that 8% of individual gun owners reported owning ten or more firearms—collectively accounting for 39% of the American gun stock—and that 20% of gun owners, who owned the most guns collectively, possessed about 60% of the nation's guns.[101]   A decade earlier, researchers found a similar pattern:  a 2004 survey indicated that 48% of gun owners possessed four or more guns and that the top 20% of firearms owners possessed 65% of all firearms.[102]

133.    While I am not aware of any current social science research providing an estimate for the number of American households that own large-capacity magazines or LCMs (defined as an ammunition feeding device with the capacity to hold more than 10 rounds of ammunition) or for the number of LCMs in private hands in America, many firearms owned by American households do not accommodate LCMs, including shotguns and many types of handguns and rifles.

134. Accordingly, the share of households containing a weapon with a large-capacity magazine will only be a subset of gun owners. This minority status of LCM ownership by

---

[100] Azrael et al., "The Stock and Flow of US Firearms: Results from the 2015 National Firearms Survey," (Russell Sage Foundation J. Soc. Sci., forthcoming (2018) (attached as Exhibit C).
[101] See Azrael et al., supra.
[102] Hepburn et al., "The US Gun Stock: Results from the 2004 National Firearms Survey," Injury Prevention 2007;13:15–19.

household both reflects the judgment of most Americans that LCMs are not important to their self-defense.

135. The minority status of LCM ownership is also consistent with numerous polls showing that two thirds or more of respondents favor limiting magazine size.[103] A January 2013 New York Times/CBS News poll of 1,110 adults nationwide found that nearly two-thirds of Americans overall favored a ban on large-capacity magazines.[104]

**Firing Capacity Restrictions Have Historically Corresponded with Increased Use and Criminal Abuse**

136. Restrictions on weaponry have historically followed growing criminal abuse and social harm, rather than at the time these weapons are first introduced. This makes sense because it is not always clear at the outset which inventions will lead to adverse impacts on public safety. Frequently, the dangers of products and practices fly below the radar until their proliferation generates sufficient social damage to enable the public and the scientific community to become aware of the full extent of their social harm.

137. The first group of state restrictions on the number of rounds that could be fired by a firearm without reloading were adopted in the 1920s and 1930s after weapons like the Tommy gun became a preferred weapon for gangsters.[105] More recently, after pistols replaced revolvers as the most commonly used handguns in the United States in the 1980s, a second round of restrictions addressing magazine capacity and assault weapons began to be adopted, including the now expired 10 year federal ban on large capacity magazines.[106] State restrictions continued to be adopted following the expiration of the federal ban, often in response to public mass shootings.

---

[103] VPR – Vermont PBS Poll (July 2018), http://projects.vpr.net/vpr-vermont-pbs-poll.; Castleton Poll Measures Vermonters' Support for Gun Control Measures, Complete Poll Results (Feb. 21, 2013), https://www.castleton.edu/academics/undergraduate-programs/political-science/poll-results/castleton-poll-measures-vermonters-support-for-gun-control-measures/complete-poll-results/
[104] Jennifer Steinhauer, "Pro–Gun Lawmakers Are Open to Limits on Size of Magazines," *N.Y. Times* (Feb. 18, 2013), http://www.nytimes.com/2013/02/19/us/politics/lawmakers-look-at-ban-on-high-capacity-gun-magazines.html?_r=1&.
[105] *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68 (2017).
[106] *See* 1990 N.J. Sess. Law Serv. 32 (West); Haw. Rev. Stat. Ann § 34–(8);  Pub. L. 103–322, § 110103 (Sep. 13, 1994).

**Limiting the Size of Ammunition Magazines Should Save Lives and Reduce Injuries**

138. No single gun control measure is likely to be as effective in addressing the problem of public mass shootings as the limitation on the size of the ammunition magazine, and the evidence from the ten-year period when the federal assault weapons ban was in effect from 1994-2004 indicates that this federal law, which contained the limitation on the size of ammunition magazines to ten bullets saved lives and reduced the mayhem from mass shootings.

139. A review of the resolution of mass shootings and other public shootings unleashed with large-capacity magazines in the U.S. suggests that bans on large-capacity magazines can help save lives by forcing mass shooters to pause and reload ammunition.  Citizens have frequently taken advantage of a perpetrator stopping to reload his weapon to tackle him or otherwise subdue him in at least 20 separate shootings in the United States since 1991, notably including the December 7th, 1993 shooting of passengers on a Long Island Railroad car,[107] the October 29th, 1994 shooting near the grounds of the White House,[108] the May 21, 1998 shooting at Thurston High School in Springfield, Oregon,[109] and the January 8th, 2011 shooting in Tucson, AZ that targeted U.S. Congresswoman Gabby Giffords.[110] In many other incidents, targeted victims were able to escape while a shooter reloaded.  Perhaps the most vivid illustration of this benefit was seen when at least nine children at Sandy Hook Elementary School were able to escape while Adam Lanza reloaded his 30 round LCM.[111]

---

[107] "DEATH ON THE L.I.R.R.: The Rampage; Gunman in a Train Aisle Passes Out Death," *The New York Times*, December 9, 1993 - http://www.nytimes.com/1993/12/09/nyregion/death-on-the-lirr-the-rampage-gunman-in-a-train-aisle-passes-out-death.html (9-millimeter pistol, 15 round magazine).

[108] "Public Report of the White House Security Review," Department of the Treasury, 1995 - http://www.fas.org/irp/agency/ustreas/usss/t1pubrpt.html (Chinese-made SKS semiautomatic rifle, 30 round magazine).

[109] When an already wounded student realized the shooter's 50 round magazine was empty, the student ran 10 to 15 feet and tackled the shooter as he tried to reload his rifle. At that point, other boys helped subdue the gunman as he reached for a handgun in his belt. Jere Longman, "SHOOTINGS IN A SCHOOLHOUSE: THE HERO; Wounded Teen-Ager Is Called a Hero," *The New York Times*, May 23, 1998, https://www.nytimes.com/1998/05/23/us/shootings-in-a-schoolhouse-the-hero-wounded-teen-ager-is-called-a-hero.html.

[110] "Crowd members took gunman down," *Los Angeles Times*, January 9, 2011 - http://articles.latimes.com/2011/jan/09/nation/la-na-arizona-shooting-heroes-20110110 (9mm Glock handgun, 30-round extended magazine).

[111] "Legislative Leaders Say Bipartisan Agreement Could Yield Nation's Strongest Gun-Control Bill," *The Hartford Courant*, April 1, 2013. http://www.courant.com/news/politics/hc-gun-deal-newtown-0413-20130401,0,7341094.story (Bushmaster .223 caliber rifle, high-capacity 30 round magazine).  While some contend that 11 children were saved in this fashion at Sandy Hook, Louis Klarevas puts the number at 9 in his book, Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016). p. 22.

140. On April 22, 2018, a man walked into a Nashville Waffle House and opened fire, killing four and wounding seven. The police credited a customer with ending the slaughter when he saw the shooter trying to reload his rifle. The 29-year-old customer "burst out from behind a swinging door where he had been hiding, wrested the weapon away and threw it over a countertop."[112] When shooters stop to reload, they are overtaken by citizens, shot by police, or provide opportunities for escape, all of which government policy should seek to facilitate. The lower the size of the magazine, the more reloading must take place in mass shooting situations.

141. Indeed, an effective ban on high-capacity magazines would likely have significantly reduced the number of deaths and non-fatal gun shot victims at the Las Vegas concert. The *New York Times* video of the 2017 Las Vegas shooting shows how the Las Vegas concert attendees would use the pauses in firing when the shooter's high-capacity magazines were spent to flee the deadly venue before more shots were fired.[113] If Stephen Paddock had been limited to using only 10-round magazines during his deadly rampage, potentially hundreds of victims at the concert could have been spared.

142. No one has a greater desire or use for a large-capacity magazine than a determined mass killer, and governments have a responsibility to thwart those desires and those uses. A ban on such magazines is an important tool in the effort to stop the most egregious homicidal rampages.

143. As noted above, Adam Lanza was able to kill more (a total of 20 children and six adults) because he was using lawfully purchased weapons equipped with a 30-round LCM. It may well be that Lanza would have criminally abused the guns that his mother had made available to him even if he had not had an LCM, but there is every reason to believe that he would have killed fewer individuals if he had to persistently reload during his murderous rampage. In other words, the LCM ban is designed precisely to save lives and by raising the costs for killers, the LCM ban would be expected to advance that goal.

144. Further, most mass killings by Americans involve the use of guns, and many of these killers – Adam Lanza (Newtown), James Holmes (the Batman movie killer in Aurora, Colorado

---

[112] Christopher Mele and Jacey Fortin, "Man Sought in Waffle House Shooting Had Been Arrested Near White House," *The New York Times*, April 22, 2018, https://www.nytimes.com/2018/04/22/us/waffle-house-shooting.html.
[113] Malachy Browne, et al., *10 Minutes. 12 Gunfire Bursts. 30 Videos. Mapping the Las Vegas Massacre*, N.Y. TimesVideo, Oct. 21, 2017, *available at* https://www.nytimes.com/video/us/100000005473328/las-vegas-shooting-timeline-12-bursts.html (last visited Nov. 1, 2017).

killed 12 and injured 70), Jared Loughner (shooting Congresswoman Gabby Giffords), Stephen
Paddock (who killed 58 and wounded roughly 500 in Las Vegas in October 2017) to name just a
few – were drawn to a vision of killing large number of individuals in a certain way that included
the use of LCM's.  On November 5, 2009, Nidal Hasan killed 13 and injured more than 30 others
at Fort Hood, near Killeen, Texas.  When Hasan purchased his killing arsenal, he asked for "the
most technologically advanced weapon on the market and the one with the highest standard
magazine capacity."[114]  This is exactly what one would do if one wanted to simply kill as many
people as possible in the shortest amount of time. If one is serious about stopping mass killings, a
good first step is to deprive such killers of their preferred killing approaches.[115]

**Assault Weapons Bans are Critical to Reducing the Cost of Mass Shootings**

145. The response that bans on assault weapons will have a limited effect on overall gun
crime, which is most commonly committed with a handgun, is misplaced because
Massachusetts' assault weapons ban was not primarily enacted to address gun crime generally,
but rather was adopted in response to the growing mass shooting problem in the United States.
Indeed, the first assault weapons ban was enacted in California in the immediate aftermath of the
1989 mass shooting in the schoolyard of Cleveland Elementary School in Stockton, California by
an individual armed with an AK-47 semiautomatic rifle (killing 5 schoolchildren and wounding
32 others).

146. The Stockton massacre was a pivotal moment when the public first began to
appreciate that the proliferation of increasingly lethal weaponry was causing a significant threat
to public safety. For example, shortly after the massacre in March 1989, Republican Vermont
Congressman Peter Smith announced that he  was cosponsoring "a bill to stop the spread of
semiautomatic assault weapons in this country. … I cannot — and will not — defend … the
proliferation of paramilitary assault weapons that were designed solely for one purpose: killing
human beings. These are not hunting rifles. These are killing machines." Realizing this threat to

---

[114] Scott Huddleston, "Hasan Sought Gun with 'High Magazine Capacity,'" MySanAntonio.com, October 21, 2010,
http://blog.mysanantonio.com/military/2010/10/hasan-sought-gun-with-high-magazine-capacity/.
[115] Anders Breivik, who committed mass murder in Norway, was aided in his efforts because of lax rules concerning
LCM's in the United States. Breivik was very unhappy that he could not get the large-capacity magazines that he
wanted to use since they were banned in Europe.  In his manifesto, he wrote about his attempts to legally buy
weapons, stating, "I envy our European American brothers as the gun laws in Europe sucks ass in comparison."
Under the section titled, "December and January - Rifle/gun accessories purchased," Breivik wrote that he
purchased ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him. Stephanie
Condon, "**Norway Massacre Spurs Calls For New U.S. Gun Laws,**" CBS News, July 28, 2011,
http://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/.

the lucrative new market in AR-15-style weapons, the NRA immediately targeted Congressman Smith, who in 1990 became the first incumbent member of Congress from Vermont to lose re-election in 30 years.[116]

147. There is not the slightest evidence that the restrictions on assault weapons and large-capacity magazines exceeding 10 rounds compromised the safety of law-abiding citizens.  Since assault weapons and large-capacity magazines are useful for those bent on mass killing, further limiting their availability will have a beneficial effect on a problem that is serious and growing in the United States.

148. The first line of defense to reducing mass shootings is clearly to try to keep guns out of the hands of those who may end up using them for criminal purposes, but this approach will never be fully effective since not all killers can be easily identified in advance.  Therefore, a critical element in trying to stop the death and injury from the growing problem of mass shootings is to limit the killing power of the weaponry available to prospective mass shooters. The value of a ban on high-capacity magazines is that it is easily definable, hard to circumvent through cosmetic changes by gun merchants, and effective at reducing the lethality of mass shooters by limiting the number of bullets that can be fired without reloading.

149. It is my opinion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, tragedies like the one in Las Vegas would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States and perhaps the world.[117]  It is also my opinion that Massachusetts' restrictions challenged in this litigation are effectively designed to reduce the likelihood that its citizens and visitors will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip themselves with weapons that are both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

---

[116] Paul Heintz, "Stickin' to His Guns? The NRA Helped Elect Bernie Sanders to Congress," Seven Days, June 26, 2019.

[117] The horrendous mass killing in Norway by Anders Breivik, endangered by the restrictive gun laws of Europe, was salvaged by his ability to procure ten 30-round, high-capacity magazines from the United States.  Stephanie Condon, "Norway Massacre Spurs Call for New U.S. Gun Laws," CBS News, July 28, 2011, *available at* https://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/ (last visited Nov. 1, 2017).

**Uses of Assault Weapons and LCMs for Self-Defense are Extremely Rare**

150. In the face of the clear evidence from around the United States and the world, Plaintiffs' motion for preliminary injunction fails to acknowledge the threat posed by weapons and instruments that Massachusetts restricts. First, it is worth noting that the vast majority of the time that an individual in the United States is confronted by violent crime, they do *not* use a gun for self-defense.  Specifically, over the period from 2007-2011 when roughly 6 million violent crimes occurred each year, data from the National Crime Victimization Survey shows that the victim did not defend with a gun in 99.2 percent of these incidents – this in a country with 300 million or more guns in civilian hands.

151. Second, even if a gun were available for self-defense use, the need for an LCM is slight according to decades of statements by NRA-affiliated and pro-gun experts. For example, John Lott has repeatedly made the following claims:

- based on "about 15 national survey[s] … about 98 percent of [defensive gun uses] involve people brandishing a gun and not using them."[118]

- "When victims are attacked, 98 percent of the time merely brandishing a gun is enough to cause the criminal to stop his attack."[119]

- "Considerable evidence supports the notion that permitted handguns deter criminals. …. In 98% of the cases, people simply brandish weapons to stop attacks."[120]

152. Gary Kleck has similarly stated: "Of the … times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers."[121]

153. In other words, a gun is used in defense less than 1 percent of the time when someone is attacked in the United States.  In the "overwhelming majority" of the less than 1% of cases in which a gun *is* used, brandishing is all that is needed for defense.  One would imagine

---

[118] Statements by John R. Lott, Jr. on Defensive Gun Brandishing Posted by Tim Lambert on October 17, 2002 http://scienceblogs.com/deltoid/2002/10/17/lottbrandish/. Page 41, State of Nebraska, Committee on Judiciary LB465, February 6, 1997, statement of John Lott, Transcript prepared by the Clerk of the Legislature, Transcriber's Office.
[119] John R. Lott, Jr., Packing Protection, Letters, *Chicago Sun-Times*, April 30, 1997, Pg. 52.
[120] John R. Lott Jr., "Unraveling Some Brady Law Falsehoods," *Los Angeles Times*, July 2, 1997.
[121] Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," 86(1) *Journal of Criminal Law and Criminology* 150-187 (Fall 1995). https://pdfs.semanticscholar.org/91da/afbf92d021f06426764e800a4e639a1c1116.pdf.

that the vast majority of the times that the gun is fired in this increasingly small subset, it will be fired no more than 10 times. All firearms that can accept high-capacity magazines can also accept magazines that hold fewer rounds. It cannot be seriously maintained that assault weapons and high-capacity magazines play any important role in furtherance of the Second Amendment goal of self-defense. Indeed, if they did, the industry would have marketed them as protection weapons instead of assault weapons – or in the more recent gun-marketing jargon "sporting" or "tactical" rifles.

154. Should there be a future case of a law-abiding citizen who 1) has a gun and 2) the need and opportunity to use it in self-defense, and 3) the desire to fire more than 10 rounds, the individual can either re-load the defensive weapon by inserting a new clip or by using a second weapon, which an increasingly large number of gun owners currently possess.  This implies that the challenged Massachusetts' restrictions, which are designed to limit the mayhem caused by criminals engaging in the most dangerous forms of violent criminal behavior, are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

155.  Bullets fired by assault weapons or a modern weapon with an LCM will easily penetrate walls, threatening family members or occupants in attached dwellings.  This point was dramatically underscored when a concealed carry permit holder attending a gun safety class inadvertently fired his weapon, which discharged a bullet that easily penetrated the classroom wall, striking and killing the owner of the gun store who was working in the next room.[122] Encouraging untrained, stressed individuals to spray bullets from a high-capacity magazine is a recipe for generating similar unwelcome outcomes that will put family members and neighbors at considerable risk.

---

[122] Peter Holley, *Ohio gun store owner accidentally killed by student during firearm-safety cl*ass, *Washington Post*, June 19, 2016, *available at* https://www.washingtonpost.com/news/morning-mix/wp/2016/06/19/ohio-gun-store-owner-accidentally-killed-by-student-during-firearm-safety-class/?utm_term=.ed4c232d20ad (last visited Nov. 1, 2017).

Another example of how doors and walls do not stop bullets from modern handguns occurred on September 13, 2015, when "39-year-old Mike Lee Dickey was babysitting an 8-year-old Casa Grande, Arizona boy.  According to police, at about 2 a.m., Dickey was in the bathroom removing his .45-caliber handgun from the waistband of his pants when he unintentionally discharged the gun. The bullet passed through two doors and struck the 8-year-old in his arm while he lay sleeping in a nearby bedroom. The boy was flown to a hospital in Phoenix for treatment."  *8-year-old boy unintentionally shot by babysitter*, Ohh Shoot, Sept. 13, 2016, *available at* http://ohhshoot.blogspot.com/2015/09/8-year-old-boy-unintentionally-shot-by.html (last visited Nov. 1, 2017).

**Law Enforcement and Military Support for Assault Weapon and LCM Bans**

156.The testimony of United States Attorney (District of Colorado) John Walsh before the Senate Judiciary Committee on February 27, 2013,[123] is worth quoting:

> From the point of view of most law enforcement professionals, a perspective I share as a long-time federal prosecutor and sitting United States Attorney, shutting off the flow of military-style assault weapons and high-capacity magazines is a top public safety priority. […]

Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public.[124]

157.Dean L. Winslow, a retired Air Force colonel, flight surgeon, and professor of medicine at Stanford University has particularly valuable insight into the wisdom of having assault weapons in civilian hands.

158.Dr. Winslow noted that "as commander of an Air Force hospital in Baghdad during the surge, I have seen what these weapons do to human beings. The injuries are devastating."[125] Moreover, unlike a shotgun filled with birdshot, which is far more likely to hit a target and less likely to penetrate walls than a bullet from an assault weapon, assault weapons are simply not well suited for defensive use in the home.  Based on his extensive military and medical experience, Dr. Winslow noted that it is "insane … that in the United States of America a civilian can go out and buy a semiautomatic weapon like an AR-15."

159.According to Maryland Police Superintendent Marcus Brown, "in many home defense situations assault weapons are likely to be less effective than handguns because they are less maneuverable in confined areas."[126] Experts consider handguns clearly more suitable than assault weapons for self-defense. Massachusetts Chief of Police Mark K. Leahy said that when

---

[123]Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).

[124]See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, *Washington Post*, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).

[125] Dean L. Winslow, "I spoke my mind on guns. Then my Senate confirmation was put on hold," *The Washington Post*, December 20, 2017. See also, Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic Monthly*, February 22, 2018, https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/.

[126]Brown Decl. ¶ 20, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).

"asked to recommend a weapon for home defense or concealed carry, I always recommend a handgun."[127]

160. Since AR-15's were selected by the Defense Department as a weapon of choice for the battlefield in Vietnam because the destructive force of the gun made it especially lethal to even outer extremity wounds, the point could not be clearer: keeping these weapons out of civilian hands will reduce the death toll and seriousness of injuries in cases of mass shootings or other criminal or accidental uses of these weapons.

161. A wise December 2016 editorial in the *Las Vegas Sun* noted the danger presented—and the lack of practical use for—LCMs:

> By overwhelmingly supporting universal background checks for firearms purchases, Clark County voters made it abundantly clear last month that they were concerned about gun violence.
>
> Now, it's time for Las Vegas-area lawmakers to go a step further to protect Nevadans and push to ban the sale of high-capacity magazines in the state. Eight states and the District of Columbia already have imposed such prohibitions, and with good reason. There's simply no legitimate civilian use for magazines that hold dozens upon dozens of rounds of ammunition.
>
> Don't believe us? Fine, then listen to Clark County Sheriff Joe Lombardo. "I'm a very avid hunter, I was in the military myself, and there's no need to have a high-capacity magazine for any practical reason," Lombardo said during a recent interview with the Sun.
>
> To the contrary, the dangers posed by such magazines are obvious. Lombardo says the time it takes for suspects to change magazines gives potential victims an opportunity to escape and law enforcement officials an opportunity to safely fire back. That being the case, the fewer times a shooter has to switch out magazines, the fewer chances for people to get away and authorities to get a protected shot.[128]

The prescience of the editorial was powerfully underscored ten months later when On October 1, 2017, the deadliest mass shooting in U.S. history occurred in Las Vegas (60 killed and hundreds wounded) – only possible because of the use of high- capacity magazines.

---

[127] Leahy Decl. ¶ 22, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).
[128] *High-capacity magazine ban a must for Nevadans' safety*, Las Vegas Sun, Dec. 11, 2016, *available at* https://lasvegassun.com/news/2016/dec/11/high-capacity-magazine-ban-a-must-for-nevadans-saf/(last visited Nov. 1, 2017).

162.    One of the most disturbing aspects of the recent mass shootings our Nation has endured is the ability of a shooter to inflict massive numbers of fatalities in a matter of minutes due to the use of high-capacity magazines.  High-capacity magazines were defined in the 1994 ban as magazines capable of holding more than 10 rounds, and this is a definition the Department endorses.  The devastating impact of such magazines is not limited to their use in military-style assault rifles; they have also been used with horrific results in recent mass shootings involving handguns.  The 2007 mass shooting at Virginia Tech involved a shooter using handguns with high-capacity magazines.  Similarly, recent mass shootings in Tucson, Arizona; Oak Creek, Wisconsin; and Fort Hood, Texas all involved handguns with magazines holding more than 10 rounds.  As evidenced by these events, a high-capacity magazine can turn any weapon into a tool of mass violence.  Forcing an individual bent on inflicting large numbers of casualties to stop and reload creates the opportunity to reduce the possible death toll in two ways: first, by affording a chance for law enforcement or bystanders to intervene during a pause to reload; and second, by giving bystanders and potential victims an opportunity to seek cover or escape when there is an interruption in the firing.  This is not just theoretical:  In the mass shooting in Tucson, for example, 9-year old Christina-Taylor Green was killed by the 13th shot from a 30-round high-capacity magazine.  The shooter was later subdued as he was trying to reload his handgun after those 30 shots.  The outcome might have been different if the perpetrator had been forced to reload after firing only 10 times.

163.    Furthermore, high-capacity magazines are not required for defending one's home or deterring further action by a criminal.  The majority of shootings in self-defense occur at close range, within a distance of three yards.  In such a scenario, and at such close ranges, a 10-round magazine is sufficient to subdue a criminal or potential assailant.  Nor are high-capacity magazines required for hunting or sport shooting.  Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public.  The continued commercial sale of high-capacity magazines serves only to provide those determined to produce a high body count with the opportunity and the means to inflict maximum damage.  Indeed, there is evidence suggesting that when the previous ban was in effect, it

reduced the number of high-capacity magazines seized by the police, as well as the lethality of incidents.[129][The citation is from Walsh's statement.][130]

## Threats to Civil Peace and to Democracy Itself

164.     There is also a larger issue at stake with the proliferation of assault weapons: their capacity to facilitate political violence and threaten American democracy.  The concern is heightened by the sharp rise in the percentage of Americans who think that violence against the government could be appropriate, which doubled from 16 percent in 2010 to 34 percent in 2021 (over 40 percent of Republicans and independents and 23 percent of Democrats agreed).[131]

165.     The extent and severity of these concerns have been clarified by the events of January 6, 2021, which I have written elsewhere has provided new insight into the dangers of such weaponry and the utter folly of many of the claims of the gun lobby:

> Consider the gun lobby protestation that "Gun control simply doesn't work." Imagine for a moment what that rally would have looked like in Houston, Texas, or some other "gun-friendly" jurisdiction. Without Washington, DC's profoundly wise firearm restrictions [including its assault weapons ban], a very large number of the rioters would have been marching on the U.S. Capitol armed with assault rifles equipped with high-capacity magazines and other highly lethal weapons. When the mob storming the Capitol spun out of control, guns would have been flashing everywhere, and it is not hard to imagine that bullets would have been cutting down scores or even hundreds of victims. Those who remember the 1970 Kent State massacre understand that once the bullets start flying in a riotous atmosphere, the consequences quickly turn lethal and dire….
>
> The pernicious Proud Boys leader Enrique Tarrio [currently being tried for seditious conspiracy],[132] who had planned to address the crowd before the U.S. Capitol riot, was thankfully taken off the streets two days earlier when he was arrested for tearing down a Black Lives Matter banner on a Washington, DC, church and lighting it on fire. At the time of his arrest, Tarrio was carrying two high-capacity magazines festooned with the Proud Boys logo. Washington, DC's wise prohibition on such unnecessary accoutrements to lethal weaponry managed to keep one conspiring criminal away from the U.S. Capitol on January 6, and

---

[129] See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, Washington Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).

[130] Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).

[131] Meryl Kornfield and Mariana Alfaro, "1 in 3 Americans say violence against government can be justified, citing fears of political schism, pandemic," *Washington Post*, January 1, 2022, https://www.washingtonpost.com/politics/2022/01/01/1-3-americans-say-violence-against-government-can-be-justified-citing-fears-political-schism-pandemic/.

[132] Alan Feuer and Zach Montague (Jan. 12, 2023). "Prosecutors Open Arguments Against Proud Boys in Sedition Trial," *The New York Times.*

thousands of others, knowing of Washington, DC's strict gun laws, were dissuaded from carrying weapons because of these laws. [Moreover, the claim that weapons equipped with high-capacity magazines could protect American democracy is fanciful.]  First, the thought that private gun owners could stand up to the modern U.S. military if it backed a tyrannical federal government is absurd. There is no circumstance in which private citizens in modern America could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government. Second, the idea that gun owners can be expected to *oppose* rather than support the tyrant was dealt a fatal blow by the violence at the U.S. Capitol.[133]

## Comments on Some of The Errors in The Plaintiffs' Allegations

166. Any discussion of assault weapons must address the tragic problem of public mass shootings. The Plaintiffs' Motion for Preliminary Injunction marches down the misguided path of trying to diminish the importance of governmental action to address this problem by making an array of misguided, erroneous, and misleading claims.

167. The Plaintiffs seem to believe that because automatic weapons are potentially more dangerous than semiautomatic assault weapons, this should disempower the ability of the state to address the worsening problem of mass shootings.  In support of this logically uncompelling argument they offer this claim at page 11 of their Motion for Preliminary Injunction:

"There is therefore a significant practical difference between a truly automatic and a merely semiautomatic rifle. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. Dept. of the Army, RIFLE MARKSMANSHIP: ML6-/M4-SERIES WEAPONS, 2-1 tbl. 2-1 (2008), available at https://bit.ly/3pvS3SW."

168. The Plaintiffs claim is misguided in two respects.  First, the current and worsening problem of mass shootings is not a problem of automatic weapons, which have been effectively been addressed by government action. Since the evidence from the United States and the world indicates that restrictions on assault weapons and large-capacity magazines reduces the harm from mass shootings, this is the area where protective government action is needed.

---

[133] John Donohue, "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf.

169. The second problem is that the Plaintiffs' misguided claim is entirely undercut by the very Army Manual that they cite, which goes on to state in two sections that the Plaintiffs ignore that:

> 7-12. The most important firing technique during fast-moving, modern combat is rapid semiautomatic fire. It is the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple, or moving targets.

> 7-14. While Soldiers sacrifice some degree of accuracy to deliver a greater volume of fire, it is surprising how devastatingly accurate rapid semiautomatic fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit. Proper training and repeated practice increases the degree of accuracy.

170. It is for this reason that all knowledgeable commentators on the lethality of the AR-15 understand that it fully enables – in the words of the Army Manual that the Plaintiff's cite -- the "most important firing technique during fast-moving, modern combat" that in the typical circumstances of an attempted mass shooting "is superior to automatic fire in all measures."

171. The nature of the misleading character of the Plaintiffs' claims is confirmed by the comments of Retired Army Maj. Gen. Paul D. Eaton:

> "As the former Commanding General of the Infantry Center at Fort Benning and Chief of Infantry, I know a bit about weapons. **Let me state unequivocally — For all intents and purposes, the AR-15 and rifles like it are weapons of war….It is a very deadly weapon with the same basic functionality that our troops use to kill the enemy.** Don't take the bait when anti-gun-safety folks argue about it. They know it's true. Now you do too."[134]

172. At the same time that the Plaintiffs are inaccurately trying to obscure the lethality of the type of weaponry covered by the Massachusetts Assault Weapons Ban, they also make preposterous claims about the lethality of the weapons available at the time of the founding of our nation. The Plaintiffs contend at page 19 of their motion that: "Firearms capable of firing more than 10 rounds without reloading are nothing new. '[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580,' and several such handguns and long guns 'pre-date[d] the American Revolution.'" It should be immediately obvious to all that

---

[134] <u>Paul Eaton, June 2, 2022</u> (emphasis supplied).

if there was any weapon remotely as available, lethal, effective, and portable as a modern assault weapon, the soldiers commanded by George Washington would have been using them. Instead, the soldiers were using muskets utterly incapable of inflicting the mass mayhem in a matter of seconds that modern Americans have to fear.

173. It is widely recognized that "Early firearms were expensive. They were complicated. They required extensive training to use, and they were very slow to load."[135] Moreover, "The flintlock musket was the most important weapon of the Revolutionary War. It represented the most advanced technological weapon of the 18th century. Muskets were smooth-bored, single-shot, muzzle-loading weapons. The standard rate of fire for infantrymen was three shots per minute." With this type of weaponry, there would be absolutely no concern about a lone gunman blasting away at unsuspecting crowds with the lethal and tragic effect that even teenage mass shooters increasingly inflict in seconds or minutes in modern America.  Any suggestion that 18th Century weaponry in civilian hands could impose anywhere near the risk to the public of the modern assault weapon is simply absurd on its face.

**Figure 11**



A musket from the 18th century, when the *Second Amendment* was written, and an assault rifle of today.
Top, MPI, via Getty Images; bottom, Joe Raedle/Getty Images .

---

[135] "Learn about American Revolutionary War usage of muskets, bayonets, and gunpowder," Britannica https://www.britannica.com/video/195113/gunpowder-muskets-American-Revolution.

174. The Plaintiffs also try to minimize the risk of the weaponry restricted by Massachusetts by arguing that the deaths from mass shootings and by assault weapons are only a relatively small portion of the total homicides in the United States (they don't even try to make that claim for weapons with high-capacity magazines). In furtherance of this misguided approach, the Plaintiffs' Motion for Preliminary Injunction states:

> "as of 2016, only 0.8 percent of state and federal prisoners reported using any kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates, 2016, U.S. DEPT OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), available at https://bit.ly/31VjRa9.

175. It is unclear whether the Plaintiffs understand that the number they present is meaningless since they are looking at the entire population of state and federal prisoners. Presumably, most of the tax cheats, embezzlers, and other swindlers are not using any firearm to commit their crimes, so using the entire base of all prisoners is nonsensical.

176. If the Plaintiffs would like to cite from this prisoner survey, a more justifiable number would be that 6.25% of those criminals who used a gun in committing a crime used a rifle – a number almost eight times as large as they statistic they provide.  Moreover, since regulation of assault weapons is not about stopping armed robbery or other less serious crimes that can lead to incarceration, but about trying to reduce mass shootings, it would be helpful to note that almost 60% of  mass shooters die at the scene – see the large numbers of mass shooters who commit suicide or are killed at the scene according to the FBI.  In other words, most of the mass shooters never end up in prison and therefore would not show up in a survey of prisoners.[136]

177.    The Plaintiffs continue the implausible effort at minimization of the problem of mass shootings by offering the following error-filled and misleading statement (on page 15):

> In the five years from 2015 to 2019 (inclusive), there were an average of 14,556 murders per year in the United States. On average, rifles of all types (of which so-called "assault weapons" are a subset) were identified as the murder weapon in 315 murders per year. U.S. Dept. of Just., Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States, 2019, FBI, available at https://bit.ly/31WmQ1V. By way of comparison, on average 669 people are murdered by "personal weapons" such as hands, fists and feet. Id. According to the FBI, a murder victim is more than twice as likely to have been killed by hands and feet than by a rifle of any type.

---

[136] See the numbers reported from an FBI report on mass shooters in footnote 33, above.

178.     Every statement in this passage from the Plaintiffs' motion is either wrong or misleading – or both.  Let's start with the first sentence in which the Plaintiffs average five numbers to give us a figure for the murders per year.  The number they use for 2019, for example, is 13,927 – but in fact the actual number of murders recorded in 2019 by the FBI (itself an undercount due to incomplete police agency reporting) was 16,425 (so the Plaintiffs were off by 2198 murders if they wanted to report the FBI murder count).

179.     The table the Plaintiffs use then tells us that in 2019 there were 364 killings with rifles.  But the Plaintiffs don't reveal that this 364 is clearly an understatement of the number of rifle killings because in a substantial number of the allegedly 10,258 firearm murders that year, the FBI doesn't know or report what type of firearm was used. For example, the table the Plaintiffs rely on says there were also 45 murders with "other guns" and 3281 murders with "firearms, type not stated" in 2019. In other words, even for the 10,258 firearm murders counted for 2019 in Plaintiffs' UCR data source, they have no information about what gun was used in 3326 of these murders, which severely undermines the value of this FBI data as shown in Table 3 below.

180.     But pretending that 3326 firearm murders about which the FBI provides no information about the firearm contain no murders with rifles is not the only massive error in the Plaintiffs' misguided effort to minimize the social burden of mass shootings.  But we also know that total number of firearm homicides the Plaintiffs use for 2019 – the 10,258 figure shown in Table 3 -- is itself severely inadequate since it fails to capture more than 4000 other firearm homicides in 2019.  The problem lies in the fact that police departments are not required to report data to the FBI, so the FBI data the Plaintiffs reference is not only inadequate in not identifying the type of lethal firearm in a very large number of the murder cases it knows about, but it also completely ignores an even larger number of firearm homicides. We know this because the CDC data on homicide is based on mandatory reporting requirements for all death certificates, which indicate if the homicide was caused by a firearm.[137]  As Table 4 reveals,

---

[137] The superiority of the CDC data on firearm homicide over the data that the Plaintiffs provide is well known by researchers of gun violence, as described in this Bureau of Justice Statistics report: "Homicide data in this report are primarily from the Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports developed from the National Vital Statistics System (NVSS) of the National Center for Health Statistics (NCHS), a part of the Centers for Disease Control and Prevention. NVSS mortality data are produced from standardized death

many thousands of firearm homicides occurred but are not even captured in the "full" FBI data. When one compares in the table below the CDC total of 14,414 firearm homicides to the 6932 homicides that the Plaintiffs based their numbers on, one sees that their data is grossly deficient and should not be relied upon. A more relevant, and sobering statistic is that the percentage of firearm homicides committed with long guns has grown steadily since 1993, doubling from 17.9 percent in that year to 35.6 percent in 2018.[138]

**Table 3**



Breakdown of 2019 Firearm Murders by Type, FBI Expanded Homicide Data

certificates and include causes of death reported by attending physicians, medical examiners, and coroners.… Generally, the NVSS produces more accurate information than the SHR on annual homicide rates at the national level …." Grace Kena and Jennifer L. Truman, "Trends and Patterns in Firearm Violence, 1993–2018," Bureau of Justice Statistics Special Report (April 2022), https://bjs.ojp.gov/content/pub/pdf/tpfv9318.pdf.
[138] Id.

Source: U.S. Dept. of Just., <u>Expanded Homicide Data Table 8: Murder Victims by Weapon,</u> <u>2015-2019,</u> Crime in the United States, 2019, FBI.

**Table 4**



181.    As a final exclamation point on the inadequacy of Plaintiffs' 2019 data, one should note that firearm homicides spiked 35 percent between 2019 and 2020, rendering their flawed 2019 accounting even less meaningful.  It is also worth noting that in 2020 firearms were used in 79 percent of homicides, which was the greatest proportion ever, up from 74 percent in 2019.[139] Moreover, the Plaintiffs would have you forget the considerable number of victims of assault weapons who do not show up in the homicide count because they survive – often with crushingly damaging and life-altering injuries.

---

[139] *Jennifer Mascia, <u>"It's Official: Gun Deaths Hit an All-Time High in 2020,"</u> The Trace*, Jan. 7, 2022.

182.    Not only is the general ploy to minimize the number of deaths caused by assault weapons and firearms equipped with high-capacity magazines based in this case on Plaintiffs' wholly inadequate data, but the entire enterprise is misguided for three additional reasons:  1) the deaths and injuries caused by mass shootings are increasing at an alarming pace, 2) the social harm from these traumatic events is far larger than the mere numerical casualty counts, and 3) the incessant efforts to enhance the deadliness of firearms to increase gun sales means that, if this deadly arms race is not restrained, mass shootings with deaths of many hundreds of individuals may well be our fate.  This growing menace cannot be effectively addressed without concerted and effective governmental action, including bans on assault weapons and high-capacity magazines.

## CONCLUSION

183.    The problem of mass shootings in the United States is socially damaging, growing worse, and will be exacerbated if appropriate limitations on the lethality of weaponry, such as the restrictions on assault weapons and high-capacity magazines enacted first by the federal government and then by the state of Massachusetts as this dire social harm first emerged, are not sustained as constitutionally permissible measures.

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail:  jjd@stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

## EMPLOYMENT

### Full-time Positions

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
  - William H. Neukom Professor of Law, February 2002 – June 2004.
  - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
  - Academic Associate Dean for Research, since July 2001 – July 2003.
  - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
  - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
  - Harry B. Reese Teaching Professor, 1994-1995
  - Professor of Law, May 1991-September 1994
  - Associate Professor, May 1989-May 1991
  - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

### Temporary Appointments

- Affiliated Research Professor, American Bar Foundation, September 2020 – August 2025.
- Visiting Professor, Tel Aviv University School of Law, May 2022.
- Lecturer on the Economics of Crime, Bogota Summer School in Economics, Universidad del Rosario, Bogota, Colombia,  June 2020.
- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.

1

- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009.
- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.
- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.
- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).

**EDUCATION**

## Yale University, 1981-1986

- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation: "A Continuous-Time Stochastic Model of Job Mobility:  A Comparison of Male-Female Hazard Rates of Young Workers."  Awarded with Distinction by Yale.

  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.

- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.

## Harvard Law School, 1974-1977 (J.D.)

- Graduated Cum Laude.

2

- <u>Activities</u>:  Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year):  (a) First Semester:  Massachusetts Advocacy Center; (b) Second Semester:  Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions.  Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against BechtelCorporation's adherence to the Arab Boycott of Israeli companies.

## Hamilton College, 1970-1974 (B.A.)

- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:

  - Brockway Prize (Highest GPA Freshman Year)
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics

- President, Root-Jessup Public Affairs Council.

**PUBLICATIONS**

## Books and Edited Volumes:

- <u>Law and Economics of Discrimination</u>, Edward Elgar Publishing, 2013.

- <u>Employment Discrimination:  Law and Theory</u>, Foundation Press, 2005, 2021 (5th edition) (with George Rutherglen).

- <u>Economics of Labor and Employment Law</u>:  Volumes I and II, Edward Elgar Publishing, 2007.  http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070

- <u>Foundations of Employment Discrimination Law</u>, Foundation Press, 2003 (2d edition).

- <u>Foundations of Employment Discrimination Law</u>, Oxford University Press, 1997 (Initial edition).

## Book Chapters:

- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).

- "The Death Penalty" Chapter in <u>Encyclopedia of Law and Economics,</u> Spring (2013) and in Alain Marciano & Giovanni Battista Ramello eds., <u>Encyclopedia of Law and Economics</u> (2019).

- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, <u>Controlling Crime: Strategies and Tradeoffs</u> (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin" in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer?  The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

3

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., <u>Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business</u> (2005).

- "The Evolution of Employment Discrimination Law in the 1990s:  A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., <u>Handbook of Employment Discrimination Research</u> (2005).

- "The Impact of Concealed Carry Laws" in Jens Ludwig and Philip Cook, <u>Evaluating Gun Policy:  Effects on Crime and Violence</u> (Washington D.C.:  Brookings, 2003).

## Articles:

- Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," JAMA.  2022;328(12):1191-1192. <u>https://jamanetwork.com/journals/jama/fullarticle/2796675</u>.

- John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook, (2022) "More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities," <u>https://www.nber.org/papers/w30190</u>.
  - Featured in <u>August 2022 Issue of NBER Digest</u>.
  - Featured in August 11, 2022 issue of *The Economist*: <u>"A Supreme Court ruling could spell even more gun crime: Right-to-carry laws are associated with increases in violence."</u>

- "The Supreme Court's gun decision will lead to more violent crime," *Washington Post*, July 8, 2022, <u>https://www.washingtonpost.com/outlook/2022/07/08/guns-crime-bruen-supreme-court/</u>.

- Daniel Cerqueira, Danilo Coelho, John J. Donohue III, Marcelo Fernandes, & Jony Pinto Junior, "A panel-based proxy for gun prevalence in US and Mexico" *International Review of Law & Economics* (2022). <u>https://www.sciencedirect.com/science/article/abs/pii/S0144818822000369</u>.

- "Increasing murders but overall lower crime suggests a growing gun problem," Am J Public Health. (2022).

- "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," <u>The Conversation</u> (December 6, 2021), <u>https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-the-rittenhouse-verdict-172741</u>.

- Lisa Vicen, Samuel Levander, & John J. Donohue III, <u>'NYSRPA v. Bruen': Studies Show Direct Link Between Right-to-Carry and Violent Crime Increase</u>, The National Law Journal, November 4, 2021. <u>https://www.law.com/nationallawjournal/2021/11/04/nysrpa-v-bruen-studies-show-direct-link-between-right-to-carry-and-violent-crime-increase/</u>.

- "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), <u>https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf</u>. This is part of the Brennan Center for Justice *Protests, Insurrection, and the Second Amendment* series.

- "We Must Confront the Threats to America's Democracy" 56 *Idaho Law Review* 119 (2020)."

- The Impact of Legalized Abortion on Crime over the Last Two Decades" *American Law and Economics Review* (Fall 2020)(with Steven Levitt), Volume 22, Issue 2, Pages 241–302. <u>https://academic.oup.com/aler/article/22/2/241/5973959?guestAccessKey=917acf36-918d-4310-9d22-73c713757238</u>

- ■ NBER Working Paper No. 25863, May 2019, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3391510.

  - ○ Featured on Freakonomics Radio, "Abortion and Crime, Revisited." https://podcasts.apple.com/us/podcast/freakonomics-radio/id354668519?i=1000444184627."

- "The Swerve to 'Guns Everywhere:' A Legal and Empirical Evaluation" 83 *Law and Contemporary Problems* 117-136 (2020). https://scholarship.law.duke.edu/lcp/vol83/iss3/7.

- Daniel Cerqueira, Danilo Santa Cruz Coelho, John J. Donohue, Marcelo Fernandes & Jony Arrais Pinto, A Panel-Based Proxy for Gun Prevalence in the US (Nat'l Bureau of Econ. Research, Working Paper No. 25530, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332277.

- "That Assault Weapon Ban? It Really Did Work" *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html?action=click&module=Opinion&pgtype=Homepage.

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019 (with Abhay Aneja and Kyle Weber), https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

- "RTC Laws Increase Violent Crime: Moody and Marvell Have Missed the Target," *Econ Journal Watch*, Vol. 16, No. 1, 97-113, March 2019 (with Abhay Aneja and Kyle Weber), https://econjwatch.org/File+download/1103/DonohueAnejaWeberMar2019.pdf?mimetype=pdf

- "It's Going to Take More Than Background Checks and AR-15 Bans to Stop Mass Shootings," *Time.com*, November 16, 2018. http://time.com/5456015/gun-control-background-checks-ar15-mass-shootings/

- "What's in a denial? Bayesian Analysis shows that Kavanaugh lied about denials under oath and Trump was foolish to believe MBS," November 2, 2018 (with Aaron Edlin). https://works.bepress.com/john_donohue/176/

- "Brett Kavanaugh won't keep Americans safe," CNN.com, September 5, 2018. https://www.cnn.com/2018/09/05/opinions/kavanaugh-wont-keep-america-safe-donohue/

- "More Gun Carrying, More Violent Crime," *Econ Journal Watch*, Vol. 15, No. 1, 67-82, January 2018. https://econjwatch.org/articles/more-gun-carrying-more-violent-crime

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, January 2018 (with Abhay Aneja, and Kyle Weber).

- "Saving lives by regulating guns: Evidence for policy," *Science* Dec. 8, 2017, Vol. 358, Issue 6368, pp. 1259-1261, http://science.sciencemag.org/content/358/6368/1259.full (with Phil Cook).

- "Laws Facilitating Gun Carrying and Homicide," American Journal of Public Health, Vol 107, No. 12, 1864-1865, December 2017, http://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304144.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.

- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694

5

- Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html

- Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments

- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html

- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).

- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3

- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al). http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf

- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html

- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016), http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp

- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/

- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/

- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html

- "The Demise of the Death Penalty in Connecticut," Legal Aggregate - Stanford Law School (June 2016),

  https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/

- "On Justice Scalia's Legacy," Legal Aggregate - Stanford Law School (February 14, 2016) https://law.stanford.edu/2016/02/15/stanford-law-faculty-on-justice-scalia/

- "Empirical Evaluation of Law:  The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.

- "Capital Punishment Does not Deter Homicides," Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides

- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227

  o  Reprinted under the title "Does the Death Penalty Deter Killers?" Newsweek, August 19, 2015.

     https://www.newsweek.com/does-death-penalty-deter-killers-364164

-

6

- "Is Widespread Gun Ownership Worth the Price of More Violence?" San Francisco Chronicle, July 2, 2015. https://www.sfchronicle.com/opinion/article/Is-widespread-gun-ownership-worth-the-price-of-6363574.php.

- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/

- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590

  - Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/

- "The 10 day period is reasonable," San Francisco Daily Journal, September 3, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973:  Are There Unlawful Racial, Gender, and Geographic Disparities?" 11 Journal of Empirical Legal Studies 637 (2014).

- "The Impact of Right to Carry Laws and the NRC Report:  The Latest Lessons for the Empirical Evaluation of Law and Policy," NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)

- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/

- Outlier Nation:  Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).

- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch

- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html

- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39

- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).

- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).

- "What Can Be Done to Stem Gun Violence?"  San Francisco Chronicle, December 21, 2012.   http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qIkJJ2

- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.

- "Time To Kill the Death Penalty?" The California Progress Report, June 28, 2012.

- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).

- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," American Law and Economics Review (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang). See January 2014 Revision released as an NBER working paper above.

- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.

- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).

- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. (Fall 2009) (with Steve Shavell).

- "Estimating the Impact of the Death Penalty on Murder," 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).

- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.

- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again:  The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).

- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract

- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.

- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society  10: 333 (2008) at http://pun.sagepub.com

- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).

- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds., Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.

- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.

- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.

- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig), http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx.

- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).

8

- "The Discretion of Judges and Corporate Executives:  An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4.  Available at: http://www.bepress.com/ev/vol3/iss8/art4

- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).

- "The Death Penalty:  No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.

  - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice:  Top Economists Take on Today's Problems (2008).

- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.

- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).

  - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology  406-407 (2d ed. 2008).

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Foundations of Law and Economics, Edward Elgar Publishing (2010)

- "Does Terrorism Increase Crime?  A Cautionary Tale," (with Daniel Ho), 2005.

- "Fighting Crime:  An Economist's View," 7 The Milken Institute Review 46 (2005).

  - Reprinted in Kurt Finsterbusch, ed., Social Problems (McGraw-Hill, 2006).

- "Guns, Crime, and the Impact of State Right-to-Carry Laws," 73 Fordham Law Review 623 (2004).

- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", The Economists' Voice: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4

- "The Employment Consequences of Wrongful-Discharge Laws:  Large, Small, or None at All?" American Economic Review:  Papers and Proceedings May, 2004 (with David Autor and Stewart Schwab).

- "Further Evidence that Legalized Abortion Lowered Crime:  A Reply To Joyce," 39 Journal of Human Resources 29 (Winter 2004)(with Steven Levitt).

- "A Clarification on Data Availability," Science: Vol. 301: No. 5641. (September 26, 2003), p. 1849, http://www.jstor.org/stable/3835157.

- "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," Criminology & Public Policy (July 2003, Volume 2, Issue 3) at pp. 397-410.

- "Shooting Down the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1193 (2003)(with Ian Ayres).

- "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1371 (2003)(with Ian Ayres).

9

- "Can Guns, Or Gun Violence, Be Controlled?" (Reviewing James Jacobs, Can Gun Control Work?), The American Prospect (December 16, 2002), p. 35, http://prospect.org/article/books-review-4.

- "The Search for Truth:  In Appreciation of James J. Heckman," 27 Law and Social Inquiry 23 (2002).

- "The Schooling of Southern Blacks:  The Roles of Social Activism and Private Philanthropy, 1910-1960," Quarterly Journal of Economics (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.

  - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).

  - Reprinted in American Bar Foundation, Anaylzying Law's Reach:  Empirical Research on Law and Society (2008)

- "The Impact of Race on Policing and Arrests," Journal of Law and Economics, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.

- "The Impact of Legalized Abortion on Crime," Quarterly Journal of Economics (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Recent Developments In Law And Economics, Edward Elgar Publishing (2010).

- "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 Stanford Law Review 897 (2001).

  - Reprinted in Michael Zimmer, Charles Sullivan et al, Cases and Materials on Employment Discrimination (6th edition)(2003).

- "Nondiscretionary Concealed Weapons Law:  A Case Study of Statistics, Standards of Proof, and Public Policy," American Law and Economics Review 436 (1999)(with Ian Ayres).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

- "Why We Should Discount the Views of Those Who Discount Discounting," 108 Yale Law Journal 1901 (1999).

- "Understanding the Time Path of Crime," 88 Journal of Criminal Law and Criminology 1423 (1998).

- "Discrimination in Employment," The New Palgrave Dictionary of Law and Economics (1998).

  - Excerpted in Lynne Dallas, Law and Public Policy:  A Socio-Economic Approach at page 261 (2003).

- "The Legal Response to Discrimination:  Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).

- "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).

- "Allocating Resources Among Prisons and Social Programs in the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).

  - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),

- "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).

- "Did Miranda Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).

- "Some Thoughts on Affirmative Action," 75 <u>Washington University Law Quarterly</u> 1590 (1997).

- "Executive Compensation," 3 <u>Stanford Journal of Law, Business & Finance</u> 1 (1997).

- "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., <u>The Crime Conundrum:  Essays on Criminal Justice</u> 45 (1997). Reissued by Routledge eBooks 2019.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 <u>Journal of Legal Studies</u> 427 (1995) (with Peter Siegelman).

- "Employment Discrimination Law in Perspective:  Three Concepts of Equality," 92 <u>Michigan Law Review</u> 2583 (1994).

- Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).

  - Translated into Chinese and published in Peking University Law Review (2007).

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 <u>Journal of Legal Studies</u> 543 (1994).

- "Liberal Law and Economics," (reviewing <u>Rethinking the Progressive Agenda</u> by Susan Rose-Ackerman), 13 <u>Journal of Policy Analysis and Management</u> 192 (1994).

- Review of Richard Epstein's <u>Forbidden Grounds:  The Case Against Employment Discrimination Laws</u>, 31 <u>Journal of Economic Literature</u> 1477 (1994).

- "Law and Macroeconomics:  Employment Discrimination Over the Business Cycle," 66 <u>University of S. Calif. L. Rev.</u> 709 (1993) (with Peter Siegelman).

- "Advocacy Versus Analysis In Assessing Employment Discrimination Law," 44 <u>Stanford Law Review</u> 1583 (1992).

  - Reprinted in Christopher McCrudden, <u>Anti-Discrimination Law</u> (2003).

- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).

- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 <u>Law and Contemporary Problems</u> 195 (1991).

- "Re-Evaluating Federal Civil Rights Policy," 79 <u>Georgetown Law Journal</u> 1713 (1991) (with James Heckman).

- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 <u>Harvard Law Review</u> 1093 (1991).

  - Reprinted in Saul Levmore, <u>Foundations of Tort Law</u> 160 (1994).

- "Continuous versus Episodic Change:  The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 <u>Journal of Economic Literature</u> 1603 (December 1991) (with James Heckman).

  - Reprinted in Paul Burstein, ed., <u>Equal Employment Opportunity</u>, Aldine De Gruyter, New York (1994).

- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 <u>Harvard Journal of Law and Public Policy</u> 41 (1991).

- "Studying the Iceberg From Its Tip:  A Comparison of Published and Unpublished Employment Discrimination Cases," 24 <u>Law and Society Review</u> 1133 (1990) (with Peter Siegelman).

- "Prohibiting Sex Discrimination in the Workplace:  An Economic Perspective," 56 University of Chicago Law Review 1337 (1989).

- "The Law & Economics of Tort Law:  The Profound Revolution," 102 Harvard Law Review 1047 (1989).

- "Using Market Incentives to Promote Auto Occupant Safety," 7 Yale Law and Policy Review 449 (1989).

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," 99 Yale Law Journal 549 (1989).

  - Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.

- "Reply to Professors Ellickson and Stigler," 99 Yale Law Journal 635 (1989).

- "Law and Economics:  The Road Not Taken," 22 Law and Society Review 903 (1988).

- "Further Thoughts on Employment Discrimination Legislation:  A Reply to Judge Posner," 136 U. Pa. L. Rev. 523 (1987).

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," Chicago Tribune, sec.1, pg. 15, July 22, 1987.

- "Posner's Third Symphony:  Thinking about the Unthinkable," 39 Stanford Law Review 791 (1987)(with Ian Ayres).

- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., Research in Population Economics, vol.6, Greenwich, Conn.:  JAI Press (1987).

- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Is Title VII Efficient?" 134 U. Pa. L. Rev. 1411 (1986).

  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De  Gruyter, New York (1994).

- "Section I Cases," Sherman's Summations, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.

- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.

- "Godfrey v. Georgia:  Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 Catholic University Law Review 13 (1980).

- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

## Blog Posts:

- "Packed and Loaded: Stanford's John Donohue on Supreme Court's Guns Decision," *Stanford Law School Legal Aggregate Blog* (Jun. 24, 2022), https://law.stanford.edu/2022/06/24/packed-and-loaded-stanfords-john-donohue-on-supreme-courts-guns-decision/?utm_source=june302022&utm_medium=mc&utm_campaign= law%40stanford&utm_content=Stanford-law-news.

- "Guns, Mass Shootings, and the Law in the U.S.," *Stanford Law School Legal Aggregate Blog* (Dec. 10, 2021), https://law.stanford.edu/2021/12/10/stanfords-john-donohue-on-guns-mass-shootings-and-the-law-in-the-u-s/.

- "Stanford's John Donohue on One Tragic Week, Two Mass Shootings, and the Uniquely American Gun Problem," *Stanford Law School Legal Aggregate Blog* (March 25, 2021), https://law.stanford.edu/2021/03/25/stanfords-john-donohue-on-one-tragic-week-with-two-mass-shootings-and-the-uniquely-american-gun-problem.

- "Open Carry Laws, Guns on Capitol Hill, and a Police Force Outgunned by Militias," *Stanford Law School Legal Aggregate Blog* (January 19, 2021), https://law.stanford.edu/2021/01/19/open-carry-laws-guns-on-capitol-hill-and-a-police-force-outgunned-by-militias/.

- "Remembering Justice Ginsburg," *Stanford Law School Legal Aggregate Blog* (September 19, 2020), https://law.stanford.edu/2020/09/19/stanford-laws-john-donohue-remembers-justice-ginsburg/.

- "The Assault Weapon Ban Saved Lives," (with Theodora Boulouta), *Stanford Law School Legal Aggregate Blog*, October 15, 2019, https://stanford.io/2MWNsrV.

- "Stanford Law's John Donohue on Mass Shootings and Gun Regulation in the U.S.,"  *Stanford Law School Legal Aggregate Blog*, August 6, 2019, https://law.stanford.edu/2019/08/06/stanford-laws-john-donohue-on-mass-shootings-and-gun-regulation-in-the-u-s/.

- "Stanford Law Faculty Remember Justice Stevens."  *Stanford Law School Legal Aggregate Blog*, July 18, 2019, https://law.stanford.edu/2019/07/18/stanford-law-faculty-remember-justice-stevens/.

- "Arming Teachers Is Not a Good Option," *Scientific American*, February 28, 2018, https://blogs.scientificamerican.com/observations/arming-teachers-is-not-a-good-option/.

- "Another Mass Shooting: An Update on U.S. Gun Laws," *Stanford Law School Legal Aggregate Blog*, February 18, 2018, https://law.stanford.edu/2018/02/18/another-mass-shooting-qa-us-gun-laws/.

- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," Stanford Law School Legal Aggregate Blog, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-and-law/.

- *"Moore v. Texas* and the Pathologies that Still Mar Capital Punishment in the U.S.," *Stanford Law School Legal Aggregate Blog*, March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/.

- "Trump and Gun Policy," *Stanford Law School Legal Aggregate Blog*, November 12, 2016, http://stanford.io/2eoWnna.

- "Facts Do Not Support Claim That Guns Make Us Safer" *Stanford Law School Legal Aggregate Blog*, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/.

- "When will America wake up to gun violence?" *CNN.com*, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html.

- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).

- "Have "Woman-Protective" Studies Resolved the Abortion Debate?  Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).

- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).

13

- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

## WORKSHOPS AND ADDRESSES:

- Panelist, "Inside the Brain of the Mass Shooter and the Impact of Their Criminal Behavior," Symposium on "The Law and Neuroscience of Mass Shootings," held virtually by the Neuroscience and Law Center, **Fordham University School of Law,** November 1, 2022.

- "Can We Get Strong Gun Safety Legislation Passed?" Vi Seminar, **Palo Alto, CA,** July 18, 2022.

- Panelist, "Inside the Brain of the Mass Shooter and the Impact of Their Criminal Behavior," Symposium on "The Law and Neuroscience of Mass Shootings," held virtually at Fordham Law School, November 1, 2022.

- "*Bruen*, Permissive Gun Carrying, Constitutional Law, and Violent Crime," Faculty Workshop, **Stanford Law School,** July 13, 2022.

- "Effectiveness of Permissive Gun Laws: Carry Laws, Stand Your Ground," Annals Authors' Conference, **University of Connecticut,** Hartford, April 7, 2022.

- "Permissive Gun Carrying Laws and Violent Crime," ETH, Zurich, April 6, 2022; Law and Economics Workshop, **Tel Aviv University School of Law,** May 11, 2022.

- "Guns and Crime in American Life and Law," **University of Zurich,** April 5, 2022.

- "Do Permissive Gun Carrying Laws Increase Violent Crime?" Applied Webinar at the **Sao Paulo School of Economics,** November 17, 2021.

- "Mass Shootings, Gun Laws and the Evolution of the Second Amendment – Where Do We Go from Here?" **Minnesota Continuing Legal Education Webcast,** November 2, 2021.

- Discussant of Richard Berk, "Firearm Sales in California Through the Myopic Vision of an Interrupted Time Series Causal Analysis," Online Causal Inference Seminar, **Stanford University,** April 6, 2021.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," American Law and Economics Association Meetings, **NYU School of Law,** May 18, 2019; Department of Economics, **University of California, Irvine,** October 13, 2020; **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021; Crime Seminar, **Northwestern Law School,** March 3, 2022.

- Discussant of Chika Okafor, "Prosecutor Politics: The Impact of Election Cycles on Criminal Sentencing in the Era of Rising Incarceration," **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.

- "Guns and Crime," Economic Analysis of Crime course, **Bocconi University,** Dept. of Social and Political Sciences, March 8, 2021.

- Discussant, "How the Massachusetts assault weapons ban enforcement notice changed firearm sales," Firearms and Policy session, **Assoc. for Public Policy Analysis and Management (APPAM) Virtual Fall Research Conference,** November 12, 2020.

- "We Must Confront the Threats to America's Democracy," Idaho Law Review Election Law Symposium, **University of Idaho College of Law,** October 20, 2020.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," Department of Economics, **University of California, Irvine,** October 13, 2020.

- "The Death Penalty: Informing Policy Through Empirical Research," Program in Criminal Law and Policy, **University of Arizona College of Law,** October 6, 2020.

14

- Discussant, "Mandatory Retirement Improved Performance on State Supreme Courts," Law and Economics Session, **NBER Summer Institute**, July 22, 2020.

- Discussant, "Measuring Racial Discrimination in Bail Decisions," Crime Session, **NBER Summer Institute**, July 15, 2020.

- "Guns and Empirical Evidence in Second Amendment Litigation," **Columbia Law School**, March 24, 2020; **Yale Law School**, March 25, 2020 (Zoom Presentation).

- Panelist, "Guns, Schools, and Adolescents: A Disaster Waiting to Happen," Psychiatry Grand Rounds,

- Sapp Center for Science Teaching and Learning, **Stanford University School of Medicine**, February 20, 2020.

- "The Power of Data to Change Hearts, Minds, and Public Policy," Law and Policy Lab, **Stanford Law School**, February 13, 2020.

- "The Move to 'Guns Everywhere'," Inaugural Cooter-Rubinfeld Lecture, **University of California, Berkeley, Law School**, February 6, 2020.

- "The Swerve:  A Legal and Empirical Evaluation of the Move to 'Guns Everywhere,'" Law and Economic Studies Workshop, **Columbia Law School**, September 23, 2019; Conference on Gun Rights and Regulations Outside the Home, **Duke Law School**, September 27, 2019.

- "Evidence to Guide Gun-related Public Policy," Conference on Gun Violence Epidemic, **Stanford Medical School**, September 16, 2019; Lecturer, Physicians and Social Responsibility Course, **Stanford Medical School**, October 7, 2019; Lecturer, Data Science Course, **Department of Statistics, Stanford University**, November 1, 2019.

- "The Legal and Political Battle over Gun Policy in America," **Hamilton College**, June 7, 2019.

- "Impact of Right to Carry Laws on Violent Crime," Public Policy colloquium, **Stanford Economics Department**, January 22, 2018; SPILS Methods Workshop, **Stanford Law School**, January 25, 2018; Quantlaw, **University of Arizona Law School**, March 2, 2018; Stanford/Berkeley Causal Inference Conference, **Stanford Graduate School of Business**, April 23, 2019; **Baldy Center/Law School Distinguished Speaker Series**, University at Buffalo School of Law, May 3, 2019; Conference on "Synthetic Controls and Related Methods," **Institute for Data, Systems, and Society, MIT**, May 21, 2019.

- "Guns, Abortion, and the Death Penalty: Informing Policy Through Empirical Research," Politics and Public Policy Lecture Series, **Stanford University**, April 1, 2019.

- "Dangers of Guns Carried Outside the Home for Protection," **GVPedia Conference**, Denver, Colorado, April 6, 2019.

- "Understanding California's Red Flag Law: How to Remove Guns from People Who Are a Threat to Themselves or Others," **Stanford Law School**, February 12, 2019.

- "Guns and Crime: Current Empirical and Legal Debates," **Fellowship Forum**, January 22, 2019.

- "Gun Policy in America at a Critical Juncture," SAFE, **Stanford Medical School**, September 17, 2018.

- "Empirical Evaluation of Law and Policy: The Battle for Truth," **Woodside Rotary Club**, September 12, 2018.

- "Discussing America's Second Amendment," **San Jose Museum of Quilts & Textiles**, July 15, 2018.

- "The Legal Battle to End the Death Penalty in Connecticut," **Law School of the University of Reggio Calabria,** Italy, June 15, 2018.

15

- Panelist, "Newtown and Gun Violence in the US, Humanity is Indivisible Series, **Stanford University**, May 31, 2018.

- "Gun Policy In California and the US," Human Rights Seminar; **Stanford Medical School**, May 29, 2018.

- "Gun Policy in the Wake of Parkland," Sigma Alpha Epsilon Leadership Speaker Series, **Stanford Law School**, March 13, 2018; Stanford in Government event, Haas Center, **Stanford University**, April 20, 2018.

- Panelist, Town Hall Meeting on Gun Violence with Congresswoman Jackie Speier, **Burlingame High School**, April 14, 2018.

- Moderator, In Studio Conversation with Berkeley Law School Dean Erwin Chemerinsky: "Defining the Limits of Free Speech," **Palo Alto League of Women's Voters**, March 27, 2018. https://youtu.be/cqHEIAVoTLY

- "More than Thoughts & Prayers," **American Constitution Society** and the **Federalist Society, U.C. Hastings School of Law**, March 14, 2018.

- Panelist, "Addressing Gun Violence," **American Constitution Society**, Stanford Law School, March 8, 2018.

- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017.

- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.

- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, **Cornell University**, October 13, 2017.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar,** April 24, 2017, Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.

- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, **JFK University School of Law,** March 18, 2017.

- "The Evidence on Guns and Gun Laws," **Federal Bar Council Program on Guns and Gun Laws** -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School**, October 17, 2016.

- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.

- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies; **University of California, Riverside**, October 24, 2016.

- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University**, August 25, 2016.

- "The Battle Over Gun Policy In America," Physicians and Social Responsibility" seminar; **Stanford Medical School**, October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association**, April 27, 2016; **The League of Women Voters of Palo Alto**, April 19, 2016; Human Rights and Health Seminar, **Stanford University**, April 12, 2016; Bechtel International Center, **Stanford University**, February 23, 2016; Stanford in Government Seminar, Haas Center, **Stanford University**, February 2, 2016.

- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), **AEA Annual Meeting**, San Francisco, January 5-7, 2016.

**16**

- "Race and Arbitrariness in the Connecticut Death Penalty," **University of Connecticut School of Law**, Nov. 20, 2015.

- *"Connecticut v. Santiago* and the Demise of the Connecticut Death Penalty," Faculty Workshop, **Stanford Law School**, August 19, 2015.

- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, **Covington and Burling, New York**, May 14,  2015; **NBER Summer Institute**, Cambridge, MA, July 23, 2015; Faculty Workshop, **Stanford Law School**, November 11, 2015.

- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, **Bocconi University School of Law, Milan, Italy**, June 18, 2015.

- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" **Stanford Law School**, Legal Theory Workshop, March 1, 2007; Faculty Workshop, **Tel Aviv University School of Law**, May 14, 2007; Faculty Workshop, **University of Haifa Law School**, May 16, 2007; Law and Economics Workshop, **Georgetown Law School**, September 19, 2007; Law and Economics Workshop, **St. Gallen Law School**, Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 21, 2008; Faculty Workshop, **University of Virginia Law School,** October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, **Universitat Pompeu Fabra (Barcelona),** June 15, 2009; **Google, Milan**, Italy, June 8, 2015.

- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, **Columbia Law School**, May 15, 2015.

- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, **Yale Law School**, April 17, 2015.

- "Assessing the Development and Future of Empirical Legal Studies," **Stanford Law School** course on Modern American Legal Thought, February 25, 2015.

- Commentator:  "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, **Boalt Hall**, Berkeley, CA, November 7,  2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973:  Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, **Economics Department, Rice University**, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, **University of Virginia Law School**, September 11, 2014; Faculty Colloquium, **University of San Diego School of Law**, October 3, 2014.

- "What's Happening to the Death Penalty?  A Look at the Battle in Connecticut," **Hamilton College**, Clinton, New York, June 6, 2014.

- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School,** May 15, 2014.

- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.

- "Guns: Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.

-  "The Impact of Antidiscrimination Law:  The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Reducing Gun Violence," Forum on Gun Violence Reduction, **Mountainview City Hall**, Mountainview, CA, Feb. 8, 2014.

- "Gun Policy Debate," **C-SPAN**. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.

- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, **Stanford Law School**, November 20, 2013.

- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16,  2010; **NBER Summer Institute** Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden, CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.

- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013;  8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.

- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.

- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013

- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?"  **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Flashes of Genius (Glimpses of <u>Extra</u>-ordinarily Novel Thinking) -- "Stemming Gun Violence," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series

- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://www.fondazioneveronesi.it/scienceforpeace2012/

- Seminar Presentation, "America's Criminal Justice System," **Renaissance Weekend**, Santa Monica, CA., Feb. 19, 2012.

- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILLS Fellow's Workshop, **Stanford Law School**, February 2, 2012.

18

- "New Evidence in the 'More Guns, Less Crime' Debate:  A Synthetic Controls Approach," Conference on Empirical Legal Studies, **Northwestern Law School**, November 4, 2011.

- "Drug Legalization and its Alternatives," *Lessons from the Economics of Crime: What Works in Reducing Offending?* **CESifo Venice Summer Institute Workshop,** July 22 , 2011.

- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," **Yale Center for the Study of Globalization**, May 12, 2011.

- Plenary Session:  Flashes of Genius (Glimpses of <u>Extra</u>-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" **Renaissance Weekend**, Liguna Niguel, CA., Feb. 18, 2011.

- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), **Stanford Law School**, January 25, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, **Stanford Law School**, April 5, 2011.

- "Empirical Evaluation of Law:  The Dream and the Nightmare," SPILS Fellows Lecture, **Stanford Law School**, January 15, 2015; Legal Studies Workshop, **Stanford Law School**, Feb. 7, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 20, 2011; **University of Denver Sturm College of Law**, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, **Columbia University**, May 20, 2011.

- Death Sentencing in Connecticut," **American Society of Criminology Annual Meeting**, San Francisco, Nov. 17, 2010.

- "The Impact of Right to Carry Laws and the NRC Report:  Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Commentator, "A Test of Racial Bias in Capital Sentencing," **NBER Political Economy Program Meeting**, April 23, 2010.

- "The (Lack of a) Deterrent Effect of Capital Punishment," Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.

- Keynote Address, "The Evolution of Econometric Evaluation of Crime and Deterrence,"1st Paris& Bonn Workshop on Law and Economics:  The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre,** September 24, 2009.

- Comment on Cook, Ludwig, and Samaha, "Gun Control after *Heller*: Litigating Against Regulation," NBER Regulation and Litigation Conference, **The Boulders**, Carefree, Arizona, September 11, 2009.

- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona),** June 18, 2009.

- Comment on Joanna Shepherd's "The Politics of Judicial Opposition," Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany**, June 12, 2009.

- "The Great American Crime Drop of the '90s:  Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty," **Hamilton College**, Clinton, NY, June 5, 2009.

- "The Impact of the ADA on the Employment and Earnings of the Disabled," **American Law and Economics Association Meetings**, University of San Diego, May 15, 2009.

**19**

- "Crime and Punishment in the United States," **Eastern State Penitentiary, Yale Alumni Event**, Philadelphia, PA, April 26, 2009.

- "Measuring Culpability in Death Penalty Cases," Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.

- "Autopsy of a Financial Crisis," Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan**, March 23, 2009.

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop**, NYU Law School**, March 10, 2009.

- Intelligence-Squared Debate:  "Guns Reduce Crime," **Rockefeller University**, New York, October 28, 2008.

- "The D.C. Handgun Controls: Did the Supreme Court's Decision Make the City Safer?" Debate, **The Contemporary Club of Albemarle**, Charlottesville, VA, October 23, 2008.

- "Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement,"  Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School**, October 11, 2008.

- "Empirical Evaluation of Gun Policy," **Harvard Law School**, October 9, 2008.

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin," **Russell Sage Foundation**, New York, May 3, 2007; Law and Economics Workshop, **Tel Aviv University School of Law**, May 28, 2008.

- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.

- "Evaluating Connecticut's Death Penalty Regime," Faculty Public Interest Conversation, **Yale Law School**, April 9, 2008.

- "The Death Penalty in Connecticut and the United States," **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law:  Criminal Sentencing and the Death Penalty, **Fordham Law School**, April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live. WNPR. Connecticut, March 10, 2008.

- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.

- "The Empirical Revolution in Law and Policy:  Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School,** Novermber 9, 2007.

- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.

- "Empirical Evaluation of Law:  The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School, Switzerland**, June 25, 2007.

- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.

- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, **Yale Law School,** "Rethinking the Incarceration Revolution Part II:  State Level Analysis," April 14, 2006.

- "Corporate Governance in America:  The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.

- "The U.S Tort System," (Latin American) Linkages Program, **Yale Law School**, February 13, 2007.

- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.

- **"**Economic Models of Crime and Punishment," Punishment:  The U.S. Record:  A Social    Research Conference at **The New School**, New York City, Nov. 30, 2006

- Comment on Baldus et al, "Equal Justice and the Death Penalty:  The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of   Texas Law, School**, Austin, Texas, October 27, 2006.

- "Empirical Evaluation of Law:  The Promise and the Peril," **Harvard Law School**, October  26, 2006.

- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland,** March 9, 2007.

- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.

- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.

- "Landmines and Goldmines:  Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," **Rosenthal Lectures, Northwestern University School of Law**, April 4-6, 2006.

- "The Impact of Legalized Abortion on Crime," **American Enterprise Institute**, March 28, 2006.

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences,"**Conference on Medical Malpractice, The Rand Corporation**, March 11, 2006.

- "Powerful Evidence the Death Penalty Deters?" **Leighton Homer Surbeck Chair Lecture, Yale Law School**, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, **University of Connecticut Law School,** October 18, 2005; Faculty Workshop, **UCLA Law School**, February 3, 2006; Law and Economics Workshop, **Stanford Law School**, February 16, 2006; ; Law Faculty, **University of Cambridge, Cambridge, England**, February 28, 2006; **University of Illinois College of Law,** Law and Economics Workshop, March 2, 2006; Faculty Workshop, **Florida State University Law School**, March 30, 2006; **ALEA**, Berkeley, CA May 6, 2006; **University of Chicago Law School,** Law and Economics Workshop, May 9, 2006.

- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School,  January 31, 2006.

- "Witness to Deception:  An Insider's Look at the Disney Trial," **2005-2006 Distinguished Lecture, Boston University School of Law**, November 10, 2005; Center for the Study of Corporate Law, **Yale Law School**, November 3, 2005; **Law Offices of Herbert Smith, London, England**, February 23, 2006; Law Faculty, **University of Cambridge, Cambridge, England**, February 27, 2006.

- "Understanding the Surprising Fall in Crime in the 1990s," **Rotary Club**, Orange, CT, August 5, 2005; Faculty Workshop, **Yale School of Management**, September 21, 2005.

- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, **Yale School of Management**, September 8, 2005.

- "Crime and Abortion," **Museo de la Cuidad de Mexico**, Mexico City, October 20, 2003.

21

- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," **MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice**, San Francisco, CA, February 28, 2003.

- "Shooting Down the More Guns, Less Crime Hypothesis," **Stanford Law School**, Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, **Boalt Hall**, University of California, Berkeley, Feb. 24, 2003; Development Workshop, **Stanford Law School**, April 25, 2003; Faculty Workshop, **Stanford Law School**, July 2, 2003; Law and Public Affairs Program Workshop, **Princeton University,** September 29, 2003; Stanford Alumni Weekend, **Stanford University**, October 17, 2003; Faculty Workshop, **CIDE**, Mexico City, October 20, 2003.

- **"**The Impact of Legalized Abortion on Teen Childbearing," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2002.

- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, **Stanford Law School**, October 4, 2000; First-Year Orientation, **Stanford Law School**, September 5, 2001; Faculty Workshop, **Harvard Law School**, April 26, 2002; Faculty Workshop, **Columbia Law School**, April 29, 2002.

- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.

- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations:  Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School**, Oct. 18, 2001.

- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2001; Labor and Employment Seminar, **NYU Law School**, October 16, 2001; Faculty Workshop, **Stanford Law School**, September 18, 2002; **Yale Law School**, January, 2004.

- "Racial Profiling:  Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference**, San Francisco, CA, November 15, 2000.

- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.

- "Corporate Governance in Developing Countries:  Opportunities and Dangers," Conference on Neoliberal Policies for Development:  Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000

- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, **Yale Law School**, September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School**, October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, **Baruch College**, November 9, 1999; MacArthur Foundation Social  Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences,** October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.

- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.

- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop**, University of Wisconsin School of Social Science**, February 19, 1999.

- "What Do We Know About Options Compensation?" Institutional Investors Forum**, Stanford Law School**, May 29, 1998.

- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.

- "Understanding The Time Path of Crime," Presentation at Conference on <u>Why is Crime Decreasing?</u> **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan Law School**, February 18, 1999.

- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.

- "Some Thoughts on Affirmative Action," Presentation at a conference on <u>Rethinking Equality in the Global Society</u>, **Washington University School of Law**, November 10, 1997.

- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.

- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business**, University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.

- "Crime in America:  Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?"  TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.

- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.

- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.

- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.

- "The Power of Law:  Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?"  The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.

- "Public Action, Private Choice and Philanthropy:  Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.

23

- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.

- Commentator, Symposium on Labor Law, **University of Texas Law School**, November 10-11, 1995.

- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.

- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.

- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law**, February 27, 1995.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University**, Law and Economics Seminars, October 31, 1994.

- "Is the United States at the Optimal Rate of Crime?"  Faculty Workshop, **Indiana University School of Law**, Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law**, April 18, 1994; Law and Economics Workshop, **Stanford Law School**, April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School**, May 13, 1994; **American Bar Foundation**, September 7, 1994; Faculty Workshop, **DePaul Law School**, September 21, 1994; Law and Economics Workshop, **University of Chicago Law School**, October 11, 1994; Faculty Seminar, **Stanford Law School**, October 31, 1994; Law and Economics Luncheon, **Stanford Law School**, November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law**, Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School**, November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School**; Law and Economics Workshop, **Yale Law School**, February 1, 1996; Faculty Workshop, **Cornell Law School**, April 10, 1996; Faculty Workshop, **Tokyo University Law School**, June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.

- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law**, September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law**, September 20, 1994.

- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University**, May 17, 1994.

- "Does Law Matter in the Realm of Discrimination?"  **Law and Society Summer Institute**, Pala Mesa Lodge, Fallbrook, California, June 25, 1993.

- Commentator, "The Double Minority:  Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research**, March 28, 1993.

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," Economic Analysis of Civil Procedure, **University of Virginia School of Law**, March 26, 1993.

- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society**, February 23, 1993.

- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School**, May 15, 1992.

- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies**, Fairfax, Virginia, March 27, 1992.

24

- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School**, February 26, 1992.

- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School**, February 13, 1992.

- "Law & Macroeconomics:  The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University**, November 6, 1991; Faculty Workshop, **University of North Carolina Law School**, Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law**, December 11, 1991; Law and

- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.

- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.

- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.

- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.

- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.

- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?"  Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School**, February 26, 1991.

- Panel Member, "The Law and Economics of Employment Discrimination," **AALS Annual Meeting**, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.

- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.

- "The Effects of Fee Shifting on the Settlement Rate:  Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure:  Issues in Controversy," June 16, 1990.

- "Studying the Iceberg From Its Tip?:  An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," **Law and Society Meetings**, Berkeley, California, May 31, 1990.

- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.

- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.

- "Continuous versus Episodic Change:  The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.

25

- "Sex Discrimination in the Workplace:  An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.

- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting**; Madison, Wisconsin, June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.

- "Law & Economics:  The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.

- "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon.  **Chicago Bar Association**, May 31, 1988.

- "The Morality of the Death Penalty."  A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.

- "Models of Deregulation of International Capital Markets."  A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.

- "Is Title VII Efficient?"  A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.

- "The Senate's Role in Confirming Supreme Court Nominees:  The Historical Record," **Northwestern University School of Law**, September 22, 1987.

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," **Yale Law School** Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; **AALS Annual Meeting**, New Orleans, January 7, 1989.

- "Women in the Labor Market--Are Things Getting Better or Worse?"  **Hamilton College**, February 23, 1987.

- "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.

- "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.

- "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.

- "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## AWARDS

- **47th Tikkun Olam Award**, The Haiti Jewish Refugee Legacy Project, February 2014, "Awarded for incredibly significant work that explores and inspires the search for justice and taking serious, correct and timely action." Tikkun Olam is a Hebrew phrase that means 'repairing the world.' https://haitiholocaustsurvivors.wordpress.com/guest-posts/47th-tikkun-olam-award-to-professor-john-j-donohue-iii/

## PROFESSIONAL ACTIVITIES

- Member, Stanford Law School academic reading group evaluating the criminal law opinions of U.S. Supreme Court nominee Judge Ketanji Brown Jackson for the ABA Standing Committee on the Federal Judiciary, March 2022.
- Member, USF Institute for Nonviolence and Social Justice Leadership Council, University of San Francisco, June 2021 – present.
- Member, Criminal Justice Expert Panel, @CJExpertPanel, providing information on the relevance of criminal justice research to current events, beginning April 2021.
- Statistical Consultant to the Fairness Committee of the 9th Circuit Court of Appeals investigating issues of sentencing disparities by race, ethnicity, and gender in federal criminal sentencing, March 2018 – March 2020.
- Legal Scholarship Network Advisory Board Member, SSRN.
- Member, Committee on Law and Justice, National Research Council, October 2011 – December 2018.
- Fellow of the Society for Empirical Legal Studies, 2015 - present.
- Member, International Advisory Council, Economic Order Study Center, Federal University of San Paolo, Brazil.
- Co-Editor (with Steven Shavell), American Law and Economics Review, May 2006 – August 2012.
- President, American Law and Economics Association, May 2011 – May 2012.
- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012.  Member, Board of Directors from November 2011 - November 2014.
- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011; Testified again before the Connecticut Judiciary Committee on March 14, 2012.
- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.
- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.
- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.
- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.
- Evaluated the Connecticut death penalty system: "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/.
- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004.  Resulting Publication:  National Research Council, Measuring Racial Discrimination (2004), http://www.nap.edu/catalog/10887.html.
- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.
- Editorial Board, Journal of Empirical Legal Studies, July 2003 – present.
- Editorial Board, International Review of Law and Economics, October 1999 – present.
- Editorial Board, Law and Social Inquiry, February 2000 – present.

- Board of Editors, <u>American Law and Economics Review</u>, August 1998 – April 2013.

- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11, 1998.

- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996.  Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.

- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).

- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.

- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).

- Chair, AALS Section on Law and Economics, January 1990-January 1991.

- Economic Consultant to Federal Courts Study Committee.  Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee.  February 1989-March 1990.

- Member, 1990 AALS Scholarly Papers Committee.

- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law.  Since December 1987.

- Associate Editor, <u>Law and Social Inquiry</u>.  Summer 1987-December 1989.

- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management.  Chicago, Illinois. May 23, 1988.

- Member, Congressman Bruce Morrison's Military Academy Selection Committee.  Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

## PRO BONO LEGAL WORK

- Co-wrote <u>amicus brief</u> for the United States Supreme Court for "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, which discusses the evidence that right-to-carry laws increase violent crime in the brief, September 21, 2021.

- Co-wrote amicus brief for the United States Supreme Court for "Public Health Researchers and Social Scientists in Support of Respondents" in *New York State Rifle & Pistol Association v. City of New York*, which quotes my article *Right-to-Carry Laws and Violent Crime* in the brief, August 12, 2019.

- Co-wrote <u>amicus brief</u> for the 9th Circuit Court of Appeals for "Empirical Scholars Concerning Deterrence and the Death Penalty In Support of Petitioner/Appellee," *Jones v. Da*vis, No. 09 Cv. 2158 CJC, which discusses the lack of deterrence of the death penalty, March 6, 2015.

- Death Penalty case:  <u>Heath v. Alabama</u>.  Fall 1986-Fall 1989.

- Wrote brief opposing death sentence in Navy spy case.  Court ruled in favor of defendant John A. Walker on September 13, 1985.

- Staff Attorney, Neighborhood Legal Services, January-July 1981.

- Appealed sentence of death for Georgia defendant to the United States Supreme Court.  Sentence vacated on May 27, 1980.  <u>Baker v. Georgia</u>.

- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

## RESEARCH GRANTS

- Stanford University Research Fund, January 1997 and January 1998.

- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.

- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

## BAR ADMISSIONS

- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 3, 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

## PROFESSIONAL and HONORARY ASSOCIATIONS

- American Academy of Arts and Sciences (since April 2009).

- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.

- Stanford Center for Racial Justice – August 2020 to present.

- American Law Institute (since September 29, 2010).

- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).

- American Bar Association

- American Economic Association

- American Law and Economics Association

## PERSONAL

- Born:  January 30, 1953.

# Recent Trends in American Gun Prevalence[*]

John J. Donohue III[†] and Isaac J. Rabbani[‡]

June 5, 2017

### Abstract

We explore trends in a variety of measures of gun prevalence, including direct surveys, proxies, and economic indicators. We find that firearm ownership, measured at both the individual and household levels, has declined significantly since the 1970s, though concentration of ownership has increased. The decrease seems attributable largely to reduced interest in hunting, as it has been driven by a drop in ownership of rifles and shotguns. Ownership of handguns, which are typically bought for self-defense, has remained stable, despite decreases in crime and in fear of danger.

# Introduction

Recent high-visibility incidents involving firearms—especially mass shootings, such as that at Sandy Hook Elementary School—have renewed public interest in firearms legislation. In order to effectively tailor gun policy, it is important to understand the extent of gun prevalence in American society, whether this prevalence has changed over time, and if so, how—all of which have been the subjects of considerable media discussion (Bialik, 2013a; Brennan, 2012; NRA-ILA, 2016). One spokesperson for the National Rifle Association ascribed the drop in violent crime rates over recent decades to the passage of shall-issue laws, claiming that "[i]t would be disingenuous for anyone to not credit increased self-defense laws to account for this decline" (Miller, 2012). Opponents of this position claim that the reduction in crime was due to other factors; that despite the initiation of concealed-carry programs, gun ownership has actually declined; and further, that this decline, reflecting a shift in popular preferences, justifies calls for stricter regulation of firearm sales (Waldman, 2012).

In this paper, we review annual survey data at the national, state, and Census-Division levels, that track the prevalence of firearms in American households. Drawing on the larger gun policy literature, we then examine several commonly used proxy measures for gun prevalence. Both approaches lead to the same conclusions: Gun ownership in the U.S. has undergone a sustained and significant decrease over the past 35 years, and has simultaneously become more concentrated. Finally, we offer potential explanations for this decline, finding that the most salient is an abatement in interest in hunting, and that it is more difficult to judge the effects of other factors.

## A Note on Terminology

For the remainder of the paper, we use the terms gun ownership and gun prevalence (or firearm ownership and firearm prevalence) interchangeably. One could argue that the two are actually subtly different: If one were studying the phenomenon of suicide committed by firearm, then perhaps a relevant factor to consider would be how accessible guns are to the everyday person—that is to say, prevalence. On the other hand, if one were studying changes in societal attitudes towards keeping a gun in the home, one might be more interested in the rate of household ownership. In practice, however—in part due to the paucity of data on

---

[*]We are extremely grateful to Deborah Azrael, Matthew Miller, Peter Siegelman, and Abhay Aneja for constructive comments, to Stephen Fischer Jr. of the FBI and Jaesok Son of the GSS for guidance on interpreting their data, and to Bhargav Gopal, Maggie Yellen, and Alex Albright for excellent research assistance.
[†]Stanford Law School, donohue@law.stanford.edu
[‡]Stanford Law School, irabbani@law.stanford.edu

guns—the literature on this subject tends to use the ownership rate, especially the household ownership rate, as a yardstick for prevalence.

# Survey Measures

Perhaps the most widely cited measure of national gun ownership is that of the General Social Survey (GSS), which has collected data on household gun ownership since 1973, and personal gun ownership since 1980, switching between annual and biennial collection in various years (Smith & Son, 2015). The GSS is considered to be one of the most reliable instruments for tracking broad social trends, especially relative to telephone surveys, because of its in-person interview format, large sample size (2,867 respondents in the 2016 survey), high response rates (consistently over 70%), and careful efforts to generate a representative sample of the U.S. population. Figure 1 shows that the GSS data reflect a substantial drop in household gun ownership levels since the late 1970s. In 2016, the GSS-reported percentage of households that contained a gun was 30.8%, a significant drop from a high[1] of 50.4% in 1977. Personal gun ownership, meanwhile, dropped from a peak of 30.5% in 1985 to 20.5% in 2016.



Figure 1: GSS-Measured Trends in Gun Ownership, 1973 - 2016.

The Pew Research Center has tracked gun ownership since 1993, and also reports a significant decrease. In Pew's 1993 survey, 45% responded yes to having a gun in their household (the corresponding GSS rate was 43.8%), and by 2013 this number had fallen to 33% (when the GSS recorded 34.4%) (Pew Research Center, 2013). In a report for the National Opinion Research Center—the organization that conducts the GSS, at the University of Chicago—Smith *et al.* (2014), using the iPoll archive, compile the results of 415 polls conducted between 1959 and 2013 that have surveyed national gun ownership. Going by the 364 of these that estimated a household rate, the authors estimate a decline in household gun ownership of 9 percentage points from the late 1970s to 2013,[2] and find that the annual trend of abatement is statistically significant and robust to controlling for various survey methodologies.[3]

---

[1] All maximum and minimum survey values are taken over the entire period for which a survey question is asked.

[2] The authors use year ranges instead of individual years, and estimate a drop from 48.4% before 1980 to 39.4% in 2006-2013.

[3] Such methodological variations include in-person interviewing versus telephone interviewing; use of all adults as the polling base, versus restriction to registered voters; and different wordings of gun possession questions.

One major survey that deviates from the GSS, Pew, and the iPoll study is Gallup, which has tracked gun ownership since 1960, but finds a different pattern, as shown in Figure 2 (Gallup, 2015). Essentially, the Gallup surveys suggest that after 1960, gun ownership declined for twenty years, and since then has roughly stayed constant, albeit with some substantial temporary swings. Part of the reason for this volatility could be that the response rates for Pew's and Gallup's surveys—as they are conducted via telephone as opposed to in person—are typically much lower than that of the GSS (Pew Research Center, 2012).



Figure 2: Survey Rates of National Household Gun Ownership, 1959 - 2015.

## Criticism of Survey Evidence

The accuracy of survey results for controversial subjects such as gun ownership is often subject to debate. Skeptics of an ownership decline contend that many firearm owners are loath to reveal their true ownership status (Bialik, 2013b). Downward response error could result from fear that one owns or uses a gun illegally (whether or not that is the case), fear that the government will acquire the survey information and secretly maintain a database of gun owners, or from simply not knowing there is a gun in the household at all (National Research Council, 2004). But at least in the past, survey respondents seemed to answer gun questions willingly and accurately. In one survey of concealed-carry permit holders, Smith (2003) found that 94% accurately reported their status. Another experiment found that only 1 of 35 people living at addresses where handguns had recently been registered denied that any kind of gun had been kept in their home (Kellermann *et al.*, 1990).[4] According to Tom Smith, director of the GSS, less than 1% of respondents have refused to answer the GSS gun ownership question since it started being asked (in 1973); the question is "asked well into [the] survey...They've already told us all kinds of things about themselves" (Bialik, 2013a).[5] Low response rates are also cited as cause for concern, though once again this is principally a problem for telephone surveys, and in any case there is little reason to believe that non-responders are more likely than

---

[4]31 respondents acknowledged possession of a gun, and the other 3 claimed that a gun was recently kept in their home, but is no longer. False positives were not assessed since only those who had recently registered guns were surveyed. See Rafferty *et al.* (1995) for another example of such evidence.

[5]For further discussion of survey validity and methodologies, see Smith *et al.* (2014) and Chapter 2 of National Research Council (2004)

responders to be gun owners.[6]  Overall, the gun prevalence decline in the GSS data seems most likely to be accurate.

# Proxy Measures

## Background

Most surveys that include questions on gun ownership are conducted at the national level or within particular states, and are not conducted every year. The GSS, for example, is only constructed to be representative at the levels of the nine Census Divisions and the country. The CDC's Behavioral Risk Factor Surveillance System (BRFSS), another commonly used state-level survey, only included questions on gun ownership in all states in 2001, 2002, and 2004. Because these limitations often make survey data difficult to employ, especially when analyzing more granular geographic units, firearms researchers have developed several proxy metrics that are highly correlated with survey measures of gun ownership, but cover broader time periods and finer units. In order to build a more complete picture of recent trends in gun ownership, we compile several of these proxies,[7] namely: the proportion of suicides committed by gun, the circulation rate of the firearm magazine *Guns & Ammo*, the per capita numbers of hunting licensees and federal firearms background checks, and the rate of accidental firearm death among children. Table 1 presents fixed-effects regressions, at the Census-Division and state levels, of the log of the GSS ownership rate on the log of each proxy.[8] In the appendix, we also present simple pairwise correlation coefficients between national, Census-Division level, and state gun ownership rates and the corresponding proxies.

### Criticism of Proxies

It should be noted that Kleck (2004) rejects the use of any gun ownership proxy to analyze inter-temporal trends, claiming that of the twelve proxies he examines, some capture inter-spatial variation in gun ownership, but none captures inter-temporal variation. His methodology, however, is to compare the annual percent change in each proxy to that of the GSS national gun ownership rate. As Hemenway (2012) rightly points out, in doing so he fails to take into account that "year-to-year changes in the GSS national measure of gun ownership...are probably almost entirely 'noise.' That changes in no other firearm proxy are highly correlated with this 'noise' does not mean other measures are bad (or good) proxies." As Table 1 and Appendix Table 2 indicate, *levels* of certain proxies are strongly predictive of survey rates at the national and sub-national levels, even after controlling for region- and year-fixed effects.

## Proxies

First validated by Miller *et al.* (2001), the fraction of suicides that are committed by gun—abbreviated FS/S, for firearm suicides divided by total suicides—is constructed from the CDC's National Vital Statistics System's Fatal Injury Reports, and is available from 1981 to 2015. FS/S has been shown to have strong and significant correlations with survey measures of gun ownership, both cross-sectionally and inter-temporally,

---

[6]Finally, Smith has said, and we have confirmed, that the rate of respondents refusing to answer the gun ownership questions has increased in recent years. As a check, we created an upper bound rate for which all refusers were assumed to have a gun in their home. For the Census Division-level data, for 180 of 225 observations (80%), this upper bound was at most 5% larger than the regular estimate. For the national-level data, the equivalent statistic is 22 of 25 (88%) observations with a difference below 5%.

[7]While there are specific criticisms against the use of each of the following proxies in statistical analysis, and we will enumerate some of those below, our goal is simply to get a more complete (if blurry) picture of gun prevalence trends. To that end, we defer to the literature, examining some of the proxies that are more commonly used by firearms researchers.

[8]The GSS is not constructed to be representative at the state level. However, note that for three of the five proxies—FS/S, licenses per capita, and circulation per capita—the coefficients at the Census-Division level are similar to those at the state level. This suggests that the state-level results are not too misleading, and that the other two proxies may simply be less reliable (for the reasons described below).

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
|  | FS/S | Acc. Gun Death Rate | Licenses per Capita | Circ. per Capita | Checks per Capita |
| Coefficient | 0.626* | 0.0573** | 0.207** | 0.331** | 0.609** |
|  | (0.308) | (0.024) | (0.084) | (0.140) | (0.194) |
| Year Range | 1982-2014 | 1982-1998 | 1973-2014 | 1980-2014 | 2000-2014 |
| Number of Years | 20 | 12 | 25 | 9 | 8 |
| Adjusted $R^2$ | 0.438 | 0.219 | 0.461 | 0.395 | 0.127 |
| N | 180 | 107 | 225 | 81 | 72 |

All regressions are log-log, and include Division- and year-fixed effects. Standard errors (in parentheses) are clustered by Division.

Number of years used does not correspond exactly to year range due to gap years in administration of GSS gun ownership question.

All nine Census Divisions' data were included in this regression.

* $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$

(a) Census-Division Level

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
|  | FS/S | Acc. Gun Death Rate | Licenses per Capita | Circ. per Capita | Checks per Capita |
| Coefficient | 0.593 | 0.0138 | 0.221** | 0.393** | -0.0327 |
|  | (0.522) | (0.042) | (0.089) | (0.188) | (0.020) |
| Year Range | 1982-2014 | 1982-1998 | 1973-2014 | 1980-2014 | 2000-2014 |
| Number of Years | 20 | 12 | 25 | 9 | 8 |
| Adjusted $R^2$ | 0.641 | 0.642 | 0.663 | 0.637 | 0.577 |
| N | 515 | 286 | 644 | 230 | 203 |

All regressions are log-log, and include state- and year-fixed effects. Standard errors (in parentheses) are clustered by state.

Number of years used does not correspond exactly to year range due to gap years in administration of GSS gun ownership question.

Regressions are weighted by the number of respondents coming from the state in each year.

Because many states had small numbers of respondents in many years, these regressions include only the 26 states for which at least 10 years exist when the number of respondents from the state was greater than or equal to 20.

Regressions do not include the District of Columbia.

* $p < 0.10$, ** $p < 0.05$, *** $p < 0.01$

(b) State Level

Table 1: Regressions of Gun Ownership Rate on Proxies.

and as a result, has become the most widely-used proxy for the level of gun ownership (Cook & Ludwig, 2006; Briggs & Tabarrok, 2014; Kalesan *et al.*, 2015). Various criticisms have been levelled against its validity (Duggan, 2003; National Research Council, 2004; Shenassa *et al.*, 2006). Perhaps the most serious of these is that if use of a gun to commit suicide, given that it is a more effective method than drug overdose and hanging, is the result of a higher level of suicidal intent, then FS/S could simply be capturing "the average level of suicidal intent in the population" (Kleck, 2004). Furthermore, if suicidal intent is at least partly driven by some latent social unrest or dysfunction, and that unrest also pushes people to acquire guns (perhaps for self-defense), then a spurious positive correlation exists between FS/S and gun ownership. Nonetheless, our results, combined with those of the previously cited studies validating it, give us confidence in using the percentage of suicides by gun to proxy for gun ownership.

The Fatal Injury Reports also contain the rate of unintentional death by firearm, which exists from 1981 to 1998 at the state level, and 1981 to 2015 at the national level.[9] We use this death rate among children aged 0 to 14 as another intuitive proxy for the level of gun prevalence: The number of unintentional firearm deaths in a given population and unit of time is feasibly a Poisson random variable whose rate parameter is proportional to, or at least increasing in, the availability of guns. One problem with this proxy is that it exhibits significant truncation, as roughly 20% of state-year rates are 0.[10]

Duggan (2001) first proposed utilizing per capita circulation of the firearm magazine *Guns & Ammo* as a proxy for gun ownership, and since then the practice has spread (Briggs & Tabarrok, 2014; Siegel *et al.*,

---

[9] This variable stops at 1998 at the state level because from 1999 on the CDC stopped reporting rates based on fewer than 10 deaths.

[10] The measurement of unintentional firearm deaths has also been found to suffer from some degree of error (Barber & Hemenway, 2011).



Figure 3: Trends in Gun Ownership Proxies, 1977 - 2015.

2014).[11] The magazine is one of the most popular amongst gun enthusiasts, with a total circulation of over 4.5 million in 2015, roughly 90% of which comes from subscriptions. Circulation data, which we have annually from 2005 to 2015, and in five-year increments from 1960 to 2000, is taken from the Alliance for Audited Media.

Siegel *et al.* (2014) introduce a novel proxy for gun ownership, a composite of FS/S with the (per capita) number of hunting license holders, the latter of which is available from the U.S. Fish and Wildlife Service starting in 1958. We look at FS/S and the hunting license measure separately, instead of as a composite. One caveat about this proxy is that it includes license holders who reside in *other* states as well, which means it is inflated for states where many people travel to hunt.[12]

Finally, the per capita number of background checks conducted through the National Instant Criminal Background Check System (NICS) is available from 1999, and has been offered as a proxy for firearm ownership. This measure is only valid if purchase rates for new firearms are proportional to current ownership rates.[13] Even assuming this proportionality requirement holds, there is reason to be skeptical of the measure's usefulness: For one, NICS checks are only necessarily conducted by federally licensed firearms dealers, whereas a significant portion of gun sales are made through state or private dealers. Since regulations defining precisely which transactions require background checks vary widely from state to state and over time, it is problematic to compare this metric between states or years.

The way check numbers are aggregated is also important. The total number of NICS checks includes, among others, checks that are undergone when one *pawns* her firearm or applies for a firearm permit,[14] as

---

[11]Some opt to use circulation of *Field & Stream,* which is more hunting-oriented. We believe that our measure of hunting licenses per capita adequately captures the hunting pathway of gun ownership, and therefore utilize *Guns & Ammo,* which caters to a broader audience.

[12]This proxy is also vulnerable to significant year-to-year fluctutations due to animal movements and the like. However, because we have such a large sample on this variable (57 years for each state), we feel comfortable looking at its long-term trend nonetheless.

[13]One must also assume that each background check represents one gun purchase. Close inspection of the NICS data reveals that most checks for gun sales seem to represent only one gun type—that is, either handgun(s) or long gun(s). However, as the FBI itself warns, "based on varying state laws and purchase scenarios, a one-to-one correlation cannot be made between a firearm background check and a firearm sale."

[14]Thirteen states and the District of Columbia have laws requiring a background check to purchase or possess a firearm (commonly known as "permit-to-purchase" laws). For these states, some proportion of the checks undergone for a firearm

well as administrative checks—essentially system tests—that are run when no firearm transaction is made at all. Moreover, when A sells a gun to B in a private transaction that is subject to a background check, the count of checks is augmented, but there is no change in gun prevalence. (Only the owner of the firearm has changed.) In the last ten years alone, four states—Colorado, Delaware, Oregon, and Washington—have adopted laws mandating universal background checks on private sales, thereby expanding the number of purchases that are counted without increasing the number of guns in circulation. We limit the checks we count to those resulting from the non-private purchases of handguns, rifles, shotguns, other gun types, and multiple gun types.[15]

We construct indices of each proxy, indexing values to the first observation of the series within a state or Division,[16] and track their progress over the study period. Figure 3 shows that, at the national level, since 1980 four of our gun prevalence proxies have undergone decreases, ranging from 15% for FS/S to 85% for the accidental firearm death rate. Figure 4 shows a starkly different pattern for firearm background checks. We address this discrepancy in the next section.



Figure 4: Trends in Gun Sales, 1986 - 2015.

## Ownership Concentration

The increase in (per capita) NICS checks seems to indicate that the (per capita) number of guns in circulation has risen considerably, which is consistent with data from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) U.S. Firearms Commerce Report (Department of Justice, 2015). As Figure 4 shows, per capita net output of firearms, where net output is defined as manufactures plus net imports, has increased

permit actually represent a purchase as well. After reviewing these states' laws, and consulting at length with FBI staff on how exactly checks are counted, we decided not to count permit checks towards the NICS metric, with one exception—Hawaii, which conducts solely permit checks because its firearm dealers opt not to re-check permit holders at the point of sale.

[15]To give readers an idea of this dataset, as of 2015, NICS check numbers are broken down into the following categories: Pre-Pawn, Redemption, Returned/Disposition, Rentals, Private Sale, Return to Seller - Private Sale, Permit, and four non-private sale categories representing the type(s) of gun being sold. It is these four columns (plus permit checks, for Hawaii) that go into our metric.

[16]The exception is the Guns & Ammo proxy, which we index to its 1980 value, as its initial movements more likely reflect the magazine's initial popularization—circulation began in 1958—than underlying gun ownership trends.

dramatically since the mid-2000s. An increase in privately held guns may seem counterintuitive in light of the evidence that household gun ownership has decreased. However, it is possible, given that the number of households has increased over the study period, that newer households have been less likely to buy guns than existing households, which are acquiring more of them. This would tend to increase the number of firearms in circulation but decrease overall prevalence.

Indeed, there is empirical evidence that individual households have been accumulating multiple firearms. Cook & Ludwig (1997), examining the results of the 1994 National Survey of Private Ownership of Firearms, found that 74% of gun owners owned two or more firearms, and that the 20% of owners who possessed the most guns collectively controlled 55% of privately owned firearms. Ten years later, Hepburn *et al.* (2007), looking at another national survey, found that of all individuals (households) that possessed a firearm, 48% (41%) owned at least four, and that the top 20% of owners controlled 65% of the country's guns. And most recently, in the 2015 iteration of the same survey, Azrael *et al.* (2017) find that 74% of owners have more than one gun, and that the top 20% possess 60% of the stock.[17] Thus to the extent that NICS checks provide a useful proxy, it is crucial that they be interpreted as a proxy for firearm *sales*, and not for ownership, or they will tell a misleading story.

**The Mexican Gun Trade**

Another factor that compromises the validity of the NICS checks as a U.S. gun prevalence proxy is the scope of the illegal firearms trade, which exports many American-purchased guns to the rest of the world. According to the ATF's Firearms Tracing System, which traces guns recovered at crime scenes and logs their origins, 87,253, or 70.3%, of the firearms recovered in Mexico from 2009 to 2015 came from the US.[18] The Government Accountability Office (2016) finds, further, that most of these had been bought legally at gun shops and gun shows in Texas, Arizona, and California. Another study estimated that from 2010 to 2012, 2.2% of domestic arms sales were attributable to U.S.-Mexico traffic, and 46.7% of federally licensed firearms dealers depended in part on demand from this trade to stay in business (McDougal *et al.*, 2015). To the extent that Mexico-bound guns are bought from federally licensed dealers, which are required to run background checks on unlicensed purchasers, or from state or private dealers that do run background checks, the NICS checks resulting from them artificially inflate the checks per capita proxy.

# Explanations

## Hunting

The most common purposes that firearm owners give for possessing a gun have consistently been self-protection and hunting (Azrael *et al.*, 2017; Hepburn *et al.*, 2007; Pew Research Center, 2013; Jelen, 2012). (The proportion that cites political beliefs as a reason is quite small.) Thus if gun prevalence has indeed declined on the scale we have suggested—and assuming supply-side factors have remained relatively stable—it is probably due to a decline in either the perceived need for self-defense, interest in hunting, or both. In Figure 5 we plot the evolution of the GSS-reported hunting rate alongside hunting licensees per capita; both indicate that Americans' tastes for hunting have abated steadily and substantially since the late 1970s. Whereas in 1977, 31.6% of adults reported being a hunter or married to one, in 2016 the corresponding rate was only 17.1%.

---

[17]An analysis of California's gun market from 1996 to 2015 finds that among dealerships, sales are highly and increasingly concentrated, with the top dealership handling over 10% of transactions (California Department of Justice, n.d.). If perennial gun buyers tend to stay loyal to particular dealerships over time, then this increase in dealership concentration could be consistent with an increase in ownership concentration, through a smaller gun-buying demographic buying more guns from a smaller pool of sellers.

[18]This figure consists of all recovered firearms "that were determined by ATF to be manufactured in the U.S. or legally imported into the U.S. by a Federal firearms licensee" (Bureau of Alcohol & Explosives, 2015, 2016). It is also likely an underestimate, as, for the other 29.7% of recovered firearms, the ATF cannot determine whether "the firearms were imported directly into Mexico, or if the firearms were legally imported into the U.S. or went to another country and then made their way to Mexico by legal or illegal means."



Figure 5: Trends in Hunting, 1977 - 2015.

If gun prevalence has declined through reduced interest in hunting, one would also expect to observe decreases in ownership of long guns—that is, rifles and shotguns—as these are disproportionately used by hunters. And indeed, between 1973 and 2016, the rate of handgun ownership remained relatively stable while that of long guns decreased dramatically, from 39.8% to 23.2% (Figure 6a). Furthermore, when we decompose per capita federal background checks based on whether they went towards handgun or long gun purchases, we find that the increase in checks noted above—and often cited in the press as indicating that overall ownership is actually increasing—has been overwhelmingly driven by increased handgun sales (Figure 6b). As we show in the Appendix, these findings are not confined to a particular region, but are consistent throughout the country.



(a) Household Gun Ownership by Type, 1973 - 2016.  (b) Federal Background Checks per Capita, 1999 - 2015.

Figure 6: Handgun and Long Gun Trends.

## Demographics

Demographic shifts could also partially explain the decrease in firearm prevalence. If certain groups own guns at systematically lower rates than their complements, and the proportion of the population in the lower-ownership groups increases, then overall gun ownership mechanically decreases as well. This seems a plausible story in the U.S., whose gun ownership rate varies significantly by sex, race, and other dimensions. In particular, going by national GSS ownership data, from 1980 to 2016 gun ownership was on average 31 percentage points higher among males than females, and 12 and 15 percentage points higher among Whites than Blacks and other-race respondents, respectively. The proportion of Whites in the U.S. population has decreased steadily by 10 percentage points since 1970, which would indeed tend to reduce overall gun ownership. The male proportion of the population, however, has actually increased by 1 percentage point since 1980, so shifts in the gender distribution cannot have been a channel of general ownership decreases.

Several publications have reported that interest in firearms and shooting sports has been increasing among women in recent years (Goode, 2013; Mann, 2012). Tabulating gun ownership by demographic, however, we find that female ownership has remained stable between 10 and 14% since 1980 (Figure 7).

Urbanization could also explain part of the gun prevalence decline. In the 2015 National Firearms Survey, 15% of urban, 19% of suburban, and 33% of rural dwellers owned at least one firearm. (Previous iterations of this survey yielded similar relative proportions.) From 1977 to 2015, the percentage of the U.S. population living in Census-designated Metropolitan Statistical Areas increased from 66 to 85%.[19]



Figure 7: Gun Ownership Among Women, 1973 - 2016.

## Crime and Other Factors

Given that a plurality of handgun owners possess handguns for self-defense, it seems likely that handgun ownership in a given time and place is largely determined by the perceived fear of danger there. To track this variable, we examine the GSS question about whether the respondent is afraid of walking around his

---

[19]While part of this could be attributed to non-gun owners self-sorting into urban areas, it is also true that urban jurisdictions tend to have stricter gun laws then rural ones, thereby curtailing ownership among people who may have otherwise had one.

neighborhood at night.[20] As one would expect given the large decline in crime that occurred starting in the early 1990s, this measure of fear decreased significantly over a similar period (Figure 8).



Figure 8: Neighborhood Fear Index.

However, this leaves us with the puzzle of why handgun ownership has remained stable over the study period if crime, as well as the fear resulting from it, have both gone down so dramatically. (Indeed, the decline in hunting also should have contributed to a decrease in handgun ownership.) Going by Figure 9, which plots handgun ownership against the fear rate for each Census Division, it would appear that even within any region, there is no relationship between the two variables. One explanation for this is that we have hitherto ignored (handgun-specific) supply-side dynamics that have served to increase ownership, such as reductions in manufacturing costs or the market becoming less concentrated. The latter is not the case: The Herfindahl-Hirschman Indices for the pistol and revolver markets have not changed significantly since 1986 (Brauer, 2013). The cost explanation is also unlikely, as the price of steel mill products, a strong determinant of costs to gun manufacturers (First Research, 2012), has increased precipitously over the study period, reaching over five times its 1973 level in late-2008 (Bureau of Labor Statistics, 2016). Another possibility is that we have misidentified the direction of causality: Perhaps reduced fear of danger does not significantly reduce the desire to own a handgun, but owning a handgun does reduce one's fear—and this mechanism is prevalent enough to scale up to a general trend. Finally, because much of the wear-and-tear on a firearm occurs through the number of rounds fired, and handguns bought for concealed-carry or home self-defense purposes are not likely to be fired very many times (especially relative to long guns bought for target shooting or hunting), it is plausible that the average handgun would last much longer than the average long gun (perhaps by decades),[21] resulting in the trends documented above.

---

[20]The exact wording is: "Is there any area right around here—that is, within a mile—where you would be afraid to walk alone at night?"

[21]There is little hard data on the life spans of different guns or their determinants, but the bulk of opinions shared on online firearm enthusiast forums suggest that certain parts in every gun need to be replaced after some number of rounds are fired, and that this "round ceiling" is the main limiting factor on a firearm's longevity.



Figure 9: Handgun Ownership and Neighborhood Fear by Census Division. $r = -0.013$

# Conclusion

Those advocating weaker regulations on guns often claim that gun ownership has increased substantially since the early 1990s, and that the concurrent drops in violent crime rates can be attributed to this trend (National Rifle Association, 2010). And indeed, the claim that violent crime is down is accurate: From 1990 to 2015, the national murder, aggravated assault, and robbery rates have dropped by roughly 48, 44, and 60%, respectively. However, for the nation as a whole and for 7 of 9 Census Divisions, gun ownership also seems to be down considerably—though those with guns have acquired larger stocks.

12

# References

Azrael, Deborah, Hepburn, Lisa, Hemenway, David, & Miller, Matthew. 2017. The Stock and Flow of US Firearms: Results from the 2015 National Firearms Survey. *RSF*. Forthcoming.

Barber, Catherine, & Hemenway, David. 2011. Too many or too few unintentional firearm deaths in official U.S. mortality data? *Accident Analysis & Prevention*, **43**(3), 724–731.

Bialik, Carl. 2013a. Gun Counts Can Be Hit-or-Miss. *The Wall Street Journal*.

Bialik, Carl. 2013b. Guns Present Polling Conundrum. *The Wall Street Journal*. Available from URL: http://blogs.wsj.com/numbers/guns-present-polling-conundrum-1223/.

Brauer, Jurgen. 2013. *The US Firearms Industry: Production and Supply*. Small Arms Survey Working Paper 14.

Brennan, Allison. 2012. Analysis: Fewer U.S. gun owners own more guns. *CNN*.

Briggs, Justin Thomas, & Tabarrok, Alexander. 2014. Firearms and suicides in US states. *International Review of Law and Economics*, **37**, 180–188.

Bureau of Alcohol, Tobacco, Firearms, & Explosives. 2015. *International Firearms Trace Data*. Office of Strategic Intelligence and Information. Accessed: 2016-07-25. Available from URL: https://www.atf.gov/resource-center/docs/mexicocy09-14pdf/download.

Bureau of Alcohol, Tobacco, Firearms, & Explosives. 2016. *International Firearms Trace Data*. Office of Strategic Intelligence and Information. Accessed: 2016-07-25. Available from URL: https://www.atf.gov/docs/internationalfirearmstracedatamexicocy2010-2015pdf/download.

Bureau of Labor Statistics. 2016. *Steel Mill Products*. Producer Price Index Commodity Data. United States Department of Labor.

California Department of Justice, OpenJustice. *Gun Sales in California*. Accessed: 2016-10-17. Available from URL: https://openjustice.doj.ca.gov/firearms/overview.

Cook, Philip J., & Ludwig, Jens. 1997. *Guns in America: National Survey on Private Ownership and Use of Firearms*. National Institute of Justice. US Department of Justice, Office of Justice Programs.

Cook, Philip J., & Ludwig, Jens. 2006. The social costs of gun ownership. *Journal of Public Economics*, **90**(1 - 2), 379–391.

Department of Justice. 2015. *Firearms Commerce in the United States - Annual Statistical Update*. Accessed: 2015-11-04. Available from URL: https://www.atf.gov/file/89561/download.

Duggan, Mark. 2001. More Guns, More Crime. *Journal of Political Economy*, **109**(5), 1086–1114.

Duggan, Mark. 2003. Guns and Suicide. *Pages 41–73 of:* Cook, Philip J., & Ludwig, Jens (eds), *Evaluating Gun Policy: Effects on Crime and Violence*. Washington, DC: Brookings Institution Press.

First Research. 2012. *Gun & Ammunition Manufacturing - Quarterly Update 4/16/2012*. First Research Industry Profiles. Hoover's Inc.

Gallup. 2015. *Guns*. Gallup Historical Trends. Gallup, Inc. Available from URL: http://www.gallup.com/poll/1645/guns.aspx.

Goode, Erica. 2013. Rising Voice of Gun Ownership Is Female. *The New York Times*.

Government Accountability Office. 2016. *Firearms Trafficking: U.S. Efforts to Combat Firearms Trafficking to Mexico Have Improved, but Some Collaboration Challenges Remain*. Report to Congressional Requesters. GAO-16-223. Accessed: 2016-07-25. Available from URL: http://gao.gov/products/GAO-16-223.

Hemenway, David. 2012. *Review of Gary Kleck (2004)*. Accessed: 2015-11-04. Available from URL: https://cdn1.sph.harvard.edu/wp-content/uploads/sites/247/2012/10/Review_of_Gary_Kleck_2004.pdf.

Hepburn, Lisa, Miller, Matthew, Azrael, Deborah, & Hemenway, David. 2007. The US gun stock: results from the 2004 national firearms survey. *Injury Prevention*, **13**(1), 15–19.

Jelen, Ted G. 2012. Gun Ownership. *Pages 356–359 of:* Carter, Greg Lee (ed), *Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law*, 2 edn. Santa Barbara, CA: ABC-CLIO.

Kalesan, Bindu, Villarreal, Marcos D, & Galea, Katherine M Keyes Sandro. 2015. Gun ownership and social gun culture. *Injury Prevention*.

Kellermann, Arthur L., Rivara, Frederick P., Banton, Joyce, Reay, Donald, & Fligner, Corine L. 1990. Validating Survey Responses to Questions About Gun Ownership Among Owners of Registered Handgun. *American Journal of Epidemiology*, **131**(6), 1080–1084.

Kleck, Gary. 2004. Measures of Gun Ownership Levels for Macro-Level Crime and Violence Research. *Journal of Research in Crime and Delinquency*, **41**(1), 3–36.

Mann, Leslie. 2012. Women and guns: Ranges, firearms shops say female customers increasing. *Chicago Tribune*.

McDougal, Topher, Shirk, David A., Muggah, Robert, & Patterson, John H. 2015. The Way of the Gun: Estimating Firearms Trafficking across the US-Mexico Border. *Journal of Economic Geography*, **15**(2), 297–327.

Miller, Emily. 2012. Miller: Gun ownership up, crime down. *The Washington Times*. Accessed: 2015-11-05. http://www.washingtontimes.com/news/2012/jun/18/gun-ownership-up-crime-down/.

Miller, Matthew, Azrael, Deborah, & Hemenway, David. 2001. Firearm availability and unintentional firearm deaths. *Accident Analysis & Prevention*, **33**(4), 477–484.

National Research Council. 2004. *Firearms and Violence: A Critical Review*. Washington, DC: The National Academies Press.

National Rifle Association, Institute for Legislative Action. 2010. More Guns, Less Crime Again. Available from URL: https://www.nraila.org/articles/20100915/more-guns-less-crime-again.

NRA-ILA. 2016. The Myth Of "Declining" Gun Ownership. *The Daily Caller*.

Pew Research Center. 2012. *Assessing the Representativeness of Public Opinion Surveys*. Pew Research Center Report. Available from URL: http://www.people-press.org/files/legacy-pdf/Assessing

Pew Research Center. 2013. *Why Own a Gun? Protection Is Now Top Reason*. Pew Research Center Report. Available from URL: http://www.people-press.org/files/legacy-pdf/03-12-13

Rafferty, Ann P., Thrush, John C., Smith, Patricia K., & McGee, Harry B. 1995. Validity of a Household Gun Question in a Telephone Survey. *Public Health Reports*, **110**(3), 282–288.

Shenassa, Edmond D, Daskalakis, Constantine, & Buka, Stephen L. 2006. Utility of indices of gun availability in the community. *Journal of Epidemiology and Community Health*, **60**(1), 44–49.

Siegel, Michael, Ross, Craig S, & King, Charles. 2014. A new proxy measure for state-level gun ownership in studies of firearm injury prevention. *Injury Prevention*, **20**(3), 204–207.

Smith, Tom W. 2003. A Seeded Sample of Concealed-Carry Permit Holders. *Journal of Quantitative Criminology*, **19**(4), 441–445.

Smith, Tom W., & Son, Jaesok. 2015. *Trends in Gun Ownership in the United States, 1972-2014*. General Social Survey Final Report. NORC at the University of Chicago.

Smith, Tom W., Laken, Faith, & Son, Jaesok. 2014. *Gun Ownership in the United States: Measurement Issues and Trends.* GSS Methodological Report 123. NORC at the University of Chicago.

Waldman, Paul. 2012. The Myth Of NRA Dominance Part IV: The Declining Role Of Guns In American Society. *ThinkProgress.* Available from URL: http://thinkprogress.org/justice/2012/03/01/435437/the-myth-of-nra-dominance-part-iv-the-declining-role-of-guns-in-american-society/.

# Appendix

## Proxy Correlations

Table 2 presents pairwise correlations, at the state, Census Division, and national levels, between the gun ownership proxies and a survey measure of gun ownership. At the state level, proxies are compared to gun ownership as captured by the BRFSS household rate in 2001, 2002, and 2004, while at the Census Division and national levels, the GSS household rate is the survey metric. Because correlations at the state level between our proxies and the BRFSS ownership rate are based on only three years of data, it is important to note that they largely capture inter-spatial, rather than inter-temporal, similarities. The same issue does not exist at the coarser levels, since we have national and Census Division-level ownership rates for many more years.

|  | BRFSS |
|---|---|
| Licenses per Capita | 0.792*** |
| NICS Checks per Capita | 0.806*** |
| FS/S | 0.770*** |

* $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$

(a) State Level

|  | GSS |
|---|---|
| FS/S | 0.836*** |
| Accidental Death Rate | 0.830*** |
| Licenses per Capita | 0.694*** |
| Circulation per Capita | 0.576*** |
| NICS Checks per Capita | 0.639*** |

* $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$

(b) Census-Division Level

|  | GSS |
|---|---|
| FS/S | 0.822*** |
| Accidental Death Rate | 0.932*** |
| Licenses per Capita | 0.945*** |
| Circulation per Capita | 0.734 |
| NICS Checks per Capita | -0.422 |

* $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$

(c) National Level

Table 2: Correlations Between Surveyed Gun Ownership Rates and Proxies.

## Regional Trends

One potential objection to our claims would be that the national trends illustrated above mask significant regional heterogeneity. Perhaps it is only in certain areas that the prevalence of long guns has decreased relative to that of handguns, or perhaps the decline in overall ownership is confined to relatively populous regions (whereas other areas have even experienced increases). As it turns out, data at the Census Division level confirm that these patterns are mostly consistent across regions. In Figures 10, 11, and 12 we reproduce three of the previous charts, plotted for each individual Census Division. (Figure 13 is a map of the Divisions.) With the exceptions of two Divisions, it appears that the decreases in access to firearms and interest in hunting, as well as the convergence between handgun and long gun ownership rates, are not limited to a particular area, but are present throughout the country. The exceptions, New England and West North Central, are also the only Divisions for which we also do not observe a downward trend in prevalence.



Figure 10: Household Gun Ownership by Census Division, 1973 - 2016.



Figure 11: Trends in Hunting by Census Division, 1977 - 2015.



Figure 12: Household Gun Ownership by Type and Census Division, 1973 - 2016.



Figure 13: Map of Census Divisions. Courtesy of Iowa State University.

Exhibit C

# The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey



DEBORAH AZRAEL, LISA HEPBURN, DAVID HEMENWAY, AND MATTHEW MILLER

*Since the mid-1990s, the U.S. civilian gun stock has grown from approximately 192 million (65 million handguns) to approximately 265 million (113 million handguns). In 2015, gun owners owned more weapons and were more likely to own both handguns and long guns than in 1994. As in 1994, ownership in 2015 was highly concentrated: the median owner owned two, but the 8 percent of all owners who owned ten or more accounted for 39 percent of the stock. Approximately seventy million firearms changed hands within the past five years (from 2011 to 2015); most were purchased. Two and a half percent of Americans had guns stolen within the past five years, accounting for an estimated five hundred thousand guns per year.*

**Keywords:** firearms, guns, gun stock, handguns

In 2015, 36,252 people died of a firearm-related injury in the United States, approximately the same number of deaths as occurred in motor vehicle crashes. The same year, more than eighty thousand people were nonfatally injured (CDC 2017). The distribution of firearm deaths in 2015 is typical of the distribution over the past several decades: the majority of firearm deaths were suicides (22,018), followed by homicides (13,463) and then unintentional firearm injuries (fewer than one thousand). By contrast, of the more than eighty thousand nonfatal firearm injuries, 60,470 were assault related, 15,928 were unintentional (self or

Deborah Azrael is research scientist at the Harvard School of Public Health and director of research for the Harvard Injury Control Research Center. Lisa Hepburn is adjunct research associate at the Harvard Injury Control Research Center. David Hemenway is professor of health policy at the Harvard School of Public Health and co-director of the Harvard Injury Control Research Center. Matthew Miller is professor of health sciences and epidemiology at Northeastern University, adjunct professor of epidemiology at the Harvard School of Public Health, and co-director of the Harvard Injury Control Research Center.

© 2017 Russell Sage Foundation. Azrael, Deborah, Lisa Hepburn, David Hemenway, and Matthew Miller. 2017. "The Stock and Flow of U.S. Firearms: Results from the 2015 National Firearms Survey." *RSF: The Russell Sage Foundation Journal of the Social Sciences* 3(5): 38–57. DOI: 10.7758/RSF.2017.3.5.02. This research was supported by grants from the Fund for a Safer Future (New Venture Fund/Fund for a Safer Future: 03272014) and the Joyce Foundation (16-37317). The authors wish to acknowledge our research assistants Joanna Cohen and Vincent Storie, both of whom took the project on with the very highest level of intelligence, curiosity, and care. The survey would have been poorer if not for the GfK's collaboration and professional input. Direct correspondence to: Deborah Azrael at azrael@hsph.harvard.edu, Harvard Injury Control Research Center, Harvard School of Public Health, 677 Huntington Ave., Boston, MA 02115; Lisa Hepburn at lhepburn@gmail.com, Harvard Injury Control Research Center, Harvard School of Public Health, 677 Huntington Ave., Boston, MA 02115; David Hemenway at hemenway@hsph.harvard.edu, Harvard Injury Control Research Center, Harvard School of Public Health, 677 Huntington Ave., Boston, MA 02115; and Matthew Miller at ma.miller@neu.edu, Northeastern University, Bouvé College of Health Sciences, Room 316 Robinson Hall, 360 Huntington Ave., Boston, MA 02115.

other) injuries, and fewer than 3,320 were acts of deliberate self-harm that proved nonlethal.

The firearms involved in these injuries, and the millions more not involved in any injuries, all start out as legally manufactured or imported guns introduced into the primary market through federally licensed dealers. Subsequently, these firearms may exchange hands through private sales, some of which involve federally licensed dealers, or through gifts, inheritance, or nonpurchase transfers such as theft or borrowing, arrangements that characterize the underground gun market (as Cook and Pollack describe in the introduction).

Beyond that, little more is known about these guns than that they are owned by roughly one in five U.S. adults and can be found in approximately one of three U.S. households. In fact, the most recent peer-reviewed nationally representative survey that focused on details about firearms other than these two basic measures of exposure was conducted in 2004 (Hepburn et al. 2007). Between 2004 and today, we know that the proportion of adults who personally own firearms (and the proportion who live in households with guns) has continued to decline, modestly but steadily, largely because of a decline in personal gun ownership by men. In 2014, for example, the National Opinion Research Center's General Social Survey, an annual survey that every other year or so includes the same two questions (about personal and household firearm ownership) estimated that 22 percent of U.S. adults personally owned a firearm (35 percent of men and 12 percent of women) and that 31 percent of American households included at least one firearm, compared with 28 percent of U.S. adults (50 percent of men and 10 percent of women) and 47 percent of U.S. households in 1980 (Smith and Son 2015).

Although the National Opinion Research Center's General Social Survey and other surveys have asked respondents whether they personally own a firearm or live in a home with firearms, few have asked about the *number* of guns respondents own, let alone more detailed information about these firearms and the people who own them, such as reasons for firearm ownership, where firearms were acquired, how much firearms cost, whether they are carried in public, and how they are stored at home (Smith and Son 2015; Gallup 2016; Morin 2014). Because of this, the best and most widely cited estimates of the number of firearms in civilian hands are derived from two national surveys dedicated to producing detailed, disaggregated, estimates of the U.S. gun stock, one conducted in 1994, the other in 2004 (Cook and Ludwig 1997, 1996; Hepburn et al. 2007). In the 1994 survey, sponsored by the National Institute of Justice, Philip Cook and Jens Ludwig estimated that American civilians owned approximately 192 million firearms, approximately one-third of which (sixty-five million) were handguns. In 2004, using a random-digit dial survey toward the end of an era when most Americans had land lines and answered their telephones, we estimated that U.S. adults owned approximately 283 million firearms (more than four per owner), 40 percent of which were handguns. These two surveys, taken together, suggested several important trends in firearm ownership between 1994 and 2004: a steady increase in the number of firearms in civilian hands, a growing proportion of the U.S. gun stock represented by handguns, and concentration of firearms among fewer gun owners.

Less is known about the movement of firearms between people than about the gun stock. Firearm manufacturing data provide one measure of the annual number of new guns available to be purchased (flow of new guns into the market); other data collected by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) provide a related, but overlapping measure: the annual number of adults who undergo a background check before acquiring (or attempting to acquire) one or more guns. Other movements of firearms, such as dispositions by the police and military, are not centrally recorded (Wright, Rossi, and Daly 1983; Cook and Ludwig 1996). The National Crime Victimization Survey (NCVS) collects information on firearm theft (Langton 2012; Rand 1994). Recent estimates suggest that between 2005 and 2010 approximately 250,000 guns were stolen annually (Langton 2012). No single source provides an estimate of the flow of guns, however. In consequence, as with the gun stock, the best available evidence to date regarding the frequency of gun transfers and

Case 1:22-cv-11431-FDS   Document 21-6   Filed 01/31/23   Page 117 of 134

the number of guns transferred comes from the 1994 and 2004 surveys.

To learn more about private ownership and use of firearms in the United States today, as well as to characterize where and the extent to which new and used firearms have exchanged hands over the past five years, we conducted the first nationally representative survey of firearm ownership and use in more than a decade—the 2015 National Firearms Survey (NFS). In this article, we focus on features related to the gun stock (such as its size, composition, and distribution and the reasons for private gun ownership) and on salient aspects of firearm transfers between parties, such as where current firearm owners acquired their most recent firearm, by type of gun and recency of acquisition.

## METHODS

Data for this study come from the NFS, a national web-based survey (N=3949) designed by the authors and conducted in January 2015 by the survey research firm Growth for Knowledge (GfK). Respondents were drawn from GfK's KnowledgePanel (KP), an online panel that includes approximately fifty-five thousand U.S. adults.[1] The KP panel is selected on an ongoing basis, using an equal probability of selection design, to provide samples, after minor adjustments for deviations from equal probability se-

lection (base weights), that are representative of the U.S. population. Prior to selection of a study sample, GfK adjusts panel base weights to account for any discrepancies between panel composition and the distribution of key demographic characteristics of the U.S. population as reflected in the most recent Current Population Survey (GfK 2013).[2]

KP panel members complete an initial demographic survey and then periodic subsequent surveys, answers to which allow efficient panel sampling and weighting for future surveys. For the NFS, the study target population comprised adults eighteen years or older who fell into one of three groups: gun owners, non–gun owners living in a gun-owning household, or non–gun owners living in a non–gun-owning household, ascertained from the demographic surveys. An additional target population was veterans, who could fall into any of the three groups. To sample this population, GfK targeted respondents who met the criteria in GfK profile surveys and reconfirmed their gun ownership and veteran status within the survey. The final study weights provided by GfK combined pre-sample weights with a set of study-specific poststratification weights accounting for oversampling and for survey nonresponse.[3]

For this survey, 7,318 KP panel members received an invitation to participate. Of these,

1. As discussed at greater length later, historically, most estimates of gun ownership come from either random-digit dial telephone surveys or, in the case of the General Social Survey, in-person interviews of respondents. Online panels such as KP have been used increasingly in the social science literature to overcome the cost and response rate limitations of these survey modalities.

2. GfK structures recruitment for the KP with the goal of having the resulting panel represent the adult population of the United States with respect to a broad set of geodemographic distributions including particular subgroups of hard-to-reach adults (for example, those without a landline telephone or those who primarily speak Spanish). Panel members are randomly recruited through probability-based sampling, and participating households are provided with access to the Internet and hardware if needed. GfK recruits panel members by using address-based sampling (previously, GfK relied on random-digit dialing methods). For selection of general population samples from KP, GfK uses an equal probability of selection method design by weighting the entire KP to the benchmarks from the latest March supplement of the U.S. Census Current Population Survey. The geo-demographic dimensions used for weighting the entire KP typically include sex, age, race, ethnicity, education, census region, household income, home ownership status, metropolitan area, and Internet access. Using these weights as the measure of size for each panel member, in the next step a probability proportional to size procedure is used to select study specific samples. Application of the proportional to size procedure methodology with the above measure of size values produces fully self-weighing samples from KP, for which each sample member can carry a design weight of unity.

3. After the study sample was selected and fielded and all of the survey data were edited and made final, design weights were adjusted for any survey nonresponse (to the initial and to the supplemental survey) as well as for

3,949 completed the survey, yielding a survey completion rate of 54.6 percent.[4] In contrast, nonprobability, opt-in, online panels typically achieve a survey completion rate between 2 percent and 16 percent (Callegaro and DiSogra 2008). All panel members except those serving in the U.S. armed forces at the time were eligible to participate. Invitations to participate were sent by email; one reminder email was sent to nonresponders three days later. Participants were not given any specific incentive to complete this survey, although GfK has a point-based program through which participants accrue points for completing surveys and can later redeem them for cash, merchandise, or participation in sweepstakes. The final sample consisted of gun owners (n=2,072), non–gun owners in gun households (n=861), and non–gun owners (n=1,016). The sample also included 1,044 veterans, distributed across the three gun ownership groups.

Following earlier work, our estimates of the magnitude and distribution of the U.S. gun stock, as well as gun transfers and theft, come from the reports of those who personally own guns (Cook and Ludwig 1997; Hepburn et al. 2007). Gun owners were identified through two questions: "Do you or does anyone else you live with currently own any type of guns?" followed by, among all respondents who answered in the affirmative, "Do you personally own a gun?" Gun owners were then asked about the types of guns they owned (handguns, divided into pistols and revolvers), long guns, and other guns) and the number of each type. Respondents were also asked about the main reasons they owned guns, as well as about their most recent firearm acquisition, including whether they bought the gun or acquired it in some other way (such as an inheritance), and whether, and if so how many, guns had been stolen from them in the past five years.[5] Data for this article come from respondents who personally own guns.

---

any under- or overcoverage imposed by the study-specific sample design. For this study, the following strata of gun ownership from weighted KP data and veteran status from the 2014 veteran supplemental survey of the census Current Population Survey were used for the raking adjustment of weights: gender by age (eighteen to twenty-nine, thirty to forty-four, forty-five to fifty-nine, sixty to sixty-nine, or seventy and older); census region (Northeast, Midwest, South, West) by metropolitan area (yes or no); gender by veteran status (yes or no); age (eighteen to twenty-nine, thirty to forty-four, forty-five to fifty-nine, sixty to sixty-nine, or seventy and older) by veteran status (yes or no); race-Hispanic ethnicity (white or non-Hispanic, black or non-Hispanic, other or non-Hispanic, two or more races and non-Hispanic, Hispanic) by veteran status (yes or no); census region (Northeast, Midwest, South, West) by veteran status (yes or no); metropolitan area (yes or no) by veteran status (yes or no); education (less than high school or high school, some college, bachelor's or greater) by veteran status (yes or no); household income (less than $25,000, $25,000 to less than $50,000, $50,000 to less than $75,000, $75,000 or more) by veteran status (yes or no); Internet access (yes or no) by veteran status (yes or no); veteran serving year (less than two years, two to three years, four to nine years, or ten or more years); armed services branch (Air Force, Army, Coast Guard or Marines or other, Navy). An iterative proportional fitting (raking) procedure was used to produce final weights aligned with respect to all strata simultaneously. In the final step, calculated weights were examined to identify and, if necessary, trim outliers at the extreme upper and lower tails of the weight distribution. The resulting weights were then scaled to the sum of the total sample size of all eligible respondents.

4. The 55 percent participation rate, according to GfK, is within the expected range for its surveys and does not signal that recruitment for this survey was particularly difficult. We did not add incentives because the participation rate was unexceptional. In surveys of this sort the participation rate can be artificially inflated by waiting a longer time for eligible parties to respond or contacting eligible members of the panel with reminders. We did not need to do so as we hit our target number of participants within a short period.

5. Each gun-owning respondent was asked separately for handguns and long guns: "What are the main reasons you own . . . ?" Response categories were as follows: "1) For protection against strangers; 2) For protection against people I know; 3) For protection against animals; 4) For hunting; 5) For other sporting use; 6) For a collection; 7) For some other reason." Respondents could check multiple responses and provide a free text answer if they indicated that a main reason for owning guns was "other." Respondents who reported that they owned other guns were asked to indicate a single primary reason they owned these guns.

Case 1:22-cv-11431-FDS   Document 21-6   Filed 01/31/23   Page 118 of 134

A supplement to our survey was conducted by GfK in November 2015. For the supplement, all gun owners from the original survey (n=2072) who were still in the KP panel (n=1880) were invited to answer an additional set of questions about the timing of their most recent gun acquisition, the number of guns they had acquired in the previous five years, and the number of guns stolen from them in the previous five years.[6]

Of those eligible for the survey (n=1,880), 1,613 responded (86 percent). The respondents to the supplemental survey did not differ from respondents to the original survey with respect to age, gender, race, type of gun most recently acquired, or acquisition patterns. Nonresponders (n=267) were more likely than responders to be younger and female and to have acquired their most recent firearm as a gift or inheritance than by purchase. Respondents to the original survey who were no longer in the GfK panel (n=192) were more likely to be younger and have refused to describe the type of gun they most recently acquired than those in the original sample. They were also less likely to have purchased their most recent firearm. These differences did not affect the overall similarities between the supplemental and original samples. We use a supplemental survey weight provided by GfK for analyses using the supplemental survey.

The Northeastern University Institutional Review Board approved this study.

### RESULTS

Results from the NFS detail the U.S. gun stock, including its size, distribution, and reasons for gun ownership, as well as gun transfers, including sales and theft.



**Figure 1.** U.S. Gun Stock by Gun Type

*Source:* Authors' tabulations based on the National Firearms Survey.

### The Gun Stock

Twenty-two (22) percent of our sample reported that they personally owned a gun. Extrapolating to the U.S. population of adults age eighteen and older (245,157,000 in 2014) (Colby and Ortman 2015), we estimate approximately 54.7 million gun owners in the United States (CI: 50.7–58.8). Sixty respondents who said that they owned guns did not answer our questions about how many guns they owned. We use results from the 2012 respondents who did provide an answer to estimate the mean number of guns owned by gun owners: 4.8 (CI: 4.37–5.32), yielding a gun stock of 265 million (CI: 245 million to 285 million).[7]

*Number and Types of Guns in U.S. Gun Stock*
Of the estimated 265 million guns in civilian hands in the United States, approximately four in ten (42 percent) are handguns, the remainder primarily (53 percent) long guns (4 percent are "other" guns).[8] Among handguns, the majority are semiautomatic pistols (62 percent) and revolvers (29 percent); the remainder are described by respondents as "other" hand-

---

6. Respondents were asked "When you completed the prior national firearms survey, sponsored by Northeastern University, in April 2015, you said that the gun you acquired most recently was a [insert type based on type noted in the April 2015 survey]. Thinking about this gun, approximately when did you acquire it?" Three options were offered: "1) Within the past two years; 2) Between two and five years ago; 3) More than five years ago." The second question was "What was the exact year that you acquired this gun?" Respondents were asked to specify the exact year or to report that they did not know what year.

7. Including or excluding those who reported being a gun owner but reported owning no guns, or calculating the mean number of guns per gun owner including those who reported owning no guns, does not materially change our estimates (21.8 percent personal gun ownership; mean number of guns, 4.7).

8. We did not ask respondents to specify what type of gun. Other guns might include single-shot "black powder" guns or machine guns.

**Figure 2.** Cumulative Distribution of Gun Stock



*Source:* Authors' tabulations based on the National Firearms Survey.

guns. Approximately six in ten long guns (62 percent) are rifles and four in ten (38 percent) are shotguns (see figure 1).

*Distribution of Gun Ownership*
Gun-owning respondents owned an average of 4.8 firearms (range: 1 to 140); the median gun owner reported owning approximately two guns. As seen in figure 2, approximately half (48 percent) of gun owners report owning one or two guns, accounting for 14 percent of the total U.S. gun stock, while those who own ten or more (8 percent) own 39 percent. Put another way, half of the gun stock (approximately 130 million guns) is owned by approximately 86 percent of gun owners, and the other half

is owned by 14 percent (14 percent of gun owners equals 7.6 million adults, or 3 percent of the adult U.S. population).[9]

*Distribution of Gun Ownership, by Gun Type*
Although the majority of guns in the U.S. gun stock are long guns, in terms of the distribution of gun types, only one in five gun owners (21 percent) own long guns only, 25 percent of gun owners own handguns only (2 percent report own "other guns" only), and half of gun owners own both handguns and long guns (44 percent) or handguns, long guns, and other guns (6 percent). The remainder of gun owners (4 percent) reported owning either "other guns" along with handguns or long guns, or

9. About one quarter (22 percent) of gun owners reported that one of the primary reasons they owned a firearm was as part of a collection, although the large majority of those who cited owning guns for a collection also cited other reasons for owning (for example, 72 percent of collectors also said they owned guns for protection). Not surprisingly, gun collectors owned more guns than those who do not collect guns (ten versus three guns), and gun collectors accounted for most of the upper range of number of guns owned (noncollectors owned one to forty-three guns; collectors owned between one and 140).

**Figure 3.** U.S. Gun Ownership by Number and Type of Firearm



*Source:* Authors' tabulations based on the National Firearms Survey.

did not specify.[10] Among those who own handguns only, two-thirds (67 percent) own one gun; for those owning long guns only, 43 percent own only a single gun (see figure 3).

### Distribution of Gun Ownership by Gun Owner Demographics

Table 1 describes the demographic characteristics of respondents who own handguns only, long guns only, and both handguns and long guns (for simplicity of presentation, it does not include the small number of respondents (ninety-one) who are not in one of these three categories). The demographic characteristics of gun owners have been well established in multiple surveys. Consistent with these surveys, we find that gun owners overall are disproportionately male, white, older, non-urban, and from the South.

Differences among gun owners emerge, however, when those who own handguns only and those who own long guns only are compared with those who own both types. Handgun-only owners, in particular, appear to be a distinct group: they are more likely to be female, nonwhite, and living in urban areas, and are less likely to have grown up in a house with a gun compared to other gun owners. For example, whereas approximately 20 percent of long gun owners are female, among gun owners who own handguns only, 43 percent are women, versus 13 percent of long gun owners and 14 percent of those who own both.

### Reasons for Gun Ownership

Almost two in three gun owners (63 percent) reported that one of the primary reasons they own their guns is for protection against people (not shown). Three-quarters of handgun owners (76 percent) reported that they owned one primarily for protection (not shown). Other reasons include hunting (40 percent), collecting (34 percent), sporting use (28 percent), protection against animals (20 percent), and some other reason (40 percent). Other reasons volunteered by respondents included gift or inheritance or the right to have them (see table 2).

Reasons for ownership varied significantly depending on the types of guns respondents owned (handguns only, long guns only, or both) and demographic characteristics. Overall, those who own only handguns or both handguns and long guns were similar to one another with respect to protection, whereas those who own only long guns and those who own both were similar with respect to hunting and sporting use. For example, almost 80 percent of people who own handguns cite protection against strangers as a reason for ownership, as do 72 percent of those who own both handguns and long guns, but only 31 percent of those who own only long guns do. Likewise, 2 percent of those who only own handguns report that hunting is a primary reason for gun ownership, while 57 percent of those who only own long guns and 55 percent of those who own handguns and long guns do.

Across demographic characteristics, female gun owners were more likely than their male counterparts to report owning any gun for protection and less likely to report owning a gun for any other reasons (see table 2). Reasons for ownership were relatively consistent across age groups, although owning a gun for protection was less common among older gun owners,

10. Other guns may include single-shot black powder guns or machine guns.

**Table 1.** Demographic Characteristics of Gun Owners

| Demographic (Percent Total Survey Population) | Any Firearm | Handgun Only | Long Gun Only | Both |
|---|---|---|---|---|
| All respondents | 22 | 6 | 5 | 11 |
| **Age** | | | | |
| Eighteen to twenty-nine (19.1) | 13 | 3 | 4 | 6 |
| Thirty to forty-four (23.5) | 21 | 6 | 4 | 10 |
| Forty-five to fifty-nine (28.2) | 24 | 6 | 5 | 13 |
| Sixty or older (29.2) | 25 | 6 | 5 | 14 |
| **Sex** | | | | |
| Male (48.3) | 32 | 7 | 8 | 18 |
| Female (51.7) | 12 | 5 | 2 | 5 |
| **Race** | | | | |
| White (70.5) | 25 | 5 | 6 | 13 |
| Hispanic (11.7) | 16 | 6 | 3 | 7 |
| Black (11.0) | 14 | 8 | 1 | 5 |
| Multiracial (1.4) | 25 | 4 | 6 | 15 |
| Other (5.5) | 8 | 3 | <1 | 5 |
| **Marital status** | | | | |
| Married (54.0) | 26 | 6 | 6 | 14 |
| Never married (23.6) | 12 | 3 | 3 | 5 |
| Divorced (9.2) | 23 | 6 | 5 | 12 |
| Living with partner (6.9) | 19 | 6 | 4 | 9 |
| Widowed (5.4) | 21 | 5 | 4 | 12 |
| Separated (1.0) | 24 | 14 | 2 | 8 |
| **Community** | | | | |
| Urban (23.0) | 15 | 6 | 3 | 7 |
| Suburban (50.3) | 19 | 6 | 4 | 10 |
| Rural (26.1) | 33 | 5 | 9 | 19 |
| **Education** | | | | |
| Less than high school (10.5) | 11 | 4 | 3 | 5 |
| High school (29.5) | 23 | 6 | 5 | 12 |
| Some college (28.6) | 26 | 6 | 5 | 15 |
| College (31.4) | 20 | 5 | 5 | 10 |
| **Annual income** | | | | |
| Less than 25,000 (16.9) | 13 | 4 | 3 | 6 |
| 25,000–59,999 (29.2) | 22 | 6 | 5 | 11 |
| 60,000–99,999 (27.6) | 24 | 7 | 4 | 12 |
| 100,000 or more (26.3) | 25 | 5 | 6 | 14 |
| **Military service** | | | | |
| Veteran (9.7) | 44 | 10 | 9 | 25 |
| Non-veteran (90.3) | 19 | 5 | 4 | 10 |
| **Political views** | | | | |
| Liberal (20.2) | 14 | 5 | 3 | 7 |
| Moderate (46.3) | 19 | 6 | 4 | 9 |
| Conservative (31.5) | 30 | 6 | 7 | 17 |

(*continued*)

THE UNDERGROUND GUN MARKET

**Table 1.** (*continued*)

| Demographic (Percent Total Survey Population) | Any Firearm | Handgun Only | Long Gun Only | Both |
|---|---|---|---|---|
| **Region** | | | | |
| Northeast (18.3) | 15 | 3 | 4 | 7 |
| Midwest (22.4) | 23 | 4 | 6 | 12 |
| South (36.9) | 25 | 8 | 4 | 13 |
| West (22.4) | 20 | 5 | 4 | 11 |
| **Child under eighteen** | | | | |
| Yes (29.8) | 19 | 5 | 7 | 9 |
| No (70.2) | 23 | 6 | 5 | 12 |
| **Grew up with a gun** | | | | |
| Yes (47.5) | 35 | 7 | 8 | 20 |
| No (48.0) | 9 | 4 | 2 | 3 |
| Don't know (3.2) | 17 | 9 | 4 | 4 |

*Source:* Authors' compilation based on the National Firearms Survey.
*Note:* Reported values are percentage of respondents indicating ownership of the specified firearm.

**Table 2.** Given Reasons for Gun Ownership

| | Protection From | | Hunting | Other Sporting Use | Collection | Other |
|---|---|---|---|---|---|---|
| | People | Animals | | | | |
| **Gun type** | | | | | | |
| Handgun only, 1 | 0.78 | 0.10 | 0.03 | 0.00 | 0.16 | 0.03 |
| Handgun only, >1 | 0.83 | 0.12 | 0.01 | 0.00 | 0.18 | 0.01 |
| Long gun only, 1 | 0.36 | 0.14 | 0.46 | 0.17 | 0.11 | 0.46 |
| Long gun only, >1 | 0.27 | 0.20 | 0.65 | 0.41 | 0.21 | 0.65 |
| Handgun and long gun | 0.72 | 0.27 | 0.55 | 0.47 | 0.36 | 0.55 |
| **Sex** | | | | | | |
| Male | 0.60 | 0.20 | 0.49 | 0.32 | 0.37 | 0.44 |
| Female | 0.69 | 0.21 | 0.32 | 0.21 | 0.28 | 0.32 |
| **Age** | | | | | | |
| Eighteen to twenty-nine | 0.60 | 0.21 | 0.38 | 0.26 | 0.39 | 0.38 |
| Thirty to forty-four | 0.67 | 0.18 | 0.41 | 0.30 | 0.38 | 0.41 |
| Forty-five to fifty-nine | 0.65 | 0.24 | 0.41 | 0.27 | 0.33 | 0.41 |
| Sixty or older | 0.58 | 0.18 | 0.41 | 0.29 | 0.32 | 0.41 |
| **Census region** | | | | | | |
| Northeast | 0.53 | 0.18 | 0.40 | 0.29 | 0.37 | 0.40 |
| Midwest | 0.55 | 0.16 | 0.51 | 0.38 | 0.36 | 0.51 |
| South | 0.73 | 0.23 | 0.37 | 0.25 | 0.28 | 0.37 |
| West | 0.56 | 0.18 | 0.35 | 0.25 | 0.42 | 0.35 |

*Source:* Authors' tabulations based on the National Firearms Survey.

and more common among those from the South.

### Gun Transfers

In addition to characterizing the stock of firearms in civilian hands, our survey provided information on the flow of guns in the United States over the past five years, including gun acquisitions, dispositions, and theft.

#### Firearms Acquisitions

We asked current gun owners a series of questions about the firearm they had acquired most recently. Approximately half said within the past five years (28 percent within the past two years, 21 percent between three and five years ago) and half (50 percent) more than five years ago (see tables 3, 4, and 5). Extrapolating to the U.S. population, we estimate that U.S. firearm owners acquired approximately seventy million guns in the past five years.[11]

The large majority of gun owners purchased their most recently acquired gun, with purchase more common for guns acquired in the past one to two years (86 percent) than for those acquired more distally (79 percent two to five years ago, 61 percent more than five years ago). Across all three periods, the most commonly acquired firearm was a handgun, with handguns constituting almost six of ten guns acquired in the past five years, and five of ten guns acquired more than five years ago. Stores (gun stores, sporting good stores, and so on) were the most common source of purchased guns, while gifts and inheritance were the most common form of nonpurchase transfer.

Firearms most recently acquired by gun owners tended to be new rather than used (see tables 6, 7, and 8). The proportion of new guns was higher among those acquired more recently; used guns account for four of ten firearms acquired more than five years ago, but only three of ten acquired in the past two years. The majority of new guns were purchased (89 percent in the past two years, 91 percent two to five years ago, 78 percent more than five years ago). Among used guns, nearly six of ten acquired more than five years ago were not purchased, versus only one-third of those acquired within the past two years. Inherited guns constitute 40 percent of used guns acquired more than five years ago, but only 16 percent of those acquired in the past two years, mirroring a decrease in the overall share of guns obtained by inheritance from 21 percent of those acquired more than five years ago to 4 percent of those acquired in the past two years.

The cost of the most recent firearm purchased (among respondents whose most recently acquired gun was purchased) was relatively evenly distributed around the mode of $250 to $500 (see table 9). Overall, used guns were less expensive than new guns and guns acquired longer ago were less expensive than

11. The NFS asked respondents who reported that they were current gun owners to describe when they acquired their most recently acquired firearm still in their possession and, separately, how many guns they had acquired in the past five years (regardless of whether those guns were still in their possession). Some respondents reported that they had acquired one or more guns during the past five years even though they had previously indicated that their most recent firearm acquisition (among the guns they currently owned) took place more than five years ago. Overall, when directly asked when they had most recently acquired a gun in their possession, 49 percent of people reported doing so within the past five years, whereas 62 percent said that they had acquired one or more firearms in the past five years when prompted to provide the number of firearms acquired (irrespective of whether those guns were still in their possession). In estimating that seventy million firearms were acquired over the past five years, we privileged the stem question to mitigate the well-established phenomenon of telescoping (that is, we excluded from our five-year estimate the 23 percent of respondents who reported acquiring at least one gun in the past five years yet also indicated their last acquisition was more than five years ago) (see table A1). Including respondents who initially reported that their most recent acquisition was more than five years ago increases our estimate of the total number of guns acquired over the past five years to eighty-five million. One possible explanation for this discrepancy is the tendency to telescope, which may have inflated the latter estimate. Alternatively, since only the second question explicitly asked respondents to consider guns that are no longer in their possession, these guns may have been excluded when respondents considered the first question.

**Table 3.** Distribution of Where Current Owners Acquired Most Recent Firearm, Less Than Two Years (28 Percent)

|  | All Guns (100%) | Handguns (59%) | Long Guns (40%) |
|---|---|---|---|
| **Percent purchased at or from** | | | |
| Any store | 62 | 65 | 54 |
| Family | 2 | 3 | 1 |
| Friend or acquaintance | 6 | 6 | 7 |
| Gun show | 4 | 3 | 5 |
| Pawn shop | 5 | 4 | 6 |
| Online | 2 | 2 | 2 |
| Other | 3 | 3 | 4 |
| All purchased firearms | 84 | 86 | 79 |
| **Percent nonpurchased transfers** | | | |
| Gift | 8 | 8 | 9 |
| Inheritance | 4 | 3 | 8 |
| Trade | 0 | 0 | 0 |
| Other | 5 | 4 | 6 |
| All nonpurchased firearms | 17 | 15 | 23 |
| All transfers | 100 | | |

*Source:* Authors' tabulations based on the National Firearms Survey.

**Table 4.** Distribution of Where Current Owners Acquired Most Recent Firearm, Two to Five Years Prior (21 Percent)

|  | All Guns (100%) | Handguns (60%) | Long Guns (39%) |
|---|---|---|---|
| **Percent purchased at or from** | | | |
| Any store | 54 | 48 | 58 |
| Family | 3 | 2 | 4 |
| Friend or acquaintance | 9 | 11 | 8 |
| Gun show | 3 | 4 | 2 |
| Pawn shop | 6 | 7 | 3 |
| Online | 1 | 1 | 2 |
| Other | 3 | 3 | 4 |
| All purchased firearms | 79 | 76 | 81 |
| **Percent nonpurchased transfers** | | | |
| Gift | 11 | 16 | 8 |
| Inheritance | 8 | 6 | 9 |
| Trade | 1 | 0 | 0 |
| Other | 1 | 2 | 6 |
| All nonpurchased firearms | 21 | 24 | 19 |
| All transfers | 100 | | |

*Source:* Authors' tabulations based on the National Firearms Survey.

**Table 5.** Distribution of Where Current Owners Acquired Most Recent Firearm, More Than Five Years Prior (50 Percent)

|  | All Guns (100%) | Handguns (51%) | Long Guns (48%) |
|---|---|---|---|
| **Percent purchased at or from** | | | |
| Any store | 42 | 42 | 42 |
| Family | 3 | 2 | 3 |
| Friend or acquaintance | 7 | 9 | 5 |
| Gun show | 2 | 3 | 2 |
| Pawn shop | 3 | 4 | 2 |
| Online | <1 | 1 | 0 |
| Other | 3 | 4 | 2 |
| All purchased firearms | 61 | 65 | 57 |
| **Percent nonpurchased transfers** | | | |
| Gift | 15 | 13 | 15 |
| Inheritance | 21 | 17 | 25 |
| Trade | 0 | 0 | 1 |
| Other | 3 | 4 | 2 |
| All nonpurchased firearms | 39 | 34 | 43 |
| All transfers | 100 | | |

*Source:* Authors' tabulations based on the National Firearms Survey.

**Table 6.** Percentage of Where Current Owners' Most Recent Transfer Occurred, Less Than Two Years (28 Percent)

|  | Percent Transfers (100%) | New (71%) | Used (26%) |
|---|---|---|---|
| **Percent purchased at or from** | | | |
| Any store | 62 | 78 | 16 |
| Family | 2 | 0 | 6 |
| Friend or acquaintance | 6 | 1 | 19 |
| Gun show | 4 | 3 | 6 |
| Pawn shop | 5 | 2 | 11 |
| Online | 2 | 1 | 5 |
| Other | 3 | 3 | 4 |
| All purchased firearms | 84 | 89 | 67 |
| **Percent nonpurchased transfers** | | | |
| Gift | 8 | 6 | 12 |
| Inheritance | 4 | 0 | 16 |
| Trade | 0 | 0 | 0 |
| Other | 5 | 5 | 5 |
| All nonpurchased firearms | 17 | 11 | 33 |
| All transfers | 100 | | |

*Source:* Authors' tabulations based on the National Firearms Survey.

**Table 7.** Percentage of Where Current Owners' Most Recent Transfer Occurred, Two to Five Years Prior (21 Percent)

|  | Percent Transfers (100%) | New (61%) | Used (37%) |
|---|---|---|---|
| **Percent purchased at or from** |  |  |  |
| Any store | 54 | 79 | 10 |
| Family | 3 | 1 | 6 |
| Friend or acquaintance | 9 | 1 | 23 |
| Gun show | 3 | 3 | 3 |
| Pawn shop | 6 | 3 | 10 |
| Online | 1 | 1 | 2 |
| Other | 3 | 3 | 2 |
| All purchased firearms | 79 | 91 | 56 |
| **Percent nonpurchased transfers** |  |  |  |
| Gift | 11 | 9 | 20 |
| Inheritance | 8 | 0 | 20 |
| Trade | 1 | 0 | 1 |
| Other | 1 | 1 | 0 |
| All nonpurchased firearms | 21 | 10 | 41 |
| All transfers | 100 |  |  |

*Source:* Authors' tabulations based on the National Firearms Survey.

**Table 8.** Percentage of Where Current Owners' Most Recent Transfer Occurred, More Than Five Years Prior (50 Percent)

|  | Percent Transfers (100%) | New (71%) | Used (26%) |
|---|---|---|---|
| **Percent purchased at or from** |  |  |  |
| Any store | 42 | 69 | 9 |
| Family | 3 | 0 | 6 |
| Friend or acquaintance | 7 | 1 | 15 |
| Gun show | 2 | 3 | 2 |
| Pawn shop | 3 | 1 | 5 |
| Online | 1 | 1 | 0 |
| Other | 3 | 4 | 3 |
| All purchased firearms | 61 | 78 | 40 |
| **Percent nonpurchased transfers** |  |  |  |
| Gift | 15 | 14 | 15 |
| Inheritance | 21 | 3 | 41 |
| Trade | 0 | 0 | 1 |
| Other | 3 | 3 | 2 |
| All nonpurchased firearms | 39 | 20 | 59 |
| All transfers | 100 |  |  |

*Source:* Authors' tabulations based on the National Firearms Survey.

**Table 9.** Cost of Purchased Firearms, in U.S. Dollars

| | $0–99 | $100–249 | $250–499 | $500–999 | $1,000 or more |
|---|---|---|---|---|---|
| All | 4.2 | 18.0 | 48.1 | 25.1 | 4.6 |
| Handguns | 3.1 | 14.3 | 50.3 | 29.6 | 2.7 |
| Long guns | 5.1 | 22.8 | 45.4 | 19.3 | 7.5 |
| New | 2.5 | 14.3 | 49.9 | 28.0 | 5.3 |
| Used | 9.1 | 29.1 | 41.9 | 17.3 | 2.7 |
| Five years or less | 2.3 | 11.6 | 48.6 | 30.2 | 7.4 |
| More than five years | 6.9 | 26.1 | 46.7 | 18.6 | 1.7 |
| Protection from strangers | 3.6 | 15.3 | 51.0 | 27.1 | 3.1 |
| Hunting | 4.2 | 24.5 | 45.7 | 18.9 | 6.7 |
| Sport shooting | 6.7 | 15.3 | 48.9 | 25.2 | 5.0 |
| Collection | 2.6 | 17.7 | 42.4 | 28.2 | 9.0 |

*Source:* Authors' tabulations based on the National Firearms Survey.
*Note:* All figures in percentages.

those purchased more recently. The most commonly cited reason for buying a firearm was self-protection, a reason more common for those purchased within the last five years (43 percent) than more than five years ago (35 percent).

*Firearm Dispositions*

Approximately 5 percent of gun owners reported that they had sold or otherwise gotten rid of a gun in the past five years (the average number of guns disposed of was two). Of these, the large majority (71 percent) had sold the gun they disposed of most recently, 13 percent had given the gun as a gift, and 10 percent had traded it for something else. A few who had disposed of a gun (1 percent) reported having gotten rid of it in a buy-back program. When gun owners sold guns, they most often sold them to a friend directly (35 percent) or to a gun dealer (32 percent), 12 percent reporting that they had sold the gun via an online advertisement and another 14 percent having sold it to a family member (not shown).

*Firearm Theft*

Approximately 2.4 percent of gun owners (CI: 1.6–3.6) reported having had one or more stolen from them in the past five years, the mean number at 1.9 (a range of 1 to 6). Assuming that theft was evenly distributed across the years, we estimate that approximately 2.3 million guns were stolen over the past five years (five hundred thousand annually).

**DISCUSSION**

In 1994, when the National Survey of Private Ownership of Firearms (NSPOF) was conducted, Philip Cook and Jens Ludwig estimated an approximate 192 million guns in the hands of U.S. civilians (1997). In 2015, we estimate that that number has grown by more than seventy million to approximately 265 million. The guns acquired over the past twenty years are disproportionately handguns, the share of which in the total gun stock is now 42 percent, versus approximately 33 percent in 1994.

The shift we observe in the gun stock toward a greater proportion of handguns may reflect the decline in hunting and a change in motivations for firearm ownership and use (Smith 2001). Indeed, a perceived, and growing, need for self-protection appears to drive contemporary gun ownership in the United States (Pew Research Center 2013). Consistent with our finding that the majority of the guns that have been added to the gun stock are handguns and that gun owners in 2015 were more likely than gun owners in 1994 to report that they owned any handgun primarily for self-protection (76 percent versus 48 percent), we find that almost 70 percent of gun owners report that a primary reason for owning a gun is protection against people. Consistent with this

trend, we find that respondents who owned only handguns were just as likely to live in an urban environment as a rural one, and to be demographically more diverse than owners of long guns (who, as a group, are more likely to be white, male, and rural).

Not only are there many more guns overall, there are also more gun owners (approximately 55 million from the NFS compared to approximately 44 million from the NSPOF), although the percentage of the adult population that owns guns has declined from 25 percent in the 1994 NSPOF (no confidence interval provided), to 22 (CI: 21–24) percent in 2015.[12] Indeed, gun owners today each own, on average, more guns (4.8 in the NFS versus approximately 4.3 in the NSPOF). Moreover, gun ownership appears to be somewhat more concentrated in 2015 than it was in 1994: the top 20 percent of gun owners owned 55 percent of the gun stock in 1994; they now own 60 percent.

In the absence of a gold standard against which to compare our estimates (of the sort that would render survey-based estimates largely unnecessary), two sources of administrative data—from the ATF and FBI—provide an opportunity to grossly validate results (ATF 2015; FBI 2016). Firearm manufacturing and import-export data available from the ATF suggest that, from 1899 through 2013 (the last year for which data are available), approximately 363 million firearms have been available for sale in the United States (see table A1).[13] Although guns are highly durable, it is reasonable to ex-

pect that every year some fraction is permanently removed from the marketplace through seizure, irrecoverable loss, or breakage. Following Cook, applying a 1 percent per year depreciation (permanent removal from use) rate to the available manufacturing data yields an estimated gun stock in 2013 of approximately 270 million (Cook 1993; Cook and Goss 2014). Assuming the number of guns was added to the market in 2014 (the last full year before our survey) was the same as the number added in 2015 (sixteen million, the largest number of guns manufactured or imported in U.S. history), the estimate of the U.S. gun stock (using the ATF data) increases to 285 million, close to the 265 million we estimate from our survey.[14]

Our estimate that approximately seventy million firearms changed hands within the past five years is also broadly consistent with estimates derived separately using—first—ATF data on firearm manufacturing, imports, and exports (which should track our estimates of new firearms acquired), and—second—National Instant Criminal Background Check System (NICS) background check data (which should correspond to the number of people who acquired firearms and underwent a background check). Given the percentage of people in the NFS who report that their most recently acquired gun was new (rather than used) and assuming that new guns correspond to the firearms that the ATF report enumerates, the total number of firearms acquired over the past five years should be approximately eighty-two mil-

12. A similar decline has been reported from the General Social Survey, in which personal gun ownership declined from 28 percent in 1994 to 22 percent in 2014 (Smith and Son 2015).

13. The data series presented in table A1 combines a summary (1899–1968), assembled from ATF reports on manufacturing plus imports (Newton and Zimring 1968), ATF data compiled by Gary Kleck (1969–1986, 1991), and the remainder from online ATF data (ATF 2015).

14. The NSPOF estimate of 192 million guns in 1994 is also remarkably consonant with ATF data up to 1994, applying the same 1 percent annual removal from market estimate. However, our estimate is 30 percent, not 15 percent lower than ATF figures. The estimate of approximately 270 million guns from our 2004 random digit dial telephone survey, appears to be an overestimate. Extrapolating from surveys to the U.S. population, especially for relatively rare events (such as owning an extremely large number of guns), has been shown to have the potential to lead to large overestimates. In the 2004 survey, two factors came into play: first, by 2004 RDD surveys were increasingly plagued, as our survey was, by low response rates, suggesting the possibility that even with the application of poststratification weights, results may not have been generalizable (and thus suitable for extrapolation) to the U.S. population. Second, because ownership of large numbers of guns is relatively uncommon, our estimates of the gun stock were sensitive to the inclusion (or exclusion) of respondents who reported that they owned large numbers of guns.

lion.[15] Our estimates based on ATF data may be an underestimate because they were calculated based on commerce data from a five-year period ending in 2013, the most recent year for which ATF data were available (and sales have been accelerating upward). Nonetheless, our estimates using NICS data are remarkably similar: eighty-three million (derived using our published finding that approximately 75 percent of gun owners who acquired their most recent firearm within the past five years underwent a background check for that acquisition, not shown).[16]

Our estimate of the number of guns stolen annually also squares well with external data sources, although our estimate that five hundred thousand guns are stolen annually is somewhat higher than the most recent gun theft estimate (233,000) reported from the NCVS. Overall, however, the number of guns stolen appears to have remained relatively stable over time. In the late 1980s, the NCVS estimated that approximately 340,000 firearms were stolen each year. Using data from the NSPOF, combined with data from a state-level survey that estimated the number of guns stolen per theft incident in that state, Cook and Ludwig estimate that slightly fewer than five hundred thousand guns per year were stolen in the United States in the mid-1990s.

The NFS used an existing probability-based online panel (KnowledgePanel) to examine U.S. gun ownership, whereas our 2004 survey and the NSPOF both relied on random digit dialing. It is possible that online panel surveys and random-digit dial (RDD) surveys elicit systematically different responses from survey participants, suggesting that comparisons over time (and across survey modes) should be undertaken with some caution. Even if it were possible (or desired) to conduct an RDD survey about gun ownership today, such a survey would be unlikely to be comparable to surveys from 1994 or 2004 due to increasingly poor response rates on telephone surveys (Link et al. 2008). Moreover, probability-based online samples have been found to reduce social desirability bias and yield more accurate results than telephone surveys (Chang and Krosnick 2009).

Although the NFS is thus likely to produce a good estimate of firearms in civilian hands, as well as to accurately characterize the flow of guns and other characteristics of gun ownership, some gun owners may nevertheless have chosen not to report their gun ownership on a survey, and some non–gun owners may have reported owning guns when in fact they do not. What evidence there is, however, suggests that gun owners appear to respond accurately with respect to their firearm ownership on surveys. Studies that have validated survey reports of gun ownership against administrative data have reported low levels of

15. Missing answers as to whether the most recently acquired gun was new (as opposed to used) were imputed, based on the assumption that the 3 percent of respondents with missing data with respect to whether their most recently acquired firearm was new or old, were missing at random. The estimate we arrive at using ATF data is higher (ninety-one million versus seventy million) if we do not restrict respondents to those who indicated in a stem question that they had acquired the last firearm currently in their possession within the past five years. The reason for this is that some of these respondents indicated that they had acquired a nonzero number of firearms in the past five years when asked directly how many firearms they had acquired regardless of whether they still had the firearm in their possession. Incorporating these respondents' answers into our estimate of the gun flow increased the estimate we arrived at using ATF data because the flow of all guns (both new and used) is derived by dividing the ATF enumeration of new guns by the percentage of new guns that our respondents reported were acquired in the past five years (and, ignoring the stem question restriction decreased the percentage of new guns from 68 percent to 62 percent).

16. If respondents were not required to indicate in the stem question that their most recently acquired firearm was acquired within the past five years, 69 percent of gun owners reported having undergone a background check with respect to their most recently acquired gun (and therefore the estimate of the number of firearms acquired over the past five years increases to ninety-one million). This number is likely to be an underestimate given that each NICS background check may result in the acquisition of more than one firearm (for additional details regarding background check data, see Miller, Hepburn, and Azrael 2017).

false negative reports (approximately 10 percent), and virtually no false positive reports (Kellermann et al. 1990; Rafferty et al. 1995). In the NFS, fewer than 1 percent of respondents refused to answer our stem question about household gun ownership, and none refused the subsequent question regarding whether they personally owned a gun. Nonetheless, it is likely that some groups of gun owners (such as those who possess firearms illegally, such as someone with a felony conviction), are not reflected in our estimates, and possible that nonresponse to some questions may affect the validity of our findings if those choosing not to answer a question differed systematically from those who did. Given that 2 percent or fewer of respondents refused to answer the vast majority of our questions about firearms, nonresponse bias among those in our survey is unlikely to have had a material influence on our findings.

### CONCLUSION

As of 2015, we estimate approximately 265 million guns in the U.S. civilian gun stock, an increase of approximately seventy million guns since the mid-1990s. Over that time, the proportion of handguns in the gun stock—most often bought for self-protection—has grown (to more than 40 percent), as has the proportion of gun owners who own both handguns and long guns (to more than 75 percent). Although the proportion of U.S. adults who report owning guns has declined only modestly, from 25 percent in 1994 to 22 percent in 2015, fewer men own them (32 percent in 2015 versus 42 percent in 1994), slightly more women do (12 percent in 2015 versus 9 percent in 1994), and owners in general are more likely to have

more guns (the mean number increased from four to five). Despite the increase in the average number of guns, the median owner owns only two (28 percent own one and 31 percent own two, accounting for 14 percent of the total U.S. stock); the 8 percent of all owners who own ten or more account for 39 percent of the gun stock (and 14 percent of owners own half the U.S. stock).

With respect to firearm transfers, we estimate that approximately seventy million firearms changed hands within the past five years, a number broadly consistent with manufacturing data from the ATF, the large majority of which were purchased, more so in the past two years (86 percent) than for those acquired more remotely (79 percent two to five years ago; 61 percent more than five years ago). Across all three periods, the most commonly acquired firearm was a handgun.

Guns not only move into but also out of the hands of owners. Five percent of gun owners in our sample reported having disposed of a gun within the past five years, most often (35 percent) through a sale to family or friends. Another 2.4 percent report having had a gun stolen within that time, accounting for an estimated five hundred thousand guns per year.

The National Firearms Survey provides the first nationally representative data about the stock and flow of guns in the United States since 2004 (and the second such since 1994). These data have the potential to ground public health, public safety and public policy discussions about guns and gun transfers in what we assume is largely the legal firearms market, which is where firearms, even those that end up in the gray or black market, all start out.

APPENDIX

**Table A1.** Estimation of Gun Stock Using Gun Manufacturing Data

| Year | Total Guns (Millions) | Δ | Adjusted Estimate (.99) | Year | Total Guns (Millions) | Δ | Adjusted Estimate (.99) |
|---|---|---|---|---|---|---|---|
| 1899–1945 | 47 | | | 1980 | 168 | 6 | 140 |
| 1946 | 48 | 1 | 48 | 1981 | 173 | 5 | 144 |
| 1947 | 51 | 3 | 50 | 1982 | 178 | 5 | 147 |
| 1948 | 53 | 2 | 52 | 1983 | 182 | 4 | 150 |
| 1949 | 55 | 2 | 53 | 1984 | 186 | 4 | 152 |
| 1950 | 58 | 3 | 56 | 1985 | 191 | 5 | 156 |
| 1951 | 60 | 2 | 57 | 1986 | 194 | 3 | 157 |
| 1952 | 62 | 2 | 58 | 1987 | 198 | 4 | 160 |
| 1953 | 64 | 2 | 60 | 1988 | 203 | 5 | 163 |
| 1954 | 66 | 2 | 61 | 1989 | 209 | 6 | 167 |
| 1955 | 67 | 1 | 62 | 1990 | 213 | 4 | 170 |
| 1956 | 69 | 2 | 63 | 1991 | 217 | 4 | 172 |
| 1957 | 71 | 2 | 64 | 1992 | 223 | 6 | 176 |
| 1958 | 73 | 2 | 66 | 1993 | 231 | 8 | 182 |
| 1959 | 75 | 2 | 67 | 1994 | 238 | 7 | 188 |
| 1960 | 78 | 3 | 69 | 1995 | 243 | 5 | 191 |
| 1961 | 80 | 2 | 71 | 1996 | 247 | 4 | 193 |
| 1962 | 81 | 1 | 71 | 1997 | 252 | 5 | 196 |
| 1963 | 84 | 3 | 73 | 1998 | 256 | 4 | 198 |
| 1964 | 86 | 2 | 75 | 1999 | 261 | 5 | 201 |
| 1965 | 89 | 3 | 77 | 2000 | 265 | 4 | 203 |
| 1966 | 93 | 4 | 80 | 2001 | 270 | 5 | 206 |
| 1967 | 97 | 4 | 83 | 2002 | 274 | 4 | 208 |
| 1968 | 102 | 5 | 87 | 2003 | 279 | 5 | 211 |
| 1969 | 107 | 5 | 92 | 2004 | 284 | 5 | 214 |
| 1970 | 112 | 5 | 96 | 2005 | 289 | 5 | 217 |
| 1971 | 117 | 5 | 100 | 2006 | 295 | 6 | 220 |
| 1972 | 122 | 5 | 104 | 2007 | 301 | 6 | 224 |
| 1973 | 128 | 6 | 109 | 2008 | 308 | 7 | 229 |
| 1974 | 135 | 7 | 115 | 2009 | 316 | 8 | 235 |
| 1975 | 140 | 5 | 118 | 2010 | 325 | 9 | 241 |
| 1976 | 146 | 6 | 123 | 2011 | 334 | 9 | 248 |
| 1977 | 151 | 5 | 127 | 2012 | 347 | 13 | 258 |
| 1978 | 156 | 5 | 131 | 2013 | 363 | 16 | 272 |
| 1979 | 162 | 6 | 135 | | | | |

*Source:* Authors' compilation based on Newton and Zimring 1968, Kleck 1991, and ATF 2015.
*Note:* We apply a 1 percent depreciation (permanent removal from use) rate to each year's adjusted stock.
Pre-1969 figures do not appear to include import (and net out export) data.

## REFERENCES

Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). 2015. "Firearms Commerce in the United States: Annual Statistical Update 2015." Washington: U.S. Department of Justice.

Callegaro, Mario, and Charles DiSogra. 2008. "Computing Response Metrics for Online Panels." *Public Opinion Quarterly* 72(5): 1008–32.

Centers for Disease Control and Prevention (CDC). 2017. "Injury Prevention and Control." Web-based Injury Statistics Query and Reporting System (WISQARS). Atlanta, Ga.: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Accessed July 3, 2017. https://www.cdc.gov/injury/wisqars/index.html.

Chang, Linchiat, and Jon A. Krosnick. 2009. "National Surveys via RDD Telephone Interviewing Versus the Internet: Comparing Sample Representativeness and Response Quality." *Public Opinion Quarterly* 73(4): 641–78.

Colby, Sandra L., and Jennifer M. Ortman. 2015. "Projections of the Size and Composition of the U.S. Population: 2014 to 2060." *Current Population Reports*, series P25, no. 1143. Washington: U.S. Census Bureau.

Cook, Philip J. 1993. "Notes on the Availability and Prevalence of Firearms."*American Journal of Preventive Medicine* 9(3): 33–38.

Cook, Philip J., and Kristin A. Goss. 2014. *The Gun Debate: What Everyone Needs to Know?* Oxford: Oxford University Press.

Cook, Philip J., and Jens Ludwig. 1996. *Guns in America: Results of a Comprehensive National Survey on Gun Ownership and Use*. Washington, D.C.: Police Foundation.

———. 1997. "Guns in America: National Survey on Private Ownership and Use of Firearms." *National Institute of Justice* Research in Brief. Washington: U.S. Department of Justice.

Federal Bureau of Investigation (FBI). 2016. "NICS Firearm Background Checks." Washington: U.S. Department of Justice. Accessed July 3, 2017. https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year.pdf/view.

Gallup. 2016. "In Depth Topics A to Z: Guns." Accessed July 3, 2017. http://www.gallup.com/poll/1645/guns.aspx.

Growth for Knowledge (GfK). 2013. "Knowledge-panel® Design Summary." Palo Alto, Calif.: GfK.

Accessed August 18, 2017. http://www.knowledgenetworks.com/knpanel/docs/knowledgepanel(R)-design-summary-description.pdf.

Hepburn, Lisa, Matthew Miller, Deborah Azrael, and David Hemenway. 2007. "The U.S. Gun Stock: Results from the 2004 National Firearms Survey." *Injury Prevention* 13(1): 15–19. DOI: 10.1136/ip.2006.013607.

Kellermann, Arthur L., Frederick P. Rivara, Joyce Banton, Donald Reay, and Corine L. Fligner. 1990. "Validating Survey Responses to Questions About Gun Ownership Among Owners of Registered Handguns." *American Journal of Epidemiology* 13(6): 1080–84.

Kleck, Gary. 1991. *Point Blank: Guns and Violence in America*. New Brunswick, N.H.: Transaction Publishers.

Langton, Lynn. 2012. "Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010." *BJS Crime Data Brief* no. NCJ-239436. Washington: U.S. Department of Justice. Accessed July 3, 2017. https://www.bjs.gov/content/pub/pdf/fshbopc0510.pdf.

Link, Michael W., Michael P. Battaglia, Martin R. Frankel, Larry Osborn, and Ali H. Mokdad. 2008. "A Comparison of Address-Based Sampling (ABS) Versus Random-Digit Dialing (RDD) for General Population Surveys." *Public Opinion Quarterly* 72(1): 6–27.

Miller, Matthew, Lisa Hepburn, and Deborah Azrael. 2017. "Firearm Acquisitions Without Background Checks: Results of a National Survey." *Annals of Internal Medicine* 166(4): 233–39.

Morin, Rich. 2014. "The Demographics and Politics of Gun-Owning Households." Washington, D.C.: Pew Research Center. Accessed July 3, 2017. http://www.pewresearch.org/fact-tank/2014/07/15/the-demographics-and-politics-of-gun-owning-households/.

Newton, George D., and Franklin E. Zimring. 1968. *Firearms and Violence in American Life*. A staff report submitted to the National Commission on the Causes and Prevention of Violence. Washington: U.S. Government Printing Office.

Pew Research Center. 2013. "Why Own a Gun? Protection Is Now Top Reason." Washington, D.C.: Pew Research Center. Accessed July 3, 2017. http://www.people-press.org/2013/03/12/why-own-a-gun-protection-is-now-top-reason/.

Rafferty, Ann P., John C. Thrush, Patricia K. Smith,

and Harry B. McGee. 1995. "Validity of a Household Gun Question in a Telephone Survey." *Public Health Reports* 110(3): 282–88.

Rand, Michael. 1994. "Guns and Crime: Handgun Victimization, Firearm Self-Defense, and Firearm Theft." *BJS* Crime Data Brief no. NCJ-147003. Washington: U.S. Department of Justice.

Smith, Tom W. 2001. "National Gun Policy Survey of the National Opinion Research Center: Research Findings." Chicago: National Opinion Research Center at the University of Chicago. Accessed July 3, 2017. http://www.norc.org/PDFs/publications/SmithT_Nat_Gun_Policy_2001.pdf.

Smith, Tom W., and Jaesok Son. 2015. "Trends in Gun Ownership, 1972–2014." Chicago: National Opinion Research Center at the University of Chicago. Accessed July 3, 2017. http://www.norc.org/PDFs/GSS%20Reports/GSS_Trends%20in%20Gun%20Ownership_US_1972-2014.pdf.

Wright, James D., Peter H. Rossi, and Kathleen Daly. 1983. *Under the Gun: Weapons, Crime, and Violence in America*. New York: Aldine de Gruyter.