**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS<br><br>and<br><br>JOSEPH R. CAPEN,<br><br>                Plaintiffs,<br><br>            v.<br><br>CHARLES D. BAKER, in his official capacity as Governor of the Commonwealth of Massachusetts,<br><br>and<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts,<br><br>             Defendants. | CIVIL ACTION No. 22-cv-11431-FDS |

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.    Justice Thomas: Laws Like the Massachusetts Statute are Clearly Unconstitutional ....................................................................1

II.   *Heller* Rejected the State's Central Premise ......................................2

III.  This Case is Very Simple...................................................................5

IV.   The Court Should Reject the State's Efforts to Move the *Heller/Bruen* Goalposts ...............................................................7

      A.    The Founding Era is the Relevant Time Frame ......................7

      B.    The Court Should Reject the State's Attempt to Ignore *Heller* and *Bruen* and Focus on the 20th Century...................8

      C.    The State's Burden is to Identify "an Enduring American Tradition," Not a Handful of Isolated Examples and Outliers................10

      D.    The State's Focus on Mass Shootings Does Not Distinguish This Case from *Heller*............................................................10

      E.    The Court Should Reject the State's Attempt to Rewrite *Heller*............12

      F.    The Fundamental Flaw in the State's Historical Analysis: Failing to Distinguish "Ban" From "Regulate"...................................13

V.    The State Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms.........................................................14

      A.    The Historical Record Has Not Changed Since *Heller* .........................14

      B.    The State's Expert Failed to Identify Historical Regulations Justifying the Ban ................................................................15

            1.    Introduction..................................................................15

            2.    Gunpowder....................................................................16

            3.    1686 Act Against Swords and Pocket Pistols .............................16

            4.    1881 Arkansas Statute....................................................17

            5.    Firearm Regulations.......................................................17

            6.    Knife Regulations ..........................................................18

            7.    Trap Guns......................................................................21

            8.    Concealed Carry Regulations ..........................................21

            9.    Summary .......................................................................22

i

VI.     Magazines Are Arms ....................................................................23

        A.      The State's Argument is Counter to *Heller* ...............................23

        B.      The State's Argument is Contrary to Lower Courts' Holdings ..............24

        C.      Magazines are an Essential Component to Semi-automatic Firearms.....25

        D.      Silencers Are Not Essential to the Operation of Any Firearm................30

VII     The Banned Arms are Not Dangerous and Unusual ..................................30

VIII.   The Court Should Reject the State's "Common Use" Argument ......................33

        A.      *Heller* Did Not Require Evidence of Actual Use....................................33

        B.      Common Use is Based on Statistics....................................................35

        C.      The State's "Comparison" Argument Fails .............................................36

        D.      The State Destroys its Own Common Use Argument ............................37

        E.      The Arms are Useful for Self-Defense ...................................................37

IX.     The State is Wrong to Rely on *Worman* and Other Abrogated Cases ................38

X.      The State's "Most Useful for Military Service" Argument Fails ......................39

XI.     The Difference Between an Automatic Firearm and a Semi-Automatic
        Firearm is Constitutionally Significant...................................................42

XII.    The State's "Conversion" Argument Fails .........................................................43

XIII.   The Court Should Reject the State's Backdoor Means-End Test ......................43

        A.      The State Misunderstands *Bruen's* Reference to "Burden"....................43

        B.      The State Misunderstands *Bruen's* Reference to "Justify".....................44

XIV.    Judges Must "Cut Through the Emotion"...........................................................45

XV.     The Court Should Disregard the State's Overheated Rhetoric
        About the Prevalence of Mass Shootings .........................................................46

XVI.    The Other Temporary Injunction Factors Are Met...........................................47

XVII.   Conclusion     .....................................................................................49

## I.      Justice Thomas: Laws Like the Massachusetts Statute are Clearly Unconstitutional

This is not a close case. The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." *D.C. v. Heller*, 554 U.S. 570, 625 (2008). Justice Thomas, the author of *Bruen* (joined by Justice Scalia, the author of *Heller*), provided a roadmap to the resolution of this matter in his dissent from denial of certiorari in *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015). Justice Thomas examined an arms ban that was for practical purposes identical to Massachusetts' Statute. He noted millions of Americans own AR-style semiautomatic rifles for lawful purposes, including self-defense and target shooting. *Id*. (Thomas, J., dissenting). "**Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons**." *Id*. (emphasis added).

The State has hired numerous experts and submitted hundreds of pages of material in an effort to make this case seem complicated. It is not. This case turns on *Heller's* simple rule to which Justice Thomas alluded. Is the firearm hardware commonly owned by law-abiding citizens for lawful purposes? "**If the answer[ is] "yes," the test is over**." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019) (emphasis added).[1] Here, the answer is unquestionably "yes." The test is over. The State has categorically banned weapons commonly possessed by law-abiding citizens for lawful purposes. The law is unconstitutional. It is just that simple.

---

[1] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022), *and rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).

**II.**     *Heller* **Rejected the State's Central Premise**

The Central Premise of the State's argument is that when it decided *Heller*, the Supreme Court surely never intended to extend Second Amendment protection to a category of firearms that can be used in mass shootings. Resp. 29. The State's Central Premise rests on a fundamental misunderstanding of *Heller* and is therefore false. This is easily demonstrated.

On April 16, 2007, Seung Hui Cho committed a mass shooting at Virginia Tech University.[2]  At the time, Cho's crime was the worst mass shooting in American history. *Id*. Cho fired 174 rounds, killed thirty-two people, and wounded many others.[3] Aside from the first two murders, Cho was able to do all of this in only a few minutes. *Id*. Cho did not use an "assault rifle" to commit his crimes.[4] He used two semiautomatic handguns. *Id*.

*Heller* was argued less than one year later on March 18, 2008,[5] and D.C. made sure the Court was aware that the worst mass shooting in U.S. history up until then had recently been committed with handguns like those banned by its ordinance. It wrote in its brief: "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). Thus, when it decided *Heller*, the Supreme Court was keenly aware that semiautomatic handguns could be used in mass shootings. Nevertheless, it struck D.C.'s ban as unconstitutional. In doing so, the Court wrote:

> **We are aware of the problem of handgun violence** in this country, and **we take seriously the concerns raised by the many** *amici* **who believe that prohibition of handgun ownership is a solution**. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating

---

[2] Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should Universities Have A Duty to Prevent Rampage Killings?,* 60 Fla. L. Rev. 895, 895–96 (2008).
[3] Grant Arnold, *Arming the Good Guys: School Zones and the Second Amendment*, 2015 B.Y.U. Educ. & L.J. 481, 500–01 (2015).
[4] *Craig R. Whitney, A Liberal's Case for the Second Amendment, 31 T.M. Cooley L. Rev. 15, 19 (2014).*
[5] *Id*., 554 U.S. at 570.

handguns, [] But the enshrinement of constitutional rights necessarily **takes certain policy choices off the table. These include the absolute prohibition of handguns** held and used for self-defense in the home.

*Heller*, 554 U.S. at 636 (emphasis added).

Only months after the Virginia Tech shooting, the Supreme Court held that the very weapons used by the shooter were protected by the Second Amendment. It follows that the State's Central Premise is false. The fact that a weapon can be used to in mass shootings does not disqualify it from Second Amendment protection.

The case for upholding Second Amendment rights is even more compelling here than in *Heller*. In *Heller*, the Court held that the rights of the millions of Americans who possess handguns will not be taken away even though handguns are used by thousands of criminals to kill over ten thousand people every year.[6] The Court was unpersuaded by Justice Breyer's dissent in which he pointed out that handguns "are specially linked to urban gun deaths and injuries, and [] are the overwhelmingly favorite weapon of armed criminals." *Id*., 554 U.S. at 682 (Breyer, J., dissenting). In contrast, as horrific as mass shootings are, they account for only a fraction of 1% of firearm homicides.[7] The State acknowledges that the weapons it bans are also possessed by millions of people. Resp. 17. The rights of those millions cannot be taken away because a few maniacs use semi-automatic rifles to kill tens of people each year in mass shootings.

Then-Judge Kavanaugh expressed the matter this way in his dissent in *Heller II*:

[C]onsidering just the public safety rationale invoked by D.C., **semi-automatic handguns are more dangerous as a class** than semi-automatic rifles . . . [H]andguns 'are the overwhelmingly favorite weapon of armed criminals.'… So it would seem a bit backwards – at least from a public safety perspective – to interpret the Second

---

[6] U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V (last visited Feb. 12, 2023).
[7] Compare FBI total firearm homicides in 2019, *supra*, note 6 (10,258) to 2019 mass shooting homicides from Exhibit B to the Klarevas Declaration (51).

Amendment to protect semi-automatic handguns but not semi-automatic rifles. …
[Heller erects a] serious hurdle … in the way of D.C.'s attempt to ban semi-automatic
rifles. Put simply, **it would strain logic and common sense to conclude that the
Second Amendment protects semi-automatic handguns but does not protect semi-
automatic rifles**.

*Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)

(emphasis added).[8]

In *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the Court reached a similar conclusion.

After reviewing the evidence Illinois submitted in support of its firearm regulation, the Court

ruled the evidence was not relevant to its resolution of the case because:

**… the Supreme Court made clear in *Heller* that it wasn't going to make the right to
bear arms depend on casualty counts.** 554 U.S. at 636, 128 S.Ct. 2783. If the mere
possibility that allowing guns to be carried in public would increase the crime or death
rates sufficed to justify a ban, *Heller* would have been decided the other way, for that
possibility was as great in the District of Columbia as it is in Illinois.

*Id.*, 702 F.3d at 939 (emphasis added).

Identical logic applies in this case. "If the mere possibility that [banning certain semi-

automatic weapons would decrease the harm of mass shootings] sufficed to justify a ban, *Heller*

would have been decided the other way, for that possibility was as great in the District of

Columbia as it is in [Massachusetts]." *Id.*

The arms banned by the State are dangerous. No one disputes that. All firearms are

dangerous. The arms used by the Virginia Tech shooter were dangerous. But if arms could be

banned merely because they are dangerous, the Second Amendment would be meaningless. "If

*Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they

are dangerous." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (Alito, J., concurring.).

---

[8] Plaintiffs shall refer to Judge Kavanaugh's dissent in this case as "*Heller II*." In *Bruen,* the Court cited Judge
Kavanaugh's dissent with approval multiple times. *See, id.*, 142 S. Ct. at 2129, n.5, 2134, 2137,

### III.    This Case is Very Simple

As Justice Thomas observed in his *Friedman* dissent about a practically identical

firearms ban, this is a very simple case. The two-part *Heller/Bruen* test states:

[T]he standard for applying the Second Amendment is as follows:

[Step One:] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.

[Step Two:] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.*, 142 S. Ct. at 2129–30.

"*Bruen* makes clear that the first step is one based **solely** on the text of the Second

Amendment to determine if it presumptively protects an individual's conduct – a presumption

that the [government] can **then** rebut with history and tradition." *U.S. v. Harrison*, 2023 WL

1771138 *4 (W.D. Okla. 2023) (emphasis in original).

The State makes much of the fact that the initial burden is on Plaintiffs (Resp. 10), and

so it is. But the point of the State's discussion is not clear, because in this case that burden is

easily met. "[T]he Second Amendment extends, prima facie, to all instruments that constitute

bearable arms." *Bruen*, 142 S. Ct. at 2132. Therefore, because the Second Amendment's plain

text covers Plaintiffs' conduct – i.e., possessing certain bearable arms – "the Constitution

presumptively protects that conduct." *Id.*, 142 S. Ct. at 2126. It is just that simple. Plaintiffs

have met their burden.

"Given that the Second Amendment presumptively protects [Plaintiffs'] conduct, the

burden shifts to the [government] to demonstrate that [its absolute ban] is "consistent with the

Nation's historical tradition of firearm regulation." *U.S. v. Harrison*, *supra*, *5 (internal

quotation omitted). But under *Heller*, absolute bans of commonly held firearms are

"categorially unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011).

("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second

Amendment right – like the handgun bans at issue in those cases … are categorially

unconstitutional.")

 Therefore, it is impossible for the State to carry its burden under step two of the

*Heller/Bruen* test. The reason for this is apparent from *Heller* itself – there is no historical

analogue to such a ban. "[A]fter considering 'founding-era historical precedent,' including

'various restrictive laws in the colonial period,' and finding that none was analogous to the

District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Bruen*, 142 S. Ct.

at 2131.

 In this case, the State has also been unable to identify a regulation analogous to its

absolute ban. This is unsurprising. After a no doubt exhaustive search, D.C. was unable to

identify a single founding era analogue (far less a widespread American tradition) of banning

any category of commonly held firearms. No one else has come close to doing so in the

intervening 15 years, so there is no reason to expect the State would be able to do so now. This

is not to say that the State has not proposed analogues. But as discussed in more detail below,

its search was no more successful than D.C.'s, and its proposals can be rejected for the same

reason *Heller* rejected D.C.'s proposals – i.e., they do not "remotely burden the right of self-

defense as much as [The State's] absolute ban." *Heller*, 554 U.S. at 632.

 In summary, the complete absence of regulations even remotely analogous to D.C.'s

absolute ban allowed *Bruen* to characterize the *Heller* historical inquiry as "relatively simple."

*Id.*, 142 S. Ct. at 2132. It was simple because, under *Heller*, absolute bans of commonly held

firearms are, in the words of the Seventh Circuit, "categorially unconstitutional." *Ezell, supra*.

*See also People v. Webb*, 2019 IL 122951, 131 N.E.3d 93, in which the Illinois Supreme Court held that categorical arms bans are "necessarily" unconstitutional.[9] Therefore, this case, like *Heller*, is simple. The Statutes cannot withstand constitutional scrutiny because the State cannot carry its burden under step two of the *Heller/Bruen* test. The Court's inquiry should end here.

## IV.   The Court Should Reject the State's Efforts to Move the *Heller/Bruen* Goalposts

### A.   The Founding Era is the Relevant Time Frame

Though this is a simple case, the Court might nevertheless want to review the State's historical analysis. The first issue in a historical inquiry is to identify the relevant time period. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have **when the people adopted them**.'" *Id*., 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634-35 (emphasis in the original). The Second Amendment was adopted in 1791. The Court cautioned against "giving postenactment history more weight than it can rightly bear." *Id*., 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted). In examining the relevant history that was offered in *Bruen*, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). The Court need not resolve the issue of whether 1791 or 1868[10] is the

---

[9] In that case, the Court held that a commonly held bearable arm may not be "subjected to a categorical ban." *Id*., 2019 IL 122951, ¶ 21, 131 N.E.3d 93, 98. And since the Illinois statute in question constituted a categorical ban "that provision **necessarily** [could not] stand." *Id*. (emphasis added).

[10] *Bruen* noted an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope ..." *Id*., 142 S.Ct. at 2138. At the same time, however, the Court noted that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*., 142 S.Ct. at 2137 (citations omitted). The founding era is key. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for*

proper timeframe, because, as in *Bruen*, "the lack of support for [the State's] law in either period makes it unnecessary to choose between them." *Id*., 142 S.Ct at 2163 (Barrett, J., concurring).

Finally, whatever may be the case as to 19th century laws, *Bruen* held that 20th century laws are certainly irrelevant to the historical inquiry. *Id*., 142 S. Ct. at 2154, n. 28 ("We will not address 20th century historical evidence …").

### B.    The Court Should Reject the State's Attempt to Ignore *Heller* and *Bruen* and Focus on the 20th Century

The State's expert, Robert J. Spitzer, knows as well as anyone that the historical record has not changed since *Heller*. Indeed, he candidly admits that there were "few" restrictions on firearms in the founding era. Spitzer Dec. ¶ 82. Therefore, he attempts to divert the analysis from that era to the 20th century, to which the vast majority of his declaration is devoted (pages 6-38; paragraphs 13-62). He attempts to justify focusing on the 20th century instead of the founding era on the ground that conditions have changed since 1791 (as if that would have been news to the *Heller* Court). Spitzer Dec. ¶ 8. The State picks up on this analysis on pages 38-42 of its brief.

The thrust of the State's argument appears to be that even if there is no founding era precedent analogous to its ban, it may instead point to 20th century precedent because the arms it bans are the product of advances in weapons technology that have created new societal problems. Resp. 40. The State even goes so far as to say "the Supreme Court has signaled that

---

*Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (2022), available at bit.ly/3Xwtgze (last visited Feb. 16, 2023). This is evident for at least two reasons. First, in *McDonald*, the Court held that the Second Amendment bears the same meaning as applied against the federal government as it does against the states. *Id*., 561 U.S. at 765. Second, the Supreme Court has always treated the time of the ratification of the Bill of Rights as the key historical period for understanding the scope of those rights – regardless of whether the Court was applying the Amendments against the federal government or against the states. *See, e.g*., *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

20th century history is relevant, and indeed essential." Resp. 40-41. Not to put too fine a point on it, the Supreme Court said just exactly the opposite: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154, n. 28. The Supreme Court ignored 20th century precedent in *Bruen*. The Court should do the same in this case. Thus, the State's argument wilts in *Bruen's* glare.

The argument is also inconsistent with *Heller*. The modern handguns at issue in *Heller* were the product of exactly the same sort of technological innovation cited by the State. Those handguns also produced the same societal problems the State says it is addressing. Nevertheless, the Supreme Court held that D.C.'s ban was an extreme historical outlier, *Heller*, 554 U.S. at 629, and for that reason the ban was unconstitutional.

The flaw in the State's argument is that it believes that merely identifying advances in firearm technology satisfies its burden. But *Bruen* flatly states it does not: "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*, 142 S.Ct. at 2132, *quoting Heller*, 554 U.S. at 582.

In summary, the issue before the Court is whether historical precedent from the founding era (not from the 20th century) evinces a comparable tradition of regulation with the purpose of controlling the societal problem identified by the State. *Id.* 142 S. Ct. at 2131-32 (internal citations and quotation marks omitted). Like D.C., the State cannot point to a single

founding-era law (far less a national tradition) that prohibited mere possession of an entire class of commonly held firearms. As Judge Kavanagh stated in *Heller II* with respect to D.C.'s ban of semi-automatic rifles, the historical facts are substantially the same as in *Heller* and therefore the result should be the same as well. *Id*., 670 F.3d at 1287.

**C.     The State's Burden is to Identify "an Enduring American Tradition," Not a Handful of Isolated Examples and Outliers**

Even if the State were able to identify a handful of isolated examples and outliers, that would not carry its burden. "[T]he burden falls on [the State] to show that [its regulation] is consistent with this **Nation's** historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135 (emphasis added). The issue is whether a widespread and enduring tradition of regulation existed, and a few isolated regulations do not establish such a tradition. The "bare existence" of "localized restrictions" is insufficient to counter an American tradition." *Id.*, 142 S. Ct. at 2154. A handful of examples is insufficient to show a tradition. *Id.*, 142 S. Ct. at 2142 (three regulations insufficient to show a tradition). Isolated examples do not "demonstrate a broad tradition of [the] States." *Id.*, 142 S. Ct. at 2156.

**D.     The State's Focus on Mass Shootings Does Not Distinguish This Case from** *Heller*

"In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. In *Helle*r, D.C.'s flat ban on the possession of handguns was a regulation the Founders themselves could have adopted to confront the societal problem D.C. identified, i.e.

handgun violence in urban areas. *Bruen*, 142 S. Ct. at 2131. And since none of the founding era regulations identified by D.C. was analogous to its ban, the ban was unconstitutional.

The State has identified a subset of firearms violence, i.e., mass shootings, as the societal problem it seeks to address with its arms ban. But the State's focus on mass shootings does not distinguish this case from *Heller*, because, once again, D.C. could have made an identical argument in *Heller*. In fact, D.C. **did** make an identical argument. D.C. included a section in its brief in which it described the "harms posed by handguns" it was seeking to address. Brief of Petitioners, *D.C. v. Heller*, *supra* 49-55. One of the harms was the use of semi-automatic handguns in mass shootings. *Id*., at 53 (citing the Virginia Tech shooting as an example). Thus, D.C. specifically identified mass shootings as one of the societal problems it was seeking to address. But the mass shooting problem D.C. identified did not change the result in *Heller*. The Court held, even in the face of this issue, that D.C. was required to demonstrate a historical tradition comparable to its firearms ban. There is no such tradition and the law was declared unconstitutional.

In this case, the State seems to believe that if it is able to identify an unprecedented societal concern, it need not identify a founding era analogue that is "relevantly similar" to its law. This is not true. Under *Bruen*, a court must determine whether the law imposes a comparable burden as that imposed by a historical analogue from the founding era. *Id*., 142 S. Ct. at 2132–33. The Court did note that when a regulation implicates unprecedented societal concerns or dramatic technological changes, the search for historical analogies may be more "nuanced." *Id*. But it never suggested that in those cases, the search for founding era analogues may be abandoned altogether. Even in these cases, the government is required to identify a relevantly similar tradition justifying its regulation.

11

*Heller* distinguishes between categorical bans and other types of regulations. The former is simple; the latter may be more nuanced. As discussed above, this case is straightforward and simple. It is not in the "nuanced" category. But even if that were not the case, the State would still be required to show founding era regulations that are "relevantly similar" to its absolute ban. It has not.

### E.    The Court Should Reject the State's Attempt to Rewrite *Heller*

The State attempts to rewrite the *Heller* test. Resp. 33, n.7. The Supreme Court held that the Nation's historical tradition of firearms regulation supports banning weapons that are both "dangerous and unusual." *Heller*, 554 U.S. at 627 (emphasis added). Importantly, "this is a conjunctive test: A weapon may not be banned unless it is **both** dangerous **and** unusual." *Caetano*, 577 U.S. at 418 (Alito, J. concurring) (emphasis in the original). An arm that is commonly possessed by law-abiding citizens for lawful purposes is, by definition, not unusual. Thus, such an arm cannot be both dangerous and unusual and therefore it cannot be subjected to a categorical ban. *Heller*, 554 U.S. at 629. It follows, that the "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418.

*Heller's* citation to 4 William Blackstone, *Commentaries on the Laws of England* does not change this conclusion. Blackstone referred to "[t]he offense of riding or going armed, with dangerous or unusual weapons …" *Id.*, at 148-49.  But even though *Heller* cited this passage, it used the conjunctive (and not the disjunctive) when it described the type of arms that may be banned. *Bruen* goes even further and explicitly links the "dangerous and unusual" test with the "common use" test:

> [In *Heller*], we found it 'fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' 'that the Second Amendment protects the

possession and use of weapons that are 'in common use at the time.' *Id*., at 627, 128 S.Ct. 2783 (first citing 4 W. Blackstone, Commentaries on the Laws of England 148–149 (1769)

*Id*., 142 S. Ct. at 2128.

In a second passage, the Court repeated this theme:

At most, respondents can show that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons' – a fact we already acknowledged in *Heller*. … Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' … Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.' … Thus, **even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today**.

*Id*., 142 S. Ct. at 2143.

The State, relying on Professor Cornell's declaration, asserts the Supreme Court got it all wrong and it may ban "unusually dangerous" weapons. But in the very passage from *Bruen* cited by the State, the Court stated that it was Professor Cornell who had gotten it wrong. *Id*., 142 S. Ct. at 2143. The Court cited the amicus brief submitted by Professor Cornell and his colleagues and stated that "*amici* … misunderstand these statutes." *Id*. And then, as quoted above, it reaffirmed *Heller's* conjunctive formulation: In summary, the passage from *Bruen* cited by the State stands for the opposite of the proposition for which it cites it.

### F.   The Fundamental Flaw in the State's Historical Analysis: Failing to Distinguish "Ban" From "Regulate"

The State asserts that there is a substantial body of historical regulations that restricted weapons in the founding era. Resp. 31. The State's assertion is irrelevant to its categorial ban on commonly possessed arms. *Heller* distinguishes between laws that **ban** arms and laws that

**regulate** arms, and the fundamental flaw in the State's historical analysis is that it has failed to distinguish between two types of laws.

Arms typically possessed by law-abiding citizens may not be banned. *Heller*, 554 U.S. at 628. But various regulations – short of bans – such as prohibitions on concealed carry, possession of firearms by felons, possession of firearms in sensitive places, and conditions on the commercial sales of weapons are legitimate. *Id.*, 554 U.S. at 627-28. The reason for this dichotomy is that nothing in the Nation's history and tradition of firearm laws, "remotely burden[s] the right of self-defense as much as an absolute ban." *Id.*, 554 U.S. at 632. Whereas regulations short of bans are "fairly supported by [] historical tradition." *Id.*, 554 U.S. at 628.

As discussed in more detail below (and in Exhibit 1), the laws identified by Spitzer in support of the Statutes do not establish a historical tradition of categorical bans of commonly used arms. As *Heller* recognized, no such tradition exists. Rather the laws he identifies establish a historical tradition of lesser regulations, such as prohibitions on concealed carry, etc. And so, while there were "regulations" of arms in the founding era, it is incorrect to assert that those lesser regulations justify the State's categorical ban.

## V.    The State Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms

### A.    The Historical Record Has Not Changed Since *Heller*

The State's experts have submitted hundreds of pages of historical information for the Court's review. The State apparently expects the Court to believe that while in *Heller* there was zero historical justification for a categorial ban of commonly held arms, there are now literally hundreds of historical arms regulations analogous to its identical ban. Of course, there are not, and the State has not identified anything in the historical record that even remotely suggests that *Heller's* conclusion should be reconsidered. As then-Judge Kavanaugh stated in *Heller II*, semi-

automatic rifles "have not traditionally been banned and are in common use today, and are thus protected under *Heller*." *Heller II*, 670 F.3d at 1287; see also *Bonta*, 542 F. Supp. 3d at 1024 ("a ban on modern rifles has no historical pedigree.").[11]

### B. The State's Expert Failed to Identify Historical Regulations Justifying the Ban

#### 1. Introduction

Most of the Spitzer declaration (pages 5-37; paragraphs 12-59) is a section entitled "Regulation History of Fully Automatic and Semi-Automatic Firearms (Early Twentieth Century)." This analysis ignores the Supreme Court's holding in *Bruen*. New York advanced 20th century analogues to support its case. The Court simply ignored them as irrelevant, because that evidence did "not provide insight into the meaning of the Second Amendment." *Id*. 142 S. Ct. at 2154, n. 28. The Court should follow *Bruen* and ignore Spitzer's 20th century evidence.

The section contained in paragraphs 60-85 of the Spitzer Declaration is entitled "Historical Hardware Restrictions on Knives, Blunt Weapons, Pistols, and Trap Guns in the Eighteenth and Nineteenth Centuries." None of the regulations cited by Spitzer support the State's case. Indeed, Spitzer all but gives away the store when he states: "firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution were few." Spitzer Dec. ¶ 81 (internal citation and quotation marks omitted). Spitzer points to laws that increased penalties for burglaries if the offender were armed. Spitzer Dec. ¶ 60. But to count as a historical analogue, a regulation must be "relevantly similar" to the law in question. *Bruen*, 142 S. Ct. at 2132. A sentence enhancer for a burglary is not "relevantly similar" to a categorial ban of a commonly held arm. Spitzer points to laws prohibiting discharge near populated areas.

---

[11] *Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021), vacated and remanded on other grounds, 2022 WL 3095986 (9th Cir. 2022). Plaintiffs will refer to this opinion as "*Bonta*."

*Id.* These are regulations on use of firearms that are comparable to many similar laws in place today, all of which are perfectly constitutional. Those regulations are not analogous to the State's ban. Spitzer asserts that four states prohibited public carry of arms. *Id.* n. 126. Spitzer misrepresents all four statutes, because none of them banned peacefully carrying firearms. But even if he were correct, a regulation of carry is a use regulation, not a categorical ban, and therefore not relevantly similar to the Statutes challenged here.[12]

### 2.    Gunpowder

The State argues that regulation of gunpowder storage is analogous to a ban on commonly held arms. Resp. 31. The Court can safely ignore this argument because the Supreme Court has already rejected an identical argument. In *Heller*, Justice Breyer advanced the same gunpowder statute advanced by the State as a historical analogue. *Id.*, 128 S. Ct. at 2849 (Breyer, J., dissenting). The majority rejected Justice Breyer's appeal to this and other gunpowder storage laws, stating:

> The other laws Justice Breyer cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. Post, at 2849 – 2850. Nothing about those fire-safety laws undermines our analysis; **they do not remotely burden the right of self-defense as much as an absolute ban on handguns.** Nor, correspondingly, does our analysis suggest the invalidity of laws regulating the storage of firearms to prevent accidents.

Id., 554 U.S. at 632.

### 3.    1686 Act Against Swords and Pocket Pistols

The State cites *An Act against wearing Swords, &c.*, Ch. IX (1686), printed in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* (1881). And it argues that this statute banned certain types of weapons. But *Bruen* addressed this statute as

---

[12] Not to mention that a categorial ban on carry would be unconstitutional under *Bruen*.

well, and it held that it banned only the concealed carry of arms that were not commonly used for lawful purposes. *Id*. 142 S. Ct. at 2143. Therefore, the law did not support a ban on the open carry of commonly possessed arms. *Id*. Far less does it support a total ban of such arms. The State asserts that bans on pocket pistols support its law. Resp. 34. Again, however, *Bruen* states that pocket pistols were considered dangerous and unusual. *Id*. Thus, a ban on such a weapon does not support a ban on commonly possessed arms.

### 4.       1881 Arkansas Statute

The State cites an 1881 Arkansas statute in support of its ban (Resp. 35) on possession of weapons. But that statute says the opposite of what the State suggests. The statute states: "Provided … That nothing in this act be so construed as to **prohibit any person from carrying any weapon** when upon a journey, or upon his own premises." (Gohlke Ex. 17 attached to Resp.) (emphasis added). Needless to say, a statute that prohibits a ban is not analogous to a statute that imposes a ban.

### 5.       Firearm Regulations

Incredibly, in his 54-page declaration, Spitzer devoted only a *single paragraph* to founding era firearms regulations. Spitzer Dec. ¶ 81. He mentions without discussing laws that regulated public carry. *Id*. The point of this is unclear, because the whole point of *Bruen* is that a total ban on public carry is unconstitutional. If a historical ban on public carry does not even justify a ban on public carry, how could it justify an absolute ban on possession? He mentions laws banning concealed carry. *Id*. Again, the point is unclear. No one disputes that the State can regulate concealed carry, because *Heller* recognized that founding era precedent supported concealed carry laws. *Id*., 570 U.S. at 626. But obviously that fact did not rescue D.C.'s categorical ban. Finally, Spitzer mentions laws that would today fall under the category of

17

"menacing." *Id*. Again, no one disputes that a law prohibiting menacing with a deadly weapon is constitutional. But such a law is not remotely analogous to a total ban.

In addition to the statutes identified by Spitzer, the State cites an 1879 Tennessee law that prohibited the sale of handguns. Resp. 35. First, it is anomalous, to say the least, for the State to rely on a law that is blatantly unconstitutional under *Heller*.[13] Secondly, 1879 is 88 years after 1791. A statute enacted in that year cannot provide any insight into the founding era. Third, the statute is a regulation on commercial transactions. It does not prohibit possession of any arm for lawful purposes. Finally, even if this were deemed analogous, a single statute from a single state is, by definition, an outlier which cannot be the basis of demonstrating a national tradition.

### 6.      Knife Regulations

Unable to find any historical firearms regulations even remotely as restrictive as the Massachusetts Statutes, Spitzer turns to regulations of other weapons, starting with Bowie knives. Spitzer states that "15 states effectively banned the possession of Bowie knives outright …" Spitzer Dec. ¶ 69.[14] This is simply false. Indeed, it is outrageously false. In support of his assertion, Spitzer refers the reader to Exhibit H, where he has listed 15 states under his column entitled "No Carry." Exhibit 1 attached hereto is a detailed review of those regulations. The discussion in the following paragraphs is a summary of that analysis. In short, none of the laws supports the State's argument.

---

[13] *See Bruen*, 142 S. Ct. 2143 ("Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today.").

[14] The State mentions other Bowie knife regulations identified by Spitzer (such as concealed carry prohibitions). Resp. 36. Plaintiffs will focus only on those laws Spitzer says effectively banned possession, because, as discussed above, those are the only types of laws that could qualify as analogues for the State's ban.

Spitzer misrepresents the Arkansas law. Far from banning possession as Spitzer says, the law expressly permits it. Spitzer omitted a key part of the statute in his quotation. The omitted part states that nothing in its provisions shall be "construed as to prohibit any person from carrying any weapon when … upon his own premises." *See McDonald v. State*, 102 S.W. 703, 703 (Ark. 1907).

Among the "states" Spitzer says banned possession of these arms are the *Kingdom* of Hawaii (i.e., before it was even a territory, much less a state) and the cities (not states) of Boise (pop. 1,899), Joplin (pop. 29,902), Nebraska City (pop. 6,050), Provo, Utah (pop. 3,432) and Nashville (pop. 25,865). (*See* Ex. 1 for population figures). Regulations in a monarchy and a handful of small towns and cities obviously do not establish a national tradition.

The Arizona,[15] Oklahoma,[16] and Texas[17] statutes Spitzer cites were specifically rejected as Second Amendment analogues in *Bruen*. Laws from the Territory of Hawaii (second example different from the law from the kingdom), West Virginia, and Missouri are from the 20th century and thus not relevant. The Colorado and Indiana laws applied only to concealed carry, not possession. The Louisiana and Tennessee laws were sensitive place regulations, not bans. The Missouri statute was a licensing law, not a ban. The New York law prohibited illegal conduct only (i.e., carrying or possessing "with intent" to use against another). It did not ban any weapon.

The Arizona, Hawaii (second example), Idaho, and Oklahoma laws were territorial laws. In addition to not being analogous to the State's ban, these laws are irrelevant to the constitutional analysis. *Bruen* stated: "[W]e will not stake our interpretation on a handful of

---

[15] *Bruen*, 142 S. Ct. at 2154.
[16] *Id*.
[17] *Id*., 142 S.Ct. at 2153.

temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption …" *Id*., 142 S.Ct. at 2155.

Spitzer suggests that laws regulating carry are the same as laws banning possession. Spitzer Dec. ¶ 69. This is obviously wrong as a matter of logic. Carrying an arm in public is not the same as possessing it in private. It is also wrong as a matter of history. As with the Arkansas law discussed above, lawmakers did not consider carry to be the same as possession. Judges distinguished the two as well. In *Andrews v. State*, 50 Tenn. 165 (1871), for example, the Tennessee Supreme Court rejected equating carry and possession. The Court held it would be unconstitutional to prevent a citizen from ordinary possession and use of an arm on his own premises, but the same citizen is subject to regulation when he carries the same arm among other people. *Id*., 50 Tenn. at 185-86.

In summary, not a single one of the 15 laws Spitzer says is analogous to a ban supports the Massachusetts Statutes at all. At best, the State has established a founding era tradition of prohibiting concealed carry. But concealed carry regulations are not analogous to a categorial ban on possession. Otherwise, *Heller* would have gone the other way, because the Heller Court recognized that founding era precedent supported concealed carry laws. *Id*., 570 U.S. at 626.

Law professor David Kopel, whose work was cited favorably in *Bruen,* reviewed Spitzer's work on this issue and came to the same conclusion. See David Kopel, *Bowie Knife Statutes 1837-1899*, available at [bit.ly/3RNRpQD](bit.ly/3RNRpQD) (last visited Feb. 10, 2023). After an exhaustive review of all nineteenth century state and territorial statutes, Kopel concluded: "As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century, **no state prohibited possession of Bowie knives**." *Id*. (emphasis added). Kopel concluded that the

history of Bowie knife law is no stronger in creating historical precedents for banning common firearms or magazines than that which was examined in *Heller* and *Bruen*. *Id*.

Finally, the State's focus on knives actually cuts dramatically against it (apologies for the pun). The State's own expert, Randolph Roth does not claim that mass killings were unknown in the founding era. Rather, he states that they were "rare." Roth Dec. ¶ 41. And he cites as an example the 1782 Gnadenhutten massacre in Ohio in which 96 Moravian Christians were killed with blade weapons. *Id*., at n. 95. If the Founders were aware of a problem and could have adopted a regulation analogous to the State's regulation to address it but did not, the State's regulation is unconstitutional. *Id.*, 142 S. Ct. at 2131. The Founders were aware of the problem of mass killings with blade weapons. They did not adopt any absolute ban on possession of blade weapons. Thus, the State's ban is unconstitutional.

### 7. Trap Guns

Spitzer's final category is "Trap guns" and "spring guns," which were devices rigged to fire without the presence of a person. Spitzer Dec. ¶ 82. But Spitzer's chart cites only one founding-era restriction on the setting of "trap guns." Spitzer Dec. Ex. B. (referring to 1763-1775 N.J. Laws 346, ch. 539, § 10). It was not until the late 19th century that such restrictions appeared elsewhere. *Id*. More importantly, these laws did not ban any class of arms. Rather, they regulated the manner of using them. That is, they banned setting loaded, unattended guns to prevent unintended discharges. Because "trap gun" laws are not comparable to the State's ban, either in terms of the type of burden they imposed or the government's justification for that burden, they are not constitutionally relevant analogues.

### 8. Concealed Carry Regulations

Finally, the State mentions that by the end of the 19th century most states banned concealed carry. Resp. 37. Again, the State's point is unclear. Laws banning concealed carry are regulations. *Heller* acknowledged that concealed carry regulations are constitutional. *Id.*, 554 U.S. at 627-28. And if laws regulating concealed carry were analogous to laws categorically banning arms commonly possessed by law-abiding citizens for lawful purposes, *Heller* would have said so and upheld D.C.'s ban. It did not, because they are not.

### 9.    Summary

As noted above, there is nothing one can say about the State's categorical ban that one could not also say about D.C.'s categorical ban. Thus, the Court's conclusion in *Heller* applies to this case as well:  None of the historical laws identified by the State "remotely burden[s] the right of self-defense as much as an absolute ban on [semi-automatic rifles.] *Id*. 554 U.S. at 632. The plain fact of the matter is that the Founders would never have tolerated a categorical arms ban. We can know this because the Founders never did impose any gun ban as a solution to a societal problem, no matter how serious. Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms-and A Strong Rebuke to "Inferior Courts,"* 2022 Harv. J.L. & Pub. Pol'y Per Curiam 24, 8 (2022). Bans on the possession of commonly held firearms are a strictly 20th and 21st century phenomenon. *Id*. So, the State's historical burden is impossible to meet, because such bans have no basis whatsoever in the early history of the republic. *Id*.

Indeed, far from banning arms in the founding era, there were laws **requiring** people to be armed with particular kinds of weapons. *Id*. For example, the Militia Act of 1792, 1 STAT. 271 (1792), required every man between eighteen and forty-five years of age to be enrolled in the militia. Those men were required to provide themselves, at their own expense,

very specific firearms, ammunition, and equipment. Thus, the laws at the Founding prescribed the firearms citizens **had to have**, not those they **could not have**. *Smith, supra.*

The Founding generation's solution for mass killings was not to deprive ordinary citizens of weapons needed for defense, but for armed citizens to have an active role in preventing, or minimizing the harm caused by, such killings. *Id.* The *North-Carolina Gazette* published an account of an incident in which "a Demoniac being left in a Room, in which were 18 loaded Muskets," shot three men and wounded another with a sword, "upon which the People present, without further Ceremony, shot him dead." Quoted in Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms*, 105 (2008), citing *North Carolina Gazette* (Newbern), July 7, 1775 at 3, col. 1. Halbrook concludes: "For the Founders, the right of the subject to be armed for defense of self and the community was necessary to suppress such tragedies – they never imagined a world in which they would be disarmed for the supposed benefit of preventing access to weapons by madmen." *Id.*

Passing a law that deprived citizens of commonly held arms would have been unthinkable to the Founders. That is why the State's task of identifying such a founding era law is hopeless. There is no historical analogue to the State's arms ban, and for that reason it is unconstitutional. The remainder of this brief discusses various errors and distortions in the State's brief, but the Court could end its analysis here as well.

## VI.   Magazines Are Arms

### A.   The State's Argument is Counter to *Heller*

"Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of

communications … the Second Amendment extends, prima facie, to all [bearable arms] even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 583. The State's arguments about magazines come perilously close to the borderline frivolous arguments to which *Heller* alluded. Modern magazines are protected even though they did not exist in the 18th century.

**B.      The State's Argument is Contrary to Lower Courts' Holdings**

Lower courts have rejected the "accessory" argument asserted by the State here. For example, in *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), the Court rejected the argument, writing:

> [The government] also contends that the prohibited magazines are not 'arms' within the meaning of the Second Amendment. This argument is not persuasive. First, … no court has found that such magazines do not qualify as 'arms' under the Second Amendment. [gathered cases omitted] Second, if [the government] is right that magazines and ammunition are not 'arms,' any jurisdiction could effectively ban all weapons simply by forbidding magazines and ammunition. This argument's logic would abrogate all Second Amendment protections. Rather, the court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as **they are integral components to vast categories of guns**.

*Id*. at 1276 (emphasis added).

The Ninth Circuit affirmed in *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015). In that case, the Court held that "to the extent that certain firearms capable of use with a magazine – e.g., certain semiautomatic handguns – are commonly possessed by law-abiding citizens for lawful purposes, **our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines** necessary to render those firearms operable." *Id*. 779 F.3d at 998 (emphasis added). To be sure, pursuant to its pre-*Bruen* means-end analysis, the Court upheld a ban on "large capacity" magazines. But it did so on the basis that the ban on this subset of magazines survived intermediate scrutiny. *Id*. 779 F.3d at

1000. The Court never held that magazines are not arms. In fact, it held just the opposite. That holding is subsumed within the Court's holding that the Second Amendment protects the right to possess at least some magazines. *Id*. 779 F.3d at 998.

### C.      Magazines are an Essential Component to Semi-automatic Firearms

The State attempts to define an entire class of arms out of existence. Resp. 11-14. But the State's effort to define its problem away fails, because whether magazines are "arms" is not decided by the State's linguistic fiat. The State's primary argument is based on the declaration of Dennis Baron, an expert in "corpus linguistics.[18] Based on Baron's work, the State argues that the "lexical data" indicates that in the founding era the term "arms" did not include "magazines." (Resp. 12-13). This argument proves nothing. Rather, it demonstrates why the "counting words" approach of corpus linguistics advocates like Baron is all but worthless for constitutional analysis.[19] In *Heller* Justice Scalia described the conclusions drawn by the dissent based on Baron's and his colleagues' work as "worthy of the Mad Hatter." *Id*., 554 U.S. at 589. Nothing has changed since then.

Baron states that in the founding era "magazine" referred to a kind of building. Baron Dec. ¶ 24. Therefore, Professor Baron applied his approach to the term "cartridge boxes"[20] and concluded that in the founding era, a box containing cartridges was considered an "accoutrement" and not an arm. Baron Dec. ¶ 34. And since a modern magazine is like a "cartridge box," it is not an arm either. *Id*. No one disputes that everyone in the founding era understood a box containing ammunition was an accoutrement and not itself an arm. But Baron

---

[18] The State also asserts that magazines are not arms because they "cannot, by themselves, be used" offensively or defensively. Resp. 12. This makes no sense because the State concedes that ammunition is protected (Resp. 13), but ammunition cannot, by itself, be used offensively or defensively either.
[19] *See generally* Mark W. Smith & Dan M. Peterson, *Big Data Comes for Textualism: The Use and Abuse of Corpus Linguistics in Second Amendment Litigation*, 70 Drake L. Rev. 387 (2022).
[20] And "cartouch boxes," but the terms mean the same thing.

goes off the rails when he asserts that a modern magazine, like a cartridge box, is also nothing but an "ammunition container" (*Id*., ¶ 55) and therefor it is an accoutrement too. If a magazine were merely a box containing ammunition, no one would argue that it is an arm. But the very source Baron cites states that it is more than merely a container. It performs a function, i.e., feeding ammunition. The OED, which Baron cites, states that a magazine **feeds ammunition** into the breech of a firearm. *Id*., ¶ 55 (emphasis added). As discussed in detail below, the fact that a magazine performs an essential active function in the operation of a semi-automatic firearm (indeed, it is what makes semi-automatic fire possible) is what sets it aside from a mere box. Baron's fundamental premise upon which all of his conclusions rest (i.e., a modern magazine is just a box) is flawed, and the conclusions he reaches based on that premise are false.

Next, it is rare that one gets to watch an expert fight with his own client, but the State and Baron are at loggerheads. The State admits that ammunition is an arm protected by the plain text of the Second Amendment. Resp. 13. But, according to Baron, that is wrong, because the term arms "does not include ammunition." Baron Dec. ¶ 9, 78. Moreover, according to Baron, the term "arms" does not include "parts of weapons." *Id*. Even an essential part of a firearm, such as a trigger, is not itself an arm according to Baron. *Id*. ¶ 9. Under Baron's analysis, Massachusetts could ban the sale and possession of ammunition and firearms parts essential for firearms to function all without violating the Second Amendment, because it would not have banned any "arm" as the Founders understood the word. This conclusion is absurd. *See Fyock v. City of Sunnyvale*, supra, 25 F. Supp. 3d at 1276 (If the magazines are not arms, "any jurisdiction could effectively ban all weapons simply by forbidding magazines … This argument's logic would abrogate all Second Amendment protections.").

26

Contra Professor Baron, the issue is not whether a magazine is analogous to 18th century boxes. Rather, the issue is whether they fit within the 18th century meaning of the word "arms." The meaning of that word in the 18th century is no different from the meaning today. *Heller*, 554 U.S. at 581. *Heller* noted that Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*, *quoting* 1 A New and Complete Law Dictionary.

The State admits the Court's analysis in *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), was correct. The Second Amendment protects those items that are "*necessary* to operate a firearm." Resp. 13 (emphasis in original). Thus, whether a magazine falls within the definition of "arms" involves a functional analysis – i.e., is a magazine necessary for a semi-automatic firearm to function? *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) ("[T]he right to keep and bear arms "protect[s] those closely related acts necessary to their exercise."). Thus, if the State wanted to introduce expert testimony on the crucial question, it should have retained a firearms expert, not a linguist. The answer to the crucial question is that a magazine is, in fact, vital to the operation of a semi-automatic firearm. Indeed, magazines are what make semi-automatic fire possible at all.

Detachable magazines are necessary to make semi-automatic firearms operate safely and effectively. Passamaneck Dec. ¶ 6. Without such magazines, semi-automatic firearms are inoperable. *Id*. A magazines is not merely a box in which ammunition is stored. *Id*.  ¶ 7. Rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id*. The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id*. If there is no magazine pushing cartridges up into the

action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of

the trigger, which is the defining characteristic of a semi-automatic weapon. *Id*. Thus, without

magazines as a designed dynamic component, semi-automatic firearms would not exist.[21]

In *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I.

2022), apparently acting as its own firearms expert, the district court asserted that a "a firearm

can fire bullets without a detachable magazine." *Id*. *12 (citing no expert). As Plaintiffs' expert

has demonstrated, this is a dubious proposition. Passamaneck Dec. ¶ 8. But even assuming

*arguendo* the Court were correct, the statement has no constitutional relevance. As discussed

above, in order for a semi-automatic firearm to operate qua semi-automatic firearm, a magazine

must be inserted. Passamaneck Dec. ¶ 7. This is just common sense. If cartridges are not being

fed from a magazine, semi-automatic fire is impossible because the cartridges would have to be

fed manually after each shot. In other words, without a magazine, a semi-automatic firearms is

reduced to a single shot firearm. Thus, *Ocean State Tactical* effectively holds that the State

could constitutionally outlaw multi-shot firearms by outlawing magazines. That is obviously

inconsistent with *Heller*, to say the least.

Apparently recognizing this obvious point, the State does not actually dispute this. It

seems to concede that some sized magazine is necessary. Resp. 13-14 (arguing that a firearm of

a particular size is not necessary but not arguing that no magazine is necessary). And of course,

it is, as even the case cited by the State recognizes. *See Oregon Firearms Fed'n, Inc. v. Brown*,

2022 WL 17454829, *9 (D. Or. 2022) ("magazines in general **are necessary** to the use of

firearms for self-defense").

---

[21] It may be technically possible to fire a semi-automatic weapon without a magazine by manually opening the action each time the weapon is fired and manually inserting a single round into the chamber. But this makes the semi-automatic firearm unreliable, unsafe, and subject to being damaged. *Id*. ¶ 8.

The State's confusion regarding this issue results from confusing the first step of the *Heller/Bruen* test (text) with the second step (history). [22] Under the first step, a magazine is a bearable arm and thus presumptively protected. Does this mean that the State cannot ban so-called large capacity magazines? Not necessarily. Just like any arm, if the State can demonstrate that a regulation banning large capacity magazines is "consistent with the Nation's historical tradition of firearm regulation," it can ban them (though, as discussed below, it cannot make such a demonstration). In summary, a magazine of some size is necessary to make the Second Amendment right to fire a semi-automatic rifle effective. Therefore, magazines, in general, constitute bearable arms that are prima facia protected by the Second Amendment under prong one (text) of the *Heller/Bruen* test. Whether magazines of a particular size can be banned is a different question that must be resolved under prong two (history) of that test.

That issue is easily resolved under *Heller's* "common use" analysis. The State does not dispute that American citizens hold over 150 million such magazines. Instead, it resorts to the "plaintiffs have access to other arms" canard specifically rejected by *Heller*, which held that "[i]t is no answer to say … that it is permissible to ban the possession of [some arms] so long as the possession of other [other arms]… is allowed." *Id.*, 554 U.S. at 629. The State also argues that those 150 million magazines are not "commonly used" because smaller magazines are available. This is a *non sequitur*. The State cannot reasonably dispute that the banned magazines are arms that are commonly used for lawful purposes. Therefore, a categorical ban of the magazines is "necessarily" unconstitutional.

---

[22] The Courts in *Brown* and *Ocean State Tactical* are also confused in this regard. That is why those cases are patently erroneous.

### D.       Silencers Are Not Essential to the Operation of Any Firearm

The state asserts that magazines are like silencers, and since courts have held that silencers are not arms, magazines are not arms either. Resp. 13. *Id*. But the State's argument assumes that magazines are like silencers. It does not demonstrate it. And in fact, courts that have considered the difference have concluded that magazines are in fact not accessories like silencers. In *United States v. Hasson*, 2019 WL 4573424 (D. Md. 2019), the Court held that silencers are not arms because they do "not contain, **feed**, or project ammunition." *Id.,* at *4 (emphasis added). But a magazine does **feed** ammunition (see above discussion). In *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) (*abrogated on other grounds by Bruen*), the Court held that "[b]ecause magazines **feed** ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." (emphasis added). And in *Hasson*, the Court cited *Ass'n of New Jersey Rifle & Pistol Clubs* to distinguish silencers (which it held are accessories) from magazines (which it acknowledged are arms).

### VII    The Banned Arms are Not Dangerous and Unusual

The State argues that it may ban these semi-automatic rifles and "large capacity" magazines[23] because they are particularly dangerous. Resp. 21, 46-47. The rifles and magazines are not more dangerous than other semi-automatic rifles and magazines that are not banned by the Statutes. Passamaneck Dec. ¶ 9. But even assuming for the sake of argument that the State is correct, the relative dangerousness of an arm is irrelevant for purposes of applying *Heller*,

---

[23] "[M]agazines with the capacity to accept more than ten rounds of ammunition are standard issue for many firearms. Thus, we would be more correct to refer to [the State's] ban on 'standard-capacity magazines.'" *Duncan v. Bonta*, 19 F.4th 1087, 1140, n.1 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022) (Bumatay, J., dissenting).

and therefore the State's argument has no relevance to the Court's resolution of the pending motion.

The banned rifles are perfectly legal to build, buy, and own under federal law and the laws of 42 states. Resp. 1, 41.[24] The AR-15 in particular, the quintessential arm banned by the State, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287, and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). These rifles are the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *See* National Shooting Sports Foundation, Inc., *2021 Firearms Retailer Survey Report*, 9, available at https://bit.ly/3gWhI8E (last visited Jan. 30, 2023).[25]

The banned magazines are also in common use. In 2021, a professional survey firm conducted a comprehensive assessment of firearms ownership and use patterns in America. William English, *2021 National Firearms Survey: Updated Analysis (*hereinafter, "English"), 1, available at https://bit.ly/3yPfoHw (last visited Jan. 30, 2023). The survey was administered to a representative sample of approximately 54,000 U.S. residents aged 18 and over, and it identified 16,708 gun owners. *Id.* According to the survey, 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to hundreds of millions of such magazines have been owned. English, 20. There is nothing surprising about that result. Many of the most popular semi-automatic rifles are manufactured with standard magazines holding more than ten rounds. *See, e.g.*, David B. Kopel, *The History of Firearm Magazines*

---

[24] The State acknowledges that the weapons are banned in only eight states (and therefore not banned in 42 states) and that the federal ban expired nearly 20 years ago. Spitzer Dec. ¶ 11.
[25] *See also* Mot. 13-18 for an extensive discussion of this issue.

*and Magazine Prohibitions*, 78 and ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). Indeed, over three quarters of modern sporting rifle magazines in the country have a capacity of more than 10 rounds. *See* Modern Sporting Rifle Comprehensive Consumer Report, at 31, NSSF (July 14, 2022), available at https://bit.ly/3GLmErS (last visited Jan. 30, 2023). The State does not attempt to refute Plaintiffs' evidence regarding these numbers. Thus, the State has conceded that Americans own over 100 million magazines like the ones it has banned.

Because the semi-automatic weapons and magazines banned by the State are not unusual, they cannot be both dangerous and unusual. It follows that, as Justice Alito wrote, their relative dangerousness is irrelevant because they belong to a class of arms commonly used for lawful purposes. Thus, the State's argument about whether these weapons are particularly dangerous misses the point, because even if they are dangerous, they are not both dangerous and unusual.

Finally, the State's argument proves too much. If semi-automatic weapons and the magazines that make them possible may be banned as such merely because they are excessively dangerous, *Heller* would have been decided the other way. As then-Judge Kavanaugh noted in *Heller II*, "the Supreme Court held that handguns – the vast majority of which today are semi-automatic – are constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens. There is **no meaningful or persuasive constitutional distinction** between semi-automatic handguns and semi-automatic rifles." *Id*., 670 F.3d at 1269 (emphasis added). "It follows from *Heller's* protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected." *Id*. The reason there is

no meaningful constitutional distinction is "that semi-automatic **rifles** fire at the same general rate as semi-automatic **handguns**." *Id.*, at 1289 (emphasis in original). *See also, Bonta*, 542 F. Supp. 3d at 1061 (same). In summary, the State's effort to cast the most popular rifle in America and standard capacity magazines as "dangerous **and** unusual" fails because they are manifestly not unusual.

**VIII.   The Court Should Reject the State's "Common Use" Argument**

    **A.**    ***Heller* Did Not Require Evidence of Actual Use**

Unable to rebut the overwhelming evidence that the arms it has banned are "typically possessed for lawful purposes," the State retreats to the specious argument that an arm is not protected unless it is in fact frequently **actually** used for self-defense. Resp. 14, 21. The State misinterprets *Heller*, basing its argument on too literal a reading of the term "use." *Fyock*, 25 F. Supp. 3d at 1276. "Second Amendment rights do not depend on how often [an arm] is actually used." *Id*. The "standard is whether the prohibited [arms] are 'typically possessed by law-abiding citizens for lawful purposes,' not whether the magazines are often used for self-defense." *Id*. Thankfully, most people will never need to defend themselves with a firearm. That should be celebrated, "not seen as a reason to except [an arm] from Second Amendment protection. Evidence that such magazines are 'typically possessed by law-abiding citizens for lawful purposes' is enough." *Id*.

The State's interpretation flies in the face of *Heller's* plain language, as Justice Thomas recognized. *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of cert.). In discussing the arms ban at issue in that case, Justice Thomas wrote that Americans own these arms "for lawful purposes like self-defense." *Id*. Justice Thomas reached this conclusion, as the Court did in *Heller*, based on the bare fact that millions

of Americans have chosen to acquire the arms. *Id*. Neither Justice Scalia in *Heller* nor Justice Thomas in *Friedman* required a study regarding "actual use" to support their conclusions.

The State argues that the phrase 'in common use' as used in *Heller*, *McDonald*, and *Bruen* does not simply refer to a weapon's *prevalence in society*." Resp. 15 (emphasis added). *Heller* held exactly the opposite when it stated D.C.'s arms ban was unconstitutional because it banned a class of arms "that is *overwhelmingly chosen by American society*." *Id*., 554 U.S. at 628 (emphasis added).

Moreover, contrary to the State's argument, in *Heller* the Supreme Court did not focus on "use" in isolation. The Court held that the Second Amendment conferred an individual right to **keep** and bear arms. *Id*., 554 U.S. at 595 (emphasis added). The Court held that "keep arms" means "possessing arms." *Id*., 554 U.S. at 583. And the Court held that banning "the most preferred firearm in the nation to **keep** and use for protection of one's home and family [fails] constitutional muster." *Id*., 554 U.S. at 628–29 (cleaned up; emphasis added). The conjunctive is important. If the State's interpretation of *Heller* were correct, the word "keep" in that sentence would be superfluous. It is not.

By posing and then using cherry-picked data to answer its own question of whether "assault weapons" are frequently used in self-defense, the State is simply reframing this case into a policy question: Does the average citizen really need a semi-automatic rifle like those it has banned? But the premise of its question was already rejected by *Heller*, which held that it is the choices of the American People – and not their government – that settle the question.

Nowhere in *Heller* did the Court suggest that it is necessary to show that a weapon's actual use in self-defense meets some threshold the State has not identified. *Heller* simply listed some of the reasons why Americans "may prefer" handguns. *Id*., 554 U.S. at 629. But in the

34

end, *Heller* concluded that the reasons people chose handguns is not relevant to the constitutional analysis. The Court wrote: "**Whatever the reason**, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid." *Id*. (emphasis added). Whatever the reason, the banned rifles and magazines are chosen in the millions by Americans, and a complete prohibition on their use is invalid.

### B.    Common Use is Based on Statistics

The State asserts the common use metric is not based on a "simplistic counting exercise." Resp. 16. But "counting" is what one does when one is interested in determining whether an arm is in common use. The common use inquiry is based on raw numbers. For example, as we have seen in his dissent from denial of certiorari in *Friedman*, Justice Thomas merely noted that millions of Americans own AR-style rifles. *Id*. That bare fact, standing alone, was sufficient to establish common use. *Id*. (Thomas, J., dissenting).

Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), is instructive on this point as well. He wrote that in determining whether the arms at issue (i.e., stun guns and Tasers) are commonly used, the "**relevant statistic**" is that over 200,000 Tasers and stun guns have been sold to private citizens who may lawfully possess them in 45 States. *Id*., 577 U.S. at 420 (internal citations and quotation marks omitted; emphasis added). Thus, Justice Alito determined common use based on bare numbers. The State attempts to explain *Caetano* away by quoting Justice Alito's statement that stun guns are "widely owned and accepted as a legitimate means of self-defense across the country." Resp. 16, n. 4, *quoting Caetano*, 577 U.S. at 420. But that quotation actually undermines the State's position and supports Plaintiffs'. Yes, Justice Alito concluded that stun guns are widely owned and accepted

as a legitimate means of self-defense across the country. But the important thing is that he, like Justice Scalia in *Heller* and Justice Thomas in *Friedman*, was able to reach that conclusion based on the bare number of arms sold and possessed by Americans. He did not require any evidence (such as a study) demonstrating that fact.

Other courts are in accord. *See Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (analyzing commonality by reviewing raw number percentage and jurisdiction counting); *Duncan IV*, 970 F.3d 1133, 1147 (9th Cir. 2020)[26] ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen*., 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017*), abrogated by Bruen* (2022) (Traxler, J. dissenting) (consensus among courts is that the test is an "objective and largely statistical inquiry"); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated on other grounds by Bruen* ("Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."); *Heller v. D.C*., 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").

## C.    The State's "Comparison" Argument Fails

Next, the State makes the astounding argument that 24 million rifles and over 100 million magazines are not enough to show common use. Resp. 22-23. The State argues that since there are proportionately fewer of these arms than handguns, they are not in common use. *Id*. First, this is a *non sequitur*. As a matter of logic, an arm can be commonly possessed even if

---

[26] *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

it is less commonly possessed than another arm. Second, the argument proves too much, because if an arm is not commonly possessed unless it is as commonly possessed as handguns, then only handguns are protected under the Second Amendment because they are the most commonly possessed firearm. Nothing in *Heller* supports limiting its holding in this way. Third, the State's argument fails as a matter of fact because 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle and 39 million people have owned magazines that hold over 10 rounds. English, 20, 33. Under any reasonable conception of the phrase, this constitutes "common use."

### D.     The State Destroys its Own Common Use Argument

As discussed above, the State argues that an arm is not in "common use" (and therefore may be banned) unless there is evidence that it is commonly actually used for self-defense. Then it asserts that "the use of **any** type of rifle in actual self-defense situations is quite rare." Resp. 23 (emphasis added). Thus, according to the State's logic, **any** type of rifle may be banned because no type of rifle is in common use. The State offers no argument for why *Heller* would permit such an absurd result.

### E.     The Arms are Useful for Self-Defense

The State asserts that the banned arms are not useful for self-defense. Resp. 16. This argument fails as an initial matter, because the Second Amendment protects a personal right to keep arms for all lawful purposes, not only self-defense. *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 412-13 (7th Cir. 2015) (Manion, J., dissenting). The assertion is not true as a factual matter as Plaintiffs demonstrated in their Motion. Mot. 14-15. Of the 25.3 million Americans who have defended themselves with a firearm, 13.1% (3.3 million) have used a rifle. English, 12, 15.

The State goes to considerable lengths attempting to prove points that are not relevant to the *Heller/Bruen* analysis. According to its experts, it is a bad idea to use the banned arms for self-defense, and the arms are not necessary for self-defense. Resp. 17, 23-25. This argument does not hold up under *Heller*. In that case, D.C. thought it was a bad idea and unnecessary for citizens to possess handguns for self-defense. That did not matter. The Supreme Court did not consult expert testimony on whether handgun use for self-defense was a good idea. It did not consult expert testimony concerning whether handgun use is necessary for self-defense. The bare fact that the arms were "typically possessed by law-abiding citizens for lawful purposes" was enough for the arms to be protected.

The Plaintiffs keep coming back to *Heller's* simple holding. The **only** relevant issue is whether an arm is typically possessed by law-abiding citizens for lawful purposes. If it is, the matter is settled. The whole point of *Heller* is that the government does not get to second-guess citizens regarding how they exercise their Second Amendment rights. Their choices regarding the best way to defend themselves and their families as reflected in the common use metric is the only relevant constitutional consideration. The government's policy assessment of the validity of their choices is of no consequence whatsoever.

## IX.   The State is Wrong to Rely on *Worman* and Other Abrogated Cases

The State relies on *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), for its assertion that the banned rifles are not suitable for self-defense. Resp. 16, n. 5. It does this even though it admits that *Worman* was abrogated by *Bruen*. *See Id.*, 142 S. Ct. at 2127. The State asserts that *Worman's* holding in this particular regard was not abrogated by *Bruen*. This is not true. In *Worman*, under the section of the opinion titled "Applying Intermediate Scrutiny," the Court noted that the plaintiffs had argued that the banned rifles are suitable for domestic self-defense.

922 F.3d at 40. The Court rejected that assertion as "too facile by half," holding that the "means" chosen by the Massachusetts legislature fit the "governmental interest" it sought to achieve. *Id*. In other words, the Court made the holding relied upon by the State as part of the means-end test rejected by the Supreme Court in *Bruen*. Similarly, the State admits that it relies on numerous other cases abrogated by *Bruen*. Resp. 25, n. 6. It is wrong for the State to cite these cases for the same reason it was wrong to cite *Worman*, i.e., the conclusions for which the State cites these cases were reached in service of the means-end scrutiny analysis rejected by *Bruen*.

**X.      The State's "Most Useful for Military Service" Argument Fails**

Citing *Heller*, the State asserts that it may ban "sophisticated" arms that are "most useful for military service." Resp. 18. Two passages from *Heller* show that the State's interpretation is the opposite of what the Court held. First, the Court stated:

> We may as well consider at this point … what types of weapons *Miller* permits. Read in isolation, *Miller's* phrase 'part of ordinary military equipment' could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on **machineguns** (not challenged in *Miller*) might be unconstitutional, **machineguns being useful in warfare in 1939**. We think that *Miller's* 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.' [*United States v. Miller*, 307 U.S. 174, 179 (1939)]. The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense.  … We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes …

*Id*., 554 U.S. at 624-25 (emphasis added). Expanding on this passage from *Miller*, the Court stated:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is

fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' [citations omitted]

It may be objected that if weapons that are most useful in military service – M–16 rifles and the like – may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require **sophisticated arms that are highly unusual in society at large**. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

*Heller*, 554 U.S. 570, 627–28 (emphasis added).

Both of these passages are extended discussions of *Miller* in which the Court clarified "what types of weapons *Miller* permits." In both passages, the Court distinguishes between two categories of weapons, the first of which is not protected by the Second Amendment and the second of which is. In the first passage, the Court refers to: (1) "[O]rdinary military equipment" (which includes "machineguns"); and (2) Arms supplied by men called for militia service. The Court noted that this second category consists of arms in common use for lawful purposes. In the second passage, the Court refers to these same categories using slightly different terms: (1) "[W]eapons that are most useful in military service." This phrase means the same thing as "ordinary military equipment" in *Miller*. The Court cites three examples of this type of weapon (machineguns like the M-16,[27] bombers, and tanks). (2) Arms supplied by men called for militia service. Again, this second category has the same "weapons in common use" meaning set forth in *Miller*.

One thing is clear. Weapons in common use brought to militia service by members of the militia are protected by the Second Amendment. What do militia members do with those

---

[27] *See Staples v. United States*, 511 U.S. 600, 603 (1994) (stating that the M-16 rifle is a military machinegun).

weapons when they bring them to militia service? They fight wars.[28] It would be extremely

anomalous, therefore, if *Heller* were interpreted to mean simultaneously that (1) weapons in

common use brought for militia service for fighting wars are protected by the Second

Amendment, and (2) weapons useful for fighting wars are not protected by the Second

Amendment. If the Court were to adopt the State's argument, this is the nonsensical result it

would have to reach. This is not the law. "*Miller* and *Heller* [merely] recognized that militia

members traditionally reported for duty carrying 'the sorts of lawful weapons that they

possessed at home,' and that the Second Amendment therefore protects such weapons as a

class, regardless of any particular weapon's suitability for military use." *Caetano v.*

*Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J., concurring).[29]

In summary, when he used the phrase "weapons that are most useful for military

service," Justice Scalia did not, as the State asserts, mean all weapons useful in warfare. Rather,

he used the phrase to contrast specialized weapons employed by a standing army (not protected

by the Second Amendment) with weapons in common use by law-abiding citizens for lawful

purposes (protected by the Second Amendment). At the end of the day, Justice Scalia was

simply stating the "common use" formulation in different terms.[30]

It is easily demonstrated that *Heller* did not hold that any weapon used in a war may be

banned. From 1911 to 1986, the United States Army issued Colt M1911 pistols to its soldiers.

Passamaneck Dec. ¶ 3. After 1986 the Army issued Beretta Model 92 pistols to its soldiers.

*Id*., ¶ 4. The Colt M1911 was used by soldiers in war (World War I, World War II, Korea,

---

[28] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").

[29] See also *Bonta* 542 F. Supp. 3d at 1014–15 (The banned rifles are not "bazookas, howitzers, or machineguns" solely useful for military purposes; they are ordinary, popular, rifles.).

[30] In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (*abrogated* by *Bruen*), Judge Traxler made this same point. He wrote that just calling an arm a "weapon of war" is irrelevant, because under *Heller* "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens." *Id*., 849 F.3d at156 (Traxler, J., dissenting).

Vietnam, etc.). *Id*., ¶ 3. The Beretta Model 92 was also used by soldiers in war (the Gulf War, Iraq, Afghanistan, etc.). *Id*., ¶ 4. Colt and Beretta have all along sold identical models of these semi-automatic handguns in the civilian market, and they are widely possessed by civilians. *Id*., ¶¶ 3-5. The possession of these handguns is protected under *Heller*. Thus, certain weapons used in war are indeed protected by the Second Amendment if the weapons are widely possessed by law-abiding citizens for lawful purposes. *Id*.

## XI.  The Difference Between an Automatic Firearm and a Semi-Automatic Firearm is Constitutionally Significant

The State asserts that the "sole difference between AR-15s and M16s" is that AR-15s are semiautomatic and M16s can fire in three-round burst or fully automatic mode. Resp. 20. Apparently, the State believes it can ban AR-15s for that reason. But this argument is precluded by *Staples v. United States*, 511 U.S. 600 (1994). In that case the Court held that the distinction between the fully automatic M-16 and semi-automatic weapons such as the AR-15 is legally significant. *Accord, Bonta*, 542 F. Supp. 3d at 1056–57 (same). The Court stated that it is not lawful for a civilian to possess a machine gun like an M-16, and it contrasted that with semi-automatic weapons (like the AR-15 at issue in that case) which "**traditionally have been widely accepted as lawful possessions**." *Id*., 511 U.S. at 612 (emphasis added). The AR-15 is the quintessential semi-automatic rifle that the State seeks to ban. Yet as the Supreme Court noted in *Staples*, the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess. *Heller II*, 670 F.3d at 1288. Thus, even if the AR-15 were useful for warfare as the State says (a debatable question, since the State has not introduced a single example anywhere in the world of a national army that uses the AR-15), it is nevertheless protected by the Second Amendment because it is exactly the sort of arm "in common use at the time" contemplated by *Heller*.

## XII.   The State's "Conversion" Argument Fails

The State argues that an AR-15 can be converted into an automatic weapon like an M-16 (Resp. 20) and it can be banned for that reason. As an initial matter, it should be obvious that the State's "conversion" argument has no merit. Sawing off a shotgun's barrel to a length less than 18 inches converts it into an illegal short barreled shotgun, the prohibition of which is consistent with *Heller*. *Id*., 554 U.S. at 625 (short-barreled shotgun not protected). But no one would argue that the shotgun was unprotected before it was sawn off. Ordinary handguns can also be converted into illegal automatic pistols. *United States v. Freitas*, 2021 WL 4222041, at *1 (N.D. Cal. 2021). But the central holding of *Heller* is that ordinary handguns cannot be categorically banned. In summary, the mere fact that it is possible to convert a legal weapon into an illegal weapon does not mean the pre-converted weapon is not protected by the Second Amendment. Finally, this was the very issue in *Staples*, *supra*, and the Court rejected equating AR-15s to M16s merely because the former may be illegally converted to automatic fire.

## XIII.   The Court Should Reject the State's Backdoor Means-End Test

### A.   The State Misunderstands *Bruen's* Reference to "Burden"

Whether an analogue is "relevantly similar" under *Bruen* is not a measure of how "heavy" or "light" the law's burden on self-defense is compared to the modern law. It is improper to "weigh" the burden and conclude it is a light burden and therefore constitutional, because that is a backdoor means-end inquiry posing as an analogical inquiry. Conversely, under *Bruen* it is proper to compare the type of burden a modern regulation imposes as compared to a founding era regulation. For example, an absolute ban on a commonly used weapon is a type of regulation. The State's burden is to find a founding era regulation of the same type (and since there are none, its ban is unconstitutional).

The first clue that the State has gone astray is that it begins its "burden" analysis by citing *Worman's* means-end analysis. Resp. 42, *citing Worman*, 922 F.3d at 37.[31] Then it writes:

> [*Worman's* "burden"] determinations remain relevant, even though they were made in the course of the now-abrogated means-end inquiry, because they address the same question now required by *Bruen*: what burden does the challenged regulation place on the core right of self-defense? Compare *Bruen*, 142 S. Ct. at 2133 with *Worman*, 922 F.3d at 36 (determining "how **heavily** [the statute] burdens that right") (internal quotation omitted).

Resp. 43, n. 12 (emphasis added). The State is confused. *Bruen* stated that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" is a central consideration when engaging in an analogical inquiry. *Id*., 142 S. Ct. at 2133 (emphasis in original). But it also said: "This does **not** mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id*., n. 7 (emphasis added). The State is doing exactly what the Court said it could not do, i.e., engaging in independent means-end scrutiny under the guise of an analogical inquiry,[32] and that approach should be rejected by the Court.

## B.  The State Misunderstands *Bruen's* Reference to "Justify"

The State's "justification" argument is an even more blatant backdoor appeal to means-end scrutiny. The State attempts to demonstrate that banning semi-automatic firearms and certain magazines is justified because it promotes the important governmental interest of addressing the "public safety threat" posed by such weapons. Resp. 45. In other words, the State argues that the means it has employed (banning arms) serves a salutary end (increasing public safety). This argument is astonishing. The means-end argument the State advances is

---

[31] It also cites the means-end analysis from three other cases abrogated by *Bruen*. Resp. 42-43.
[32] The State suggest that this Court should not take too literally *Heller's* admonition that the availability of alternative arms does not justify banning commonly used arms. Resp. 44, n. 14. Plaintiffs suggest that the wiser course is to take the Supreme Court at its word. The availability of alternative arms does not justify banning commonly used arms. *Heller*, 554 U.S. at 629.

precisely what the Supreme Court held a government may not do to justify a firearms regulation. "To justify its regulation, the government **may not simply posit that the regulation promotes an important interest**. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). Certainly, the State believes the Statutes promote an important governmental interest, but just as certainly, under *Bruen*, the State's belief is irrelevant to the constitutional analysis.

Finally, the State makes another run at arguing the rifles and magazines should be banned because they are dangerous. Resp. 46. Plaintiffs are sorely tempted to get into the factual weeds with the State, because practically everything the State says in support of its means-end analysis is either flat out wrong or substantially distorted. But Plaintiffs will resist this temptation, because almost the whole point of *Bruen* is that it is not "legitimate" for judges to make "empirical judgments" about the "costs and benefits of firearms restrictions." *Id.*, 142 S. Ct. at 2130, *quoting McDonald*, 561 U.S. at 790-91. There is, therefore, nothing to be gained by challenging the empirical predicate of the State's means-end analysis. That discussion is simply irrelevant to the Court's resolution of this case. Accordingly, as difficult as it is, Plaintiffs will ignore the means-end red herring, and they hope the Court will ignore it as well.

## XIV.   Judges Must "Cut Through the Emotion"

This case is like *Heller II*, in which then-Judge Kavanaugh noted that "emotions run high on both sides of the policy issue because of the vital public safety interests at stake." *Id.*, 670 F.3d at 1295. Judge Kavanaugh wrote that he was "acutely aware" of the gun violence that plagued D.C. and, as a citizen, he shared the city's goal of reducing or eliminating the violence. *Id*. And while he respected the motivation behind the city's gun laws, a faithful application of

*Heller* precluded him from deferring to the city's ban on semi-automatic rifles. A judge's task,
he said, is to apply the Constitution and the precedents of the Supreme Court, regardless of
whether he or she personally agrees as a matter of first principles or policy. *Id.*, 670 F.3d at
1295-96. Judge VanDyke put the matter this way: "The emotional impact of these tragedies
does all the work for the government [but] that is precisely where judges must cut through the
emotion and do their job of holding the government to its … burden." *Duncan V*, 19 F.4th at
1168 (VanDyke, J., dissenting).

**XV.    The Court Should Disregard the State's Overheated Rhetoric About the
        Prevalence of Mass Shootings**

The State would have the Court believe there were 51 "mass shootings" in January
2023. Resp. 1. As authority for this dubious statistic, it cites the website of the Gun Violence
Archive ("GVA"). That same website reports there were 647 mass shootings in 2022.[33] There
were, on average, nearly two mass shootings every single day last year? Who knew? It turns out
that no one knew. Unsurprisingly, this hyper-partisan activist organization State vastly inflated
the numbers through definitional games.

*Mother Jones*, hardly a pro-Second Amendment bastion, reports "the FBI and leading
criminologists essentially defined a mass shooting as a single attack in a public place in which
four or more victims were killed."[34] "In January 2013, a mandate for federal investigation of
mass shootings authorized by President Barack Obama lowered that baseline to three or more
victims killed." *Id.* This definition is intended to distinguish mass shootings from more
conventionally motivated crimes like armed robbery and gang violence. *Id.* According to

---

[33] See GVA, https://www.gunviolencearchive.org/past-tolls (last visited Feb. 20, 2023).
[34] Mother Jones, *A Guide to Mass Shootings in America*, https://www.motherjones.com/politics/2012/07/mass-shootings-map/ (last visited Feb. 20, 2023).

*Mother Jones'* comprehensive database of mass shootings, using the FBI's definition, in the 40 years since 1982, there have been 141 mass shootings with 1,095 fatalities.[35]

In contrast to the FBI and leading criminologists, GVA defines a "mass shooting based ONLY on the numeric value of 4 or more shot or killed, not including the shooter."[36] (emphasis in original). This means that GVA defines mass shootings to include events where no one is killed at all. "Equal importance is given to the counting of those injured as well as killed …" *Id*. Thus, GVA would equate the Columbine High School shooting with a drive-by gang shooting in which no one was killed.

Mass shootings are a problem. No one denies that. But that problem must be kept in perspective. They actually account for only a fraction of 1% of firearm homicides.[37] And it is unhelpful, to say the least, when the State attempts to bolster its case with extremely misleading statistics generated by a hyper-partisan activist group.

## XVI.   The Other Temporary Injunction Factors Are Met

In their Motion, Plaintiffs noted the well-settled rule that in a case involving an alleged violation of a constitutional right, the likelihood of success on the merits will often be the determinative factor. Motion, 4. The State responds to that argument by suggesting that rule applies only in First Amendment cases. Resp. 49. And the State then argues, essentially, that since the Second Amendment is a second-class right, the rule does not apply. This is wrong, because "[t]he constitutional right to bear arms in public for self-defense is not a second-class

---

[35] Mother Jones, *US Mass Shootings, 1982–2023* https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ (last visited Feb. 20, 2023).
[36] GVA, https://www.gunviolencearchive.org/methodology (last visited Feb. 20, 2023).
[37] Compare FBI total firearm homicides in 2019, *supra*, note 6 (10,258) to 2019 mass shooting homicides from Exhibit B to the Klarevas Declaration (51).

right, subject to an entirely different body of rules than the other Bill of Rights guarantees."
*Bruen*, 142 S. Ct. at 2156.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). That is why in *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1 (1st Cir. 2012), the First Circuit held that where there is a strong showing of likelihood of success on the merits of their First Amendment claim, the irreparable injury component of preliminary injunction analysis is necessarily satisfied. *Id.*, 699 F.3d at 15, *citing Elrod*. *Bruen* makes clear that, similarly, the loss of Second Amendment rights even for a minimal period of time "unquestionably, constitutes irreparable injury." *Id.*, 142 S. Ct. at 2156 (Second Amendment protection not less than First Amendment protection). Plaintiffs have made a strong showing of likelihood of success on the merits of their Second Amendment claim; therefore, the irreparable injury component of preliminary injunction analysis is necessarily satisfied.[38] *See also Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (deprivation of constitutional rights is unquestionably irreparable injury).

"[O]bviously, should the statute be unconstitutional, the public interest would be adversely affected by denial of such an injunction." *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988). "In addition, the public interest weighs in favor of allowing injunctive relief because it **is always in the public interest** to prevent the violation of a party's constitutional rights." *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (internal

---

[38] Contrary to the State's assertion, the loss of Second Amendment rights has already been held to necessarily establish irreparable harm in the Second Amendment context. In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the plaintiffs established probable success on the merits of their Second Amendment claim. The Court held no further showing was required because "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.*, 651 F.3d at 699, *quoting* Charles Alan Wright, *et al*, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995).

citation and quotation marks omitted; emphasis added). See also *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 128 (D. Mass. 2003) (protecting constitutional rights "is *ipso facto* in the interest of the general public"). For the same reason, the balance of harm factor is satisfied, because the "public interest" and "balance of harm" factors merge when the government is the defendant. *Massachusetts Fair Hous. Ctr. v. United States Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020), citing *Nken v. Holder*, 556 U.S. 418, 435 (2009). Thus, as argued in the Motion, on a claim for deprivation of constitutional rights, probable success on the merits is the critical factor. Once that is established, as it has been in this case, the other factors fall in line.

## XVII.  Conclusion

 For the foregoing reasons, Plaintiffs respectfully renew their motion for preliminary injunction.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington*
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
(303) 205-7870
barry@arringtonpc.com
*Pro Hoc Vice*

Thomas M. Harvey
Law Office of Thomas M. Harvey
22 Mill Street
Suite 408
Arlington, MA 02476-4744
617-710-3616
Fax: 781-643-1126
Email: tharveyesq@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to counsel of record:

*/s/ Barry K. Arrington*
_____

Barry K. Arrington