UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and JOSEPH R. CAPEN, <br><br>        Plaintiffs, <br><br>   v. <br><br> ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts, <br><br>        Defendant. | Civil Action No. 1:22-cv-11431-FDS |

**DEFENDANT'S SURREPLY IN FURTHER OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

ANDREA JOY CAMPBELL,
in her official capacity as Attorney General of the
Commonwealth of Massachusetts,

Julie E. Green, BBO # 645725
Grace Gohlke, BBO # 704218
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2085
(617) 963-2527
(617) 727-5785 (Facsimile)
Julie.Green@mass.gov
Grace.Gohlke@mass.gov

Date:  April 6, 2023

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

    I.    Plaintiffs Have Not Shown Likelihood of Success on the Merits. ........................ 2

        A.    Plaintiffs Have Not Shown That LCMs or Assault Weapons Are
            "Arms" Protected by the Second Amendment............................................. 2

            1.    Plaintiffs Have Not Shown LCMs Are "Bearable Arms"
                Within the Scope of the Second Amendment. ............................... 3

            2.    Plaintiffs Distort the "Common Use" Test for "Arms"
                Protected by the Second Amendment. ........................................... 6

            3.    Plaintiffs Cannot Establish LCMs or Assault Weapons Are
                in "Common Use" for Self-Defense ............................................. 9

        B.    Plaintiffs Fail to Rebut the Evidence Showing that the Act is
            Consistent with the Historical Tradition of Weapon-Specific
            Firearms Regulations. ............................................................................. 13

            1.    A Weapon-Specific Ban is Amply Supported by the
                Historical Tradition of Weapon-Specific Restrictions................. 13

            2.    There is a Longstanding Historical Tradition of Weapon-
                Specific Restrictions. .................................................................. 16

                  a.    Bowie Knives..................................................... 17

                  b.    Pocket Pistols ................................................... 20

                  c.    Clubs and Other Blunt Weapons....................... 22

                  d.    Semiautomatic Weapons and LCMs................. 23

             3.    Plaintiffs' Exclusive Focus on 1791 Ignores Relevant
                History......................................................................................... 24

             4.    The Act is Analogous to these Historical Regulations. ............... 27

    II.    Plaintiffs Have Not Met Their Burden on Any of the Remaining
        Preliminary Injunction Factors. .......................................................................... 29

CONCLUSION................................................................................................................ 30

## <u>INTRODUCTION</u>

Plaintiffs' self-described "simple" theory is that the Second Amendment prevents States from banning *any* bearable weapon that is owned by enough people—no matter how deadly, destructive, and unrelated to self-defense that weapon may be. ECF #50 ("Reply") at 1. This theory rests on three false premises: that *Heller* already resolved the issues presented in this case, Reply at 2-4; that the Second Amendment protects *all* bearable arms that are sufficiently "common" without regard to use for self-defense, Reply at 5; and that the historical record categorically forecloses a ban on *any* such arm, Reply at 6.

None of these propositions is correct. Most fundamentally, neither *Heller* nor *Bruen* resolved the issues raised by this case. Plaintiffs go to great lengths to obfuscate a central holding of *Heller* and *Bruen*—that handguns are protected as a category of "arms" under the Second Amendment, and so cannot be completely prohibited or their public carry effectively foreclosed, because they "are weapons 'in common use' today *for self-defense*." *Bruen*, 142 S. Ct. at 2134 (emphasis added). But assault weapons and LCMs are not ordinary handguns, and they are not in common use for self-defense.

By ignoring the "central component" of self-defense, Plaintiffs fail to meet their burden to show LCMs and assault weapons are "Arms" protected by the text of the Second Amendment. The Commonwealth's largely unrebutted expert evidence shows that neither LCMs nor assault weapons are in "common use today for self-defense," as required under *Heller* and *Bruen*. And LCMs are not even bearable arms at all. Plaintiffs offer no reliable evidence on the issue of self-defense, and instead rest solely on bare ownership statistics and legal arguments that misstate the Supreme Court's holdings about the original public meaning of the "Arms" protected by the Second Amendment. This is not enough to carry their burden.

Moreover, the historical record supports a ban on assault weapons and LCMs, because legislatures have always enjoyed the ability to suppress specific *types* of weapons that are unusually dangerous—weapons that pose a heightened danger, and contribute disproportionately to criminality, in relation to ordinary weapons of self-defense.  Plaintiffs' insistence that only a Founding-era ban will satisfy the Commonwealth's burden is inconsistent with *Bruen*, because Plaintiffs' interpretation would demand a "historical twin," rather than the "historical analogue" required by *Bruen*, and would amount to the "regulatory straightjacket" that *Bruen* rejects. *Bruen*, 142 S. Ct. at 2133.  The public understanding of the Second Amendment has always recognized the right of individuals to possess weapons of self-defense, as well as the right of governments to regulate specific weapons that present special dangers to society.

## ARGUMENT

**I.    Plaintiffs Have Not Shown Likelihood of Success on the Merits.**

**A.    Plaintiffs Have Not Shown That LCMs or Assault Weapons Are "Arms" Protected by the Second Amendment.**

The first question in any Second Amendment challenge, under *Bruen*, is whether the plaintiffs have established that their "proposed course of conduct" satisfies all the "textual elements" of the Second Amendment's operative clause.  *Bruen*, 142 S. Ct. at 2134; *accord* Reply at 5 (agreeing the burden at "step one" is on Plaintiffs).  One critical "textual element" is whether the items that the plaintiffs seek to possess and use are "Arms."  *Bruen*, 142 S. Ct. at 2132.  As the Supreme Court has affirmed, "the Second Amendment's definition of 'arms' . . . covers modern instruments *that facilitate armed self-defense*."  *Id.* at 2132 (emphasis added).  In other words, the Second Amendment's protections—consistent with its codification of a pre-existing right—extend to "weapons 'in common use' today for self-defense."  *Id.* at 2134.

The Commonwealth's largely undisputed expert evidence shows, first, that LCMs are not weapons at all, but rather accessories that are not necessary to render any firearm operable. Second, the Commonwealth's largely unrefuted expert evidence shows that neither LCMs nor assault weapons are suited for, or actually used in, self-defense, and are instead weapons and accessories most suited to offensive warfare. Domestically, they are disproportionately used in mass shootings and in the murders of police officers in the line of duty—not to exercise the constitutional right to armed self-defense recognized in *Heller* and *Bruen*.

In response, Plaintiffs distort *Heller* and *Bruen*. They ignore the repeated commands of the Supreme Court to consider "individual self-defense" as "the *central component*" of the Second Amendment's protections. *Bruen*, 142 S. Ct. at 2133 (emphasis in original) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), in turn quoting *Heller*, 554 U.S. at 599). And they cite evidence that is neither relevant nor reliable. None of their evidence shows that the right to an LCM or an assault weapon is protected by the text of the Second Amendment.

### 1. Plaintiffs Have Not Shown LCMs Are "Bearable Arms" Within the Scope of the Second Amendment.

Plaintiffs' reply confirms they cannot meet their burden, under *Bruen*'s textual analysis, to show that the provisions of the Act that ban LCMs violate the Second Amendment. LCMs are not "Arms" protected by the plain meaning of the Second Amendment, but rather constitute *accessories*, as other courts have held post-*Bruen*. *Oregon Firearms Fed'n, Inc. v. Brown*, No. 22-cv-1815, 2022 WL 17454829, at *9 (D. Or. Dec. 6, 2022); *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-1866, 2022 WL 17721175, at *12-13 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

First, Plaintiffs' central premise that the Act is "a categorical ban" on magazines is wrong. Reply at 29. The Act operates as a size *limitation* on magazines, banning only large-

capacity magazines—capable of accepting more than 10 bullets—that have no utility for self-defense but *are* suitable for mass killing. Magazines that accept 10 or fewer bullets are perfectly lawful in Massachusetts. The operative question is whether *LCMs* qualify as "Arms," not whether magazines in general are entitled to some measure of Second Amendment protection.

Next, Plaintiffs argue that all magazines qualify as "bearable arms" under the Second Amendment. Reply at 29. This is incorrect. Magazines—including LCMs—are not bearable arms, but rather accessories. The Commonwealth's experts have confirmed this from both a historical linguistic and a weapons technology standpoint. *See* ECF #21 ("Opp") at 11-13; ECF #21-3 ("Baron") ¶¶ 10, 25, 34; ECF #21-4 ("Busse") ¶ 15. Contrary to Plaintiffs' summary dismissal of Professor Baron's approach,[1] corpus linguistics is accepted by federal courts as a "a helpful tool in assessing common usage." *Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682 (6th Cir. 2022); *see also United States v. Rice*, 36 F.4th 578, 583 (4th Cir. 2022) ("[C]orpus linguistics is gaining traction as an interpretive tool. Hopefully, this trend will continue." (citing cases)). And the categorization of magazines as "accessories," rather than "arms," is confirmed by the Commonwealth's firearms expert (thus addressing Plaintiffs' mistaken contention that the Commonwealth should have retained a firearms expert, Reply at 27). Busse ¶ 15; *cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (silencers are a "firearm accessory" and thus are not "arms").

---

[1] Plaintiffs spend considerable space arguing the Commonwealth's argument is at odds with the opinion of Professor Baron. Reply at 25-27. Once again, Plaintiffs mischaracterize the Commonwealth's argument. Professor Baron's opinion is that magazines do not qualify as "arms," as that term was understood at the time of the Founding. *See, e.g.*, Baron ¶¶ 10, 25, 34, 78. The Commonwealth agrees. Magazines are not "arms." Although some courts have extended the Second Amendment's protections to accessories necessary to operate a firearm – an extension that would not apply here – that does not alter the threshold analysis of whether an item is an "Arm" within the plain text of the Second Amendment.

Relying on cases that have held a ban on *ammunition* would be tantamount to a ban on "Arms" because ammunition is necessary to operate arms, Plaintiffs suggest the same is true of LCMs. *See* Reply at 25-29. Some courts have indeed recognized an *extension* of the Second Amendment's protections to accessories that are *necessary* to the operation of a firearm. Opp. at 13. But an LCM is not necessary to operate any firearm. The Commonwealth's unrebutted evidence by firearms experts establishes that *all* firearms that can accept an LCM can also accept a lower-capacity magazine. Opp. at 13-14; Busse ¶ 14; ECF #21-12 ("Yurgealitis") ¶ 61. Plaintiffs' proffered expert opinion on the necessity of detachable magazines to operate semi-automatic firearms, Reply at 27; ECF #50-2 ("Passamaneck") ¶¶ 6-8, is thus irrelevant—the Act does not prevent anyone from owning a detachable magazine. Plaintiffs do not—because they cannot—contest that any firearm using a detachable magazine can use one with a capacity of 10 or fewer bullets. *See* Busse ¶ 14; Yurgealitis ¶ 61. Plaintiffs' selective quotation, Reply at 28, from *Ocean State Tactical*'s denial of a preliminary injunction also omits this vital point. *Ocean State Tactical*, 2022 WL 17721175, at *12 ("But a firearm can fire bullets without a detachable magazine, *and in any event,* a firearm does not need a magazine containing more than ten rounds to be useful." (emphasis added)).[2]

Even assuming that the Second Amendment may cover accessories necessary to operate a gun, the text of the Second Amendment cannot be stretched to cover *any and all* magazines of any size. Any such extension of the Second Amendment's text would swallow the rule—that only accessories *necessary* to operate a firearm would fall within its scope. *See, e.g., Jackson v.*

---

[2] Plaintiffs call *Ocean State Tactical*'s statement a "dubious proposition," Reply at 28, but fail to acknowledge that the start of the quoted language was referring to all firearms, not semi-automatic weapons in particular. 2022 WL 17721175, at *12. *Ocean State Tactical*'s statement is factually accurate—some types of firearms (for example, revolvers) do not require any magazine to function, and *no* firearm requires an LCM to function. Busse ¶ 14; Yurgealitis ¶ 61.

*City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).  Thus, Plaintiffs' reliance

on the district court opinion in *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal.

2014) is misplaced, because the Ninth Circuit on review recognized only "some corollary, albeit

*not unfettered*, right to possess *the magazines necessary* to render those firearms operable."

*Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (emphases added).  Standard-capacity

magazines are unaffected by the Act and are lawful in Massachusetts.  A ban on LCMs is

nothing like a ban on ammunition, much less a ban on "Arms."

> **2.      Plaintiffs Distort the "Common Use" Test for "Arms" Protected by the Second Amendment.**

Even if this Court declines to hold that LCMs are accessories outside the scope of the

Second Amendment, Plaintiffs still fail to carry their burden to show LCMs and assault weapons

satisfy *Bruen*'s textual analysis.  Plaintiffs' reply fundamentally misstates *Bruen*'s approach.

Plaintiffs selectively quote language in *Bruen* to contend that the Second Amendment covers any

"bearable" arm, full stop.  Reply at 5.  And they assert that the "common use" test is not part of

the textual analysis at all.  *E.g.*, Reply at 29.

Plaintiffs' position is contradicted by *Heller* and *Bruen*.  As the Eleventh Circuit recently

recognized, the Second Amendment's definition of "Arms" is "informed by the historical

tradition."  *Nat'l Rifle Ass'n v. Bondi*, No. 21-12314, 2023 WL 2484818, at *3 (11th Cir. 2023).

*Heller* explained that the Second Amendment "codified a *pre-existing* right."  554 U.S. at 591.

The "common use" test, which derives from the historical constraints of the Second

Amendment's scope, limits "the sorts of weapons protected"— that is, the "common use" test

bears on the scope of protected "Arms."  *Id.* at 627; *see also id.* at 623 (the right "extends only to

certain types of weapons").  Similarly, *Bruen* expressly addressed that handguns were "weapons

'in common use' today for self-defense" as part of its initial analysis of whether the Second

Amendment's text presumptively protected the plaintiffs' conduct.  142 S. Ct. at 2134-35.  Only after finishing its discussion of these issues did the Court move to the historical analogue inquiry, where—by contrast—"the burden falls on respondents."  *Id.* at 2135.  Plaintiffs' contrary approach cannot be squared with *Bruen*.

In arguing "common use" is outside the textual inquiry, Plaintiffs rely primarily on a dissent from denial of certiorari that predated *Bruen*, and an unpublished district court decision that dealt with a federal statute criminalizing possession of *any* firearm by users of controlled substances.  Reply at 5 (citing *Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from denial of certiorari); *United States v. Harrison*, No. 22-cr-328, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023)).  Neither can overcome *Heller* and *Bruen*'s instruction: before the burden shifts to the government, a court must first conclude that all the "textual elements" of the Second Amendment's operative clause are met, including that the plaintiffs propose to keep and bear "weapons 'in common use' today for self-defense."  *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627).

Plaintiffs next assert that common use is based solely on bare statistics.  Reply at 35-36.[3] But the sheer number of a particular weapon or accessory in circulation—with no regard to the suitability and use of the weapon in self-defense—cannot possibly be the test for "common use" as described in *Bruen* and *Heller*.  *See* Opp. at 15 (citing cases).[4]  For example, there are almost

---

[3] In support of their approach, Plaintiffs repeatedly cite non-binding statements in two pre-*Bruen* cases—a dissent from denial of certiorari by Justice Thomas, and a concurrence by Justice Alito joined only by Justice Thomas—to argue that these define the Supreme Court's interpretation of the Second Amendment.  Reply at 35-36.  Obviously, the law is not made in separate opinions.

[4] Contrary to Plaintiffs' claims, the Commonwealth strongly disputes Plaintiffs' figures regarding American ownership of LCMs and assault weapons.  Reply at 29, 37.  As explained in the rebuttal report of Dr. Louis Klarevas, attached hereto, these figures are unsubstantiated and unreliable.  *See* Klarevas Rebuttal Dec. ¶¶ 5-8, 14-17.  Regardless of the precise figures, though, Plaintiffs cannot meet their burden to show "common use" in self-defense.

176,000 machine guns in civilian possession in the United States.  *See* ATF Freedom of Information Act Response # 2016-0003 / AP-2015-05939, February 24, 2016 (Gohlke Supp. Dec. Ex. 26).  But even though there are a comparable number of civilian-owned machine guns as, for example, the number of stun guns discussed in Justice Alito's concurrence in *Caetano*, 577 U.S. at 420, *Heller* explained that the Second Amendment does not protect machine guns. *Heller*, 554 U.S. at 625.  The Court labelled "startling" the idea that "restrictions on machine guns . . . might be unconstitutional"; to the contrary, the Court explained, "M-16 rifles and the like" "may be banned."  *Id*. at 624, 627.  Thus, the idea that some minimum number of weapons in circulation means that weapon is automatically entitled to Second Amendment protection, such that it cannot be banned, is squarely at odds with the Supreme Court's opinions.  And it has no limiting principle:  Plaintiffs' reading would foreclose *any* ban on a weapon that attains some unspecified threshold of circulation.  *See, e.g.,* Reply at 13-14.  If, for example, manufacturers mass produced sawed-off shotguns or shoulder-mounted grenade launchers, States would be powerless to ban their spread under the Plaintiffs' preferred interpretations.

But neither *Heller* nor *Bruen* contemplates such an extreme result.  Instead, both *Heller* and *Bruen* repeatedly emphasize the centrality of self-defense to the pre-existing right protected by the Second Amendment, with that purpose limiting the weapons that fall within the amendment's protections.  Opp. at 6-9.  Plaintiffs argue "prevalence" is the only test, quoting language from *Heller*.  Reply at 34.  But Plaintiffs misleadingly end their quotation too early. *Heller* wrote that handguns are a class of arms "overwhelmingly chosen by American society *for that lawful purpose*."  554 U.S. at 628.  The referenced "lawful purpose" is "the inherent right of self-defense," which "has been central to the Second Amendment right."  *Id.*  The Court has consistently focused on self-defense as limiting the scope of the Second Amendment's

protections.  The Court's majority opinion in *Heller* uses the phrase "self-defense" 32 times, and, in *Bruen*, 49 times.  *See generally*, *Heller*, 554 U.S. 570; *Bruen*, 142 S. Ct. 2111.  And the long pedigree of the "basic right" to "[s]elf-defense" was central to the public understanding of the Second Amendment at the time it was ratified by the States.  *McDonald*, 561 U.S. at 767; *see also id.* at 770 ("By the 1850's, . . . the right to keep and bear arms was highly valued for purposes of self-defense.")  Plaintiffs would erroneously write out this central focus of the Second Amendment by counting up ownership numbers alone.

### 3.    Plaintiffs Cannot Establish LCMs or Assault Weapons Are in "Common Use" for Self-Defense

The Second Amendment protects weapons "in 'common use' for self-defense today." *Bruen*, 142 S. Ct. at 2143.[5]  At issue in both *Heller* and *McDonald* were complete bans on handguns, the "quintessential self-defense weapon," *Heller*, 554 U.S. at 628-29; *McDonald*, 561 U.S. at 750, while *Bruen* struck down a law that made it "effectively impossible" for most law-abiding citizens to carry a handgun in public, 142 S. Ct. at 2159 (Alito, J., concurring). Plaintiffs' repeated attempts to equate the weapons and accessories banned by the Act with handguns are unconvincing.  *See, e.g.,* Reply at 1, 32-33.  Assault weapons and LCMs are, empirically, rarely "used" for self-defense, Opp. at 22-25, which is no surprise given that they are offensive military weapons and accessories ill-suited for defense, Opp. at 16-22.

Plaintiffs contend that the law does not require them to show "use" at all.  Reply at 33-36. That position is flat wrong.  The textual question is *which* "Arms" can be kept and borne.  And *Heller* and *Bruen* explain that the "Arms" covered by the Second Amendment's text are those

---

[5] To the extent Plaintiffs argue—relying on a single out-of-circuit dissent—that weapons in "common use" for lawful purposes *other than* self-defense fall within the scope of the Second Amendment, Reply at 37, they have not put forward any credible evidence that LCMs or assault weapons are used for other lawful purposes besides self-defense.  The Commonwealth's expert, on the other hand, has opined that assault weapons are ill-suited to hunting.  Yurgealitis ¶ 45.

"in common *use* at the time." *Heller*, 554 U.S. at 624 (emphasis added). This makes sense. The Second Amendment is not an idle right to stockpile curiosities. It protects the rights of law abiding citizens to "*use* [weapons] for the core lawful purpose of self-defense." *Id.* at 630 (emphasis added). It therefore protects the right to both "keep and bear" the "Arms" that are suitable for and actually used for that purpose. There are hundreds, if not thousands, of instances of self-defensive gun use every year. *See, e.g.*, ECF #20-2 ("Allen") ¶ 9 (discussing NRA Armed Citizen database). And in those actual cases, LCMs and assault weapons are rarely, if ever, used. *Id.* ¶¶ 6, 9, 18, 24; Opp. at 23-25.

Despite the lack of evidence to support their position, Plaintiffs nonetheless contend that assault weapons are commonly used for self-defense. At the outset, they attempt to move the goalpost by claiming that assault weapons are "useful" for self-defense. Reply at 37-38. In theory, *any* weapon—even a blunt object—could be *useful* for self-defense. Yet no one reasonably believes that civilians have a constitutional right to possess, for example, a machine gun or a sawed-off shotgun. *See Heller*, 554 U.S. at 624-25. Once again, the relevant test is suitability and actual use, not whether a particular firearm "could" be "useful."

In any event, Plaintiffs ignore the Commonwealth's overwhelming and unchallenged evidence from firearms experts that LCMs and assault weapons are not suitable for or used in self-defense. Opp. at 16-22 (citing expert reports). As the Commonwealth's experts have explained, the very features that define a "assault weapon" and an "LCM" under the Act are designed for military purposes, and are not necessary for or suited to self-defense. Busse ¶¶ 9-14; ECF #21-6 ("Donohue") ¶ 64. This evidence matches common sense, as these guns were designed for military use, have the same features as the M-16 on the military's preferred setting (semi-automatic), and are one quick "fix" away from being identical to the M-16 in fully

automatic mode.[6]  ECF #21-9 ("Roth") ¶¶ 49, 52-53; Busse ¶¶ 19, 27; Yurgealitis ¶¶ 28-39, 46-47, 64-66; Donohue ¶¶ 104-08.  The Commonwealth has not argued, contrary to Plaintiffs' claim, that any weapon used in warfare lies outside the Second Amendment.  Reply at 41.  Instead, the Commonwealth has argued that the particular weapons and accessories banned by the Act are *specifically designed for* and *most useful in* offensive military combat, with little to no corresponding utility for individual civilian self-defense.  Opp. at 16-22.  This is fully consistent with *Heller* and its discussion of *Miller*, where the Court clearly stated that "weapons that are *most useful* in military service" lie outside the scope of the Second Amendment and "may be banned," *Heller*, 554 U.S. at 627, as Plaintiffs accurately quote.  Reply at 40.

Plaintiffs argue that the difference between an automatic firearm and a semi-automatic firearm is constitutionally significant, citing *Staples v. United States*, 511 U.S. 600 (1994).  Reply at 42.  But *Staples* says nothing of the kind.  *Staples* was a statutory construction case about *mens rea* under the National Firearms Act, that held that a conviction for possession of an *automatic* weapon required proof beyond a reasonable doubt that the defendant actually knew his *semiautomatic* weapon had been converted to automatic fire.  *Staples*, 511 U.S. at 602.  It pre-dated both *Heller* and *Bruen*; and it conducted no analysis of whether assault weapons are "in common use" within the historical meaning of the Second Amendment—it did not even mention the Second Amendment.  *See id.* at 612.  Furthermore, the undisputed facts here show that the semiautomatic weapons banned by the Act can be *more* lethal and *more* suited to military

---

[6] *See Bevis*, 2023 WL 2077392, at *15 ("Assault rifles can also be easily converted to increase their lethality and mimic military-grade machine guns. Some of these 'fixes' are as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15.") (quotation omitted). Contrary to Plaintiffs' claims, Reply at 43, the Commonwealth has not argued the convertibility of assault weapons into fully automatic weapons alone places them outside the Second Amendment. Convertibility is one of several characteristics that render assault weapons, "like" M-16s, most suited to offensive combat, rather than civilian self-defense. Opp. at 16-21.

combat than weapons used in fully automatic mode.  Opp. at 20.  If machine guns can be banned because they are suited to offensive, rather than defensive, situations, then surely guns that are identical but for one characteristic that is still best-suited to offensive combat can be banned.

Tellingly, Plaintiffs have not identified a *single* instance in which anyone lawfully used an LCM or an assault weapon for self-defense.  The only purported "evidence" that Plaintiffs offer in response is the English paper's assertion that 13.1% of Americans who have defended themselves with a firearm used a "rifle."  Reply at 38.  This figure is useless on its face.  Many rifles, including many semi-automatic rifles, are not banned by the Act, so this statistic does not inform how many *assault weapons*, as defined by the Act, are actually used in self-defense.  And, in any case, this Court should disregard the English survey results relied on by Plaintiffs because they are unreliable.  As Dr. Klarevas explains, the English paper does not meet the standards in the field for reliance on its reported results.  Klarevas Rebuttal Dec. ¶¶ 8–13.  English has not made his survey data available to the public.  In fact, he has not even published the complete survey questions themselves—a "serious violation of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research (AAPOR)." *Id.* ¶ 9. Because these and other methodological deficiencies are apparent from the face of his paper, English's survey "cannot be deemed reliable." *Id.* ¶ 13.

In sum, Plaintiffs have failed to meaningfully rebut the Commonwealth's extensive expert evidence that LCMs and assault weapons are both ill-suited to, and not actually used in, individual civilian armed self-defense.  Because Plaintiffs bear the burden of proof to show "common use" as part of the textual analysis of "Arms," their utter lack of evidence on this point is dispositive.  They are unlikely to succeed on the merits of their Second Amendment challenge.

**B.      Plaintiffs Fail to Rebut the Evidence Showing that the Act is Consistent with the Historical Tradition of Weapon-Specific Firearms Regulations.**

Even if the Court were to proceed to the Commonwealth's historical analogues, the historical record demonstrates that there is an established tradition throughout American history of restricting *specific* weapons that are unusually dangerous—weapons that pose a heightened danger, and contribute disproportionately to criminality, in relation to ordinary weapons of self-defense.  For this reason, two federal district courts have recently denied preliminary injunctions in similar challenges, concluding (in the words of the District Court for the Northern District of Illinois) that "[t]he history of firearm regulation … establishes that governments enjoy the ability to regulate highly dangerous arms (and related dangerous accessories)" that "pose an exceptional danger, more so than standard self-defense weapons such as handguns."  *Bevis v. City of Naperville*, No. 22-cv-4775, 2023 WL 2077392, at *14-*16 (N.D. Ill. Feb. 17, 2023), *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023); *see also Del. State Sportsmen's Ass'n  v. Del. Dep't of Safety & Homeland Sec. ("DSSA")*, No. 22-951, 2023 WL 2655150 at *12 (D. Del. Mar. 27, 2023).  Plaintiffs thus fundamentally misunderstand the tradition, and the basis for the Act, when they contend the Commonwealth seeks to ban weapons "merely because they are dangerous."  Reply at 2-4 (arguing *Heller* rejected the Commonwealth's purported "Central Premise").  The Act in fact stands in a long line of regulation targeting specific weapons outside the ordinary weapons of self-defense that are unusually lethal, and disproportionately involved in criminality, in relation to any legitimate self-defensive use.

**1.      A Weapon-Specific Ban is Amply Supported by the Historical Tradition of Weapon-Specific Restrictions.**

Under Plaintiffs' interpretation of the text-and-history test, a legislature could never ban any bearable weapon (once it was owned in some unspecified number), on the ground that eighteenth-century legislatures did not regulate by means of weapon-specific *bans*.  (Indeed,

Plaintiffs suggest that history limits the permissible regulatory tools to "prohibitions on concealed carry, possession of firearms by felons, possession of firearms in sensitive places, and conditions on the commercial sales of weapons."  Reply at 14.)  This reasoning lacks any limiting principle, and is contradicted by the many weapon-specific (and other) regulations enacted over the last two centuries in response to evolving technologies and social problems.

First, Plaintiffs' interpretation cannot be correct because, as even Plaintiffs implicitly recognize, some weapons, like bazookas, howitzers, or machine guns, may be banned.  Reply at 41 n. 29.  If Plaintiffs were right that history precludes a weapon-specific ban, then bans on machine guns, bazookas and howitzers would be invalid (or at least, their validity would be determined solely "based on the bare number of arms sold and possessed," as Plaintiffs contend, Reply at 36).  Indeed, any new firearm, no matter how lethal, would become immune from a weapon-specific ban as soon as it was sold in sufficient numbers.  *See* Section I.A.2, above.

Plaintiffs' error is that a Founding-era weapon-specific ban would be a "historical twin," rather than the "historical analogue" required by *Bruen*.  142 S. Ct. at 2133.  *Bruen* makes clear that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster," *id.*, and thus forecloses Plaintiffs' strategy of simply "comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022).  Nothing in the concept of an analogue requires identical regulatory tools.  Plaintiffs' interpretation amounts to the "regulatory straightjacket" that *Bruen* warns against, 142 S. Ct. at 2133, by freezing the permissible regulatory tools to those available in the eighteenth century, and preventing modern legislatures from responding to "unprecedented societal concerns" and "dramatic technological changes," *id.*

14

at 2132, with modern regulatory methods.  Plaintiffs' interpretation would force States to confront twenty-first century threats with eighteenth-century regulatory tools.

At the heart of Plaintiffs' argument is a logical fallacy:  they infer that "the Founders would never have tolerated a categorical arms ban" from the premise that the Founders "never did impose any gun ban as a solution to a societal problem."  Reply at 22.  But "a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution."  *Kelly*, 2022 WL 17336578, at *2 (emphasis in original).

In fact, the evidence in the record explains why eighteenth-century legislatures did not employ weapon-specific bans:  neither the weapons, nor the social problems, nor the regulatory resources existed yet.  The eighteenth century did not have any analogously lethal new firearms technology.  The firearms of the period were single-shot flintlock muzzle-loading guns, like muskets and fowling pieces. Opp. at 27-28; *see also* ECF #21-10 ("Spitzer") ¶¶ 38-53; Roth ¶¶ 14-17; ECF # 21-5 ("Cornell") ¶¶ 20-22.  It was not until the early national period that lethal new weapons began to proliferate, at which point state legislatures acted swiftly to contain them through a variety of regulatory modes.  Opp. at 33-37.  And there was no analogous social problem:  homicide rates were low, guns were not the weapon of choice for homicide, and mass shootings by a lone individual were technologically impossible.  Opp. at 29.  Plaintiffs' own example of the Gnadenhutten Massacre, Reply at 21, in which a 90-person militia murdered 96 individuals during the Revolutionary War,[7] only illustrates Professor Roth's point that "[t]he

---

[7] "Gnadenhutten Massacre," Britannica.com, available at
https://www.britannica.com/event/Gnadenhutten-Massacre (last accessed March 26, 2023).

only way to kill a large number of people was to rally like-minded neighbors and go on a rampage." Roth ¶ 41. Finally, young governments lacked the regulatory resources to implement weapon-specific bans. Spitzer ¶ 73 (early governments relied for law enforcement on "a haphazard mix of the watch system, constables, militias and vigilantes"). Importantly, Plaintiffs do not dispute this historical evidence or submit any countervailing evidence of their own.

The historical record shows that legislatures did respond analogously to the analogous public safety threat caused by the proliferation of analogously dangerous new weapons: they acted to suppress those specific weapons without restricting the ordinary weapons of self-defense. A good example is Alabama's 1837 "Act to Suppress the Use of Bowie Knives" which sought to "suppress" Bowie knives by imposing a prohibitive sales tax of one hundred dollars. Act of Jun. 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7 (Spitzer Exhibit E, p. 2).[8] While the early efforts to eliminate these weapons from the public sphere may have employed different regulatory tools at different times (driven by the specific nature of the threat and the regulatory resources available), the historical record shows that the right of self-defense has never been understood to prevent legislatures from acting to suppress specific limited categories of weapons that are unusually lethal and that are not typical self-defense weapons.

### 2. There is a Longstanding Historical Tradition of Weapon-Specific Restrictions.

A brief review of some salient examples illustrates the relevant tradition of weapon-specific restrictions.[9] Plaintiffs' most common response to some of these statutes—that *Heller* already rejected them as potential analogues, *see*, *e.g.*, Reply at 14, 16—again mischaracterizes

---

[8] All historical statutes cited in the Commonwealth's briefing appear in the accompanying Appendix of Representative Historical Statutes.

[9] *See* Opp. at 25-42 for a fuller discussion of the history and tradition.

*Heller*.  The analogy considered in *Heller* was to a complete ban on *handguns*, the

"quintessential self-defense weapon," 554 U.S. at 629, not a ban on a limited group of weapons

that pose an exceptional threat in relation to their negligible self-defensive utility.  Thus, *Heller*'s

rejection of any given historical analogue does not resolve the analogical inquiry in this case.

Further, much of Plaintiffs' response to the Commonwealth's historical evidence is a

piecemeal response to Professor Spitzer's declaration, and many of their characterizations are

simply wrong, either quoting language that does not appear in the declaration or ignoring

language that does.[10]  (In fact, the disconnect is so pervasive, especially in the citations, as to

suggest the Reply may be responding to a different document, possibly filed in a different case.)

Professor Spitzer corrects these mistakes in his Rebuttal Declaration, and they will not be

addressed further here.  *See* Spitzer Rebuttal Dec., *passim*.

### a.    Bowie Knives

Bowie knives were one of the earliest weapons that state legislatures considered to be

unusually dangerous and therefore appropriate for restriction.[11]  In 1837, Georgia enacted "An

---

[10] To take one example, Plaintiffs falsely attribute to Prof. Spitzer the statement that "15 states effectively banned the possession of Bowie knives outright," which Plaintiffs attack as "outrageously false."  Reply at 18 (purporting to cite "Spitzer Dec. ¶ 69").  In fact, neither Professor Spitzer nor the Commonwealth makes this statement.  To the contrary, Professor Spitzer describes in detail the regulatory techniques that the States used to suppress Bowie knives, which included concealed carry bans, open carry bans, enhanced criminal penalties, and prohibitive taxes.  Spitzer ¶¶ 71-72; Spitzer Rebuttal Dec. ¶¶ 18-20.  To take another example, the Reply claims that "the vast majority" of the Spitzer Declaration is devoted to the twentieth century, Reply at 8 (citing "paragraphs 13-62"), whereas in actuality, well over half is devoted to pre-twentieth century history (including many of the paragraphs in the paragraph range cited by Plaintiffs).  *See* Spitzer ¶¶ 38-53, 63-86; *see also* Spitzer Rebuttal Dec. ¶ 7.

[11] Gunpowder regulations, while not involving specific weapons, also illustrate the broad scope of the Founding-era understanding of the police power to regulate firearms in the interest of public safety.  *See, e.g.*, *Brown v. Maryland*, 25 U.S. 419, 443 (1827) (Marshall, C.J.); *Commonwealth v. Alger*, 61 Mass. 53, 85-86 (1857).  Plaintiffs are wrong when they suggest these laws did not prohibit loaded weapons.  Reply at 16 (quoting *Heller*, 554 U.S. at 632).

Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons," which prohibited the *sale or possession* of "Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c."[12]  *Bevis*, 2023 WL 2077392, at *10 & n.19.  In the same year, Alabama enacted "An Act to Suppress the Use of Bowie Knives," which placed a prohibitively expensive tax of one hundred dollars on "selling, giving or disposing" of Bowie knives.[13]  *Id.* at *10 & n.18.  Florida went one step further with an annual tax of $200 on selling Bowie knives and $10 on carrying them openly.[14]  And Tennessee prohibited *both* the sale *and* the concealed carry of Bowie knives,[15] which statute was upheld against a constitutional challenge to its concealed carry prohibition in 1840.  *Aymette v. State*, 21 Tenn. 154 (1840) (distinguishing between protected weapons and "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin.").  In the late 1830s, Virginia and Alabama also passed anti-Bowie knife legislation.[16]

---

Massachusetts did prohibit the keeping of loaded firearms in homes and other buildings in the City of Boston.  1782 Mass. Acts 119, ch. 46.  Plaintiffs are also wrong when they dismiss these laws as having been rejected in *Heller*, because *Heller* held only that they are not analogous to an absolute ban on *handguns*, the "quintessential self-defense weapon."  554 U.S. at 629.

[12] 1837 Ga. Acts. 90, § 1 (Spitzer Exhibit E, p. 22).

[13] Act of Jun. 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7 (Spitzer Exhibit E, p. 2).

[14] Act of February 10, 1838, Pub. L. No. 24 § 1,1838 Fla. Laws 36, 36, *An Act in addition to An Act, (approved January 30th, 1835), An Act to prevent any person in this Territory from carrying arms secretly* (Spitzer Ex. E, p. 20).

[15] *An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State*, 1837-38 Tenn. Pub. Acts 200-01, ch. 137, §§ 1-2 (Spitzer Ex. E, p. 77).

[16] Act of February 2, 1838, ch. 101, § 1, 1838 Va. Acts 76, 76 (concealed carry) (Spitzer Ex. E p. 86); Ch. 77, § 1, 1839 Ala. Laws 67, 67 (concealed carry) (Spitzer Ex. E, p. 2).

*Bevis*, 2023 WL 2077392, at *10 & n.20.  Alabama's statute too was upheld against a

constitutional challenge.  *State v. Reid*, 1 Ala. 612, 616-17 (1840) (describing the statute as "a

law which is intended to promote personal security, and to put down lawless aggression and

violence, and to that end inhibits the wearing of certain weapons, in such a manner as is

calculated to exert an unhappy influence upon the moral feelings of the wearer").

States continued to target Bowie knives by name, until, by the end of the nineteenth

century, 49 states plus the District of Columbia restricted them.  Spitzer ¶ 71; *Bevis*, 2023 WL

2077392, at *10 & n.21 & 22 (collecting representative statutes).  As Professor Spitzer explains,

legislatures used a variety of regulatory modes to suppress Bowie knives.  Spitzer ¶ 72 & Ex. H

(table of Bowie knife laws by state, date and mode of regulation).  While concealed carry laws

were the most common, a number of jurisdictions enacted prohibitions on *open carry* of Bowie

knives.[17]  For example, Texas in 1871 criminalized the "carrying on or about his person, saddle,

or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles,

bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or

---

[17] *See, e.g.*, <u>Hawaii</u>:  1852 Haw. Sess. Laws 19, *Act to Prevent the Carrying of Deadly Weapons Dangerous or Unusual Weapons*, § 1 (Spitzer Ex. E, p. 24); <u>Tennessee</u>:  1871 Tenn. Pub. Acts 81, *An Act to Preserve the Peace and to Prevent Homicide*, Ch. 90; Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884), 5533 (Spitzer Ex. E, p. 80); <u>Texas</u>:  1871 Tex. Laws 25, *An Act to Regulate the Keeping and Bearing of Deadly Weapons* (Spitzer Ex. E, pp. 81-82); <u>Arkansas</u>: 1881 Acts of the General Assembly of Arkansas 191, No. 96 § 1 (1881) (Spitzer Ex. E, p. 9); <u>West Virginia</u>:  1882 W. Va. Acts 421-22, § 7 (Spitzer Ex. E, p. 91); <u>New York</u>: George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York, as Amended 1882-5 172 (1885) available at The Making of Modern Law: Primary Sources, Carrying, Using Etc., Certain Weapons § 410 (Spitzer Ex. E, p. 62); <u>Arizona</u>:  1889 Ariz. Sess. Laws 16-17, Act of Mar. 18, 1889, §§ 1, 3 (Spitzer Ex. E, p. 6); <u>Oklahoma</u>:  1890 Okla. Laws 495, art. 47, § 2 (Spitzer Ex. E, p. 68-69).

defense" except on one's own premises or with "reasonable grounds for fearing an ['immediate and pressing'] unlawful attack on his person."[18]

### b.    Pocket Pistols

Laws on pocket pistols too exemplify this tradition of restricting unusually dangerous weapons.  One of the earliest gun regulations, the 1686 East New Jersey statute, prohibited the concealed carrying of "any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons."[19]  As *Bruen* observed when it distinguished this 1686 state from New York's broad public-carry restriction, the 1686 statute was aimed only at certain *specific* weapons that the legislature deemed a particular threat—a category that included pocket pistols. *Bruen*, 142 S. Ct. at 2143.  While Plaintiffs attempt to distinguish the 1686 statute on a claim that pocket pistols were not "commonly possessed" in 1686, Reply at 16-17, this statute was only the first in a long series of statutes that continued through the early national period, Reconstruction and beyond—periods when pocket pistols were indisputably common.  Roth ¶ 24.  For example, in 1819, Indiana prohibited the concealed carry of "any dirk, pistol, sword in cane, or any other unlawful weapon,"[20] a later version of which was upheld as constitutional.  *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833).  In 1821, Tennessee prohibited any person from "so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols, either public or private."[21]  In the 1830s, Arkansas and Virginia both prohibited the concealed carry of

---

[18] An Act to Regulate the Keeping and Bearing of Deadly Weapons, 1871 Tex. Laws 25, § 1 (Spitzer Ex. E, pp. 81-82).

[19] *An Act against wearing Swords, &c.*, Ch. IX (1686), *printed in* The Grants, Concessions, and Original Constitutions of the Province of New Jersey (1881) (Gohlke Ex. 15).

[20] 1819 Ind. Acts 39.

[21] 1821 Tenn. Acts ch. 13, p. 15 (exempting knives carried conspicuously "on the strop of a shot pouch," and persons on a journey).

pistols.[22]  More statutes were enacted in the post-bellum period.  Most notably, Arkansas and Tennessee both prohibited the *sale* of pocket pistols.[23]  ECF #21-8 ("Rivas") ¶¶ 34-38.  (Plaintiffs are wrong when they say that the Arkansas statute "says the opposite of what the State suggests."  Reply at 17.  They mistakenly focus on Section 1, which is an open-carry prohibition, rather than Section 3, which prohibits the sale of both pistols and pistol cartridges.)

The Supreme Court of Tennessee upheld an 1870 statute prohibiting open carry specifically as it applied to "pocket pistols," *Andrews v. State*, 50 Tenn. 165, 186 (1871) ("[w]e hold, then, that the Act of the Legislature in question, so far as it prohibits the citizen 'either publicly or privately to carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol,' is constitutional"), even though it held the statute unconstitutional as applied to larger revolvers, and thus struck down the entire statute as "too broad."  *Id.* at 188.  The court emphasized that, "[a]dmitting the right of self-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good," explaining that "where certain weapons are forbidden to be kept or used by the law of the land, in order to the prevention of crime—a great public end—no man can be permitted to disregard this general end … to gratify his whim or willful desire to use a particular weapon in his particular self-defense."  *Id.* at 188-89.  The Supreme Court of Arkansas adopted a similar distinction when it upheld an 1875 statute that prohibited the "wear[ing] or carry[ing] of any pistol of any kind whatever, or any dirk, butcher or Bowie knife, or sword or spear in a cane,

---

[22] Josiah Gould, A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381-82 (1837) (Spitzer Ex. E, p. 8); Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76, § 1 (Spitzer Ex. E, p. 86).

[23] 1879 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1 (Gohlke Ex. 17); Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) (Gohlke Ex. 18).

brass or metal knucks, or razor" (except on a journey or one's own premises), in a case applying that statute to a pocket pistol. *Fife v. State*, 31 Ark. 455, 456 (1876). *See also Bruen*, 142 S. Ct. at 2147 & nn. 20 & 21. Tennessee and Arkansas subsequently codified this distinction, enacting new statutes that exempted army or navy pistols.[24]

### c.       Clubs and Other Blunt Weapons

Clubs and other blunt weapons were also heavily regulated. Spitzer ¶ 74; *Bevis*, 2023 WL 2077392, at *11. Every state in the nation had laws restricting one or more types of clubs or other blunt instruments. Spitzer ¶ 74. States particularly singled out billy clubs and slung shots (a hand-held weapon developed in the 1840s for striking by means of a piece of metal or stone attached to a flexible strap or handle). Spitzer ¶¶ 76, 78. States enacted an array of legislation on these weapons beginning before the Founding era and continuing into the twentieth century. For example, in 1750, Massachusetts enacted a law authorizing the dispersal or seizure of groups of twelve or more people armed with "clubs or other weapons."[25] The most common regulatory method during the nineteenth century was the prohibition of concealed carry, but other mechanisms were used as well. Spitzer ¶¶ 74-81. For example, some states prohibited the manufacture and/or sale of slung shots, including Massachusetts in 1850, Florida in 1868, and Minnesota in 1888.[26] States prohibiting open carry of slung shots included Tennessee and West

---

[24] Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884), 5533 (Spitzer Ex. E, p. 80) ("except the army or navy pistol used in warfare, which shall be carried openly in hand."); 1881 Acts of the General Assembly of Arkansas 191, No. 96 § 1 (1881) (Spitzer Ex. E, p. 9) ("except such pistols as are used in the army or navy of the United States").

[25] 1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

[26] Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11; Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425; George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.

Virginia.[27]  Later, states prohibited not only the manufacture but also possession of items like slung shots, billy clubs and bludgeons.[28]

### d.    Semiautomatic Weapons and LCMs

This tradition continued into the twentieth century as semi-automatic weapons were developed and began to proliferate.  Plaintiffs are wrong when they assert that semi-automatic weapons have traditionally been accepted as lawful possessions.  Reply at 42.  In fact, between eight and eleven jurisdictions banned semiautomatic weapons shortly after they began to proliferate in the 1920s and 1930s—typically in the *same legislation* that established the now widely-accepted "tradition" of banning machine guns.  *See Heller v. D.C.*, 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (justifying ban on machine guns on ground that they "have traditionally been banned").

So, for example, Rhode Island in 1927 banned the manufacture, sale, or possession of "any weapon which shoots more than twelve shots *semiautomatically*"; Michigan in 1927 banned the sale or possession of any firearm "which can be fired more than sixteen times without *reloading*"; Congress, for the District of Columbia, in 1932 banned the possession of "any firearm which shoots automatically *or semiautomatically* more than twelve shots without reloading"; Minnesota in 1933 banned the sale ownership or possession of "[a]ny firearm capable of *loading or* firing automatically, the magazine of which is capable of holding more than twelve cartridges"; and Virginia in 1934 effectively banned public carry of "weapons,

---

[27] 1879 Tenn. Pub. Acts 231, An Act to amend the Criminal Laws of this State upon the subject of carrying concealed weapons and amend Section 4759 of the Code; 1882 W. Va. Acts 421-22, § 7.

[28] Act of May 4, 1917, ch. 145, §§ 1, 2, 5, 1917 Cal. Sess. Laws 221, 221-22; 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, *semi-automatically* or otherwise discharged without reloading."[29]  *Bevis*, 2023 WL 2077392, at *12 & nn.35-38 (citing representative statutes).

In the same era, regulations limiting magazine capacity were also common:  twenty-three States imposed some limitation on ammunition magazine capacity, restricting the number of rounds to typically between five and eighteen.  Spitzer ¶¶ 31-33 & Table 1; *Bevis*, 2023 WL 2077392, at *12 & n.39.  In addition to those mentioned above, representative examples include California, which defined prohibited machine guns as including "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges"; Louisiana and Illinois, which defined machine guns as firearms "capable of automatically discharging more than eight cartridges successively without reloading"; and Vermont, which prohibited the use in hunting of any "automatic rifle of military type with a magazine capacity of over six cartridges."[30]

### 3.       Plaintiffs' Exclusive Focus on 1791 Ignores Relevant History

Plaintiffs are mistaken to dismiss this nineteenth and twentieth century history as too late to be relevant.  *See, e.g.*, Reply at 7-8, 18.  Regardless of whether the Court views 1791 or 1868

---

[29] 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 (emphasis added); 1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1, 4 (emphasis added); Act of July 8, 1932, ch. 465, § 1, 47 Stat. 650, 650 (emphasis added); Act of Apr. 10, 1933, ch. 190, § 1, 1933 Minn. Laws 231, 232 (emphasis added); 1934 Va. Acts 137-40, ch. 96 (emphasis added).

[30] 1933 Cal. Stat. 1169, 1170; Act of July 7, 1932, No. 80, § 1, 1932 La. Acts 336, 337; 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

as the relevant ratification date,[31] the Supreme Court has made clear that post-ratification history

is not only relevant, it is a "critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605;

*Bruen*, 142 S. Ct. at 2136 (same). *Heller* conducted an extensive review of post-ratification

sources from 1803 to 1891, *Heller*, 554 U.S. at 605-19, and *Bruen* did likewise through 1890,

*Bruen*, 142 S. Ct. at 2154. *Heller* stressed the importance of post-ratification history to elucidate

"the public understanding of a legal text in the period after its enactment or ratification," and

took pains to distinguish "postratification history," which it endorsed, from "postenactment

*legislative* history," which it dismissed as a "contradiction in terms." *Heller*, 554 U.S. at 605

(emphasis added). *Bruen* recognized that evidence of a "regular course of practice" over

multiple periods of history can "liquidate" and "settle the meaning of disputed or indeterminate

terms" in the Constitution. *Bruen*, 142 S. Ct. at 2136 (quotation marks and citations omitted). In

other words, "where a governmental practice has been open, widespread, and unchallenged since

---

[31] The Court should decline the Plaintiffs' invitation to focus exclusively on 1791, Reply at 7-8, because the Supreme Court itself has not resolved the question of whether 1791 or 1868 is the relevant focus of the historical inquiry. *Bruen*, 142 S. Ct. at 2139. This case does not require the Court to resolve that issue either, because the historical tradition the Commonwealth relies on existed throughout the nation's history, as explained above. However, if the Court were to reach that issue, 1868 is the proper date because the law at issue in this case is a state or local, not federal, law. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634-35; *Bruen*, 142 S. Ct. at 2136. "[B]ecause the Fourteenth Amendment is what caused the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters." *Bondi*, 2023 WL 2484818 at *3-*5; *see also Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (when a Second Amendment claim concerns a state or local law, courts focus on "how the right was publicly understood when the Fourteenth Amendment was proposed and ratified"). Scholars, too, explain that "[w]hen the people adopted the Fourteenth Amendment," they "readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022) (draft cited in *Bruen*, 142 S. Ct. at 2138); *see also* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction*, xiv, 223, 243 (1998) (cited in *Bruen*, 142 S. Ct. at 2138).

the early days of the Republic," post-ratification practice "should guide [the] interpretation of an ambiguous constitutional provision." *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)); *see also, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 400-01 (1989) (examining post-ratification "practice" throughout 19th and 20th centuries to the 1960s as "additional evidence" of constitutional meaning).

Plaintiffs are also wrong that "*Bruen* held that 20th century laws are certainly irrelevant to the historical inquiry." Reply at 8.  *Bruen* did not reject any time period as per se irrelevant. Rather, it rejected the *specific* late 19th- and 20th-century examples offered by the respondents in that case because they "contradict[ed] earlier evidence." 142 S. Ct. at 2154 & n.28.[32]  Here, in contrast, Plaintiffs have not shown (and do not even contend) that the 19th- and 20th-century evidence "contradicts" earlier evidence; they simply urge the Court to ignore 20th-century evidence altogether.  Reply at 9.  But it is relevant, because the Act is part of a longstanding tradition of weapon-specific restrictions that stretches back in time through such statutes as Rhode Island's 1927 ban on semiautomatic weapons, Tennessee's 1879 ban on the sale of pocket pistols, Alabama's 1837 "Act to Suppress the Use of Bowie Knives," and New Jersey's 1686 restriction on pocket pistols, among many others.  *DSSA*, 2023 WL 2655150 at *12 (refusing to disregard 20th-century regulations because they "do not depart from this pattern, and, indeed, reinforce it.").

---

[32] Thus, *Bruen* declined to address the 20th-century evidence "brought to bear by respondents or their amici," explaining that, "[a]s with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*."  *Bruen*, 142 S. Ct. at 2154 n.28 (emphasis added).

### 4.      The Act is Analogous to these Historical Regulations.

The Act is analogous to these and other historical precursors in terms of both burden and justification.  *DSSA*, 2023 WL 2655150 at *12-13.  In terms of burden, the Act is analogous because it does not regulate standard weapons of self-defense, targeting only certain particularly dangerous weapons and accessories that are devastating when criminally misused.  *DSSA*, 2023 WL 2655150 at *12; *Oregon Firearms*, 2022 WL 17454829, at *14.  There is no basis for Plaintiffs' insistence that the "burden" analysis under *Bruen* requires historical regulation to be the same "type" as the modern one—that is, that the only analogue for a weapon-specific ban is another weapon-specific ban.  Reply at 43.  Plaintiffs cite no basis for this assertion, and *Bruen* says nothing about a "type" requirement.  To the contrary, *Bruen* and *Heller* both relied on the *degree* of burden when they examined proposed historical analogues.  *Bruen*, 142 S. Ct. at 2145 (proffered analogues did not impose "a *substantial* burden on public carry analogous to the burden created by New York's restrictive licensing regime") (emphasis added); *Heller*, 554 U.S. at 632 (proffered analogues did not "remotely burden the right of self-defense *as much as* an absolute ban on handguns") (emphasis added).  *See also Bondi*, 2023 WL 2484818, at *6 (historical regulations burdened right of self-defense "more severely" and "to an even greater extent" than challenged statute).  Plaintiffs' interpretation would, moreover, impermissibly require a historical twin, and be tantamount to the "regulatory straightjacket" that *Bruen* warns against, as discussed in Section I.B.1, above.

Plaintiffs also mistakenly dismiss *Worman*'s determination that the Act does not heavily burden the core right of self-defense, claiming it is irrelevant due to *Bruen*'s abrogation of the means-end analysis.  Reply at 43-44.  Plaintiffs miss the point:  *Worman*'s conclusion about the degree of burden was not itself the product of means-end balancing; it was a subsidiary determination made for the purpose of selecting the correct level of scrutiny.  *Worman*, 922 F.3d

at 37. *Worman*'s reasoning remains equally valid here: the Act does not heavily burden the core right of self-defense because (1) the Act proscribes only certain weapons rather than an entire class; (2) the features of assault weapons make them ill-suited to self-defense; and (3) assault weapons and LCMs are not in fact commonly used for self-defensive purposes. *Worman*, 922 F.3d at 37; *see also* Section I.A.3, above. The Commonwealth's evidence supports each of these conclusions, whereas Plaintiffs have not submitted any reliable contrary evidence. *See* Section I.A.3, above. Thus, unlike the DC statute in *Heller* that burdened the right of self-defense much *more* than historical statutes, *Heller*, 554 U.S. at 632, the Act burdens the right of self-defense *less*. *DSSA*, 2023 WL 2655150 at *12 (assault weapon/LCM ban does "not impose a greater burden on the right of armed self-defense than did analogous historical regulations").

In terms of justification, both the Act, and the historical statutes described above were enacted "for the same reason: enhancing public safety." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 2023 WL 2484818 at *7 (11th Cir. 2023) (prohibition on firearm sales to persons under 21); *see also Oregon Firearms*, 2022 WL 17454829, at *14; *DSSA*, 2023 WL 2655150 at *13. More specifically, in the words of then-Governor Romney, the Act was enacted to target "instruments of destruction" that "are not made for recreation or self-defense" and whose "sole purpose" is "hunting down and killing people." Opp. at 4-5 (citing Gohlke Ex. 5). Similarly, the historical statutes described above targeted particular weapons for their prevalence in offensive criminal use.

More fundamentally, Plaintiffs are wrong when they insist that *Heller* and *Bruen* resolve the issues in this case. *See, e.g.*, Reply at 2-4, 11, 22. *Heller* and *Bruen* involved severe restrictions on *handguns*. Plaintiffs ignore the uncontroverted evidence that assault weapons and LCMs are a different class of weapons and accessories altogether. *Bevis*, 2023 WL 2077392, at

*14; *see also id.* at *14-*16 (reviewing evidence distinguishing assault weapons from handguns). Unlike conventional handguns, AR-15-style weapons descend from firearms designed specifically for military purposes.  Donohue ¶¶ 104-108; Roth ¶ 49; Busse ¶¶ 9-16; Yurgealitis ¶¶ 27-39, 46-47; *Kolbe*, 849 F.3d at 137.  They cause gruesome wounds unlike those of other firearms.  Gohlke Exs. 19-25; Yurgealitis ¶ 42; *Worman*, 922 F.3d at 39-40.[33]  They are uniquely deadly to children.  Gina Kolata, "A pediatric trauma surgeon in Nashville describes gunshot wounds in children," *New York Times*, March 28, 2023 ("wounds from an assault-style weapon are 'almost unsurvivable' for children") (Gohlke Supp. Dec. Ex. 27).  And their availability has dramatically increased the frequency and lethality of mass shootings.  Klarevas ¶¶ 11-17; Klarevas Rebuttal Dec. ¶¶ 18-29; Roth ¶¶ 54-60; *Worman*, 922 F.3d at 39.  The Second Amendment has never been understood to prevent legislatures from protecting their citizens from the special public safety threat posed by unusually lethal offensive weapons.  *Cf. Terminiello v. Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting) (Bill of Rights is not a "suicide pact").

## II.    Plaintiffs Have Not Met Their Burden on Any of the Remaining Preliminary Injunction Factors.

Because Plaintiffs have no likelihood of success on the merits, the remaining factors become matters of "idle curiosity."  *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  But they fail to satisfy the other factors as well.  For example, they present no evidence of any actual injury to their right to self-defense.  Instead, they rely entirely on their claimed deprivation of a constitutional right.  Reply at 49 ("the other factors fall in line").  This approach is not sufficient to warrant the "drastic remedy" of enjoining enforcement

---

[33] *See also* "The Blast Effect: This is how bullets from an AR-15 blow the body apart," *The Washington Post*, available at https://www.washingtonpost.com/nation/interactive/2023/ar-15-damage-to-human-body/?itid=co_enhanced_ar15_4 (last accessed March 30, 2023) (3-D animations illustrating AR-15 bullet impact).

of a 25-year old public safety statute.  *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Green*, 553 U.S. 674, 689-90 (2008)).

To start, even with constitutional claims, "every case depends on its own facts."  *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) ("The appellants have not shown any *immediate* injury that requires issuance of an emergency injunction, putting aside their claim that Maine's laws burden their speech in contravention of the First Amendment."); *see also DSSA*, 2023 WL 2655150 at *13 ("an alleged deprivation of a Second Amendment right does not automatically constitute irreparable harm").  And while a "strong" likelihood of success on the merits may satisfy irreparable harm in certain constitutional contexts, *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012), Plaintiffs have not shown that this Second Amendment case is one such context, *see* Opp. at 49, nor have they made the requisite showing of a "strong" likelihood of success, *see* Opp. at 6-48.  Thus, Plaintiffs' entire argument on the remaining factors fails as well.

By contrast, the Commonwealth has shown that the Act causes no harm to Plaintiffs' ability to defend themselves, *see* Opp. at 48-49; *DSSA*, 2023 WL 2655150 at *13, that a preliminary injunction would upset, rather than maintain, the status quo that has existed for the last 25 years, *see* Opp. at 49, and that the public interest strongly supports denial of a preliminary injunction to avoid an unwarranted opening of the Massachusetts market to weapons and accessories designed for mass killings, Opp. at 49-50.  Plaintiffs have failed to rebut any of these points and so the remaining preliminary injunction factors all favor the Commonwealth.

## CONCLUSION

For the foregoing reasons and those explained in the Commonwealth's opposition, Plaintiffs' Motion for Preliminary Injunction (ECF # 15) should be denied.

April 6, 2023

Respectfully submitted,

ANDREA JOY CAMPBELL,
in her official capacity as Attorney General of the
Commonwealth of Massachusetts,

*s/ Julie E. Green*
Julie E. Green, BBO # 645725
Grace Gohlke, BBO # 704218
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2085
(617) 963-2527
(617) 727-5785 (Facsimile)
Julie.Green@mass.gov
Grace.Gohlke@mass.gov

## CERTIFICATE OF SERVICE

I, Julie E. Green, hereby certify that a true and correct copy of the foregoing document, including all exhibits attached hereto, was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 6, 2023.

*s/ Julie E. Green*