UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and JOSEPH R. CAPEN,<br><br>      Plaintiffs,<br><br>v.<br><br>CHARLES D. BAKER and ANDREA JOY CAMPBELL<br><br>      Defendant. | No. 22-cv-11431-FDS |

### REBUTTAL DECLARATION OF ROBERT J. SPITZER

I, Robert J. Spitzer, hereby depose and state:

1. I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

2. I have attached a copy of a rebuttal expert report I have prepared, as well as exhibits cited therein. The opinions expressed in this rebuttal report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my rebuttal report in this declaration as if set forth in full.

I declare under penalty of perjury on this 27th day of March, 2023, that the foregoing is true and correct.

*[signature]*
Robert J. Spitzer

## REBUTTAL DECLARATION OF ROBERT J. SPITZER

I, Robert J. Spitzer, declare under penalty of perjury that the following is true and correct:

1. I previously submitted an expert declaration in this case (my "Declaration") to provide an opinion on the history of firearms restrictions, including those enacted in the early twentieth century, addressing machine guns (fully automatic firearms), semiautomatic firearms, and ammunition feeding devices, and tracing those regulations back to earlier hardware and use restrictions on other types of weapons enacted in the nineteenth century and earlier.

2. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3. I have been retained by the office of the Massachusetts Attorney General and I have been asked to review and respond to certain portions of the following two documents, which were filed in this case:

--Reply In Support of Motion for Preliminary Injunction, Case 1:22-cv-11431-FDS Document 50 Filed 03/06/23, hereafter "Reply";

--Exhibit 1: Rebuttal of Spitzer Exhibit H, Case: 1:22-cv-04774 Document #: 81-3 Filed: 02/20/23, hereafter "Exhibit 1."

4. The Reply and Exhibit 1 attempt to make a series of criticisms regarding my Declaration. However, as I explain below, those materials make a series of errors regarding my Declaration, and they offer no information to blunt, contradict, or undermine the opinions and information I provide in my Declaration, including the evidence I set forth to demonstrate a long tradition of new weapons technologies developments, their spread into society, and subsequent regulation by the government as part of a centuries-long effort to protect the public from weapons' harm and to dampen weapons-related criminality and violence.

I.  **Comments on "Reply"**

5.  Reply, Page 8: The Reply says, "he [Spitzer] candidly admits that there were 'few' restrictions on firearms in the Founding Era. Spitzer Dec. ¶ 82. Therefore, he attempts to divert the analysis from that era to the 20th century, to which the vast majority of his declaration is devoted (pages 6-38; paragraphs 13-62)."

6.  First, this is a mischaracterization (which the Reply repeats on page 15). I wrote that there were "few" firearms restrictions from the end of the 1600s through *the eve of the Revolution*. (Spitzer p. 52, ¶ 82). But the Founding period extends through the Revolution and including the period of the adoption of the modern Constitution in 1789 and the Bill of Rights in 1791, during which time more laws were enacted. In addition, I quoted historian Randolph Roth, who notes that "firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution" were few because "homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur." (Spitzer p. 52, ¶ 82) My overarching argument in my Declaration is that there is a tradition across American history in which governments enacted new weapons restrictions when various weapons entered civil society and were used in ways that threatened public safety or were tied to harm or criminality. Because gun-related homicides were few from the end of the 1600s through the eve of the Revolution, as Roth makes clear, governments in this period did not need to enact the same firearms restrictions that later generations enacted. That history supports the tradition I identify and discuss in my Declaration.

7.  Second, the Reply, Page 8 says "he [Spitzer] attempts to divert the analysis from that era to the 20th century, to which the vast majority of his declaration is devoted (pages 5-37; paragraphs 12-59)." This is incorrect, and ignores entire sections of my Declaration that address

eighteenth and nineteenth century history. I address the regulation of fully automatic and semi-automatic firearms, and ammunition feeding devices in the early 20th century, on pages 6-23 (¶¶ 13-37) of my Declaration, not pages 5-37. (The Reply repeats this mistake on page 15). In contrast, I address pre-twentieth century history in the sections entitled "The History of Pre-Twentieth Century Firearms Technologies" at pages 23-34 (¶¶ 38-53) of my Declaration, and "Historical Hardware Restrictions on Knives, Blunt Weapons, Pistols, and Trap Guns," at pages 38-53 (¶¶ 63-86).

8. Moreover, my discussion of the 20th century is not a "diversion." The examples I discuss of regulation of fully automatic and semi-automatic firearms, and ammunition feeding devices in the early 20th century, are relevant because they are illustrative examples of a tradition, tracing back to early America, in which new weapons technologies were developed and spread into society, and in which governments subsequently regulated those technologies to protect the public from harm and to dampen weapons-related criminality and violence. Other laws that I discuss from the late 19th and 20th centuries, which the Reply and Exhibit 1 criticize on similar grounds, are relevant to my analysis for these same reasons.

9. Reply, Pages 15-16 attempts to minimize the significance of anti-carry weapons laws. While these represent only one type of law enacted to combat the harmful consequences of weapons-carrying by civilians, these laws were a bulwark enacted at a time (mostly in the 19th century) when the still-developing American state possessed an under-developed police power and fewer regulatory tools. The notion that various harmful and dangerous weapons were not ubiquitously "banned" in this time period fails to appreciate that such a mechanism was a practical impossibility at the time. This lesson applies with particular force to regulated items such as fighting knives and various types of clubs, as these were very simple to make, compared

to firearms. Carry restrictions—no less sensible in the 19th century than now—were a feasible and logical policy tool suited to the time and place.

10. Reply, Page 16: "Spitzer asserts that four states prohibited public carry of arms. *Id.* n. 126. Spitzer misrepresents all four statutes, because none of them banned peacefully carrying firearms."

11. This is incorrect. I did not misrepresent anything. Instead, the Reply has mischaracterized what I wrote, by replacing my word "criminalized" with the word "prohibited." In the sentence to which this portion of the Reply refers (in paragraph 63 of my Declaration), I wrote: "At least four states (Virginia, Massachusetts, North Carolina, Tennessee) *criminalized* public arms carrying,"[1] (emphasis added) which is what these laws did. To wit:

- The Virginia law (1786) provided that no man was to "go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison. . . ."

- The Massachusetts law (1786) provided: "if any persons to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously or tumultously assembled, any Justice of the Peace, Sheriff or Deputy-Sheriff of the county, or constable of the town, shall, among the rioters, or as near to them as he can safely come, command silence while proclamation is making, and shall openly make proclamations in these or the like words. … and if such persons, assembled as aforesaid, shall not disperse themselves within one hour after proclamation made, or attempted to be made, as aforesaid, it shall be lawful for every such officer to command sufficient aid, and he shall seize such persons, …"

---

[1] Spitzer ¶ 63 & n.134 (citing 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays; 1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof; Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792); Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801, An Act for the Restraint of Idle and Disorderly Persons § 6).

- The North Carolina law (1792) provided: "no man great nor small" "with force and arms" shall "go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor i[n] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. …"

- The Tennessee law (1801) provided: "if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail …"

12. These examples, and the other weapons restrictions I present in my Declaration, are consistent with and therefore support the tradition I describe, in which enactment of weapons restrictions "occurred only after the weapons technologies matured, entered the civilian market, and threatened the public through criminal use."[2] For example, relevant to the examples I discuss in paragraph 63 of my Declaration, homicide rates increased substantially in the early 1800s, and governments responded to that increase in part with laws that restricted public carrying of firearms.[3] Other laws that I present elsewhere in my Declaration support this tradition for similar reasons (including, for example, the trap gun laws discussed at page 21 of the Reply, which I discuss below).

13. Reply, Page 16: "Spitzer suggests that laws regulating carry are the same as laws banning possession. Spitzer Dec. ¶ 69."

14. My ¶ 69 (page 45) discussed the Texas case of *Cockrum v. State*, not what the Reply seems to be referring to about "laws regulating carry." My ¶ 71 does discuss the various types of Bowie knife and other fighting knife laws to summarize the overlapping objectives that various weapons restrictions advanced, whether they regulated carry, banned possession,

---

[2] Spitzer Decl. ¶ 63.
[3] Spitzer Decl. ¶¶ 63, 82.

imposed sales restrictions, or used other regulatory means to restrict weapons. What I say about this is best summarized in my closing sentence to that paragraph: "The desirability and utility of such restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence." (Spitzer, p. 46, ¶ 71)

15.     Reply, Page 17: The Reply quotes with approval: "Kopel concluded: 'As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. ... At the end of the 19th century, no state prohibited possession of Bowie knives.'"

16.     Kopel undercounts the numbers of restrictions on Bowie knives and other long-bladed fighting knives. By the close of the 19th century over 40 states had anti-Bowie knife laws, and the remaining states generally had anti-fighting knife laws that would have been understood to include Bowie knives (e.g. South Dakota barring carry of "any sharp or dangerous weapon"[4]). And Kopel's added comment that "no state prohibited possession" understates the extensive and varied regulations enacted against Bowie knives. I detailed those restrictions both here and in my Declaration.[5]

17.     Reply, Page 17, says that "Spitzer devoted only a *single paragraph* to founding era firearms regulations. Spitzer Dec. ¶ 81." Not so. My Declaration examines eighteenth century laws on pages 38-39 (¶ 63, discussed above); on pages 52-53 (at ¶ 82, not ¶ 81) where I discuss both weapons brandishing and display laws—laws that the Reply says "would today fall under the category of 'menacing.'" (Reply, Pages 17-18) The Reply here fails to note that nearly half of these

---

[4] S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.
[5] Spitzer Decl. Pages 39-47, ¶¶ 64–73.

laws criminalized the mere display of weapons—that is, the simple carrying of them openly in public with other people present.[6] Further, my discussion of clubs and other blunt weapons (pages 48-52, ¶¶ 74-81) also includes eighteenth century laws.

18. Reply, Page 18 says: "Spitzer states that '15 states effectively banned the possession of Bowie knives outright …' Spitzer Dec. ¶ 69." The Reply goes on to characterize this quotation as "simply false" and "outrageously false."

19. The Reply is incorrect. This sentence does not appear gun my Declaration, at paragraph 69 or anywhere else. Instead, my Declaration describes in detail the regulatory techniques that the States used to suppress Bowie knives, which included concealed carry bans, open carry bans, enhanced criminal penalties, and prohibitive taxes, among others, as follows:

> 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibit H).

20. My Exhibit H identifies these states along with seven different types of Bowie knife laws, including laws that barred any carry of Bowie knives, that taxed or punished the sale of the knives, and that barred sale or possession entirely to named groups. My Declaration does say that "[s]everal states banned the possession of Bowie knives outright . . . (see Exhibit H)," p. 46, ¶ 71, that statement relies on Exhibit H. Some of these laws did amount to effective bans. None of my discussion about Bowie knives is "false" or "outrageous."

21. Reply, Page 21: The Reply dismisses the category of anti-"trap gun" laws in my Declaration, saying that they "did not ban any class of arms" because the laws "regulated the manner of using them." (Reply, page 21) The functionality of a trap gun was to rig or alter a

---

[6] Spitzer Decl. ¶ 82.

firearm in such a way that it would discharge when the person who rigged the gun was not present. But these laws did indeed "ban a class of firearm," i.e. trap guns. A modern analog would be to take a legal semi-automatic weapon and alter its firing capabilities so that it then fires in a fully automatic (and therefore illegal) manner.

22. Finally, the Reply (Pages 19-20) raises objections to my treatment of various state laws. I discuss these below.

**II. Comments on "Exhibit 1"**

23. State 1, Arizona 1889: Exhibit 1 (at page 1) says that the Court in *Bruen* "specifically ruled that this statute is irrelevant." That is inaccurate. *Bruen* said only that this law did not outweigh the "overwhelming evidence of an otherwise enduring American tradition permitting public carry" of handguns. [7] I am citing this law for its restrictions on Bowie knives and other weapons, not handguns. In addition, notably, Exhibit 1 does not raise any question regarding the two other Arizona laws regulating Bowie knives that I present in my Declaration (enacted in 1893 and 1901). [8]

24. Exhibit 1, State 2: Arkansas 1881, Page 1 says that "Spitzer flat out misrepresents this law when he states that it 'banned the possession of Bowie knives outright.' Spitzer Dec. ¶69. In his exhibit he deleted a key portion of the statute. When that portion is added back in, the statute expressly states the exact opposite of what Spitzer represented." First, I did not say that the Arkansas statute banned the possession of Bowie knives outright. . My Exhibit H identifies this statute as a ban on public carry. (Spitzer Dec. Exhibit H). Exhibit H lists seven different types of Bowie knife laws, including laws that barred any carry of Bowie knives, that taxed or punished the sale of the knives, and that barred sale or possession entirely to named groups.

---

[7] *Bruen*, 142 S. Ct. at 2154 (emphasis added).
[8] *See* Spitzer Decl., Exhibits E and H.

9

Some of these laws amounted to effective bans, most especially to the named groups found in some of the laws.

25. Further, I did not "delete[d] a key portion of the statute." The source from which I obtained the text of the law (the Duke Center for Firearms Law Repository of Historical Gun Laws[9]) contained only that portion of the text that I reprinted. The additional text from the statute that the Reply provides does not state "the exact opposite" of my comment about it. The added text simply demonstrates my point by noting that the weapons in question were confined to one's home.

26. State 3, Colorado 1881**:** Exhibit 1 (at page 3) argues that this law is not relevant because it prohibited concealed carry of arms but did not regulate open carry. However, this law, like others I cite, support the opinions in my Declaration, even though it does not prohibit open carry as its regulatory means. Such laws are consistent with and exemplify the tradition I describe, in which weapons regulations were enacted when new weapons technologies "circulate[d] sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address."[10]

27. State 4, Hawaii, 1852 and 1913: Exhibit 1 (at pages 3-4) does not raise any criticism about my inclusion of these laws in my Declaration, except to argue that these laws are not relevant under *Bruen* because they pre-date the time when Hawaii became a state.

28. State 5, Idaho 1879: Exhibit 1 (at page 5) argues that this law is not relevant because it prohibited only concealed carry and not open carry. Again, however, such concealed carry restrictions support and are consistent with my opinions, for the reasons I explained in the point above with regard to the 1881 Colorado law.

---

[9] https://firearmslaw.duke.edu/repository/search-the-repository/
[10] Spitzer Decl. ¶ 35.

29.     State 6, Indiana 1859: Exhibit 1 (at page 5) says that this law is not relevant because it "prohibits carrying concealed and carrying with the 'intent or avowed purpose of injuring' another." In fact, this law also prohibited "carry[ing] or wear[ing] any such weapon openly" in the circumstances it describes.[11] It supports and is consistent with my opinions for the reasons I explain above regarding concealed carry restrictions.

30.     State 7, Louisiana 1870: Exhibit 1 (at page 5) says that this law is not relevant because it "regulated carry of arms only in certain designated places and even then only once every two years (i.e., during election and registration)." However, Exhibit 1 ignores that my Declaration also discussed another law, enacted in Louisiana in 1855, which prohibited **all** concealed carry of Bowie knives and other dangerous weapons.[12]

31.     State 8, Missouri 1917 and 1923: Exhibit 1 (at pages 6–7) says that these laws are not relevant because one "regulated carry of arms only in certain designated places" and the other "forbids only the carrying of arms while in a vehicle of any type that was carrying liquor." That is not accurate. In addition to restricting the carry of arms in certain designated places, the 1917 law provides: "If any person shall *carry concealed* upon or about his person a dangerous or deadly weapon of any kind or description … he shall be deemed guilty of a misdemeanor," regardless of place, and the 1917 law contains a list that expressly includes Bowie knives as an example of a "deadly weapon."[13]

---

[11] The full relevant text of the Indiana law provides: "Every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars." 1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefore, § 1 (cited in Spitzer Decl., Exhibit E at 27).

[12] Louisiana 1855 law, 1855 La. L. Chap. 120, Sec. 115, p. 148 (cited in Spitzer Decl., Exhibit E at 33) ("[W]hoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution …").

[13] Joplin Code of 1917, Art. 67, § 1201 (cited in Spitzer Decl., Exhibit E at 47; emphasis added).

32.     State 9, Nebraska 1872: Exhibit 1 (at page 7) does not raise any criticism about my inclusion of this law in my Declaration, except to argue that it is not relevant under *Bruen* because of when and where it was enacted.

33.     State 10, New York 1885: Exhibit 1 (at page 8) says that this law is not relevant because it only "prohibits a person from carrying or possessing an arm 'with the intent to [] use' the arm against another." However, Exhibit 1 ignores other language in this law, which provided: "The *possession*, by any person other than a public officer, of any of the weapons specified in the last section, *concealed or furtively carried* on the person, *is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same* in violation of that section."[14] In other words, this law effectively banned all concealed carry (at least absent evidence rebutting the presumption), not just concealed carry with intent to use against another, because it treated concealed or "furtive" carry as presumptive evidence of such intent.

34.     State 11, Oklahoma 1890 and 1891: Exhibit 1 (at pages 8–9) says that the Court in *Bruen* "specifically considered" the 1891 law and "held that it is irrelevant." That is inaccurate. The *Bruen* decision said only that this law did not outweigh the "overwhelming evidence of an otherwise enduring American tradition permitting public carry" of handguns.[15] I cited this law for its restrictions on Bowie knives and other weapons, not handguns. Exhibit 1 also says that these statutes are irrelevant because they prohibited only public carry, not private possession. For the same reasons I have explained now in several points above, such laws are consistent with and illustrate the tradition I describe, in which weapons regulations were enacted when new weapons

---

[14] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885), § 410 (cited in Spitzer Decl., Exhibit E at 61; emphasis added).
[15] *Bruen*, 142 S. Ct. at 2154 (emphasis added).

technologies "circulate[d] sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address."[16]

35. State 12, Tennessee 1869, 1881, and 1893: Exhibit 1 (at pages 9–11) criticizes my presentation of these three laws for reasons similar to those that I have already addressed here. Notably, however, Exhibit 1 raises no question regarding any of the four other laws from Tennessee that restricted Bowie knives or other similar knives that I presented in my Declaration (enacted in 1838, 1856, 1863, and 1867.)[17]

36. State 13, Texas 1871: Exhibit 1 (at page 11) says that the Court in *Bruen* specifically rejected this statute as an "outlier." However, *Bruen* characterized this law as an outlier solely to the extent it prohibited carrying of handguns.[18] I cite this law not for its restrictions on handguns, but for its restrictions on Bowie knives and other weapons.[19]

37. State 14, Utah 1877: Exhibit 1 (at page 12) does not raise any criticism about my inclusion of this law in my Declaration, except to argue that it is not relevant under *Bruen* because of when and where it was enacted.

38. State 15, West Virginia 1882, 1891, and 1925: Exhibit 1 (at pages 12–13) criticizes my inclusion of these three laws on grounds similar to those that I have already addressed. However, Exhibit 1 raises no question regarding the fourth law from West Virginia (enacted in 1870[20]) that restricted Bowie knives or other similar knives that I presented in my Declaration.

---

[16] Spitzer Decl. ¶ 35.
[17] *See* Spitzer Decl., Exhibits E and H.
[18] *See Bruen*, 142 S. Ct. at 2153.
[19] *See* 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons (cited in Spitzer Decl., Exhibit E at 80) ("[A]ny person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense … shall be guilty of a misdemeanor …").
[20] *See* Spitzer Decl., Exhibit H; *see also* Spitzer Decl., Exhibit E at 90.

39.     In all, Exhibit 1 raises questions about 22 laws I cite from 15 states. Most of these questions argumentatively quibble about whether the cited statutes are or are not appropriate for consideration in the light of *Bruen*. These 15 laws represent roughly 6 percent of the list of over 240 laws presented in my Declaration involving all manner of weapons regulations spanning all the states and over three centuries.

## III.  Further Item

40.     Finally, I wish to clarify a point on page 32, ¶ 50 of my Declaration, where I wrote this: "In addition, in the late 1800s and early 1900s at least a half-dozen states barred possession of such weapons outright, regardless of other circumstances.[21]" The sentence (including footnote) should instead say this, to correctly reflect the number of applicable cited laws:

"In addition, in the late 1800s and early 1900s several states barred possession of such weapons outright, regardless of other circumstances.[22]"

---

[21] 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695; Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1883 Kan. Sess. Laws 159, §§ 1-2; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) § 410; 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1; 1931 N.Y. Laws 1033, ch. 435, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5; 1923 S.C. Acts 221. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

[22] Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) § 410; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1; 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5; 1917 Cal. Sess. Law 221-225; 1923 Cal. Stat. 695; 1931 N.Y. Laws 1033, ch. 435, § 1. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

**IV. Conclusion**

      41.    Neither the Reply nor Exhibit 1 offer any arguments or evidence to undermine my facts, analysis, or overarching conclusion in my Declaration, which is that there is a tradition across American history in which governments enacted new weapons restrictions when various new weapons technologies entered civil society and were used in ways that threatened public safety or were tied to harm or criminality.