UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and JOSEPH R. CAPEN,<br><br>    Plaintiffs,<br><br>  v.<br><br>ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts,<br><br>    Defendant. | Civil Action No. 1:22-cv-11431-FDS |

## REBUTTAL DECLARATION OF LOUIS KLAREVAS

I, Louis Klarevas, hereby depose and state:

1. I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

2. I have attached a copy of a rebuttal expert report I have prepared, as well as exhibits cited therein. The opinions expressed in this rebuttal report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my rebuttal report in this declaration as if set forth in full.

I declare under penalty of perjury on this 27th day of March, 2023, that the foregoing is true and correct.

_____
Louis Klarevas

## REBUTTAL EXPERT REPORT OF LOUIS KLAREVAS

1.      I have been asked by the Office of the Attorney General of the Commonwealth of

Massachusetts to prepare this rebuttal expert report addressing several assertions made by the

Plaintiffs in their Reply in Support of Motion for Preliminary Injunction.[1]

2.      On January 27, 2023, I signed and executed a Declaration in the present case in

support of Defendant's Opposition to Motion for Preliminary Injunction, which incorporated the

Expert Report I prepared in this case ("Expert Report" hereinafter).[2]  In my Expert Report, I

discussed the following six findings:

> It is my professional opinion, based upon my extensive review and analysis of the data,
> that (1) in terms of individual acts of intentional criminal violence, mass shootings
> presently pose the deadliest threat to the safety of American society in the post-9/11 era,
> and the problem is growing nationwide; (2) high-fatality mass shootings involving assault
> weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than
> similar incidents that did not involve assault weapons and/or LCMs; (3) mass shootings
> resulting in double-digit fatalities are relatively modern phenomena in American history,
> largely related to the use of assault weapons and LCMs; (4) assault weapons are used by
> private citizens with a far greater frequency to perpetrate mass shootings than to stop
> mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault
> weapons), are the most commonly owned firearms in the United States; and (6) states that
> restrict both assault weapons and LCMs experience fewer high-fatality mass shooting
> incidents and fatalities, per capita, than states that do not restrict assault weapons and
> LCMs.[3]

---

[1] Plaintiffs' Reply in Support of Motion for Preliminary Injunction, *National Association for Gun Rights v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.), March 6, 2023, Doc. 50 ("Plaintiffs' Reply" hereinafter).

[2] Expert Report of Louis Klarevas, *National Association for Gun Rights v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.), incorporated by Declaration of Louis Klarevas, *National Association for Gun Rights v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.), January 31, 2023, Doc. 21-7 ("Klarevas Expert Report" hereinafter).

[3] *Ibid.*, para. 10.

3.      Based on these findings, I offered the following assessment in my Expert Report: "it is my opinion that restrictions on assault weapons and LCMs have the potential to save lives by reducing the frequency and lethality of high-fatality mass shootings."[4]  I continue to stand by the findings and conclusions in my Expert Report.

4.      The Plaintiffs present questionable estimates regarding the number of assault rifles and LCMs that are owned by Americans as well as a misrepresentation of mass shooting violence in the United States—views that differ from the findings and conclusions in my Expert Report.  The Office of the Attorney General of the Commonwealth of Massachusetts has requested that I address these differences in the present Rebuttal Expert Report.

## OPINIONS

## I.      Plaintiffs Present Questionable Estimates Regarding Assault Rifles and LCMs

5.      In my Expert Report, I noted that the National Sport Shooting Foundation (NSSF) estimates that there are approximately 24.4 million modern sporting rifles in circulation in the United States, as of the end of 2020 (when the most recent data is available).[5]  Using firearm industry and federal government data, I calculated that *at most* 5.3% of all firearms in circulation in the United States are what the NSSF calls "modern sporting rifles" (MSRs)—a firearm industry term for AR-platform and AK-platform firearms.[6]  I also noted that, "in all likelihood, this is an over-estimation because the figures appear to include firearms belonging to law enforcement agencies in the United States."[7]  Furthermore, there is reason to believe that this

---

[4] *Ibid*.  In my Expert Report as well as in the present Rebuttal Expert Report, "high-fatality mass shootings" (also referred to as "gun massacres") are defined as shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or underlying motive.  *Ibid*., para. 10, note 4.  See Section II below for further discussion of how "high-fatality mass shootings" relate to the overarching concept of "mass shootings."

[5] *Ibid*., para. 13, note 8.

[6] *Ibid*., para. 13.

[7] *Ibid*.

rate includes MSRs that are currently in the possession of firearm retailers and persons who possess firearms illegally. Assuming that the NSSF is correct when it estimates that there are approximately 24.4 million MSRs in society, the percentage of MSRs that make up the privately-owned stock of all firearms in the United States should be, at most, no more than 5.3% (which is, again, in all likelihood, an over-estimate). Based on NSSF data relating to MSRs, it can be determined that, at most, *less than* 8% of all civilian gun owners in the United States (which amounts to *less than* 2% of the entire population) own MSRs.[8]

6.      Unlike data on MSRs, which can at least be estimated based on firearm manufacturing records that are publicized by the NSSF, the current number of LCMs in American society is unknown. As I noted in my Expert Report, "Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar analysis of ownership rates using LCMs instead of modern sporting rifles."[9] That said, a decade ago, in 2013, the estimated number of LCMs in circulation was approximately 40 million.[10] But without source data, estimates like this one from 2013 are unverifiable.

7.      In the present case, Plaintiffs offer drastically different estimates of how many MSRs and LCMs are privately-owned in the United States. According to the 2022 Declaration of James Curcuruto, the former director of Research and Market Development at the NSSF, "between 1990-2021, more than 20 million AR-platform rifles have been manufactured in the United States and are owned by millions of persons in the United States."[11] Regarding LCMs, Curcuruto adds, "there are at least one hundred fifty million magazines of a capacity of more

---

[8] *Ibid*., para. 27, notes 23-24.

[9] *Ibid*., para. 29, note 27.

[10] *See* Patrik Jonsson, "Gun Debate 101: Time to Ban High-Capacity Magazines?" *Christian Science Monitor*, January 16, 2013, *available at* https://www.csmonitor.com/USA/Politics/DC-Decoder/2013/0116/Gun-debate-101-Time-to-ban-high-capacity-magazines (last accessed March 19, 2023).

[11] Declaration of James Curcuruto, *Rocky Mountain Gun Owners v. Town of Superior*, 22-cv-1685 (D. Colo.), July 13, 2022, para. 7, submitted in *National Association for Gun Rights v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.), November 9, 2022, Doc. 15-3.

than ten rounds in possession of American citizens."[12]  By contrast, citing a survey that was conducted in 2021 by William English, Plaintiffs claim that "30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle."[13]  According to English, based on his calculations, "up to 44 million AR-15 styled rifles have been owned by U.S. gun owners."[14]  Plaintiffs also draw on the English survey to claim that "48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to hundreds of millions such magazines have been owned."[15]  According to English, his more precise estimate is that 542 million magazines with a capacity greater than 10 rounds have been owned by Americans.[16]  To put these figures in perspective, the difference between the Curcuruto and English MSR estimates is more than two-fold.  Regarding LCMs, the difference is more pronounced.  From an estimated 40 million such magazines in 2013, in less than 10 years the number of privately-owned LCMs has either increased nearly four-fold, if we accept Curcuruto's estimate of at least 150 million LCMs, or nearly fourteen-fold, if we accept English's estimate of 542 million.

8.     There is good reason to be suspicious of both estimates advanced by the Plaintiffs. For starters, the Curcuruto estimates are asserted without any evidence or authority to support them.  They are merely blanket claims offered with zero proof.  In addition, while the English survey is discussed in an unpublished academic paper that is publicly available online, there are three significant problems with the survey which call into question all of the findings reported in the paper.

---

[12] *Ibid*.

[13] Plaintiffs' Reply, *supra* note 1, at 37, citing William English, "2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned," Unpublished Paper (May 13, 2022; Revised September 22, 2022), *available at* https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=4283305 (last accessed March 7, 2023), at 33.

[14] English, *supra* note 13, at 33.

[15] Plaintiffs' Reply, *supra* note 1, at 31, citing English, *supra* note 13, at 20.

[16] English, *supra* note 13, at 20.

9.      First, the survey (as reported in the paper) appears to be in serious violation of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research (AAPOR).[17]  Among the ways that the English survey seemingly runs afoul of AAPOR canons, it fails to identify the source of sponsorship funding and it fails to fully disclose the measurement tools (Rules III.A.2-3).  The former is vital to assuring that the survey was not designed and conducted to further the political or economic interests of particular people or organizations.  The latter allows independent observers and researchers to assess if, among other factors, question order, question wording, or answer options biased responses.  The latter is also crucial to assuring that select findings were not suppressed because they would, if publicized, undermine the agenda of the survey's sponsor(s).[18]  Without release of the entire questionnaire and the full results, it cannot be confirmed that questions and corresponding responses were not suppressed.

10.     Second, the paper employs a methodological technique that, for all practical purposes, buries one of the most striking findings in the paper.  As discussed above, according to English, "about 24.6 million people" have owned "an AR-15 or similar styled rifle."[19]  English also reports that, based on the average number of AR-15 styled rifles owned by each owner, he was able to calculate that "up to 44 million AR-15 styled rifles have been owned by U.S. gun

---

[17] *See* "AAPOR Code of Professional Ethics and Practices," April 2021 (Attached as **Exhibit A**).

[18] With regard to this last point, the paper at one point discusses an open-answer question that was posed to survey respondents.  It is the only such open-ended question discussed in the paper.  However, the question that is reported implies that there might have been an earlier open-ended question in the survey: "Have you ever been in a situation (*including any referenced in earlier responses*) in which it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds?  If so, please briefly describe that situation." English, *supra* note 13, at 26, 28.  Indeed, one answer to this question is reported word-for-word verbatim: "Yes.  The first incident I mentioned."  English, *supra* note 13, at 28.  As this response indicates, there might have been at least one other open-answer question that is not reported in the paper.

[19] *Ibid*., at 33.

5

owners."[20]  However, in calculating his estimated ownership rates, English notes that "*we disregard the 0.3%* that indicate owning over 100" AR-15 styled rifles.[21]  Assuming English correctly estimates that 24.6 million people have owned an AR-15 or similarly styled rifle, his survey found that approximately 74,000 people own over 100 such rifles.  Moreover, English also reports that 1.3% of all AR-15 style rifle owners (approximately 320,000 people) own between 11 and 100 such rifles.[22]  Even if, for the sake of argument, these 74,000 people all owned only 101 AR-15s and these additional 320,000 people all owned 11 AR-15s—the lowest possible number in the range that they identified as best capturing the number of AR-15 styled rifles they own—that would mean that, **at the very least, approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners**.[23]

11.  Depending on whether one uses the English estimate of as many as 44 million such rifles in society or the NSSF estimate of as many as 24.4 million such rifles in society, the English survey suggests that, *at a minimum*, either 25% or 45% of all such rifles in circulation are possessed by less than 0.5% of the estimated 81 million gun owners in the United States.[24]

---

[20] *Ibid*.

[21] *Ibid*.  English does not cite any scholarship or authority that advises analysts to exclude certain respondents due to the magnitude of their scaled responses.  English also does not explain who "we" refers to in his paper, when stating that data exclusions were made.  But a natural set of questions follows.  Was the decision to exclude certain people and their responses from the analysis made by a group of people?  If so, who were the people involved?  And what criteria did they use to determine what got included and what got excluded?  None of the answers to these questions can be answered from the publicly available paper relating to the survey.

[22] *Ibid*.

[23] Again, if English's findings are accurate, 11 million AR-15 style rifles is a conservative estimate calculated using the absolute minimum numbers in the reported ranges of 11-to-100 and 101-or-more.  *Ibid*.

[24] While the NSSF, unlike English, does not report whether respondents in its surveys of MSR owners happen to own more than 10, let alone more than 100, MSRs, NSSF has detected a growing trend toward increased ownership of multiple MSRs.  For instance, in its 2010 survey, it found that 40% of MSR owners owned only 1 MSR and 60% owned multiple MSRs, with the average number of MSRs owned being 2.6.  In its 2013 survey, it found that 35% of MSR owners owned only 1 MSR and 65% owned multiple MSRs, with the average number of MSRs owned increasing to 3.1.  In its most recent, 2021 survey, the NSSF found that 24% of MSR

And these percentages are necessarily higher if the number of MSRs possessed by law enforcement, gun retailers, and prohibited possessors are excluded from the calculations.  The fact that English, without citing any authority that justifies excluding certain respondents, purposely chose to "disregard" a subgroup of owners who appear to have amassed personal arsenals of AR-15 style rifles raises further suspicions about the survey and accompanying paper.  The Plaintiffs, nevertheless, fail to address the problematic foundation and conflicting nature of these estimates.

12.     Third, the paper reports some counter-intuitive findings and then interprets them in a manner that appears to be a speculative, tortured attempt to make sense of those findings.  In one example, discussed above, respondents were asked if they ever found themselves in a situation "in which it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds."  Approximately 550 respondents answered this question in the affirmative.[25]  Over 10% of the paper is allocated to reproducing, verbatim, 31 select answers to this question.  Presumably, the 31 reproduced answers are the most instructive as to the utility of LCMs in self-defense situations.[26]  Out of these 31 scenarios, **only two** involved an armed citizen actually firing his or her firearm, and in **only one** of these two scenarios did the respondent confirm that they fired more than 10 rounds.  Neither scenario involved self-defense against a criminal.  Instead, both involved the use of gunfire to ward off

---

owners owned only 1 MSR and 76% owned multiple MSRs, with the average number of MSRs owned increasing yet again to 3.8.  This speaks to a growing trend in which MSRs are being purchased by gun owners who already own an MSR, resulting in MSRs being concentrated, relatively speaking, in the hands of those who already own MSRs.  NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at* https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last accessed March 7, 2023).

[25] English, *supra* note 13, at 28.

[26] *Ibid.*, at 28-33.  Again, without all 550 answers available for review, it is difficult to assess the insightfulness of the responses provided by the other 519 survey participants who answered this question in the affirmative.

animals: in one instance a bear and in another a pack of coyotes.[27]  Taking situations that involved brandishing a firearm, driving away from the potential threat, or having their dog chase away the criminals, and interpreting them as examples that reflect the usefulness of LCMs for purposes of self-defense, is unfounded.  In another example, English reports the percentage of gun owners who have owned LCMs in each state.  The state with the highest rate of LCM ownership is the District of Columbia, with 69.2% of D.C. respondents reporting that they have owned LCMs.[28]  This is a mind-boggling finding because the District of Columbia has the strictest prohibitions on LCMs in the U.S.[29]  Intuitively, the District of Columbia should be one of the states with the lowest LCM ownership rates.  To make sense of this baffling finding, English then offers some possible explanations: (1) LCM owners were including magazines that they keep in another state or that are legal to possess because they are "grandfathered" and (2) states with low gun ownership rates "such as DC and Hawaii" are more likely to have a higher concentration of "gun enthusiasts."[30]  English offers no evidence whatsoever that LCM owners in the District of Columbia store their LCMs in other states (not to mention that neighboring Maryland also restricts LCM possession).  Nor does English offer any evidence that there is a higher concentration of gun enthusiasts in Washington, D.C.[31]  And, we can rule out the "grandfathering" theory because the District of Columbia does not grandfather LCMs.

13.     In sum, due to questionable ethics and practices, unorthodox methodological tactics, and tortured analyses as described above, suspicions about the integrity and findings of this survey appear warranted.  For the foregoing reasons, the survey cannot be deemed reliable.

---

[27] *Ibid*.

[28] *Ibid*., at 27.

[29] *See* Giffords Law Center to Prevent Gun Violence, "Large-Capacity Magazines," available at https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines (last accessed March 7, 2023).

[30] English, *supra* note 13, at 25-26.

[31] *Ibid*.  English also fails to explain how the rate of gun ownership is related to the percentage of gun enthusiasts.

14.     In addition to relying on the unsubstantiated Declaration of James Curcuruto and the questionable survey conducted by William English, the Plaintiffs also turn to a law review article to support one of their claims.  Their Reply states:

> Many of the most popular semi-automatic rifles are manufactured with standard magazines holding more than ten rounds. *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 and ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds.")[32]

Plaintiffs do not provide any quantitative data from either the firearms industry or the federal government to support their statement.  Instead, they rely solely on the cited law review article by David Kopel.  But turning to the specific page of the Kopel article does not turn up any evidence in support of this statement.  On the other hand, the sentence from Kopel's article that Plaintiffs parenthetically quote does appear on the cited page of the article as part of a broader discussion of the availability of assault rifles in the civilian marketplace in the 1950s and 1960s.  But this too is subject to challenge (and speaks to the risks of relying on non-peer-reviewed law review articles as primary sources of data).  According to *Gun Digest*, the factory-issue magazine that was sold with the genuine AR-15, produced by Colt, was 5 rounds in capacity, not 20 or 30 rounds.[33]  When Plaintiffs insist that "[m]any of the most popular semi-automatic rifles are manufactured with standard magazines holding more than ten rounds," a natural follow-up question is: How many exactly?  The Plaintiffs' cited sources do not say.

15.     A decade-by-decade analysis of the civilian firearms market in the United States during the latter portion of the 20th century indicates how many makes and models of new firearms (handguns and long guns) were sold with factory-issue magazines having a capacity greater than 10 rounds of ammunition.[34]  The information is drawn from *Gun Digest*, which since its 1955 edition has systematically published this data in what is now known as the *Gun Digest*

---

[32] Plaintiffs' Reply, *supra* note 1, at 31-32.

[33] *See*, for example, *Gun Digest 1966* and *Gun Digest 1991* (Attached as **Exhibit B**).

[34] Air, pellet, and BB guns have been excluded from this analysis.

9

GUNDEX.[35]  The objective of this evaluation is to identify the percentage of new firearm

models sold with factory-issue LCMs in the U.S. civilian marketplace from the mid-1950s until

the mid-1990s, when LCMs were restricted nationwide.  As mentioned in my Expert Report, in

1994, Congress enacted the Federal Assault Weapons Ban, which prohibited the manufacture,

importation, and sale of new LCMs that were not legally possessed prior to the ban taking

effect.[36]  As such, after the ban took effect on September 13, 1994, firearms sold in the civilian

marketplace were not sold with new magazines holding more than 10 rounds of ammunition.

These restrictions remained in effect until September 13, 2004, when the Federal Assault

Weapons Ban expired.

16.     Table 1 shows the number of new firearm models, current at-the-time, being sold

with factory-issue magazines holding more than 10 rounds of ammunition at mid-decade,

between 1955 and 1995.[37]  According to *Gun Digest*, in 1955, only two new firearm models

---

[35] GUNDEX is a registered trademark of *Gun Digest*.  While *Gun Digest* has provided information on guns available for purchase in the United States since the publication of its first edition in 1944, it was not until the 1955 edition that *Gun Digest* began presenting this information in a quasi-systematic fashion, including make, model, and estimated price (at the time of publication).  *Gun Digest* first referenced its catalog as the GUNDEX in its 1984 edition. Prior to that, it was referred to as the *Gun Digest* "Complete Compact Catalog."  Describing the Complete Compact Catalog in its 1980 edition, *Gun Digest* wrote: "Its all-inclusive nature provides, if you look at a lot of them, a history of firearms availability in the United States.  It covers virtually all firearms available to U.S. shooters, whether manufactured in the United States or elsewhere, or marketed by United States firms or others, and whether the arm is rimfire, centerfire, muzzleloader, rifle, handgun, shotgun."  *Gun Digest, 34th Anniversary, 1980 Deluxe Edition* (1979), at 288.

[36] The 1994 Federal Assault Weapons Ban prohibited the manufacture, transfer, or possession of assault weapons and LCMs not in circulation at the time that the law took effect on September 13, 1994.  The ban applied nationwide, restricting assault weapons and LCMs in all 50 states plus the District of Columbia.  Because the law contained a 10-year sunset provision, as it was not renewed, it expired on September 13, 2004.  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[37] For purposes of this analysis, data is drawn from the 1955, 1965, 1975, 1985, and 1995 editions of the GUNDEX.  These editions, respectively, reflect market availability of firearm models in 1954, 1964, 1974, 1984, and 1994.  The 1995 *Gun Digest*, which contains the 1995 GUNDEX, was published in 1994.  Despite being in the 1995 edition, the 1995 GUNDEX predominantly captures gun models available in the marketplace in 1994.  The same pattern holds for all *Gun Digest* GUNDEXs—they reflect the firearm models available in the American

were sold in the United States with factory-issue LCMs.  By 1995, this number had reached 152 new firearm models available in the civilian marketplace.  As a share of all firearm models available in the American marketplace in the decades prior to the Federal Assault Weapons Ban taking effect, the range ran from a low of less than 1% in the 1950s and 1960s to a high of just over 7% of all new firearms sold with factory-issue large-capacity magazines in the 1990s (immediately prior to the federal ban imposing prohibitions on LCMs).

**Table 1.  Firearm Models Sold with Factory-Issue LCMs in U.S., 1955-1995**

|  | Number of New Firearm Models Sold with Factory-Issue LCMs in Civilian Market | Number of New Firearm Models Sold in Civilian Market | New Firearm Models Sold with Factory-Issue LCMs as a Share of New Firearm Models Sold in Civilian Market |
|---|---|---|---|
| **1955** | 2 | 301 | 0.7% |
| **1965** | 3 | 510 | 0.6% |
| **1975** | 14 | 834 | 1.7% |
| **1985** | 69 | 1,270 | 5.4% |
| **1995** | 152 | 2,108 | 7.2% |

Sources: *Gun Digest, 1955*; *Gun Digest, 1965*; *Gun Digest, 1975*; *Gun Digest, 1985*; and *Gun Digest, 1995*.

As Table 1 shows, the highest percentage of new firearm models sold with factory-issue large-capacity magazines prior to the enactment of the Federal Assault Weapons Ban peaked at 7% of all new firearm models sold in the civilian marketplace.

17.     As the above example indicates, law review articles should not be used as primary source materials on the manufacture, availability, sale, and ownership of firearms, especially when industry and/or government data are publicly available.[38]

---

marketplace in the year of publication (not the year of the *Gun Digest*'s annual edition, which is the year appearing on the cover).  Again, every annual *Gun Digest* is published in the year prior to the edition listed on the cover.

[38] Similarly, Plaintiffs in their Reply assert that "in recent years it has been 'the best-selling rifle type in the United States,'" citing a 2009 law review article as their source.  Plaintiffs' Reply, *supra* note 1, at 31.  Leaving aside that a 2009 source is likely too outdated to reflect "recent" trends, this is again another example of relying on a source far removed from the primary data.

**II.**    **Plaintiffs Misrepresent the Prevalence and Threat of Mass Shooting Violence**

18.    In my Expert Report, I noted that "the problem of *high-fatality* mass shooting violence is on the rise."[39]  In support of this finding, I documented patterns and trends in high-fatality mass shootings since 1991.  Because the number of incidents and deaths associated with this particular subset of mass shooting violence—gun massacres resulting in a minimum of six of more victims being shot to death—has been increasing over the years at a rate that far outpaces population growth, I concluded that "mass shootings pose a significant—and growing—threat to American public safety."[40]

19.    In its Opposition to the Plaintiffs' Motion for a Preliminary Injunction, the Commonwealth of Massachusetts also pointed out that mass shootings pose a grave danger to society.  Drawing on data collected and published by the Gun Violence Archive (GVA), the State noted in its pleadings that in January 2023 there had been 51 mass shootings in the United States (which amounted to a rate of more than 1.6 mass shootings per day during the first month of 2023).[41]

20.    The Plaintiffs appear to be taking issue with these claims pertaining to the frequency and lethality of mass shooting violence.  In particular, the Plaintiffs' arguments on "the prevalence of mass shootings" appear to be driven by two related objectives: (1) discrediting the GVA as a source on mass shooting data; and (2) minimizing the danger of mass shooting violence on the basis that mass shootings occur too infrequently and result in too few deaths.  In the Plaintiffs own words:

---

[39] Klarevas Expert Report, *supra* note 2, para. 11 (emphasis added).

[40] *Ibid*.

[41] Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, *National Association for Gun Rights v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.), January 31, 2023, Doc. 21, at 1.

The State would have the Court believe there were 51 "mass shootings" in January 2023. As authority for this *dubious statistic*, it cites the website of the Gun Violence Archive ("GVA"). That same website reports there were 647 mass shootings in 2022. There were, on average, nearly two mass shootings every single day last year? Who knew? It turns out that no one knew. Unsurprisingly, this *hyper-partisan activist organization ... vastly inflated the numbers through definitional games*....

    *In contrast to the FBI and leading criminologists*, GVA defines a "mass shooting based ONLY on the numeric value of 4 or more shot or killed, not including the shooter." This means that GVA defines mass shootings to include events where no one is killed at all. "Equal importance is given to the counting of those injured as well as killed …" Thus, GVA would equate the Columbine High School shooting with a drive-by gang shooting in which no one was killed.[42]

21.    There is a lot to unpack in these two paragraphs. For starters, the Plaintiffs never argue, let alone establish, that the GVA's data is erroneous. Instead, the Plaintiffs object to the way the GVA defines a "mass shooting" incident. Because the Plaintiffs offer no direct evidence to support their claims regarding the GVA, they are in essence levelling ad hominem attacks, accusing the GVA of being a "hyper-partisan activist organization" that has "vastly inflated the numbers [pertaining to mass shooting violence] through definitional games," resulting in statistics that are "dubious" in nature.[43] But ad hominem attacks do not contribute to the substance of an issue—in this instance, what is the most useful data set for assessing the prevalence and threat of mass shooting violence.

22.    Beyond the ad hominem nature of the Plaintiffs' criticisms, there are numerous substantive problems with Plaintiffs' analysis in this section. First, contrary to the Plaintiffs' insistence, the GVA is considered a legitimate and comprehensive source of data on mass shootings, broadly defined as incidents of gun violence resulting in four or more victims being shot fatally or non-fatally.[44] As noted in my book on mass shootings, I also define mass

---

[42] Plaintiffs' Reply, *supra* note 1, at 46-47 (internal citations omitted; emphases added).

[43] *Ibid*., at 46.

[44] Gun Violence Archive, "General Methodology," Gun Violence Archive (website), *available at* https://www.gunviolencearchive.org/methodology (last accessed March 20, 2023).

shootings in a manner similar to the GVA.[45]  Furthermore, this definition is accepted in

academia,[46] the news media,[47] and the judiciary,[48] including Justices of the Supreme Court.[49]

23.     Second, the Plaintiffs want us instead to rely on data sets, like the *Mother Jones*

data set, that purportedly use the FBI's definition of a mass shooting: "'a single attack in a public

place in which four or more victims were killed.'"[50]  The Plaintiffs add that, besides setting a

higher fatality threshold, "[t]his definition is intended to distinguish mass shootings from more

conventionally motivated crimes like armed robbery and gang violence."[51]  It is the Plaintiffs'

contention that "[a]ccording to *Mother Jones*' *comprehensive* database of mass shootings, *using*

*the FBI's definition*, in the 40 years since 1982, there have been 141 mass shootings with 1,095

fatalities."[52]  Again, there is a significant problem with the Plaintiffs' claim: there is no FBI

---

[45] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016), at 48, Table 2.1 (Attached as **Exhibit C**).

[46] *See*, e.g., Lisa Geller, et al., "The Role of Domestic Violence in Fatal Mass Shootings in the United States, 2014-2019," 8 *Injury Epidemiology* 38 (2021).

[47] *See*, e.g., Julia Ledur and Kate Rabinowitz, "There Have Been More Than 600 Mass Shootings since January 2022," *Washington Post*, January 23, 2023, *available at* https://www.washingtonpost.com/nation/2022/06/02/mass-shootings-in-2022 (last accessed March 20, 2023).

[48] *See*, e.g., *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175 (D.R.I. Dec. 14, 2022).

[49] *See*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (Breyer, J., dissenting).

[50] Plaintiffs' Reply, *supra* note 1, at 46.

[51] *Ibid*.

[52] *Ibid*., at 46-47 (emphases added).  The Plaintiffs actually miscounted.  According to *Mother Jones*, between January 1, 1982, and February 20, 2023, which is when the Plaintiffs last visited the *Mother Jones* database, there have been 140 incidents resulting in a cumulative 1,095 fatalities.  *See*, Mark Follman, Gavin Aronsen, Deanna Pan, "US Mass Shootings, 1982–2023: Data from *Mother Jones*' Investigation," Mother Jones, February 14, 2023, *available at* https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (last accessed March 20, 2023).

definition of a mass shooting, nor has there ever been.  This perhaps explains why the Plaintiffs fail to cite any FBI source on the matter.[53]

24.     Third, the Plaintiffs appear to be of the view that the data set maintained by *Mother Jones* is a sounder one for purposes of analysis.[54]  However, the Plaintiffs disregard the scholarly criticisms leveled against *Mother Jones* for using selection criteria that are arbitrary in nature.[55]  For instance, *Mother Jones* only includes shootings if "[t]he killings were carried out by a lone shooter."[56]  However, because this would lead to the exclusion of high-profile incidents such as the Columbine High School and San Bernardino Inland Regional Center attacks, it clearly ignores its own criterion and includes these incidents (and others involving multiple shooters).  As another example, *Mother Jones* only includes shootings if "[t]he shootings occurred in a public place."[57]  Because some prominent mass shootings occurred partly or entirely in private residential settings, such as the Crandon and Newtown rampages, it again ignores its own criterion and includes these incidents (and others occurring in residential settings).  By ignoring established criteria, *Mother Jones* has, in essence, cherry-picked its data, which undermines both its data and any analyses performed using that data.

---

[53] This is not to suggest that there are not datasets that only collect data on shooting incidents, unrelated to an underlying crime "like armed robbery or gang violence," that result in four or more deaths in public spaces.  There are indeed such data sets, including the data set maintained by the Violence Project.  *See*, The Violence Project, "Methodology," The Violence Project (website), *available at* https://www.theviolenceproject.org/methodology (last accessed March 20, 2023).  But, again, incidents defined in this manner are often referred to as "mass public shootings"—another subset of mass shootings.

[54] Plaintiffs' Reply, *supra* note 1, at 46-47.

[55] See, e.g., James Alan Fox and Monica J. DeLateur, "Mass Shootings in America: Moving Beyond Newtown," 18 *Homicide Studies* 125, at 128-130 (2014); and Klarevas, *Rampage Nation*, *supra* note 45, at 43-44.

[56] Mark Follman, Gavin Aronsen, Deanna Pan, "A Guide to Mass Shootings in America," *Mother Jones*, February 13, 2023, *available at* https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (last accessed March 20, 2023).

[57] *Ibid*.

25.     The bottom line is that there are better and more comprehensive data sets than the *Mother Jones* data set, which excludes the vast majority of mass shootings that have occurred in the United States.  Nevertheless, using this relatively small data set, the Plaintiffs maintain that since 1982, there have only been about 140 mass shootings and about 1,095 lives lost in those incidents.  But if the *Mother Jones* data set is compared to the GVA data set, using full calendar year data for the overlapping timeframe between both data sets (2013-2022), the differences become abundantly evident.[58]  As shown in Figures 1 and 2, the *Mother Jones* data set only captures about 1.8% of all incidents and about 12.5% of all deaths in the GVA data set.[59]

**Figure 1.  Comparison Between Incidents in *Mother Jones* and GVA Data Sets, 2013-2022**



|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| MJ | 5 | 4 | 7 | 6 | 11 | 12 | 10 | 2 | 6 | 12 |
| GVA | 254 | 269 | 335 | 382 | 346 | 337 | 417 | 610 | 690 | 648 |

■ MJ  ■ GVA

---

[58] The GVA only came into existence about 10 years ago.  The first year in its mass shooting data collection is 2013.  Therefore, in order to perform a symmetrical, annual-basis comparison between the GVA and *Mother Jones* data sets, the timeframe must be limited to 2013-2022.

[59] From 2013 through 2022, there were 75 and 4,288 incidents, respectively, in the *Mother Jones* and GVA data sets.  The 75 incidents in the *Mother Jones* data set during this timeframe represent 1.8% of the 4,288 incidents in the GVA data set.  From 2013 through 2022, there were 566 and 4,536 deaths, respectively, in the *Mother Jones* and GVA data sets.  The 566 deaths in the *Mother Jones* data set during this timeframe represent 12.5% of the 4,536 deaths in the GVA data set.

**Figure 2.  Comparison Between Deaths in *Mother Jones* and GVA Data Sets, 2013-2022**



| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| ■ MJ | 35 | 18 | 46 | 71 | 117 | 80 | 73 | 9 | 43 | 74 |
| ■ GVA | 289 | 262 | 368 | 451 | 438 | 371 | 465 | 513 | 705 | 674 |

■ MJ  ■ GVA

26.      In addition, the *Mother Jones* data set shows that, between 2013 and 2022, there were 75 incidents resulting in a total of 566 deaths, which produces an annual average of 7.5 mass shooting incidents and 56.6 mass shooting fatalities.  In contrast, the GVA data set, which does not exclude incidents based on arbitrary criteria, shows that, between 2013 and 2022, there were 4,288 incidents resulting in a total of 4,536 deaths, which produces an annual average of 428.8 mass shooting incidents and 453.6 mass shooting fatalities.  To put these differences in perspective, the increase from 75 to 4,288 incidents reflects a 5,617% increase and the increase from 566 deaths to 4,536 deaths reflects a 701% increase.  What these comparisons clearly demonstrate is that the Plaintiffs are correct when they argue that definitions matter, but they are mistaken when they suggest that *Mother Jones* data provide a better, more comprehensive understanding of mass shooting violence than GVA data.

27.      It is the Plaintiffs' view that the problem of mass shootings "must be kept in perspective."[60]  In particular, they insist that "it is unhelpful, to say the least, when the State attempts to bolster its case with extremely misleading statistics generated by a hyper-partisan

---

[60] Plaintiffs' Reply, *supra* note 1, at 47.

activist group."[61]   It appears that what the Plaintiffs are really arguing is that while mass

shootings are a problem, they are not, relatively speaking, as big of a problem as they are often

portrayed to be.   For instance, out of the 10,258 firearm homicides that the FBI reported in 2019,

the Plaintiffs maintain that mass shootings "actually account for only a fraction of 1% of [those]

firearm homicides."[62]   However, in an attempt to support this assertion, the Plaintiffs took

fatality data from my data set on *high-fatality* mass shootings and misrepresented it as deaths

resulting from *all* mass shootings.   Specifically, the Plaintiffs state, "Compare FBI total firearm

homicides in 2019 (10,258) to 2019 mass shooting homicides from Exhibit B to the Klarevas

Declaration (51)."[63]   The Plaintiffs are correct that in 2019 there were four high-fatality mass

shootings that resulted in a combined 51 deaths (which is, on average, nearly 13 deaths per

incident).   In fact, in the five years from 1994 through 1998, there were zero high-fatality mass

shootings in the United States.   Nevertheless, the absence of mass shootings resulting in six or

more victims killed during this five-year period that roughly tracks with the first half of the

Federal Assault Weapons Ban being in effect, should not be interpreted as an absence of all mass

shootings during this timeframe.[64]

        28.     As suggested in the previous paragraph, the problem with the Plaintiffs' argument

is that this determination of less than 1% is dependent on using a subset of mass shooting

fatalities as the numerator (e.g., the 51 deaths resulting from high-fatality mass shootings in 2019

reported in Exhibit B of my Expert Report, which the Plaintiffs use to perform this

calculation).[65]   Nevertheless, the 51 deaths that the Plaintiffs reference from my data set is not a

---

[61] *Ibid*.

[62] *Ibid*.   The language preceding this quote is as follows: "Mass shootings are a problem. No one denies that.   But that problem must be kept in perspective.   They actually account for only a fraction of 1% of firearm homicides."   *Ibid*.

[63] *Ibid*., at 47, note 37.   The Plaintiffs make an identical claim earlier in their Reply as well.   *Ibid*., at 3.

[64] Klarevas, *Rampage Nation*, *supra* note 45, at 241, Figure 7.1 (Attached as **Exhibit D**).

[65] Plaintiffs' Reply, *supra* note 1, at 47, note 37.

representation of all mass shooting deaths in 2019.  As I clearly stated in my Expert Report, the 51 deaths in 2019 are attributable to *high-fatality* mass shootings, which are a subset of mass shooting incidents that result in 6 or more victims being shot to death.[66]

29.     When the numerator is *all* lives lost in shooting incidents resulting in four victims struck by gunfire, the share increases substantially.  For purposes of consistency, using 2019 GVA data shows that 465 victims were killed in mass shooting violence that year.[67]  This, in turn, indicates that approximately 4.5% of all firearm homicide victims in 2019 lost their lives in a mass shooting.  And compared to the 0.5% share of all firearm homicide victims that the Plaintiffs insist on, a share of 4.5% reflects an increase of 800%—a substantial difference.[68]  Moreover, lost in this comparison is the fact that, since September 11, 2001, the deadliest acts of intentional criminal violence in the U.S. have all been mass shootings (Table 1).[69]

**Table 1.  The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

|   | Deaths | Date | Location | Type of Violence |
|---|--------|------|----------|------------------|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

---

[66] Klarevas Expert Report, *supra* note 2, para. 10, note 4.  As noted above, since the publication of my book in 2016, I have consistently defined mass shootings as incidents resulting in four or more people being shot, regardless of whether the gunshot wounds are fatal or non-fatal.  High-fatality mass shootings are a subset of mass shootings that result in six or more victims being shot to death.  Klarevas, *Rampage Nation*, *supra* note 45 (Attached as **Exhibit C**).

[67] Gun Violence Archive, "Mass Shootings in 2019," Gun Violence Archive (website), *available at* https://www.gunviolencearchive.org/reports/mass-shooting?year=2019 (last accessed March 20, 2023).

[68] The percentages are calculated as follows: 51 ÷ 10,258 = 0.5% and 465 ÷ 10,258 = 4.5%.  The percentage increase from 0.5 to 4.5 is 800%.

[69] Klarevas Expert Report, *supra* note 2, para. 11.

30.     The Plaintiffs admonish us to keep the problem of mass shootings in perspective. However, by maintaining that mass shootings account for only a fraction of 1% of all firearm homicides, it appears that the Plaintiffs are implying that mass shootings occur too infrequently and claim too few lives to be a policy priority.  Such a "perspective" evokes the words of Professor Nate Holdren, who reminds us that a "person of conscience" should avoid using "a ruler to argue that what they see before them is in fact a short and not a tall stack of corpses."[70]

---

[70] Nate Holdren, *Pandemic Nihilism, Social Murder, and the Banality of Evil*, Bill of Health (Harvard Law School Blog), September 19, 2022, *available at* https://blog.petrieflom.law.harvard.edu/2022/09/19/pandemic-nihilism-social-murder-and-the-banality-of-evil (last accessed March 15, 2023).

# EXHIBIT A

**The Code of Professional Ethics and Practices**

We—the members of the American Association for Public Opinion Research (AAPOR) and its affiliated chapters—subscribe to the principles expressed in this document, the AAPOR Code of Professional Ethics and Practices ("the Code"). Our goals are to support sound and ethical practice in the conduct of public opinion and survey research and promote the informed and appropriate use of research results.

The Code is based in fundamental ethical principles that apply to the conduct of research regardless of an individual's membership in AAPOR or any other organization. Adherence to the principles and actions set out in the Code is expected of all public opinion and survey researchers.

As AAPOR members, we pledge to maintain the highest standards of scientific competence, integrity, accountability, and transparency in designing, conducting, analyzing, and reporting our work, and in our interactions with participants (sometimes referred to as respondents or subjects), clients, and the users of our research. We pledge to act in accordance with principles of basic human rights in research. We further pledge to reject all tasks or assignments that would require activities inconsistent with the principles of this Code.

The Code sets the standard for the ethical conduct of public opinion and survey research at the time of publication. Recommendations on best practices for research design, conduct, analysis, and reporting are beyond the scope of the Code but may be published separately by AAPOR Executive Council.

**Definitions of Terms Used in the Code**

1. "Public opinion and survey research" refers to the systematic collection and analysis of information from or about individuals, groups, or organizations concerning their behaviors, cognitions, attitudes or other characteristics. It encompasses both quantitative and qualitative research methods, traditional or emerging.
2. "Participants" refers to individuals whose behaviors, cognitions, attitudes, or other characteristics are measured and analyzed. Participants can include individuals representing groups or organizations, and individuals such as minors or those unable to consent directly, for whom a parent, legal guardian, or other proxy makes participation decisions or provides information.
3. "Personally identifiable information" refers to (i) measurements, records, or other data that can be used alone or in combination to distinguish or trace an individual's identity and (ii) any other information that is linkable to an individual (e.g., employment information, medical history, academic records).

**I. Principles of Professional Responsibility in Our Research**

A. Responsibilities to Participants
    1. We will avoid practices or methods that may harm, endanger, humiliate, or unnecessarily mislead participants and potential participants.

1

2. We will not misrepresent the purpose of our research or conduct other activities (such as sales, fundraising, or political campaigning) under the guise of conducting research.
3. We recognize that participation in our research is voluntary except where specified by regulation or law. Participants may freely decide, without coercion, whether to participate in the research, and whether to answer any question or item presented to them.
4. We will make no false or misleading claims as to a study's sponsorship or purpose and will provide truthful answers to participants' questions about the research. If disclosure of certain information about the research could endanger or cause harm to persons, could bias responses, or does not serve research objectives, it is sufficient to indicate, in response to participants' questions about the research, that some information cannot be revealed.
5. We recognize the critical importance of protecting the rights of minors and other vulnerable individuals when obtaining participation decisions and conducting our research.
6. We will act in accordance with laws, regulations, and the rules of data owners (providers of research or administrative records previously collected for other purposes) governing the collection, use, and disclosure of information obtained from or about individuals, groups, or organizations.

B. Responsibilities When Collecting Personally Identifiable Information
1. We recognize the right of participants to be provided with honest and forthright information about how personally identifiable information that we collect from them will be used.
2. We recognize the importance of preventing unintended disclosure of personally identifiable information. We will act in accordance with all relevant best practices, laws, regulations, and data owner rules governing the handling and storage of such information. We will restrict access to identifiers and destroy them as soon as they are no longer required, in accordance with relevant laws, regulations, and data owner rules.
3. We will not disclose any information that could be used, alone or in combination with other reasonably available information, to identify participants with their data, without participant permission.
4. When disclosing personally identifiable data for purposes other than the current research, we will relay to data users any conditions of their use specified in the participant permission we have obtained.
5. We understand that the use of our research results in a legal proceeding does not relieve us of our ethical obligation to protect participant privacy and keep confidential all personally identifiable data, except where participants have permitted disclosure.

C. Responsibilities to Clients or Sponsors
1. When undertaking work for a client, we will hold confidential all proprietary information obtained about the client and about the conduct and findings of the research undertaken for the client, except when the dissemination of the information is expressly authorized by the client.
2. We will inform those (partners, co-investigators, sponsors, and clients) for whom we conduct publicly released research studies about AAPOR's Standards for Disclosure in Section III of the Code, and provide information on what should be disclosed in their releases.

3. We will be mindful of the limitations of our expertise and capacity to conduct various types of research and will accept only those research assignments that we can reasonably expect to accomplish within these limitations.

D. Responsibilities to the Public
1. We will disclose to the public the methods and procedures used to obtain our own publicly disseminated research results in accordance with Section III of the Code.
2. We will correct any errors in our own work that come to our attention which could influence interpretation of the results. We will make good faith efforts to identify and issue corrective statements to all parties who were presented with the factual misrepresentation or distortions. If such factual misrepresentations or distortions were made publicly, we will correct them in a public forum that is as similar as possible to original data dissemination.
3. We will correct factual misrepresentations or distortions of our data or analysis, including those made by our research partners, co-investigators, sponsors, or clients. We will make good faith efforts to identify and issue corrective statements to all parties who were presented with the factual misrepresentations or distortions, and if such factual misrepresentations or distortions were made publicly, we will correct them in a public forum that is as similar as possible. We also recognize that differences of opinion in the interpretation of analysis are not necessarily factual misrepresentations or distortions and will exercise professional judgment in handling disclosure of such differences of opinion.

E. Responsibilities to the Profession
1. We recognize the importance to the science of public opinion and survey research of disseminating as freely as practicable the ideas and findings that emerge from our research.
2. We can point with pride to our membership in AAPOR and adherence to the Code as evidence of our commitment to high standards of ethics in our relations with research participants, our clients or sponsors, the public, and the profession. However, we will not cite our membership in the Association nor adherence to this Code as evidence of professional competence, because the Association does not certify the professional competence of any persons or organizations.

**II. Principles of Professional Practice in the Conduct of Our Work**
A. We will exercise due care in developing research designs, samples, and instruments, and in collecting, processing, and analyzing data, taking all reasonable steps to assure the reliability and validity of results.
1. We will recommend and employ only those tools and methods of analysis that, in our professional judgment, are fit for the purpose of the research questions.
2. We will not knowingly select research tools and methods of analysis that yield misleading conclusions.
3. We will not knowingly make interpretations of research results that are inconsistent with the data available, nor will we tacitly permit such interpretations. We will ensure that any findings we report, either privately or for public release, are a balanced and accurate portrayal of research results.
4. We will not knowingly imply that interpretations are accorded greater confidence than the data warrant. When we generalize from samples to make statements about populations, we will only make claims of precision and applicability to broader populations that are warranted by the sampling frames and other methods employed.

5.  We will not engage in data fabrication or falsification.
6.  We will accurately describe and attribute research from other sources that we cite in our work, including its methodology, content, comparability, and source.

B. We will describe our methods and findings accurately and in appropriate detail in all research reports, adhering to the standards for disclosure specified in Section III of the Code.


**III. Standards for Disclosure**

Broadly defined, research on public opinion can be conducted using a variety of quantitative and qualitative methodologies, depending on the research questions to be addressed and available resources. Accordingly good professional practice imposes the obligation upon all public opinion and survey researchers to disclose sufficient information about how the research was conducted to allow for independent review and verification of research claims, regardless of the methodology used in the research. Full and complete disclosure for items listed in Section A will be made at the time results are released, either publicly or to a research client, as the case may be. As detailed below, the items listed in Section B, if not immediately available, will be released within 30 days of any request for such materials. If the results reported are based on multiple samples or multiple modes, the preceding items (as applicable) will be disclosed for each.

A. Items for Immediate Disclosure

1.  **Data Collection Strategy:** Describe the data collection strategies employed (e.g. surveys, focus groups, content analyses).

2.  **Who Sponsored the Research and Who Conducted It**. Name the sponsor of the research and the party(ies) who conducted it. If the original source of funding is different than the sponsor, this source will also be disclosed.

3.  **Measurement Tools/Instruments.** Measurement tools include questionnaires with survey questions and response options, show cards, vignettes, or scripts used to guide discussions or interviews. The exact wording and presentation of any measurement tool from which results are reported as well as any preceding contextual information that might reasonably be expected to influence responses to the reported results and instructions to respondents or interviewers should be included. Also included are scripts used to guide discussions and semi-structured interviews and any instructions to researchers, interviewers, moderators, and participants in the research. Content analyses and ethnographic research will provide the scheme or guide used to categorize the data; researchers will also disclose if no formal scheme was used.

4.  **Population Under Study.** Survey and public opinion research can be conducted with many different populations including, but not limited to, the general public, voters, people working in particular sectors, blog postings, news broadcasts, an elected official's social media feed. Researchers will be specific about the decision rules used to define the population when describing the study population, including location, age, other social or demographic characteristics (e.g., persons who

4

access the internet), time (e.g., immigrants entering the US between 2015 and 2019). Content analyses will also include the unit of analysis (e.g., news article,  social media post) and the source of the data (e.g., Twitter, Lexis-Nexis).

5. **Method Used to Generate and Recruit the Sample.** The description of the methods of sampling includes the sample design and methods used to contact or recruit research participants or collect units of analysis (content analysis).

   a. Explicitly state whether the sample comes from a frame selected using a probability-based methodology (meaning selecting potential participants with a known non-zero probability from a known frame) or if the sample was selected using non-probability methods (potential participants from opt-in, volunteer, or other sources).

   b. Probability-based sample specification should include a description of the sampling frame(s), list(s), or method(s).

      i. If a frame, list, or panel is used, the description should include the name of the supplier of the sample or list and nature of the list (e.g., registered voters in the state of Texas in 2018, pre-recruited panel or pool).

      ii. If a frame, list, or panel is used, the description should include the coverage of the population, including describing any segment of the target population that is not covered by the design.

   c. For surveys, focus groups, or other forms of interviews, provide a clear indication of the method(s) by which participants were contacted, selected, recruited, intercepted, or otherwise contacted or encountered, along with any eligibility requirements and/or oversampling.

   d. Describe any use of quotas.

   e. Include the geographic location of data collection activities for any in-person research.

   f. For content analysis, detail the criteria or decision rules used to include or exclude elements of content and any approaches used to sample content. If a census of the target population of content was used, that will be explicitly stated.

   g. Provide details of any strategies used to help gain cooperation (e.g., advance contact, letters and scripts, compensation or incentives, refusal conversion contacts) whether for participation in a survey, group, panel, or for participation in a particular research project. Describe any compensation/incentives provided to research subjects and the method of delivery (debit card, gift card, cash).

6. **Method(s) and Mode(s) of Data Collection.** Include a description of all mode(s) used to contact participants or collect data or information (e.g., CATI, CAPI, ACASI, IVR, mail, Web for survey; paper and pencil, audio or video recording for qualitative research, etc.) and the language(s) offered or included. For qualitative research such as in-depth interviews and focus groups, also include length of interviews or the focus group session.

7. **Dates of Data Collection.** Disclose the dates of data collection (e.g., data collection from January 15 through March 10 of 2019). If this is a content analysis, include the dates of the content analyzed (e.g., social media posts between January 1 and 10, 2019).

8. **Sample Sizes (by sampling frame if more than one frame was used) and (if applicable) Discussion of the Precision of the Results**.
    a. Provide sample sizes for each mode of data collection (for surveys include sample sizes for each frame, list, or panel used).
    b. For probability sample surveys, report estimates of sampling error (often described as "the margin of error") and discuss whether or not the reported sampling error or statistical analyses have been adjusted for the design effect due to weighting, clustering, or other factors.
    c. Reports of non-probability sample surveys will only provide measures of precision if they are defined and accompanied by a detailed description of how the underlying model was specified, its assumptions validated, and the measure(s) calculated.
    d. If content was analyzed using human coders, report the number of coders, whether inter-coder reliability estimates were calculated for any variables, and the resulting estimates.

9. **How the Data Were Weighted.** Describe how the weights were calculated, including the variables used and the sources of the weighting parameters.

10. **How the Data Were Processed and Procedures to Ensure Data Quality.** Describe validity checks, where applicable, including but not limited to whether the researcher added attention checks, logic checks, or excluded respondents who straight-lined or completed the survey under a certain time constraint, any screening of content for evidence that it originated from bots or fabricated profiles, re-contacts to confirm that the interview occurred or to verify respondent's identity or both, and measures to prevent respondents from completing the survey more than once. Any data imputation or other data exclusions or replacement will also be discussed. Researchers will provide information about whether any coding was done by software or human coders (or both); if automated coding was done, name the software and specify the parameters or decision rules that were used.

11. **A General Statement Acknowledging Limitations of the Design and Data Collection**. All research has limitations and researchers will include a general statement acknowledging the unmeasured error associated with all forms of public opinion research.

B. Additional Items for Disclosure. After results are reported, we will make the following items available within 30 days of any request for such materials:

1. Procedures for managing the membership, participation, and attrition of the panel, if a pool, panel, or access panel was used. This should be disclosed for both probability and non-probability surveys relying on recruited panels of participants.

2. Methods of interviewer or coder training and details of supervision and monitoring of interviewers or human coders. If machine coding was conducted, include description of the machine learning involved in the coding.

3. Details about screening procedures, including any screening for other surveys or data collection that would have made sample or selected members ineligible for the current data collection (e.g., survey, focus group, interview) will be disclosed (e.g., in the case of online surveys if a router was used).

4. Any relevant stimuli, such as visual or sensory exhibits or show cards. In the case of surveys conducted via self-administered computer-assisted interviewing, providing the relevant screen shot(s) is strongly encouraged, though not required.

5. Summaries of the disposition of study-specific sample records so that response rates for probability samples and participation rates for non-probability samples can be computed. If response or cooperation rates are reported, they will be computed according to AAPOR Standard Definitions. If dispositions cannot be provided, explain the reason(s) why they cannot be disclosed, and this will be mentioned as a limitation of the study.

6. The unweighted sample size(s) on which one or more reported subgroup estimates are based.

7. Specifications adequate for replication of indices or statistical modeling included in research reports.

C. Access to Datasets

Reflecting the fundamental goals of transparency and replicability, AAPOR members share the expectation that access to datasets and related documentation will be provided to allow for independent review and verification of research claims upon request. In order to protect the privacy of individual respondents, such datasets will be de-identified to remove variables that can reasonably be expected to identify a respondent. Datasets may be held without release for a period of up to one year after findings are publicly released to allow full opportunity for primary analysis. Those who commission publicly disseminated research have an obligation to disclose the rationale for why eventual public release or access to the datasets is not possible, if that is the case.

D. AAPOR Standards Complaint

If any of our work becomes the subject of a formal investigation of an alleged violation of this Code, undertaken with the approval of the AAPOR Executive Council, we will provide additional information on the research study in such detail that a fellow researcher would be able to conduct a professional evaluation of the study.

.

# EXHIBIT B

# GUN DIGEST

## 1966-20th Anniversary Edition

The firearms encyclopedia for
Hunters, Target Shooters, Collectors,
Reloaders and Law Enforcers

## 32 Pages of Firearms In Full Color

New Product Evaluations · Field Tests
Technical Data · Ballistics Charts · Handloading
Antique and Custom Guns · Gunsmithing
Aids to Buying, Shooting and Care of Firearms

Original Technical Articles by
America's Leading Experts

Edited by JOHN T. AMBER

The world's most complete Firearms Book with latest prices on all
modern domestic and imported rifles, shotguns, handguns and accessories

FOUR DOLLARS AND NINETY-FIVE CENTS

## U.S. CENTERFIRE RIFLES



# Lever and
# Slide Action Rifles

**A SEARS 54 LEVER ACTION CARBINE**
Solid frame, 6-shot tubular mag. 20″ bbl. Half-cock hammer safety. Walnut straight grip stock with nickelplated checkered steel buttplate; metal tipped fore-end (13⅛″x1⅞″x2⅝″). Bead front sight on ramp; open notch rear windage adj. Tapped for receiver sights and Sears 3x scope and #784 side mount. Wgt. 6½ lbs., 37¾″ over-all. Cal. 30-30 only ......................................................**$73.95**

**B WESTERN FIELD LEVER ACTION CARBINE**
6-shot full length mag., 20″ bbl., solid top receiver, side ejection. Walnut stock and fore-end, fluted comb; recoil pad, 1″ leather sling strap with swivels. Hammer spur for cocking with scope mounted. Open rear, beaded front sight. Wgt. 7½ lbs., 38½″ over-all. Cal. 30-30 only. ......................................................**$75.95**

**C WINCHESTER 88 LEVER ACTION CARBINE**
Hammerless, rotating 3-lug front-locking bolt. Side ejection, cross-bolt safety. Solid frame with one-piece p.g. stock (13¾″x1½″x2⅝″), basket-weave checkered. Short stroke, fast operating lever. 22″ round bbl. Bead front sight on ramp, with cover; folding leaf rear. Tapped for scope mounts; 4-shot detachable magazine, (3-shot in 284). Weight 7¼ lbs., 42½″ over-all. Calibers: 243 Win., 284 Win., (10″ twist), 308 Win., (12″ twist) ......................................**$139.50**
Extra 4-shot magazine............................ 3.90

# Autoloading Rifles

**D COLT AR-15 SPORTER CARBINE**
Semi-automatic, gas-operated carbine, cal. 223. Barrel, bolt, recoil buffer unit and stock assembled as straight-line unit, minimizes barrel jump on recoil. Magazine blocked to 5 rounds. Over-all 39″, bbl. 21″, weight 6¾ lbs. Price includes two magazines, sling, flash suppressor, recoil pad, cleaning assembly and maintenance manual........**$189.50**

**E WINCHESTER 94 LEVER ACTION CARBINE**
Solid frame, 6-shot tubular magazine. 20″ bbl. Walnut straight grip stock and fore-end (12⅞″x1¾″x2½″). Bead front sight on ramp with removable cover; open rear. Tapped for receiver sights. Weight 6½ lbs., 37¾″ over-all. Calibers: 30-30 and 32 Special...........**$84.95**

**WINCHESTER 94 ANTIQUE CARBINE**
Same as M94 except: color case-hardened and scrolled receiver, brass-plated loading gate and saddle ring. 30-30 only.........**$93.95**

**F REMINGTON 760 GAMEMASTER SLIDE ACTION**
Hammerless, solid frame, side ejection rifle. Rotary multiple-lug breechbolt locks into 22″ bbl., fully encloses cartridge. Trigger must be released and action fully closed for each shot. Checkered walnut p.g. stock (13½″x1¾″x2¼″) and fore-end; metal buttplate. Cross-bolt safety. Gold bead front sight on matted ramp, open sporting rear. Tapped for scope mounts. 4-shot detachable magazine. Wgt. 7½″ lbs., 42″ over-all. Cals: 223 (5.56mm), 280, 35 Rem., 270, 308 Win., 30-06. ......................................................**$129.95**
Sling strap and swivels (installed)....................... 9.10
Extra 4-shot clip ....................................... 3.90

**REMINGTON 760 GAMEMASTER CARBINE**
Same as M760 except has 18½″ barrel. Wgt. 7¼ lbs., 38½″ over-all. Cals: 35 Rem., 308 Win., and 30-06...................**$129.95**
Also in Peerless (D) and Premier (F) grades.........**$575 and 1050**

**G UNIVERSAL 440 VULCAN SLIDE ACTION**
Hammerless 5-shot clip magazine carbine. 18¼″ bbl. with 6-groove rifling. Walnut stock and fore-end. Ramp front sight with gold bead; semi-buckhorn rear adj. for w. and e. Cross lock safety in guard. Wgt. 6 lbs., 36⅞″ over-all. Cal. 44 Magnum.....................**$109.95**



THE WORLD'S GREATEST GUN BOOK

$18.95 U.S.

# Gun Digest®

## 1991/45th Annual Edition

■ The *complete* gun book, comprehensive and detailed, for all shooters— hunters, handgunners, collectors, handloaders and law enforcement officers.



SIGARMS

Edited by
Ken Warner

# CENTERFIRE RIFLES—MILITARY STYLE AUTOLOADERS

**Auto-Ordnance Thompson M1**
Similar to the Model 27 A-1 except is in the M-1 configuration with side cocking knob, horizontal forend, smooth unfinned barrel, sling swivels on butt and forend. Matte black finish. Introduced 1985.
**Price:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$712.50**

**AMAC LONG-RANGE RIFLE**
**Caliber:** 50 BMG.
**Barrel:** 33", fully fluted, free-floating.
**Weight:** 30 lbs. **Length:** 55.5" overall.
**Stocks:** Composition. Adjustable drop and comb.
**Sights:** Comes with Leupold Ultra M1 20x scope.
**Features:** Bolt-action long-range rifle. Comes with Automatic Ranging Scope Base. Adjustable trigger. Rifle breaks down for transport, storage. From Iver Johnson.
**Price:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$4,468.00**



Barrett Model 82 A-1

**BARRETT LIGHT-FIFTY MODEL 82 A-1 AUTO**
**Caliber:** 50 BMG, 10-shot detachable box magazine.
**Barrel:** 29".
**Weight:** 28.5 lbs. **Length:** 57" overall.
**Stock:** Composition with Sorbothane recoil pad.
**Sights:** Open, iron and 12x scope.
**Features:** Semi-automatic, recoil operated with recoiling barrel. Three-lug locking bolt; muzzlebrake. Self-leveling bipod. Fires same 50-cal. ammunition as the M2HB machinegun. Introduced 1985. From Barrett Firearms.
**Price:** From . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$4,995.00**

**BARRETT MODEL 90 BOLT-ACTION RIFLE**
**Caliber:** 50 BMG, 5-shot magazine.
**Barrel:** 29".
**Weight:** 22 lbs. **Length:** 35" overall.
**Stock:** Sorbothane recoil pad.
**Sights:** Scope optional.
**Features:** Bolt-action, bullpup design. Disassembles without tools; extendable bipod legs; match-grade barrel; high efficiency muzzlebrake. Introduced 1990. From Barrett Firearms Mfg., Inc.
**Price:** From . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$3,350.00**

**Colt AR-15A2 H-BAR**
Similar to the AR-15A2 Delta H-BAR except has heavy barrel, 800-meter M-16A2 rear sight adjustable for windage and elevation, case deflector for left-hand shooters, target-style nylon sling. Introduced 1986. **Law enforcement sales only.**
**Price:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$899.95**



Colt AR-15A2 Rifle

**Colt AR-15A2 Delta H-BAR Match**
Similar to the AR-15A2 Government Model except has standard stock, heavy barrel, is refined and inspected by the Colt Custom Shop. Comes with a 3-9x rubber armored scope and removable cheekpiece, adjustable scope mount, black leather military-style sling, cleaning kit, and hard carrying case. Pistol grip has Delta medallion. Introduced 1987. **Law enforcement sales only.**
**Price:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$1,424.95**

**COLT AR-15A2 GOVERNMENT MODEL TARGET RIFLE**
**Caliber:** 223 Rem., 5-shot magazine.
**Barrel:** 20".
**Weight:** 7.5 lbs. **Length:** 39" overall.
**Stock:** Composition stock, grip, forend.
**Sights:** Post front, aperture rear adjustable for windage and elevation.
**Features:** Five-round detachable box magazine, standard-weight barrel, flash suppressor, sling swivels. Has forward bolt assist. Military matte black finish. Model introduced 1989. **Law enforcement sales only.**
**Price:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$859.95**



Colt AR-15A2 Carbine

**COLT AR-15A2 GOVERNMENT MODEL CARBINE**
**Caliber:** 223 Rem.
**Barrel:** 16".
**Weight:** 5.8 lbs. **Length:** 35" overall (extended).
**Stock:** Telescoping aluminum.
**Sights:** Post front, adjustable for elevation, flip-type rear for short, long range, windage.
**Features:** 5-round detachable box magazine, flash suppressor, sling swivels. Forward bolt assist included. Introduced 1985. **Law enforcement sales only.**
**Price:** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$879.95**

**CAUTION:** PRICES CHANGE. CHECK AT GUNSHOP.

# EXHIBIT C

LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS



Prometheus Books

59 John Glenn Drive
Amherst, New York  14228

### Table 2.1. The Concept of a Mass Shooting.

**Definition of a Mass Shooting:**

Any violent attack that results in four or more individuals incurring gunshot wounds.

**Categories of Mass Shooting:**

1. *Nonfatal*
   Mass shootings in which no one dies.

2. *Fatal*
   Mass shootings in which at least one victim dies.

3. *High-Fatality / Gun Massacre*
   Mass shootings in which six or more victims die.



It's easy to dismiss conceptual discussions and debates as exercises in Ivory Tower intellectualism. But how we identify and think about mass shootings impacts which attacks capture national attention and which are disregarded—something which has far-reaching policy consequences. Thus, coming up with the best possible definition and conceptualization is a vital first step toward explaining and preventing rampage violence. As the Socratic adage reminds us, "The beginning of wisdom is the definition of terms."[43]

# EXHIBIT D

LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS



Prometheus Books

59 John Glenn Drive
Amherst, New York  14228

Published 2016 by Prometheus Books

*Rampage Nation: Securing America from Mass Shootings.* Copyright © 2016 by Louis Klarevas. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, digital, electronic, mechanical, photocopying, recording, or otherwise, or conveyed via the Internet or a website without prior written permission of the publisher, except in the case of brief quotations embodied in critical articles and reviews.

Cover image © Getty Images
Cover design by Nicole Sommer-Lecht
Cover design © Prometheus Books

Trademarked names appear throughout this book. Prometheus Books recognizes all registered trademarks, trademarks, and service marks mentioned in the text.

Every attempt has been made to trace accurate ownership of copyrighted material in this book. Errors and omissions will be corrected in subsequent editions, provided that notification is sent to the publisher.




Inquiries should be addressed to
Prometheus Books
59 John Glenn Drive
Amherst, New York 14228
VOICE: 716–691–0133
FAX: 716–691–0137
WWW.PROMETHEUSBOOKS.COM

20  19  18  17  16    5  4  3  2  1

Library of Congress Cataloging-in-Publication Data

Names: Klarevas, Louis, author.
Title: Rampage nation : securing America from mass shootings / by Louis Klarevas.
Description: Amherst, New York : Prometheus Books, 2016. |
        Includes bibliographical references and index.
Identifiers: LCCN 2016011430 (print) | LCCN 2016018097 (ebook) |
        ISBN 9781633880665 (hardcover) | ISBN 9781633880672 (ebook)
Subjects: LCSH: Gun control—United States. | Firearms ownership—United
        States. | Violent crimes—United States—Prevention. | Mass murder—United
        States—Prevention.
Classification: LCC HV7436 .K53 2016 (print) | LCC HV7436 (ebook) |
        DDC 364.4/0450973—dc23
LC record available at https://lccn.loc.gov/2016011430

Printed in the United States of America



| | Pre -10 | Pre -9 | Pre -8 | Pre -7 | Pre -6 | Pre -5 | Pre -4 | Pre -3 | Pre -2 | Pre -1 | Ban 1 | Ban 2 | Ban 3 | Ban 4 | Ban 5 | Ban 6 | Ban 7 | Ban 8 | Ban 9 | Ban 10 | Post +1 | Post +2 | Post +3 | Post +4 | Post +5 | Post +6 | Post +7 | Post +8 | Post +9 | Post +10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Incidents | 1 | 1 | 4 | 3 | 0 | 2 | 2 | 1 | 4 | 1 | 0 | 0 | 0 | 0 | 3 | 2 | 2 | 1 | 3 | 1 | 3 | 3 | 5 | 5 | 5 | 3 | 3 | 5 | 3 | 2 |
| ■ Deaths | 6 | 14 | 25 | 20 | 0 | 17 | 16 | 23 | 28 | 6 | 0 | 0 | 0 | 0 | 28 | 14 | 14 | 6 | 18 | 9 | 22 | 20 | 38 | 32 | 45 | 29 | 20 | 39 | 39 | 18 |

Fig. 7.1. Gun Massacres Before, During, and After the Assault Weapons Ban of 1994.
Note: The lines in the graph demarcate the start and end points of the Assault Weapons Ban, which was in effect from September 13, 1994, through September 12, 2004. The data are drawn from Table 3.2.

BREAKING THE TRINITY    241