1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

NATIONAL ASSOCIATION FOR GUN        )
4   RIGHTS, and JOSEPH R. CAPEN,         )
                        Plaintiffs,     )
5                                        )
                                         )  No. 22-11431-FDS
6   vs.                                  )
                                         )
7                                        )
MAURA HEALEY, in Her Official       )
8   Capacity As Attorney General of     )
the Commonwealth Of                 )
9   Massachusetts,                       )
                        Defendant       )
10

11

BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR
12

13
                        MOTION HEARING VIA ZOOM
14

15

16

                John Joseph Moakley United States Courthouse
17                       Courtroom No. 10
                        1 Courthouse Way
18                       Boston, MA 02210

19

20                        May 30, 2023
                        11:00 a.m.
21

22

23                       Valerie A. O'Hara
                        Official Court Reporter
24       John Joseph Moakley United States Courthouse
                        1 Courthouse Way
25                       Boston, MA 02210
                E-mail: vaohara@gmail.com

1

2     APPEARANCES:

3     <u>For the Plaintiffs:</u>

4          Arrington Law Firm, by BARRY K. ARRINGTON, ESQ.,
      4195 Wadsworth Boulevard, Wheat Ridge, Colorado 80033;

5          Law Office of Thomas M. Harvey, by THOMAS M. HARVEY, ESQ.,
      22 Mill Street, Suite 408
6     Arlington, Massachusetts 02476-4744;

7     <u>For the Defendant:</u>

8          Office of the Attorney General, by JULIE E. GREEN,
      ATTORNEY, One Ashburton Place, Boston, Massachusetts 02108
9
           Massachusetts Attorney General's Office, by GRACE GOHLKE,
10    ATTORNEY, McCormack Building, One Ashburton Place,
      Boston, Massachusetts 02108.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>PROCEEDINGS</u>

2           THE CLERK:  Court is now in session in the matter of

3    Capen, et al. vs. Healey, et al, Civil Action Number 22-11431.

4           Participants are reminded that photographing,

5    recording or rebroadcasting of this hearing is prohibited and

6    may result in sanctions.

7           Would counsel please identify themselves for the

8    record, starting with the plaintiff.

9           MR. HARVEY:  Thomas Harvey for the plaintiffs.

11:00AM 10           THE COURT:  Good morning.

11           MR. HARVEY:  Good morning, your Honor.  I think

12    Barry Arrington should be on also for the plaintiffs.

13           THE CLERK:  Attorney Arrington, I think you're on

14    moot.

15           MR. ARRINGTON:  I was on moot.  I'm sorry.  This is

16    Barry Arrington appearing for the plaintiffs.

17           THE COURT:  Good morning.

18           MR. ARRINGTON:  Good morning.

19           THE COURT:  And for the Commonwealth?

11:01AM 20           MS. GREEN:  Good morning, your Honor.  Assistant

21    Attorney General Julia Green for the Commonwealth, and with me

22    is Grace Gohlke but off camera.

23           THE COURT:  Good morning.  This is a hearing on

24    plaintiff's motion for a preliminary injunction.  As you know,

25    it is something of an unusual preliminary injunction motion in

1   the sense that the case is not three days old and there has not

2   been extensive briefing, or there has been extensive briefing,

3   I should say, but I do want to keep this argument within

4   reasonable time boundaries.  This may or may not be the main

5   event, so why don't we see if we can't keep the argument on

6   both sides to let's say a half hour or 45 minutes, and with

7   that, who is taking the lead for the plaintiffs?

8           MR. ARRINGTON:  Your Honor, this is Barry Arrington.

9   I'll be arguing for the plaintiffs today.

11:02AM 10          THE COURT:  All right, go ahead.

11           MR. ARRINGTON:  So I'll start from the beginning,

12   which is we're dealing with the Second Amendment here, which we

13   know from *McDonald* is a fundamental right and incorporated as

14   applicable to the states under the Fourteenth Amendment as one

15   of the core liberties necessary for our ordered system of

16   liberty, and I think that one of the undercurrents of *Bruen*

17   from last summer was that the inferior courts had not been

18   recognizing that sufficiently, for example, there was in the

19   *Duncan* case out of the Ninth Circuit, the dissent there went

11:03AM 20   back and looked at all of the Ninth Circuit cases, and the

21   government was 53 and 0 in the Ninth Circuit.

22           And so what other incorporated right does the

23   government always win?  And, of course, the answer is none, and

24   I think that one of the things that Justice Thomas writing for

25   the court was emphatic about is that the way that the inferior

1   courts have been treating the rights since McDonald has not

2   been consonant with the court's intent in *Heller* and *McDonald*,

3   and that was one of the things that *Bruen* was clarifying.

4          And so as we know, *Bruen* did not establish a new test

5   for the Second Amendment, it simply said this is the test that

6   we announced in *Heller* that you guys have been kind of

7   ignoring, and now we want you to really start applying it, and

8   it abrogated a number of cases, including the cases in the

9   First Circuit that had not followed the *Heller* precedent

11:04AM  10   faithfully and reiterated the *Heller* test, which is a two-step

11   test, text in history and tradition.

12          Under the text prong, all that is necessary is for the

13   plaintiffs to show that their conduct is protected by the text

14   of the Second Amendment, and in the context of a bearable arm,

15   that's an extraordinarily light burden, because all they have

16   to show, look, we want to possess these bearable arms, this law

17   prohibits us from possessing these bearable arms, therefore,

18   text is met.

19          The *Bruen* court said that it is presumptively

11:05AM  20   protected by the Constitution, the right to hold, possess in

21   the bearable arm is presumptively protected by the

22   Constitution.

23          Another way of saying that is that the states under a

24   faithful application of *Bruen*, the state law at issue here is

25   presumptively under the Constitution.  If the Constitution

1    presumptively protects it, the arms that it has banned, then it

2    is presumptively in the Constitution.

3         That's not, of course, where the analysis ends.  The

4    next step is if the state -- the plaintiffs have met their

5    burden, as they have in this case, the state may rebut that

6    presumption of unconstitutionality by showing that its law is

7    consistent with the nation's history and tradition of firearm

8    regulation.  And in the way that it does that, it goes back to

9    the founding era and shows analogous statutes from the founding

11:06AM 10    era.

11         In this case, that's impossible, and why do we know

12    that that's impossible?  Because in *Heller*, the courts have

13    said that absolute bans of commonly-owned arms, there's nothing

14    in the founding era remotely, where the court used "remotely"

15    analogous to that, and, therefore, the state is not able to

16    bear its burden under the history and tradition test.  It's

17    just that simple.

18         In the materials that we provided, the plaintiffs have

19    shown the court that these arms are owned by literally millions

11:06AM 20    of law-abiding citizens for lawful purposes, and I think it's

21    significant that in the *Friedman* case, which I cited in the

22    briefs, Justice Thomas, the author of *Bruen*, and Justice

23    Scalia, the author of *Heller*, talk about what that means, and

24    the course of state is right, the *Friedman* dissent is from

25    denial of certiorari is not binding precedent, but it's

1    certainly, the author of *Bruen* and the author of *Heller* are

2    speaking about what *Heller* meant.  It's sufficient for the

3    court to set up a tight notice about what Justice Scalia and

4    Justice Thomas were saying, and Justice Thomas said something

5    very, very simple.  He said it's what?  These type of rifles,

6    AR-15-type rifles are owned by millions of law-abiding

7    Americans for lawful purposes, and here's the main thing that

8    he said, "That is all that is necessary for the Second

9    Amendment to protect them under our precedence."

11:07AM 10          THE COURT:  Let me stop you there.  So, as I

11    understand it, the issue is or one of the issues is are these

12    weapons in common use for lawful purposes?  That test requires

13    or for something to not be covered by that, it has to be

14    dangerous and unusual, as I understand it.  It's conjunctive.

15    They have to prove it's both dangerous and unusual, and I think

16    we're talking about here what is unusual.

17          But it seems odd to me that this standard is driven by

18    the market.  In other words, that the constitutionality depends

19    on cash register receipts.  That's bizarre to me, particularly

11:08AM 20    since we're now looking at what's happening in 2023 as opposed

21    to what happened in 1791 or 1868, so, you know, the more of a

22    particular type of weapon that someone buys, the more

23    constitutional it becomes.

24          I just -- I don't think the Supreme Court said that,

25    and, I mean, if that winds up being the standard, then we live

1    with that, but it seems to me bizarre to say that all you need

2    to show is that lots of people have these things.  I mean, you

3    know, lots of people have fentanyl, millions of people

4    probably, you know, have illegal drugs.  That's not the

5    standard for whether or not you can ban it.

6            MR. ARRINGTON:  It's also not protected by the Second

7    Amendment, your Honor.

8            THE COURT:  Well, all right, let's talk about the word

9    is "unusual," I think, right?  What does it mean to be unusual?

11:09AM 10   Would you agree that the government can regulate sawed-off

11   shotguns?

12           MR. ARRINGTON:  Certainly, *Heller* said as much.

13           THE COURT:  Okay.  And why?

14           MR. ARRINGTON:  And it said because -- it

15   specifically -- they said that because sawed-off shotguns fall

16   within the category of dangerous and unusual weapons.

17           THE COURT:  But why?  That's circular, but the

18   question is why.  What is it about sawed-off shotguns that

19   makes them usual.

11:10AM 20           MR. ARRINGTON:  They're not commonly possessed by

21   common citizens for lawful purposes.  That's what *Heller* says.

22           THE COURT:  It's as simple as that, if someone designs

23   a surface to air missile that like an iPhone is cheap and

24   commonly available and lots of people say, hey, that's cool, I

25   want to buy one, it now becomes constitutional because a lot of

1  people have bought it.  In ten years now if the technology

2  changes, things become constitutional that are not now

3  constitutional?

4        MR. ARRINGTON:  So I will say two things:  One, I

5  don't have anything to say about science fiction scenarios in

6  the distant future, but --

7        THE COURT:  Well, in 1791, this would have been

8  science fiction, the idea you have an automatic weapon that is

9  readily purchasable, right, I think people would have thought

11:10AM 10  that was science fiction in 1791.

11        MR. ARRINGTON:  First of all, we're not talking about

12  automatic weapons, we're talking about semiautomatic weapons.

13        THE COURT:  Okay, same.

14        MR. ARRINGTON:  Huh?

15        THE COURT:  Same, a semiautomatic weapon to the

16  founding fathers who were, you know, familiar with muskets and

17  pistols and fouling guns, a semiautomatic pistol would have

18  been science fiction to them.

19        MR. ARRINGTON:  So both *Heller* and *Bruen* talked about

11:11AM 20  that, the fact that they were science fiction to the founders

21  means -- I mean, the Internet would have been science fiction

22  to the founders.  Does that mean that you don't have a right to

23  free speech on the Internet?  Telephones, TVs, radios, those

24  all would have been science fiction to the founders.

25        *Bruen*, *Caetano* and *Heller* all specifically addressed

1    the fact it would have been science fiction to the founders,

2    and they said just as those things, which were not imaginable

3    to the founders but protected by the First Amendment, weapons

4    that were not imaginable to the founders are protected by the

5    Second Amendment.

6         Now, the issue with respect to semiautomatic weapons,

7    I hope the court would agree that semiautomatic handguns are

8    protected by the Second Amendment.  That's what *Heller* held,

9    right?  And those same semiautomatic handguns, the argument the

11:12AM 10   court just made would have been addressed to those.

11   Semiautomatic handguns would have been science fiction to the

12   founders.  The court specifically held in *Heller* that handguns,

13   which includes semiautomatic handguns, are protected by the

14   First Amendment or Second Amendment.

15        And, by the way, the context in which the court held

16   that these semiautomatic handguns are protected by the Second

17   Amendment is very, very important because what had happened

18   mere months prior to the time *Heller* was argued, at that time

19   the largest mass shooting in the history of the nation,

11:12AM 20   Virginia Tech mass shooting had occurred, and that attack

21   occurred with semiautomatic handguns, and D.C., as I pointed

22   out in my brief, pointed that out to the court, said, look,

23   these semiautomatic handguns that are issued in this case were

24   just used in a mass shooting, and the court said, yeah, we

25   understand that that's a problem, but you can't ban them.

1          THE COURT:  Let me back up.  The question in my mind

2     or one of the questions is what does it mean to be dangerous

3     and unusual?  And I'll come back to dangerous in a moment.

4     Unusual.  You say it's market driven, if millions of people

5     have them, boom, done.

6          MR. ARRINGTON:  I don't say that.  This is what *Heller*

7     said, that the weapons that are commonly possessed by

8     law-abiding citizens are protected by the Second Amendment.

9     It's not my view, it's what *Heller* said.

11:13AM 10          THE COURT:  Commonly possessed or commonly possessed

11     for legitimate purposes, like defense of hearth and home,

12     hunting or shooting.

13          MR. ARRINGTON:  For lawful purposes is what it said,

14     commonly possessed for lawful purposes.

15          THE COURT:  So, again, it's just simply commonly

16     possessed for all practical purposes is the end of the story,

17     either it's common or it's not?  Sawed-off shotguns --

18          MR. ARRINGTON:  Justice Thomas and Justice Scalia

19     specifically said in their *Friedman* dissent, the fact they're

11:14AM 20     owned by millions of people, that's all that's necessary.  We

21     don't need to guess about what Justice Thomas and Justice

22     Scalia meant by common.

23          THE COURT:  If they're possessed by 10,000 people, is

24     that enough?  100,000?  Is it a numerical standard?

25          MR. ARRINGTON:  Well, if we're talking about 10,000 or

1    100,000 instead of tens of millions or over 150 million, we

2    might want to indulge in those sorts of hypotheticals, but

3    whatever commonly possessed meant, it certainly applies in this

4    case where tens of millions of people own these weapons.

5           THE COURT:  All right.  Let me turn to the dangerous

6    part.  All weapons are dangerous, right?  A BB gun is dangerous

7    in context, right, by design and intent of purpose?  Firearms

8    are dangerous, that's the point of them.  Does that word mean

9    anything?  Does it mean things that are unreasonably or

11:15AM 10    unusually dangerous or present an unusual hazard to, you know,

11    bystanders or others when used for lawful purposes, does that

12    have any meaning?

13           MR. ARRINGTON:  So I will go to Justice Alito's

14    concurrence in *Caetano*, who said if *Heller* tells us anything,

15    it's that a weapon may not be banned merely because it's

16    dangerous.  As you're saying, all weapons are dangerous, and if

17    the court --

18           THE COURT:  The standard is dangerous and unusual,

19    right, so it can't be that every weapon is dangerous, or that

11:15AM 20    standard has no meaning, right?

21           MR. ARRINGTON:  That's why Justice Alito said it was a

22    conjunctive.  If you say dangerous weapons are not protected,

23    that means no weapons are protected.

24           THE COURT:  Right, and if you just say unusual --

25           MR. ARRINGTON:  You also have to prove they're

1    unusual.

2           THE COURT:  But you have to prove they're dangerous

3    and you have to prove they are unusual, and since all weapons

4    are dangerous, it can't be a tautology.  That word has to mean

5    something.  It has to be a dangerous weapon.  A kitchen knife

6    can be dangerous, so it has to mean something, right?

7    Unusually or unreasonable dangerous in the context of lawful

8    purposes, how about that?

9           MR. ARRINGTON:  Well, the sentence conjunctive, I

11:16AM 10   mean, plaintiffs will stipulate that all firearms are

11   dangerous, and so that part of it, the conjunctive part of it

12   is met.  We stipulate that all firearms are dangerous.  We

13   don't stipulate that these firearms are unusual because they're

14   plainly not.

15          THE COURT:  So the first part of the standard

16   effectively means nothing because all firearms fall within it?

17          MR. ARRINGTON:  The first part of the standard

18   is -- so what you have to realize about the dangerous and

19   unusual standard is that it said -- it didn't necessarily talk

11:17AM 20   about a category of weapons, what it said is that the *Heller*'s

21   common use test in which weapons that are in common use at the

22   time is supported by the historical tradition of banning

23   dangerous and unusual arms, and so under *Heller*, it is

24   impossible to de-link the dangerous and unusual arms test from

25   the *Miller* common use test because that's what *Heller* said.

1    *Heller* said that the tradition of the Second Amendment

2    protecting weapons that are "in common use at the time," quote

3    unquote, is supported by the historical tradition of banning

4    dangerous and unusual arms.

5    *Heller* was talking about those at the same time.  It

6    was not limiting the common use at the time's formulation, it

7    was explaining why it was historically justified.  Common use

8    at the time is the *Heller* test.

9    THE COURT:  So let me try it this way.  So one way of

11:18AM 10   approaching, you know, thinking about this is there are

11   firearms that people can possess for lawful purposes, most

12   prominently, hunting, shooting, and defense of hearth and home

13   or personal defense on the sidewalk, I guess we can include

14   that as well, and I think I hear you saying that at least in

15   this context, if millions of people own a particular weapon,

16   that is enough to say that they are not -- that that weapon is

17   not dangerous and unusual whether or not it is commonly used

18   for hunting, shooting, defense of hearth and home or personal

19   defense, it doesn't have to be connected to any of those lawful

11:19AM 20   purposes, just because people think it's cool, or, you know,

21   whatever, they like it, that's good enough, as long as --

22   MR. ARRINGTON:  So it doesn't matter what I say.

23   THE COURT:  Okay, well, tell me what is the standard.

24   MR. ARRINGTON:  My opinion is irrelevant.  What

25   Justice Thomas and what Justice Scalia said is the fact that

1   millions of people own AR-15 type weapons for a variety of

2   lawful purposes is sufficient for them to be protected.

3           THE COURT:  But, again, even assuming that that's the

4   opinion of the court, this is tautological, you just keep

5   saying since they own them for lawful purposes, that's enough.

6   Okay.  Well, what are the lawful purposes?  I've identified

7   four:  Hunting, shooting, defense of hearth and home, personal

8   defense.  Does it have to be tied in any way to those things?

9   Are they reasonable to be used for those purposes?  There is no

11:19AM 10   limitation as long as enough people own them, it doesn't matter

11   whether it's cumbersome, you can't carry it down the street,

12   you know, no matter how heavy or large the weapon is, it

13   doesn't matter as long as enough people own them, that's kind

14   of what you're saying.

15           MR. ARRINGTON:  So what you're saying is should we

16   make empirical judgments about whether or not these things are

17   suitable for lawful purposes, and that's specifically what

18   *Bruen* said this court is not allowed to do.

19           The state urges the court to say, to come in and say

11:20AM 20   these weapons are not suitable, we, the state, have come in and

21   brought in a bunch of experts, and in their judgment it is an

22   empirical fact that these weapons are not suitable for

23   self-defense.

24           THE COURT:  Then why can't we buy surface to air

25   missiles?  Why can that be regulated?

1          MR. ARRINGTON:  Because surface to air missiles are

2    not -- are not commonly held by lawful, law-abiding citizens

3    for lawful purposes.

4          THE COURT:  Because they're expensive, right?  Or

5    whatever, they're hard to get.  Again, you keep saying as long

6    as enough people own them, the standard is satisfied.  I'm

7    saying is there any limitation to that?  Sawed-off shotguns,

8    not enough people own them, you say, bazookas, not enough

9    people own them.

11:21AM 10          MR. ARRINGTON:  That's what *Heller* says.  *Heller* says

11    sawed-off shotgun, you can ban them because they fit within the

12    category of dangerous and unusual weapons.

13          THE COURT:  And that's tautological, it is what it is,

14    that's what you're saying, there's no objective standard there

15    other than cash register receipts?  There are lots of regular

16    shotguns, fewer sawed-off shotguns, ergo, sawed-off shotguns

17    are not usual, they are unusual, and, therefore, they can be

18    regulated, and there's no objective reasonable principle there

19    of any kind?

11:21AM 20          MR. ARRINGTON:  Justice Thomas and Justice Scalia, and

21    Justice Alito, let's bring Justice Alito into the mix with the

22    stun guns.  He said that the fact that they're commonly used

23    for lawful purposes is sufficient for them, and it was a

24    numbers game.  He didn't ask for an empirical study about how

25    many times they were used in a particular self-defense

1    instance.  *Heller* didn't ask for an empirical study about how

2    many times they were used in self-defense situations.  *Bruen*

3    didn't say, well, you guys never ran out and did a study about

4    whether these were actually used.  None of that is necessary

5    because, again, under Justice Thomas, Justice Alito,

6    Justice Scalia have told us that the issue is whether they are

7    commonly possessed for lawful purposes, and commonly possessed

8    means just that, there's a lot of them.

9         THE COURT:  And so it doesn't matter whether the

11:22AM 10   magazine can fire 10 bullets or a hundred or a thousand, it

11   doesn't matter whether or not that's reasonably necessary for

12   any lawful purpose?

13        MR. ARRINGTON:  Reasonably necessary.  What is that,

14   your Honor?  That's an empirical judgment, right?

15        THE COURT:  Sure.

16        MR. ARRINGTON:  *Bruen* specifically said you can't do.

17   *Bruen* said that the court is out of the business of making

18   difficult empirical judgments for which it is not qualified.

19   *Bruen* said we, as judges, don't know what the answer to these

11:23AM 20   empirical questions, and we're not going to answer them, all

21   that is necessary for a weapon to be protected by the Second

22   Amendment, it is commonly possessed for lawful purposes.

23        THE COURT:  All right.  Let's talk about the

24   consistent with historical tradition of firearm regulation

25   analysis.

1          MR. ARRINGTON:  Okay.  So we've just talked about it.

2     The historical tradition, according to *Bruen*, is that there is

3     nothing in the historical tradition remotely as burdensome as

4     an absolute ban on a commonly-used firearm, and so the state

5     would have you say that it's the plaintiff's burden to show

6     that these are commonly used.  It is not.  Plaintiff's burden

7     is only to show that they're bearable arms, which they have,

8     therefore, they're presumptively protected by the Second

9     Amendment, and the law is presumptively unconstitutional.

11:24AM 10          Now, the state could come in and say, well, they are

11     even though we've rebutted the presumption of

12     unconstitutionality by showing they are analogous to founding

13     era regulations.

14          Well, *Heller* has already foreclosed that argument and

15     *Bruen* has already foreclosed that argument in the context of

16     absolute bans.

17          Now, this is something that the Seventh Circuit made

18     explicit in its *Ezell* decision, and I'll just read briefly from

19     that.  "The city's firearm ban is not merely regulatory.  It

11:25AM 20     prohibits the law-abiding citizens of Chicago from engaging in

21     target practice in a controlled environment at a firing range.

22     This is a serious encroachment on the right to maintain

23     proficiency in firing use, an important corollary to the

24     meaningful exercise of the right to possess firearms for

25     self-defense."

1        In other words, and that it goes on to say that *Heller*

2   and *McDonald* differentiated between regulatory measures and

3   absolute bans, which are categorically unconstitutional, and we

4   would just ask the court to follow in this respect the

5   Supreme Court Judicial Court in Massachusetts.  In

6   Massachusetts, it is already illegal, it is already

7   categorically illegal to ban commonly-held weapons under the

8   *Ramirez* case, which was in response to the *Caetano* case.  The

9   court looked at these stun guns, the commonly used for lawful

11:26AM 10   purposes, and held that the state's absolute ban on those was

11   unconstitutional.

12        If the stun gun, which is owned in the hundreds of

13   thousands, meet that test, then a fortiori, these semiautomatic

14   rifles and magazines meet that test, which were owned in the

15   tens of millions, if not the hundreds of millions.

16        Now, the state comes in and said, well, we've shown a

17   bunch of regulations from its founding era.  That should be

18   enough.  *Heller* has specifically said we looked at those

19   regulations.  That's not enough.  Regulations are different

11:26AM 20   from bans.

21        So to go on with some of the things that the state

22   says -- your Honor, I'm just curious about how much time I have

23   left?

24        THE COURT:  I'll give you a few more minutes here.

25        MR. ARRINGTON:  Okay.  Before I go on and use those

1   three minutes in things that the court isn't interested in, is

2   there any other particular questions that the court has?

3        THE COURT:  One question I have is does

4   it -- obviously, whether we're talking about a stun gun or a

5   semiautomatic rifle or anything, these weapons did not exist in

6   1791.  First off, is 1791 the relevant date as opposed to 1868?

7        MR. ARRINGTON:  That's what *Heller* -- so, in *Bruen*,

8   the court noted that founding era is the relevant time period.

9   It also noted that there's some sort of academic debate about

11:28AM 10   whether, you know, post-reconstruction era regulations are also

11   relevant.

12        The problem is it doesn't matter, just as in *Bruen*,

13   there were no absolute bans.  Absolute bans on firearms is a

14   product of the 20th Century, and any absolute ban is

15   inconsistent with founding era precedent whether you measure

16   that at 1791 or 1868.

17        There were no absolute bans on commonly possessed arms

18   in either of those eras, so it doesn't matter, but which is why

19   the plaintiffs urge the court to follow *Bruen's* lead, which

11:28AM 20   said that if a 20th Century precedent conflicts with prior

21   precedent from the founding era measured in either the 18th or

22   19th century, it's ignored.

23        The state's entire case depends upon ignoring *Bruen* in

24   that respect and relying upon these 20th Century analogs, and

25   so the answer is the founding era means 1791, but even if it

1    means also 1868, it doesn't matter in this case because there

2    were no bans.

3            THE COURT:  So I think I hear you saying --

4            MR. ARRINGTON:  By the way, the state admits this, the

5    state does not deny that it cannot identify any bans.

6            THE COURT:  Any ban on any kind of weapon as of 1791,

7    nothing whatsoever, no regulation at all?

8            MR. ARRINGTON:  I would just point the court to

9    page 15 of the state's sur-reply.  In fact, the evidence in the

11:30AM 10    record explains why 18th century legislature did not employ

11    weapon-specific bans.  The state admits in the founding era,

12    they did not employ weapon-specific bans.

13            And you know what, your Honor, as we point out, far

14    from banning commonly-used weapons, in the founding era, men

15    were required to use commonly owned, commonly used weapons.

16    All the militia acts were common throughout the colonies, and

17    the area states required all abled-body men to own commonly

18    possessed weapons.

19            THE COURT:  Right.  But, obviously, we're talking

11:30AM 20    about the development of technology, and I'm just curious about

21    going forward.  Again, if someone invents a Star Wars-type

22    laser gun that unlike a stun gun is capable of tremendous

23    damage, let's say, to bystanders, property, everything else, as

24    long as enough people like them and acquire them, since,

25    obviously, there was no regulation of any kind in 1791

1    concerning laser-type weapons, we're stuck, right, and no one

2    can do anything to regulate them?

3              MR. ARRINGTON:  So --

4              THE COURT:  That's basically what you're saying, it

5    doesn't matter where technology develops, as long as it becomes

6    commonly used, we're stuck, the Constitution is in effect a

7    suicide pact, it doesn't matter what kind of weapon technology

8    becomes developed in the future, there is nothing anyone can do

9    about it because there was no analogous regulation in 1791.

11:31AM 10              MR. ARRINGTON:  I decline to speculate, your Honor,

11    about the future because I don't think constitutional law is

12    based upon, you know, musings, contemplations, and

13    hypotheticals about science fiction.

14              What I will say, it's based upon the facts on the

15    ground that these weapons are owned by tens of millions of

16    people for lawful purposes, and, therefore --

17              THE COURT:  You know, on that fact, on that fact

18    alone, the constitutionality of this ban depends, basically as

19    long as tens of millions of people own them, you keep saying

11:32AM 20    it, you keep coming back to the same point, that is enough,

21    done, over, doesn't matter the historical tradition, dangerous,

22    unusual, it doesn't matter, that one fact governs the

23    constitutionality of this statute that lots of people own these

24    things.

25              MR. ARRINGTON:  That's what Justice Scalia and

1    Justice Thomas said in so many words.

2    THE COURT:  Okay, let me hear from Ms. Green and then

3    I'll give you a chance to respond.

4    MS. GREEN:  Good morning, your Honor.  I'd like to

5    spend some time on the common use test that you've been asking

6    about, but let me just start by giving you my road map.

7    This case is about the right of the people acting

8    through the democratic process to protect their communities

9    against certain specific combat-style weapons that are

11:33AM 10    exceptionally dangerous, that are increasingly used for mass

11    murder but rarely, if ever, used for self-defense.

12    Six out of the seven courts to have faced preliminary

13    injunction motions in challenges like this one have denied the

14    motion, and this court should do the same for three reasons:

15    First, the plaintiffs have failed to carry their

16    burden at Step 1, the text of the Constitution, because they

17    have not established that assault weapons or large capacity

18    magazines are in common use for self-defense.  And, in fact,

19    large capacity magazines, LCMs, are not even arms at all within

11:33AM 20    the meaning of the Second Amendment.

21    Second, at Step 2 of the *Bruen's* test, even if these

22    weapons are covered by the Second Amendment, the act stands in

23    a long tradition of restricting certain specific weapons that

24    are exceptionally dangerous in relation to their self-defensive

25    use.

1        And, finally, the preliminary injunction should be

2    denied because the plaintiffs have failed to show any

3    irreparable harm.

4        So, with that, let me turn to the common use issue

5    that you were discussing with Mr. Arrington.  The plaintiffs

6    are asserting in this case that common use boils down to simple

7    numbers.  That is not consistent with the Supreme Court's --

8    what the Supreme Court has said about Step 1, and it's not

9    consistent with the way the First Circuit has examined the

11:34AM 10    constitutional text.

11        I think what step 1 looks at is not simple numbers, it

12    asks whether the arm in question is a bearable arm in common

13    use for self-defense, and self-defense is a critical component

14    of the Step 1 test.

15        The best way of illustrating this is to look at the

16    Supreme Court's own application of Step 1 in *Bruen*.  This is

17    part 3A of the *Bruen* decision at pages 2134 to 35.  If you look

18    at what the Supreme Court there says about weapons, about

19    whether the Second Amendment covers the weapons in question,

11:35AM 20    what it says is, "Nor does any party dispute that handguns are

21    weapons in common use today for self-defense."

22        If you look at the entirety of the discussion in

23    Section 3A, which is all about whether the conduct in question

24    is within the Second Amendment, it is all about use in

25    self-defense.

1    The word "self-defense" appears six times in six

2    paragraphs in that discussion.  More broadly, the Supreme Court

3    was very clear in *Bruen*, and it was clear in *Heller* as well

4    that self-defense is the central component of the Second

5    Amendment, right, the word "self-defense" appears 49 times in

6    *Bruen* and 32 times in *Heller*, and I think, you know, in a sort

7    of more fundamental sense, the Supreme Court has told us in

8    *Heller* that the Second Amendment codified a pre-existing right,

9    and that pre-existing right was a right to self-defense.  It is

11:36AM 10    not a right to sporting or hunting.  Self-defense is at the

11    core at what the Second Amendment was codifying, so that's my

12    answer to -- oh, sorry, let me move to Mr. Arrington's point

13    about the simple numbers calculation.

14    The First Circuit made an observation about that issue

15    in footnote 5 in the *Worman* case, in which it commented on how

16    that test is essentially illogical because it would allow the

17    Constitution's scope to be determined by basically market

18    practices, so manufacturers could flood the market with a

19    particular new weapon, you know, your example of

11:37AM 20    shoulder-mounted missile launchers or some yet to be invented,

21    like a handheld laser.

22    Manufacturers could flood the market before

23    legislatures had time to react, and if the plaintiffs were

24    correct, that weapon would then become constitutionally immuned

25    to any prohibition, like the act.  That can't be what the

1    framers had in mind with the Second Amendment, and that's what

2    the First Circuit said in *Worman* at footnote 5.

3         The plaintiff's position on this issue really is

4    relying entirely on concurrences and dissents, a dissent by two

5    justices from a denial of certiorari, which has never garnered

6    a vote of the full court.  The sheer numbers approach has never

7    been adopted by the Supreme Court, and nor do I expect that it

8    ever will.

9         So if you don't have any questions about the test, let

11:38AM 10  me just go quickly.

11        THE COURT:  One thing that I can't say I think is

12   particularly workable is this notation of, you know, it's a

13   combat-style weapon or designed for military purposes.  It

14   seems to me that's not a particularly workable standard,

15   doesn't seem to be the standard, and one of the issues that I

16   have with that is probably at heart, probably every firearm was

17   designed at some level for military purposes.  Go back to

18   Colt 45 revolvers or whatever, I mean, it just doesn't get us

19   very far.

11:38AM 20        It's easy to say that a surface to air missile was

21   designed for military purposes or an atomic bomb, but for

22   ordinary handguns, rifles, shotguns, you know, there's no clear

23   dividing line there, what is military, what is not.  These

24   things developed, the technology develops, and it strikes me

25   that whatever the standard is, that that is not really a

1    helpful metric maybe is the way I'm thinking about it, but...

2         MS. GREEN:  I think I understand what you're asking,

3    and we are not relying on its military pedigree, we're really

4    focused on its utility for self-defense, and there we're

5    relying on the evidence that we've put into the record, which

6    is largely unrebutted that neither assault weapons or LCMs are

7    suitable for self-defense nor are they actually used for

8    self-defense, and that's really what I wanted to walk through

9    now.

11:39AM 10         THE COURT:  All right.  So let me hear you.

11         MS. GREEN:  Okay.  So I particularly -- I think one of

12    the salient characteristics is the nature of the wounds they

13    create.  This is a feature specific to these weapons.  It has

14    to do with the high velocity at which bullets leave the muzzle

15    and the nature of the .223 calibre rounds that are fired.

16         These weapons cause catastrophic wounds that don't

17    leave clean bullet holes, they destroy entire organs, and in

18    particular we've put in statements from pediatricians saying

19    that the types of wounds they create are practically

11:40AM 20    unsurvivable for children.  That is not a self-defensive

21    utility.  It's designed to kill enemy soldiers.

22         Similarly, the high velocity is designed to kill a lot

23    of people at great distances, but it's not a self-defensive

24    application.  You're not defending yourselves from people of

25    hundreds of yards away.

1        The high velocity has particularly lethal

2   characteristics that are -- that render it unsuitable for

3   self-defense, which are that because -- which are that

4   essentially the bullets are so powerful that they penetrate

5   walls.  They're highly likely to hit bystanders nearby, to

6   injure family members, so they're really not a good weapon of

7   choice for the sort of close range, self-protective weapons

8   that are covered by the Second Amendment.

9        They also, the high velocity, high kinetic energy is

11:41AM 10   enough to penetrate the typical body armor worn by law

11   enforcement.  The weapons also allow criminals to engage with

12   law enforcement from great distances, preventing engagement and

13   subduing of mass shooters.

14        The capacity to accept a detachable magazine, which is

15   one of the defining features under the Massachusetts Act allows

16   soldiers to fire many rounds rapidly to hit a larger number of

17   targets.  That, too is not a self-defensive, it has no

18   self-defensive utility.

19        The pistol grips and the barrel shrouds that are also

11:41AM 20   part of the defining features test also allow for more accurate

21   rapid sustained and more lethal fire, again, to kill more

22   people as rapidly as possible.

23        With regard to LCMs specifically, having large numbers

24   of rounds available for firing without reloading has little

25   self-defensive utility, and, in fact, is harmful to

1   self-defense because there is sort of a documented tendency to

2   fire indiscriminately in stressful situations until the

3   magazine is empty, which has the tendency to injure bystanders

4   and family members, whereas it's of great use in criminal mass

5   shootings because it eliminates the gap of time necessary to

6   reload, which is typically when victims have a chance to flee

7   and law enforcement has a chance to take down a shooter, so for

8   that reason, the First Circuit on a full summary judgment

9   record concluded that it's not surprising that AR-15s equipped

11:42AM 10   with LCMs have been the weapons of choice in many of the

11   deadliest mass shootings in recent history.

12          THE COURT:  Do you agree that the standard is

13   objective?  I mean, one problem I have with the statistics

14   about how often this actually happens is it's kind of like the

15   sales, numbers, you know, it's based on facts that, you know,

16   can change as opposed to an objective standard.  I wonder what

17   your reaction to that is.  In other words, not how the guns are

18   designed, high velocity, to actual magazines and so forth or

19   maybe how heavy they are, how difficult they are to use as a

11:43AM 20   practical matter, you know, carrying them on the street.  All

21   that is more or less subjective but the fact that people don't

22   ever use them for self-defense.

23          Well, what's your reaction to that?  That's a

24   statistic that I'm concerned about, again, for the same reason

25   the constitutionality might vary depending on behavioral things

1    in the field.

2            MS. GREEN:  I think the constitutionality can vary

3    based on the nature of the weapon and the features of the

4    weapon, and everything that I've recited is essentially

5    evidence that they are not in common use for self-defense.

6    That evidence consists of -- it's really twofold evidence, it's

7    evidence of their features, and it's evidence of the actual use

8    in self-defense, so I would say that the court does look at

9    evidence to determine whether a weapon is in common use for

11:44AM 10    self-defense, but it's both statistics on usage and the

11    features of the weapon.

12            THE COURT:  Okay.

13            MS. GREEN:  I think the court has to look sensitively

14    at the nature of the weapon and not simply sweep in weapons

15    based on share ownership numbers.  I think the plaintiffs

16    essentially agree that evidence has to be taken into account in

17    Step 1, at least insofar as you're looking at evidence of

18    ownership statistics.

19            THE COURT:  Okay.

11:45AM 20            MR. ARRINGTON:  Plaintiffs don't agree to that.

21            THE COURT:  Please continue, Ms. Green.

22            MS. GREEN:  I'm sorry, I was going to comment briefly

23    on LCMs and then move to history unless you'd like to direct me

24    elsewhere.

25            THE COURT:  Go ahead.

1          MS. GREEN:  Just briefly, I would say that LCMs are

2     not even arms at all, and I say that because of *Bruen's* most

3     recent -- *Bruen* and *Heller* both spoke about the actual

4     definition of the term "arms" being weapons of offense or armor

5     of defense or anything that a man wears for his defense or

6     takes into his hands or use if in raft to cast at or strike at

7     another.  LCMs are plainly not arms under either of those

8     definitions.

9          The plaintiffs are relying on case law that has spoken

11:45AM 10  about extending the Second Amendment to cover certain

11    accessories that are necessary for the operation of firearms.

12    And what I say to that is that just because the Second

13    Amendment may confer some degree of protection on accessories,

14    that doesn't necessarily mean that every single type of

15    accessory out there is entitled to the full measure of Second

16    Amendment protection.

17         What the Second Amendment prohibits is for the

18    Commonwealth to come in and outlaw every type of magazine so

19    that firearms, so that semiautomatic firearms become

11:46AM 20  inoperable, but that's not what the act does.  It simply acts

21    as a size restriction on certain categories, certain magazines.

22         Let me be clear.  We've put in evidence in the record,

23    and our evidence is unrebutted, that there is no firearm that

24    is rendered inoperable without a large capacity magazine.

25    Every firearm can operate with a magazine of 10 rounds or

1    fewer.

2            So, and those are the declarations of

3    James Yurgealitis and Ryan Busse, so I'm going to move to

4    Step 2 in the history, unless you have any questions on those.

5            THE COURT:  No, go ahead.

6            MS. GREEN:  All right.  As the courts that have

7    already ruled on preliminary injunction motions in this context

8    have held, the act stands in a long tradition of firearms

9    regulations going back to the time of the founding and beyond

11:47AM 10    that have restricted specific types of firearms that pose an

11    extreme danger to public safety but that have limited

12    self-defensive futility.

13            Specifically, there is a pattern of longstanding that

14    when the first dangerous new weapon is introduced into society,

15    it then begins to proliferate to the point where it is used in

16    violent crime and only then does it get regulated by

17    legislatures.

18            And sort of at the outset, I want to emphasize that

19    unlike the laws under review in *Bruen* and *Heller*, the act here

11:48AM 20    does not address a social problem that has existed since the

21    time of the founding, but *Bruen* and *Heller* were clear that they

22    were applying an analysis on the assumption that the problem at

23    issue had existed since the time of the founding.

24            The act here is, was enacted specifically to address

25    the problem of mass shooters of a lone individual who is able

1    to pick up a weapon and cause multiple fatalities in a single

2    act of violence.  This is a problem, it is a societal problem

3    that was unprecedented at the time of the founding and that has

4    been made possible only by dramatic technological developments

5    such that under *Bruen*, the court applies the more nuanced

6    analysis, and it is not required to find a historical twin.

7         Nevertheless, why don't I just sort of quickly give

8    you some highlights of the historical tradition that I'm

9    relying on.  I think most importantly I point to the very

11:49AM 10    earliest restrictions calling out weapons by name, which are

11    the bowie knife restrictions of the early, early 19th century

12    beginning almost as soon as those weapons were invented in the

13    1830's.  This is within the living memory of the founding

14    generation.

15         These regulations were extensive and ubiquitous.  I

16    also want to be clear that bowie knives were clearly in common

17    use in terms of sheer numbers at the time that these

18    restrictions were all enacted, and for that reason, I'd

19    emphasize that the notion that weapons cannot be restricted if

11:50AM 20    they're in common use is clearly debunked by historical

21    tradition.

22         And the one example I think that is more salient from

23    the historical tradition is Alabama's 1837 Act, which was

24    called an act to suppress the use of bowie knives, which sought

25    to suppress bowie knives by imposing a prohibitive sales tax of

1    $100, so my point being it wasn't an outright ban, but it was a

2    sales tax designed to be so prohibitive that it would act to

3    suppress bowie knives altogether.

4         States acted through a variety of different modes,

5    including prohibitive taxes, and at least eight jurisdictions

6    excluded bowie knives from the public sphere altogether by

7    prohibiting public carry.  By the end of the 19th century, 49

8    states had anti-bowie knife legislation.

9         The other type of weapon that I want to highlight are

11:50AM 10    pocket pistols.  Regulations restricting pocket pistols go back

11    to 1686 with New Jersey's prohibition on concealed carry, and I

12    particularly want to emphasize in the 1870s, and this is sort

13    of contemporaneous with the 1868 Enactment of the

14    Fourteenth Amendment, both Arkansas and Tennessee outright

15    prohibited the sale of pocket pistols.

16         And then finally on the historical side, I want to

17    draw your attention to the prohibitions on semiautomatic and

18    automatic weapons in the early 20th Century.  Semiautomatic

19    weapons, as well as automatic weapons, were widely regulated,

11:51AM 20    including being banned outright almost as soon as they began to

21    proliferate in society in the early 1920's and 1930's.

22         The Supreme Court has recognized that these early 20th

23    Century bans on fully automatic weapons were constitutional,

24    and I want to draw your attention to the bans on semiautomatic

25    weapons were part and parcel of the same legislation that

1    banned fully automatic weapons in that period.

2             So between 8 and 11 jurisdictions banned semiautomatic

3    weapons altogether, and at least 23 jurisdictions restricted

4    magazine capacity size in some way.

5             And I think that the single best example is that

6    Congress in 1932 for the District of Columbia banned the

7    possession of any firearm which shoots automatically or

8    semiautomatically more than 12 shots without reloading.

9             Let me just respond to plaintiff's argument, the 20th

11:52AM 10   Century, that you should disregard 20th Century history.  The

11   Supreme Court has never said that 20th Century history is

12   irrelevant.  In fact, on the contrary, what it said is that

13   post-ratification history is relevant to liquidate and settle

14   the meaning of constitutional texts.

15            It's only when the later history contradicts earlier

16   testimony that the Supreme Court has disregarded it, as in

17   *Bruen*, and I would urge you to regard 20th Century history here

18   as uniquely prohibitive because it reflects really the first

19   time that legislatures faced the particular societal problem

11:53AM 20   and the technological change that is at issue in this case, and

21   it's clear that they acted swiftly to enact legislation exactly

22   like the act that banned the possession and sale of such

23   weapons.

24            And then just before I close on the history, I want to

25   draw your attention to the gunpowder regulations of the

1    founding era because I think they're particularly relevant to

2    large capacity magazines.  In particular, the statute in

3    Massachusetts that banned the possession of loaded weapons in

4    buildings of all sorts, including in the home, was far more

5    restrictive of the right of armed self-defense than is ban on

6    large capacity magazines, which does not restrict anybody's

7    ability to keep a loaded weapon, to keep as much ammunition as

8    they want, or to keep as many magazines they want, it only

9    restricts the size of the container of the rounds.

11:54AM 10        And the last point I wanted to address is irreparable

11   harm, unless if you have any other questions on the history,

12   I'll address irreparable harm.

13        THE COURT:  No, go ahead.

14        MS. GREEN:  The long and short of it is the plaintiffs

15   haven't put in any evidence of irreparable harm at all.  They

16   haven't even made the attempt.  They rely entirely on their

17   legal claim that they are of a constitutional violation.

18   Leaving aside the question of whether that legal claim alone is

19   sufficient, I'd emphasize that they haven't shown a likelihood

11:55AM 20   of success on the merits of that claim.

21        If they did have evidence that their right of

22   self-defense were meaningfully impacted by the act, I think

23   they would have put in that evidence, and they haven't, and I

24   think on a motion for preliminary injunction, that's very

25   significant in the analysis.

 1          THE COURT:  But normally with constitutional rights,

 2     assuming you get past Step 1 and show that your constitutional

 3     right is -- you can't exercise it, obviously, normally it's an

 4     issue of undue burden, but they're saying that this is a

 5     constitutional right to do certain things is effectively

 6     prohibited.

 7          Do they really need to show much in the way of

 8     irreparable harm?  I mean, suppose, you know, Massachusetts

 9     passed a statute prohibiting the reading of books written by

11:55AM 10     people whose last name begins with the letter G, you wouldn't

11     have to show much in the way of irreparable harm, right, you

12     prove it's unconstitutional, and, you know, the PI more or less

13     follows.

14          Why is this any different, assuming, you know, that,

15     again, they show likelihood of success on the merits?

16          MS. GREEN:  In terms of the law, I'd say the

17     First Circuit has emphasized even in the First Amendment

18     context that each case should be evaluated on its facts, that

19     the presumption of irreparable harm is very limited.  It's

11:56AM 20     probably limited to the First Amendment context, although I

21     appreciate the analogy to the Second Amendment context, but

22     even in the First Amendment context, the First Circuit has

23     emphasized that the preliminary injunction motions should be

24     evaluated on the facts and the evidence, and here there plainly

25     is no evidence of any impact on the plaintiff's right of armed

1    self-defense, and I think that's sort of intuitive because it's

2    clear that plaintiffs have ample avenue of self-defense, and

3    that assault weapons and LCMs are not genuinely useful for

4    self-defense.

5            THE COURT:  All right.  Mr. Arrington, quick response.

6            MR. ARRINGTON:  Sure, I'll pick up with the last issue

7    first.  *Ezell* held exactly as the court just indicated, that a

8    ban as opposed to a regulation cannot be compensated by

9    damages.  Infringement of the Second Amendment right cannot be

11:57AM 10   compensated by damages when we're talking about an absolute

11   ban, and it was relying exactly on the analogy to *Elrod vs.*

12   *Burns* in the First Amendment context.

13           A number of other courts have held the exact same

14   thing in the context of bans:  *Koons vs. Platkin*, which is

15   '23, Westlaw 3478604; *Spencer vs. Nigrelli*, '22, Westlaw

16   17985966; and others have held that exact same thing that when

17   you're talking about a ban on a Second Amendment right or any

18   constitutional right, an absolute prohibition just establishing

19   that it has occurred is sufficient.

11:58AM 20           So let's talk about this suitability issue.  I think

21   it's interesting, in *D.C. vs. Heller*, the government was

22   arguing, well, we've left them the ability to have all these

23   long guns, they don't need handguns, and they're just not

24   suitable, the government said they're not suitable, they should

25   go out and get a bunch of long guns, and the court said, well,

1   the fact that you've left open long guns does not rescue the

2   fact that you have prohibited a commonly-used arm chosen

3   overwhelmingly by the American people.

4        Now, here's the -- the semiautomatic handguns are the

5   most popular weapon in American.  The weapons that we're

6   talking about right now, the semiautomatic rifles that are

7   banned by the state are the second most popular weapon in

8   America, so the court has a very stark decision to make.  Is

9   *Heller* in terms of ban cabined to its facts because that is the

11:59AM 10   effect of what the state is arguing that, yes, we can't ban the

11   most popular weapon in America but we sure can ban the second

12   most popular weapon in America, and I would suggest that is

13   obviously foreclosed by *Heller* and *Bruen*, and I would also

14   point the court to then Judge Kavanaugh's dissent in *Heller* II

15   where it says it makes absolutely no sense to say that

16   semiautomatic handguns are banned or it's unconstitutional to

17   ban them and not to say the same thing about semiautomatic

18   rifles.  Why?  Because, if anything, the public safety concerns

19   that animate the state's regulations are more concentrated with

12:00PM 20   respect to semiautomatic handguns.

21        Again, it was making an a fortiori argument, if public

22   safety is what you are worried about, we should be banning

23   semiautomatic weapons because they are used to kill not dozens

24   but tens of thousands of people, and the court said no, we

25   can't ban those.

1        And why?  Because they're over -- here is the essence

2   of *Heller*, *Caetano* and *Bruen*, we will not allow the bad acts of

3   a tiny minority to affect the constitutional rights of an

4   overwhelming majority.

5        So, yes, it is beyond dispute that a few dozen maniacs

6   have used these weapons to commit some horrific crimes, but

7   millions of Americans use them for lawful purposes, so the

8   issue before the court is do those few dozen maniacs, does the

9   state get to rely upon that to basically outlaw the rights of

12:01PM 10   millions of others?  And the resounding answer to that from

11  *Heller*, *Caetano*, and *Bruen* is no.

12       The measure of constitutionality of a weapon is its

13  common possession for lawful purposes by law-abiding citizens,

14  and that's what we have here.

15       The state gives away the store on its argument with

16  respect to large capacity feeding devices.  It admits that it

17  can't ban them all, and I commend the state for its candor for

18  that because it can't.  And why can't it?  Because they're arms

19  that are protected by the Second Amendment.  They're protected

12:02PM 20   by the text of the Second Amendment.  They're instruments that

21  facilitate self-defense, magazines, as a general class of arm.

22       So does that mean that the courthouse can, the state

23  can ban a thousand round magazine?  Well, that's a different

24  question, and just as not all firearms that are presumptively

25  protected by the text of the Second Amendment are actually

1    protected because they are dangerous and unusual, and the

2    sawed-off shotgun was the example that was used.  Just because

3    all magazines are presumptively protected because they are

4    arms, they are necessary for the vast majority of weapons that

5    are sold now to operate, does that mean that they can't ban the

6    large capacity?  The court might be -- my answer is not

7    necessarily.  They may be able to ban them.  Well, how can they

8    ban them?  What can they do to ban them?  Well, it says they're

9    protected by the text.  If they can show that there is a

12:04PM 10  historical tradition of banning these analogous weapons, then

11   they can ban these weapons.

12        Well, the problem is there are over 150 million of

13   these out there, and, again, we're at the common use test.  The

14   state cannot demonstrate that there is a historical -- under

15   the history and tradition of firearm regulations in this nation

16   that magazines of 15, over 15 rounds or 10 rounds are banned by

17   the nation.

18        And so, yes, so in this instance, Step 1, text,

19   they're necessary for semiautomatic firearms to use, to

12:04PM 20  operate, therefore, they're protected by the text, history and

21   tradition, they're in common use by law-abiding citizens,

22   therefore, the history and tradition to show that they're

23   dangerous and unusual is precluded by that fact, and so the

24   state's argument that they can ban magazines fails for that

25   simple reason.

1        I'll also go to all of the empirical data that the
2    state talked about.  It talked about wounds and about their
3    expert saying that they're not really good, useful, their
4    experts saying that other weapons are better for self-defense.
5    That is a lot of empirical data.  And in *Bruen*, the court said
6    that it is not legitimate for judges to make, quote, "difficult
7    and empirical judgments about the cost and benefits of firearms
8    restrictions."  That's at 142 Supreme Court 2130.

9        That's exactly what the state is asking the court to
12:06PM 10    do.  It's asking it to make empirical judgments about the costs
11    and benefits of its regulation.  It's saying, well, the cost is
12    public safety.

13        There's a lot of public safety issues that are issue
14    here, and the benefit, well, there's not -- they have a lot of
15    other things that they can use, and our experts say they don't
16    really need them, and so we weigh the costs and benefits for
17    us, Judge, and you can trust us.  The benefits of our
18    regulation would far outweigh the costs.  It's exactly kind of
19    an astonishing argument because that's exactly what the court
12:06PM 20    in *Bruen* said you can't do.

21        The court asked about shoulder-mounted SAMS, so to
22    speak.  Well, obviously, that's a military weapon, most useful
23    in military service, and they're highly unusual in society at
24    large.  And in *Heller*, the court gave two examples of weapons
25    that can be banned.  The first weapon, the first example is

1    dangerous and unusual weapons, and we talked about sawed-off

2    shotguns.

3         THE COURT:  Which a sawed-off shotgun I have to say is

4    quite useful for self-defense.  You know, it's unlike a

5    shotgun, it's not a long gun, it's very short, and is capable

6    of a large amount of damage and is quite useful it seems to me

7    for self-defense and yet states can ban it.

8         MR. ARRINGTON:  Because it's unusual.

9         THE COURT:  It's unusual because it's been banned,

12:07PM 10   but, okay, yeah.

11        MR. ARRINGTON:  Well, at the time of the -- *Heller*

12   held that it fell within the category of dangerous and unusual

13   arms, and there weren't tens of millions of them out there,

14   like there are of this one.

15        Now, we can talk about shoulder-mounted weapons.  That

16   comes within the second example of arms that can be banned, and

17   that's any sophisticated military arms, and the examples that

18   *Heller* gave were machine guns, bombers, and tanks, and we can

19   go on and say bazookas and air surface missiles and that sort

12:08PM 20   of thing.

21        Those can be banned because they're not in common use,

22   and we have to go back to what was the purpose of the common

23   use test from *Miller* to *Heller* to *Bruen*?  It is the arms that

24   are commonly used by law-abiding citizens, and going back to

25   the founding era, those arms were available to be picked up and

1      used for militia service and what they had available.

2             And the fact of the matter is, if we go back to the

3      founding era and you look at all of the militia laws, if AR-15s

4      had existed in the founding era, apart from being banned,

5      states would have required them to be available because they

6      were the types of arms that were commonly available for

7      self-defense in militia service, so there's simply no

8      historical analogous regulation here.  As a matter of fact, the

9      historical record is directly to the contrary.

12:09PM 10          The state's entire case, your Honor, the state's

11      entire case absolutely depends upon saying that a ban, an

12      absolute categorical ban is analogous to a regulation, but

13      *Heller* told us it's not.  *Heller* absolutely said that a

14      categorical ban is not remotely analogous to any of the

15      regulations.

16             And amazingly the very regulation that *Heller* said is

17      not analogous, the state just trotted out a myth, and that is

18      the gunpowder storage regulation.  The state examined that very

19      statute and said it's not analogous to a ban on a

12:10PM 20      commonly-possessed firearm, but the state is here saying to you

21      that it is, and that's the reason you should uphold these bans.

22      It's not.  And unless the court has any other questions.

23             THE COURT:  That's fine.  Ms. Green, last word.

24             MS. GREEN:  Thank you, your Honor.  Just three points,

25      and I'll be very quick.

1          First, sawed-off shotguns, the reason that sawed-off

2     shotguns are not common is because they were banned, and they

3     were banned for the same reasons that semiautomatic weapons

4     were banned in the early 20th Century and the reason that

5     assault weapons are banned today, which is that legislatures at

6     the time recognized that they were used, they were

7     exceptionally dangerous, and they were used for criminal

8     purposes but rarely, if ever, for self-defense.  The same

9     rationale applies equally here.

12:11PM 10          Second, Mr. Arrington was emphasizing that *Heller* and

11    *Bruen* already decided this case by saying that bans are not

12    permissible.  That is not what *Heller* and *Bruen* said.  *Heller*

13    and *Bruen* emphasized that the legislation they were reviewing

14    was too great a burden on the right of armed self-defense.

15    That's what it was considering.  It was considering whether an

16    outright prohibition on the most possible self-defensive

17    weapons was what degree of burden on the right of armed

18    self-defense, and it said that the degree of burden was far

19    greater than any of the historical statutes that the states in

12:12PM 20    those cases were pointing to.

21          Here, we have a very different situation because the

22    burden on the right of armed self-defense is minimal, as the

23    First Circuit concluded on a full record in *Worman*, the burden

24    is minimal because the weapons themselves are not used for

25    armed self-defense, and, therefore, the legislation beyond

1    simple outright bans is more relevant, and in the two metrics

2    that the Supreme Court emphasized in *Bruen*, the degree of

3    burden, how it burdens the right of armed self-defense and why

4    it burdens the right of armed self-defense.

5         And with that, that brings me to my third point, which

6    is the state is not engaged in impermissible needs and

7    balancing here.  What we're saying is at Step 1, assault

8    weapons and LCMs are not in common use for self-defense, and,

9    second, that the act stands in a long tradition of prohibiting,

12:13PM 10   restricting, including prohibiting weapons that are

11   exceptionally dangerous with little self-defensive use, and I

12   want to be clear, there is no balancing involved.

13        THE COURT:  All right.  Thank you.  I'm going to take

14   it under advisement.  Okay.  All right, thank you, all.

15        MR. ARRINGTON:  Thank you, your Honor.

16        (Whereupon, the hearing was adjourned at 12:14 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript,

8    Pages 1 through 47 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Civil

10   Action No. 22-11431-FDS, NATIONAL ASSOCIATION FOR GUN RIGHTS,

11   and JOSEPH R. CAPEN vs. MAURA HEALEY, IN HER OFFICIAL CAPACITY

12   AS ATTORNEY GENERAL OF THE COMMONWEALTH OF

13   MASSACHUSETTS, and thereafter by me reduced to typewriting and

14   is a true and accurate record of the proceedings.

15           Dated June 5, 2023.

16               s/s Valerie A. O'Hara

17           _____

18               VALERIE A. O'HARA

19               OFFICIAL COURT REPORTER

20

21

22

23

24

25