UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL ASSOCIATION FOR GUN RIGHTS,
and JOSEPH R. CAPEN,

       Plaintiffs,

   v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
of Massachusetts,

       Defendant.

Civil Action No. 1:22-cv-11431-FDS

## **DEFENDANT'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendant Andrea Joy Campbell, in her official capacity as Attorney General of the

Commonwealth of Massachusetts, submits this Second Notice of Supplemental Authority to

apprise the Court of two recent decisions issued since the hearing in this matter on May 30,

2023.

- *Hartford v. Ferguson*, 2023 WL 3836230, 3:23-cv-05364-RJB (W.D. Wa. June 6,
  2023) (**Exhibit A**).  In *Hartford*, the Plaintiffs sought a preliminary injunction to
  enjoin enforcement of a Washington statute banning manufacture or sale of assault
  weapons.  The court denied the motion, holding that the Plaintiffs failed to
  demonstrate a likelihood of success on the merits or irreparable harm, or that the
  balance of equities tipped in their favor.

- *People of the State of Colorado v. Sgaggio*, 2022M5894 (El Paso Cty. June 8, 2023)
  (**Exhibit B**).  In *Sgaggio*, the Defendant moved to dismiss criminal charges, on
  Second Amendment grounds, arising from a violation of a Colorado statute banning

possession of handgun magazines holding more than 15 rounds.  The court denied the

motion, concluding that there is a historical tradition of regulating large-capacity

magazines, and that large-capacity magazines are designed and primarily used for

military or offensive use, not individual self-defense.

June 9, 2023                                    Respectfully submitted,

                                                ANDREA JOY CAMPBELL,
                                                in her official capacity as Attorney General of the
                                                Commonwealth of Massachusetts,

                                                *s/ Julie E. Green*
                                                Julie E. Green, BBO # 645725
                                                Grace Gohlke, BBO # 704218
                                                Assistant Attorney General
                                                Office of the Attorney General
                                                One Ashburton Place
                                                Boston, MA 02108-1698
                                                (617) 963-2085
                                                (617) 963-2527
                                                (617) 727-5785 (Facsimile)
                                                Julie.Green@mass.gov
                                                Grace.Gohlke@mass.gov

## <u>CERTIFICATE OF SERVICE</u>

      I, Julie E. Green, hereby certify that a true and correct copy of the foregoing document, including all exhibits attached hereto, was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 9, 2023.

                                    *s/ Julie E. Green*

# EXHIBIT A

2023 WL 3836230

Only the Westlaw citation is currently available.

United States District Court, W.D. Washington,
at Tacoma.

Lawrence HARTFORD; Douglas Mitchell;
Brett Bass; Sporting Systems Vancouver,
Inc.; Second Amendment Foundation, Inc.;
and Firearms Policy Coalition, Inc., Plaintiffs,

v.

Robert FERGUSON, in his official capacity as
Washington State Attorney General; John R. Batiste,
in his official capacity as Chief of the Washington
State Patrol; John Gese, in his official capacity as
Sheriff for Kitsap County; Clayton Myers, in his
official capacity as Sheriff for Kittitas County; John
Horch, in his official capacity as Sheriff for Clark
County; Adam Fortnoy, in his official capacity as
Sheriff for Snohomish County; Chad M. Enright, in
his official capacity as County Prosecutor for Kitsap
County; Greg Zempel, in his official capacity as
County Prosecutor for Kittitas County; Tony Golik,
in his official capacity as County Prosecutor for Clark
County; and Jason Cummings, in his official capacity as
County Prosecutor for Snohomish County, Defendants.

CASE NO. 3:23-cv-05364-RJB
|
Signed June 6, 2023

**Synopsis**

**Background:** Individual gun owners, a gun dealer, and
associations of gun owners dedicated to Second Amendment
advocacy brought § 1983 action against Washington State
Attorney General, Chief of the Washington State Patrol, and
sheriffs and prosecutors for various Washington counties,
in their official capacities, alleging that Washington law
prohibiting the manufacture, importation, distribution or sale
of assault weapons with certain exceptions violated their
Second Amendment right to keep and bear arms. Plaintiffs
moved for preliminary injunction and to advance a trial on the
merits and consolidate it with the preliminary injunction or,
in the alternative, to grant summary judgment.

**Holdings:** The District Court, Robert J. Bryan, J., held that:

[1] plaintiffs failed to make clear showing of evidence that
supported contention that weapons covered under law were
protected by Second Amendment;

[2] law was consistent with historic tradition of arms
regulation;

[3] plaintiffs failed to show that they were likely to suffer
irreparable harm in the absence of preliminary relief; and

[4] plaintiffs failed to show that the balance of equities tipped
in their favor or that an injunction was in the public interest.

Motions denied.

**Procedural Posture(s):** Motion for Preliminary Injunction;
Motion for Summary Judgment; Other.

West Headnotes (18)

**[1]** **Injunction** 🡨 Grounds in general;  multiple
factors

Under one test, plaintiffs seeking a preliminary
injunction in the Ninth Circuit may show: (1) that
they are likely to succeed on the merits, (2) that
they are likely to suffer irreparable harm in the
absence of preliminary relief, (3) the balance of
equities tips in their favor, and (4) an injunction
is in the public interest.

**[2]** **Injunction** 🡨 Grounds in general;  multiple
factors

Under one variant of the Ninth Circuit's test
for a preliminary injunction, the "sliding scale"
version of the standard provides that if a plaintiff
can only show that there are serious questions
going to the merits—a lesser showing than
likelihood of success on the merits—then a
preliminary injunction may still issue if the
balance of hardships tips sharply in the plaintiff's
favor, and the other two preliminary injunction
factors are satisfied.

**[3]**    **Injunction**   Clear showing or proof

Preliminary injunction may only be awarded upon clear showing of evidence that supports each relevant preliminary injunction factor.

**[4]**    **Injunction**   Evidence

**Injunction**   Hearing procedure

Even though a clear showing of evidence that supports each relevant preliminary injunction factor is required, due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings.

**[5]**    **Injunction**   Scope of inquiry and matters considered

In deciding motion for preliminary injunction, district court is not bound to decide doubtful and difficult questions of law or disputed questions of fact.

**[6]**    **Weapons**   Right to bear arms in general

Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home. U.S. Const. Amend. 2.

**[7]**    **Weapons**   Right to bear arms in general

Second Amendment right to keep and bear arms is not unlimited. U.S. Const. Amend. 2.

**[8]**    **Weapons**   Violation of right to bear arms

In determining whether firearm regulation violates Second Amendment right to keep and bear arms, test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, applies: first to be considered, is whether the Second Amendment's plain text covers an individual's conduct regulated by the challenged law; if so, the Constitution

presumptively protects that conduct; second, the burden shifts to proponents of the law to justify the challenged law by demonstrating that it is consistent with the nation's historical tradition of firearm regulation. U.S. Const. Amend. 2.

**[9]**    **Weapons**   Violation of right to bear arms

The first consideration under the analysis, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms requires inquiry into whether the plain text of the Second Amendment protects each of the individual plaintiffs' proposed courses of conduct. U.S. Const. Amend. 2.

**[10]**    **Injunction**   Particular cases

Individual gun owners, gun dealer, and associations of gun owners failed to make clear showing of evidence supporting contention that weapons covered under Washington law prohibiting sale of assault weapons were in common use and protected by Second Amendment, and thus they did not show likelihood of success on the merits or serious questions going to merits, which weighed against preliminary injunction, in § 1983 action against Washington State and county officials, alleging that law violated right to keep and bear arms; plaintiffs' submission of articles purporting to indicate that there were millions of assault weapons sold in United States and court cases discussing number of assault weapons was marked by argument without citations or sources showing support by admissible evidence. U.S. Const. Amend. 2; 42 U.S.C.A. § 1983.

More cases on this issue

**[11]**    **Weapons**   Violation of right to bear arms

Under the analysis, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms, in order to show that a law is consistent

with the Nation's historical tradition of firearm regulation, proponents of the law must point to a historic regulation or regulations that is an analogue for the modern firearm regulation at issue; this inquiry requires a determination of whether the two regulations are relevantly similar using at least two metrics: the how and why the regulations burden a law-abiding citizen's right to armed self-defense. U.S. Const. Amend. 2.

**[12]**    **Weapons** 🔑  Violation of right to bear arms

In demonstrating that proposed law is consistent with the nation's historical tradition of firearm regulation, proponents of a law regulating firearms need not point to a historical twin or a dead ringer for historical precursors to pass constitutional muster, under the analysis, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms. U.S. Const. Amend. 2.

**[13]**    **Injunction** 🔑  Weapons and explosives

Washington law prohibiting sale of assault weapons was consistent with historic tradition of arms regulation, and thus gun owners, gun dealer, and associations of gun owners failed to establish likelihood of success on merits or serious questions going to merits, which weighed against preliminary injunction, in § 1983 action against Washington officials, alleging that law violated Second Amendment right to keep and bear arms; trap guns, bowie knives, clubs, slingshots, multi-shot revolvers, and automatic weapons were examples of weapons regulated due to use for interpersonal violence, and historical regulations and Washington law imposed comparable burdens on right of armed self-defense that were justified by public safety concerns regarding weapons considered extremely dangerous. U.S. Const. Amend. 2; 42 U.S.C.A. § 1983.

More cases on this issue

**[14]**    **Weapons** 🔑  Violation of right to bear arms

In demonstrating that proposed law is consistent with the nation's historical tradition of firearm regulation, analysis, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms does not require that the historical regulation be the exact same; it is not a historical straight jacket. U.S. Const. Amend. 2.

**[15]**    **Weapons** 🔑  Violation of right to bear arms

In demonstrating that proposed law is consistent with the nation's historical tradition of firearm regulation, under analysis, in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms, analogical reasoning requires that the law's proponents identify a well-established and representative historical analogue, not a historical twin. U.S. Const. Amend. 2.

**[16]**    **Injunction** 🔑  Weapons and explosives

Individual gun owners, gun dealer, and associations of gun owners failed to show that they were likely to suffer irreparable harm in the absence of preliminary relief, which weighed against preliminary injunction, in their § 1983 action against Washington State and county officials, alleging that Washington law prohibiting sale of assault weapons violated their Second Amendment right to keep and bear arms, although individual gun owners asserted that they already owned assault weapons and were harmed because they wished to purchase more; individual owners had alternative weapons available, particularly for self-defense, and gun dealer had no independent Second Amendment right to sell firearms separate from its customer's right to acquire them. U.S. Const. Amend. 2; 42 U.S.C.A. § 1983.

More cases on this issue

[17]    **Injunction** 🔑 Injunctions Sought by Government in General

**Injunction** 🔑 Injunctions against government entities in general

When the government is a party, the las two preliminary injunction factors, balance of equities and public interest, merge.

[18]    **Injunction** 🔑 Weapons and explosives

Individual gun owners, gun dealer, and associations of gun owners failed to show that the balance of equities tipped in their favor or that an injunction was in the public interest, which weighed against preliminary injunction in their § 1983 action against Washington State and county officials, alleging that Washington law prohibiting sale of assault weapons violated their Second Amendment right to keep and bear arms; considering the exceptional dangerousness of assault weapons, public interest in their regulation outweighed plaintiffs' desire to purchase them, and in light of recent mass deaths caused by assailants using assault weapons, it was appropriate for governmental bodies to find ways to protect the public from dangerous weapons, within the limits of the Second Amendment. U.S. Const. Amend. 2; 42 U.S.C.A. § 1983.

More cases on this issue

**Attorneys and Law Firms**

Joel B. Ard, Ard Law Group PLLC, Bainbridge Island, WA, for Plaintiffs.

R. July Simpson, William McGinty, Attorney General's Office, Olympia, WA, Andrew R.W. Hughes, Kristin Beneski, Attorney General's Office, Seattle, WA, for Defendants Robert Ferguson, John R. Batiste.

Christine M. Palmer, Kitsap County Prosecutor's Office, Port Orchard, WA, for Defendants John Gese, Chad M. Enright.

Christopher E. Horner, Kittitas County Prosecuting Attorney, Ellensburg, WA, for Defendants Clayton Myers, Gregory L. Zempel.

Amanda Marie Migchelbrink, Leslie Anne Lopez, Clark County Prosecuting Attorney's Office, Vancouver, WA, for Defendants John Horch, Tony Golik.

Lyndsey Marie Downs, Margaret Duncan, Snohomish County Prosecuting Attorney (Civil), Civil Division, Everett, WA, for Defendants Adam Fortnoy, Jason Cummings.

Kai A. Smith, Meha Goyal, Zachary J. Pekelis, Pacifica Law Group LLP, Seattle, WA, for Defendant Alliance for Gun Responsibility.

Trevor Burrus, Pro Hac Vice, Arlington, VA, Derek Angus Lee, Angus Lee Law Firm, PLLC, Vancouver, WA, for Amici Washington Gun Rights, American Firearms Association.

ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION

ROBERT J. BRYAN, United States District Judge

**\*1** This matter comes before the Court on the Plaintiffs' Motion for Preliminary Injunction. Dkt. 10. The Court has considered the pleadings filed regarding the motion and the remaining file. It is fully advised. No party has requested oral argument on this motion under Local Rule W.D. Wash. 7(b)(4) and argument is not necessary to decide the motion fairly.

In this case, the Plaintiffs challenge a recently enacted Washington State assault weapons regulation, Substitute House Bill 1240 ("HB 1240"), arguing that it violates their constitutional right to bear arms. Dkt. 1. They now move for an order preliminarily enjoining HB 1240's enforcement. Dkt. 10. For the reasons provided below, the motion (Dkt. 10) should be denied.

**I. FACTS AND PROCEDURAL HISTORY**

On April 25, 2023, HB 1240 was enacted in the State of Washington. 2023 Wash. Sess. Laws, ch. 162, § 1. HB 1240 prohibits the manufacture, importation, distribution or sale of "assault weapons" with certain exceptions. *Id.* It does not bar the possession or inheritance of an "assault weapon." *Id.* "Assault weapons" are defined in HB 1240 to

include specific firearms like AK-47s, AR15s, and M16s, semiautomatic rifles that have an overall length of less than 30 inches, conversion kits, and semiautomatic weapons that accept a detachable magazine and have one of several other enumerated accessories. *Id.* While the Plaintiffs maintain that these weapons are not "assault weapons," this opinion will refer to the weapons regulated under HB1240 as "assault weapons" because that is the term that is used, and defined, in the statute.

The Plaintiffs, individual gun owners who wish to purchase weapons covered by HB 1240, a gun dealer, and two associations of gun owners dedicated to Second Amendment advocacy, filed this case on April 25, 2023, arguing that HB 1240 violates their Second Amendment rights, as applied to enactments of Washington state through the Fourteenth Amendment. Dkt. 1.

Plaintiffs moved for a preliminary injunction on May 5, 2023. Dkt. 10. In addition to moving for a preliminary injunction, the Plaintiffs move the Court to advance a trial on the merits and consolidate it with the preliminary injunction, or in the alternative, grant summary judgment to the Plaintiffs. *Id.*

In Plaintiffs' Motion for Preliminary Injunction and supporting documents, they contend that they have alleged, both directly and impliedly, all of the facts necessary to justify their position and to pass the test justifying a preliminary injunction. In Defendants' responsive pleadings, however, Defendants have alleged facts contrary to Plaintiffs' showing which raise fact questions challenging Plaintiffs' showing.

## II. DISCUSSION

### A. STANDARD ON MOTION FOR PRELIMINARY INJUNCTION

 **[1]**  **[2]** Plaintiffs seeking a preliminary injunction in the Ninth Circuit must establish one of two tests. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). The first test requires plaintiffs to show: (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018)(*citing Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Under the second variant of the Ninth Circuit's test for a preliminary injunction, the "sliding scale" version

of the *Winter* standard provides that "if a plaintiff can only show that there are serious questions going to the merits— a lesser showing than likelihood of success on the merits— then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies* at 1217 (*cleaned up*).

 **\*2**  **[3]**  **[4]**  **[5]** A preliminary injunction may only be awarded "upon a clear showing" of evidence that supports each relevant preliminary injunction factor. *Winter* at 22, 129 S.Ct. 365. Even though a "clear showing" is required under *Winter*, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.,* 736 F.3d 1239, 1250 n. 5 (9th Cir. 2013). Further, "[i]n deciding a motion for a preliminary injunction, the district court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 551 (9th Cir. 1986).

### B. SUCCESS ON THE MERITS/SERIOUS QUESTIONS GOING TO THE MERITS

Adopted in 1791 as part of the Bill of Rights, the Second Amendment to the U.S. Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." At the time of the Bill of Rights' adoption, it was understood to only apply to the federal government. *D.C. v. Heller*, 554 U.S. 570, 619, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In 1868, the Fourteenth Amendment was adopted, applying the Bill of Rights, including the Second Amendment, to the States. *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 764, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

 **[6]**  **[7]** The Second Amendment protects "a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald* at 780, 130 S.Ct. 3020. This Second Amendment right "is not unlimited." *Heller* at 626, 128 S.Ct. 2783. The Supreme Court in *Heller* noted:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the

right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627, 128 S.Ct. 2783. The *Heller* Court also "recognized another important limitation on the right to keep and carry arms ... the sorts of weapons protected were those 'in common use at the time.' " *Id.* at 627, 128 S.Ct. 2783. *Heller's* list of permitted prohibitions on arms use, possession, and sale does not purport to be exhaustive. *Id.* at 626 n. 26, 128 S.Ct. 2783.

[8]  In determining whether Washington's assault weapons regulation violates the Plaintiffs' Second Amendment rights, a test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* ―― U.S. ――, 142 S. Ct. 2111, 2138, 213 L.Ed.2d 387 (2022), applies. First to be considered under *Bruen,* is whether the "Second Amendment's plain text covers an individual's conduct" regulated by the challenged law. *Bruen* at 2126, 2129-2130. If so, the "Constitution presumptively protects that conduct." *Id.* Second, under *Bruen,* the burden shifts to proponents of the law to justify the challenged law "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2126 and 2130.

The Plaintiffs maintain that they need only show that the "arms" regulated by HB1240 are "in common use" today for lawful purposes and so are not "unusual." Dkts. 10 and 50. If they do, they contend, the weapon cannot be banned under *Heller* and *Bruen. Id.*

*3  The Plaintiffs misread *Heller* and *Bruen. Heller* noted that the right to keep and bear arms protected under the Second Amendment is limited to the sorts of weapons "in common use at the time." *Heller* at 627, 128 S.Ct. 2783. It found that this limitation is "supported by the historical tradition of prohibiting 'dangerous and unusual weapons.' " *Id. Heller* does not hold that access to all weapons "in common use" are automatically entitled to Second Amendment protection without limitation. Further, under *Bruen,* if Plaintiffs demonstrate that their proposed conduct, that of buying and selling weapons regulated by HB1240, is covered by the Second Amendment, the "Constitution **presumptively** protects that conduct." *Bruen* at 2126, 2129-2130 (*emphasis added*). This presumption can be overcome. *Id.*

This opinion will now turn to the two *Bruen* considerations.

### 1. Whether Plain Text Covers Conduct Regulated by HB 1240

[9]  The first consideration under the *Bruen* analysis requires inquiry into whether the plain text of the Second Amendment protects each of the individual Plaintiffs' proposed courses of conduct. *Id.* at 2126.

[10]  The Plaintiffs seek to either buy or sell weapons regulated by HB 1240. Dkt. 10. In support of their theory that the weapons regulated by HB 1240 are protected under the Second Amendment, the Plaintiffs point to various articles and websites purporting to indicate that there are millions of assault weapons sold in the United States. Dkts. 10 and 50. They point to court cases in which the number of assault weapons in the United States is discussed. *Id.* However, the Plaintiffs' submissions fail to submit any **evidence** in the record before this Court. Their showing is marked by argument without citations and sources showing that their argument would be supported by admissible evidence, even under the relaxed rules for preliminary injunctions. It is wholly unclear whether **all** of the weapons (like conversion kits or semiautomatic pistols) regulated by HB 1240 are "in common use" based on the Plaintiffs' scant submission. The Plaintiffs have not made "a clear showing" of evidence (*Winter* at 22, 129 S.Ct. 365) that supports their contention that all of the weapons covered by HB 1240 are "in common use" and therefore not "unusual" (*Heller* at 626, 128 S.Ct. 2783).

Nevertheless, for purposes of this motion only, the Court is willing to assume that Plaintiffs can produce evidence in support of *Bruen's* first requirement, that the Plaintiffs had made a "clear showing" that the Constitution presumptively protected the Plaintiffs' proposed conduct. That assumption does not end the inquiry. *Bruen* at 2130. This opinion will now address the second portion of *Bruen* - the burden shifting analysis.

### 2. Whether the Regulations in HB 1240 are Consistent with Historical Regulations

**[11]  [12]**  At this stage, the burden shifts to the law's proponents to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen* at 2126, 2130. In order to show that a law is "consistent with the Nation's historical tradition of firearm regulation," the proponents must point to a historic regulation (or regulations) that is an analogue for the modern firearm regulation at issue. *Id.* at 2132. This inquiry "requires a determination of whether the two regulations are relevantly similar" using at least two metrics: the "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The proponents need not point to a "historical twin" or a "dead ringer for historical precursors" to pass constitutional muster. *Id.*

**[13]**  While no U.S. Circuit Court of Appeals has ruled on this issue, other district courts have held that several regulations in our Nation's history are sufficiently analogous to newly passed assault weapons bans to justify those bans and defeat motions for preliminary injunction consistent with the Second Amendment. *Bevis v. City of Naperville, Illinois,* 2023 WL 2077392, at *11-12 (N.D. Ill. Feb. 17, 2023); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.,* 2023 WL 2655150, at *12 (D. Del. Mar. 27, 2023); *Herrera v. Raoul,* 2023 WL 3074799, at *6 (N.D. Ill. Apr. 25, 2023). The reasoning in these cases is persuasive.

**\*4**  As in *Bevis, Delaware State Sportsmen,* and *Herrera,* HB 1240's proponents have demonstrated that HB 1240 is arguably consistent with the Nation's historic tradition of arms regulation. According to the proponents' experts, Brennan Rivas, Ph.D. and Robert J. Spitzer, Ph.D., throughout the Nation's history, there are times when a new weapon is invented, perhaps for the military, and then ended up on the commercial market for civilian use. Dkts. 47 at 2-3; 48

at 2-3. Drs. Rivas and Spitzer further note that often these new weapons proliferated and resulted in a rise in criminal violence that terrorized the public. *Id.* They point out that it was then that States historically stepped in and regulated those dangerous weapons. *Id.*

HB 1240's proponents convincingly point to regulations on trap guns, bowie knives, clubs, slingshots, multi-shot revolvers, and automatic weapons (like the Thompson submachine gun or "Tommy Gun") as historical examples of weapons that, after being invented, their use proliferated, the weapons began to be used for interpersonal violence, and then States regulated the weapons. Dkt. 42 (*citing* Dkts. 47 and 48).

As early as 1771, twenty years before the Second Amendment was adopted, regulations banning dangerous weapons existed. According to Dr. Spitzer, in 1771, New Jersey passed a law that prohibited trap guns, "devices or contraptions rigged in such a way as to fire when the owner need not be present." Dkt. 48 at 19. Fifteen more states followed suit over the next several years. Dkt. 48-2.

As stated above, this court is not the only court to consider historical analogues for assault weapons bans. The *Bevis* court (that was considering whether a state and local ban on the sale of assault weapons and related accessories violated the Second Amendment) examined over fifty examples of arms regulation from the Colonial era to the early 20th century, including those that HB 1240's proponents point to here. Relying on Dr. Spitzer's opinion (also filed in this case at Dkt. 48), the *Bevis* court's review of a portion of those regulations provided, in part:

> An early example of these regulations concerned the "Bowie knife," originally defined as a single-edged, straight blade between nine and ten inches long and one-and-half inches wide. In the early 19th century, the Bowie knife gained notoriety as a "fighting knife" after it was supposedly used in the Vidalia Sandbar Fight, a violent brawl that occurred in central Louisiana. Shortly afterwards, many southerners began carrying the knife in public because it offered a better chance to stop an assailant than the more cumbersome guns of the era, which were unreliable and inaccurate. They were also popular in fights and duels over the single-shot pistols. Responding to the growing prevalence and danger posed by Bowie knives, states quickly enacted laws regulating them. Alabama was first, placing a prohibitively expensive tax of one hundred dollars on "selling, giving or disposing" the weapon, in

an Act appropriately called "An Act to Suppress the Use of Bowie Knives," followed two years later by a law banning the concealed carry of the knife and other deadly weapons. Georgia followed suit the same year, making it unlawful "for any merchant ... to sell, or offer to sell, or to keep ... Bowie, or any other kinds of knives." By 1839, Tennessee, Florida, and Virginia passed similar laws. The trend continued. At the start of the twentieth century, every state except one regulated Bowie knives; thirty-eighty states did so by explicitly naming the weapon, and twelve more states barred the category of knives encompassing them.

*Id.* at 10. Dr. Spitzer notes that, all told, fifteen states barred the carrying of a Bowie knife. Dkt. 48 at 9. After noting that state courts uniformly upheld the laws regulating Bowie knives, the *Bevis* court turned to other laws regulating "melee weapons," again relying on Dr. Spitzer's opinion:

**\*5**  As early guns proved unreliable, many citizens resorted to clubs and other blunt weapons. Popular instruments included the billy (or billie) club, a heavy, hand-held club usually made of wood, plastic, or metal, and a slungshot, a striking weapon that had a piece of metal or stone attached to a flexible strip or handle. States responded to the proliferation of these weapons. The colony of New York enacted the first "anti-club" law in 1664, with sixteen states following suit, the latest being Indiana in 1905, which proscribed the use of clubs in sensitive places of transportation. The city of Leavenworth, Kansas passed the first law regulating the billy club in 1862. By the early 1900s, almost half of states and some municipalities had laws relating to billy clubs. Many, such as North Dakota and the city of Johnstown, Pennsylvania, banned their concealed carry, while others outlawed them entirely. "Anti-slungshot" carry laws proved the most ubiquitous though. Forty-three states limited slungshots, which "were widely used by criminals and street gang members in the 19th Century" because "[t]hey had the advantage of being easy to make silent, and very effective, particularly against an unsuspecting opponent." ...

*Bevis* at 11.

The regulatory pattern continued when multi-shot revolvers became popular. According to Dr. Spitzer, "single shot guns were the ubiquitous firearm until after the Civil War." Dkt. 48 at 26. It wasn't until the 1830s when the "affordable, reliable" Colt multi-shot revolver was developed that multi-shot weapons became widely used. *Id.* Once revolvers began

to spread from the military to the civilian market following the Civil War "and became associated with lawless violence, they were swiftly met by laws and regulations aimed at curbing their possession and use." *Id.* at 26 and 30-31; Dkt. 47 at 13-15.

Dr. Spitzer opines that it was only in the post-World War I era when multi-shot semiautomatic and fully automatic long guns, like Tommy guns, began to publicly circulate and "came to be associated with criminal use that they became a regulatory and public policy concern, leading to the enactment of anti-machine gun laws in at least 32 states and between eight and eleven state laws restricting semi-automatic firearms." Dkt. 48 at 31. As an example of restrictions on semiautomatic weapons, in the 1920s, Rhode Island enacted a law that prohibited the manufacture, sale, purchase, and possession of "any weapon which shoots more than twelve shots semi-automatically without reloading." 1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1,4.

In response to the rise in crime related to automatic weapons, in 1934, Congress enacted the National Firearms Act, which imposed extensive regulations on fully automatic weapons. Dkt. 48 at 42. Later, in 1994, Congress passed the Violent Crime Control Act of 1994, which imposed a ten-year ban on semiautomatic assault weapons. Pub. L. 103-322. In part, it prohibited the manufacture, transfer or possession of assault weapons. 18 U.S.C. § 922(v)(1)(*now expired*). Even these late events are part of assault weapon regulation in the Nation's history.

Each of the above arms restrictions, including bans and restrictions on carrying, arose from the same historical pattern. The weapon was invented, perhaps for the military, became widely popular with civilians, was associated with criminal use, and was then regulated by the States. Dkts. 47 and 48. As has been the case throughout our Nation's history, HB 1240's prohibition on the manufacture, import, and sale of semiautomatic assault weapons responds to the same pattern: technological weapons change that sets forth unprecedented social concerns.

Semiautomatic assault weapons represent a significant technological change - they allow a shooter to fire as fast as they can pull the trigger, unlike previous guns. Dkt. 45 at 3-6. While semiautomatic weapons like the AR-15 were invented in the 1950s, the growth in ownership of semiautomatic assault weapons proliferated in the late 2000s. *Id.* at 6-15.

HB 1240's proponents have shown that unprecedented social concerns have arisen from the proliferation of these weapons. These weapons are exceptionally dangerous. Assault weapons are used disproportionately in mass shootings (Dkt. 46 at 11), police killings (*Bevis* at 15) and gang activity (*Id.*). Mass shootings are on the rise. Dkt. 46 at 6-8. Use of assault weapons in mass shootings leads to a disproportionately greater likelihood of death. Dkt. 46 at 12. "For instance, assault weapons were used in 80% of all mass public shootings resulting in more than 24 deaths and 100% of all high-fatality mass shootings resulting in more than 40 deaths." *Id.* In the last ten years, the use of assault weapons in high-fatality mass shootings and mass public shootings has resulted, respectively, in 109% and 106% increases in average fatalities per incident. Dkt. 46 at 14-15. Regulation of assault weapons and their dangerous accessories, as HB 1240 regulates, is arguably consistent with our Nation's history and tradition of exceptionally dangerous arms regulation.

**\*6**  **[14]**  **[15]**  The Plaintiffs argue that not all of the regulations recounted above were complete bans so they are not historical analogues of the type required under *Bruen.* Dkt. 50. This argument is unavailing. *Bruen* does not require that the historical regulation be the exact same; it is not a "historical straight jacket." *Bruen* at 2133. Analogical reasoning requires that the law's proponents "identify a well-established and representative historical analogue, not a historical twin." *Id.* Further, as explained by Dr. Spitzer in relation to the Bowie knife regulations, complete bans on the possession of certain weapons (as opposed to laws forbidding the carrying of those weapons) did not occur as much in our early Nation's history because the federal and state governments did not have the "maturity, powers, tools, or resources" to implement and enforce a complete ban. Dkt. 48 at 10. Instead, the chief remedy enacted by the states was to bar the carrying of knives, "along with the other two categories of weapons that also threatened public safety, clubs and pistols." *Id. Bruen* specifically cautioned that in cases of "dramatic technological changes" or "unprecedented societal concerns," a "more nuanced approach" may be necessary. *Bruen* at 2132.

The burden imposed by both the historical regulations and HB 1240 are "relevantly similar:" they impose "comparable burdens" on the right of armed self-defense, and those burdens are "comparably justified." *Bruen* at 2133. The burden of HB 1240 on armed self-defense is slight. The proponents of HB 1240 have pointed to evidence that assault weapons are rarely used for self-defense. Dkts. 44 and 45.

Moreover, the burdens imposed by the historical regulations listed above and HB 1240 are "comparably justified." All were enacted to respond to public safety concerns regarding weapons considered to be extremely dangerous.

The Plaintiffs have not shown a "likelihood of success on the merits" or that there are "serious questions going to the merits" on the issue of whether HB 1240 violates their Second Amendment rights.

### C. IRREPARABLE HARM

**[16]**  The Plaintiffs have not shown that they are "likely to suffer irreparable harm in the absence of preliminary relief." While the Plaintiffs maintain that any constitutional violation results in irreparable harm, the case law cited is from First and Fourth Amendment violations and not from alleged Second Amendment violations. Dkt. 10 (*citing Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)(First Amendment violation) and *Melendres v. Arpaio,* 695 F.3d 990 (9th Cir. 2012) (Fourth Amendment)). The individual Plaintiffs assert that they already own assault weapons and are harmed because they wish to purchase more. Yet, Plaintiffs have other alternative weapons available, particularly for self-defense. HB 1240 does not affect several other weapons, including handguns, which are the "quintessential self-defense weapon." *Bruen* at 2143. Moreover, Sporting Systems Vancouver, Inc., the gun dealer Plaintiff, has no independent Second Amendment right to sell firearms separate from its customer's right to acquire them. *Teixeira v. County of Alameda,* 873 F.3d 670, 690 (9th Cir. 2017). The Plaintiffs do not demonstrate an irreparable harm or a constitutional emergency warranting the "extraordinary remedy" of a preliminary injunction. *Winter* at 24, 129 S.Ct. 365.

### D. BALANCE OF EQUITIES AND PUBLIC INTEREST

**[17]**  When the government is a party, as here, the last two *Winter* factors merge. *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014).

**[18]**  The Plaintiffs have not shown that the "balance of equities tips in their favor" or that an "injunction is in the public interest." *Winter* at 7, 129 S.Ct. 365. The Plaintiffs wish to buy or sell more assault weapons. Considering the exceptional dangerousness of these weapons, the public interest in their regulation by the State outweighs the Plaintiffs' desire to purchase more assault weapons. In light

of recent mass deaths caused by assailants using assault weapons (Dkt. 44), it is appropriate for governmental bodies to find ways to protect the public from dangerous weapons, within the limits of the Second Amendment. Public opinion is apparently strongly divided between the Plaintiffs and Defendants – between those who wish unfettered access to assault weapons and those who seek to curtail that access for public protection. From the record here, neither position reflects the true public interest nor balances the equities in the favor of the Plaintiffs.

**E. CONCLUSION**

**\*7** The Plaintiffs' Motion for Preliminary Injunction (Dkt. 10) should be denied. Plaintiffs have failed to demonstrate a likelihood of success on the merits of the motion nor have they raised a serious question on the merits tipping the balance of hardships in Plaintiffs' favor. They have not pointed to irreparable harm if an injunction does not issue, that the balance of equities tips in their favor, or that public interest favors a preliminary injunction. Issues raised in this opinion cannot be resolved on a motion for preliminary injunction.

To the extent that the Plaintiffs move to advance a trial on the merits or for summary judgment, those motions should be denied without prejudice.

**III. <u>ORDER</u>**

It is **ORDERED** that:

- The Plaintiffs' Motion for Preliminary Injunction (Dkt. 10) **IS DENIED;** and

- The Plaintiffs' motion to advance to a trial on the merits and/or motion for summary judgment (Dkt. 10) **ARE DENIED WITHOUT PREJUDICE**.

**All Citations**

--- F.Supp.3d ----, 2023 WL 3836230

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

| | |
|---|---|
| <u>COUNTY COURT, EL PASO COUNTY, COLORADO</u><br>Court Address:  270 S. Tejon<br>                       Colorado Springs, CO 80903<br>Phone Number: (719) 452-5191 | DATE FILED: June 8, 2023 10:11 AM<br>CASE NUMBER: 2022M5894 |
| PEOPLE OF THE STATE OF COLORADO<br><br>vs<br><br>DELBERT ELMER SGAGGIO,<br><br>DEFENDANT | ⬆            ⬆<br>COURT USE ONLY |
| | Case Number:  2022M5894,<br><br>Division  D<br><br>Courtroom S203 |
| **ORDER RE: DEFENDANT'S FEBRUARY 21, 2023, MOTION TO DISMISS** | |

      For nearly 250 years, since just after the founding of this Nation, the possession of arms by our citizens, specifically firearms for the purpose of self-defense, has been a protected by the Second Amendment to the Federal Constitution.  The question before this Court is whether Colorado's Large Capacity Magazine Ban runs afoul of those protections.  For the reasons set forth below, the Court finds that it does not.

## I.  BACKGROUND[1]

      On March 20, 2013, Colorado's Governor signed House Bill 13-1224 into law thereby enacting C.R.S. §18-12-301, *et seq.* commonly referred to as Colorado's Large Capacity Magazine Ban (hereinafter the "LCM Ban").  In a nutshell, and as applicable in this matter, the ban prohibits the possession of a detachable handgun magazine that is capable of holding in excess of 15 rounds of ammunition.  *See* C.R.S. §§18-12-301(2)(a)(I), 18-12-302(1)(a).[2]

---

[1] The background facts specific to this case come from a number of sources to include the Summons, and the Pleadings and Exhibits of the Parties.  The Court will cite to those sources where critical to its determination of the Motion.

[2] Colorado defines LCM as capable of containing more than 15 rounds of ammunition.  However, some jurisdictions *currently* define a LCM as capable of holding as little as 11 rounds.  *See e.g.* D.C. Code §7-2506.01(b), or as much

On the morning of August 15, 2022, Mr. Sgaggio entered the Colorado Springs Police Department's Sand Creek Substation and produced a 21 Round Sig Sauer Magazine.[3]  Mr. Sgaggio's magazine was confiscated as evidence and he was served a Summons and released on his promise to appear.

Mr. Sgaggio filed Motions to Dismiss pursuant to the United States and Colorado Constitutions on October 17, 2022, and November 3, 2022.  Mr. Sgaggio argued in his Motions that the LCM Ban is unconstitutional.  The Motions were denied because the issue had previously been decided by both Colorado Supreme Court in Rocky Mountain Gun Owners v. Polis, 467 P.3d 314(Colo. 2020), and the Federal District Court in Colorado Outfitters Ass'n v. Hickenlooper, 24 F. Supp 3d 1050 (D. Colo. 2014).[4]  However, because the issue was not decided under current standard for review set forth by the United States Supreme Court in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111(2022), this Court, having been newly assigned, gave leave to Mr. Sgaggio to refile his Motion to challenge the LCM Ban and provide a copy of his Motion to the Colorado Attorney General as required by C.R.S. §16-9-501.

Mr. Sgaggio filed his newest challenge pursuant only to the United States Constitution on February 21, 2023.[5]  The Colorado Attorney General's Office filed its Response on April 21, 2023,[6] and Mr. Sgaggio filed his Reply on May 2, 2023.  The Court, now being fully informed, now FINDS and ORDER as follows:

---

as 17. *See e.g.* 11 Del. C. §1468(2).  While rulings on these bans (including those with lower capacities than Colorado's) are persuasive to the Court and this Court may refer to "LCM Bans" generally, the Court's analysis and holding is narrowly tailored to the Colorado definition of an LCM.

[3] *See* Summons filed with the Court on August 23, 2022, and Defendant's October 17, 2022, Motion to Dismiss, at page 3.

[4] The Court notes the District Attorney erroneously cited this as arising out of the 10th Circuit. In fact, the citation is for the United States District Court for the District of Colorado.  The 10th Circuit reversed and remanded the case due to the Plaintiff's lack of Article III standing in Colorado Outfitters Association v. Hickelooper, 823 F.3d 527 (10th Cir. 2016).  However, neither ruling impacts this Court's Order.

[5] The Court notes that Mr. Sgaggio's Motion was filed well past the Court's 28 day deadline.  However, in light of the Constitutional nature of the Motion, the Court has allowed the Motion to proceed.

## II.   APPLICABLE LAW

On December 15, 1791, the United States ratified the Second Amendment to the United States Constitution.  The Amended reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

On July 9, 1868, the Fourteenth Amendment to the United States Constitution was ratified. Section One of the Fourteen Amendment reads, in pertinent part, as follows:  "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  In McDonald v. City of Chicago, 561 U.S. 742(2010), the United States Supreme Court held that the 2nd Amendment, through the 14th Amendment, applies to the States and prohibits States from enacting legislation that would violate a citizen's Second Amendment right to bear arms.

In District of Columbia v. Heller, 554 U.S. 570 (2008) the Supreme Court recognized an individual's right to keep and bear arms for the purpose of self-defense.  The Court also noted that the right is not absolute. Id. at 576, and legislatures can still regulate "those weapons not typically possessed by law-abiding citizens for lawful purposes," Id. at 626 *quoting* United States v. Miller, 307 U.S. 174 (1939), and those statutes related to the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Heller, at 628.

Following Heller, many jurisdictions adopted a two-part test to evaluate Second Amendment challenges.  The test developed asked first "whether the regulated activity falls within

---

[6] Mr. Sgaggio takes issue with the timeliness of the Attorney General's Response.  However, the Attorney General was granted extensions by this Court to file a Response.

the scope of the Second Amendment" based on text and history.  And, if so, looked into the strength

of the government's justification for restricting or regulating the exercise of Second Amendment

rights" and evaluated the "regulatory means the government has chosen and the public-benefits

end it seeks to achieve." *See* Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2011).

However, in New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111(2022)

the Supreme Court dispensed with the proposed two-part test and implemented a more stringent

test for Second Amendment cases.  The Bruen test also requires a two-part analysis: if the "Second

Amendment's plain text covers an individual's conduct, the Constitution presumptively protects

that conduct. The government must then justify its regulation by demonstrating that it is consistent

with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the

individual's conduct falls outside the Second Amendment's "unqualified command."Bruen 142 S.Ct.

at 2129-2130, *quoting* Konigsberg v. State Bar of Cal, 366 U.S. 36, at 50 n. 10 (1961).

What was left up in the air, as pointed out by the Attorney General, is the appropriate

standard of proof.  The Court agrees with the Attorney General that, under prevailing Colorado

precedent, Mr. Sgaggio bears the initial burden of proving beyond a reasonable doubt that the

Second Amendment covers his conduct.  In other words, that Mr. Sgaggio's possession of a Large

Capacity Magazine is protected by the Second Amendment.  As our courts have long recognized, a

statute is presumed to be constitutional. Curious Theater Co. v. Colo. Dep't of Pub. Health &

Env't, 216 P.3d 71, 76–77 (Colo. App. 2008), *aff'd,* 220 P.3d 544 (Colo. 2009).  Further, the "party

challenging the constitutionality of a statute has the burden of proving the statute is

unconstitutional, as applied, beyond a reasonable doubt." *See* People v. Nozolino, 350 P.3d 940, 945

(Colo. App. 2014) *citing* People v. Gutierrez, 622 P.2d 547, 555 (Colo. 1981).  Of course, if Mr.

Sgaggio were able to achieve that burden, then it falls to the People to prove that the LCM Ban is

rooted in our country's historical tradition.

### III.    WHETHER "MAGAZINES" ARE ARMS

The first inquiry for the Court is whether a magazine is an "arm" within the meaning of the Second Amendment, or whether it is simply an accessory or "accoutrement" as argued by the Attorney General.

Colorado Revised Statute §18-1-901(3)(h) defines a "firearm" as including any "handgun, ... pistol, or other instrument capable or intended to be capable of discharging bullets, cartridges, or other explosive charges."  The legislature has opted not to define "firearm" or "handgun" any further, and the LCM Ban is silent as to whether or not the legislature considers magazines to be part of a firearm, or merely an accessory.

The Attorney General argues that magazines are not "arms" within the meaning of the Second Amendment and has offered two expert declarations in support of their position.  Dr. Dennis Barron, an expert in the historical aspects of the English language, opines that "magazines" are merely "accoutrements" and not a part of a firearm.  His opinion is based, primarily, on the fact that magazines in their current form did not exist when the Second Amendment was ratified, and the closest analogy is a "cartridge box" or "cartouch box"[7] which was used for the storage of ammunition apart from the firearm.[8]  Dr. Barron's opinion is not based on any specialized knowledge of firearms, but that of linguistics.  This argument ignores the requirement that this Court must still consider weaponry that was not in existence at the time of the nation's founding. *See* Heller, 554 U.S. at 582.  This analogy also ignores the fact that a "magazine" is not simply an ammunition storage box as were cartouch boxes, but a necessary part of a semi-automatic pistol designed to "feed multiple rounds of ammunition" into the chamber of the pistol (or other firearm) so it can be fired.[9]  Contrast this with an item that can accessorize a firearm or change its performance such as silencers or bump-stocks.  The former can reduce the decibel level of a firearm

---

[7] *See* Declaration of Dennis Baron at ¶9, 34, 69, 71.
[8] *See* Declaration of Joseph Bilby at p. 3.

a limited amount, and the latter increases the speed of firing a semi-automatic rifle through the rifle's recoil.  While both of these items are "accessories" to the firearm, neither are necessary for the firearm to function as designed.

The Attorney General's second expert suggests that magazines are not weapons since they are not classified as weapons by law enforcement authorities.[10]  However, the Court does not find this opinion to be persuasive for two reasons.  First, the list of "weapons" which includes shotguns, pistols, and other firearms, does not include *any* individual part of a firearm (i.e. firing pin, trigger, stock, etc.). The other "weapon" categories include, *inter alia*, "drowning", "blunt objects", "none", "unknown", "unarmed", and "other." Given the expansive definition of "weapons" used by law enforcement, which includes the catchall words "unknown" and "other," it is clear that *any* object falls into the definitional category of weapon, including "magazines" dependent on how it is used.

This conclusion is also support by Colorado Law.  Colorado Revised Statute §18-1-901(1)(e)(II) defines a "Deadly Weapon" to include a "knife, bludgeon, or any other weapon, *device, instrument*, material, or substance, whether animate or inanimate, *that, in the manner it is used or intended to be used, is capable of producing death or serious bodily injury*." [Emphasis added].  LCMs (and all magazines) were designed for military service with a clear purpose of causing injury and death. *See generally* §IV *infra.*  It is clear to this Court that the Colorado Legislature has a very broad definition of what constitutes a deadly weapon which would include all magazines.  *See also* People v. Pennese, 830 P.2d 1085 (Colo. App. 1991) (Fists as a deadly weapon); People in Interest of J.R., 867 P.2d 125 (Colo. App. 1993) (BB Gun as a deadly weapon).  The Court also notes the legislature's concern regarding LCM in establishing the ban: that LCMs have the potential of causing substantially more injury and loss of life due to their design in limiting breaks in firearm operation. *See* §IV.c. *infra*.

---

[9] *See* Declaration of James E. Yurgealitis at ¶15.
[10] *See* Declaration of Jeffrey Zax, Ph.D. at ¶ I.A.

Given that magazines have been described by the Attorney General's experts as a necessary part of the proper function of a firearm, the Court finds persuasive the 3rd Circuit Court of Appeals' holding in New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey, 910 F.3d 106 (3d Cir. 2018). The 3rd Circuit held, "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." Id. at 116.  This conclusion is supported by caselaw cited by the Attorney General. See Fyock v. Sunnyvale, 779 F.3d 991(9th Cir. 2015).  Therein, the 9th Circuit Court of Appeals noted recognized the Second Amendment includes a limited "right to possess the magazines necessary to render … firearms operable." Id. at 998.

The Attorney General also concedes in their brief that a ban on magazines would likely be a de facto regulation of "arms" which require magazines to function.[11]  Of course, that is not necessarily at issue in the instant matter for two reasons: First, Mr. Sgaggio admits that his firearm functions without the need for a magazine, it simply becomes a single-shot pistol which requires reloading after each round is fired.[12] Second, and more importantly, the statute at issue prohibits the sale, transfer, or possession of LCMs. See C.R.S. §18-12-302(1)(a).  There is no requirement in the statute that the LCM be inside a firearm, in the vicinity of a firearm, intended to be used with a firearm, or that the possessor of the LCM even have access to a firearm.  The simple possession of the LCM is the crime for which Mr. Sgaggio is charged, not his intended use.  This is also in line with other Colorado Statutes that outlaw simple possession of an illegal item, regardless of whether the item will, or even can be used. See e.g.  C.R.S. §18-18-403.5 (Possession of a Controlled Substance, as opposed to Use a Controlled Substance prohibited by C.R.S. §§18-18-404; 18-12-102 (Possession illegal weapons including brass knuckles and dangerous weapons including ballistic knives and

---

[11] See "The Attorney General's Response Under §16-9-501, C.R.S. to Defendant's Constitutional Challenge," at n. 6.
[12] See Mr. Sgaggio's "Response to the Attorney General's Motion for Extension of Time to File Response to Defendant's Constitutional Challenge" filed on March 20, 2023, at p. 1.

silencers); 18-5-903.5(Possession of another's driver's license); 42-4-1415 (Possession of Radar Jamming Device).

The Court finds that a magazine, and specifically a LCM is an "arm" within the meaning of the Second Amendment irrespective of whether a firearm is present for its use.  The fact that Mr. Sgaggio has a pistol to be used in conjunction with the LCM only supports this conclusion as the LCM Ban applies to him personally.  It matters not that Mr. Sgaggio's firearm may operate effectively as a single-shot pistol without the magazine, but that Mr. Sgaggio's firearm only functions as designed with a magazine inserted.  Modern semi-automatic firearms are designed to operate with the use of a magazine, thus making the magazine an "arm" within the meaning of the Second Amendment.

The Court finds, based on the record before it, including the Attorney General's Exhibits, that Mr. Sgaggio has met the threshold burden of proving beyond a reasonable doubt that the "Second Amendment's plain text covers [his] conduct" in possessing an LCM.  The Court now turns to whether the LCM Ban "is consistent with the Nation's historical tradition of firearm regulation." Bruen 142 S.Ct. at 2129-2130.

### IV. WHETHER LCMS ARE SUBJECT TO RESTRICTIONS

Having concluded that magazines are "arms" within the meaning of the Second Amendment, the Court now turns to whether LCMs can still be regulated, or outright banned.

The Attorney General has provided expert declarations supporting a historical tradition of regulating LCMs dating back to the late 19th and early 20th centuries.  Mr. Sgaggio argues these are irrelevant since the only time period this Court should consider is the 77 years between the ratifications of the Second and Fourteenth Amendments.

### IV.a. Analogous Restrictions in Historical Tradition from 1791 to 1868

The District Attorney suggests magazines are more analogous to cartouch boxes, an argument with which this court disagrees for the reasons set forth in §III. *Supra.*  As previously

noted, cartouch boxes were used for the storing and carrying ammunition separately from the firearm by an individual.  This is as opposed to devices that are meant to assist in feeding ammunition into the chamber of a firearm or firing multiple rounds without the need to stop and reload.  No Exhibit provided by either party reveals a "historical twin" for the modern magazine, and the Court seeks the closest "historical analog" to use in its analysis. *See* <u>Bruen</u> 142 S.Ct at 2133. The Court notes the "historical analogs" existing during the early part of the relevant time period encompassing 1791 through 1868 are mostly limited to wind guns, and the occasional novelty firearm such as pepperbox pistols. [13]  These weapons did not achieve any mass production, and while several "repeating" type firearms were also invented, none were generally available to the public and were primarily designed for, and marketed to governments for military use. [14] None of these firearms were designed for civilian use for self-defense.

During the early to mid-1800s the lever action rifle and revolvers were invented and came into production.  However, with the exception of some rare novelty weapons, the maximum capacity for these firearms was generally no more than ten rounds (less for revolvers), with limited exception including the Henry Rifle and the Winchester 1873 Rifle that each held 15 rounds in their internal magazines.  However, the Henry Rifle only saw limited production in the civilian sector for a very short span of time,[15] and the Winchester 1873 was specifically designed for military use.[16]

It wasn't until the early 20th century that detachable magazines were invented,[17] and it wasn't until the 1920's following the advent of the Thompson Machine Gun that LCMs increased production.[18] Once again, these advances in technology were designed and intended for use by the military.[19]  Given the rarity of LCMs or their historical analogs between 1791 and 1868, it is

---

[13] *See generally* Declaration of Dennis Barron, Declaration of Joseph Bilby and Declaration of Robert J. Sptizer.
[14] *See generally* Declaration of Joseph Bilby.
[15] <u>Id.</u> at 21.
[16] *See* Declaration on Spitzer at ¶38 *quoting* Koller, *The Fireside Book of Guns*, 112.
[17] <u>Id.</u> at 28.
[18] *See* Declaration of Robert J. Spitzer at ¶4.
[19] *See generally* Declaration of Joseph Bilby and Declaration of Robert J. Spitzer.

unsurprising that there is a lack of legislation amongst the states specifically regulating that technology.

Mr. Sgaggio relies on the dissent in <u>Duncan v. Bonta</u>, 19 F.4th 1087 (9th Cir. 2021) to support his position that LCMs have a long historical pedigree in our country.  However, the dissent in <u>Duncan v. Bonta</u>, merely makes a conclusory statement regarding the "highlights" of LCMs in the United States, without additional analysis.  <u>Id</u>. at 1154-115 (Bumatay, *dissenting*).  The dissent relies heavily on the conclusions of David B. Kopel from *The History of Firearm Magazines and Magazine Prohibitions,* 78 Alb. L. Rev 849 (2015).   However, Mr. Kopel's conclusions are contradicted by Dr. Spitzer in Attorney General's Exhibit 4.[20]  The Court agrees with Dr. Spitzer's analysis, and no contradictory evidence has been presented. *cf.* <u>People v. DeBaca</u>, 736 P.2d 25 (Colo. 1987) (Courts may not ignore uncontradicted credible evidence in the record).[21]

The Court maintains its conclusion, based on the signed declarations admitted as evidence by the Attorney General, that firearms capable of firing multiple rounds of ammunition without reloading were simply not commonplace, certainly not in the civilian sector, and therefore there was no need for specific regulations.  As noted by Dr. Spitzer, for there to be a regulation of a certain firearm technology, there must first be the technology (which is generally designed for military use), and ultimately that technology must make its way into the civilian sector and pose a threat such that legislatures recognize the need to take action.[22]  That chain of events did not occur until the early 20th century.

### IV.b. LCM regulation in the 19th and 20th Centuries

After the advent of detachable magazines in the early part of the 20th century, and those magazines began to make their way into the civilian sector, legislatures across the county began

---

[20] *See* Declaration of Robert J. Spitzer at ¶¶26-27.
[21] Mr. Sgaggio submitted Exhibit 1 with his Reply Brief, the Declaration of James Curcuruto that was submtted in a Federal Civil Action.  The Declaration relates to the availability and prevalence of the AR-15 Rifle, a subject that has no relevance to these proceedings.
[22] <u>Id</u>. at ¶43.

working on legislation to regulate those arms.  The first bans came about in 1917 with the majority

enacted between 1927 and 1933.[23] In all, ten(10) state legislatures and the United States Congress

(specific to the District of Columbia) limited the possession of magazines that contained between

two(2) and seventeen(17) rounds of ammunition depending on the jurisdiction.[24]

That Colorado waited until 2013 to enter the fold is inconsequential to this Court.  While

Colorado's law is young, it is clear that within a decade of LCM becoming widely available, the

United States Congress, a quarter of all states, and Hawaii all imposed some form of ban on firearms

that could fire multiple rounds without reloading.  Twenty-three states imposed some restriction

on automatic weapons that had ammunition feeding capabilities.[25]  Given that a number of states

and the District of Columbia (via the United States Congress) reacted relatively soon after

magazines became readily available, the Court is convinced that historically there has been

regulation of magazines, both detachable and fixed.

The Court recognizes the lag time between the ratification of the Second and Fourteenth

Amendments, and the legislation.  However, this is not unusual where the technology sought to be

regulated did not exist, nor could reasonably be foreseen when ratification occurred.  *See*  Katz v.

United States, 389 U.S. 347 (1967) (wiretapping phones violates the 4th Amendment);  Carpenter v.

United States, 585 U.S. ___ (2018), 138 S.Ct. 2206 (2018) (Applying 4th Amendment protections to

Cellular GPS data);  Reno v. ACLU, 521 U.S. 844 (1997) (First Amendment protections applied to

internet communications).

### IV.c.    Justifications for the LCM Ban

The Colorado Legislature enacted LCM Ban in an effort to prevent further mass casualties.

As the Attorney General noted in its Brief, "the LCM Ban mandates a critical pause during otherwise

uninterrupted shooting by forcing a shooter to replace a spent magazine."  The pause ultimately

---

[23] Id. at 20, Table 1.
[24] Id.

gives potential victims an opportunity to escape injury or death, and law enforcement an opportunity to intervene.[26] *See also* <u>Rocky Mtn Gun Owners v. Hickenlooper</u>, 472 P.3d 10 (Colo. App. 2018).  This purpose is consistent with the basis for the early 20th century LCM bans.  The bans were designed to reduce criminality, to protect civilian lives and because LCMs were deemed to serve no lawful purpose in civilian use, to include self-defense.[27]

Mr. Sgaggio argues that the magazine is necessary to defend himself against some unforeseen enemy.  However, as noted previously the firearm Mr. Sgaggio professes to own does not *require* an LCM, or any magazine for that matter.  Of course, to function as designed *a magazine* must be inserted into the firearm, but not necessarily a 21 round magazine.  In fact, as the Attorney General noted in its Brief, the LCM Mr. Sgaggio is alleged to have had in his possession is interchangeable with a fully-legal ten round magazine.[28]

Given that the Second Amendment is rooted in the right to bear arms in self-defense, the Court turns to whether the possession of a LCM is consistent with that right. *See* <u>Bruen</u>, 142 S.Ct. at 2134; As noted previously, the <u>Heller</u> Court noted the core of the Second Amendment is to provide a mechanism for self-defense. 554 U.S. at 576. Further, those protections do not extend to weapons designed for military use. 554 U.S. at 627.  The Court is persuaded by the historical analysis provided by the Attorney General that the historical analog firearms that could fire more than 10 rounds without reloading were designed, and used primarily by the military and not for individual self-defense. *See* Section IV.b. *supra.* Mr. Sgaggio has presented no evidence to the contrary. *See* <u>People v. DeBaca</u>, *supra.*

The Court finds the Attorney General has established a historical tradition of regulating military-style weapons, specifically LCMs once they are available in the civilian sector.  The Court

---

[25] <u>Id</u>.
[26] Attorney General's Response at p.2.
[27] *See* Declaration of Spitzer at ¶¶ 16-20.
[28] *See* Attorney General's Response at p. 8 & n. 7.

further finds the Attorney General has established that LCMs were designed and primarily used for military or offensive use, and *not* for individual self-defense.

### V. MOTION FOR BILL OF PARTICULARS

Mr. Sgaggio requested, as alternative relief, a Bill of Particulars.[29] As an initial matter, Colorado Rule Crim. P. 7(g) requires that a Bill of Particulars be filed within 14 days after arraignment "*or at such other time before or after arraignment as may be prescribed by rule or order.*" [emphasis added].  This matter was arraigned in Division H on November 22, 2022.  Under the rule the request for a Bill of Particulars was due no later than December 6, 2022.  This Court was assigned the case and Mr. Sgaggio appeared before it on December 13, 2022, for scheduling.  The Court issued a Case Management Order (CMO) on that date, and gave leave for Mr. Sgaggio to file additional Motions consistent with the CMO.  The CMO sets a deadline of 28 days for the filing of all Motions. *See* CMO Paragraph 2. Thus, all motions were due no later than close of business on January 10, 2023.  The instant Motion was file more than one month  past the deadline set by the Court, and significantly past the deadline set by Crim. P. 7(g).

Notwithstanding, the Court has considered the Motion and the Court file. In ruling on a request for a Bill of Particulars, the Court should consider whether the requested information is necessary for the defendant to prepare his defense. People v. Whitman, 205 P.3d 371 (Colo. App. 2007). The prosecutor need not, however, disclose all evidence in detail, or explain legal theories upon which he intends to rely at trial. People v. Rubanowitz, 688 P.2d 231 (Colo. 1984). Finally, a Bill of Particulars is not necessary where the Summons sufficiently advises the defendant of the accusations. Howe v. People, 496 P.2d 1040 (Colo. 1972).

The Court, having reviewed the Summons, finds it is sufficiently detailed to fully inform Mr. Sgaggio of the charge against him, and the allegations that gave rise to that charge.  This is

---

[29] *See* Motion to Dismiss at p. 16.

particularly true in light of Mr. Sgaggio's pleadings in this Matter and apparent knowledge of the charge with which he is accused.

## VI. CONCLUSION

The Court finds that magazines are "arms" for the purpose of the Second Amendment. The Court finds the Attorney General has established that C.R.S. §18-12-301, *et seq*. is consistent with the historical tradition of firearms regulation.  The Motion to Dismiss is respectfully DENIED.

The Court is not sitting in equity in this Matter, but as a criminal court.  Thus, Defendant's request for declaratory relief is respectfully denied as outside of this Court's Jurisdiction and inconsistent with this Court's Findings and Order as set forth above.

The Motion for a Bill of Particulars is DENIED.

In light of the ruling, the Court declines to address the Attorney General's additional arguments. *See* People v. Curtis, 350 P.3d 949 (Colo. App. 2014) ("[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more." (quoting PDK Lab'ys Inc. v. U.S. Drug Enf't Admin., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment)).

SO ORDERED this  7th  day of  June , 2023.

BY THE COURT:

_____
DENNIS L. MCGUIRE
COUNTY COURT JUDGE